**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Matthew Borden**, *pro hac vice* application pending
borden@braunhagey.com
**J. Noah Hagey**, *pro hac vice* application pending
hagey@braunhagey.com
**Gunnar K. Martz**, *pro hac vice* application pending
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **TUCK WOODSTOCK**; **DOUG BROWN**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **JOHN RUDOFF**; and those similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION ALLEGATION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| **CITY OF PORTLAND**, a municipal corporation; and **JOHN DOES 1-60**, individual and supervisory officers of Portland Police Bureau and other agencies working in concert, | |
| Defendants. | |

PAGE 1 - COMPLAINT

Plaintiffs Tuck Woodstock, Mathieu Lewis-Rolland, Kat Mahoney, Doug Brown, Sam Gehrke, and John Rudoff, on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1.     This case seeks to stop the Portland police[1] from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd. The police's efforts to intimidate the press and suppress reporting on the police's own misconduct offends fundamental constitutional protections and strikes at the core of our democracy.

2.     Plaintiffs are members of the media and legal observers, who have a right to witness important public events and recount them to the world. Plaintiffs Tuck Woodstock, Mathieu Lewis-Rolland, Sam Gehrke, and John Rudoff are journalists whom the Portland police attacked with flash-bang grenades, rubber bullets, and tear gas merely for seeking to cover the protests. Plaintiffs Kat Mahoney and Doug Brown are neutral legal observers whom the Portland police assaulted with batons, rubber bullets, and tear gas simply for watching how they were treating demonstrators. Plaintiff Class is comprised of all journalists who have or will be attacked or forcefully dispersed by Defendants pursuant to their unlawful policy of targeting and dispersing neutrals.

3.     The police retaliation against Plaintiffs is part of a broader pattern of the Portland police repeatedly and intentionally shooting, gassing, and beating journalists and observers covering the George Floyd demonstrations.

4.     On June 3, the police physically assaulted KBOO reporter Cory Elia, even though he identified himself as press, because he was recording them. Video here:

https://tinyurl.com/EliaAssaulted.

---

[1] For convenience, the term "Portland police" in this Complaint refers to officers of the Portland Police Bureau as well as any officers of other law enforcement agencies working in concert with the Portland Police Bureau within the City of Portland.

5.      On June 6, the police hit freelance journalist Sergio Olmos with a truncheon and threatened to tear gas him because he was recording them. His press pass was clearly visible. Video here: https://tinyurl.com/OlmosBeaten.

6.      On June 7, the police attacked Donovan Farley with a wooden bat and sprayed him in the face with tear gas or pepper spray while he was trying to walk away from them. He had identified himself as press and was filming several police officers kneeling on a protester's neck, George Floyd-style. Video here: https://tinyurl.com/FarleyBeatenAndSprayed.



*Figure 1: Farley films the arrest (1); one officer approaches him, truncheon aloft (2); officer beats Farley as he retreats (3); officer sprays Farley as he retreats (4).*

7.      On June 7, the police attacked Mr. Elia again—this time with a blast of tear gas to the face. Mr. Elia was holding up his press pass, and police knew he was press when they attacked him. Video here: https://tinyurl.com/EliaSprayed.

8.      On June 13, the police slammed reporter Beth Nakamura of *The Oregonian* in the back with a truncheon. She had her hands up, press pass in hand, and was saying "press, press." The officer responded: "I don't give a fuck."

9.    Also on June 13, the police ordered reporter Zane Sparling of *The Portland Tribune* to leave an area where they were enforcing a dispersal order against protesters. Sparling responded that he was media. The officer responded: "I don't give a shit! Go!" He then shoved Mr. Sparling into a wall, and another officer shot a crowd-control munition at his heel. Video here: https://tinyurl.com/SparlingAssaulted.

10.    On June 14, the police announced that they would use force to disperse reporters and protestors alike—except for select reporters that they allowed to "imbed" with police. This viewpoint-based restriction on speech violates the rights of the press to observe and report on important events. It is not narrowly tailored to achieve any legitimate government objective; rather, it is designed to prevent the press from exposing police violence. Nor could any law preventing coverage of protests pass constitutional muster because there is no compelling need to preclude the media from observing and reporting. Defendants' policy remains in place, is being used to remove journalists and observers, and is chilling reporters and observers from monitoring and reporting on important events.

11.    Many other journalists have reported that they have been specifically targeted.[2] Indeed, members of the Plaintiff Class have petitioned Portland Mayor Ted Wheeler "to ensure that the Portland Police Bureau ceases assaulting and intimidating reporters."[3]

12.    In addition to intentionally targeting reporters and observers, the police are using indiscriminate force to punish them along with demonstrators. For instance, on June 2, the police sprayed a large group of protesters with tear gas from all sides in what is known as a "kettling" or "killbox" military strategy. Killboxing protesters cannot disperse them. Its sole purpose is to inflict pain and suffering. The police gassed many journalists and observers in this operation,

---

[2] Rebecca Ellis, *Police Keep Injuring Journalists Covering Portland Protests*, OPB (June 15, 2020), https://www.opb.org/news/article/portland-journalists-harmed-covering-george-floyd-blm-protests/.
[3] *Mayor Wheeler: Protect journalists and the First Amendment*, Change.org, https://www.change.org/p/mayor-ted-wheeler-mayor-wheeler-protect-the-first-amendment (last visited June 24, 2020, 1:39 P.M.).

including Plaintiffs Gehrke and Mahoney and Portland Mercury reporters Alex Zielinski and Blair Stenvick.

13.     Intimidating reporters is the craft of the world's most oppressive regimes and has no place in Portland—or anywhere else in the world.[4] As the Ninth Circuit has observed, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012).

14.     Plaintiffs seek monetary damages and prospective injunctive relief to so that they can report on police activities without fear of being targeted for punishment.

## PARTIES

15.     Plaintiff Tuck Woodstock is an Oregon resident who lives in the City of Portland. They have been a journalist for seven years and their work has been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They have attended the protests in Portland over the last month at least 15 times as a freelance and independent journalist for the purpose of documenting and reporting on them.

16.     Plaintiff John Rudoff is an Oregon resident who lives in the City of Portland. He is a photojournalist whose work has been published internationally, including extensive reporting on the Syrian refugee crisis, the 'Unite the Right' events in Charlottesville, Virginia, the Paris 'Yellow Vest' protests, and the Rohingya Genocide. He has covered protests (among other things) in Portland for more than 5 years, and his work has appeared in the *New York Times*, the *Guardian*, CBS, and ABC, among other sites. He has attended the protests in Portland over the last month for the purpose of documenting and reporting on them.

