**Matthew Borden**, *pro hac vice* application pending
borden@braunhagey.com
**J. Noah Hagey**, *pro hac vice* application pending
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, *pro hac vice* application pending
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **TUCK WOODSTOCK**; **DOUG BROWN**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **JOHN RUDOFF**; and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF PORTLAND**, a municipal corporation; and **JOHN DOES 1-60**, individual and supervisory officers of Portland Police Bureau and other agencies working in concert,<br><br>Defendants. | Case No. 3:20-cv-1035-BR<br><br>**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Plaintiffs Tuck Woodstock, Doug Brown, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, and John Rudoff hereby move for a Temporary Restraining Order ("TRO") and Preliminary Injunction. This Motion is based on Federal Rule of Civil Procedure 65, 42 U.S.C. § 1983, the First and Fourth Amendments to the United States Constitution, and Article I, Section 8 of the Oregon Constitution. Plaintiffs support this Motion with the accompanying Memorandum of Law, the Declarations of Matthew Borden, Tuck Woodstock, Doug Brown, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, John Rudoff, Elliot Tippie, Alex Zielinski, Alex Tracy, Wm. Steven Humphrey, Nathan Millsap, Suzette Smith, Blair Stenvick, Zach Putnam, and Sergio Olmos, and others in the process of being collected and signed at the time of filing of this motion.

Plaintiffs specifically seek an order enjoining Defendants and their agents, servants, employees, and representatives from:

1.      Using physical force against a journalist or legal observer, including without limitation tear gas, pepper spray, chemical irritants, flash-bang devices, rubber ball blast devices, batons, rubber bullets and other impact munitions, and any other means.

2.      Threatening journalists or legal observers with arrest or detention, or taking any journalist or observer into custody, or seizing their equipment.

3.      Threatening, harassing, or intimidating a journalist or legal observer.

4.      Deploying indiscriminate munitions, including but not limited to tear gas, smoke, rubber ball blast devices and flash bang grenades, into a crowd where journalists or legal observers are likely to be present.

5.      Kettling or killboxing crowds that are likely to include journalists or legal observers.

6.      Ordering or forcing journalists or legal observers to disperse, or to stop recording or observing a protest.

The materials submitted in support of this Motion demonstrate that "immediate and irreparable injury, loss, or damage will result to the movant[s] before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). They demonstrate a threat of irreparable harm to Plaintiffs and those similarly situated, that Plaintiffs are likely to succeed on the merits, that the balance of this harm against the harm that the TRO will inflict on other parties weighs in favor of granting the TRO, and that the public interest favors issuing a TRO. If the Court grants the requested relief, Plaintiffs seek an expedited hearing under Federal Rule of Civil Procedure 65(b)(3). For the reasons argued in the Memorandum of Law, the Court should enter an order granting this relief.

# TABLE OF CONTENTS

MEMORANDUM OF LAW ................................................................................ 1

INTRODUCTION ......................................................................................... 1

FACTUAL BACKGROUND ........................................................................... 3

    A.    Portland's Demonstrations Over the Murder of George Floyd ............................ 3

    B.    The Police's Pattern of Targeting and Retaliating Against
        Journalists and Observers ..................................................................... 3

    C.    The Police's Use of Indiscriminate Force Against Protesters and
        Neutrals Alike ................................................................................... 5

    D.    The Police's Policy of Dispersing Members of the Press Who Are
        Trying to Report on the Protests ............................................................ 6

ARGUMENT ............................................................................................. 6

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
    THEIR FIRST AMENDMENT CLAIMS ....................................................... 7

    A.    Plaintiffs Are Likely to Prevail on Their Retaliation Claim ........................... 7

        1.    Newsgathering and Recording the Police Are
            Constitutionally Protected Activities .......................................... 7

        2.    The Police's Repeated Use of Violent Force Has Chilled
            Plaintiffs from Continuing to Engage in Constitutionally
            Protected Activity ................................................................ 9

        3.    The Protected Activity Was a Substantial Motivating Factor
            in the Officers' Conduct ........................................................ 13

    B.    Plaintiffs Are Likely to Prevail on Their Claim that the Police's
        Policy of Dispersing Reporters Is Unlawful ............................................ 14

        1.    The Police's Dispersal Policy Is Viewpoint-Based on Its
            Face ............................................................................... 15

            a.    Plaintiffs May Assert a Facial Challenge to the
                Dispersal Policy ...................................................... 15

            b.    The Police Policy Discriminates by Viewpoint on
                Its Face Because It Gives the Police Unbridled
                Discretion ............................................................. 16

2.     The Police's Dispersal Policy Is Viewpoint-Based as Applied...................................................................................... 18

3.     Journalists and Observers Have No Alternative Forum........................... 19

4.     The Police's Policy is Not Narrowly Tailored to Any Legitimate Government Objective............................................. 20

C.     Kettling and Killboxing Journalists and Observers Violates the First Amendment......................................................................................... 23

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION ............................................................. 24

III.     THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS ..................................... 25

A.     The Public Has an Unassailable Interest in a Free Press ...................... 25

B.     The Balance of Equities Weighs Strongly in Favor of Plaintiffs ......................... 27

CONCLUSION............................................................................................................ 28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abudiab v. Georgopoulos*,
586 F. App'x 685 (9th Cir. 2013).......................................................................... 9

*Adkins v. Limtiaco*,
537 F. App'x 721 (9th Cir. 2013).......................................................................... 8

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .............................................................................. 6

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) .............................................................................. 13

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)........................................................................................... 22

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012) .............................................................................. 25

*Barich v. City of Cotati*,
2015 WL 6157488 (N.D. Cal. Oct. 20, 2015)..................................... 8, 9, 10, 11

*Bernal v. Fainter*,
467 U.S. 216 (1984)........................................................................................... 17

*Black Lives Matter Seattle—King Cty. v. City of Seattle*,
2020 WL 3128299 (W.D. Wash. June 12, 2020)................................................. 9

*Boos v. Berry*,
485 U.S. 312 (1988)...................................................................................... 17, 19

*Branzburg v. Hayes*,
408 U.S. 665 (1972)............................................................................................. 7

*Brown v. Entm't Merch. Ass'n*,
564 U.S. 786 (2011)........................................................................................... 26

*Chicago Police Dep't v. Mosley*,
408 U.S. 92 (1972)............................................................................................. 18

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)........................................................................................... 26

*City of Houston v. Hill*,
482 U.S. 451 (1987)............................................................................................. 8

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ............................................................................ 27

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975).......................................................................... 8, 19, 20, 22

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014)............................................................................... 7

*Faulk v. City of St. Louis*,
2019 WL 5653576 (E.D. Mo. Oct. 31, 2019) .................................................... 23

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)........................................................................................... 21

