IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TUCK WOODSTOCK; DOUG BROWN; SAM GEHRKE; MATHIEU LEWIS-ROLLAND; KAT MAHONEY; JOHN RUDOFF; and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND; and JOHN DOES 1-60,<br><br>Defendants. | Case No. 3:20-cv-1035-SI<br><br>**TEMPORARY RESTRAINING ORDER** |

Matthew Borden, J. Noah Hagey, Athul K. Acharya, and Gunnar K. Martz, BRAUNHAGEY & BORDEN LLP, 351 California Street, Tenth Floor, San Francisco, CA 94104; Kelly K. Simon, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON, P.O. Box 40585, Portland, OR 97240. Of Attorneys for Plaintiffs.

Naomi Sheffield and Denis M. Vannier, Deputy City Attorneys, OFFICE OF THE PORTLAND CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs Tuck Woodstock, Doug Brown, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, and John Rudoff (collectively, "Plaintiffs") bring this putative class action against the City of Portland (the "City") and numerous as-of-yet unnamed individual and supervisory

PAGE 1 – TEMPORARY RESTRAINING ORDER

officers of the Portland Police Bureau ("PPB") and other agencies allegedly working in concert with the PPB. As alleged in the Complaint, Plaintiffs seek "to stop the Portland police from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd." Complaint, ¶ 1 (ECF 1). Plaintiffs assert that "[t]he police's efforts to intimidate the press and suppress reporting on the police's own misconduct offends fundamental constitutional protections and strikes at the core of our democracy." *Id*. Plaintiffs allege violations of the First and Fourth Amendments of the United States Constitution and Article I, sections 8 and 26 of the Oregon Constitution. Plaintiffs request declaratory and injunctive relief and money damages. Pending before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. ECF 7. The Court has reviewed Plaintiffs' motion and 19 supporting declarations. Although Defendants have not yet formally appeared in this lawsuit or had sufficient time to file any responsive documents, on July 1 and July 2, 2020, the Court heard the respective positions of the parties by telephone conference. For the reasons explained below, Plaintiffs' motion for a temporary restraining order ("TRO") is granted in part.

## STANDARDS

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that

an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

Plaintiff Tuck Woodstock has been a journalist for seven years. Their work has been published in the *Washington Post, NPR, Portland Monthly, Travel Portland,* and the *Portland Mercury*. They has attended the George Floyd protests several times as a freelancer for the *Portland Mercury* and more times as an independent journalist. When they attended these protests, they wears a press pass from the *Portland Mercury* that states "MEDIA" in large block letters. At all times during police-ordered dispersals, They holds a media badge over their head. ECF 23, ¶¶ 2-3.

Plaintiff Doug Brown has attended many protests in Portland, first as a journalist with the *Portland Mercury* and later as a volunteer legal observer with the ACLU. He has attended the George Floyd protests on several nights, wearing a blue vest issued by the ACLU that clearly identifies him as a legal observer, for the purpose of documenting police interactions with protesters. ECF 9, ¶¶ 1-2.

PAGE 3 – TEMPORARY RESTRAINING ORDER

Plaintiff Sam Gehrke has been a journalist for four years. He previously was on the staff of the *Willamette Week* as a contractor. He now is a freelance journalist. His work has been published in *Pitchfork*, *Rolling Stone*, *Vortex Music*, and *Eleven PDX*, a Portland music magazine. He has attended the protests in Portland during the last month for the purpose of documenting and reporting on them, and he wears a press pass from the *Willamette Week*. ECF 10, ¶¶ 1-3.

Plaintiff Mathieu Lewis-Rolland is a freelance photographer and photojournalist who has covered the ongoing Portland protests. He has been a freelance photographer and photojournalist for three years and is a regular contributor to *Eleven PDX*. He is listed on its masthead. ECF 12, ¶¶ 1-2.

Plaintiff Kat Mahoney is an independent attorney and unpaid legal observer. She has attended the Portland protests nearly every night for the purpose of documenting police interactions with protesters. She wears a blue vest issued by the ACLU that clearly identifies her as an "ACLU LEGAL OBSERVER." ECF 13, ¶¶ 1-2; ECF 26, ¶ 3.

Plaintiff John Rudoff is a photojournalist. His work has been published internationally, including reporting on the Syrian refugee crises, the "Unite the Right" events in Charlottesville, Virginia, the Paris "Yellow Vest" protests, and the Rohingya Genocide. He has attended the protests in Portland during the past month for the purpose of documenting and reporting on them. While attending the Portland protests, he carries and displays around his neck press identification from the National Press Photographers Association, of which he has been a member for approximately ten years. He also wears a helmet that is clearly marked "Press." ECF 17, ¶¶ 1-3.

Plaintiffs and other declarants have submitted evidence of PPB officers targeting journalists. For example, Tuck Woodstock reports that on several nights, the police have

announced that any members of the press who remain in a specified area "will be arrested alongside protesters." ECF 23, ¶ 10. In addition, on June 30, 2020, Ms. Mahoney attended the protests in North Portland as a legal observer. She wore a blue ACLU-issued vest that clearly identifies her as a legal observer. Her vest reads "ACLU LEGAL OBSERVER," in big block letters across the back and smaller lettering on the front. Ms. Mahoney states that a police officer slammed her in the back with a truncheon, striking her diagonally from the base of her right shoulder blade to her lower left side, across her spine and ribcage. Another officer ran up to her, yelled, "MOVE," and shoved her. She stumbled into a protester and had to be helped to her feet, all while wearing her blue ACLU-issued legal observer vest with the words "ACLU LEGAL OBSERVER" plainly visible. She adds that she also saw the police chase and attempt to beat two other legal observers who also were clearly marked as legal observers. ECF 26, ¶¶ 3, 9, 13.

