**Matthew Borden**, *pro hac vice* application pending
borden@braunhagey.com
**J. Noah Hagey**, *pro hac vice* application pending
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, *pro hac vice* application pending
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>**CITY OF PORTLAND**, a municipal corporation; and **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert,<br><br>        Defendants. | Case No. 3:20-cv-1035-SI<br><br><br>**CLASS ACTION ALLEGATION FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau, on behalf of themselves and those similarly situated, allege as follows:

## **INTRODUCTION**

1.     This case seeks to stop the Portland police[1] from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd. The police's efforts to intimidate the press and suppress reporting on the police's own misconduct offends fundamental constitutional protections and strikes at the core of our democracy.

2.     Plaintiffs are a newspaper, members of the media, and legal observers, who have a right to witness important public events and recount them to the world. Plaintiff Portland Mercury is a newspaper that has been reporting on critical events for the last two decades. Plaintiffs Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Sergio Olmos, John Rudoff, Alex Tracy, Tuck Woodstock, and Justin Yau are journalists whom the Portland police attacked with flash-bang grenades, rubber bullets, and tear gas merely for seeking to cover the protests. Plaintiffs Kat Mahoney and Doug Brown are neutral legal observers whom the Portland police assaulted with batons, rubber bullets, and tear gas simply for watching how they were treating demonstrators. Plaintiff Class is comprised of all journalists and legal observers who have or will be attacked or forcefully dispersed by Defendants pursuant to their unlawful policy of targeting and dispersing neutrals.

3.     The police retaliation against Plaintiffs is part of a broader pattern: The Portland police have repeatedly and intentionally shot, gassed, and beaten journalists and observers covering the George Floyd demonstrations.

---

[1] For convenience, the term "Portland police" in this Complaint refers to officers of the Portland Police Bureau as well as any officers of other law enforcement agencies working in concert with the Portland Police Bureau within the City of Portland.

4.      On June 2, the police tear-gassed reporters Alex Zielinski and Blair Stenvick of Plaintiff Portland Mercury; Plaintiffs Gerhke, Mahoney, and Tracy; and many other journalists and legal observers.

5.      On June 3, the police physically assaulted KBOO reporter Cory Elia, even though he identified himself as press, because he was recording them. Video here: https://tinyurl.com/EliaAssaulted.

6.      On June 6, the police hit freelance journalist Plaintiff Sergio Olmos with a truncheon and threatened to tear gas him because he was recording them. His press pass was clearly visible. Video here: https://tinyurl.com/OlmosBeaten.

7.      On June 7, the police attacked Donovan Farley with a wooden bat and sprayed him in the face with tear gas or pepper spray while he was trying to walk away from them. He had identified himself as press and was filming several police officers kneeling on a protester's neck, Derek Chauvin-style. Video here: https://tinyurl.com/FarleyBeatenAndSprayed.



*Figure 1: Farley films the arrest (1); one officer approaches him, truncheon aloft (2); officer beats Farley as he retreats (3); officer sprays Farley as he retreats (4).*

8.      On June 7, the police attacked Mr. Elia again—this time with a blast of tear gas to the face. Mr. Elia was holding up his press pass, and police knew he was press when they attacked him. Video here: https://tinyurl.com/EliaSprayed.

9.      On June 13, the police slammed reporter Beth Nakamura of *The Oregonian* in the back with a truncheon. She had her hands up, press pass in hand, and was saying "press, press." The officer responded: "I don't give a fuck."

10.     Also on June 13, the police ordered reporter Zane Sparling of *The Portland Tribune* to leave an area where they were enforcing a dispersal order against protesters. Sparling responded that he was media. The officer responded: "I don't give a shit! Go!" He then shoved Mr. Sparling into a wall, and another officer shot a crowd-control munition at his heel. Video here: https://tinyurl.com/SparlingAssaulted.

11.     On June 14, the police announced that they would use force to disperse reporters and protestors alike—except for select reporters that they allowed to "imbed" with police. This viewpoint-based restriction on speech violates the rights of the press to observe and report on important events. It is not narrowly tailored to achieve any legitimate government objective; rather, it is designed to prevent the press from exposing police violence. Nor could any law preventing coverage of protests pass constitutional muster because there is no compelling need to preclude the media from observing and reporting. Defendants' policy remains in place, is being used to remove journalists and observers, and is chilling reporters and observers from monitoring and reporting on important events.

12.     Thereafter, the police continued their attacks on journalists and legal observers.

13.     On the night of June 15-16, the police noticed Plaintiff Conley using his camera and launched at least one flash-bang grenade directly at him. He was nowhere near any protesters and there was no other target at which the police could have been aiming. The police later charged at him, after telling him that it did not matter if he was media. Plaintiff Conley fell over while running away and only narrowly avoided a traumatic head injury.

14.     On June 19, the police shot Plaintiff Rudoff with pepper balls.

15.     The day after this lawsuit was filed, the police intensified their attacks on journalists and legal observers. They struck Plaintiff Mahoney with a truncheon across the back, where the words "ACLU LEGAL OBSERVER" are emblazoned on her vest; they arrested Plaintiff Yau; they assaulted Plaintiff Woodstock; and they arrested two other journalists, Cory Elia and Lesley McLam.

16.     Many other journalists have reported that they have been specifically targeted.[2] Indeed, members of the Plaintiff Class have petitioned Portland Mayor Ted Wheeler "to ensure that the Portland Police Bureau ceases assaulting and intimidating reporters."[3]

17.     In addition to intentionally targeting reporters and observers, the police are using indiscriminate force to punish them along with demonstrators. For instance, on June 2, the police sprayed a large group of protesters with tear gas from all sides in what is known as a "kettling" or "killbox" military strategy. Killboxing protesters cannot disperse them. Its sole purpose is to inflict pain and suffering. The police gassed many journalists and observers in this operation, including Plaintiffs Gehrke, Mahoney, and Tracy, as well as reporters Alex Zielinski and Blair Stenvick of Plaintiff Portland Mercury.

18.     Intimidating reporters is the craft of the world's most oppressive regimes and has no place in Portland—or anywhere else in the world.[4] As the Ninth Circuit has observed, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012).

---

[2] Rebecca Ellis, *Police Keep Injuring Journalists Covering Portland Protests*, OPB (June 15, 2020), https://www.opb.org/news/article/portland-journalists-harmed-covering-george-floyd-blm-protests/.

[3] *Mayor Wheeler: Protect journalists and the First Amendment*, Change.org, https://www.change.org/p/mayor-ted-wheeler-mayor-wheeler-protect-the-first-amendment (last visited June 24, 2020, 1:39 P.M.).

[4] *See, e.g.*, *Syrian Forces Aimed to Kill Journalists, U.S. Court Is Told*, N.Y. Times (Apr. 9, 2018), https://www.nytimes.com/2018/04/09/world/middleeast/syria-marie-colvin-death.html; *Duterte Says Journalists in the Philippines 'Are Not Exempt from Assassination'*, Time (June 1, 2016), https://time.com/4353279/duterte-philippines-journalists-assassination/; *Violence against Journalists Escalates in Hong Kong*, Reporters Without Borders (Aug. 13, 2019), https://rsf.org/en/news/violence-against-journalists-escalates-hong-kong.

19.     Plaintiffs seek monetary damages and prospective injunctive relief so that they can report on police activities without fear of being targeted for punishment.

## PARTIES

20.     Plaintiff Portland Mercury is an alternative bi-weekly newspaper and media company founded in 2000 in Portland, Oregon. Its headquarters are at 115 SW Ash Street, Suite 600, Portland, OR 97204. It is published by Index Newspapers LLC, a Washington limited-liability company.

21.     Plaintiff Doug Brown is an Oregon resident who lives in the City of Portland. He has attended protests in Portland every year since 2016, first as a journalist with the *Portland Mercury* and then as a volunteer legal observer with the ACLU. He has attended the George Floyd protests on several nights for the purpose of documenting police interaction with protesters.

22.     Plaintiff Sam Gehrke is an Oregon resident who lives in the City of Portland. He is a freelance photojournalist whose work has been published in *Pitchfork*, *Rolling Stone*, *Vortex Music*, and *Eleven PDX*. He has attended the protests in Portland on several nights for the purpose of documenting and reporting on them.

23.     Plaintiff Mathieu Lewis-Rolland is an Oregon resident who lives in the City of Portland. He is a photographer for *Eleven PDX*, and his work has also been featured in local news outlets and on the official website for the City of Portland. He attended protests in Portland on several nights for the purpose of documenting them.

