**Matthew Borden**, Admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, Admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, Admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated, | Case No. 3:20-cv-1035-SI |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS U.S. DEPARTMENT OF HOMELAND SECURITY AND U.S. MARSHALS SERVICE** |
| v. | |
| **CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**, | **EXPEDITED HEARING REQUESTED** |
| Defendants. | |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau hereby move for a temporary restraining order and preliminary injunction. This motion is based on Federal Rule of Civil Procedure 65 and the First and Fourth Amendments to the United States Constitution. Plaintiffs support this motion with the accompanying memorandum of law and the declarations of Mathieu Lewis-Rolland and Garrison Davis and others in the process of being collected and signed at the time of filing of this motion.

Plaintiffs specifically seek an order enjoining Defendant Department of Homeland Security ("DHS"), Defendant U.S. Marshals Service ("USMS"), and their agents and employees (collectively, the "federal agents") as follows:

1.        The federal agents are enjoined from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), unless the federal agents have probable cause to believe that such individual has committed a crime. For purposes of this injunction, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse. Such persons shall, however, remain bound by all other laws.

2.        The federal agents are further enjoined from seizing any photographic equipment, audio- or video-recording equipment, or press passes from any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), or ordering such person to stop photographing, recording, or observing a protest, unless the federal agents are also lawfully seizing that person consistent with this injunction. The federal agents must return any seized equipment or press passes immediately upon release of a person from custody.

3.        To facilitate the federal agents' identification of Journalists protected under this injunction, the following shall be considered indicia of being a Journalist: visual identification as

a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or distinctive clothing that identifies the wearer as a member of the press. These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this injunction. The federal agents shall not be liable for unintentional violations of this injunction in the case of an individual who does not carry a press pass or wear a press badge or distinctive clothing that identifies the wearer as a member of the press.

4.      To facilitate the federal agents' identification of Legal Observers protected under this injunction, the following shall be considered indicia of being a Legal Observer: wearing a National Lawyers' Guild issued or authorized Legal Observer hat (typically a green NLG hat) or wearing a blue ACLU issued or authorized Legal Observer vest.

5.      The federal agents may issue otherwise lawful crowd-dispersal orders for a variety of lawful reasons. The federal agents shall not be liable for violating this injunction if a Journalist or Legal Observer is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed after the issuance of an otherwise lawful dispersal order.

The materials submitted in support of this motion demonstrate that "immediate and irreparable injury, loss, or damage will result to the movant[s] before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). They demonstrate a threat of irreparable harm to Plaintiffs and those similarly situated, that Plaintiffs are likely to succeed on the merits, that the balance of this harm against any harm the TRO may inflict on other parties weighs in favor of granting the TRO, and that the public interest favors issuing a TRO. If the Court grants the requested relief, Plaintiffs seek an expedited hearing under Federal Rule of Civil Procedure 65(b)(3). For the reasons argued in the memorandum of law, the Court should enter an order granting this relief.

# TABLE OF CONTENTS

MEMORANDUM OF LAW ............................................................................................... 1

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 3

    A.    Portland's Demonstrations Over the Murder of George Floyd ........................... 3

    B.    The Court Issues a TRO Against the Police ......................................................... 3

    C.    Federal Agents Attack Journalists and Legal Observers ...................................... 3

            1.    Federal Agents Shoot Plaintiff Lewis-Rolland ......................................... 4

            2.    Federal Agents Shoot Journalist Garrison Davis and Assault
                Legal Observers......................................................................................... 6

            3.    Federal Agents' Violent Attacks Continue Even as Legal
                Action Is Threatened ................................................................................. 7

ARGUMENT ................................................................................................................. 7

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
      THEIR FIRST AMENDMENT CLAIMS ......................................................... 8

    A.    Federal Agents Unlawfully Retaliated Against Plaintiff Lewis-
        Rolland ................................................................................................................ 8

            1.    Mr. Lewis-Rolland Was Engaged in Constitutionally
                Protected Activities.................................................................................... 8

            2.    Federal Agents' Use of Violent Force Has Chilled Mr. Lewis-Rolland from
                Exercising His First Amendment Rights ...................................................10

            3.    Mr. Lewis-Rolland's Newsgathering and Reporting Was a
                Substantial Motivating Factor in Federal Agents' Conduct......................11

