James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
Tel:   503-227-1011
Fax:   503-573-1939
E-mail:  jbuchal@mbllp.com
*Attorney for Amicus Curiae*
*National Police Association*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS LLC, a Washington limited-liability company, dba PORTLAND MERCURY; DOUG BROWN; BRIAN CONLEY; SAM GERHRKE; MATHIEU LEWIS-ROLLAND; KAT MAHONEY; SERGIO OLMOS; JOHN RUDOFF; ALEX MILAN TRACY; TUCK WOODSTOCK; JUSTIN YAU; and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation, JOHN DOES NOS 1-60, officers of Portland Police Bureau and other agencies working in concert; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. MARSHALS SERVICE,<br><br>Defendants. | No. 3:20-cv-01035-SI<br><br><br>***AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE ASSOCIATION** |

*AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE ASSOCIATION

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Preliminary Statement ............................................................................. 1

Argument ................................................................................................. 2

I.      RELEVANT OREGON AND FEDERAL LAW ................................ 2

     A.    Relevant Oregon Law ......................................................... 3

     B.    Relevant Federal Statutes .................................................... 6

     C.    Federal Constitutional Law ................................................. 9

II.     THE PRACTICAL DIFFICULTIES FACED BY LAW
     ENFORCEMENT IN PORTLAND ................................................. 13

     A.    The Need to Distinguish Between Protest and Riot ............ 13

     B.    Crowd Control Generally .................................................... 14

     C.    Particular Tactical Issues in Crowd Control ...................... 16

           1.    The police perspective .............................................. 16

           2.    Use of force generally .............................................. 19

           3.    Kettling ..................................................................... 20

           4.    The lack of less restrictive alternatives ................... 21

           5.    Special problems posed by journalists and observers .................. 22

     D.    The Specific Factual Context of Plaintiffs' Allegations ............ 26

           1.    Brief commentary on plaintiffs' evidence ................ 27

           2.    PPB's July 8, 2020 Presentation ............................... 29

     E.    The Larger Issues at Stake ................................................. 35

Conclusion ............................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Boreta v. Kirby*,
    328 F. Supp. 670 (N.D. Cal. 1971) ..........................................................................7

*Branzburg v. Hayes*,
    408 U.S. 665, 92 S. Ct. 2646 (1972)......................................................................11

*Case of Austin and Others v. The United Kingdom*,
    Application Nos. 39692/09, 40713/09, and 41008/09
    (Eur. Ct. Human Rights Mar. 15, 2012) ...............................................................21

*City of Portland v. Roth*,
    130 Or. App. 179 (1994)..........................................................................................4

*Dinan v. Multnomah Cty.*,
    No. 3:12-cv-00615-PK, 2013 U.S. Dist. LEXIS 11088
    (D. Or. Jan. 28, 2013) ..............................................................................................2

*Felarca v. Birgeneau*,
    891 F.3d 809 (9th Cir. 2018) .................................................................................10

*Forrester v. City of San Diego*,
    25 F.3d 804 (9th Cir. 1994) ...................................................................................10

*Graham v. Connor*,
    490 U.S. 386, 109 S. Ct. 1865 (1989)................................................................9, 10

*Houchins v. KQED, Inc.*,
    438 U.S. 1, 98 S. Ct. 2588 (1978)....................................................................11, 12

*Iko v. Shreve*,
    535 F.3d 225 (4th Cir. 2008) ...................................................................................2

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*,
    411 F.2d 934 (7th Cir. 1969) ...................................................................................6

*Nichols v. United States*,
    236 F. Supp. 260 (N.D. Miss. 1964).......................................................................9

*Nurse v. United States*,
    226 F.3d 996 (9th Cir. 2000) ...................................................................................7

*Plakas v. Drinski*,

19 F.3d 1143 (7th Cir. 1994) ..................................................................10

*Red Lake Band of Chippewa Indians v. United States,*
    255 U.S. App. D.C. 162, 800 F.2d 1187 (1986) ................................9, 17

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,*
    192 U.S. App. D.C. 376, 593 F.2d 1030 (1978) .....................................11

*Rundle* v. Madigan,
    356 F. Supp. 1048 (N.D. Cal. 1972) ...................................................7, 8

*Sami v. United States,*
    199 U.S. App. D.C. 173, 617 F.2d 755 (D.C. Cir. 1979) .......................8

*Scott v. Harris,*
    550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).....................2

*Smith v. United States,*
    330 F. Supp. 867 (E.D. Mich. 1971)......................................................8

*State v. Chakerian,*
    325 Or. 370 (1996).................................................................................4

*United States v. Dellinger,*
    472 F.2d 340 (7th Cir. 1972) ........................................................12, 16

*United States v. Faneca,*
    332 F.2d 872 (5th Cir. 1964) .................................................................9

*United States Fid. & Guar. Co. v. United States,*
    837 F.2d 116 (3d Cir.), *cert. denied,* 487 U.S. 1235,
    108 S.Ct. 2902, 101 L.Ed.2d 935 (1988) ..............................................7

*Walsh v. City of Portland,*
    No. 3:17-cv-01899-PK, 2018 U.S. Dist. LEXIS 185353
    (D. Or. Oct. 30, 2018) ..........................................................................21

## Federal Statutes

18 U.S.C. § 111(a)(1)...........................................................................7

18 U.S.C. § 1361...................................................................................7

18 U.S.C. § 2101...................................................................................6

18 U.S.C. § 2102(b)............................................................................12

28 U.S.C. § 2680(a) ...............................................................................7

28 U.S.C. § 2680(g) ...............................................................................7

**Federal Rules**

41 C.F.R. § 102.74.380(d) .....................................................................7

41 C.F.R. § 102.74.385 ..........................................................................7

41 C.F.R. § 102.74.390 ..........................................................................7

**State Statutes**

ORS 30.265 .............................................................................................5

ORS 30.265(6)(c) ....................................................................................5

ORS 30.265(6)(e) ....................................................................................6

ORS 131.675 ...........................................................................................4

ORS 164.315 ...........................................................................................5

ORS 164.325 ...........................................................................................5

ORS 164.335 ...........................................................................................5

ORS 166.015 ...........................................................................................4

ORS 166.025 ...........................................................................................3

ORS 401.990 ...........................................................................................3

ORS 431A.010 ........................................................................................3

ORS 814.040 ...........................................................................................5

ORS 814.070 ...........................................................................................5

ORS 814.010 ...........................................................................................5

**State Rules**

OAR 734-020-0045 .................................................................................5

**Other Authorities**

City Code Chapter 7.22..........................................................................................................5

City Code Chapter 16.70.210..............................................................................................5

**Preliminary Statement**

*Amicus* National Police Association (NPA) files this memorandum to assist the Court in resolving the pending motion for a temporary restraining order against the Federal Defendants, and to inform the Court generally about the issues present in the case from a police perspective.

Plaintiffs allege they are "news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd." (2d Am. Cmplt. ¶ 1.)  They allege that during ongoing protests in Portland concerning police conduct, Portland Police Bureau officers have repeatedly and intentionally assaulted them and others "similarly situated," and seek damages and injunctive relief.