---

[4] *See, e.g.*, *Syrian Forces Aimed to Kill Journalists, U.S. Court Is Told*, N.Y. Times (Apr. 9, 2018), https://www.nytimes.com/2018/04/09/world/middleeast/syria-marie-colvin-death.html; *Duterte Says Journalists in the Philippines 'Are Not Exempt from Assassination'*, Time (June 1, 2016), https://time.com/4353279/duterte-philippines-journalists-assassination/; *Violence against Journalists Escalates in Hong Kong*, Reporters Without Borders (Aug. 13, 2019), https://rsf.org/en/news/violence-against-journalists-escalates-hong-kong.

17.     Plaintiff Mathieu Lewis-Rolland is an Oregon resident who lives in the City of Portland. He is a photographer for *Eleven PDX*, and his work has also been featured in local news outlets and on the official website for the City of Portland. He attended protests in Portland on several nights for the purpose of documenting them.

18.     Plaintiff Kat Mahoney is an Oregon resident who lives in the City of Portland. She is an independent attorney and volunteers as a legal observer with the ACLU. She has attended the protests nearly every night for the purpose of documenting police interaction with protesters.

19.     Plaintiff Doug Brown is an Oregon resident who lives in the City of Portland. He has attended protests in Portland every year since 2016, first as a journalist with the Portland Mercury and then as a volunteer legal observer with the ACLU. He has attended the George Floyd protests on several nights for the purpose of documenting police interaction with protesters.

20.     Plaintiff Sam Gehrke is an Oregon resident who lives in the City of Portland. He is a freelance photojournalist whose work has been published in *Pitchfork*, *Rolling Stone*, *Vortex Music*, and *Eleven PDX*. He has attended the protests in Portland over the last month for the purpose of documenting and reporting on them.

21.     Defendant City of Portland is a municipality incorporated in the State of Oregon. As a local governmental entity, the City of Portland is a juridical entity under 42 U.S.C. § 1983. The Bureau is a department or division of the City.

22.     Defendant John Does 1-20 are police officers employed by the City who directly assaulted Plaintiffs and members of the Plaintiff Class. They are sued in their individual capacity.

23.     Defendant John Does 21-30 are supervisory officials whose liability could include their own culpable action or inaction in the training, supervision, or control of their subordinates, their acquiescence in the constitutional deprivations alleged here, or conduct showing a reckless or callous indifference to the rights of Plaintiffs. They are sued in their individual capacity.

24.    Defendant John Does 31-60 are individual and supervisory officers of other law enforcement agencies, including but not limited to the Clackamas County Sheriff's Office, Clark County Sheriff's Office, Multnomah County Sheriff's Office, Washington County Sheriff's Office, Port of Portland Police, Gresham Police, Vancouver Police, Washougal Police, Oregon State Police, and the Oregon National Guard, who are working under the Portland Police Bureau's direction and control pursuant to PPB Directive 635.10 § 7 ("The Bureau may request assistance from other law enforcement agencies . . .  The Bureau [Incident Commander] shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when force may be used and when to deploy less lethal munitions to address civil disturbance and/or disperse the crowd."). Does 31-60 are acting in concert with and agents of the City and Does 1-30.

25.    The Doe Defendants have concealed their identities and their names or they are not yet fully known to Plaintiffs. On information and belief, Does 1-60 are responsible for the conduct alleged herein.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

27.    Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because defendants are subject to personal jurisdiction in the District of Oregon.

## FACTUAL ALLEGATIONS

### A.    The Police Murdered George Floyd

28.    On May 25, 2020, the police killed George Floyd in Minneapolis, Minnesota.

29.    Mr. Floyd was the most recent in a long list of Black victims of police brutality, many of which caused protests across the nation. In Portland alone, the police have killed several Black people, including Quanice Hayes, Terrell Johnson, Keaton Otis, Aaron Campbell, Patrick

Kimmons, Darris Johnson, and Kendra James. Some other well-known victims of lethal police

force include Michael Brown, Breonna Taylor, Tamir Rice, Philando Castile, Freddie Gray,

Walter Scott, Botham Jean, Atiana Jefferson, and, of course, Eric Garner, whose last words

echoed those of Mr. Floyd: "I can't breathe."

30.    Videos of Mr. Floyd's murder were widely and rapidly disseminated around the

world and catalyzed protests across the country in every major city.

**B.    Portland Police Use Brutal Force Against Demonstrators Protesting Police Brutality**

31.    In Portland, for over four weeks, thousands of people have gathered every night to

protest and mourn Mr. Floyd's murder and insist that our institutions start ensuring that Black

lives matter. These protests continue to the present day.

32.    One focal point for protesters has been the "Justice Center" in downtown

Portland. The building houses the police's central precinct, which includes offices for their

command staff, a few county courtrooms, and a county jail where hundreds of people—

disproportionately Black—are warehoused in small cage-like cells. Both Portland police arrest

data and Multnomah County criminal justice data reveal that Black residents are

disproportionately harmed by every part of the criminal justice system from arrest through

prosecution and sentencing.[5] The Justice Center is, in short, a perfect symbol of the iniquities

protesters are demonstrating against.

33.    With limited exceptions, these protests have been overwhelmingly peaceful. But

nearly every night, the Portland police have used increasingly severe tactics to deter speech on

this important issue.

34.    Portland police have shot rubber bullets into crowds of protesters. Rubber bullets

are 40mm-wide "pain compliance devices." They are designed to "provide sufficient pain

stimulus" to "incapacitat[e] … an aggressive, non-compliant subject." But they can be lethal,

---

[5] W. Haywood Burns Institute for Justice Fairness and Equity, *Racial and Ethnic Disparities in Multnomah County* (Nov. 2019), https://multco.us/file/84525/download.

especially if they hit someone in the head. Figure 2 depicts a round that an officer shot at one

protester's head as he was retreating with his hands up. Figure 3 depicts the severe type of injury

such a round can inflict, even when it impacts only a large muscle group on a young, healthy

individual.

 

*Figure 2: Left, the manufacturer's image of the 40mm eXact iMpact Sponge Round.*
*Right, a rubber bullet that Portland police officers fired at a retreating, compliant protester.*



*Figure 3: An example of the severe injuries rubber bullets can inflict.*

35.     Portland police have also deployed multiple types of tear gas, including Agent CS, phenacyl chloride, and oleoresin capsicum. The use of tear gas is banned in warfare.[6] It can cause inflammation, coughing, wheezing, vomiting, blistering, burns, and breathing difficulty or airway closure, especially in people with respiratory conditions.[7] Its use is especially deadly during the current coronavirus pandemic, because it (1) "weaponizes" infected individuals to become "efficient transmitter[s] of infection"; (2) makes those not infected more likely become infected; and (3) makes coronavirus more deadly to those it infects.[8] Nevertheless, the police used tear gas indiscriminately against protesters nearly every night for the first week of protests and many nights since then.