*Fordyce v. City of Seattle,*
  55 F.3d 436 (9th Cir. 1995) ...................................................................... 8, 9
*Forsyth Cty. v. Nationalist Movement,*
  505 U.S. 123 (1992) ............................................................................... 16, 17
*Frisby v. Schulz,*
  487 U.S. 474 (1988) ..................................................................................... 19
*Garrison v. Louisiana,*
  379 U.S. 64 (1964) ....................................................................................... 20
*Gaudiya Vaishnava Soc. v. City & Cty. of San Francisco,*
  952 F.2d 1059 (9th Cir. 1990) ................................................................ 19, 20
*Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982) ..................................................................................... 26
*Goldman, Sachs & Co. v. City of Reno,*
  747 F.3d 733 (9th Cir. 2014) ......................................................................... 6
*Hartman v. Moore,*
  547 U. S. 250 (2006) ...................................................................................... 7
*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
  138 S. Ct. 2448 (2018) .................................................................................. 26
*Kaahumanu v. Hawaii,*
  682 F.3d 789 (9th Cir. 2012) ................................................................. passim
*Leigh v. Salazar,*
  677 F.3d 892 (9th Cir. 2012) ................................................................. passim
*Long Beach Area Peace Network v. City of Long Beach,*
  574 F.3d 1011 (9th Cir. 2009) ............................................................... passim
*McComas v. City of Rohnert Park,*
  2017 WL 1209934 (N.D. Cal. Apr. 3, 2017) ................................................. 8
*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) ....................................................................... 25
*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
  192 F.3d 1283 (9th Cir. 1999) .................................................................... 7, 9
*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ............................................................................... 18, 26
*Reed v. Lieurance,*
  863 F.3d 1196 (9th Cir. 2017) ..................................................................... 20
*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ..................................................................................... 22
*Rohman v. City of Portland,*
  909 F. Supp. 767 (D. Or. 1995) ................................................................... 25
*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ............................................................................... 17, 19
*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a
  Generation v. City of Seattle,*
  550 F.3d 788 (9th Cir. 2008) ....................................................................... 19
*Ulrich v. City & Cty. of S.F.,*
  308 F.3d 968 (9th Cir. 2002) ....................................................................... 13

*United States v. Sherman*,
   581 F.2d 1358 (9th Cir. 1978) ................................................................................. 7
*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ............................................................................. 6, 24

## STATUTES

U.S. Const. amend. I ....................................................................................................... 7

## OTHER AUTHORITIES

11A Charles Alan Wright, *Fed. Prac. & Proc.*, § 2948.1 (2d ed. 2004) ....................................... 24
Gerald Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on
   a Changing Court: A Model for a Newer Equal Protection*,
   86 Harv. L. Rev. 1 (1972) .......................................................................................... 17, 18
Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*,
   44 Stan. L. Rev. 927 (1992) ...................................................................................... 22

## MEMORANDUM OF LAW

Plaintiffs Tuck Woodstock, Doug Brown, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, and John Rudoff respectfully submit this memorandum in support of their motion for a temporary restraining order and preliminary injunction.

## INTRODUCTION

Plaintiffs respectfully seek to enjoin the Portland Police Bureau and other agencies acting at its behest (the "police") from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd. The police's efforts to intimidate and suppress reporting on the police's own misconduct violate clearly established First Amendment law and are causing irreparable harm to Plaintiffs and the public.

Plaintiffs are members of the media and legal observers. They have a right to witness important public events and recount them to the world. Their newsgathering, observing, and recording activities are at the core of what the First Amendment protects. *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) ("The free press is the guardian of the public interest[.]").

As demonstrated in the attached declarations from journalists, newspapers, and observers, the police are using tear gas, pepper spray, munitions, beatings, threats, and arrests to retaliate against Plaintiffs and countless other journalists and legal observers for trying to document how the police are treating protesters. Punishing individuals for engaging in these protected activities violates the First Amendment, and the police's conduct should be enjoined immediately to lift the storm cloud of fear and intimidation they have intentionally created.

The police have also issued a policy statement that they will forcefully disperse press and neutrals who are documenting and observing any protest that law enforcement unilaterally deems "unlawful." The only exception to this rule is for press whom the police have allowed to embed with them. Under longstanding Ninth Circuit law, this policy is an illegal viewpoint-based restriction on speech because it contains no standard governing who the police may allow to

report on their activities and why the police may revoke access. *Kaahumanu v. Hawaii*, 682 F.3d 789, 806-07 (9th Cir. 2012). Moreover, the police's policy is not narrowly tailored to achieve any legitimate government objective. Reporters and observers pose no danger to the public nor interfere with lawful police activities, and their witnessing and reporting the events at issue is a vital check against abuse of power. The police's policy—which follows a longstanding effort to shield their treatment of protesters from public scrutiny—has prevented numerous journalists and observers from reporting on the police. This is repugnant to the core principles of the First Amendment. *Leigh*, 677 F.3d at 900 (9th Cir. 2012) (reversing denial of preliminary injunction where government prevented photojournalist from observing and recording horse roundup).

Defendants' conduct is causing irreparable, immediate harm. The protests are ongoing every day, and they will only intensify as the Fourth of July holiday approaches. Each day that passes without relief, Plaintiffs and other journalists and observers are denied their constitutional right to observe and report on public demonstrations without fear. Each day, the public is deprived of critical information, peaceful demonstrators are exposed to violence, and the government operates in the shadows. That is not how our nation is supposed to work.

Accordingly, Defendants and their agents, servants, employees, representatives, and those acting in concert with them should be enjoined from:

1.      Using physical force against a journalist or legal observer, including without limitation tear gas, pepper spray, chemical irritants, flash-bang devices, rubber ball blast devices, batons, rubber bullets and other impact munitions, and any other means.

2.      Threatening journalists or legal observers with arrest or detention, or taking any journalist or observer into custody, or seizing their equipment.

3.      Threatening, harassing, or intimidating a journalist or legal observer.

4.      Deploying indiscriminate munitions, including but not limited to tear gas, smoke, rubber ball blast devices and flash bang grenades, into a crowd where journalists or legal observers are likely to be present.

5.      Kettling or killboxing crowds that are likely to include journalists or legal observers.

6.      Ordering or forcing journalists or legal observers to disperse, or to stop recording or observing a protest.

## FACTUAL BACKGROUND

### A.      Portland's Demonstrations Over the Murder of George Floyd

The Minneapolis police murdered George Floyd on May 25, 2020. His killing prompted protests worldwide, including in Portland. Since his murder, thousands of people have gathered every night in Portland to protest and mourn Mr. Floyd's murder and insist that our institutions start ensuring that Black lives matter. These protests continue to the present day. (Declaration of Doug Brown ("Brown Decl.") ¶ 8.)

For the most part, the protesters have been overwhelmingly peaceful. (*Id.* ¶ 9.) But nearly every night, the Portland police have used increasingly violent tactics against them. (*Id.*) They have shot rubber bullets into crowds, beat protesters with truncheons, shot them with flash-bang grenades, and deployed multiple types of tear gas, all with little or no warning and in the absence of any danger to the public, police, or property. (*Id.*)

### B.      The Police's Pattern of Targeting and Retaliating Against Journalists and Observers

Plaintiffs are all journalists and legal observers who have attended the Portland protests against police brutality. (Brown Decl. ¶ 1; Declaration of Sam Gehrke ("Gehrke Decl.") ¶ 1; Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland Decl.") ¶ 1; Declaration of Kat Mahoney ("Mahoney Decl.") ¶ 1; Declaration of John Rudoff ("Rudoff Decl.") ¶ 1; Declaration of Tuck Woodstock ("Woodstock Decl.") ¶ 1.) They are neutrals: They are there simply to observe, record, and report, and their appearance makes clear that they are there in their capacity as journalists and observers. (Brown Decl. ¶¶ 6, 10, 20, 23-24; Gehrke Decl. ¶ 3; Lewis-Rolland Decl. ¶ 7; Mahoney Decl. ¶¶ 2, 6; Rudoff Decl. ¶¶ 2-3 & Ex. 1; Woodstock Decl. ¶ 3.) They neither take part in the protests nor intercede on behalf of protesters. (Brown Decl. ¶¶ 3-4;

Mahoney Decl. ¶¶ 3-4; Lewis-Rolland Decl. ¶ 9; Rudoff Decl. ¶ 2.) Each of them has been harassed, intimidated, threatened, assaulted, and tear-gassed by the Portland police. Plaintiff Mathieu Lewis-Rolland took this photo right before the police shot at him for doing nothing more than photographing them (Lewis-Rolland Decl. ¶ 9):



*Figure 1. Police take aim at Plaintiff Mathieu Lewis-Rolland.* Lewis-Rolland Decl. ¶ 8.