Declarant Alex Milan Tracy is a journalist with a master's degree in photojournalism. He reports seeing PPB officers arresting photojournalist Justin Yau and journalists Cory Elia and Lesley McLay after the arresting officers were informed that these people were credentialed members of the press. Declarant Tracy adds that the police removed Ms. McLay's press badge during her arrest. ECF 28, ¶¶ 1, 8-12. Declarant Tracy also reports that in the early hours of June 16th, he was documenting police officers, when one officer told Mr. Tracy to "get out of here now" or he would be arrested. According to Mr. Tracy, the officer added, "I don't care if you're press, get out of here right now." ECF 22, ¶ 12.

The First Amendment prohibits any law "abridging the freedom of speech, or of the press[.]" U.S. Const., amend. I. Although the First Amendment does not enumerate special rights for observing government activities, "[t]he Supreme Court has recognized that newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361

(9th Cir. 1978); *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

As the Ninth Circuit has explained: "Open government has been a hallmark of our democracy since our nation's founding." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012). Further, "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Id.* at 898. By reporting about the government, the media are "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (Burger, C.J., announcing judgment); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). As further described by the Ninth Circuit, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900 (quoting Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence.")).

Addressing the requirements for granting a temporary restraining order, because Defendants have not yet entered a formal appearance or had a sufficient opportunity to respond to the allegations and evidence, it would be unfair at this time for the Court to conclude that Plaintiffs have shown a substantial likelihood of success on the merits. There is, however, nothing unfair in the Court recognizing now that Plaintiffs have shown, at the minimum, serious questions going to the merits. In *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"),

PAGE 6 – TEMPORARY RESTRAINING ORDER

478 U.S. 1 (1986), the Supreme Court established a two-part test for right of access claims. First, the court must determine whether a right of access attaches to the government proceeding or activity by considering (1) whether the place and process have historically been open to the press and general public and (2) whether public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise II*, 478 U.S. at 8-9. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. at 9 (citation omitted); *see also Leigh*, 677 F.3d at 898 (discussing *Press-Enterprise II*). The public streets historically have been open to the press and general public, and public observation of police activities in the streets plays a significant positive role in ensuring conduct remains consistent with the Constitution. Further, there are at least serious questions regarding the police tactics directed toward journalists and other legal observers and whether restrictions placed upon them by the PPB are narrowly tailored.

Next, anytime there is a serious threat to First Amendment rights, there is a likelihood of irreparable injury. "[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (quotation marks omitted); *see also* 11A Charles Alan Wright, Federal Practice & Procedure, § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

PAGE 7 – TEMPORARY RESTRAINING ORDER

Regarding the public interest, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment). Finally, because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted).

Accordingly, the Court grants in part Plaintiffs' motion for TRO (ECF 7) and Orders as follows:

## TEMPORARY RESTRAINING ORDER

1. Defendants and their agents and employees, including but not limited to the Portland Police Bureau and all persons acting under the direction of the Portland Police Bureau (collectively, "the Police"), are enjoined from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), unless the Police have probable cause to believe that such individual has committed a crime. For purposes of this Order, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse. Such persons shall, however, remain bound by all other laws.

2. Defendants and their agents and employees, including but not limited to the Portland Police Bureau and all persons acting under the direction of the Portland Police Bureau (collectively, "the Police"), are further enjoined from seizing any photographic equipment,

PAGE 8 – TEMPORARY RESTRAINING ORDER

audio- or video-recording equipment, or press passes from any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), or ordering such person to stop photographing, recording, or observing a protest, unless Defendants are also lawfully seizing that person consistent with this Order. Police must return any seized equipment or press passes immediately upon release of a person from custody.

3. To facilitate the Police's identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or distinctive clothing that identifies the wearer as a member of the press. These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order. The Police shall not be liable for unintentional violations of this Order in the case of an individual who does not carry a press pass or wear a press badge or distinctive clothing that identifies the wearer as a member of the press.

4. To facilitate the Police's identification of Legal Observers protected under this Order, the following shall be considered indicia of being a Legal Observer: wearing a green National Lawyers' Guild issued or authorized Legal Observer hat (typically a green NLG hat) or wearing a blue ACLU issued or authorized Legal Observer vest.

5. The Police may issue otherwise lawful crowd-dispersal orders for a variety of lawful reasons. The Police shall not be liable for violating this Order if a Journalist or Legal Observer is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed after the issuance by the Police of an otherwise lawful dispersal order.

6. In the interest of justice, Plaintiffs need not provide any security, and all requirements under Rule 65(c) of the Federal Rules of Civil Procedure are waived.

PAGE 9 – TEMPORARY RESTRAINING ORDER

7.  This Order shall expire fourteen (14) days after entry, unless otherwise extended by stipulation of the parties or by further order of the Court.

8.  The parties shall confer and propose to the Court a schedule for briefing and hearing on whether the Court should issue a preliminary injunction.

**IT IS SO ORDERED.**

DATED this 2nd day of July, 2020, at 4:55 p.m.

_____
Michael H. Simon
United States District Judge

PAGE 10 – TEMPORARY RESTRAINING ORDER