24.     Plaintiff Kat Mahoney is an Oregon resident who lives in the City of Portland. She is an independent attorney and volunteers as a legal observer with the ACLU. She has attended the protests nearly every night for the purpose of documenting police interaction with protesters.

25.     Plaintiff Sergio Olmos is an Oregon resident who lives in the City of Portland. His work has been published in the *Portland Tribune*, the *Willamette Week*, *Reveal: The Center for Investigative Reporting*, *Crosscut*, *The Columbian*, and *InvestigateWest*. He has attended the

protests as a freelance journalist on many nights for the purpose of documenting and reporting on them.

26.     Plaintiff John Rudoff is an Oregon resident who lives in the City of Portland. He is a photojournalist whose work has been published internationally, including extensive reporting on the Syrian refugee crisis, the 'Unite the Right' events in Charlottesville, Virginia, the Paris 'Yellow Vest' protests, and the Rohingya Genocide. He has covered protests (among other things) in Portland for more than five years, and his work has appeared in the *New York Times*, the *Guardian*, CBS, and ABC, among other sites. He has attended the protests in Portland on many nights for the purpose of documenting and reporting on them.

27.     Plaintiff Alex Milan Tracy is an Oregon resident who lives in the City of Portland. He has published his work in local and national publications, including the Associated Press. He has attended the protests as a freelance journalist on many nights for the purpose of documenting and reporting on them.

28.     Plaintiff Tuck Woodstock is an Oregon resident who lives in the City of Portland. They have been a journalist for seven years and their work has been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They have attended the protests in Portland over the last six weeks over 20 times as a freelance and independent journalist for the purpose of documenting and reporting on them.

29.     Plaintiff Justin Yau is an Oregon resident who lives in the City of Portland. He has covered protests in Hong Kong and Portland. He is a student at the University of Portland studying communications under the G.I. Bill, with a focus on journalism; before that, he served in the U.S. Army, where he was deployed to the Middle East in support of Operation Inherent Resolve. His work has been published in the *Daily Mail*, *Reuters*, and msn.com. He has attended the protests in Portland as a freelance and independent journalist for the purpose of documenting and reporting on them.

30.     Defendant City of Portland is a municipality incorporated in the State of Oregon. As a local governmental entity, the City of Portland is a juridical entity under 42 U.S.C. § 1983. The Bureau is a department or division of the City.

31.     Defendant John Does 1-20 are police officers employed by the City who directly assaulted Plaintiffs and members of the Plaintiff Class. They are sued in their individual capacity.

32.     Defendant John Does 21-30 are supervisory officials whose liability could include their own culpable action or inaction in the training, supervision, or control of their subordinates, their acquiescence in the constitutional deprivations alleged here, or conduct showing a reckless or callous indifference to the rights of Plaintiffs. They are sued in their individual capacity.

33.     Defendant John Does 31-60 are individual and supervisory officers of other law enforcement agencies, including but not limited to the Clackamas County Sheriff's Office, Clark County Sheriff's Office, Multnomah County Sheriff's Office, Washington County Sheriff's Office, Port of Portland Police, Gresham Police, Vancouver Police, Washougal Police, Oregon State Police, and the Oregon National Guard, who are working under the Portland Police Bureau's direction and control pursuant to PPB Directive 635.10 § 7 ("The Bureau may request assistance from other law enforcement agencies . . . . The Bureau [Incident Commander] shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when force may be used and when to deploy less lethal munitions to address civil disturbance and/or disperse the crowd."). Does 31-60 are acting in concert with and as agents of the City and Does 1-30.

34.     The Doe Defendants have concealed their identities and their names or they are not yet fully known to Plaintiffs. On information and belief, Does 1-60 are responsible for the conduct alleged herein.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

36.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

## FACTUAL ALLEGATIONS

### A.     The Police Murdered George Floyd

37.     On May 25, 2020, the police killed George Floyd in Minneapolis, Minnesota.

38.     Mr. Floyd was the most recent in a long list of Black victims of police brutality, many of which caused protests across the nation. In Portland alone, the police have killed several Black people, including Quanice Hayes, Terrell Johnson, Keaton Otis, Aaron Campbell, Patrick Kimmons, Darris Johnson, and Kendra James. Some other well-known victims of lethal police force include Michael Brown, Breonna Taylor, Tamir Rice, Philando Castile, Freddie Gray, Walter Scott, Botham Jean, Atiana Jefferson, and, of course, Eric Garner, whose last words echoed those of Mr. Floyd: "I can't breathe."

39.     Videos of Mr. Floyd's murder were widely and rapidly disseminated around the world and catalyzed protests across the country in every major city.

### B.     Portland Police Use Brutal Force Against Demonstrators Protesting Police Brutality

40.     In Portland, for over six weeks, thousands of people have gathered every night to protest and mourn Mr. Floyd's murder and insist that our institutions start ensuring that Black lives matter. These protests continue to the present day.

41.     One focal point for protesters has been the "Justice Center" in downtown Portland. The building houses the police's central precinct, which includes offices for their command staff, a few county courtrooms, and a county jail where hundreds of people—disproportionately Black—are warehoused in small cage-like cells. Both Portland police arrest data and Multnomah County criminal justice data reveal that Black residents are disproportionately harmed by every part of the criminal justice system from arrest through

prosecution and sentencing.[5] The Justice Center is, in short, a perfect symbol of the iniquities protesters are demonstrating against.

42.     With limited exceptions, these protests have been overwhelmingly peaceful. But nearly every night, the Portland police have used increasingly severe tactics to deter speech on this important issue.

43.     Portland police have shot rubber bullets into crowds of protesters. Rubber bullets are 40mm-wide "pain compliance devices." They are designed to "provide sufficient pain stimulus" to "incapacitat[e] … an aggressive, non-compliant subject." But they can be lethal, especially if they hit someone in the head. Figure 2 depicts a round that an officer shot at one protester's head as he was retreating with his hands up. Figure 3 depicts the severe type of injury such a round can inflict, even when it impacts only a large muscle group on a young, healthy individual.



*Figure 2: Left, the manufacturer's image of the 40mm eXact iMpact Sponge Round.*
*Right, a rubber bullet that Portland police officers fired at a retreating, compliant protester.*

---

[5] W. Haywood Burns Institute for Justice Fairness and Equity, *Racial and Ethnic Disparities in Multnomah County* (Nov. 2019), https://multco.us/file/84525/download.



*Figure 3: An example of the severe injuries rubber bullets can inflict.*

44.    Portland police have also deployed multiple types of tear gas, including Agent CS, phenacyl chloride, and oleoresin capsicum. The use of tear gas is banned in warfare.[6] It can cause inflammation, coughing, wheezing, vomiting, blistering, burns, and breathing difficulty or airway closure, especially in people with respiratory conditions.[7] Its use is especially deadly during the current coronavirus pandemic, because it (1) "weaponizes" infected individuals to become "efficient transmitter[s] of infection"; (2) makes those not infected more likely to become infected; and (3) makes coronavirus more deadly to those it infects.[8] Nevertheless, the police used tear gas indiscriminately against protesters nearly every night for the first week of protests and many nights since then.

---

[6] *Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare*, June 17, 1925, 26 U.S.T. 571.

[7] *Health Impacts of Crowd-Control Weapons: Chemical Irritants (Tear Gas and Pepper Spray)*, Physicians for Human Rights (Jan. 1, 2017), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-chemical-irritants-tear-gas-and-pepper-spray/.

[8] Expert Declaration of Peter Chin-Hong ¶¶ 6-7, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 24.

45.     On June 6, Mayor Wheeler supposedly suspended the use of tear gas.[9] On June 9, this Court enjoined the police from using tear gas unless "the lives or safety of the public or the police are at risk," and specifically ordered the police not to use tear gas "to disperse crowds where there is no or little risk of injury."[10] Nevertheless—defying this Court's Order—Portland police have continued to use tear gas.

46.     The police have also beat protesters with truncheons and shot them with flash-bang grenades with little or no warning, in the absence of any danger to the public, police, or property.

47.     The police's use of disproportionate force against demonstrations over police violence against people of color follows the Portland police's prolific history of excessive force against people of color, including the shootings of Quanice Hayes in 2017, Denorris McClendon in 2015, Keaton Otis and Aaron Campbell in 2010, and Kendra James in 2003. In 2012, the U.S. Department of Justice filed suit against the City "to remedy a pattern or practice of unconstitutional uses of force by officers of the Portland Police Bureau,"[11] which was settled by a consent decree in 2015.[12] The decree has not resulted in a less brutal police force.[13]

C.     **Both the Protests and the Police's Handling of Them Garner National Interest and Are Widely Discussed in the Press and Other Public Fora**

48.     Nationwide protests over the murder of George Floyd have garnered coverage in every major news outlet. They have been discussed in the *New York Times*, the *Washington Post*, the *Los Angeles Times*, and the *Chicago Sun-Times*. They have been featured on MSNBC, CNN, and Fox News. Every local paper has covered them.