    B.    For Reasons the Court has Already Explained, Federal Agents
        Have Unlawfully Denied Access to Journalists and Legal
         Observers............................................................................................................12

    C.    The Court Can Grant Equitable Relief Against the Federal
        Government.........................................................................................................14

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE
      COURT'S INTERVENTION.............................................................................15

III.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH
        STRONGLY IN FAVOR OF PLAINTIFFS .................................................................15

        A.    The Public Has an Unassailable Interest in a Free Press ....................................15

        B.    The Balance of Equities Weighs Strongly in Favor of Plaintiffs.........................17

CONCLUSION..............................................................................................................................17

MOTION FOR TRO & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

## TABLE OF AUTHORITIES

Page(s)

Cases

*Abudiab v. Georgopoulos*,
  586 F. App'x 685 (9th Cir. 2013) ..................................................................10
*Adkins v. Limtiaco*,
  537 F. App'x 721 (9th Cir. 2013) ....................................................................9
*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*,
  824 F.3d 858 (9th Cir. 2016)..........................................................................11
*Associated Press v. Otter*,
  682 F.3d 821 (9th Cir. 2012)..........................................................................15
*Barich v. City of Cotati*,
  2015 WL 6157488 (N.D. Cal. Oct. 20, 2015)....................................... 9, 10, 15
*Black Lives Matter Seattle—King Cty. v. City of Seattle*,
  2020 WL 3128299 (W.D. Wash. June 12, 2020)............................... 10, 15
*Branzburg v. Hayes*,
  408 U.S. 665 (1972) .........................................................................................9
*Brown v. Entm't Merch. Ass'n*,
  564 U.S. 786 (2011) .......................................................................................16
*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) .......................................................................................16
*City of Houston v. Hill*,
  482 U.S. 451 (1987) .........................................................................................9
*Cmty. House, Inc. v. City of Boise*,
  490 F.3d 1041 (9th Cir. 2007)........................................................................17
*Courthouse News Serv. v. Planet*,
  947 F.3d 581 (9th Cir. 2020)..........................................................................15
*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ................................................................................. 9, 12
*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014)............................................................................8
*E.V. v. Robinson*,
  906 F.3d 1082 (9th Cir. 2018)........................................................................14
*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995)....................................................................... 9, 10
*Globe Newspaper Co. v. Superior Court*,
  457 U.S. 596 (1982) .......................................................................................16
*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014)............................................................................7
*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*,
  24 F.3d 893 (7th Cir. 1994)............................................................................15
*Hartman v. Moore*,
  547 U.S. 250 (2006) .........................................................................................8

MOTION FOR TRO & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018) ...................................................16
*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012)..........................................passim
*McComas v. City of Rohnert Park*,
    2017 WL 1209934 (N.D. Cal. Apr. 3, 2017)........................9
*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)..........................................15
*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999)........................................8, 10
*New York Times Co. v. Sullivan*,
    376 U.S. 254 ..................................................................16
*Press-Enterprise Co. v. Superior Court ("Press-Enterprise II")*,
    478 U.S. 1 (1986)..........................................................12, 13
*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017).........................................13
*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)......................................................13
*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019)..........................................14
*Sierra Club v. Trump*,
    2020 WL 3478900 (9th Cir. June 26, 2020) ...................14, 15
*the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)..........................................7
*Ulrich v. City & Cty. of S.F.*,
    308 F.3d 968 (9th Cir. 2002)..........................................11
*United States v. Sherman*,
    581 F.2d 1358 (9th Cir. 1978).........................................9
*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005)..........................................7, 15

Statutes

5 U.S.C. § 702....................................................................14
U.S. Const. amend. I ...........................................................8

Rules

Fed. R. Civ. P. 65(b)(1)(A) .................................................3
Federal Rule of Civil Procedure 65......................................2
Federal Rule of Civil Procedure 65(b)(3)..............................3

Other Authorities

H.R. Rep. No. 94-1656........................................................14
*Newsgathering, Press Access, and the First Amendment*,
    44 Stan. L. Rev. 927 (1992) ...........................................13

## MEMORANDUM OF LAW

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau respectfully submit this memorandum in support of their motion for a temporary restraining order and preliminary injunction.

## INTRODUCTION

Plaintiffs respectfully seek to enjoin Defendant Department of Homeland Security ("DHS"), Defendant U.S. Marshals Service ("USMS"), and their agents and employees (collectively, "federal agents") from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting Defendants' violent response to protests over the murder of George Floyd. The Court has issued an identical TRO enjoining the Portland police from engaging in identical conduct.[1] The federal agents are aware of the Court's TRO, but have taken the position that they need not comply, which has once again placed press and legal observers in peril.