With regard to injunctive relief, they allege that a "policy of dispersing neutrals" is violative of their First Amendment rights (*id.* ¶ 203), and that the conduct utilized to disperse them and others involves unconstitutionally excessive uses of force, including "threats of arrest, riot batons, semi-lethal projectiles and chemical weapons" in asserted violation of Fourth Amendment and other rights (*id.* ¶ 214).

We present below relevant legal authority concerning judicial review of these highly-discretionary choices concerning crowd control, and to offer a police perspective on the practical difficulties of such crowd control.  This Court will decide whether the defendants' lawful uses of force amount, in substance, to allegedly assaulting the plaintiffs to prevent their video recording police uses of force, and whether journalists and legal advisors should receive a special exemption from police orders to disperse, after a protest has deteriorated into a riot.

The Court's considerations include balancing the rights of the observers with the obligations of the police officers to enforce the law. The evidence already before the Court, at least in the form of hyperlinked video recordings of the serious hazards police officers have confronted at violent riots in Portland, should be carefully reviewed in its totality.[1]

When balancing these issues, the primary ramifications to journalists and observers (plaintiffs) include the possibility that they may not be able to get the story precisely the way they wish to present it to their editors, supervisors, or directly to the public, from within the heart of the violence. However, the ramifications for police officers (defendants) of enacting rulings or laws that create additional hazards, risks, dangers, and distractions will imperil officers to the point of increasing their risk of serious injury or death.

### Argument

## I.    RELEVANT OREGON AND FEDERAL LAW.

Portland and federal police officers are faced with a wide array of criminal conduct conducted by masses of people, in a legal context that affords the utmost discretion to their discretionary choices as to how to respond to all this criminal activity. While that discretion does not extend to violations of clearly-established constitutional

---

[1] Where, as here, plaintiffs present video capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *Dinan v. Multnomah Cty.*, No. 3:12-cv-00615-PK, 2013 U.S. Dist. LEXIS 11088, at *24 (D. Or. Jan. 28, 2013) ("since the video recording captures Vetter's conduct, there can be little factual dispute concerning the amount of force Vetter applied"). NPA suggests that the Court order plaintiffs to file the underlying videos they cite with the Court in the form of electronic data files for the completeness of the record.

Page 2:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE ASSOCIATION

law, the fundamental problem with plaintiffs' case is that the First Amendment protects the right *peaceably* to assemble, and when such assemblies degenerate into riots, the police can and should utilize reasonable crowd control measures.

### A.    Relevant Oregon Law.

All persons present in the protests, whether peaceful or not, including plaintiffs are committing crimes under the Governor's Executive Order No. 20-27, issued June 4, 2020,[2] which continues to forbid all "cultural, civil, and faith-based gatherings of more than 25 people" (§ 3(a)).  Under the Order, violators are to be penalized pursuant to ORS 431A.010 and ORS 401.990, *making every participant guilty of a Class C misdemeanor.*

Many protestors, and perhaps even some of the plaintiffs, are guilty of disorderly conduct in the second degree pursuant to ORS 166.025, which provides:

> "A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:
>
> > "(a) Engages in fighting or in violent, tumultuous or threatening behavior;
> >
> > "(b) Makes unreasonable noise;
> >
> > "(c) Disturbs any lawful assembly of persons without lawful authority;
> >
> > "(d) Obstructs vehicular or pedestrian traffic on a public way . . ."

While the plaintiff journalists may or may not have been involved in such conduct themselves, they are plainly part of assemblies where these Class B misdemeanors are being committed on a massive scale.

---

[2] Available at https://www.oregon.gov/gov/admin/Pages/eo_20-27.aspx.  This order has been continued without modification by Executive Order No. 20-30 through September 4, 2020.  (available at https://www.oregon.gov/gov/admin/Pages/eo_20-30.aspx).

There are also ongoing cases of felony riot under ORS 166.015:

"(1) A person commits the crime of riot if while participating with five or more other persons the person engages in tumultuous and violent conduct and thereby intentionally or recklessly creates a grave risk of causing public alarm.

"(2) Riot is a Class C felony."

The video recordings submitted by plaintiffs confirm mass participation in such "tumultuous and violent conduct."  While individual participants, including plaintiffs, may not have *personally* engaged in such conduct, the law cannot be construed to prevent law enforcement from stopping a riot merely because not every person in it can be convicted of riot.  *See State v. Chakerian*, 325 Or. 370, 375 n.8 (1996) (individual must have actually "engage[d] in violent and tumultuous conduct").

More importantly, Oregon law contains a specific command to officers to disperse rioters and arrest those who refuse to disperse:

"When any five or more persons, whether armed or not, are unlawfully or riotously assembled in any county, city, town or village, the sheriff of the county and the deputies of the sheriff, the mayor of the city, town or village, or chief executive officer or officers thereof, and the justice of the peace of the district where the assemblage takes place, or such of them as can forthwith be collected, shall go among the persons assembled, or as near to them as they can with safety, and command them in the name of the State of Oregon to disperse. If, so commanded, they do not immediately disperse, the officer must arrest them or cause them to be arrested; and they may be punished according to law."

ORS 131.675.  This statute expresses the common sense understanding that all those who refuse to disperse should be arrested, with decisions as to punishment to abide determination of the specific culpabilities involved.[3]

---

[3] Those who do no more than passively disobey such orders to disperse may not be punished, *see City of Portland v. Roth,* 130 Or. App. 179 (1994), but that does not make the arrests improper or unlawful; they are a necessary feature of crowd control.

Page 4:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE ASSOCIATION

The Portland Fire Bureau has also reported hundreds of cases of arson, ranging from felony attacks on occupied buildings (ORS 164.325 (first degree arson)) or other property causing damages exceeding $750 (ORS 164.315 (second degree arson)), all the way down to misdemeanor "reckless burning" (ORS 164.335), which is occurring every night in Portland in the immediate vicinity of the conduct about which plaintiffs complain.

Protestors, and perhaps plaintiffs here, are also routinely violate other laws, including ORS 814.010 (obey  traffic control devices), 814.040 (yield to vehicles), 814.070 (improper position on highways), OAR 734-020-0045 (prohibiting pedestrians on interstate highways) and City Code Chapter 16.70.210 (failure to use crosswalks).

While it is not directly relevant to the legal status of journalists, even peaceful protestors themselves are operating lawlessly, in violation of, among other things, Chapter 7.22 of the Portland City Code, which requires a permit for use of "streets or sidewalks" for the purposes of "walks, marches, parades . . . or other processions on streets or on sidewalks held by sponsors that require use of City resources."

For all these reasons, it is impossible to understate the vast scale of illegal conduct with which the law enforcement personnel operating in Portland have been confronted with, for weeks, on a daily basis.

A final area of relevant state law is Oregon's Tort Claim statute, ORS 30.265; like many legislatures, Oregon has attempted to create very broad immunities for "discretionary functions" like crowd control (ORS 30.265(6)(c)), as well as specific immunities for "[a]ny claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the prevention of any of the foregoing"

(ORS 30.265(6)(e)).  As further explained below, the Legislature cannot insulate the police from accountability for actions that are unconstitutional, but the existence of these statutes in a democratic system calls for attention to the concerns they raise about holding state actors accountable in court in situations involving "riot, civil commotion or mob action".