---

[6] *Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare*, June 17, 1925, 26 U.S.T. 571.
[7] *Health Impacts of Crowd-Control Weapons: Chemical Irritants (Tear Gas and Pepper Spray)*, Physicians for Human Rights (Jan. 1, 2017), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-chemical-irritants-tear-gas-and-pepper-spray/.
[8] Expert Declaration of Peter Chin-Hong ¶¶ 6-7, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 24.

PAGE 10 - COMPLAINT

36.    On June 6, Mayor Wheeler supposedly suspended the use of tear gas.[9] On June 9, this Court enjoined the police from using tear gas unless "the lives or safety of the public or the police are at risk," and specifically ordered the police not to use tear gas "to disperse crowds where there is no or little risk of injury."[10] Nevertheless—defying this Court's Order—Portland police have continued to use tear gas as recently as the night of June 25.

37.    The police have also beat protesters with truncheons and shot them with flash-bang grenades with little or no warning, in the absence of any danger to the public, police, or property.

38.    The police's use of disproportionate force against demonstrations over police violence against people of color follows the Portland police's prolific history of excessive force against people of color, including the shootings of Quanice Hayes in 2017, Denorris McClendon in 2015, Keaton Otis and Aaron Campbell in 2010, and Kendra James in 2003. In 2012, the U.S. Department of Justice filed suit against the City "to remedy a pattern or practice of unconstitutional uses of force by officers of the Portland Police Bureau,"[11] which was settled by a consent decree in 2015.[12] The decree has not resulted in a less brutal police force.[13]

**C.    Both the Protests and the Police's Handling of Them Garner National Interest and Are Widely Discussed in the Press and Other Public Fora**

39.    Nationwide protests over the murder of George Floyd have garnered coverage in every major news outlet. They have been discussed in the *New York Times*, the *Washington Post*, the *Los Angeles Times*, and the *Chicago Sun-Times*. They have been featured on MSNBC, CNN, and Fox News. Every local paper has covered them.

---

[9] Nicole Chavez, *Portland is the latest city to suspend the use of tear gas on protesters*, CNN (June 6, 2020), https://www.cnn.com/2020/06/06/us/portland-police-tear-gas-protests/index.html.

[10] Order, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 29.

[11] Complaint, *United States v. City of Portland*, No. 3:12-cv-2265-SI (Dec. 17, 2012), Dkt. 1.

[12] Amended Order Entering Settlement Agreement Conditionally Dismissing Litigation, *id.*, Dkt. 99.

[13] Alex Zielinski, *Hall Monitor: Checking Boxes*, Portland Mercury (Nov. 7, 2019), https://www.portlandmercury.com/opinion/2019/11/07/27438204/hall-monitor-checking-boxes.

40.    The police's violent response to the protests has also been the subject of national attention. The *New York Times* wrote about the 99 U.S. cities where police used tear gas against protesters.[14] The *Washington Post* covered police violence in Richmond, Virginia.[15] The *L.A. Times* demanded an investigation of police violence in Los Angeles.[16] In cities across the country, citizens have protested, police have overreacted—and the press has been there to document and report on everything.

41.    Or nearly everything. In a brazen effort to suppress speech, Portland police have taken to beating, gassing, and arresting journalists and observers as well as protesters.

**D.    The Police's Pattern of Intentionally Targeting and Retaliating against Journalists and Observers**

42.    Since the protests began, the Portland police have been intentionally and indiscriminately attacking neutral members of the press and legal observers. This conduct has intimidated journalists and neutrals and reduced the number of media and observers willing to attend protests and to stay to document and observe the protests. The police's conduct is part of a longstanding pattern of assaulting and threatening members of the press to prevent them from telling the public about the police's conduct.

**1.    Police Intentionally Shoot at and Tear Gas Plaintiff Lewis-Rolland**

43.    Plaintiff Lewis-Rolland is a freelance photographer and photojournalist who has covered the ongoing Portland protests. He carries a large Nikon D850 camera with a 70-200mm lens and a flash. He is unmistakably present in a journalistic capacity.

---

[14] K.K. Rebecca Lai et al., *Here Are the 99 U.S. Cities Where Protesters Were Tear-Gassed*, N.Y. Times (June 17, 2020), https://www.nytimes.com/interactive/2020/06/16/us/george-floyd-protests-police-tear-gas.html.
[15] Gregory S. Schneider, *Police fire chemical irritant, rubber bullets at Richmond protesters outside police headquarters*, Wash. Post (June 15, 2020), https://www.washingtonpost.com/local/richmond-police-fire-pepper-spray-at-protesters-in-standoff-near-police-headquarters/2020/06/14/be1ccb26-aeac-11ea-8f56-63f38c990077_story.html.
[16] *Editorial: LAPD's violence against protesters demands investigation*, L.A. Times (June 9, 2020), https://www.latimes.com/opinion/story/2020-06-09/excessive-lapd-protest-response.

44.    On the night of May 31, Mr. Lewis-Rolland was covering the protests. Around

10:40 p.m., he heard a loud bang and began proceeding toward the intersection it came from, SW

Salmon Street and SW 3rd Street. The intersection was not crowded and was mostly clear of

protesters. As he approached, he saw police marching in his direction. He began taking

photographs. That is when he captured this image of an officer aiming a gun directly at him:



*Figure 4. Police take aim at Plaintiff Mathieu Lewis-Rolland.*

PAGE 13 - COMPLAINT

45.     Shortly after Mr. Lewis-Rolland captured that image, the officer fired upon him. The officer offered no warning, and Mr. Lewis-Rolland had done nothing to provoke the officer other than take a photograph. Mr. Lewis-Rolland was showered with shrapnel as the first round exploded at his feet. Several more followed, as well as canisters of tear gas. Mr. Lewis-Rolland was overcome by the effects of tear gas and was unable to continue documenting protests or police action at that location, but he attempted to continue operating his camera to the best of his ability while recovering from the effects of the tear gas. He was able to capture a visual cloud of gas hovering over the intersection he had just retreated from.