Similarly, the police shot flash-bang grenades at Plaintiff Doug Brown twice in the same night and beat him with their truncheons during a sudden charge maneuver. (Brown Decl. ¶¶ 13, 15-16, 18.) They shot Plaintiff Sam Gehrke in the back while he was photographing a crowd of

protesters. (Gehrke Decl. ¶ 5.) They shot at Plaintiff Kat Mahoney to prevent her from recording their takedown of a woman experiencing a mental-health crisis. (Mahoney Decl. ¶¶ 14, 16-18.) They shot Plaintiff John Rudoff with pepper balls. (Rudoff Decl. ¶ 4.) And Plaintiff Tuck Woodstock has assiduously limited their reportage to avoid a similar fate. (Woodstock Decl. ¶¶ 6-10.) As detailed in the attached declarations from newspapers and reporters, the police's intentional, unnecessary, and indiscriminate uses of force have prevented and deterred Plaintiffs and many others from observing and reporting on how police are treating protesters at Portland's recent Black Lives Matter demonstrations. (*Id.*; Brown Decl. ¶¶ 17, 19, 26; Gehrke Decl. ¶¶ 6, 10; Lewis-Rolland Decl. ¶ 13; Mahoney Decl. ¶¶ 7-9; Rudoff Decl. ¶ 8; Declaration of Elliott Tippie ("Tippie Decl.") ¶¶ 18, 20; Declaration of Alex Zielinski ("Zielinski Decl.") ¶¶ 10, 14; Declaration of Alex Milan Tracy ("Tracy Decl.") ¶¶ 6, 17; Declaration of Zach Putnam ("Putnam Decl.") ¶ 4; Declaration of Wm. Steven Humphrey ("Humphrey Decl.") ¶¶ 4-9; Declaration of Nathan Millsap ("Millsap Decl.") ¶¶ 5-11, 14; Declaration of Sergio Olmos ("Olmos Decl.") ¶ 8; Declaration of Suzette Smith ("Smith Decl.") ¶¶ 4, 8, 12-13; Declaration of Blair Stenvick ("Stenvick Decl.") ¶¶ 6-7, 9.)

### C. The Police's Use of Indiscriminate Force Against Protesters and Neutrals Alike

In addition to specifically targeting journalists and observers, the police have frequently used indiscriminate force against crowds without regard to whom they hit—agitators, peaceful demonstrators, families, children, or neutrals. (Zielinski Decl. ¶ 6; Mahoney Decl. ¶¶ 7, 21; Tracy Decl. ¶¶ 7, 9-10, 16; Millsap Decl. ¶ 13; Brown Decl. ¶¶ 13, 18; Rudoff Decl. ¶ 4.) On at least one occasion, the police have trapped a crowd and inundated it with gas using a military attack technique known as "kettling" or "killboxing." This tactic cannot disperse the trapped crowd; its only goal is to inflict maximum pain and suffering on everyone in it. (Zielinski Decl. ¶¶ 6-8; Stenvick Decl. ¶¶ 5-6; Humphrey Decl. ¶¶ 3-4; Tracy Decl. ¶ 7 (video).)

Using indiscriminate tactics is an official police policy. Lt. Franz Schoening, commander of the Bureau's Rapid Response Team, has explained that the police will use indiscriminate force

on non-violent protestors and media alike: "[W]hen officers can't see disrupters in a dense crowd because they're four to five rows back from officers and they won't comply with orders to leave the area," the Bureau's formal policy is to use tear gas against the crowd as a whole.[1]

### D. The Police's Policy of Dispersing Members of the Press Who Are Trying to Report on the Protests

On June 14, 2020, the police announced that they would enforce dispersal orders against media and neutral observers unless the members of the press had been handpicked by the police to be "imbed[ded]" with the police. (Declaration of Matthew Borden ("Borden Decl."), Ex. 1.) The police subsequently issued a warning through the police's official Twitter account stating that reporters and neutral observers must obey the police's dispersal orders to protesters if they wished to "stay safe and avoid arrest or altercation." According to the policy, "[t]he unlawful orders [sic] apply to everyone"—except those the police have permitted to "imbed" with them. (*Id.*)

## ARGUMENT

Under the traditional four-factor test, plaintiffs may obtain a preliminary injunction if they show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). Alternatively, in the Ninth Circuit, plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotation marks omitted)). Here, Plaintiffs easily meet either bar.

---

[1] Maxine Bernstein, *Portland police, fire medics describe crowd control tactics, munitions*, The Oregonian (June 4, 2020), https://www.oregonlive.com/portland/2020/06/portland-police-fire-medics-describe-crowd-control-tactics-munitions.html.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. amend. I. To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, Defendants bear the burden of justifying the restriction on Plaintiffs' speech. *Id.*

Plaintiffs seek a temporary restraining order to enjoin: (1) acts of retaliation and intimidation against journalists and legal observers, (2) the police's unconstitutional policy of "dispersing" journalists and observers when they are trying to document police activities, and (3) the police's use of kettling or killboxing military tactics when it is possible that neutrals may be present in a crowd. All these acts violate Plaintiffs' First Amendment rights, and Plaintiffs are likely to prevail on their claims as to each.

### A. Plaintiffs Are Likely to Prevail on Their Retaliation Claim

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).

#### 1. Newsgathering and Recording the Police Are Constitutionally Protected Activities

Plaintiffs easily satisfy the first prong of a retaliation claim because they were engaged in the core First Amendment activities of newsgathering and recording the police at a protest.

Because freedom of the press lies at the heart of the First Amendment, "newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). That principle applies

with greater force when the media reports on "the proceedings of government," because it then acts as "surrogates for the public." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975); *Leigh*, 677 F.3d at 900 (quotation marks omitted). Here, Plaintiffs attended the protests as journalists and observers to inform the public about the protests and how police were treating protesters. (Woodstock Decl. ¶ 1; Rudoff Decl. ¶ 1; Lewis-Rolland Decl. ¶ 1; Gehrke Decl. ¶ 1; Mahoney Decl. ¶ 1; Brown Decl. ¶ 1.) They were thus engaging in core protected activity.