---

[9] Nicole Chavez, *Portland is the latest city to suspend the use of tear gas on protesters*, CNN (June 6, 2020), https://www.cnn.com/2020/06/06/us/portland-police-tear-gas-protests/index.html.

[10] Order, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 29.

[11] Complaint, *United States v. City of Portland*, No. 3:12-cv-2265-SI (Dec. 17, 2012), Dkt. 1.

[12] Amended Order Entering Settlement Agreement Conditionally Dismissing Litigation, *id.*, Dkt. 99.

[13] Alex Zielinski, *Hall Monitor: Checking Boxes*, Portland Mercury (Nov. 7, 2019), https://www.portlandmercury.com/opinion/2019/11/07/27438204/hall-monitor-checking-boxes.

49.     The police's violent response to the protests has also been the subject of national attention. The *New York Times* wrote about the 99 U.S. cities where police used tear gas against protesters.[14] The *Washington Post* covered police violence in Richmond, Virginia.[15] The *L.A. Times* demanded an investigation of police violence in Los Angeles.[16] In cities across the country, citizens have protested, police have overreacted—and the press has been there to document and report on everything.

50.     Or nearly everything. In a brazen effort to suppress speech, Portland police have taken to beating, gassing, and arresting journalists and observers as well as protesters.

**D.      The Police's Pattern of Intentionally Targeting and Retaliating Against Journalists and Observers**

51.     Since the protests began, the Portland police have been intentionally and indiscriminately attacking neutral members of the press and legal observers. This conduct has intimidated journalists and neutrals and reduced the number of media and observers willing to attend protests and to stay to document and observe the protests. The police's conduct is part of a longstanding pattern of assaulting and threatening members of the press to prevent them from telling the public about the police's conduct.

**1.      Police Threaten and Arrest Plaintiff Yau**

52.     Plaintiff Yau is a freelance journalist who has covered the ongoing Portland protests. He wears a black helmet that says "PRESS" in white letters on both sides, a glo-vest that says "PRESS" on the front and the back, and a press pass around his neck; he carries an SLR

---

[14] K.K. Rebecca Lai et al., *Here Are the 99 U.S. Cities Where Protesters Were Tear-Gassed*, N.Y. Times (June 17, 2020), https://www.nytimes.com/interactive/2020/06/16/us/george-floyd-protests-police-tear-gas.html.
[15] Gregory S. Schneider, *Police fire chemical irritant, rubber bullets at Richmond protesters outside police headquarters*, Wash. Post (June 15, 2020), https://www.washingtonpost.com/local/richmond-police-fire-pepper-spray-at-protesters-in-standoff-near-police-headquarters/2020/06/14/be1ccb26-aeac-11ea-8f56-63f38c990077_story.html.
[16] *Editorial: LAPD's violence against protesters demands investigation*, L.A. Times (June 9, 2020), https://www.latimes.com/opinion/story/2020-06-09/excessive-lapd-protest-response.

camera around his neck and a gimbal video camera on his backpack. He is unmistakably present in a journalistic capacity. He attends the protests five to six nights per week in this capacity.

53.     On June 5, Mr. Yau was covering the police's dispersal of a crowd with two other journalists. They remained in front of the police skirmish line, but police yelled at them that "you have to pick up the pace—you're interfering at this point and you will be arrested. Let's go— FASTER!"

54.     Mr. Yau and his colleagues informed the police that they were press. The police responded: "You'd better start running!"[17]

55.     In the early hours of July 1, only a day after Plaintiffs filed this lawsuit, Mr. Yau was attending a protest in North Portland that the police had begun to disperse. He was 30-45 feet away from the police skirmish line, documenting a female protester walking slowly by herself, when he heard the leader of the skirmish line order her to "move to the sidewalk or you will be hurt." He began filming.

56.     Officers sprinted forward to tackle, mace, and arrest her.

57.     A second later, as he was on the sidewalk, filming, Mr. Yau himself was tackled by several officers. All of his fragile equipment hit the ground at high speed. His phone flew out of his hands and his DSLR crashed to the ground with him, as did his gimbal camera.

58.     At least two officers dogpiled on top of him, pushed him into the ground, removed his backpack, and put metal handcuffs on him. A third was also present.

59.     Mr. Yau informed the arresting officers that he was a journalist. The officers looked at his press badge, said that they did not recognize the issuing organization, and asked what news stations he contributes to. Mr. Yau informed them that his work has been published in the *Daily Mail*, *Reuters*, and *Spectee*, a Japanese news outlet. The officers did not release Mr. Yau.

---

[17] @PDocumentarians, Twitter (June 5, 2020, 3:51 A.M.), https://twitter.com/PDocumentarians/status/1268858091358924800.

60.     When the officers tackled Mr. Yau, he landed on his knee. It was so sore that he was unable to sleep.

61.     This Court issued a TRO on July 2 ordering the police to "return any seized equipment or press passes immediately upon release of a person from custody." Nevertheless, the police did not return Mr. Yau's equipment until July 6.

62.     On the night of the arrest, Mr. Yau was in contact with two news agencies, *Reuters* and *Ruptly*, to publish his footage from the night. Because officers confiscated his equipment, he was unable to complete the arrangement. He was deprived of licensing revenue and the public was deprived of his footage.

## 2.     Police Intentionally Shoot at and Tear Gas Plaintiff Lewis-Rolland

63.     Plaintiff Lewis-Rolland is a freelance photographer and photojournalist who has covered the ongoing Portland protests. He carries a large Nikon D850 camera with a 70-200mm lens and a flash. He is unmistakably present in a journalistic capacity.

64.     On the night of May 31, Mr. Lewis-Rolland was covering the protests. Around 10:40 p.m., he heard a loud bang and began proceeding toward the intersection it came from, SW Salmon Street and SW 3rd Street. The intersection was not crowded and was mostly clear of protesters. As he approached, he saw police marching in his direction. He began taking photographs. That is when he captured this image of an officer aiming a gun directly at him:



*Figure 4. Police take aim at Plaintiff Mathieu Lewis-Rolland.*

65.     Shortly after Mr. Lewis-Rolland captured that image, the officer fired upon him. The officer offered no warning, and Mr. Lewis-Rolland had done nothing to provoke the officer other than take a photograph. Mr. Lewis-Rolland was showered with shrapnel as the first round exploded at his feet. Several more followed, as well as canisters of tear gas. Mr. Lewis-Rolland was overcome by the effects of tear gas and was unable to continue documenting protests or police action at that location, but he attempted to continue operating his camera to the best of his

ability while recovering from the effects of the tear gas. He was able to capture a visual cloud of gas hovering over the intersection he had just retreated from.

66.     About an hour later, at the intersection of SW 4th Street and SW Taylor Street, Mr. Lewis-Rolland was documenting a tense interaction between police and protesters:



*Figure 5: Plaintiff Lewis-Rolland (not pictured) documents a tense interaction between police and peaceful protesters.*

67.     This time, an officer popped open a crowd-control-sized canister of tear gas and threw it directly at Mr. Lewis-Rolland's feet. Used at such close range, the canister delivered a full frontal blast of gas to Mr. Lewis-Rolland's face and once again, he was overcome by its effects. Mr. Lewis-Rolland was completely incapacitated for at least 30 seconds and forced to stop documenting the scene until he could recover.

### 3.     The Police's Repeated Attacks on Plaintiff Mahoney

68.     On June 2, the police used tear gas of a different formulation or a stronger concentration on Plaintiff Mahoney. On June 10, they shot a rubber bullet at her to prevent her

from recording an arrest. And the day after Plaintiffs filed this action, the police beat Plaintiff Mahoney—right across the back of her vest where it says "ACLU LEGAL OBSERVER" in big block letters.

### a. Police Use Extra-Strong Tear Gas on Plaintiff Mahoney

69. Plaintiff Mahoney has been attending the protests nearly every night since they began. Nearly every night, from the beginning of the protests until this Court issued its injunction in *Don't Shoot Portland v. City of Portland*, Ms. Mahoney was a victim of police's tear gas.