After the Court issued its TRO, journalists and legal observers enjoyed a respite from the violence and intimidation that gave rise to this lawsuit. Unfortunately, in the days that followed, President Trump sent federal agents into Portland to suppress protests and subject Portland to the same indiscriminate violence that he used to clear Lafayette Square of peaceful protesters, stating that "[t]he locals couldn't handle it" because "[l]ocal law enforcement has been told not to do too much."[2] President Trump added that his shock troops were "handling it very nicely"—by which he meant, apparently, that they were successfully subjugating protesters and carrying out his longstanding vendetta against the press.

---

[1] The Court's TRO covered "Defendants and their agents and employees, including but not limited to the Portland Police Bureau and all persons acting under the direction of the Portland Police Bureau." (Dkt. 33 at 8 ¶ 1.)

[2] Conrad Wilson & Jonathan Levinson, *President Trump Says Portland Police Are Incapable of Managing Protests*, OPB (July 10, 2020), https://www.opb.org/news/article/president-trump-portland-police-are-incapable-of-managing-protests/.

PAGE 1 -  MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

In the early hours of July 12, 2020, federal agents shot at least two journalists, including Plaintiff Mathieu Lewis-Rolland. (Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland Decl."), Dkt. 44 ¶¶ 13-16; Declaration of Garrison Davis ("Davis Decl."), Dkt. 43 ¶¶ 13-14.) Mr. Lewis-Rolland wore a shirt stating "PRESS" on large letters on the front and back and was photographing the protests with professional camera equipment. Nevertheless, federal agents shot him 10 times in the back and side—all above the waist. (Lewis-Rolland Decl. ¶¶ 2-3, 13.) They also shot journalist Garrison Davis, even though he too was clearly marked as press and was prominently displaying his press pass. (Davis Decl. ¶¶ 4, 13-14.) They also chased away legal observers affiliated with the National Lawyers' Guild by threatening to beat them with batons. (Davis Decl. ¶ 16.) The next day, the President announced: "We very much quelled it. If it starts again, we'll quell it again, very easily. It's not hard to do."[3] In the days that followed, federal agents have continued attacking journalists and legal observers and using indiscriminate military violence to chill Plaintiffs' protected activities.

As the Court has already ruled, such conduct raises "a serious threat to [Plaintiffs'] First Amendment rights," and therefore poses "a likelihood of irreparable injury." (Dkt. 33 at 7.) As members of the media and legal observers, Plaintiffs have a right to witness important public events and recount them to the world. Their newsgathering, observing, and recording activities are at the core of what the First Amendment protects. *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) ("The free press is the guardian of the public interest"). Federal agents' efforts to intimidate and suppress reporting on their own misconduct violate clearly established First Amendment law and are causing irreparable harm to Plaintiffs and the public. Federal agents are not above the law. They cannot attack media and legal observers for trying to document and observe law-enforcement activities—that is the hallmark of a totalitarian regime. For the reasons the Court issued the TRO against the police, the Court should issue identical relief against

---

[3] @keaton_thomas, Twitter (July 13, 2020, 11:47 A.M.), https://twitter.com/keaton_thomas/status/1282748500782899200.

PAGE 2 -   MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

federal agents, prohibiting them from assaulting people they know or reasonably should know are journalists or legal observers.

## FACTUAL BACKGROUND

The factual background for this motion is largely the same as the background for the TRO the Court issued 15 days ago. What is new is that even as Portland police comply with the TRO, the federal government has begun attacking journalists and legal observers in their stead. These facts are detailed below.

### A.    Portland's Demonstrations Over the Murder of George Floyd

The Minneapolis police murdered George Floyd on May 25, 2020. His killing prompted protests worldwide, including in Portland. Since his murder, thousands of people have gathered every night in Portland to protest and mourn Mr. Floyd's murder and insist that our institutions start ensuring that Black lives matter. These protests continue to the present day. (Declaration of Doug Brown ("Brown Decl."), Dkt. 9 ¶ 8.)