### B.    Relevant Federal Statutes.

Federal law also provides a wide range of relevant statutes which have been violated without number during the riots, beginning with the federal riot statute,

18 U.S.C. § 2101: Riots

> "(a) Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—

> "(1) to incite a riot; or

> "(2) to organize, promote, encourage, participate in, or carry on a riot; or

> "(3) to commit any act of violence in furtherance of a riot; or

> "(4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

As the Seventh Circuit has explained,

> ". . . the federal government has a strong interest in preventing violence to persons and injury to their property, and when clear and present danger of riot appears, the power of Congress to punish is obvious. *Cf. Cantwell v. State of Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 84 L. Ed. 1213. The definition of riot as used in Section 2102(a) of the Criminal Code is carefully limited to apply to such situations . . . and Section 2101 does not proscribe the peaceful exercise of the rights of free speech and assembly."

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 939 (7th Cir. 1969).

Other relevant federal crimes with which federal authorities operating in Portland have already charged rioters include destruction of federal property, 18 U.S.C. § 1361, assaulting, resisting, impeding and interfering with a federal officer, 18 U.S.C. § 111(a)(1) & (b), and a variety of other crimes including 41 C.F.R. § 102.74.380(d) (creating a hazard on federal property), 41 C.F.R. § 102.74.390 (disorderly conduct on federal property), and 41 C.F.R. § 102.74.385 (failing to obey a lawful order).

As in Oregon law, federal law has discretionary function exception precluding claims against the United States which are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused." 28 U.S.C. § 2680(a).  Federal law goes even further to protect law enforcement offers, with a general immunity against any claim for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution".  *Id.* § 2680(g).

Of course, "the Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply."  *Nurse v. United States*, 226 F.3d 996,1002 & n. 2 (9th Cir. 2000). And "[f]ederal officials do not possess discretion to violate constitutional rights."  *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir.), *cert. denied*, 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988).

In assessing the conduct challenged by plaintiffs, and considering systemic equitable relief, this Court needs to consider generally whether "the act complained of the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability?"  *Boreta v. Kirby*, 328 F. Supp. 670, 673 (N.D. Cal. 1971); *see also Rundle v.*

*Madigan*, 356 F. Supp. 1048, 1050 (N.D. Cal. 1972).  The discretionary function exemption is uniquely suited to questions, such as riot control, where "the question is not negligence but social wisdom, not due care but political practicability . . ."  *Sami v. United States*, 199 U.S. App. D.C. 173, 617 F.2d 755, 766-67 (D.C. Cir. 1979) (citation omitted).

Federal courts have been in the position of this Court before during many periods of riot and social unrest, and have given federal authority the latitude needed to maintain order.  As one federal judge remarked during Vietnam-era protests:

> "The means and method of restoring order in a city faced with anarchy and breakdown of civilian authority are delegated to the Executive Branch of the Government, not the judiciary. That some may say with the wisdom of hindsight that the National Guard was not sufficiently prepared to cope with the delicate task of quelling a riot motivated by racial tensions does not create a cause of action. It is more appropriately a plea addressed to the legislative and executive departments of Government.

> "The court is not unaware that an exception for discretionary functions of Government may create hardships on innocent persons. However, not all those injured, economically or physically, by the action of the Government can always be made whole for their injury. One commentator analyzed the problem thus:

>> "'One aspect of the problem involves intricate issues about proper distribution of governmental powers. Much of what is done by officers and employees of government must remain beyond the range of judicial inquiry, as it always has been. For instance, if the Secretary of State miscalculates in getting too close to the brink of war, clearly we do not want the courts in damage suits to determine whether the Secretary was negligent in dealing with the problem of international relations." K.C. Davis, Administrative Law, § 25.11.

> "The present case falls squarely in the above class."

*Smith v. United States*, 330 F. Supp. 867, 869 (E.D. Mich. 1971).

Looking further back in history, to the time when U.S. Marshalls had to be employed in connection with the enrollment of James Meredith in the University of

Mississippi, the federal judiciary rejected the claim that "[t]he United States, Katzenbach, and McShane lacked skill and ability in the formulation of plans or control of their personnel and should have known that the Deputy Marshals . . . were immature, nervous, or unseasoned in the use of gas projectiles and the controlling of large groups of persons." *United States v. Faneca*, 332 F.2d 872, 873 (5th Cir. 1964); *see also Nichols v. United States*, 236 F. Supp. 260, 262-63 (N.D. Miss. 1964) (holding that FTCA discretionary function exception applied to methods used by federal law enforcement officials in enforcing desegregation orders and quelling riots); *see also Red Lake Band of Chippewa Indians v. United States*, 255 U.S. App. D.C. 162, 800 F.2d 1187, 1198 (1986) (decisions concerning officer deployment not judicially reviewable, as "[l]aw enforcement personnel receive warnings, rumors and threats all the time [ . . .] are constantly required to assess the reliability of the information they receive, and to allocate scarce personnel resources accordingly").

This whole line of authority suggests that while the federal courts can and should provide a remedy against individual officers for specific misconduct that violates clearly established constitutional rules, there is no federal jurisdiction to impose broad remedies that interfere with federal discretionary choices for riot control.

### C.    Federal Constitutional Law.

Claims of excessive force involving arrest are primarily analyzed under the Fourth Amendment, where a court is to evaluate the use of force from the perspective of a reasonable officer on the scene, involving factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).  The test "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation".  *Id.* at 397. Other factors include "the availability of less intrusive alternatives to the force employed and whether warnings were given".  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).  However, the Fourth Amendment does not require officers to use the least intrusive alternative.  *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994).

Most generally, the Court is to engage in "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake".  *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994).  (A second inquiry, as to whether the right was clearly established at the time of the challenged conduct, is beyond the scope of this memorandum.)

This particular case focuses upon First Amendment interests, particularly those of persons alleged to be journalists.  The First Amendment, of course, does not protect riotous conduct.  The full text is:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people *peaceably* to assemble, and to petition the Government for a redress of grievances" (emphasis added).

The plaintiffs argue that they "are members of the media and legal observers, who have a right to witness important public events and recount them to the world." (2d Am Cmplt. ¶ 2.)  They certainly enjoy those rights in the context of peaceful protests. However, they enjoy no special rights over other citizens in the context of violent riots

where law enforcement has issued general and lawful orders to disperse to preserve

public order, and in that context, it is hyperbole to characterize the law enforcement

response as "efforts to intimidate the press and suppress reporting on the police's own

misconduct offends fundamental constitutional protections and strikes at the core of our

democracy." (*Id.* ¶ 1.)

> With regard to freedom of the press, the D.C. Circuit has explained,
>
> "The First Amendment is not the personal preserve of 'journalists.'  It covers almost all forms of expression; it covers associative activities; it covers religious activities. Each citizen has First Amendment rights and each one's rights are as precious as the other's. Every time law enforcement officers arrest an individual, they place restraints on First Amendment activity."