46.     About an hour later, at the intersection of SW 4th Street and SW Taylor Street, Mr. Lewis-Rolland was documenting a tense interaction between police and protesters:



*Figure 5: Plaintiff Lewis-Rolland (not pictured) documents a tense interaction between police and peaceful protesters.*

47.     This time, an officer popped open a crowd-control-sized canister of tear gas and threw it directly at Mr. Lewis-Rolland's feet. Used at such close range, the canister delivered a

full frontal blast of gas to Mr. Lewis-Rolland's face and once again, he was overcome by its effects. Mr. Lewis-Rolland was completely incapacitated for at least 30 seconds and forced to stop documenting the scene until he could recover.

### 2.    Police Use Extra-Strong Tear Gas on Plaintiff Mahoney

48.    Plaintiff Mahoney has been attending the protests nearly every night since they began. Nearly every night, from the beginning of the protests until this Court issued its injunction in *Don't Shoot Portland v. City of Portland*, Ms. Mahoney was a victim of police's tear gas.

49.    Ms. Mahoney has served as a legal observer since 2017. She is no stranger to the police's indiscriminate, excessive, and unlawful use of tear gas.

50.    On June 2, however, she noticed that the police had begun to use a new form of tear gas. On that night, Ms. Mahoney was on her motorcycle. To avoid getting tear gas inside her helmet, she remained on a side street near the edges of the crowd. Nevertheless, the tear gas reached her and she sought to retreat.

51.    Her first indication that this was a new type of gas was that it smelled different and felt stronger. She managed to drive her motorcycle only two blocks before losing her vision. In addition to the usual effects—profuse tears, profusely runny nose—her throat began to close and she had trouble breathing. She quickly sought medical attention.

52.    Once she felt it was safe, she attempted to return home on her motorcycle. On the way home, however, she began involuntarily convulsing, shaking, and twitching. She was unable to concentrate on basic tasks like shifting gears. Fortunately, she was able to arrive home safely.

53.    Once home, however, she was disoriented and unable to function for several hours. She was barely able to open her door. She was unable to count past six. She was unable to open a tube of toothpaste. Although Ms. Mahoney has been the victim of Portland police's tear gas many times, she has never suffered such symptoms. On information and belief, on June 2, Portland police used tear gas of a different formulation, or a stronger concentration, in order to

inflict more severe injuries on neutrals and protesters. On information and belief, the police also used such tear gas in the "killbox" maneuver detailed below.

### 3.    Police Shoot at Plaintiff Mahoney

54.    On the night of June 10, Ms. Mahoney was attending the protests near the Justice Center as a legal observer volunteering with the ACLU. She was wearing a blue vest which clearly identified her as a legal observer. At all relevant times, she was well-lit by police floodlights. No police officer could have been confused as to the role in which she was attending.

55.    Shortly after midnight, a woman who appeared to be mentally unstable wandered into the fenced-off area near the Justice Center. She walked back and forth for a moment, exited Ms. Mahoney's field of view, and then returned having shed all of her clothing. At this point, Ms. Mahoney moved to the front of the crowd, because she knew that legal observation might become crucial.

56.    Portland police officers began running at the woman. She began running away, but became confused and was unable to find the exit. She panicked. As she ran alongside the fence, a protester entered the fenced-off area to assist her. Together, they began running away from the police and toward the exit.

57.    Most people who were at the fence, including Ms. Mahoney, were recording the events unfolding on their cameras and smartphones. Even though the two individuals inside the fenced-off area were retreating, Portland police officers opened fire on them. And, in an attempt to minimize video evidence, Portland police also opened fire on people recording the event near the fence, including Ms. Mahoney.

58.    One rubber bullet impacted a cement barrier a few inches from Ms. Mahoney's face. It exploded and shrapnel from the detonation hit Ms. Mahoney's hands, phone, and shoulders. Had Ms. Mahoney not been recording the event, shrapnel would have hit her directly in the face. As it was, Ms. Mahoney suffered severe injuries to her left hand, including her left ring finger, which swelled up to three times its normal size.

59.     The police targeted Ms. Mahoney, even though she was clearly marked as a neutral legal observer by her blue vest, because she was recording an altercation between police and protesters.

**4.     Police Shoot at and Beat Plaintiff Brown**

60.     On the night of June 12, legal observer Doug Brown was attending the protests as a volunteer with the ACLU. He was wearing a blue vest which clearly identified him as a legal observer.

61.     Shortly after 12:30 a.m., the police decided to put an end to the protests. They declared the area between Naito Parkway and 13th Street, from SW Lincoln Street to NW Everett Street, off-limits to everyone—protesters, press, legal observers, and anyone else. This area contains the entirety of downtown Portland and parts of two Northwest Portland neighborhoods and comprises some 21 million square feet.

62.     A video of the following events can be viewed here: https://tinyurl.com/BrownAttacked.

63.     At around 12:35 a.m., the police began firing flash-bang grenades into the crowd. A minute later, they fired a flash-bang grenade directly at Mr. Brown. *Id.* at 4:11-15.

64.     Then, they began physically clearing people out of the park. Mr. Brown complied with their directive and moved with the crowd, but because he was present as an observer and not a protester, he continued filming and observing how the police enforced their order.

65.     Around 12:39 a.m., the police had moved the crowd one block from their starting position. Then they began what is known as a "dynamic" maneuver. They halted and arranged in formation, truncheons and guns at the ready. *Id.* at 7:44. On command, they all began running at the crowd, yelling "MOVE!" and beating anyone in their way. *Id.* at 8:18.

66.     This type of massed kinetic maneuver—a massed charge—is extremely dangerous. Strong, armored police, running full tilt at less-armored persons, frequently cause grave injury. And by design, they run over all things in their path—including journalists and legal observers.

67.     Mr. Brown continued to observe and record. For that, the police beat him, too. *Id.* at 8:23-34. This still frame from his video shows police officers charging at him with their truncheons, shortly before they beat him:



*Figure 6: Police charge at an ACLU legal observer to beat him with their truncheons.*

68.     Mr. Brown was forced to flee and could no longer safely document the police's violent enforcement tactics.

69.     After a minute, the police halted and began firing flash-bang grenades directly at people. They scored a direct hit on Mr. Brown. *Id.* at 8:58-9:09.

70.     As a result of the police's firing two flash-bang grenades at him and beating him with their batons, Mr. Brown suffered temporary tinnitus for several hours and some contusions.

71.     The police's efforts to prevent Mr. Brown from recording and reporting on their violent tactics were successful. Shortly after the second flash-bang, he left the scene, even though the protests and the police's violent dispersal of protesters continued.

**5.      Police Threaten to Arrest Plaintiff Brown**

72.     On the night of June 14, Mr. Brown was again attending the protests as a volunteer with the ACLU. He was wearing a blue vest which clearly identified him as a legal observer.