Plaintiffs were also engaged in the separate and independent constitutionally protected activity of recording the protests and the police. *Id.* For 25 years, the Ninth Circuit has recognized that people have the right to "film matters of public interest." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (finding First Amendment interest in "nonconsensual audio recording of public officials performing their official duties in public"). *Fordyce* itself involved facts remarkably similar to those here—a plaintiff who videotaped and audio-recorded a protest in the streets of Seattle and was "assaulted and battered by a Seattle police officer" in retaliation. 55 F.3d at 439. In the decades since *Fordyce*, courts have continued to recognize this clearly established right. *See, e.g.*, *McComas v. City of Rohnert Park*, 2017 WL 1209934, at *7 (N.D. Cal. Apr. 3, 2017) (holding that the right against retaliation for "peacefully filming [an] officer" is clearly established); *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) (same); *see also Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) (allowing retaliation claim for photographing police officers to proceed even when plaintiff directed "a significant amount of verbal criticism and challenge" at officers (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987))).

Here, Plaintiffs were recording public demonstrations on the streets of Portland to document protest activities and gather news, just as Jerry Fordyce did 25 years ago on the streets of Seattle. (Woodstock Decl. ¶¶ 1, 10; Rudoff Decl. ¶¶ 1, 4; Lewis-Rolland Decl. ¶¶ 1, 8-10; Gehrke Decl. ¶¶ 1, 12; Mahoney Decl. ¶¶ 1-2, 13-17; Brown Decl. ¶¶ 1, 10-13, 15-17.) For this

reason too, Plaintiffs were engaged in a constitutionally protected activity. *Fordyce*, 55 F.3d at 439.

### 2. The Police's Repeated Use of Violent Force Has Chilled Plaintiffs from Continuing to Engage in Constitutionally Protected Activity

The police's retaliatory actions against Plaintiffs and other journalists and observers have included spraying them with chemical agents and pepper spray, shooting at them with impact munitions, hitting them with batons, threatening them with violence and arrest, and arresting them. (Woodstock Decl. ¶¶ 7-10; Brown Decl. ¶ 9; Olmos Decl. ¶ 5; Rudoff Decl. ¶¶ 4, 6-7; Gehrke Decl. ¶¶ 4-5; Lewis-Rolland Decl. ¶¶ 9, 11; Millsap Decl. ¶¶ 5-11; Tracy Decl. ¶¶ 7-12; Tippie Decl. ¶¶ 5-17.) This easily satisfies the second prong of a retaliation claim, *i.e.*, that the police's conduct would or did deter a reasonable person from exercising their constitutional rights. *Mendocino*, 192 F.3d at 1300-01.

Courts have repeatedly held that the types of force used by the police here would chill a person of ordinary firmness from exercising their constitutional rights. *See, e.g.*, *Abudiab v. Georgopoulos*, 586 F. App'x 685, 686 (9th Cir. 2013) (denying qualified immunity for retaliation where officer pepper-sprayed and punched plaintiff); *Black Lives Matter Seattle—King Cty. v. City of Seattle*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020) (holding that using tear gas, pepper spray, and rubber bullets would "surely chill[] speech"); *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) ("No reasonable trier of fact could doubt that a person of ordinary firmness would be deterred by the threat of arrest.").

Any one of the uses of force on any one of the Plaintiffs detailed below suffices to show that injunctive relief is warranted. Together, they show that the police have created a pervasive atmosphere of fear that has substantially chilled Plaintiffs and other journalists and observers from exercising their First Amendment rights to gather news and to record police activities.

Plaintiff Lewis-Rolland is a photojournalist who carries a large Nikon D850 camera with a 70-200mm lens and a flash; when he attends protests, he is unmistakably present in a journalistic capacity. (Lewis-Rolland Decl. ¶ 7.) On May 31, 2020, he took photographs of police

officers at a protest, for which the officers shot at him and then tear-gassed him. (*Id.* ¶¶ 8-9.) He was forced to stop documenting police action at that location. (*Id.* ¶ 9.) About an hour later, Mr. Lewis-Rolland was photographing an intense interaction between the police and a citizen. (*Id.* ¶ 10.) This time, an officer opened a crowd-control-sized canister of tear gas and kicked or threw it directly at Mr. Lewis-Rolland's feet. (*Id.* ¶ 11.) Used at such close range, the canister delivered a full frontal blast of gas to his face and once again, he was overcome by its effects and forced to stop documenting the scene. (*Id.*) He has stopped covering the protests in part because the police's actions have made him apprehensive about his safety. (*Id.* ¶ 13.)

Plaintiff Gehrke is a photojournalist who also carries a large camera, wears a press pass from the *Willamette Week*, and is obviously present as a journalist to record and report on the protests. (Gehrke Decl. ¶ 2.) On June 12, Mr. Gehrke was taking photos near the Justice Center when police shot him in the back with a rubber bullet. (*Id.* ¶ 5.) Shortly after this, the police swarmed the crowd from behind, physically assaulting and beating people at random. (*Id.*) The actions and attitude of the police during this incident made Mr. Gehrke feel so unsafe that he has stopped reporting on the protests entirely. (*Id.* ¶ 6.)

Plaintiff Brown attended the George Floyd protests on several nights for the purpose of documenting how police interact with protesters, wearing a blue vest that clearly identifies him as a legal observer. (Brown Decl. ¶ 1.) On the night of June 12, while Mr. Brown was serving as a volunteer legal observer, the police beat him and fired a flash-bang grenade directly at him when he was trying to record what the police were doing. (*Id.* ¶¶ 10-18.) The police rushed Mr. Brown in a "dynamic" maneuver, yelling "MOVE!" and beating anyone who could not out-sprint them. (*Id.* ¶ 15.) Mr. Brown continued to observe and record this maneuver; for that, the police beat him, too. (*Id.* ¶ 17.) They then scored a direct hit on Mr. Brown with a second flash-bang grenade. (*Id.* ¶ 18.) As a result, Mr. Brown suffered temporary tinnitus for several hours, contusions, and had to leave even though he wished to continue documenting the scene. (*Id.* ¶¶ 18-19.)

Plaintiff Mahoney is a legal observer who has attended the Portland protests nearly every night for the purpose of documenting police interaction with protesters. (Mahoney Decl. ¶ 1.) She wears a blue vest that clearly identifies her as a legal observer. (*Id.*) On June 10, Ms. Mahoney suffered severe injuries to her left hand when police opened fire on her for recording their activity in public. (*Id.* ¶¶ 16-18.) Had she not been holding her phone up to record, the shrapnel that injured her hand would have hit her face. (*Id.*) She intends to keep covering the protests, but is fearful for her safety. (*Id.* ¶ 23.)

These stories are but a small sample of the daily horrors police have visited on the press in Portland. (For further examples captured on film, *see* Olmos Decl. ¶ 9; Millsap Decl. ¶ 4; Tippie Decl. ¶ 14; Tracy Decl. ¶¶ 11-13, Ex. 1.) And journalists follow the news. They know what police have been doing, and it has made them more fearful to gather news at these protests. (*E.g.*, Gehrke Decl. ¶¶ 7-10; Putnam Decl. ¶¶ 2-4; Humphrey Decl. ¶¶ 8-9.) The police's conduct has actually deterred each Plaintiff, as well as other journalists and observers, from engaging in constitutionally vital speech:

- "I have not attended any protests since June 19, 2020. I would like to continue reporting on the protests, but I am fearful that the police might injure me. I am deeply upset because I cannot do my work because of being forcibly removed from the area of events." (Rudoff Decl. ¶ 8.)
- "I have ceased covering the protests in part because the actions of the police have made me apprehensive about my safety." (Lewis-Rolland Decl. ¶ 13.)
- "On June 12, I was taking photos near the Justice Center when police shot me in the back with a rubber bullet. . . . After this incident, I stopped reporting on the protests because the actions and attitude of the police made me feel unsafe." (Gehrke Decl. ¶¶ 5-6.)
- "Rather than be arrested, I left the scene and was no longer able to fulfill my role as a legal observer." (Brown Decl. ¶ 26.)