70. Ms. Mahoney has served as a legal observer since 2017. She is no stranger to the police's indiscriminate, excessive, and unlawful use of tear gas.

71. On June 2, however, she noticed that the police had begun to use a new form of tear gas. On that night, Ms. Mahoney was on her motorcycle. To avoid getting tear gas inside her helmet, she remained on a side street near the edges of the crowd. Nevertheless, the tear gas reached her and she sought to retreat.

72. Her first indication that this was a new type of gas was that it smelled different and felt stronger. She managed to drive her motorcycle only two blocks before losing her vision. In addition to the usual effects—profuse tears, profusely runny nose—her throat began to close and she had trouble breathing. She quickly sought medical attention.

73. Once she felt it was safe, she attempted to return home on her motorcycle. On the way home, however, she began involuntarily convulsing, shaking, and twitching. She was unable to concentrate on basic tasks like shifting gears. Fortunately, she was able to arrive home safely.

74. Once home, however, she was disoriented and unable to function for several hours. She was barely able to open her door. She was unable to count past six. She was unable to open a tube of toothpaste. Although Ms. Mahoney has been the victim of Portland police's tear gas many times, she has never suffered such symptoms. On information and belief, on June 2, Portland police used tear gas of a different formulation, or a stronger concentration, in order to

inflict more severe injuries on neutrals and protesters. On information and belief, the police also used such tear gas in the "killbox" maneuver detailed below.

### b.     Police Shoot at Plaintiff Mahoney

75.     On the night of June 10, Ms. Mahoney was attending the protests near the Justice Center as a legal observer volunteering with the ACLU. She was wearing a blue vest which clearly identified her as an ACLU legal observer. At all relevant times, she was well-lit by police floodlights. No police officer could have been confused as to the role in which she was attending.

76.     Shortly after midnight, a woman who appeared to be mentally unstable wandered into the fenced-off area near the Justice Center. She walked back and forth for a moment, exited Ms. Mahoney's field of view, and then returned having shed all of her clothing. At this point, Ms. Mahoney moved to the front of the crowd, because she knew that legal observation might become crucial.

77.     Portland police officers began running at the woman. She began running away, but became confused and was unable to find the exit. She panicked. As she ran alongside the fence, a protester entered the fenced-off area to assist her. Together, they began running away from the police and toward the exit.

78.     Most people who were at the fence, including Ms. Mahoney, were recording the events unfolding on their cameras and smartphones. Even though the two individuals inside the fenced-off area were retreating, Portland police officers opened fire on them. And, in an attempt to minimize video evidence, Portland police also opened fire on people recording the event near the fence, including Ms. Mahoney.

79.     One rubber bullet impacted a cement barrier a few inches from Ms. Mahoney's face. It exploded and shrapnel from the detonation hit Ms. Mahoney's hands, phone, and shoulders. Had Ms. Mahoney not been recording the event, shrapnel would have hit her directly in the face. As it was, Ms. Mahoney suffered severe injuries to her left hand, including her left ring finger, which swelled up to three times its normal size.

80.     The police targeted Ms. Mahoney, even though she was clearly marked as a neutral legal observer by her blue vest, because she was recording an altercation between police and protesters.

### c.     The Police Intentionally Beat Plaintiff Mahoney the Day after Plaintiffs Filed this Action

81.     The day after Plaintiffs filed this action, Ms. Mahoney attended the protests in North Portland as a legal observer. She wore her blue ACLU vest that clearly identified her as a legal observer with the words "ACLU LEGAL OBSERVER" in big block letters across the back and in smaller lettering on the front.

82.     She had not intended to attend the protests that night, but another legal observer who was present informed her that only one ACLU observer was there, and that based on the police's actions, more might be necessary.

83.     She arrived at the intersection of N Lombard Street and N Denver Avenue a little before 9:30 p.m. When she arrived, the police had already declared an unlawful assembly and were pushing the crowd east.

84.     Within minutes of Ms. Mahoney's arrival, the police began firing pepper balls indiscriminately into the crowd. She began coughing and choking, and was forced to seek medical treatment. After she recovered from the pepper spray, she returned to continue observing.

85.     Later, she became the target of a police dispersal maneuver. Officers began running toward her location yelling "MOVE!" Because there was a dense crowd in front of her, including a man on crutches whom several other protesters were helping, she could not get out of the way in time.

86.     One officer slammed her in the back with a truncheon. He struck diagonally from the base of her right shoulder blade to her lower left side, across her spine and ribcage. Another officer ran up to her, yelled "MOVE," and shoved her so hard she stumbled into a protester and had to be helped to her feet.

87.     Because she was wearing her blue ACLU legal observer vest, both officers could plainly see the words "ACLU LEGAL OBSERVER" when they beat her and shoved her.

88.     The same night, Ms. Mahoney also saw the police chase and attempt to beat two other legal observers who were clearly marked as legal observers.

89.     The following morning, her back was extremely painful. She was unable to rotate her torso or sit up for periods of time without pain. It hurt her to breathe.

### 4.     The Police's Assaults on Plaintiff Brown

90.     On June 12, police fired a flash-bang grenade directly at Plaintiff Brown, twice, and beat him with their bats. And on June 14, they threatened to arrest him, even though they knew he was an ACLU legal observer.

### a.     Police Shoot at and Beat Plaintiff Brown

91.     On the night of June 12, legal observer Doug Brown was attending the protests as a volunteer with the ACLU. He was wearing a blue vest which clearly identified him as an ACLU legal observer.

92.     Shortly after 12:30 a.m., the police decided to put an end to the protests. They declared the area between Naito Parkway and 13th Street, from SW Lincoln Street to NW Everett Street, off-limits to everyone—protesters, press, legal observers, and anyone else. This area contains the entirety of downtown Portland and parts of two Northwest Portland neighborhoods and comprises some 21 million square feet.

93.     A video of the following events can be viewed here:

https://tinyurl.com/BrownAttacked.

94.     At around 12:35 a.m., the police began firing flash-bang grenades into the crowd. A minute later, they fired a flash-bang grenade directly at Mr. Brown. *Id.* at 4:11-15.

95.     Then, they began physically clearing people out of the park. Mr. Brown complied with their directive and moved with the crowd, but because he was present as an observer and not a protester, he continued filming and observing how the police enforced their order.

96.     Around 12:39 a.m., the police had moved the crowd one block from their starting position. Then they began what is known as a "dynamic" maneuver. They halted and arranged in formation, truncheons and guns at the ready. *Id.* at 7:44. On command, they all began running at the crowd, yelling "MOVE!" and beating anyone in their way. *Id.* at 8:18.

97.     This type of massed kinetic maneuver—a massed charge—is extremely dangerous. Strong, armored police, running full tilt at less-armored persons, frequently cause grave injury. And by design, they run over all things in their path—including journalists and legal observers.

98.     Mr. Brown continued to observe and record. For that, the police beat him, too. *Id.* at 8:23-34. This still frame from his video shows police officers charging at him with their truncheons, shortly before they beat him:



*Figure 6: Police charge at an ACLU legal observer to beat him with their truncheons.*

99.     Mr. Brown was forced to flee and could no longer safely document the police's violent enforcement tactics.

100.     After a minute, the police halted and began firing flash-bang grenades directly at people. They scored a direct hit on Mr. Brown. *Id.* at 8:58-9:09.

101.     As a result of the police's firing two flash-bang grenades at him and beating him with their batons, Mr. Brown suffered temporary tinnitus for several hours and some contusions.

102.     The police's efforts to prevent Mr. Brown from recording and reporting on their violent tactics were successful. Shortly after the second flash-bang, he left the scene, even though the protests and the police's violent dispersal of protesters continued.

### b.     Police Threaten to Arrest Plaintiff Brown

103.     On the night of June 14, Mr. Brown was again attending the protests as a volunteer with the ACLU. He was wearing a blue vest which clearly identified him as a legal observer.

104.     Audio of the following events, together with some contemporaneous photos Mr. Brown took, is available here: https://tinyurl.com/BrownThreatened.

105.     Around 10:40 p.m., Mr. Brown arrived at the intersection of SW 6th Street and SW Market Street, where Portland police officers were arresting a man undergoing a mental-health crisis.

106.     As they had the previous night, the police had issued a dispersal order vacating downtown Portland.

107.     Nevertheless, some five to seven people were at the scene, observing the arrest. Mr. Brown also began observing and recording the event.

108.     For the first seven minutes Mr. Brown was present, the interaction between police and the individuals watching them was calm and uneventful.