### B.    The Court Issues a TRO Against the Police

As detailed in Plaintiffs' previous motion for a TRO, over a month of protests, the police had repeatedly retaliated against journalists and legal observers and forcibly prevented them from covering the protests. (Dkt. 7 at 3-6.) On June 30, Plaintiffs moved for a TRO. (Dkt. 7.) On July 2, the Court granted a TRO enjoining the police from "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer," along with certain indicia to facilitate the police's identification of journalists and legal observers. (Dkt. 33 at 8-10.)

### C.    Federal Agents Attack Journalists and Legal Observers

After court issued TRO, journalists and legal observers enjoyed a brief respite and were able to report on protests without threat of reprisal. But then President Trump decided to move in federal agents to "quell" the protests.

### 1.    Federal Agents Shoot Plaintiff Lewis-Rolland

In the early hours of July 12, Mr. Lewis-Rolland was at the protests near the federal courthouse, documenting the protesters and their interaction with federal officials. (Lewis-Rolland Decl. ¶¶ 4, 6.) He was carrying bulky camera equipment, wearing a t-shirt that said "PRESS" in big block letters, and staying in well-lit areas to make sure officials could see that he was there in a journalistic capacity. (*Id.* ¶¶ 3-4.)

Around 1:54 a.m., federal agents began rushing out of the federal courthouse to eject protesters and neutrals alike from the area with tear gas, impact projectiles, and physical force. (*Id.* ¶¶ 5-7.) The agents were from "more than a half-dozen federal law enforcement agencies and departments" under the purview of DHS, including the Federal Protective Service.[4] Mr. Lewis-Rolland took the following video that documents much of what ensued: https://www.facebook.com/MathieuLewisRolland/videos/10218671503762415/. (Lewis-Rolland Decl. ¶ 5.)

Soon after the federal agents emerged from the courthouse, one shoved Mr. Lewis-Rolland, shouting "GET BACK! GET BACK!" (*Id.* ¶ 7.) About a minute later, an agent from the Federal Protective Service, Agent Doe, took aim at Mr. Lewis-Rolland but ultimately did not shoot at that time. (*Id.* ¶ 9.) Mr. Lewis-Rolland began moving west, complying with the agents' orders. (*Id.* ¶ 10.) About three minutes after the agents began their offensive, Mr. Lewis-Rolland had moved almost all the way to SW 4th Avenue, well past the boundary of federal property. (*Id.* ¶ 11.) Nevertheless, federal agents, including Agent Doe, continued to chase him and the crowd. (*Id.*) A few seconds later, Agent Doe or other federal agents next to him shot Mr. Lewis-Rolland in the side and back ten times. (*Id.* ¶ 13.) They riddled him with hard plastic bullets launched with enough force to put bullet holes in his "PRESS" t-shirt (*id.* ¶ 18):

---

[4] Ben Fox & Gillian Flaccus, *Homeland Security Deploys Officers In Portland Under Trump Monument Order*, OPB (July 10, 2020), https://www.opb.org/news/article/portland-oregon-homeland-security-officers-protests-trump-monument-order/.



*Figure 1: Federal agents' bullets ripped Mr. Lewis-Rolland's t-shirt at the bottom left and bottom right corners.*

Mr. Lewis-Rolland posed no threat to any federal agent or anyone else. (*Id.*) He was only documenting what officers and protesters were doing. (*Id.*) He was performing an essential function of the Fourth Estate. For his trouble, he suffered several wounds, lacerations, and contusions (*e.g.*, *id.* ¶ 15):



*Figure 2: Two of the ten times federal agents shot Mr. Lewis-Rolland. More pictures in Lewis-Rolland Decl. ¶¶ 14-16.*

### 2.    Federal Agents Shoot Journalist Garrison Davis and Assault Legal Observers

Journalist Garrison Davis was also covering the protests on the night of July 11 and the early morning of July 12. (Davis Decl. ¶¶ 1, 3.) Like Mr. Lewis-Rolland, Mr. Davis was clearly there as press: He wore a helmet that said "PRESS" on it in big block letters, held his press pass in one hand and his iPhone in the other, and did not participate in protests. (*Id.* ¶¶ 4-5.)