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,* 192 U.S. App. D.C. 376,

593 F.2d 1030, 1059 (1978).

> In general, of course, the Fourteenth Amendment guarantees "the equal protection

of the laws" to all citizens, journalists or nonjournalists.  The federal courts have long

resisted the creation of special privileges for journalists, beginning with the seminal case

of *Branzburg v. Hayes*, 408 U.S. 665, 703-04, 92 S. Ct. 2646, 2668 (1972).  As the

Supreme Court explained in denying a privilege on the part of a journalist to withhold

evidence from a grand jury,

> "The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order. Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods."

*Id*. at 703-04.  The Supreme Court expanded this holding in *Houchins v. KQED*, Inc., 438

U.S. 1, 15, 98 S. Ct. 2588, 2597 (1978), to conclude that "[n]either the First Amendment

nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."

Plaintiffs' requests for injunctive relief generally seek to create special rights for journalists or legal observers to gather information in areas where protests have become riots, and the defendants are attempting to bring them under the government's control. There is no basis in law for affording plaintiffs any greater rights than anyone else present in these events, vast number of whom appear from videos to be taping the events in question as do plaintiffs.

A final and critical First Amendment question is the degree to which participants whose conduct is limited to speech or other expressive conduct may nonetheless be held criminally liable under either common law theories of aiding and abetting, or specific statutes like 18 U.S.C. § 2102(b):

> "As used in this chapter, the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts."

The constitutional scope of such provisions is beyond the scope of this memorandum, but as the Seventh Circuit has explained,

> ". . . rioting, in history and by nature, almost invariably occurs as an expression of political, social, or economic reactions, if not ideas. The rioting assemblage is usually protesting the policies of a government, an employer, or some other institution, or the social fabric in general, as was probably the case in the riots of 1967 and 1968 which are the backdrop for this legislation. A second reason is that a riot may well erupt out of an originally peaceful demonstration which many participants intended to maintain as such."

*United States v. Dellinger*, 472 F.2d 340, 359 (7th Cir. 1972).  We discuss below the roles played by various categories of participants in the ongoing riots in Portland, some

of whom are engaging in expressive conduct, in a way that assists those engaged in more violent conduct.  Absent further development of the facts, the Court should not conclude that only those actively attacking police positions may be held accountable for criminal conduct.

## II.    THE PRACTICAL DIFFICULTIES FACED BY LAW ENFORCEMENT IN PORTLAND.

### A.    The Need to Distinguish Between Protest and Riot.

In their complaint, the plaintiffs consistently conflate "riot" with "protest". Plaintiffs refer to riot only three times in their complaint, and that is when referencing a "riot baton"; they refer to "protests" and "protesters" over a hundred times.  This goes hand in hand with general allegations that police are assaulting "peaceful" people at "protests".

The NPA understands that many Oregon leaders are aligned with plaintiffs in failing to distinguish riots from protests, and notes that Oregon Governor Kate Brown also conflates protest with riot.  About a recent riot where a demonstrator was seriously injured by an impact munition, allegedly fired by a U.S. Marshal, she referred to [the federal government] "continuing to push for force and violence in response to *protests*" (emphasis added).[4]  Portland Mayor Ted Wheeler has also said, "Journalists need to be able to cover the protests safely."[5]

---

[4] J. Levinson, Oregon Public Broadcasting, "Federal Officers Shoot Portland Protester In Head With 'Less Lethal' Munitions," July 12, 2020 (available at: https://www.opb.org/news/article/federal-officers-portland-protester-shot-less-lethal-munitions/).

[5] D. Orr, Oregon Public Broadcasting, *ACLU Sues Portland Police, Saying Officers Attacked Journalists at Protest*, June 28, 2020 (available at: https://www.opb.org/news/article/aclu-sues-portland-oregon-police-officers-attacked-journalists-blm-protests/).

From the perspective of the NPA, the primary issue here is conduct during riots, not peaceful protests.  Journalists have no problem reporting on peaceful protests.  No one can guarantee anyone's safety if they remain to cover or observe a riot because riots are, by their nature and legal definition, violent.  Even Mayor Wheeler declared during an interview with KGW, "This is a riot.  It's a full-on riot."[6]

The NPA urges this Court hold that when a protest becomes violent, and the police initiate actions or issue orders to disperse the crowd, everyone must disperse, including journalists, legal observers, and other neutrals.  If a journalist or legal observer refuses to obey the law, he or she is accepting the risk and consequences of use of force by police officers.  Dispersing journalists or legal observers along with other members of a crowd that has become a riot, that does not mean officers are preventing journalists from covering or legal observers from observing the event.  It means officers are removing lawbreakers, according to training, policy, and law.

**B.    Crowd Control Generally.**

Much has been written on training police in crowd management and crowd control policies, strategies, and tactics intended to reduce the possibility of death or injuries to demonstrators, bystanders, and police officers.[7]  Lt. Dan Marcou, a retired police officer and noted expert in mass demonstrations and riot preparedness, has

---

[6] P. Helsel, KGW, "Portland, Oregon, mayor: 'This is a riot. It's a full-on riot'," May 30, 2020 (available at: https://www.nbcnews.com/news/us-news/blog/george-floyd-death-nationwide-protests-live-updates-n1219376/ncrd1219481#blogHeader).

[7] *See, e.g.,* B. Brown, "*Cops and Chaos: A Historical Examination of the Police Role in Riot Control, Journal of Applied Security Research,*" 10 Journal of Applied Security Research, Issue 4 (2015), at 427-465.

usefully summarized the complexity of police riot control in an article entitled "5 steps of riot prep:  How to do crowd control correctly," published in PoliceOne.com,[8]

To facilitate as uniform an application of authorized crowd control strategies and tactics as practicable, law enforcement agencies develop and publish police manuals and directives encompassing a vast range of police operations, including crowd control. These manuals and directives establish policies informed by federal, state, and local laws as well as industry standards.

These manual sections and directives are similar across jurisdictions regionally and nationally.  Generally speaking, though police orders to disperse prior to using force on a violent crowd are important, they are not mandatory.  Most policies provide a caveat regarding providing warnings "when feasible."  This is because it may be necessary for the police to engage in uses of force to disperse a crowd without warning to ensure officer and public safety.  Some riot situations can be unexpectedly volatile, and it illustrates police restraint when they manage to issue orders to disperse in spite of the violence.

For example, the Portland Police Bureau's Directive 0635.10 *Crowd Management/Crowd Control*[9] and the Seattle Police Department Manual (SPDM) Section 14.090 Crowd Management[10] both acknowledge the volatility of large demonstrations

---

[8] Lt. Dan Marcou, "5 steps of riot prep: How to do crowd control correctly," June 1, 2020 (available at: https://www.policeone.com/police-products/tactical/riot-gear/articles/5-steps-of-riot-prep-how-to-do-crowd-control-correctly-y1ZCeeGGOfjnGaXN/).