73.     Audio of the following events, together with some contemporaneous photos Mr. Brown took, is available here: https://tinyurl.com/BrownThreatened.

74.     Around 10:40 p.m., Mr. Brown arrived at the intersection of SW 6th Street and SW Market Street, where Portland police officers were arresting a man undergoing a mental-health crisis.

75.     As they had the previous night, the police had issued a dispersal order vacating downtown Portland.

76.     Nevertheless, some five to seven people were at the scene, observing the arrest. Mr. Brown also began observing and recording the event.

77.     For the first seven minutes Mr. Brown was present, the interaction between police and the individuals watching them was calm and uneventful.

78.     At 10:47 p.m., the police decided to remove all observers from the scene. One officer, with a makeshift ID number 254047, ordered everyone to leave and threatened them with arrest if they did not comply. *Id.* at 7:00-7:50.

79.     Mr. Brown continued to document the events. The officer heard his shutter clicking and turned on him: "You have plenty of pictures, okay? … We don't want to make an arrest." *Id.* at 7:58-8:20.

80.     Three more officers walked up to Mr. Brown and put their hands on him. One of them said: "You should know better, you're with the ACLU." *Id.* at 8:35.

81.     A minute later, a police SUV with a long-range acoustic system arrived. It, too, singled Mr. Brown out as an ACLU legal observer and threatened him with arrest: "You are all subject to arrest for trespassing. This area is closed. That includes the ACLU legal observer. You are trespassing. … You are failing to obey the direct order of a peace officer in the State of Oregon." *Id.* at 9:52-10:15.

82.     Again, the police's efforts to eject Mr. Brown from the scene of an arrest were successful. Rather than be arrested himself, he left the scene and was no longer able to fulfill his role as a legal observer.

### 6.     The Police Have Intentionally Targeted Many Other Reporters and Neutrals

83.     The police's use of excessive force against neutral observers extends to all Plaintiff Class members and other neutrals.

84.     On June 3, the police physically assaulted KBOO reporter Cory Elia because he was recording them. He had identified himself as press. As the bystander who recorded the interaction later recalled, "Hearing the screams from him in the background is truly terrifying."[17]

85.     On the night of June 5, a red truck flying an American flag drove through a crowd of protesters and nearly hit one of iHeartRadio podcaster Robert Evans's staffers. When the staffer attempted to capture the license plate of the truck, the police aimed their crowd-control weapons at her and threatened to fire. They prevented her from recording the license plate of the truck. She no longer accompanies Mr. Evans to the protests in Portland.[18]

86.     On June 6, the police physically assaulted freelance reporter Sergio Olmos and threatened him with tear gas because he was recording them. Mr. Olmos was attempting to comply with a dispersal order, but found himself trapped behind a phalanx of police officers. To

---

[17] @Billings29James, Twitter (June 3, 2020, 12:16 A.M.), https://twitter.com/Billings29James/status/1268079034321133570.
[18] @IwriteOK, Twitter (June 6, 2020, 3:41 P.M.), https://twitter.com/IwriteOK/status/1269399061775306752.

avoid giving surprise, he tried to inform them that he was approaching from behind. He had his press pass clearly visible. Nevertheless, the police attacked him with a baton.[19]

87.    Also on June 6, Mr. Evans was filming the police arranged in a phalanx advancing on a crowd of protesters. He was holding his phone in one hand and his press pass in the other. Also, his helmet was clearly labeled "PRESS." Police fired an impact munition at him, hitting him in the very hand that was holding the press pass.

88.    June 7 was a banner day for Portland police's campaign of violence against journalists:

> a.    The police brutally attacked Donovan Farley with a truncheon and tear gas. Farley, a reporter who has been published in *Rolling Stone*, *VICE*, and the *Willamette Week*, was recording the police, who were arresting a protester using exactly the same maneuver that had killed George Floyd. When they noticed him, they chased him away, beat him, and—even as he was retreating from the scene—sprayed him in the face with tear gas.[20]

> b.    The police also attacked Mr. Elia again—this time with tear gas rather than a truncheon—even though, as before, he was holding up his press pass and police knew he was press when they attacked him.[21]

> c.    The police also arrested one of Mr. Evans's staff members for asking an officer his name. She did not provoke him in any other way or do anything to justify police action. Nevertheless, police arrested her and took her to the Justice Center, where they held her for several hours.

---

[19] @MrOlmos, Twitter (June 6, 2020, 1:27 A.M.), https://twitter.com/MrOlmos/status/1269184050314407936; @MrOlmos, Twitter (June 6, 2020, 4:15 A.M.), https://twitter.com/MrOlmos/status/1269226525020184577.
[20] @DonovanFarley, Twitter (June 7, 2020, 11:44 A.M.), https://twitter.com/DonovanFarley/status/1269701897377603584; @TVAyyyy, Twitter (June 7, 2020, 12:08 A.M.), https://twitter.com/TVAyyyy/status/1269526590456643584.
[21] @Human42LM, Twitter (June 7, 2020, 10:29 A.M.), https://twitter.com/Human42LM/status/1269683012515409921.

89.     On June 11, the police confiscated medical supplies from an OHSU medic tent. They also arrested one of the medics, Michael Martinez, because he was recording them.[22]

90.     On June 12, Plaintiff Sam Gehrke was taking photos near the Justice Center when the police shot him in the back with a rubber bullet. Mr. Gehrke was holding a large camera, wearing a press pass from the *Willamette Week*, and was obviously present as a journalist to record and report on the protests. Shortly after this, the police swarmed the crowd from behind, physically assaulting and beating people at random.

91.     On June 13, the police beat reporter Beth Nakamura of *The Oregonian* with a truncheon, even though she was displaying her press pass and shouting "press, press." The officer responded: "I don't give a fuck."[23]

92.     Also on June 13, the police ordered reporter Zane Sparling of *The Portland Tribune* to leave an area where they were enforcing a dispersal order against protesters, shoved him into a wall, and shot a crowd-control munition at his heel.[24] When Mr. Sparling informed them that he was media, they responded that they didn't "give a shit."

93.     On the night of June 15, OPB reporter Jonathan Levinson was reporting on the protests downtown. As Portland police issued orders to disperse, he continued reporting. Officers informed him that if he did not "run," they would arrest him.[25] They then violently arrested another individual and prevented Mr. Levinson from recording or reporting on the arrest.[26]

---

[22] Lindsay Nadrich, *OHSU student arrested handing medical supplies to protesters*, KOIN (June 18, 2020), https://www.koin.com/news/protests/ohsu-student-arrested-handing-medical-supplies-to-protesters/.