- "[I]n an attempt to minimize video evidence, Portland police also opened fire on people recording the event near the fence, including me." (Mahoney Decl. ¶ 16.)

- "These actions by the Portland police make me feel unsafe when I report on the protests." (Olmos Decl. ¶ 8.)

- "On several nights, the police have announced that any press that remain in an area will be arrested alongside protesters. On such nights, I go home to avoid being arrested. Once again, I am unable to do my job of covering the protests and keeping the public informed. On at least one night of which I am aware, after I and another reporter left the scene, the group of protesters we were covering were severely attacked by police officers." (Woodstock Decl. ¶ 10.)

- "I would like to continue reporting on the protests, but I am fearful that the police might injure or kill me. As a result of the violent way the police have treated photographers, media and neutral observers, I leave the protests before it gets dark, even though I would like to stay longer to help record what happens." (Putnam Decl. ¶ 4.)

- "Because I was arrested, I was unable to continue documenting the protest and police response that night. Nor have I returned to cover the protests since being arrested because it rattled me so much that I am fearful for my safety and liberty." (Millsap Decl. ¶ 11.)

- "I have decided not to approach a line of police officers in riot gear to accurately document their interactions with the public, because I am afraid I will be shot by their munitions or chemical gas. I have stopped reporting earlier than I intended during protests due to fear of violence and harm from police officers. This has hampered my ability to write transparently about police conduct." (Zielinski Decl. ¶ 14.)

Plaintiffs easily meet the second prong of the retaliation test.

### 3. The Protected Activity Was a Substantial Motivating Factor in the Officers' Conduct

The last element of a retaliation claim is that a plaintiff's protected activity must be "a substantial motivating factor" in defendants' conduct—that is, there must be some "nexus between [Defendants'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). This standard is easily met here.

First, substantial evidence shows that police have intentionally used force to stop constitutionally protected reporting. Each Plaintiff was obviously newsgathering or observing at the time the police targeted them, so the police knew they were assaulting reporters. (Brown Decl. ¶¶ 10, 20; Gehrke Decl. ¶¶ 3, 5; Lewis-Rolland Decl. ¶ 7; Mahoney Decl. ¶¶ 18, 20; Rudoff Decl. ¶ 6; Woodstock Decl. ¶ 9.) When the police shot at and tear-gassed Plaintiff Lewis-Rolland, he was in the act of photographing them. (Lewis-Rolland Decl. ¶¶ 8-9, 10-11.) Plaintiff Gehrke was photographing the crowd. (Gehrke Decl. ¶ 5.) Plaintiff Brown was videorecording them when they shot at him. (Brown Decl. ¶¶ 12-13.) So was Plaintiff Mahoney. (Mahoney Decl. ¶ 16.) So was Plaintiff Woodstock, and they were holding up their press pass, too. (Woodstock Decl. ¶ 9.) Police also threatened to arrest Mr. Brown for taking photos. (*Id.* ¶ 23 ("You have plenty of pictures, okay? … We don't want to make an arrest.").) And they told Plaintiff Rudoff forthrightly, when he showed them his press pass and camera equipment, that "we don't care if you're media." (Rudoff Decl. ¶ 6.) Much of this evidence is irrefutable because it is captured on video.

Further, the police retaliation against Plaintiffs occurs against the backdrop of the police retaliating against other newsgatherers. The police intended to chill reporter Tippie's First Amendment rights when he expressly informed them that his filming them was "a First Amendment protected activity," and they responded: "Not down here it's not." (Tippie Decl.

¶¶ 9-10.) They intended to chill reporter Alex Milan Tracy's rights when they told him they "don't care that [he's] press" and threatened to arrest him if he did not "get out of [t]here right now." (Tracy Decl. ¶ 12.) And they intended to violate reporter Sergio Olmos's rights when they hit him with a baton and threatened him with pepper spray for no reason other than he was recording them. (Olmos Decl. ¶ 5.) This further confirms that the police have chilled and prevented speech intentionally. Taken together, all this is insurmountable proof that the police intended to deprive Plaintiffs of their constitutional rights.

**B.     Plaintiffs Are Likely to Prevail on Their Claim that the Police's Policy of Dispersing Reporters Is Unlawful**

On June 14, 2020, the police declared a policy that once they issue an order declaring a protest to be "unlawful," they will use force to "disperse" protesters, media, and observers alike—unless the neutrals are embedded with the police. (Borden Decl., Ex. 1.) The police have followed this policy in attacking, arresting, and threatening Plaintiffs and other journalists and observers to prevent journalists and observers from seeing and recording the critical inflection point of a protest—when police go to break it up. (Woodstock Decl. ¶¶ 7-10; Brown Decl. ¶ 9; Olmos Decl. ¶ 5; Rudoff Decl. ¶¶ 4, 6-7; Gehrke Decl. ¶¶ 4-5; Lewis-Rolland Decl. ¶¶ 9, 11; Millsap Decl. ¶¶ 5-11; Tracy Decl. ¶¶ 7-12; Tippie Decl. ¶¶ 5-17.) Because the dispersal process has so often resulted in police violence, it is critical that press and observers be allowed to remain at that time.

Plaintiffs are overwhelmingly likely to prevail on their claim that the police's policy violates the First Amendment for at least four reasons. *First*, this policy is a viewpoint-based restriction on speech on its face. The police have unbridled discretion over whom to embed, which means that once they issue a dispersal order, they have unbridled discretion over who may remain. That discretion permits them to control the content of reporters' coverage and therefore violates the First Amendment on its face. *Second*, the police have in fact used it to decide whom they will allow to "embed" based on viewpoint. *Third*, even if the policy were not viewpoint based, it would still be unconstitutional because there is no alternative way for reporters not

embedded with the police to report on the violence with which police enforce their dispersal orders. *Fourth*, even if it were not viewpoint based, the policy obviously fails longstanding First Amendment principles because it is not narrowly tailored to meet any legitimate government objective; rather, it sweeps in Plaintiffs' protected conduct when they pose no threat to public safety or law enforcement.

### 1.     The Police's Dispersal Policy Is Viewpoint-Based on Its Face

The police's policy is viewpoint-based on its face because it gives the police unlimited discretion to decide who they will allow to embed (and allow to gather news), and who they will "disperse" (and prevent from recording, observing, and reporting). Under established precedent, such policies are properly subject to facial challenge, and fail as a matter of law.