109.     At 10:47 p.m., the police decided to remove all observers from the scene. One officer, with a makeshift ID number 254047, ordered everyone to leave and threatened them with arrest if they did not comply. *Id.* at 7:00-7:50.

110.    Mr. Brown continued to document the events. The officer heard his shutter clicking and turned on him: "You have plenty of pictures, okay? … We don't want to make an arrest." *Id.* at 7:58-8:20.

111.    Three more officers walked up to Mr. Brown and put their hands on him. One of them said: "You should know better, you're with the ACLU." *Id.* at 8:35.

112.    A minute later, a police SUV with a long-range acoustic system arrived. It, too, singled Mr. Brown out as an ACLU legal observer and threatened him with arrest: "You are all subject to arrest for trespassing. This area is closed. That includes the ACLU legal observer. You are trespassing. … You are failing to obey the direct order of a peace officer in the State of Oregon." *Id.* at 9:52-10:15.

113.    Again, the police's efforts to eject Mr. Brown from the scene of an arrest were successful. Rather than be arrested himself, he left the scene and was no longer able to fulfill his role as a legal observer.

### 5.    Police Assault Plaintiff Olmos

114.    Plaintiff Olmos is a freelance journalist who has covered the ongoing Portland protests. He wears a press badge and a Kevlar vest that says "PRESS" on both sides. He also carries several cameras, including a film camera, in part so that it is unmistakable that he is present in a journalistic capacity as a member of the press.

115.    On the night of June 6, Mr. Olmos was recording the way the police were enforcing their dispersal order.

116.    He was also attempting to comply with the order, but found himself trapped behind a phalanx of police officers. To avoid giving surprise, he tried to inform them that he was approaching from behind. He had his press pass clearly visible.

117.     Nevertheless, the police beat Plaintiff Olmos with a truncheon and threatened him with tear gas because he was recording them.[18]

118.     Mr. Olmos has been subjected to physical harm by the Portland police on many other occasions during the protests. They have physically assaulted him to make him comply with a dispersal order, thrown a flash-bang grenade at his chest, and impacted him with flash-bang grenades several other times.

**6.     Police Attack Plaintiff Tracy and Seize His Equipment after He Filed this Lawsuit**

119.     Plaintiff Tracy is a freelance journalist who has covered the ongoing Portland protests. He wears a helmet that reads "PRESS" on the front and back and a business card on his chest that clearly identifies him as a photojournalist. He also carries two large, professional-grade cameras around his neck and over his shoulder. He is unmistakably present in a journalistic capacity.

120.     On June 7, Mr. Tracy was documenting as protesters ran and hid from oncoming police vehicles as streets were cleared in the early hours of the day. As he was recording, the police arrested two people who were hiding behind a car because they had been "taking photos." Another officer approached Mr. Tracy and offered to arrest him, too, if he did not leave. Mr. Tracy held up his credentials and one of his two cameras clearly stating that he was press, but also moved back and complied with the order. The police's threats prevented Mr. Tracy from documenting how the police executed the arrest.[19]

121.     Later that evening, the police hit Mr. Tracy on the lower left leg with a neon green police paint marker round.

_____

[18] @MrOlmos, Twitter (June 6, 2020, 1:27 A.M.), https://twitter.com/MrOlmos/status/1269184050314407936; @MrOlmos, Twitter (June 6, 2020, 4:15 A.M.), https://twitter.com/MrOlmos/status/1269226525020184577.
[19] @ AlexMilanTracy, Twitter (June 7, 2020, 3:29 A.M.), https://twitter.com/AlexMilanTracy/status/1269577129265524736.

122.     Just after midnight that same evening, Mr. Tracy witnessed the police arrest a member of the media with press credentials clearly visible. The following is a photograph he took of the incident, with a close-up of the press pass inset:



*Figure 7: Police arrest a member of the press with his press pass clearly visible.*

123. On June 16, Plaintiff Tracy was documenting Portland police making arrests. One officer told him to "get out of here now," or he was going to go to jail. "I don't care if you're press," he repeated, "get out of here right now."[20] Mr. Tracy was unable to continue reporting on the arrest.

124. The day after this action was filed, the police confiscated Mr. Tracy's camera, claiming it was "evidence." They had repeatedly been executing "dynamic" maneuvers against crowds including journalists and observers. While running away from one such charge, a GoPro Hero 8 camera that Mr. Tracy used for newsgathering purposes fell out from a pouch on his waist. One officer told him that it would be seized "as evidence" because the police line had advanced in front of it. He tried to communicate with officers to be able to look for and retrieve his camera, but they prevented him from doing so.

### 7. Police Intimidate and Launch Flash-Bangs at Plaintiff Conley

125. Plaintiff Brian Conley has been a journalist for twenty years and has trained journalists in video production across a dozen countries internationally. He founded Small World News, a documentary and media company dedicated to providing tools to journalists and citizens around the world to tell their own stories.

126. On the night of June 15-16, the police launched one or more flash-bang grenades directly at Mr. Conley, who was standing at least ten feet away from any protesters in the area around the Justice Center.

127. Mr. Conley was wearing a photographer's vest and carrying a micro four-thirds camera with a large telephoto lens, an off-camera flash, a streaming cellphone held aloft in one hand, and at times held a second video camera that he otherwise carried in his backpack. He was unmistakably present in a journalistic capacity.

---

[20] @ AlexMilanTracy, Twitter (June 16, 2020, 1:16 A.M.), https://twitter.com/AlexMilanTracy/status/1272805156225048578.

128.     The police did not notice him until he activated the light on his camera. At that point, an officer who was about 5-10 feet away saw him, saw that he was using his camera, and threw a flash-bang at him.

129.     Mr. Conley was isolated away from protesters. There was no other target in the immediate vicinity.

130.     Despite having covered international protests and war zones for twenty years, this was the first time that Mr. Conley was hit with a flash-bang grenade. The impact left him shocked, stunned, and the closest individual to the advancing police line.

131.     Later, Mr. Conley was documenting near the intersection of Broadway and Salmon Streets in downtown Portland when the police issued a dispersal order. When Mr. Conley activated the light on his bigger camera, he saw an officer point at him and signal other officers towards Mr. Conley's position.

132.     Another officer approached Mr. Conley and several fellow journalists and told them they had to leave, and that it did not matter if they were media. Two officers then pursued them down the street outside the Heathman Hotel. Plaintiff Conley fell over a statue of a bulldog outside the hotel while fleeing but narrowly avoided a traumatic head injury.

133.     Mr. Conley has covered only a few protests since that day because the police's actions that day made him fearful about covering the protests without someone else present, such as a friend or colleague, in case the police were to ultimately injure or arrest Mr. Conley.

### 8.     Police Shoot Plaintiff Rudoff

134.     Plaintiff Rudoff is an internationally renowned freelance journalist who has covered the ongoing Portland protests. Mr. Rudoff wears press identification from the National Press Photographers Association, carries large camera equipment, and wears a helmet clearly marked "press."

135.     Since he began covering protests in Portland, Mr. Rudoff has been tear-gassed many times and occasionally shot with pepper balls. Most recently, on June 19, the Portland

police shot Plaintiff John Rudoff with pepper balls while he was documenting the protest at the Justice Center.

136.    On the same day, Mr. Rudoff was documenting police action near the Justice Center when a line of police began pushing the crowd down the street. He showed them his press pass and camera equipment, and an officer responded that he "[didn't] care if you're media" and pushed him to move with the crowd.

137.    Mr. Rudoff was prevented from further documenting the protests and violent police response at that time. Moreover, he did not attend protests from that day until this Court entered a temporary restraining order on July 2, because the police's actions that day made him fearful that the police would ultimately injure him.

### 9.    Police Assault Plaintiff Woodstock

138.    Plaintiff Woodstock is a freelance journalist who has covered the ongoing Portland protests. They wear a press pass from the *Portland Mercury* that says "MEDIA" in large block letters.

139.    On the evening of June 30, they attended the protests in North Portland to report on them. Around 11:00 p.m., after the police issued their dispersal order, they were walking with a group of protesters and journalists complying with the order and moving east. All of a sudden, the police arrayed themselves in a line and then started sprinting at the group. The police tackled and arrested people to either side of Plaintiff Woodstock.

140.    Plaintiff Woodstock tried to film the arrests. Almost immediately, however, they felt a baton pressed into their back as an officer yelled "MOVE, MOVE, MOVE, MOVE," directly in their ear. They informed the officer several times that they were media, but the officer did not care and continued to push them to the east. They were physically pushed at least four times by two officers during this incident.