Shortly after midnight, the federal agents issued what they called a "last warning." (*Id.* ¶ 12.) They then launched a tear-gas offensive, engulfing the entirety of the steps of the courthouse, SW 3rd Avenue, and Lownsdale Square in tear gas. (*Id.*) They also started shooting munitions into the crowd. (*Id.*) As Mr. Davis moved backward, one Government agent shot him in the back with a tear gas canister. (*Id.* ¶ 13.) The canister fell into Mr. Davis's bag and

PAGE 6 -   MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY
           INJUNCTION AGAINST FEDERAL DEFENDANTS

inundated him with tear gas until people nearby helped him remove it. (*Id.*) Government agents also shot directly at him with pepper bullets and other munitions, even though he was no threat to them or anyone else. (*Id.* ¶ 14.) Mr. Davis also saw Government agents chase, truncheons swinging, after legal observers who were clearly affiliated with the National Lawyers' Guild. (*Id.* ¶ 17.)

### 3. Federal Agents' Violent Attacks Continue Even as Legal Action Is Threatened

After this Court issued a preliminary injunction preventing the police from retaliating against and dispersing journalists and legal observers, and even after Plaintiffs moved to add the federal officers as parties to this litigation, the federal agents continued their attacks on journalists and legal observers. (Declaration of Doug Brown ("Brown Decl.") ¶¶ 11-15.) These attacks included indiscriminately shooting and tear-gassing them for no cause whatsoever. (*Id.*; Declaration of Justin Yau ("Yau Decl.") ¶¶ 5-6.)

## <u>ARGUMENT</u>

Under the traditional four-factor test, plaintiffs may obtain a preliminary injunction if they show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). Alternatively, in the Ninth Circuit, plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotation marks omitted)). Here, Plaintiffs easily meet either bar.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. amend. I. To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying the restriction on Plaintiffs' speech. *Id.*

Federal agents retaliated against Plaintiff Lewis-Rolland and have illegally denied access to journalists and legal observers trying to document and record what Defendants are doing to protesters. The substantive First Amendment issues here are therefore essentially the same as those the Court decided in granting the TRO against the City. And there is no jurisdictional or procedural bar to granting Plaintiffs the same relief against the federal agents. Thus, Plaintiffs satisfy the likelihood-of-success prong and the Court should enjoin the federal agents from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a journalist or legal observer.

### A.   Federal Agents Unlawfully Retaliated Against Plaintiff Lewis-Rolland

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). These elements are easily satisfied here.

#### 1.   Mr. Lewis-Rolland Was Engaged in Constitutionally Protected Activities

Mr. Lewis-Rolland easily satisfies the first prong of a retaliation claim because he was engaged in the core First Amendment activities of newsgathering and recording federal agents at a protest.

Because freedom of the press lies at the heart of the First Amendment, "newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). That principle applies with greater force when the media reports on "the proceedings of government," because the media then acts as "surrogates for the public." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975); *Leigh*, 677 F.3d at 900 (quotation marks omitted). Here, at the time federal agents shot him, Mr. Lewis-Rolland was doing just that: reporting on protests against the government and government agents' dispersal of the protesters. (Lewis-Rolland Decl. ¶¶ 2-4.)[5]

Mr. Lewis-Rolland's activity was constitutionally protected for a separate and independent reason: For 25 years, the Ninth Circuit has recognized that people have the right to film "public officials performing their official duties in public." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). *Fordyce* itself involved facts remarkably similar to those here—a plaintiff who was "assaulted and battered by a Seattle police officer" in retaliation for videotaping and audio-recording a protest in the streets of Seattle. 55 F.3d at 439. In the decades since *Fordyce*, courts have continued to recognize this clearly established right. *See, e.g.*, *McComas v. City of Rohnert Park*, 2017 WL 1209934, at *7 (N.D. Cal. Apr. 3, 2017) (holding that there is a clearly established right against retaliation for "peacefully filming [an] officer"); *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) (same); *see also* *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) (allowing retaliation claim for photographing police officers to proceed even when plaintiff directed "a significant amount of verbal criticism and challenge" at officers (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987))).

Here, Mr. Lewis-Rolland was gathering news, recording public demonstrations on the streets of Portland, and documenting protest activities and police conduct, just as Jerry Fordyce

---

[5] As explained in Plaintiffs' motion for a temporary restraining order, all of the Plaintiffs attend protests to record and observe events, not to protest. (Dkt. 7 at 8.)

did 25 years ago on the streets of Seattle. (Lewis-Rolland Decl. ¶¶ 2-4.) For this reason, Mr. Lewis-Rolland was engaged in a constitutionally protected activity. *Fordyce*, 55 F.3d at 439.