[9] City of Portland Police Bureau Directive available at: https://www.portlandoregon.gov/police/article/649358 (Note "directive currently under review")

[10] Seattle Police Department Manual available at: http://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management

unexpectedly to turn violent. As noted above, so too does the federal judiciary. *Dellinger*, 472 F.2d at 359 ("a riot may well erupt out of an originally peaceful demonstration which many participants intended to maintain as such").

Portland's Directive, Section: 8, *Announcements and Warnings*, 8.1 recognizes police may not have time to issue orders to disperse: "*When feasible*, members shall make loud, intelligible and consistent announcements and warnings to the crowd" (emphasis added). And Section: 9, Crowd Dispersal, 9.1.2, provides: "Prior to taking police action to disperse the crowd, and when tactically feasible and time reasonably permits, members shall issue a minimum of two warnings at reasonable intervals to allow the crowd to comply." Similarly, the SPDM 14.090, Section 9, Crowd Dispersal, states, "The Incident Commander or designee will issue the order to disperse prior to instructing officers to disperse the crowd, *if feasible*" (emphasis added).

These policies deserve deference from this Court, as they are the product of agency expertise including experience with police enveloped within the midst of tumult may have no time to issue warnings to disperse before initiating force. That being said, police most often do issue audible warnings to disperse.

### C.    Particular Tactical Issues in Crowd Control.

In general, if a demonstrator refuses to leave after being ordered to disperse by the police, the police must consider that person as "participating" in the riot. This is the product of sound crowd control tactics, and should not be regarded as unconstitutional.

#### 1.    The police perspective.

As the D.C. Circuit has noted, "[l]aw enforcement personnel receive warnings, rumors and threats all the time[,] . . . are constantly required to assess the reliability of the

information they receive, and to allocate scarce personnel resources accordingly". *Red Lake Band*, 800 F.2d at 1198.  During these ongoing and volatile protests, police must constantly look for signs of impending and actual violence.

If violence breaks out, if feasible, commanders will issue amplified warnings for the crowd to disperse or they may be arrested.  After the warnings, people within the crowd who choose to stay, peaceful or otherwise, become a part of the riot.  People refusing commands to disperse who argue the police should consider them "peaceful" because they are not committing violence at the moment is unrealistic.

The plaintiffs in this case ignore the impossibility of the police making precise distinctions between violent and non-violent protesters during a riot.  Even if a particular person is not committing violence, he or she is still contributing to the miasma making it unreasonable for an officer to differentiate between friend and foe.  This applies even when journalists and legal observers are credentialed, or even wearing a specifically colored vest.

Police officers in the midst of a riot need fewer distractions, not more.  For example, media reported 75 officers injured during one recent riot in Denver.[11]  And, "at least twelve police officers have been shot in the line of duty as riots and protests rage…."[12]  There must be a balance between First Amendment protections and officer and public safety concerns.  People injured during rioting, including the plaintiffs, choose to place themselves at risk.

---

[11] FOX 32 News, Denver: https://kdvr.com/news/local/75-denver-police-officers-injured-during-george-floyd-protests-and-riots/

[12] The Daily Caller, *These Are The Police Officers Shot During The Riots*: https://kdvr.com/news/local/75-denver-police-officers-injured-during-george-floyd-protests-and-riots/

Often, during riots, police must deploy teargas.  This requires officers don gasmasks that inhibit their vision, hearing, and head movement.  Despite these deficits, they must be aware of violence directed at them from every angle.  This includes rioters aiming laser pointers at their eyes, throwing rocks, bricks, bottles, balloons filled with paint to blind them, attacks using ball bearings and slingshots, using the sticks signs are attached to as clubs, and even being aware that someone might walk up from behind and shoot them in the head.[13]

This happened to an officer at a riot in Las Vegas.  That officer is paralyzed for life.  Evidence included a video showing the suspect "walking by, taking out a gun and firing… at officers." [14]  Another federal officer died in May, when a gunman shot two federal officers during violent demonstrations in Oakland.[15]  Even in Portland, an agitator attacked a federal officer with a "four-pound blacksmith's hammer".[16]  Police officers nationally are keenly aware of the life-threatening dangers posed by the ongoing riots.

It is in this dynamic and violent environment that the plaintiffs expect police officers to separate the peaceful who disobey police orders from the violent who disobey police orders to disperse?  This is, as a practical matter, asking too much of officers

---

[13] "Officer shot during protest transferred to long-term care facility," Las Vegas Sun, July 1, 2020 (available at https://lasvegassun.com/news/2020/jul/01/officer-shot-during-protest-transferred-to-long-te/ )

[14] AP, "Police officer shot during Las Vegas protest paralyzed," June 14, 2020 (available at:  https://abcnews.go.com/US/wireStory/police-officer-shot-las-vegas-protest-paralyzed-71246536)

[15] KPIX, CBS, "Update: Security Officers Gunned Down At Oakland Federal Building; DHS Official Calls Gunman 'An Assassin'," May 30, 2020 (available at: https://sanfrancisco.cbslocal.com/2020/05/30/george-floyd-officers-gunned-down-at-oakland-federal-building-one-dead-one-wounded/).

[16] *United States v. Gaines*, No. 3:20-cr-00223-IM (filed July 16, 2020) (in addition to the quoted Indictment, this Court's file also contains a Complaint with a supporting affidavit providing further details).

Page 18:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE
              ASSOCIATION

dealing with so many dangerous, including life-threatening, distractions.  There should be no dispute that recent demonstrations pose life threatening risks to police officers.

While it is possible for an officer to incite a crowd to violence, it is rare.  Police respond to demonstrations, and crowd and individual behaviors dictate the amount of force necessary.  Often, it does not take much to "incite" agitators because they are looking for anything to use as an excuse to commit violence.  An unfortunate reality is peaceful protesters, unwittingly and wittingly, provide tacit and overt protection for violent protesters, rioters.  They provide a refuge from which the violent can commit a crime and then blend back into the crowd, back into a peaceful protester, journalist, photographer, legal observer, etc.

> **2.      Use of force generally.**

The plaintiffs allege unconstitutional use of force, accusing police of inciting violence and "targeting journalists" during protests based on video evidence gathered as the police respond to criminal violence during riots.  The plaintiffs hope the Court will be affected emotionally by lawful police uses-of-force employed to quell the violence and in self-defense, because no use of force ever looks "good" even when it is necessary and done properly.

The NPA, as well as Rob Mahoney, recommend one of the best articles on police use of force.  It was written by FBI Special Agent (Ret.) and current Chief & Division Counsel at Federal Bureau of Investigation, Thomas D. Petrowski.  In a two-part series, Petrowski "provide[s] an overview of the constitutional constraints on the use of force by law enforcement, address the inherent hesitation of police officers to use significant levels of force, and make recommendations regarding the ubiquitous force continuum and

other training considerations."[17]  In fact, Petrowski describes the phenomenon in one section titled, "Hesitation:  The Ever-Present Adversary."  Petrowski describes in detail the dangers that exist for officers who hesitate, writing, "The notion that one must not hesitate in the face of a dangerous threat seems elementary in use-of-force training, but in some training contexts, hesitation is exactly what is encouraged or expressly prescribed."