[23] @bethnakamura, Twitter (June 15, 2020, 8:27 A.M.), https://twitter.com/bethnakamura/status/1272551330184228864; @bethnakamura, Twitter (June 15, 2020, 8:54 A.M.), https://twitter.com/bethnakamura/status/1272558094870970368.

[24] @PDXzane, Twitter (June 13, 2020, 11:49 P.M.), https://twitter.com/PDXzane/status/1272058454799028226.

[25] @MrOlmos, Twitter (June 16, 2020, 12:40 A.M.), https://twitter.com/MrOlmos/status/1272796206071087105.

[26] @MrOlmos, Twitter (June 16, 12:48 A.M.), https://twitter.com/MrOlmos/status/1272798234809782272.

94.    On June 19, the Portland police shot Plaintiff John Rudoff with pepper balls while he was documenting the protest at the Justice Center. Mr. Rudoff was displaying press identification from the National Press Photographers Association, carrying large camera equipment, wearing a helmet clearly marked "press."

### 7.    The Police Have Intentionally Targeted Reporters and Legal Observers in the Past

95.    In August 2018, Plaintiff Brown and Donovan Farley were reporting on protests in downtown Portland. Without warning, the police rushed protesters, shot rounds, and set off explosions. Then, they charged at and beat a group of journalists, including Mr. Brown and Mr. Farley, all of whom had press passes clearly displayed or were holding obviously professional cameras.[27] Video here: https://tinyurl.com/BrownBeaten18.

96.    At the same protest, police hit KATU reporter Ric Peavyhouse with a rubber bullet[28] and documentary filmmaker Michelle Fawcett with a flash-bang grenade.[29]

97.    During protests in 2017, Mr. Brown was attending as a journalist for the *Portland Mercury*. Police beat him with a truncheon and fired on him with flash-bangs.

98.    Also during protests in 2017, the police beat Plaintiff Rudoff with a truncheon because he was not moving quickly enough for an officer's liking.

### E.    Police Deploy a Killbox Tactic against Reporters and Observers

99.    Portland police use tear gas indiscriminately when confronted with crowds. Lt. Franz Schoening, commander of the Bureau's Rapid Response Team, has stated as much:

---

[27] Donovan Farley, *In Portland, the Police Played Into the Hands of the Fascists and Attacked Their Own Citizens*, Paste Magazine (Aug. 7, 2018), https://www.pastemagazine.com/politics/political-violence/in-portland-the-police-played-into-the-hands-of-th/.
[28] @RPeavyhouse, Twitter (Aug. 5, 2018, 2:34 P.M.), https://twitter.com/RPeavyhouse/status/1026219809552224256.
[29] Alex Zielinski, *Portland Police Explain Why They Fired Munitions at Protesters on August 4*, *Portland Mercury* (June 4, 2019), https://www.portlandmercury.com/blogtown/2019/06/04/26589682/portland-police-explain-why-they-fired-munitions-at-protesters-on-august-4.

"[W]hen officers can't see disrupters in a dense crowd because they're four to five rows back from officers and they won't comply with orders to leave the area," the Bureau's formal policy is to use tear gas against the crowd as a whole.[30]

100.    Because tear gas is inherently an indiscriminate weapon, this policy necessarily means that Portland police shoot tear gas at neutral parties who are attending to document and report on protests. And indeed, many journalists and legal observers have found themselves caught in the police's widespread use of tear gas during these protests.

101.    One particularly egregious example took place on the night of June 2, when reporters employed by the *Portland Mercury*, as well as Plaintiffs Sam Gehrke and Kat Mahoney, found themselves victims of a "killbox" action by Portland police.

102.    Reporters Alex Zielinski and Blair Stenvick were covering the protests for the Mercury that night. Ms. Zielinski was in the middle of the crowd, while Stenvick was towards the back. Neither was near the fence surrounding the Justice Center. Plaintiff Gehrke was also in the crowd reporting on the protests.

103.    The police issued a warning to protesters to stay away from the fence. To underscore the point, officers on the other side of the fence shot tear gas at protesters near the fence.

104.    Had officers merely shot gas at protesters closest to the fence, the reporters might not have been injured. However, the police had decided to create a gas trap by shooting tear gas from the rear and sides of the crowd as well. This gas trap, by design, snared not only protesters agitating near the fence, but many other peaceful protesters far from the fence with no desire to get involved. And, of course, it also caught all three reporters, as well as Plaintiff Mahoney.

105.    Because they had been inundated with tear gas, neither Ms. Zielinski nor Stenvick was able to report on the protests for the rest of the night. As the Mercury's editor wrote that

---

[30] Maxine Bernstein, *Portland police, fire medics describe crowd control tactics, munitions*, The Oregonian (June 4, 2020), https://www.oregonlive.com/portland/2020/06/portland-police-fire-medics-describe-crowd-control-tactics-munitions.html.

night: "Due to the dangerous situation and loss of control exhibited by the Portland Police, we have pulled our reporters off the street for the night. It's simply too dangerous for them to be out there right now."[31]

106.    Portland police have a policy or practice of using indiscriminate killbox or kettling tactics against crowds including journalists and other neutrals. They have used the same tactic in at least November 2014, January 2017, and June 2017.[32]

**F.    The Police Announce an Unconstitutional Policy of Dispersing and Arresting Members of the Press Who Are Trying to Report on the Protests**

107.    On June 14, the police announced that they would enforce dispersal orders against media and neutral observers unless the members of the press had been handpicked by the police to be "imbed[ded]" with the police.[33]

108.    The police subsequently warned reporters and neutral observers that they must obey the police's dispersal orders to protesters if they wished to "stay safe and avoid arrest or altercation." In the view of the police, "[t]he unlawful orders [sic] apply to everyone"—except those the police have permitted to be "imbedded" with them.[34]

109.    This proclamation was issued from the official Twitter account of the Portland police, @PortlandPolice, and is a written statement of the Bureau's formal policy. It is also an accurate statement of the Portland police's widespread custom and practice. Plaintiffs and

---

[31] Wm. Steven Humphrey, *Live Updates: Protesting the Death of George Floyd in Downtown Portland, Night Five*, Portland Mercury (June 2, 2020), https://www.portlandmercury.com/blogtown/2020/06/02/28499376/live-updates-protesting-the-death-of-george-floyd-in-downtown-portland-night-five.
[32] Maxine Bernstein, *Portland police deny 'kettling' of protesters in response to ACLU lawsuit*, The Oregonian (Jan. 19, 2019), https://www.oregonlive.com/portland/2018/01/portland_police_deny_kettling.html.
[33] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386641462607872.
[34] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386738338410496.