### a.     Plaintiffs May Assert a Facial Challenge to the Dispersal Policy

To bring a facial challenge to the policy, Plaintiffs must show they have Article III standing. In this context, standing is a truncated inquiry that asks only whether "the challenged provision or provisions apply to [the plaintiff's] conduct." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009). Here, Plaintiffs are journalists and legal observers who seek to observe, record, and report on how the police are enforcing their unlawful-assembly orders. The police's policy of using force to disperse journalists and observers who have not curried sufficient favor to become embedded with the police plainly applies to them. (Woodstock Decl. ¶¶ 1, 10; Rudoff Decl. ¶¶ 1, 4; Lewis-Rolland Decl. ¶¶ 1, 8-10; Gehrke Decl. ¶¶ 1, 12; Mahoney Decl. ¶¶ 1-2, 13-17; Brown Decl. ¶¶ 1, 10-13, 15-17.)

Plaintiffs must also show that the challenged regulation has a nexus to expression. *Kaahumanu*, 682 F.3d at 802. Here, the challenged regulation does not merely have a nexus with expression; it directly regulates who may observe and report on protests after a dispersal order has issued. (Borden Decl., Ex. 1); *Long Beach Area Peace Network*, 574 F.3d at 1020. Plaintiffs easily satisfy both requirements to bring a facial challenge.

### b. The Police Policy Discriminates by Viewpoint on Its Face Because It Gives the Police Unbridled Discretion

An ordinance that gives officials unbridled discretion to permit or deny expressive activity is an invalid viewpoint-based regulation of speech. *Kaahumanu*, 682 F.3d at 806-07 (ability to revoke or modify permit to access public beaches in "absolute discretion" of government violates First Amendment because "an unbridled discretion on a licensing official creates the danger of self-censorship, as well as a danger of government censorship").

In *Kaahumanu*, Plaintiffs brought a facial challenge to a permitting system for access to public beaches. In striking down the portion of the regulation allowing the government to terminate or modify a license at will, the Ninth Circuit held that a regulation that grants government officials unbridled discretion to permit or deny expressive activity violates the viewpoint-neutrality requirement for statutes that regulate expressive conduct. *Id.* at 806. The Court explained that such discretion creates twin dangers: Not only might the official censor the speaker, but the speaker might censor herself for the sake of pleasing the official and obtaining the permit. *Id.* at 806-07. When an official has unbridled permitting discretion, "[a] citizen may hesitate to express, or refrain from expressing, his or her viewpoint for fear of adverse government action such as the denial of a permit." *Id.* at 807.

Similarly, in *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992), the Supreme Court struck down as viewpoint-based an ordinance governing demonstration permits that required paying law enforcement expenses. The Court held:

> The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official.

*Id*. To survive Plaintiffs' facial attack, the dispersal policy must contain standards that are sufficiently "narrow, objective, and definite" to enable judicial review, and it must require the

police to explain a decision to embed or not embed a reporter in terms of those standards. *Long Beach Area Peace Network*, 574 F.3d at 1025 (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992)).

Here, the police's policy offers no standards whatsoever for how police should select which journalists they will allow to embed. (Borden Decl., Ex. 1.) The Directives that govern Portland police officers, which are publicly available, also contain no relevant standards.[2] They do not even *refer* to the dispersal or embedding policy. This case is therefore on all fours with *Kaahumanu*, and it is overwhelmingly likely that Plaintiffs will prevail. 682 F.3d at 806-807.

The only standard of which Plaintiffs are aware related to embedding with the police during a "demonstration event" is an "agreement" proposed in 2018 that imposes numerous prior restraints and only underscores the police's intent to restrict speech. (Humphrey Decl. ¶ 10, Ex. 1.) This policy contains many other reasons why the police's policy is unconstitutional.

Foremost, the policy is viewpoint-based because it forbids journalists to present—or even solicit—the viewpoint of a protester. (*Id.* at 14 ("Should you decide to engage in the demonstration as a protester or conduct an interview of a protester while on the ground, your observation period will be considered voluntarily ended by you.").) Viewpoint-based restrictions fail under virtually any circumstance because they offend the most basic principles of the First Amendment. They are "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995), which must be "subjected to the most exacting scrutiny." *Boos v. Berry*, 485 U.S. 312, 321 (1988). Such scrutiny "is 'strict' in theory but usually 'fatal' in fact." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) (quoting Gerald Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972)). Nor is there any legitimate basis for a rule that would enable press to obtain the views of the police but not protesters.

---

[2] *See generally Directives Manual*, The City of Portland, Oregon, https://www.portlandoregon.gov/police/29867 (last visited June 28, 2020, 10:55 P.M.).

The embedding policy is also content-based because it requires all applicants to sign a Non-Disclosure Agreement (itself a restriction on speech) that provides that that "[t]he Receiving Party shall not make any audio or video recordings of the event on any device." (Humphrey Decl., Ex. 1 at 10.) Content-based restrictions on speech are also subject to strict scrutiny, and fail on their face. *Chicago Police Dep't v. Mosley*, 408 U.S. 92, 95-96 (1972) ("Any restriction on expressive activity because of its content would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wise-open.'" (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))).

Finally, the policy requires applicants to agree to all the police's "rules," and provides that their "application may be rejected at the discretion of PPB based on the results of [a] background/criminal history check." (Humphrey Decl., Ex. 1 at 1, 3, 10.) Further, the police "may terminate [an applicant's] sit-along at any time, without explanation or advance notice, if the Bureau determines immediate termination is warranted or needed." (*Id.* at 3.) That provides officers unbridled discretion to revoke access, which—just like unbridled discretion to terminate access found unconstitutional by the Ninth Circuit in *Kaahumanu*—renders the policy invalid. 682 F.3d at 807.

## 2. The Police's Dispersal Policy Is Viewpoint-Based as Applied

In addition to being facially invalid, the police's dispersal policy is invalid as applied. A permitting policy is "vulnerable to an as-applied challenge if, in its implementation, there emerge[s] a pattern of unlawful favoritism." *Long Beach Area Peace Network*, 574 F.3d at 1029 (quotation marks omitted). Here, the implementation of the police's only known embedding policy notoriously evinced a pattern of unlawful favoritism: The Bureau cherrypicked two local journalists, one from the *Oregonian* and one from the *Portland Tribune*, who had a "history of 'fair and balanced' reporting" to embed during a small protest.[3] No clearer evidence of viewpoint

---

[3] Alex Zielinski, *Mayor Invites "Fair and Balanced" Reporters to Cover Protest From Police HQ*, Portland Mercury (Nov. 15, 2018),

discrimination is conceivable. And, as explained above, a viewpoint-discriminatory practice is unconstitutional. *Rosenberger*, 515 U.S. at 828; *Boos*, 485 U.S. at 321 (collecting cases).

### 3. Journalists and Observers Have No Alternative Forum

The police's policy of dispersing reporters and observers fails for the separate and independent reason that it leaves no alternative way for Plaintiffs and other journalists and legal observers to record and observe what the police are doing to disperse protesters. All of Plaintiffs' newsgathering and observing activities at issue took place on public streets and public open spaces. (Brown Decl. ¶¶ 12, 21; Gehrke Decl. ¶ 5; Lewis-Rolland Decl. ¶¶ 8, 10; Mahoney Decl. ¶¶ 7, 13; Rudoff Decl. ¶ 6; Woodstock Decl. ¶ 9.) Public streets are "the archetype of a traditional public forum." *Gaudiya Vaishnava Soc. v. City & Cty. of San Francisco*, 952 F.2d 1059, 1065 (9th Cir. 1990) (quoting *Frisby v. Schulz*, 487 U.S. 474 (1988)). "Public open spaces" such as parks are even more so, because they are "uniquely suitable for public gatherings and the expression of political or social opinion." *Long Beach Area Peace Network*, 574 F.3d at 1022 (quotation marks omitted).