141.    Some time later, police conducted another sprint-and-arrest maneuver. Again, there were people being arrested all around Plaintiff Woodstock. They tried to film the arrests

but, again, an officer removed them from the scene. The officer said that "[I] know you're media but you have to leave."

142. Because of the actions of the police, Plaintiff Woodstock was unable to film the arrests at all. Both times, the officers pushed Plaintiff Woodstock out of the area so fast that they could not even record over their shoulder—they had to put down their phone and run or risk falling over and getting arrested as well.

>  **10.  Police Deploy a Killbox Tactic against Portland Mercury Reporters, Plaintiffs Gehrke, Mahoney, and Tracy, and Other Journalists and Observers**

143. Portland police use tear gas indiscriminately when confronted with crowds. Lt. Franz Schoening, commander of the Bureau's Rapid Response Team, has stated as much: "[W]hen officers can't see disrupters in a dense crowd because they're four to five rows back from officers and they won't comply with orders to leave the area," the Bureau's formal policy is to use tear gas against the crowd as a whole.[21]

144. Because tear gas is inherently an indiscriminate weapon, this policy necessarily means that Portland police shoot tear gas at neutral parties who are attending to document and report on protests. And indeed, many journalists and legal observers have found themselves caught in the police's widespread use of tear gas during these protests.

145. One particularly egregious example took place on the night of June 2, when reporters employed by the *Portland Mercury*, as well as Plaintiffs Sam Gehrke, Kat Mahoney, and Alex Tracy, found themselves victims of a "killbox" action by Portland police.

146. Portland Mercury reporters Alex Zielinski and Blair Stenvick were covering the protests for the *Mercury* that night. Ms. Zielinski was in the middle of the crowd, while Stenvick was towards the back. Neither was near the fence surrounding the Justice Center. Plaintiffs Gehrke and Tracy were also in the crowd reporting on the protests.

---

[21] Maxine Bernstein, *Portland police, fire medics describe crowd control tactics, munitions*, The Oregonian (June 4, 2020), https://www.oregonlive.com/portland/2020/06/portland-police-fire-medics-describe-crowd-control-tactics-munitions.html.

147.     The police issued a warning to protesters to stay away from the fence. To underscore the point, officers on the other side of the fence shot tear gas at protesters near the fence.

148.     Had officers merely shot gas at protesters closest to the fence, the reporters might not have been injured. However, the police had decided to create a gas trap by shooting tear gas from the rear and sides of the crowd as well. This gas trap, by design, snared not only protesters agitating near the fence, but many other peaceful protesters far from the fence with no desire to get involved. And, of course, it also caught all four reporters, as well as Plaintiff Mahoney.

149.     Because they had been inundated with tear gas, neither Ms. Zielinski nor Stenvick was able to report on the protests for the rest of the night. As the *Mercury*'s editor wrote that night: "Due to the dangerous situation and loss of control exhibited by the Portland Police, we have pulled our reporters off the street for the night. It's simply too dangerous for them to be out there right now."[22]

150.     Portland police have a policy or practice of using indiscriminate killbox or kettling tactics against crowds including journalists and other neutrals. They have used the same tactic in at least November 2014, January 2017, and June 2017.[23]

### 11.     The Police Have Intentionally Targeted Many Other Reporters and Neutrals

151.     The police's use of excessive force against neutral observers extends to all Plaintiff Class members and other neutrals.

---

[22] Wm. Steven Humphrey, *Live Updates: Protesting the Death of George Floyd in Downtown Portland, Night Five*, Portland Mercury (June 2, 2020), https://www.portlandmercury.com/blogtown/2020/06/02/28499376/live-updates-protesting-the-death-of-george-floyd-in-downtown-portland-night-five.
[23] Maxine Bernstein, *Portland police deny 'kettling' of protesters in response to ACLU lawsuit*, The Oregonian (Jan. 19, 2019), https://www.oregonlive.com/portland/2018/01/portland_police_deny_kettling.html.

152. On June 3, the police physically assaulted KBOO reporter Cory Elia because he was recording them. He had identified himself as press. As the bystander who recorded the interaction later recalled, "Hearing the screams from him in the background is truly terrifying."[24]

153. On the night of June 5, a red truck flying an American flag drove through a crowd of protesters and nearly hit one of iHeartRadio podcaster Robert Evans's staffers. When the staffer attempted to capture the license plate of the truck, the police aimed their crowd-control weapons at her and threatened to fire. They prevented her from recording the license plate of the truck. She no longer accompanies Mr. Evans to the protests in Portland.[25]

154. Also on June 6, Mr. Evans was filming the police arranged in a phalanx advancing on a crowd of protesters. He was holding his phone in one hand and his press pass in the other. Also, his helmet was clearly labeled "PRESS." Police fired an impact munition at him, hitting him in the very hand that was holding the press pass.

155. June 7 was a banner day for Portland police's campaign of violence against journalists:

> a. The police brutally attacked Donovan Farley with a truncheon and tear gas. Farley, a reporter who has been published in *Rolling Stone*, *VICE*, and the *Willamette Week*, was recording the police, who were arresting a protester using exactly the same maneuver that had killed George Floyd. When they noticed him, they chased him away, beat him, and—even as he was retreating from the scene—sprayed him in the face with tear gas.[26]

---

[24] @Billings29James, Twitter (June 3, 2020, 12:16 A.M.), https://twitter.com/Billings29James/status/1268079034321133570.

[25] @IwriteOK, Twitter (June 6, 2020, 3:41 P.M.), https://twitter.com/IwriteOK/status/1269399061775306752.

[26] @DonovanFarley, Twitter (June 7, 2020, 11:44 A.M.), https://twitter.com/DonovanFarley/status/1269701897377603584; @TVAyyyy, Twitter (June 7, 2020, 12:08 A.M.), https://twitter.com/TVAyyyy/status/1269526590456643584.

b.   The police also attacked Mr. Elia again—this time with tear gas rather than a truncheon—even though, as before, he was holding up his press pass and police knew he was press when they attacked him.[27]

c.   The police threatened to arrest Plaintiff Tracy for recording them arresting two people hiding behind a car, as described above.

d.   The police also arrested one of Mr. Evans's staff members for asking an officer his name. She did not provoke him in any other way or do anything to justify police action. Nevertheless, police arrested her and took her to the Justice Center, where they held her for several hours.

156.   On June 11, the police confiscated medical supplies from an OHSU medic tent. They also arrested one of the medics, Michael Martinez, because he was recording them.[28]

157.   On June 12, Plaintiff Sam Gehrke was taking photos near the Justice Center when the police shot him in the back with a rubber bullet. Mr. Gehrke was holding a large camera, wearing a press pass from the *Willamette Week*, and was obviously present as a journalist to record and report on the protests. Shortly after this, the police swarmed the crowd from behind, physically assaulting and beating people at random.

158.   On June 13, the police beat reporter Beth Nakamura of *The Oregonian* with a truncheon, even though she was displaying her press pass and shouting "press, press." The officer responded: "I don't give a fuck."[29]

159.   Also on June 13, the police ordered reporter Zane Sparling of *The Portland Tribune* to leave an area where they were enforcing a dispersal order against protesters, shoved

[27] @Human42LM, Twitter (June 7, 2020, 10:29 A.M.), https://twitter.com/Human42LM/status/1269683012515409921.

[28] Lindsay Nadrich, *OHSU student arrested handing medical supplies to protesters*, KOIN (June 18, 2020), https://www.koin.com/news/protests/ohsu-student-arrested-handing-medical-supplies-to-protesters/.

[29] @bethnakamura, Twitter (June 15, 2020, 8:27 A.M.), https://twitter.com/bethnakamura/status/1272551330184228864; @bethnakamura, Twitter (June 15, 2020, 8:54 A.M.), https://twitter.com/bethnakamura/status/1272558094870970368.

him into a wall, and shot a crowd-control munition at his heel.[30] When Mr. Sparling informed them that he was media, they responded that they didn't "give a shit."

160.    On the night of June 15, OPB reporter Jonathan Levinson was reporting on the protests downtown. As Portland police issued orders to disperse, he continued reporting. Officers informed him that if he did not "run," they would arrest him.[31] They then violently arrested another individual and prevented Mr. Levinson from recording or reporting on the arrest.[32]

161.    The day after this action was filed, the police set a new high-water mark for violence against journalists and legal observers:

      a.   The police confiscated Plaintiff Tracy's camera as described above.

      b.   The police arrested Plaintiff Yau as described above.

      c.   The police assaulted Plaintiff Woodstock as described above.

      d.   And finally, the police arrested two other journalists: Mr. Elia and his KBOO colleague Lesley McLam. Neither Mr. Elia nor Ms. McLam were engaging in any conduct that posed a threat to police, property, or the public. Both were simply reporting on the events of the evening.[33]

## 12.    The Police Have Intentionally Targeted Reporters and Legal Observers in the Past

162.    In August 2018, Plaintiff Brown and Donovan Farley were reporting on protests in downtown Portland. Without warning, the police rushed protesters, shot rounds, and set off explosions. Then, they charged at and beat a group of journalists, including Mr. Brown and Mr.