>        **2.    Federal Agents' Use of Violent Force Has Chilled Mr. Lewis-Rolland from Exercising His First Amendment Rights**

Federal agents shot Mr. Lewis-Rolland ten times because he was filming them. (Lewis-Rolland Decl. ¶¶ 13-16.) They shot him with hard plastic bullets that ripped his shirt and left him covered in bruises and lacerations. (*Id.* ¶¶ 13-18.) On the same night, they shot Mr. Davis with a tear gas canister, pepper bullets, and other munitions, and they threatened to beat legal observers. (Davis Decl. ¶¶ 13-14, 16.)

This is easily enough to chill a reasonable person's speech. *Mendocino*, 192 F.3d at 1300-01. Courts have repeatedly held that similar uses of force would deter a person of ordinary firmness from exercising their constitutional rights. *See, e.g.*, *Black Lives Matter Seattle—King Cty. v. City of Seattle*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020) (holding that using tear gas, pepper spray, and rubber bullets would "surely chill[] speech"); *Abudiab v. Georgopoulos*, 586 F. App'x 685, 686 (9th Cir. 2013) (denying qualified immunity for retaliation where officer pepper-sprayed and punched plaintiff); *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) ("No reasonable trier of fact could doubt that a person of ordinary firmness would be deterred by the threat of arrest.").

Indeed, similar uses of force by PPB have actually deterred Plaintiffs from continuing to cover protests. (Dkt. 7 at 11-12.) Mr. Lewis-Rolland himself stated, before this Court's first TRO, that he had "ceased covering the protests in part because the actions of the police ha[d] made [him] apprehensive about [his] safety." (Declaration of Mathieu Lewis-Rolland in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 12 ¶ 13.) Relying on the protection conferred by the Court's TRO, Mr. Lewis-Rolland returned to his reporting. (Lewis-Rolland Decl. ¶ 1.) If federal agents can do what the Court has forbidden the police to do, he will be chilled once again.

### 3. Mr. Lewis-Rolland's Newsgathering and Reporting Was a Substantial Motivating Factor in Federal Agents' Conduct

The last element of a retaliation claim is that a plaintiff's protected activity must be "a substantial motivating factor" in federal agents' conduct—that is, there must be some "nexus between [federal agents'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). Plaintiffs easily meet this standard here.

First, federal agents plainly knew Mr. Lewis-Rolland was newsgathering and reporting when they fired upon him. He was carrying a large, professional camera, with a long telephoto lens, and his phone was attached to the top via hotshoe. (Lewis-Rolland Decl. ¶ 3.) He was wearing a t-shirt that said "PRESS" in big block letters on both sides. (*Id.*) He was staying in well-lit areas so that it would be clear he was there only to document the protesters and their interaction with federal officials. (*Id.* ¶ 4.) He was not protesting. (*Id.*) Federal agents knew full well that he was reporting when they shot him.

Second, the agent who most likely shot Mr. Lewis-Rolland, Agent Doe, actually took aim at Mr. Lewis-Rolland a few minutes earlier, but he lowered his weapon when he realized Mr. Lewis-Rolland was capturing him on camera. (*Id.* ¶ 9.) Agent Doe then followed Mr. Lewis-Rolland as he moved to stay ahead of the skirmish line, waited until Mr. Lewis-Rolland's camera was turned away from him, and only then lit Mr. Lewis-Rolland up with a rapid succession of hard plastic bullets. (*Id.* ¶¶ 12-13.) This too shows that Agent Doe specifically targeted Mr. Lewis-Rolland for participating in protected First Amendment activity.

Third, the federal agents shot Mr. Lewis-Rolland in the back and side. (*Id.* ¶¶ 13-16.) He was not even facing them and therefore could not have been posing any risk to them. (*Id.* ¶ 13.) They also shot him multiple times, which was plainly excessive and not commensurate with any risk. Moreover, they shot him all ten times above the waist, risking damage to major organs,

rather than take aim at the large muscle groups of the buttocks and thighs.[6] All of these facts strongly suggest an intent to chill speech.

Finally, the federal agents' attack on Mr. Lewis-Rolland took place against the backdrop of their attacking press and legal observers generally. On the same night, federal agents shot another journalist with a tear-gas canister, pepper bullets, and other munitions. (Davis Decl. ¶¶ 13-14.) They also prevented legal observers in green National Lawyers' Guild hats from observing their activities by chasing them away with batons and threats of beatings. (Davis Decl. ¶ 16.) Taken together, all this is insurmountable proof that federal agents intended to deprive Mr. Lewis-Rolland of his constitutional rights.