In Part 2 of Petrowski's article,[18] he writes, "The law, which reflects the pragmatic factors, and the natural hesitation officers experience when using force suggest it is not prudent to use an escalating force continuum when training officers to use force in defense of life.  Force continua perpetuate hesitation and exacerbate the natural reluctance of officers to apply significant force even when faced with a serious threat."

During riots, officers are already asked to hesitate to the point that they put their safety at risk.  The plaintiffs are asking for the Court to put yet another impediment that will cause officers to hesitate in the midst of violence.  They wish for the Court to write additional hesitation into law.  This endangers officer lives while providing special rights contrary to law.

### 3. Kettling.

Most often, demonstrators far outnumber police officers.  Law enforcement agencies around the world therefore developed and introduced tactics such as kettling specifically to reduce the use of force necessary to control an aggressive, hostile, and

---

[17] T. Petrowski, "Use-of-force policies and training: a reasoned approach," The FBI Law Enforcement Bulletin, Oct. 1, 2002 (available at  https://www.thefreelibrary.com/Use-of-force+policies+and+training%3a+a+reasoned+approach.+(Legal...-a093915942).

[18] Available at https://www.thefreelibrary.com/Use-of-force+policies+and+training%3a+a+reasoned+approach.+(Legal...-a093915942).

violent crowds. Kettling, or "containing" or "corralling," attempts to restrict demonstrators loosely within a more manageable area.

While its legality remains the subject of ongoing litigation in this Court,[19] the practice is worldwide and has been upheld by the European Court of Human Rights against charges that it violates Article 5, § 1 of the Convention for the Protection of Human Rights and Fundamental Freedoms.[20]  Regardless, activists continue to condemn the tactic.

Properly understood, kettling is an attempt to reduce the likelihood of officers having to use force at crowd control incidents or deploy impact munitions or chemical agents, or resort to pepper spray and impact weapons such as batons. Kettling is one of these options and encompasses a broader view of crowd management. It is a tactic designed to contain demonstrators within a cordon which then exploits human nature, behavior, and environmental conditions. Frustration, fatigue, boredom, and, sometimes, inclement weather encourage people to remain peaceful or to leave of their own accord.

### 4.    The lack of less restrictive alternatives.

Over time, the history of crowd control has moved away from ancient use of live fire to the use of less-lethal use-of-force alternatives (pepper spray, teargas, impact munitions, tasers, etc.). Plaintiffs and others with which they are aligned now call for bans on these alternatives. These kinds of bans leave officers with fewer less-lethal options. By all appearances, police critics complain about certain police strategies and

---

[19] *See Walsh v. City of Portland*, No. 3:17-cv-01899-PK, 2018 U.S. Dist. LEXIS 185353, at *14 n.3 (D. Or. Oct. 30, 2018).

[20] *Case of Austin and Others v. The United Kingdom*, Application Nos. 39692/09, 40713/09, and 41008/09 (Eur. Ct. Human Rights Mar. 15, 2012) (available at: https://www.legal-tools.org/doc/376078/pdf/).

Page 21:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE
          ASSOCIATION

tactics and when police respond with less harmful alternatives, critics find a reason to oppose these, too.

### 5.      Special problems posed by journalists and observers.

Once police have issued orders to disperse, it is virtually impossible, certainly impractical, and definitely dangerous for the police to attempt to differentiate between the non-violent and the violent and distinguish the agitators from the "neutral" participants covering or observing a riot.

Following the recent riots in San Antonio, Texas, Police Chief William McManus addressed this issue during an interview with a local NBC affiliate. Two journalists claimed they were struck by impact munitions fired by the police during a protest that turned violent.  Chief McManus said, "During crowd dispersal actions officers cannot readily distinguish between peaceful protesters, media and agitators once the situation has reached the boiling point."[21]

Rob Mahoney, was a highly-regarded Seattle Police Department Defensive Tactics instructor for many years.  He also taught seminars at the Washington State Criminal Justice Training Commission (WSCJTC) and at the International Law Enforcement Educators and Trainers Association (ILEETA).  Mahoney has advised the NPA, "Having worked over 90 percent of the demonstrations and riots in Seattle since 2013, there is no way to protect or avoid journalists in the crowd unless they are embedded with the police.  In fact, we have had to forcibly move many of them when they obstruct the police line when it starts to move.  They can be as much a danger to

---

[21] G. Tracy, "Chief McManus asks for help to identify riot instigators, explains use of force," San Antonio News, June 3, 2020 (available at: https://news4sanantonio.com/news/local/chief-mcmanus-asks-for-help-to-identify-riot-instigators-explains-use-of-force).

officers as many of the protestors or even greater because the protestors/rioters want the exposure and will gravitate towards the cameras, especially if they are seen as creating a weakness or abnormality in the [police] lines."

Officers should not disperse only those they see committing violence in a given moment. Reestablishing order requires removing everyone who is refusing police directions to leave the area. Rather, it is reasonable for law enforcement to consider everyone (with rare exceptions, such as the injured, infirmed, a child, or an elderly person) who refuses to disperse from a violent protest (riot), or remains after the violence starts, to be a rioter.

The problem police face is that a person who is peaceful one moment can easily commit a violent act and then return to being "peaceful" once again. If policy restrictions or laws prevent police from using measured but effective strategies and tactics to disperse a violent crowd, nothing prevents violent protesters from morphing into and out of non-violence or pretending to be media, legal observers, or another neutral party.

In this chaotic environment, plaintiffs ask police officers to distinguish not only between non-violent and violent demonstrators but also between the violent demonstrators and the folks ostensibly there to cover or observe the event. The NPA submits that this is demanding the police do the impossible. Nearly everyone at some point during the event is video recording the event with at least a cell phone, and anyone can fabricate a credential or a colored vest.

The NPA notes the following recently-posted Tweet which by all appearances is

from plaintiff Woodstock (and a reply) that bear on these questions:



Whether or not plaintiff Woodstock made this posting is less important than the

ability of anyone to print "press" credentials at will.  The NPA believes that further

factual development will confirm that even now, in Portland, a practice is rapidly-

emerging of simply inventing press credentials from single-person operations not

Page 24:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE
          ASSOCIATION

traditionally identified as "journalists."[22]  And there is every reason to believe that active

Antifa demonstrators will take advantage of the opportunity to utilize "press" status to

interfere with law enforcement:[23]



---

[22] Available at https://twitter.com/pdxT1/status/1283865258746982400?s=09.

[23] Available at https://twitter.com/MrAndyNgo/status/1284440832297369600?s=09.

There is unreasonable danger to officers to accept "press" or "observer" credentials at face value once the situation has disintegrated into a riot. To try and bypass people who identify themselves as journalists or legal observers, may leave those bypassed at police officers' backs. (And it was from that position that a demonstrator shot the aforementioned Las Vegas police officer.) The only other option is that police ignore their public safety obligations, abandon crowd control efforts, and allow violence to reign.