Plaintiff Class have repeatedly been dispersed by the police when they were peacefully trying to record the protests and posed no danger to the public or law enforcement.

110.    The police have not rescinded this proclamation or changed their practice.

111.    This policy is an unlawful viewpoint-based restriction on speech. Once the police issue a dispersal order, this policy gives them unbridled discretion over which reporters may remain, and thus permits them to control the content of reporters' coverage.[35] It is designed to prevent reporters and legal observers from holding the police accountable precisely when accountability is most needed. No government interest can justify such a policy, especially because reporters are not a threat to the public, police, or property. Nor is there any alternative way for reporters not embedded with the police to report on the violence with which police enforce their dispersal order.

**G.    The Police's Intimidation Campaign Works**

112.    The police's campaign of intimidation and fear has been effective. Plaintiff Woodstock's experience is typical.

113.    Plaintiff Woodstock has been a journalist for seven years. They have been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They are a seasoned veteran of reporting in tense situations.

114.    Plaintiff Woodstock is not a threat to the public or to law enforcement and has not engaged in any activities that would constitute such a threat. Plaintiff Woodstock does their best to avoid police violence but has been swept up in it anyway when the police assaulted individuals near them or ordered them to leave on pain of being assaulted or arrested. They have seen people next to them get shot in the head with rubber munitions. They have witnessed

---

[35] *See, e.g.*, Elana J. Zeide, Note, *In Bed with the Military: First Amendment Implications of Embedded Journalism*, 80 N.Y.U. LAW REV. 1309, 1321 ("Embedding typically takes place in a constrained environment where journalists cannot afford to alienate the limited sources available. Accordingly, most reporters will be reluctant to publish anything that the officers and soldiers surrounding them might receive badly.").

reporters getting shot with rubber bullets or maced in the face when they tried to gather evidence. The have been tackled by police in the course of their reporting through no fault of their own.

115.    The Portland police's indiscriminately violent conduct toward journalists and protesters alike has made it difficult—and at times, impossible—for Plaintiff Woodstock to report on the protests accurately and thoroughly.

116.    For example, because police shoot rubber bullets at and otherwise use force against anyone who approaches gas canisters or spent rounds, including journalists, Plaintiff Woodstock is unable to verify whether tear gas was used at a particular location, or whether a particular round fired at a protester's head was a rubber bullet or some other impact munition.

117.    Similarly, Plaintiff Woodstock is unable to determine which agency's officers are enforcing a dispersal order in a given location because police shoot anyone who approaches, including journalists.

118.    Because the police threaten to arrest any journalist who remains in an area after a dispersal order, Plaintiff Woodstock generally complies and departs after a dispersal order is issued. The result, however, is that Plaintiff Woodstock is unable to document the violent tactics with which police enforce their dispersal order against protesters. On information and belief, at least one time after they complied with a dispersal order, the police severely attacked the group of protesters they were covering.

119.    The police's goal is to prevent the press from holding them accountable. It works.

**H.    Plaintiffs Are Suffering Irreparable Harm**

120.    Plaintiffs fear for their safety from police violence. Reporters who attend and document the protests are at risk of being hit with tear gas, rubber bullet, police batons, arrests, and more. Even reporters who remain at the rear of the crowd cannot cover the protests without injury because the police use strategies like the "killbox" strategy they used on June 2.

121.    Plaintiffs and Plaintiff Class want to continue attending protests to gather news and observe and document how police are treating demonstrators, and whether demonstrators are actually provoking the outpouring of violence from the police, as the police claim, or whether

police are engaging in indiscriminate unprovoked violence. They also want to be able to document how police are dispersing protesters. They are fearful, however, that they themselves will be targeted for the same violence police mete out against protesters. The police have prevented Plaintiffs and Plaintiff Class from documenting how police have dispersed protesters and have repeatedly told them that they will be similarly arrested and assaulted if they fail to stop recording these events.

122.    On information and belief, countless others would report on the ongoing protests and volunteer to neutrally and peacefully observe them, but for fear that they would be subjected to police violence.

123.    The police's use of force against journalists has become so untenable, and their targeting of journalists so obvious, that even Mayor Wheeler admitted that the Bureau's tactics are "extremely concerning" and that "[j]ournalists need to be able to cover the protests safely."[36]

## CLASS ALLEGATIONS

124.    Plaintiffs Lewis-Rolland, Woodstock, Gehrke, and Rudoff (the "Journalist Plaintiffs") bring this action under Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil procedure on behalf of themselves and a class of similarly situated people who, as journalists, reporters, and photographers, have been subjected to violence, retaliation, arrest, or dispersal by the Portland police, or who will in the future report on protest activity or the conduct of law enforcement officers on duty within the City of Portland in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All reporters, journalists, and photographers who on or after May 25, 2020, have been subjected to violence, arrested, or dispersed by the Portland police while covering a protest, or who intend to engage in newsgathering or reporting in Portland related to protest activities and/or the law enforcement response to those

---

[36] @tedwheeler, Twitter (June 15, 2020, 11:30 A.M.), https://twitter.com/tedwheeler/status/1272597259150999553.

protests.

125.    The Plaintiff Class is so numerous that joinder of all the members would be impracticable. Hundreds of journalists are in Portland to cover the protests that followed Mr. Floyd's murder and the aftermath.

126.    As a result of Defendants' custom or policy of arresting members of the Plaintiff Class; targeting them with rubber bullets, chemical irritants, truncheons, and other uses of force; denying them freedom of movement to observe, record, and report on public demonstrations and law enforcement officers on duty; and intimidating them by threats of violence and arrest, the Plaintiff Class have been and will continue to be deprived of their constitutional rights under the First and Fourth Amendments.

127.    The Journalist Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because protests are ongoing and the Journalist Plaintiffs and Plaintiff Class have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies.