When the government seeks to regulate access to traditional public fora, "First Amendment protections are at their strongest and regulation is most suspect." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) (quotation marks omitted). To justify such regulations, the government must meet an "extraordinarily heavy burden." *Id.* That burden is further increased when the forum is "host to core First Amendment speech," like newsgathering and reporting on government activity. *Long Beach Area Peace Network*, 574 F.3d at 1022; *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975) (explaining that the public relies on the press to "report fully and accurately the proceedings of government").

Even in traditional public fora, and even when core First Amendment speech is involved, the government may still place reasonable time, place, and manner restrictions. But to be valid

https://www.portlandmercury.com/blogtown/2018/11/15/24590776/mayor-invites-fair-and-balanced-reporters-to-cover-protest-from-police-hq.

under the First Amendment, such restrictions must be "content-neutral, narrowly tailored to serve a significant government interest, and retain ample alternative channels of communication." *Gaudiya Vaishnava*, 952 F.2d at 1065. In cases involving the "First Amendment-protected activity of observing a government operation," the regulation must leave open ample "alternative *observation* opportunities." *Reed v. Lieurance*, 863 F.3d 1196, 1211-12 (9th Cir. 2017) (emphasis added).

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). The public relies on the press to "report fully and accurately the proceedings of government." *Cox Broad. Corp.*, 420 U.S. at 491-92. This maxim is perhaps at its zenith when the "proceedings" at issue involve the government using force against the people. And journalists have *no* alternative opportunities—let alone "ample" opportunities—to observe and report on such uses of force than to be present when they take place. *Cf. Reed*, 863 F.3d at 1211-12.

Here, the police's use of force specifically takes place after they declare a protest "unlawful" and issue a dispersal order. (Millsap Decl. ¶ 5; Smith Decl. ¶ 11; Stenvick Decl. ¶ 5.) And yet, it is precisely then that the police declare the press must depart too, or else be subjected to the same use of force. (Borden Decl., Ex. 1.) "[I]f the location of the expressive activity is part of the expressive [conduct], alternative locations may not be adequate." *Long Beach Area Peace Network*, 574 F.3d at 1025. Here, the location is *crucial* to journalists' and observers' expressive conduct. There is no alternative location to the scene where the police are using violent force against the people. Thus, the police's dispersal policy is invalid because it fails to leave "ample observation opportunities" for legal observers and the press. *See Reed*, 863 F.3d at 1211-12.

### 4. The Police's Policy is Not Narrowly Tailored to Any Legitimate Government Objective

Even if the police policy was not unconstitutional for all of the reasons above, it would still very obviously violate the First Amendment because it is not narrowly tailored to protect any

legitimate government interest. It is not "tailored" whatsoever and, as a result, prohibits substantial amounts of constitutionally protected activities.

The First Amendment protects more than expression simpliciter; it also regulates when the government may "limit[] the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). When the government seeks to restrict access to government activity, the following standard applies:

> First, the court must determine whether a right of access attaches to the government proceeding or activity by considering 1) whether the place and process have historically been open to the press and general public and 2) whether public access plays a significant positive role in the functioning of the particular process in question. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.

*Leigh*, 677 F.3d at 898 (quotation marks and citation omitted). The police's policy cannot satisfy this standard.

First, protests have been traditionally covered by the press and protests are traditionally open to the general public. Further, press access to protests is critical to the process both because protests often occur to publicize a cause and because the press act as a key check against how the government treats protesters—all the more so where the protests are about police misconduct in the first place. *Leigh*, 677 F.3d at 900.

Second, the government has no legitimate interest, much less an "overriding interest," in excluding press and observers. The police might have a valid interest in protecting public safety, preventing vandalism or looting, or protecting themselves—but media and neutral observers present no such threat. To the contrary, as the Ninth Circuit explained in *Leigh*:

> By reporting about the government, the media are "surrogates for the public." When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate. If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press. Thus, courts have a duty to conduct a thorough and searching review of any attempt to restrict public access.

677 F.3d at 900 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)); *see also Cox Broad. Corp.*, 420 U.S. at 490-91 ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."); Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence.").

Further, the government's policy is not narrowly tailored to protect any legitimate interest in ensuring public safety or preventing crime because it does not exclude journalists and legal observers. Nor would it unduly burden police to require that they exempt journalists and observers from their dispersal orders. Plaintiffs, and other journalists and observers who have been attacked by police, were plainly identifiable as neutrals by their press passes, their blue vests, their equipment, and what they were doing when the police attacked them. (Brown Decl. ¶¶ 6, 10, 20, 23-24; Gehrke Decl. ¶ 3; Lewis-Rolland Decl. ¶ 7; Mahoney Decl. ¶¶ 2, 6; Rudoff Decl. ¶¶ 2-3 & Ex. 1; Woodstock Decl. ¶ 3; Tippie Decl. ¶ 3; Zielinski Decl. ¶¶ 3-4; Tracy Decl. ¶ 5; Olmos Decl. ¶ 3; Smith Decl. ¶ 3; Stenvick Decl. ¶ 3.) Because the police's dispersal policy makes no exemption or distinction for such obviously neutral parties engaging in constitutionally protected activities, it is overinclusive and therefore unconstitutional on its face and as applied to Plaintiffs. *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004).[4]

---

[4] Anyone recording the police is engaged in a protected activity. Such individuals also should not be targeted for violence or arrest—unless the police have probable cause to believe they engaged in looting, vandalism or violence.

**C.** **Kettling and Killboxing Journalists and Observers Violates the First Amendment**

Kettling and killboxing are law-enforcement tactics in which officers encircle a group of demonstrators, protestors, journalists, neutrals, and anyone else who happens to be in the area, without providing a means of egress, and then attack the group. (*E.g.*, Zielinski Decl. ¶ 6.) Kettling and killboxing journalists and observers has a chilling effect on the speech and constitutional rights of the press and observers and violates clearly established Fourth Amendment law. *Faulk v. City of St. Louis*, 2019 WL 5653576, at *4 (E.D. Mo. Oct. 31, 2019) (police use of kettling, if proven, would violate Fourth Amendment and would not be subject to qualified immunity).

The Portland police have a policy and practice of using kettling and killboxing to punish crowds. They have used kettling and killboxing during the current, ongoing protests. For instance, on June 2, the police sprayed a large group of protesters with tear gas from all sides, a traumatic experience recounted in Plaintiffs' declarations. (Zielinski Decl. ¶¶ 6-8; Stenvick Decl. ¶¶ 5-6; Humphrey Decl. ¶¶ 3-4; Tracy Decl. ¶ 7 (video).)[5] They have employed the same tactic in at least November 2014, January 2017, and June 2017.[6] The police know that this tactic is wrongful because kettling and killboxing violate the Bureau's official written policy, Directive 635.10 § 9, governing Crowd Dispersal, which provides that "riot control agents (RCAs) and/or special impact munitions may be deployed to prevent violence, injury or property damage and to avoid a greater application of force . . . only . . . when avenues of escape (i.e., clear path or route) are available to the crowd."