---

[30] @PDXzane, Twitter (June 13, 2020, 11:49 P.M.), https://twitter.com/PDXzane/status/1272058454799028226.
[31] @MrOlmos, Twitter (June 16, 2020, 12:40 A.M.), https://twitter.com/MrOlmos/status/1272796206071087105.
[32] @MrOlmos, Twitter (June 16, 2020, 12:48 A.M.), https://twitter.com/MrOlmos/status/1272798234809782272.
[33] @TheRealCoryElia, Twitter (June 30, 2020, 11:14 P.M.), https://twitter.com/therealcoryelia/status/1278210455652061184, at 6:00; @mayorofbabytown, Twitter (July 1, 2020, 1:14 A.M.), https://twitter.com/mayorofbabytown/status/1278240587095785472.

Farley, all of whom had press passes clearly displayed or were holding obviously professional cameras.[34] Video here: https://tinyurl.com/BrownBeaten18.

163.    At the same protest, police hit KATU reporter Ric Peavyhouse with a rubber bullet[35] and documentary filmmaker Michelle Fawcett with a flash-bang grenade.[36]

164.    During protests in 2017, Mr. Brown was attending as a journalist for the *Portland Mercury*. Police beat him with a truncheon and fired on him with flash-bangs.

165.    Also during protests in 2017, the police beat Plaintiff Rudoff with a truncheon because he was not moving quickly enough for an officer's liking.

**E.    The Police Announce an Unconstitutional Policy of Dispersing and Arresting Members of the Press Who Are Trying to Report on the Protests**

166.    On June 14, the police announced that they would enforce dispersal orders against media and neutral observers unless the members of the press had been handpicked by the police to be "imbed[ded]" with the police.[37]

167.    The police subsequently warned reporters and neutral observers that they must obey the police's dispersal orders to protesters if they wished to "stay safe and avoid arrest or altercation." In the view of the police, "[t]he unlawful orders [sic] apply to everyone"—except those the police have permitted to be "imbedded" with them.[38]

---

[34] Donovan Farley, *In Portland, the Police Played Into the Hands of the Fascists and Attacked Their Own Citizens*, Paste Magazine (Aug. 7, 2018), https://www.pastemagazine.com/politics/political-violence/in-portland-the-police-played-into-the-hands-of-th/.

[35] @RPeavyhouse, Twitter (Aug. 5, 2018, 2:34 P.M.), https://twitter.com/RPeavyhouse/status/1026219809552224256.

[36] Alex Zielinski, *Portland Police Explain Why They Fired Munitions at Protesters on August 4, Portland Mercury* (June 4, 2019), https://www.portlandmercury.com/blogtown/2019/06/04/26589682/portland-police-explain-why-they-fired-munitions-at-protesters-on-august-4.

[37] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386641462607872.

[38] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386738338410496.

168. This proclamation was issued from the official Twitter account of the Portland police, @PortlandPolice, and is a written statement of the Bureau's formal policy. It is also an accurate statement of the Portland police's widespread custom and practice. Plaintiffs and Plaintiff Class have repeatedly been dispersed by the police when they were peacefully trying to record the protests and posed no danger to the public or law enforcement.

169. The police have not rescinded this proclamation or changed their practice.

170. This policy is an unlawful viewpoint-based restriction on speech. Once the police issue a dispersal order, this policy gives them unbridled discretion over which reporters may remain, and thus permits them to control the content of reporters' coverage.[39] It is designed to prevent reporters and legal observers from holding the police accountable precisely when accountability is most needed. No government interest can justify such a policy, especially because reporters are not a threat to the public, police, or property. Nor is there any alternative way for reporters not embedded with the police to report on the violence with which police enforce their dispersal order.

### F. The Police's Intimidation Campaign Works

171. The police's campaign of intimidation and fear has been effective. Plaintiff Woodstock's experience is typical.

172. Plaintiff Woodstock has been a journalist for seven years. They have been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They are a seasoned veteran of reporting in tense situations.

173. Plaintiff Woodstock is not a threat to the public or to law enforcement and has not engaged in any activities that would constitute such a threat. Plaintiff Woodstock does their best to avoid police violence but has been swept up in it anyway when the police assaulted

---

[39] *See, e.g.*, Elana J. Zeide, Note, *In Bed with the Military: First Amendment Implications of Embedded Journalism*, 80 N.Y.U. Law Rev. 1309, 1321 ("Embedding typically takes place in a constrained environment where journalists cannot afford to alienate the limited sources available. Accordingly, most reporters will be reluctant to publish anything that the officers and soldiers surrounding them might receive badly.").

individuals near them or ordered them to leave on pain of being assaulted or arrested. They have seen people next to them get shot in the head with rubber munitions. They have witnessed reporters getting shot with rubber bullets or maced in the face when they tried to gather evidence. The have been tackled by police in the course of their reporting through no fault of their own.

174.     The Portland police's indiscriminately violent conduct toward journalists and protesters alike has made it difficult—and at times, impossible—for Plaintiff Woodstock to report on the protests accurately and thoroughly.

175.     For example, because police shoot rubber bullets at and otherwise use force against anyone who approaches gas canisters or spent rounds, including journalists, Plaintiff Woodstock is unable to verify whether tear gas was used at a particular location, or whether a particular round fired at a protester's head was a rubber bullet or some other impact munition.

176.     Similarly, Plaintiff Woodstock is unable to determine which agency's officers are enforcing a dispersal order in a given location because police shoot anyone who approaches, including journalists.

177.     Because the police threaten to arrest any journalist who remains in an area after a dispersal order, Plaintiff Woodstock generally complies and departs after a dispersal order is issued. The result, however, is that Plaintiff Woodstock is unable to document the violent tactics with which police enforce their dispersal order against protesters. On information and belief, at least one time after they complied with a dispersal order, the police severely attacked the group of protesters they were covering.

178.     The police's goal is to prevent the press from holding them accountable. It works.

**G.     Plaintiffs Are Suffering Irreparable Harm**

179.     Plaintiffs fear for their safety from police violence. Reporters who attend and document the protests are at risk of being hit with tear gas, rubber bullets, police batons, arrests, and more. Even reporters who remain at the rear of the crowd cannot cover the protests without injury because the police use strategies like the "killbox" strategy they used on June 2.

180.     Plaintiffs and Plaintiff Class want to continue attending protests to gather news and observe and document how police are treating demonstrators, and whether demonstrators are actually provoking the outpouring of violence from the police, as the police claim, or whether police are engaging in indiscriminate unprovoked violence. They also want to be able to document how police are dispersing protesters. They are fearful, however, that they themselves will be targeted for the same violence police mete out against protesters. The police have prevented Plaintiffs and Plaintiff Class from documenting how police have dispersed protesters and have repeatedly told them that they will be similarly arrested and assaulted if they fail to stop recording these events.

181.     On information and belief, countless others would report on the ongoing protests and volunteer to neutrally and peacefully observe them, but for fear that they would be subjected to police violence.

182.     The police's use of force against journalists has become so untenable, and their targeting of journalists so obvious, that even Mayor Wheeler admitted that the Bureau's tactics are "extremely concerning" and that "[j]ournalists need to be able to cover the protests safely."[40]

## CLASS ALLEGATIONS

183.     Plaintiffs bring this action under Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil procedure on behalf of themselves and a class of similarly situated people who, as journalists, reporters, photographers, and legal observers, have been subjected to violence, retaliation, arrest, or dispersal by the Portland police, or who will in the future report on protest activity or the conduct of law enforcement officers on duty within the City of Portland in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All reporters, journalists, photographers, and legal observers who on or after May 25, 2020, have been subjected to violence, arrested, or dispersed by the Portland police while covering a protest, or who intend to engage in newsgathering or reporting in

---

[40] @tedwheeler, Twitter (June 15, 2020, 11:30 A.M.), https://twitter.com/tedwheeler/status/1272597259150999553.

Portland related to protest activities and/or the law enforcement
response to those protests.