### B.   For Reasons the Court has Already Explained, Federal Agents Have Unlawfully Denied Access to Journalists and Legal Observers

As the Court previously recognized, Plaintiffs seek a right of access. They assert the right to observe, record, and report on how Defendants enforce their dispersal orders. To vindicate that right, Plaintiffs must show (1) that the place and process to which they seek access have historically been open to the press and general public and (2) that public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 8-9 (1986).

Both elements are met here: "[P]ublic streets historically have been open to the press and general public, and public observation of police activities in the streets plays a significant positive role in ensuring conduct remains consistent with the Constitution." (Dkt. 33 at 7.) Permitting Plaintiffs to observe and report on how federal agents disperse crowds will have a salutary effect by facilitating federal agents' accountability to the public. *Cox Broad. Corp.*, 420 U.S. at 490-91 ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the

---

[6] The same night, federal agents shot a protester in the head causing severe injuries. Jonathan Levinson, *Federal Officers Shoot Portland Protester In Head With 'Less Lethal' Munitions*, OPB (July 12, 2020), https://www.opb.org/news/article/federal-officers-portland-protester-shot-less-lethal-munitions/.

press to bring to him in convenient form the facts of those operations."). And Plaintiffs have no

"alternative observation opportunities" other than remaining at the scene where federal agents

are using violent force against the people. *Reed v. Lieurance*, 863 F.3d 1196, 1211-12 (9th Cir.

2017). Thus, Plaintiffs have a qualified right of access.

Defendants can defeat that right only if they show "an overriding interest based on

findings that closure is essential to preserve higher values and is narrowly tailored to serve that

interest." *Press-Enterprise II*, 478 U.S. at 9. But Defendants have no legitimate interest, much

less an "overriding interest," in shooting people clearly marked as press or legal observers, who

are committing no crime but simply documenting how federal agents interact with protesters.

Federal agents might have a valid interest in protecting public safety, preventing vandalism or

looting, or protecting themselves—but media and neutral observers present no such threat. To the

contrary, as the Ninth Circuit explained in *Leigh*:

> By reporting about the government, the media are "surrogates for
> the public." When wrongdoing is underway, officials have great
> incentive to blindfold the watchful eyes of the Fourth Estate. If a
> government agency restricts public access, the media's only
> recourse is the court system. The free press is the guardian of the
> public interest, and the independent judiciary is the guardian of the
> free press. Thus, courts have a duty to conduct a thorough and
> searching review of any attempt to restrict public access.

677 F.3d at 900 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)); *see*

*also* Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev.

927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as

administrative convenience, preservation of evidence, or protection of reporters' safety, its real

motive may be to prevent the gathering of information about government abuses or

incompetence.").

As for narrow tailoring, the Court has already held that "there are at least serious

questions" about whether it is narrowly tailored for law enforcement to exclude journalists and

legal observers. (Dkt. 33 at 7.) Effecting that exclusion with the kind of extreme violence federal

agents used against Mr. Lewis-Rolland can never be narrowly tailored. (Lewis-Rolland Decl.

¶¶ 13-18.) Mr. Lewis-Rolland posed no threat to federal officers, so shooting him ten times at close range was not tailored at all.

### C.    The Court Can Grant Equitable Relief Against the Federal Government

The Court has jurisdiction over Plaintiffs' claim for injunctive relief against the federal agents because the federal government has waived its immunity against such claims:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. In enacting that sentence, Congress "eliminate[d] the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." *E.V. v. Robinson*, 906 F.3d 1082, 1092 (9th Cir. 2018) (quoting H.R. Rep. No. 94-1656, at 9 (1976)). Plaintiffs seek only equitable relief against the federal agents. Thus, sovereign immunity is no bar and the Court has jurisdiction over Plaintiffs' claim.

Plaintiffs plainly also have a cause of action to bring such a claim. When plaintiffs seek equitable relief under the First Amendment, courts often reach the merits without even "discussing whether a cause of action existed to challenge the alleged constitutional violation." *Sierra Club v. Trump*, 929 F.3d 670, 694-95 (9th Cir. 2019) (citing *Trump v. Hawaii*, S. Ct. 2392, 2416-17 (2018)) (collecting cases); *Sierra Club v. Trump*, 2020 WL 3478900, at *11-12 (9th Cir. June 26, 2020) (explaining plaintiffs "ha[ve] a cause of action to enjoin the [federal government's] unconstitutional actions" under courts' "historic [power] of equitable review").