### D.    The Specific Factual Context of Plaintiffs' Allegations.

Plaintiffs asks the Court to believe, in substance, that the police are, unprovoked, instigating violence against peaceful journalists, legal observers, and others, inferring they are observing *peaceful* demonstrations. The abundance of video evidence does not bear this out. In fact, even during peaceful protests, Portland police officers have shown astonishing tolerance and patience in the face of vicious verbal attacks, including cruel racist slurs, and even of what are technically physical assaults.[24] To date, officers of the Portland Police Bureau have seen more than seven weeks of daily protests/demonstrations, many of them declared riots.[25] Federal officers have been continuously serving since their arrival as well.

---

[24] The Gateway Pundit, Hoft, 2018:
https://www.thegatewaypundit.com/2018/07/portland-protesters-hurled-racist-slurs-screamed-fing-ner-at-ice-officers-for-the-entire-month-but-its-ok-cuz-theyre-leftists/

[25] *See, e.g*., "Riot declared, arrests made on 46th night of Portland protests," KOIN 6 News, July 13, 2020 (available at: https://www.koin.com/news/protests/protesters-march-to-police-union-in-north-portland/).

Page 26:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE
          ASSOCIATION

## 1.    Brief commentary on plaintiffs' evidence.

The initial video evidence presented in the plaintiffs' complaint (*e.g.,* at ¶ 5)[26] alleges "police physically assaulted KBOO reporter Cory Elia, even though he identified himself as press, [and] because he was recording them."  This assumes two things: first, an assault occurred.  For an assault to have occurred, the police must use force unlawfully.  Second, for Elia to have concluded the officers' motives, "because he was recording them," would require Elia could read the officers' minds.  Many people video record at these events.

The video immediately shows clouds of riot control agents[27] (teargas, smoke, etc.) permeating the area.  These agents are evidence the police are dispersing an illegal gathering.  A person identified as Cory Elia, is seen straddling a bicycle.  He is holding up what appears to be an I.D. badge and stating he is a journalist.

Again, the NPA does not believe that officers generally have the luxury of checking I.D.s during riots.  Simply holding up a piece of paper or plastic is not an I.D. check.  An officer does not know that person and, during a riot, cannot risk being distracted by checking people's I.D.s.

About 15 seconds into the video, viewers hear, "This is the Portland Police Bureau.  This event is an unlawful assembly.  Leave the area now, to the north, or be subject to use of force to include riot control agents and impact munitions."[28]  Upon police issuing such an order to disperse, they are announcing the protest has officially

---

[26] https://tinyurl.com/EliaAssaulted

[27] CDC, *Facts About Riot Control Agents Interim Document*: https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp

[28] Defense Technology, Impact Munitions: https://www.defense-technology.com/product-category/impact-munitions/

become a riot.  This includes even "peaceful" people who have chosen to remain against police orders.  In the video, a person, perhaps the person recording the event, screams, "We were peaceful, you pigs!"

More recently, plaintiffs have presented affidavits from ACLU legal observer Doug Brown and an assertedly-independent journalist Justin Yau.  Mr. Brown offers testimony that in the heat of a crowd advancing "toward the federal agents," "nobody had done anything threatening or unlawful".  (Brown Decl. ¶ 5)  The NPA suggests that a cursory review of the video cited will show that this is completely false, with multiple criminal violations based on the size of the assembly, and various sorts of disorderly conduct, including blocking streets.  It is manifestly a chaotic situation.

Mr. Yau reports that a federal agent fired a tear gas canister at him at about 4:00 a.m. while the federal agents were clearing a crowd in the street—at the least, the crime of disorderly conduct.  (Yau Decl. ¶¶ 4-6.)  He reports that he was forty feet away from the crowd that was being cleared, when a federal agent fired from approximately 150 feet away.  He reports nothing about the overall context, or whether there were others near him.

Similarly, Mr. Tracy provides the Court with only narrow snippets of footage that omit context other than to show a haze of gas; the "press" helmet he wears is again nothing that can readily be distinguished in a mass of helmeted, gas-masked combatants.  (Tracy Decl. ¶¶ 6-7.)  Mr. Rudoff also confirms he was in the middle of tear gas in a context where the officers involved were defending the federal courthouse; his subjective experiences are no substitute for evidence of overall context here.  (Rudoff Decl. ¶¶ 4-5.)

Only the testimony of Mr. Howard provides some evidence that a single officer, acting contrary to all the others with whom Mr. Howard, may have identified him prior to shooting him with pepper balls—although again there is inadequate context to tell, and no supporting video evidence, though Mr. Howard was allegedly documenting the situation. (Howard Decl. ¶¶ 5-7.)  Properly understood, his declaration militates against general injunctive relief, and at most calls into question the actions of a single officer.

Agents at the distances reported (or carefully unreported) by plaintiffs, who may have been operating for hours, may have suffered the effects of gas limiting his vision, or attacks by demonstrators that impaired his visors, could even have seen any "press" markings at this distance.  Testimony that police "targeted" plaintiffs because they were hit with rubber bullets does not provide they were hit *because* they were journalists; the factual context makes them part of a crowd that poses a threat, in which all present and refusing to cease assaults on the courthouse subject to such "targeting".

Ultimately, as Seattle officer Mahoney explained, "there is no way to protect or avoid journalists in the crowd unless they are embedded with the police."  The injuries reported, while unfortunate, are the unavoidable consequence of plaintiffs' choice to stand in and around a crowd of those attacking the police.

### 2.    PPB's July 8, 2020 Presentation.

As we advised the Court in seeking *amicus* status, we have continuing concerns about the willingness of City (and now City-based federal) authorities to defend police conduct here, given the extraordinary political climate.  The NPA respectfully suggests that it would be appropriate for this Court to consider the general context of the Portland

riots, usefully summarized in a July 8, 2020 presentation by Portland Police Bureau Deputy Chief ("DC") Chris Davis.[29]

DC Davis gives an overview and timeline of the violence that has been occurring nightly in Portland for nearly 50 days, including a lot of publicly-posted video,[30] which DC Davis narrates. While some of DC Davis' information recaps information previously covered herein, it serves to underscore the endemic nature of these crucial issues. And, demonstrating police restraint, DC Davis mentions police sometimes delaying over an hour after the initial violence begins before declaring an official riot and deploying force.

DC Davis states there have been more than 100 city employees [police] and members of the public injured, and an estimated $23 million has been lost by businesses in damage and lost revenue during the past six weeks of rioting.

DC Davis also stressed not conflating protests with riots. He said, "Protests and this are two different things." Agitators have hijacked a legitimate "message and use it as a cover for criminal activity." He lauded the PPB's upholding of the guarantees of freedom of the press, free speech, and peaceful assembly. He also expressed the PPB's support for "the idea that black lives matter." But he says that message is lost in the nightly "violence, property damage, and criminal activity."

DC Davis said, during the day, Portland saw large peaceful protests with over 10,000 people participating. He noted these protests "really didn't need a lot of police interaction." Crowd actions determine the level of police force. It also shows that

---

[29] Available at https://youtu.be/rAtdLHg5JRo.

[30] With regard to dangers to police in Portland, this Court can take judicial notice that the federal courthouse is covered with graffiti which, like the graffiti show in DC Davis' videos, references "dead cops" and "burn pigs."

protests, such as these, that remain peaceful, are of little concern to the police.  But that is not what is happening at night.