128.    The Journalist Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. The Journalist Plaintiffs have no conflicts involving other class members or Defendants. The Journalist Plaintiffs understand their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

129.    Questions of law or fact are common to the class. These legal and factual questions include but are not limited to:

    a.   Whether targeting journalists with violence and threats of violence violates the First Amendment;

    b.   Whether targeting journalists with violence and threats of violence violates the Fourth Amendment;

    c.   Whether targeting journalists with arrests and threats of arrest violates the First Amendment;

d.   Whether targeting journalists with arrests and threats of arrest violates the Fourth Amendment;

e.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists constitute a viewpoint-based restriction on speech that violates the First Amendment;

f.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists constitute an overbroad restriction on speech that violates the First Amendment;

g.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists serve any legitimate government interest;

h.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists are narrowly tailored;

i.   Whether Defendants' policy of embedding select journalists vests unbridled discretion to permit or prohibit speech in City officials;

j.   Whether Defendants' policy of embedding select journalists is an unlawful prior restraint in violation of the First Amendment;

k.   Whether Defendant City of Portland is liable for implementing a written or unwritten policy that violates the Fourth Amendment under principles of municipal liability;

l.   Whether Defendant City of Portland is liable for a custom or practice that violates the First Amendment under principles of municipal liability;

m.  Whether Defendant City of Portland is liable for a custom or practice that violates the Fourth Amendment under principles of municipal liability;

n.   Whether Defendant City of Portland has manifested a failure to properly train and supervise its agents and officers;

o.   Whether Defendant City of Portland has exhibited a deliberate indifference to the unconstitutional conduct alleged in this Complaint.

130.     Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that would allow the constitutional violations described in this Complaint to continue.

131.     This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(B). A ruling with respect to a single Journalist Plaintiff in this case would arguably be strong stare decisis with respect to other putative class members and members of the law enforcement community. There is no benefit to litigating the overwhelmingly common issues in this case individually. The interests of both Plaintiff Class members and Defendants requires class-wide treatment.

132.     Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Journalist Plaintiffs were targeted not because of anything unique to them as individuals, but because of their activities as journalists. Defendants targeted the Journalist Plaintiffs as part of a broader pattern and practice of unconstitutional conduct directed against the Plaintiff Class, including without limitation the police's unlawful policy related to dispersing members of the press. Injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

133.     Common questions of law and fact "predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating" this controversy. Fed. R. Civ. P. 23(b)(3). The questions outlined in

paragraph 129 above are the primary questions in this litigation, and no other method will adjudicate this controversy as fairly and efficiently as a class action.

## CAUSES OF ACTION

134.    "If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 898.

### First Cause of Action
### (Violation of the First Amendment)

135.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

136.    Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct. Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity. Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

137.    Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' First Amendment rights on its face and as applied. Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Defendants know that reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests. Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

138.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were demonstrating. Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

139.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place. Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

140.    By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, and by adopting an unlawful policy that restricts activities protected by the First Amendment, Defendants, under color of state law, subjected or caused Plaintiffs and Plaintiff Class to be subjected to the deprivation of rights secured by the First Amendment of the Constitution.

141.    It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

142.    The City's failure to supervise and train its employees and agents with respect to the First Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

143.    The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the George Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's First Amendment rights.

144.    Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

PAGE 33 - COMPLAINT

**Second Cause of Action**
**(Violation of the Fourth Amendment)**

145.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

146.    Plaintiffs and Plaintiff Class, who were present at the protests to observe and report committed no crime. Nor did they pose a threat to any of Defendants' officers or agents or any other person.

147.    Plaintiffs and Plaintiff Class were seized by Defendants when their officers intentionally, through threats of arrest, chemical agents, rubber bullets, and other uses of force, terminated their freedom of movement.

148.    Using threats of arrest, riot batons, semi-lethal projectiles, and chemical weapons against neutral parties who are present to observe protests and report on them is an unconstitutionally excessive use of force. Defendants' seizure of Plaintiffs and Plaintiff Class was thus objectively unreasonable. Defendants, under color of state law, subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Fourth Amendment of the Constitution.

149.    It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the Fourth Amendment violations.

150.    The City's failure to supervise and train its employees and agents with respect to the Fourth Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

151.    The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's Fourth Amendment rights.

152.     Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

153.     Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

**<u>Third Cause of Action</u>**
**(Violation of the Oregon Constitution, Art. I, §§ 8, 26)**

154.     Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

155.     Article I, § 8, of the Oregon Constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right." Article I, § 26, provides: "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of [grievances]."

156.     "The difference in the language of the Oregon and federal constitutions may . . . be pointed to as indicating an intention to provide a larger measure of protection to free expression under the Oregon Constitution. The California Constitution, which contains language similar to Oregon Constitution, Art. I, § 8, was so construed in *Wilson v. Superior Court of Los Angeles County*, 532 P.2d 116, 120 (Cal. 1975), where the court said: 'A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press.'" *Deras v. Myers*, 272 Or. 47, 64 n.17 (Or. 1975); *see also State v. Tusek*, 52 Or. App. 997, 1000 n.2 (Or. Ct. App. 1981) ("[I]n some instances, Art I

§ 8 of the Oregon Constitution provides a larger measure of protection to citizens than does the First Amendment to the U.S. Constitution.").

157.    Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct secured by the Oregon Constitution, Art. I, §§ 8 and 26. Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity. Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

158.    Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' constitutional right to free speech on its face and as applied. Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Defendants know that reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests. Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

159.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were demonstrating. Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

160.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place. Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

161.    By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, Defendants subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Oregon Constitution, Art. I, §§ 8 and 26.

### Fourth Cause of Action
**(Declaratory Judgment)**

162.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

163.    Plaintiffs and Plaintiff Class intend to continue attending protests in Portland for the purpose of documenting, reporting on and observing the events. Plaintiffs are fearful, however, that they will be subjected to police violence or dispersed pursuant to the police's illegal policy. Plaintiffs are also fearful that the police will continue to use kettling and killbox tactics against protesters that sweep in media and observers.

164.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates the First Amendment.

165.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates the Fourth Amendment.

166.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates Article I, Section 8 of the Oregon Constitution.

167.    A judicial declaration is necessary and appropriate so that Plaintiffs and Plaintiff Class may ascertain their rights to engage in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

168.    Plaintiffs and Plaintiff Class are entitled to a declaratory judgment that Defendants may not threaten Plaintiffs and Plaintiff Class with arrest, arrest Plaintiffs and Plaintiff Class, or target Plaintiffs and Plaintiff Class for uses of force, while they are engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.      Declaratory relief;

B.      Injunctive relief;

C.      Compensatory damages;

D.      Punitive damages;

E.      An award of pre-judgment interest;

F.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.      Any other relief the Court deems proper.


Dated: June 28, 2020                    Respectfully submitted,

                                        By: *s/ Kelly K. Simon*
                                        Kelly K. Simon, OSB No. 154213
                                        ACLU FOUNDATION OF OREGON

                                        Athul K. Acharya, OSB No. 152436
                                        Matthew Borden, *pro hac vice* pending
                                        J. Noah Hagey, *pro hac vice* pending
                                        Gunnar K. Martz, *pro hac vice* pending
                                        BRAUNHAGEY & BORDEN LLP

                                        *Attorneys for Plaintiffs*