---

[5] Notably, this wanton cruelty came one day after police purchased $45,000 worth of riot-control agents and munitions, including rubber ball blast grenades that deploy tear gas. Tess Riski, *Portland Police Bureau Spent More Than $45,000 on Riot Control Agents and Munitions June 1*, Willamette Week (June 29, 2020), https://www.wweek.com/news/2020/06/29/portland-police-bureau-spent-more-than-45000-on-riot-control-agents-and-munitions-on-june-1/.

[6] The Portland police's kettling of protesters at the June 2017 demonstration is the subject of a class action lawsuit. *Haber v. City of Portland*, No. 3:17-cv-01827-JR (D. Or.). *See also* Maxine Bernstein, *Portland police deny 'kettling' of protesters in response to ACLU lawsuit*, The Oregonian (Jan. 19, 2019), https://www.oregonlive.com/portland/2018/01/portland_police_deny_kettling.html.

Such tactics serve no legitimate purpose and thus can only be retaliation for being present. They do not disperse protesters, nor are they designed to; the sole purpose is to inflict pain and suffering. (Zielinski Decl. ¶ 7; Stenvick Decl. ¶ 5.) When the police employ these tactics, it punishes journalists and neutral observers, including people in the back of the crowd, such as Plaintiff Sam Gehrke and *Portland Mercury* reporters Alex Zielinski and Blair Stenvick, who are trying to watch and record the events without participating. (Gehrke Decl. ¶ 4; Zielinski Decl. ¶¶ 6-7; Stenvick Decl. ¶¶ 4-5.) Being subjected to this retribution has chilled reporters and observers from performing protected activities. For the same reasons above, Defendants' tactics of kettling and killboxing journalists and observers violates the First Amendment.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION

Every minute that Plaintiffs are inhibited and intimidated from exercising their First Amendment rights, they suffer irreparable injury. Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their constitutionally protected right to record police activity in public has been infringed, the irreparable injury element is met.

"[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier*, 418 F.3d at 1001-02 (quotation marks omitted); *see also* 11A Charles Alan Wright, *Fed. Prac. & Proc.*, § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Not only have Plaintiffs shown an overwhelming likelihood of success, they have also shown immediate and threatened irreparable harms—including their inability to record events that will not recur. The protests are ongoing daily, and they will only intensify as the Fourth of July holiday approaches. (Humphrey Decl. ¶ 5.) Plaintiffs want to attend—to observe, to document, and to report. (Brown Decl. ¶ 27; Gehrke Decl. ¶ 10; Lewis-Rolland Decl. ¶ 13; Mahoney Decl. ¶ 23; Rudoff Decl. ¶ 8; Woodstock Decl. ¶ 11.) Indeed, some of them *will*

attend—and given the repeated pattern of conduct documented in the evidence submitted with this motion, they will suffer at the hands of the police. (Brown Decl. ¶¶ 9, 16, 18, 27; Mahoney Decl. ¶¶ 7-12, 23; Woodstock Decl. ¶¶ 8, 11.)

Plaintiffs already have been injured in their constitutionally protected rights to report: All journalists covering the protests, even those who have not found themselves the direct targets of this harassment, necessarily fear for their continued physical safety in light of the tactics that the police have consistently employed over the last several years, which they have warned that they will continue to use based on their unlawful policy, and which they have continually deployed pursuant to their unlawful policy in a consistent pattern over the last several weeks. (Woodstock Decl. ¶ 11; Rudoff Decl. ¶ 8; Brown Decl. ¶ 27; Mahoney Decl. ¶ 23; Gehrke Decl. ¶¶ 7-10; Olmos Decl. ¶¶ 6-8; Putnam Decl. ¶¶ 8-10; Lewis-Rolland Decl. ¶ 13 ("Soon after these events, I printed out a t-shirt that said 'PRESS' on it. My intention was to wear it to identify myself as press so that I wouldn't be a target. In fact, however, I am apprehensive that it will make me more of a target.").) Thus, Defendants' conduct is chilling the speech of reporters and observers who are or would be observing, covering, recording, and recounting these important events to a worldwide audience.

Defendants' unconstitutional policy also constitutes an irreparable injury because it is actively restricting speech. *Rohman v. City of Portland*, 909 F. Supp. 767, 775 (D. Or. 1995) (noting that "prolong[ing] a deprivation" of First Amendment freedoms, "for any degree of time, constitutes irreparable injury"). For all these reasons, the irreparable injury requirement is met.

## III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

### A. The Public Has an Unassailable Interest in a Free Press

"Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*,

695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under Fourth Amendment).

Plaintiffs are journalists and observers reporting on public demonstrations of worldwide interest. As members of the news media, they were given express permission by the Mayor's curfew order to be at the protest sites so they could provide live, up-to-date coverage of the activities of protesters and demonstrators, and also monitor the conduct of law enforcement.[7] This express permission is an acknowledgement of the uniquely significant public interest in press coverage in this case. In the context of the violent, destructive events of recent weeks, the public's interest in having information of this nature in a timely manner is obvious and constitutionally unassailable.

It would be difficult to identify a situation in which the public has a greater interest in unbiased media coverage of police conduct than this one. The protests are rooted in an incident of shocking police brutality, and how the police respond to the protesters is of critical importance to how and whether the community will be able to move forward. Although the protests began in Minneapolis, they have now spread across the country and the globe. The public interest in press coverage of these events cannot be reasonably questioned.

"The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times*, 376 U.S. at 270. It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citation omitted), and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v.*

---

[7] Emergency Executive Order Declaring an Emergency and Implementing a Temporary Nighttime Curfew in the City of Portland Oregon (May 30, 2020), https://www.portland.gov/sites/default/files/2020-05/5.30.20-mayors-state-of-emergency-.pdf.

*Superior Court*, 457 U.S. 596, 604 (1982). Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

**B.      The Balance of Equities Weighs Strongly in Favor of Plaintiffs**

Because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted). Plaintiffs' evidence—both video and testimony—shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish journalists for recording police conduct and that their unlawful policy is aimed toward the same end. In contrast to the substantial and irreparable injuries to Plaintiffs, any harm to the police would be negligible. The police have no interest in preventing journalists from reporting on what they are doing to protesters. While the police might have an interest in maintaining order and public safety, that interest is not served by using force against individuals who are identified as journalists, or who are merely recording events and present no threat of harm to police or the public.

The balance of equities weighs heavily in favor of Plaintiffs.

* * *

The police's attempts to shield their violence against protesters from public scrutiny by targeting press and legal observers shows, once again, that "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900. But just as the "free press is the guardian of the public interest," so "the independent judiciary is the guardian of the free press." *Id.* To protect the press—and ultimately, the public's power to govern its public servants—this Court should enjoin the police from dispersing and retaliating against press and legal observers.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Motion for a temporary injunction and preliminary injunction be granted.

Dated: June 30, 2020                           Respectfully Submitted,

                                               By: <u>s/*Athul K. Acharya*</u>
                                                   Athul K. Acharya, OSB No. 152436
                                                   Matthew Borden
                                                   J. Noah Hagey
                                                     Gunnar K. Martz
                                                   BRAUNHAGEY & BORDEN LLP

                                                   Kelly K. Simon, OSB No. 154213
                                                   ACLU FOUNDATION OF OREGON

                                                   *Attorneys for Plaintiffs*