184.     The Plaintiff Class is so numerous that joinder of all the members would be
impracticable. Hundreds of journalists and legal observers are in Portland to cover the protests
that followed Mr. Floyd's murder and the aftermath.

185.     As a result of Defendants' custom or policy of arresting members of the Plaintiff
Class; targeting them with rubber bullets, chemical irritants, truncheons, and other uses of force;
denying them freedom of movement to observe, record, and report on public demonstrations and
law enforcement officers on duty; and intimidating them by threats of violence and arrest, the
Plaintiff Class have been and will continue to be deprived of their constitutional rights under the
First and Fourth Amendments.

186.     Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff
Class because protests are ongoing and Plaintiffs and Plaintiff Class have a reasonable fear that
Defendants will continue to carry out their unconstitutional customs or policies.

187.     Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class.
Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understand
their role as class representatives and their duties to the class in this litigation. Plaintiffs are
represented by competent and skilled counsel whose interests are fully aligned with the interests
of the class.

188.     Questions of law or fact are common to the class. These legal and factual
questions include but are not limited to:

>     a.   Whether targeting journalists and legal observers with violence and threats of
>     violence violates the First Amendment;
>
>     b.   Whether targeting journalists and legal observers with violence and threats of
>     violence violates the Fourth Amendment;
>
>     c.   Whether targeting journalists and legal observers with violence and threats of
>     violence violates the Oregon Constitution, Art. I, § 8;

d.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the First Amendment;

e.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the Fourth Amendment;

f.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the Oregon Constitution, Art. I, § 8;

g.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute a viewpoint-based restriction on speech that violates the First Amendment;

h.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute a viewpoint-based restriction on speech that violates the Oregon Constitution, Art. I, § 8;

i.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute an overbroad restriction on speech that violates the First Amendment;

j.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute an overbroad restriction on speech that violates the Oregon Constitution, Art. I, § 8;

k.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers serve any legitimate government interest;

l.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers are narrowly tailored;

m.   Whether Defendants' policy of embedding select journalists vests unbridled discretion to permit or prohibit speech in City officials;

n.   Whether Defendants' policy of embedding select journalists is an unlawful prior restraint in violation of the First Amendment;

o. Whether Defendant City of Portland is liable for implementing a written or unwritten policy that violates the Fourth Amendment under principles of municipal liability;

p. Whether Defendant City of Portland is liable for a custom or practice that violates the First Amendment under principles of municipal liability;

q. Whether Defendant City of Portland is liable for a custom or practice that violates the Fourth Amendment under principles of municipal liability;

r. Whether Defendant City of Portland has manifested a failure to properly train and supervise its agents and officers;

s. Whether Defendant City of Portland has exhibited a deliberate indifference to the unconstitutional conduct alleged in this Complaint.

189. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable. Doing so would only contribute to a state of uncertainty and confusion that would allow the constitutional violations described in this Complaint to continue.

190. This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(B). A ruling with respect to a single Plaintiff in this case would arguably be strong *stare decisis* with respect to other putative class members and members of the law enforcement community. There is no benefit to litigating the overwhelmingly common issues in this case individually. The interests of both Plaintiff Class members and Defendants requires class-wide treatment.

191. Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs were targeted not because of anything unique to them as individuals, but because of their activities as journalists and legal observers. Defendants targeted Plaintiffs as part of a broader pattern and practice of unconstitutional conduct directed against the Plaintiff Class, including without limitation the police's unlawful policy related to dispersing members of the press. Injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

192.     Common questions of law and fact "predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating" this controversy. Fed. R. Civ. P. 23(b)(3). The questions outlined in paragraph 188 above are the primary questions in this litigation, and no other method will adjudicate this controversy as fairly and efficiently as a class action.

## CAUSES OF ACTION

193.     "If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 898.

### First Cause of Action
### (Violation of the First Amendment)

194.     Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

195.     Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct. Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity. Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

196.     Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' First Amendment rights on its face and as applied. Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Defendants know that

reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests. Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

197.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were demonstrating. Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

198.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place. Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

199.    By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, and by adopting an unlawful policy that restricts activities protected by the First Amendment, Defendants, under color of state law, subjected or caused Plaintiffs and Plaintiff Class to be subjected to the deprivation of rights secured by the First Amendment of the Constitution.

200.    It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

201.    The City's failure to supervise and train its employees and agents with respect to the First Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and

discipline officers for First Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

202.    The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the George Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's First Amendment rights.

203.    Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

<u>**Second Cause of Action**</u>
**(Violation of the Fourth Amendment)**

204.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

205.    Plaintiffs and Plaintiff Class, who were present at the protests to observe and report committed no crime. Nor did they pose a threat to any of Defendants' officers or agents or any other person.

206.    Plaintiffs and Plaintiff Class were seized by Defendants when their officers intentionally, through threats of arrest, chemical agents, rubber bullets, and other uses of force, terminated their freedom of movement.

207.    Using threats of arrest, riot batons, semi-lethal projectiles, and chemical weapons against neutral parties who are present to observe protests and report on them is an unconstitutionally excessive use of force. Defendants' seizure of Plaintiffs and Plaintiff Class was thus objectively unreasonable. Defendants, under color of state law, subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Fourth Amendment of the Constitution.

208.    It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the Fourth Amendment violations.

209.    The City's failure to supervise and train its employees and agents with respect to the Fourth Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

210.    The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's Fourth Amendment rights.

211.    Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

212.    Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

### Third Cause of Action
**(Violation of the Oregon Constitution, Art. I, §§ 8, 26)**

213.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

214.    Article I, § 8, of the Oregon Constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right." Article I, § 26, provides: "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from

instructing their Representatives; nor from applying to the Legislature for redress of [grievances]."

215.    "The difference in the language of the Oregon and federal constitutions may . . . be pointed to as indicating an intention to provide a larger measure of protection to free expression under the Oregon Constitution. The California Constitution, which contains language similar to Oregon Constitution, Art. I, § 8, was so construed in *Wilson v. Superior Court of Los Angeles County*, 532 P.2d 116, 120 (Cal. 1975), where the court said: 'A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press.'" *Deras v. Myers*, 272 Or. 47, 64 n.17 (Or. 1975); *see also State v. Tusek*, 52 Or. App. 997, 1000 n.2 (Or. Ct. App. 1981) ("[I]n some instances, Art I § 8 of the Oregon Constitution provides a larger measure of protection to citizens than does the First Amendment to the U.S. Constitution.").

216.    Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct secured by the Oregon Constitution, Art. I, §§ 8 and 26. Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity. Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

217.    Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' constitutional right to free speech on its face and as applied. Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Defendants know that reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests. Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

218.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were

demonstrating. Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

219.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place. Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

220.    By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, Defendants subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Oregon Constitution, Art. I, §§ 8 and 26.

## Fourth Cause of Action
## (Declaratory Judgment)

221.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

222.    Plaintiffs and Plaintiff Class intend to continue attending protests in Portland for the purpose of documenting, reporting on and observing the events. Plaintiffs are fearful, however, that they will be subjected to police violence or dispersed pursuant to the police's illegal policy. Plaintiffs are also fearful that the police will continue to use kettling and killbox tactics against protesters that sweep in media and observers.

223.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including

newsgathering, reporting, and documenting police interaction with protesters, violates the First Amendment.

224.     As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates the Fourth Amendment.

225.     As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates Article I, Section 8 of the Oregon Constitution.

226.     A judicial declaration is necessary and appropriate so that Plaintiffs and Plaintiff Class may ascertain their rights to engage in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

227.     Plaintiffs and Plaintiff Class are entitled to a declaratory judgment that Defendants may not threaten Plaintiffs and Plaintiff Class with arrest, arrest Plaintiffs and Plaintiff Class, or target Plaintiffs and Plaintiff Class for uses of force, while they are engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.       Declaratory relief;

B.       Injunctive relief;

C.       Compensatory damages;

D.       Punitive damages;

E.       An award of pre-judgment interest;

F.       An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.       Any other relief the Court deems proper.


Dated: July 10, 2020                              Respectfully submitted,

                                                  By: */s/ Athul K. Acharya*
                                                  Athul K. Acharya, OSB No. 152436
                                                  Matthew Borden, *pro hac vice* pending
                                                  J. Noah Hagey, *pro hac vice* pending
                                                  Gunnar K. Martz, *pro hac vice* pending
                                                  BRAUNHAGEY & BORDEN LLP

                                                  Kelly K. Simon, OSB No. 154213
                                                  ACLU FOUNDATION OF OREGON

                                                  *Attorneys for Plaintiffs*