Because Plaintiffs seek to enjoin federal agents from violating their First Amendment rights, they have an equitable cause of action to seek relief. Thus, there is no jurisdictional or procedural bar to granting Plaintiffs the same relief as the Court granted against the federal agents. (*See* Dkt. 33 at 8-10.)

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION

"[A]nytime there is a serious threat to First Amendment rights, there is a likelihood of irreparable injury." (Dkt. 33 at 7 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005)).) Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their constitutionally protected right to record Government activity in public has been infringed, they have satisfied the irreparable-injury requirement. (*See id.*) As long as the Government is free to shoot and arrest journalists and legal observers, Plaintiffs' exercise of their First Amendment rights will "surely [be] chilled." *Black Lives Matter*, 2020 WL 3128299, at *3; *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) ("No reasonable trier of fact could doubt that a person of ordinary firmness would be deterred by the threat of arrest.").

What is more, in the newsgathering context. the Ninth Circuit has recognized that time is of the essence and that any delay or postponement "undermines the benefit of public scrutiny and may have the same result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (quoting *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). Thus, every minute that Plaintiffs are inhibited and intimidated from exercising their First Amendment rights, they suffer irreparable injury. (Dkt. 33 at 7.)

## III.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

### A.    The Public Has an Unassailable Interest in a Free Press

"Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under Fourth Amendment).

Plaintiffs are journalists and observers reporting on public demonstrations of worldwide interest. As members of the news media, they were given express permission by the Mayor's

curfew order to be at the protest sites so they could provide live, up-to-date coverage of the activities of protesters and demonstrators, and also monitor the conduct of law enforcement.[7] This express permission is an acknowledgement of the uniquely significant public interest in press coverage in this case. In the context of the violent, destructive events of recent weeks, the public's interest in having information of this nature in a timely manner is obvious and constitutionally unassailable.

It would be difficult to identify a situation in which the public has a greater interest in unbiased media coverage of police and Government conduct than this one. The protests are rooted in an incident of shocking police brutality, and how the police and Government agents respond to the protesters is of critical importance to how and whether the community will be able to move forward. Although the protests began in Minneapolis, they have now spread across the country and the globe. The public interest in press coverage of these events cannot reasonably be questioned.

"The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. at 270. It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citation omitted), and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

---

[7] Emergency Executive Order Declaring an Emergency and Implementing a Temporary Nighttime Curfew in the City of Portland Oregon (May 30, 2020), https://www.portland.gov/sites/default/files/2020-05/5.30.20-mayors-state-of-emergency-.pdf.

PAGE 16 - MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

### B.    The Balance of Equities Weighs Strongly in Favor of Plaintiffs

Because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted). Plaintiffs' evidence—both video and testimony—shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish journalists for recording Government conduct and that their unlawful policy is aimed toward the same end. In contrast to the substantial and irreparable injuries to Plaintiffs, any harm to the Government would be negligible. The Government no interest in preventing journalists from reporting on what it is doing to protesters. While the Government might have an interest in protecting federal buildings and property, that interest is not served by using force against individuals who are identified as journalists, or who are merely recording events and present no threat of harm to police or the public.

The balance of equities weighs heavily in favor of Plaintiffs.

* * *

The Government's attempts to shield its violence against protesters from public scrutiny by targeting press and legal observers shows, once again, that "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900. But just as the "free press is the guardian of the public interest," so "the independent judiciary is the guardian of the free press." *Id.* To protect the press—and ultimately, the public's power to govern its public servants—this Court should enjoin the police from dispersing and retaliating against press and legal observers.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Motion for a temporary injunction and preliminary injunction be granted.

Dated: July 17, 2020                    Respectfully Submitted,


By: /s/ Matthew Borden
    Matthew Borden, *pro hac vice*
    J. Noah Hagey, *pro hac vice*
    Athul K. Acharya, OSB No. 152436
    Gunnar K. Martz, *pro hac vice*
    BRAUNHAGEY & BORDEN LLP


    Kelly K. Simon, OSB No. 154213
    ACLU FOUNDATION OF OREGON

    *Attorneys for Plaintiffs*