DC Davis recounts a summary of the month and a half of nightly violence.  He said even with the relatively small first event (end of May), "someone threw a Molotov cocktail."  Of the next successive events, he noted this was more violent a display of civil unrest than "I have ever seen in my entire career in the PPB."  This included, "widespread burglary, theft, property damage…," arsons and assaults on police officers. Agitators also forced entry into the Sheriff's Office, ransacked it, and attempted to set it ablaze.  They also vandalized the federal courthouse.

Agitators also threw bottles, rocks, and fireworks at Sheriff's Office staff outside the Multnomah County Detention Center (jail).  DC Davis said it was at about this time police began to realize there was a "fairly well-organized agitator core," who would attempt to conscript initially peaceful people to join in the violence.  He noted how, one video shows, plastic water bottles hurled at the police would hit the ground and not break. They had been frozen to increase their lethality, while minimizing physical evidence. These are sophisticated tactics.

DC Davis noted a laser pointer repeatedly shined in an officer's eyes and notes the "volume of projectiles… thrown at officers at this point."  He said the PPB attempted many times to de-escalate, but nothing worked, and often increased the agitator's attacks. In one case, agitators blocked a door to a city fueling facility with flammable materials and attempted to set it on fire with officers trapped inside.

DC Davis continued to cite example after example of this type of violence and criminal activity that was occurring nightly. He said, "We believe that the [Oregon] State

Police Crowd Control Team likely prevented the PPA headquarters from being set on fire…"  Again, DC Davis was struck by the volume of projectiles agitators were throwing at the state police.  Troopers were injured by some of these objects, which included full beer cans, marbles fired from slingshots, and lasers shined in troopers' eyes.

On the 4th of July, DC Davis reports, agitators attacked federal officers protecting the federal courthouse.  He describes someone firing a "mortar-style firework into the [interior of the] building."  He discussed the role of fire, generally, in riots.  Many buildings in Portland, especially in the older areas, are made of wood.  He recalled agitators setting an American flag on fire as it was affixed to plywood on a building.

DC Davis provided a PDF of an agitator's group's organizational operations chart:



Narrating the video, he shows how the strategies and tactics police have seen used by agitators are listed on this very diagram, though it apparent was generated with reference to protests in Hong Kong.

DC Davis discusses how agitators employ strategies that encourage people, acting as individuals, to join the collective. He shows how, as the police approach, someone will shout for people in front to put their hands up. Then agitators will launch their projectiles from behind the people raising their hands. One notable tactic of the "Range

Soldier," is to carry umbrellas even when it is not raining.  These are used to deflect police less-lethal munitions, obscure identities, and as an impaling weapon.

Regarding crowd control agents, DC Davis describes that while pepper spray can affect a person for 90 minutes, a person in a cloud of teargas need only walk away from it to relieve its effects.  He said, "if we allow that group to come back together… we're going to be facing more violence."

The DC reiterates how, with the brutality of the weapons used against police, the police need to be cautious but effective. Another agitator weapon is paint-filled balloons. Agitators attempt to strike the officers' face shields, forcing the officers to have to raise those protective shields, which exposes their faces to lasers and projectiles.

DC Davis discusses other tactics agitators use, such as choosing areas to assemble near parks so they can stage supplies so they can rearm throughout the riot.  This Court can take judicial notice that when the City attempted to place fences around the parks in the immediate vicinity of the Justice Center and the federal courthouse, they were almost immediately destroyed.

DC Davis mentions that agitators use green lasers because they can cause eye damage and visual interference from greater distances than red lasers.  He mentions agitators "doxing" officers by using a bullhorn to announce officers' names and addresses so they and their families are at risk of harassment or physical attack.

In addition to D.C. Davis' presentation, Acting Homeland Security Secretary Wolf has also circulated a "snapshot of the lawless destruction and violence of the past several weeks that Department of Homeland Security and its subcomponents of Immigration and Customs Enforcement, Customs and Border Protection, and Federal

Protective Service have faced," which focuses on damage to federal property and attacks on federal officers.[31]

###    E.    The Larger Issues at Stake.

As DC Davis pointed out, the agitators (rioters) are very organized.  This is not simply a group of protesters who suddenly became upset and turned violent.  These are sophisticated agitators who arrive ready for battle.  His presentation delineates planning for active and passive roles, facilitating violence at what begins as a peaceful protest. While there are certainly people who show up to peacefully protest, from the perspective of those inclined toward violence, they also serve a purpose toward furthering violence.

This is not simply a group planning a protest in compliance with the First Amendment.  This is a sophisticated criminal conspiracy, with preparations and planning specifically intended to thwart lawful police actions, undermine public order, and assault police officers.  This elevates the agitators to the realm of domestic terrorists, and they should not be underestimated.  They have been operating increasingly as paramilitary organizations, employing militaristic terminologies, strategies, tactics, and weaponry.

DC Davis goes on to describe the multi-level, multi-faceted, and organized effort to defeat police efforts to end riots before, during, and after they occur.  His organizational chart shows the *before*, the during is evident, and lawsuits such as this one brought by the plaintiffs show the *after*.  Each facet appears a part of the larger strategy directed at weakening law enforcement's ability to quell violent disturbances.  Every impediment to police use-of-force, including injunctive relief exempting asserted

---

[31] Available at:  https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland.

Page 35:  *AMICUS CURIAE* MEMORANDUM OF THE NATIONAL POLICE
          ASSOCIATION

journalists and observers from dispersal during a riot, creates more danger for officers and the public and furthers the larger subversive goals of those fomenting disorder.

In short, this very suit shows plaintiffs, wittingly or not, operating hand in hand with part of a larger strategy misrepresenting the true motivations of the police: to enhance public safety by maintaining or restoring peace.  NPA submits that the historically-unprecedented attacks on Portland's Justice Center, courthouse, and police facilities are not good faith protests to raise awareness of lingering racism in our system of justice, but rather an attempt to undermine public order in the service of revolutionary objectives that would destroy the rule of law.

## Conclusion

This Court should be leery of reaching any conclusion that police officers, particularly federal officers, specifically "targeted" the plaintiffs.  By all appearances, they targeted any person who did not obey police orders to disperse, and their uses of force were necessary, reasonable, and lawful according to training, policy, and law.

Dated:  July 20, 2020.

*/s/  James L. Buchal*
James L. Buchal, OSB No. 921618
*Attorney for Amicus Curiae*
*National Police Association*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b),

26-3(b), 54-1(c), or 54-3(e) because it contains 9,346 words, including headings,

footnotes, and quotations, but excluding the caption, table of contents, table of cases and

authorities, signature block, exhibits, and any certificates of counsel.

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing *AMICUS CURIAE* MEMORANDUM

OF THE NATIONAL POLICE ASSOCIATION on the following attorneys on July 21,

2020, by notice of electronic filing using the CM/ECF system:

<u>/s/  James L. Buchal</u>
James L. Buchal, OSB No. 921618
*Attorney for Amicus Curiae*
*National Police Association*