ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*, | Case No. 3:20-cv-1035-SI |
| Plaintiffs. | **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRATING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF PORTLAND, *et al.*, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    Recent Destruction of Federal Property and Assaults on Federal Officers in
        Portland ....................................................................................................................2

    II.    Legal Authority to Protect Federal Property ....................................................6

STANDARD FOR EMERGENCY RELIEF ...................................................................... 9

ARGUMENT .................................................................................................................... 11

    I.    Plaintiffs Lack Standing to Obtain an Injunction Against Federal Defendants .................11

    II.    Plaintiffs are Not Likely to Succeed on the Merits Because They Will Not Suffer a First
        Amendment Violation and the Injunction They Seek is Legally Improper. .....................16

        A.    Plaintiffs Have Not Demonstrated that Federal Defendants Violated Their
                Constitutional Rights, Much Less that They Will Continue To Do So ................ 16

        B.    The Legally Improper Injunction Plaintiffs Seek is Overbroad and
                Unworkable................................................................................................. 21

    III.    Plaintiffs Cannot Demonstrate Irreparable Harm...............................................24

    IV.    Both the Balance of Equities and Publice Intersts Weigh Against Granting an
         Injunction.............................................................................................................25

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................................ 10

*Barney v. City of Eugene*,
  20 F. App'x 683 (9th Cir. 2001) ................................................................. 16-17

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) ......................................................................... 26

*Blair v. Shanahan*,
  38 F.3d 1514 (9th Cir. 1994) ......................................................................... 13

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ........................................................................................ 12

*Branzburg v. Hayes*,
  408 U.S. 665–85 (1972) ............................................................................ 23, 27

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) ..................................................................... 24

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ........................................................................................ 22

*California First Amendment Coal. v. Calderon*,
  150 F.3d 976 (9th Cir. 1998) .................................................................... 19, 27

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ......................................................................... 10

*Capp v. City of San Diego*,
  940 F.3d 1046 (9th Cir. 2019) ....................................................................... 17

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................... passim

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................ 15

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ........................................................................................ 18

*Curtis v. City of New Haven*,
  726 F.2d 65 (2d Cir. 1984) ............................................................................. 14

*Cuviello v. City of Oakland*,
  2009 WL 734676 (N.D. Cal. Mar. 19, 2009) ............................................ 23-24

*E. Bay Sanctuary Covenant v. Barr,*
  934 F.3d 1026 (9th Cir. 2019) ........................................................................... 22

*Eggar v. City of Livingston,*
  40 F.3d 312 (9th Cir. 1994) .............................................................................. 14

*Feiner v. New York,*
  340 U.S. 315 (1951) .................................................................................... 23, 25

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ............................................................................ 10

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ...................................................................................... 22

*Graham v. Connor,*
  490 U.S. 386 (1989) ................................................................................ 7, 8, 22

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .......................................................................................... 26

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
  505 U.S. 672 (1992) .......................................................................................... 26

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
  941 F.2d 970 (9th Cir.1991) ............................................................................. 22

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) ............................................................................ 9

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................... 11, 12

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
  192 F.3d 1283 (9th Cir. 1999) .......................................................................... 16

*Mims v. City of Eugene,*
  145 F. App'x 194 (9th Cir. 2005) ..................................................................... 17

*Munns v. Kerry,*
  782 F.3d 402 (9th Cir. 2015) ............................................................................ 15

*Murphy v. Kenops,*
  99 F. Supp. 2d 1255–60 (D. Or. 1999) ...................................................... 14, 16

*Nelsen v. King Cty.,*
  895 F.2d 1248 (9th Cir. 1990) ............................................................... 11, 12, 16

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 25

*NLRB v. USPS,*
    486 F.3d 683 (10th Cir. 2007) ........................................................... 24

*Occupy Sacramento v. City of Sacramento,*
    878 F. Supp. 2d 1110 (E.D. Cal. 2012) ............................................. 18

*Olagues v. Russoniello,*
    770 F.2d 791 (9th Cir. 1985) ............................................................. 24

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ........................................................................... 13

*Pac. Kidney & Hypertension, LLC v. Kassakian,*
    156 F. Supp. 3d 1219 (D. Or. 2016) .................................................... 9

*Perry v. Los Angeles Police Dep't,*
    121 F.3d 1365 (9th Cir. 1997) ........................................................... 19

*Press-Enterprise Co. v. Super. Ct. of Cal.,*
    478 U.S. 1 (1986) ......................................................................... 18, 19

*Rendish v. City of Tacoma,*
    123 F.3d 1216 (9th Cir. 1997) ........................................................... 24

*Ringgold-Lockhart v. Cty. of Los Angeles,*
    761 F.3d 1057 (9th Cir. 2014) ........................................................... 26

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ...................................................................... 13-14

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
    241 F.3d 232 (2d Cir. 2001) .............................................................. 24

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ............................................................................ 11

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .......................................................................... 10

*United Presbyterian Church v. Reagan,*
    738 F.2d 1375 (D.C. Cir. 1984) ......................................................... 11

*United States v. Christopher,*
    700 F.2d 1253 (9th Cir. 1983) ................................................... 7, 17-18

*United States v. Doe,*
    870 F.3d 991 (9th Cir. 2017) ............................................................. 20

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – v

*United States v. Griefen*,
  200 F.3d 1256 (9th Cir. 2000) ................................................................. 25-26, 26

*United States v. Patane*,
  542 U.S. 630 (2004) ...................................................................................... 21

*United States v. Sharpe*,
  470 U.S. 675 (1985) ...................................................................................... 24

*Updike v. Multnomah Cty.*,
  870 F.3d 939 (9th Cir. 2017) ............................................................. 12, 13, 16

*Washington Mobilization Committee v. Cullinane*,
  566 F.2d 107 (D.C. Cir. 1977) ............................................................... 20, 22

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................... 11, 12

*Williams v. Birmingham Bd. of Educ.*,
  904 F.3d 1248 (11th Cir. 2018) ..................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................................... 10

## Constitution

U.S. Const., amend. I .............................................................................. passim

## Statutes

18 U.S.C § 111 .......................................................................................... 6, 26

18 U.S.C. § 1361 ........................................................................................... 26

28 U.S.C. § 566 .......................................................................................... 8, 9

40 U.S.C. § 1315 ......................................................................................... 6, 7

## Regulations

41 C.F.R. § 102-74.390 ................................................................................... 7

## Rules

Fed. R. Civ. P. 65 .......................................................................................... 23

## INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction that would hinder the ability of federal law enforcement officers to protect federal property that has been repeatedly damaged after weeks of violent protests in Portland.  Plaintiffs base their request for emergency injunctive relief on alleged violations of their First Amendment rights, including the freedom of the press.  Their request fails for several reasons.

First, Plaintiffs lack standing to seek emergency relief.  It is well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm.  *See City of Los Angeles v. Lyons,* 461 U.S. 95 (1983).  Yet that is Plaintiffs' gambit here—they seek to have the Court enter an emergency injunction based on alleged past encounters involving federal law enforcement officers, but have not demonstrated that similar incidents will take place in the future, much less that these *particular* plaintiffs will again experience the same alleged conduct by federal law enforcement officers.  Because Plaintiffs cannot demonstrate a certainly impending injury, they lack standing to seek injunctive relief.  For many of these same reasons, Plaintiffs also cannot show a likelihood of irreparable harm, a prerequisite for granting emergency injunctive relief.

Second, the relief that Plaintiffs seek is entirely improper.  Plaintiffs seek a sweeping injunction that would be unworkable in light of the split-second judgments that federal law enforcement officers have to make while protecting federal property and themselves during dynamic, chaotic situations.  By granting immunity to journalists and observers from lawful orders to disperse, the injunction would effectively grant those individuals immunity from otherwise applicable legal requirements and would improperly bind the hands of law enforcement, including by preventing them from taking appropriate action when individuals are engaging in criminal conduct.  The proposed injunction is also unworkable from a practical

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 1

standpoint.  It would require law enforcement officers responding to a violent situation threating public safety to draw fine distinctions among a crowd based on who is wearing press identification badges and different colored hats, all under the threat of potential contempt.

Third, and finally, the balance of the equities and the public interest counsel against granting Plaintiffs' request.  Freedom of the press is not being threatened by the actions of the federal defendants in protecting federal property.  Equally important is the public interest in public safety, including protecting federal property, which has already been substantially damaged as a result of weeks of violent protests, as well the protection of officers and the general public against imminent threats of serious bodily injury.  Simply put, the federal government has the legal obligation and right to protect federal property and federal officers, and the public has a compelling interest in the protection of that property and personnel.  The press is free to observe and report on the destruction of that property, but it is not entitled to special, after-hours access to that property in the face of lawful order to disperse.

## **BACKGROUND**

### I.    **Recent Destruction of Federal Property and Assaults on Federal Officers in Portland**

For nearly two months, Portland has witnessed daily protests in its downtown area.  *See* Declaration of Gabriel Russell ¶ 3, Federal Protective Service (FPS) Regional Director, (Exhibit 1).  These daily protests have regularly been followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault.  *See id.*

Federal buildings and property have been the targets of many of these attacks, including the Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement (ICE) Building, and the Edith Green Wendall Wyatt Federal Office Building.  *See* Russell Decl. ¶ 4.  For example, on

May 28, 2020, the ICE Portland Field Office was targeted by a Molotov Cocktail.  *See* Affidavit of Special Agent David Miller ¶ 5 (July 4, 2020), *United States v. Olsen*, 20-mj-00147 (D. Or) (Exhibit 2).  The Mark O. Hatfield Courthouse has experienced significant damage to its façade and building fixtures, including the vandalism and theft of building security cameras and access control devices.  *Id.*  The most recent repair estimate for the damage at the Hatfield Courthouse is in excess of $50,000.  *Id.*

Officers protecting these properties have also been subject to threats, rocks and ball bearings fired with wrist rockets, improvised explosives, aerial fireworks, commercial grade mortars, high intensity lasers targeting officers' eyes, full and empty glass bottles, and balloons filled with paint and other substances such as feces.  Russell Decl. ¶ 4.  The most serious injury to an officer to date occurred when a protester wielding a two-pound sledgehammer struck an officer in the head and shoulder when the officer tried to prevent the protester from breaking down a door to the Hatfield Courthouse.  *Id.*  In addition, an officer was hit in the leg with a marble or ball bearing shot from a high-powered wrist rocket or air gun, resulting in a wound down to the bone.  *Id.*  To date, 28 federal law enforcement officers have experienced injuries during the rioting.  Injuries include broken bones, hearing damage, eye damage, a dislocated shoulder, sprains, strains, and contusions.  *Id.; see* Acting Secretary Wolf Condemns The Rampant Long-Lasting Violence in Portland (July 16, 2020) (Exhibit 3) (listing over 75 separate incidents of property destruction and assaults against federal officers between May 29, 2020 and July 15, 2020).

In response to the damage to federal property and assaults on federal law enforcement officers, DHS deployed federal officers to Portland for the purposes of protecting federal buildings and property.  Russell Decl. ¶ 5.  There are currently 114 federal law enforcement

officers from the FPS, ICE, U.S. Customs and Border Protection (CBP), and the U.S. Marshals Service (USMS) protecting federal facilities in downtown Portland. *Id.* From May 27 until July 3, officers were stationed in a defensive posture intended to de-escalate tensions by remaining inside federal buildings and only responding to breach attempts or other serious crimes. *Id.* This attempt to de-escalate was unsuccessful and an increasingly violent series of attacks culminated in a brazen effort to break into and set fire to the Hatfield Courthouse in the early morning hours of July 3, 2020. *Id.* A group of individuals used teamwork and rehearsed tactics to breach the front entry of the Courthouse by smashing the glass entryway doors. *Id.* The individuals threw balloons containing an accelerant liquid into the lobby and fired powerful commercial fireworks towards the accelerant in an apparent attempt to start a fire. *Id.*

The violence against federal officers and federal property over the Fourth of July holiday weekend resulted in the necessity of arrests of multiple individuals:

- On July 2-3, 2020, Rowan Olsen used his body to push on and hold a glass door at the Hatfield Courthouse closed, preventing officers from exiting the building and causing the door to shatter. With the door broken, a mortar firework entered the courthouse, detonating near the officers. The officers used shields and their bodies to block the open doorway for approximately six hours until demonstrators dispersed.

- On July 4, 2020, Shat Singh Ahuja willfully destroyed a closed-circuit video camera mounted on the exterior of the Hatfield Courthouse.

- On July 5, 2020, Gretchen Blank assaulted a federal officer with a shield while the officer was attempting to arrest another protester.

- On July 5-6, 2020, four men assaulted federal officers with high intensity lasers. At the time of his arrest, one of the men also possessed a sheathed machete.

*See* Seven Arrested, Facing Federal Charges After Weekend Riots at Hatfield Federal Courthouse (July 7, 2020) (Exhibit 4). In response to the increasingly violent attacks, DHS implemented tactics intended to positively identify and arrest serious offenders for crimes such

as assault, while protecting the rights of individuals engaged in protected free speech activity.
Russell Decl. ¶ 5.

Plaintiffs' motion primarily focuses on the response by federal officials to a violent
protest near the Hatfield Courthouse that occurred on the evening of July 11 into the early
morning of July 12.  *See* Pls.' Mot. at 4–7.  During that time the crowd of protesters near the
Hatfield Courthouse grew to approximately 300 people.  Russell Decl. ¶ 6.  A barrier of police
tape was established across the front of the Hatfield Courthouse and protesters were ordered not
to trespass on federal property but refused to comply with that command.  *Id.*  Commands were
made using a long-range acoustic device that is audible even with loud crowd noises.  *Id.*  As a
joint team of FPS, CBP, and USMS officers deployed and made an arrest for trespass, protesters
swarmed the officers.  *Id.*  FPS officers deployed less-lethal projectile rounds to allow the arrest
team to safely withdraw from federal property.  *Id.*  The protesters responded by throwing items
that posed a risk of officer injury, including rocks, glass bottles, and mortar-style fireworks, and
by pointing lasers at law enforcement personnel.  *Id.*  One protester encroached on a police
barrier, refused to leave, and became combative while detained.  *Id.*  A crowd of protesters
swarmed the officers and tear gas was deployed to protect officers as they withdrew to the
Hatfield Courthouse.  *Id.*

FPS gave protesters additional warnings to stay off federal property, and to cease
unlawful activity.  Russell Decl. ¶ 7.  Tear gas was deployed again to push protesters back from
the Hatfield Courthouse.  *Id.*  FPS contacted the Portland Police Bureau (PPB), who were
preparing to declare an unlawful assembly.  *Id.*  By this time the size of the group had diminished
to approximately 100 people.  *Id.*  Federal law enforcement teams from the Hatfield Courthouse
and the Edith Green Federal Building pushed the crowd towards the park across from the

building.  *Id.*  The PPB arrived and closed all roads in the vicinity of the facilities.  *Id.*  There

were multiple attacks throughout the night involving hard objects including rocks and glass

bottles and commercial-grade lasers directed at officers' eyes.  *Id.*  Federal officers made seven

arrests including three for assault on an officer and others for failure to comply with lawful

orders.  *Id.*  The PPB declared an unlawful assembly and began making arrests for failure to

disperse.  *Id.*  FPS also issued dispersal orders on federal property and cleared persons refusing

to comply with these orders at the same time.  *Id.*

## II.    Legal Authority to Protect Federal Property

FPS, a component of the Department of Homeland Security, is the federal agency

charged with protecting federal facilities across the country.  *See* Federal Protective Service

Operation, at https://www.dhs.gov/fps-operations.  Congress authorized DHS to "protect the

buildings, grounds, and property that are owned, occupied, or secured by the Federal

Government."  40 U.S.C. § 1315(a).  While engaged in their duties, FPS officers are authorized

to conduct a wide range of law enforcement functions:

(A) enforce Federal laws and regulations for the protection of persons and  property;

(B) carry firearms;

(C) make arrests without a warrant for any offense against the United States committed in
the presence of the officer or agent or for any felony cognizable under the laws of the
United States if the officer or agent has reasonable grounds to believe that the person
to be arrested has committed or is committing a felony;[1]

(D) serve warrants and subpoenas issued under the authority of the United States;

(E) conduct investigations, on and off the property in question, of offenses that may have
been committed against property owned or occupied by the Federal Government or
persons on the property; and

---

[1] *See, e.g.*, 18 U.S.C § 111 (assaulting a federal officer).

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 6

(F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C. § 1315(b)(2).

Additionally, the Secretary of Homeland Security may designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property."  40 U.S.C. § 1315(b)(1).

Congress also delegated authority to DHS to issue regulations "necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property." 40 U.S.C. § 1315(c).  Current regulations may include "reasonable penalties," including fines and imprisonment for not more than 30 days.  40 U.S.C. § 1315(c)(2). The regulations cover many activities, including prohibiting disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. § 102-74.380(d)).  *See United States v. Christopher*, 700 F.2d 1253 (9th Cir. 1983) (affirming convictions on charges of being present on federal property after normal work hours in violation of 41 C.F.R. §§ 101–20.302 and 101– 20.315).

In exercising its authority to protect federal property, FPS follows DHS policy on the use of force.  *See* DHS Policy on the Use of Force (Sept. 7, 2018) (Exhibit 5).  Consistent with guidance from the Supreme Court, *see Graham v. Connor*, 490 U.S. 386 (1989), DHS policy authorizes officers to "use only the force that is objectively reasonable in light of the facts and circumstances confronting him or her at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and

rapidly evolving." DHS Policy at 1–2. The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage." *Id.* at 3. DHS components must conduct training on "less-lethal use of force" at least every two years and incorporate decision-making and scenario-based situations. *Id.* at 5. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact weapons or chemical agents, before using such devices. *Id.* DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics." *Id.* at. 3.

DHS has also emphasized to its employees the importance of respecting activities protected by the First Amendment. *See* DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2029) (Exhibit 6). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1.

In addition to DHS's authority to protect federal property, the United States Marshals Service, a component of the Department of Justice, provides security inside federal courthouses in each of the 94 federal judicial districts and in the District of Columbia Superior Court. *See* U.S. Marshals Service, Court Security, at www.usmarshals.gov/duties/courts.htm/. The Marshals Service protects judges and other court officials at over 400 locations where court-related activities are conducted. *Id.* As set forth in 28 U.S.C. § 566(a), "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law." The regulations governing the duties of the Marshals Service further authorize it to provide "assistance in the protection of Federal property and buildings." 28 C.F.R. § 0.111(f); *see also*

28 U.S.C. § 566(i) (requiring the Director of the United States Marshals Service to consult with the Judicial Conference of the United States concerning, *inter alia*, "the security of buildings housing the judiciary" and stating that the "United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government.").

The Marshals Service's actions to protect the federal judiciary are guided by an agency-wide use of force policy. *See* United States Marshals Service, Policy Directive 14.15, Use of Force (Sept. 24, 2018) (Exhibit 7). Pursuant to that policy, the use of force must be objectively reasonable and Deputy Marshals may use less-than-lethal force only in situations where reasonable force, based upon the totality of the circumstances at the time of the incident, is necessary to, among other things, protect themselves or others from physical harm or make an arrest. *See id.* Deputy Marshals are not authorized to use less-than-lethal devices if voice commands or physical control achieve the law enforcement objective. *See id.* Further, they must stop using less-than-lethal devices once they are no longer needed to achieve its law enforcement purpose. *See id.* And in all events, less-than-lethal weapons may not be used to punish, harass, taunt, or abuse a subject. *See id.*

## STANDARD FOR EMERGENCY RELIEF

The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016). A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).[2]  "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the court "need not consider the other factors."  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  Because standing is a prerequisite to the Court's exercise of jurisdiction, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), the plaintiff's claims on the merits have no likelihood of success if the plaintiffs cannot establish standing.  *Id.* at 158 ("The party invoking federal jurisdiction bears the burden of establishing' standing and must do so "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.") (internal quotations and citations omitted).

Plaintiffs must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted).  As explained below, Plaintiffs cannot meet this demanding standard.

---

[2] Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted).

**ARGUMENT**

I.     **PLAINTIFFS LACK STANDING TO OBTAIN AN INJUNCTION AGAINST FEDERAL DEFENDANTS**

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983).  One of the "landmarks" that differentiates a constitutional case or controversy from more abstract disputes "is the doctrine of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  And the first requirement of standing is that "the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural' or "hypothetical."'" *Id.* at 560.

Where, as here, a party seeks prospective equitable relief, the complaint must contain "allegations of future injury [that are] particular and concrete."  *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 109 (1998).  While allegations of past injury might support a remedy at law, prospective equitable relief requires a claim of imminent future harm.  *Lyons,* 461 U.S. at 105; *see also Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990) ("[P]ast exposure to harm is largely irrelevant when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm."); *United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1381 (D.C. Cir. 1984) (past harm suffered by plaintiff does not support declaratory and injunctive relief).

It is therefore well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm.  *Lyons*, 461 U.S. at 101–02; *Nelsen*, 895 F.2d at 1251.  As the Supreme Court held in *Whitmore v. Arkansas,* 495 U.S. 149 (1990), allegations of possible future injury do not satisfy the requirements of Article

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 11

III.  A threatened injury must be "certainly impending" to constitute injury in fact.  495 U.S. at

158 (quoting *Babbitt v. United Farm Workers,* 442 U.S. 289, 298 (1979)).  As a result, in order

to invoke Article III jurisdiction, a plaintiff in search of prospective equitable relief must show a

significant likelihood and immediacy of sustaining some direct injury.  *Updike v. Multnomah

Cty.*, 870 F.3d 939, 947 (9th Cir. 2017) ("[S]tanding for injunctive relief requires that a plaintiff

show a 'real and immediate threat of repeated injury.'" (quoting *O'Shea v. Littleton*, 414 U.S.

488, 496 (1974))).  And standing cannot be presumed or deferred just because this case is

currently being considered on a TRO and preliminary injunction posture; standing is "an

indispensable part of the plaintiff's case" that "must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.

For a plaintiff to have standing, an alleged injury must be "concrete" and "actual or

imminent, not 'conjectural' or 'hypothetical.'"  *Lyons*, 461 U.S. at 101–02.  Even where a

plaintiff establishes that his rights were violated in past incidents, he nonetheless lacks standing

to obtain prospective injunctive relief absent a "real and immediate threat" that he will suffer the

same injury in the future. *Id.* at 105.  "[P]ast wrongs do not in themselves amount to that real and

immediate threat of injury necessary to make out a case or controversy."  *Id.* at 103 (citing

*O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) and *Rizzo v. Goode,* 423 U.S. 362, 372 (1976)).

*See also Nelsen*, 895 F.2d at 1251.  This "imminence requirement ensures that courts do not

entertain suits based on speculative or hypothetical harms." *Lujan*, 504 U.S. at 564.  Thus, a

plaintiff "who has been subject to injurious conduct of one kind [does not] possess by virtue of

that injury the necessary stake in litigating conduct of another kind, although similar, to which he

has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

Moreover, the plaintiff seeking injunctive relief must show not just that the predicted *injury* will reoccur, but also that the plaintiff himself will suffer it. *See, e.g.*, *Updike*, 870 F.3d at 948 (holding that the plaintiff lacked standing for injunctive relief because his evidence was "insufficient to establish that any such wrongful behavior is likely to recur against him"); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (holding that a plaintiff seeking declaratory or injunctive relief must "establish a personal stake" in the relief sought). In other words, plaintiffs cannot show an entitlement to injunctive relief unless they show that they themselves are likely to suffer injury from the allegedly unlawful activities. That other individuals might suffer future harm does nothing for a plaintiff's own standing.

The facts and reasoning of *Lyons* are instructive. At issue in *Lyons* was a civil rights action against the City of Los Angeles and several police officers who allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police . . . , while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea*, 414 U.S. at 495-96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Rizzo*, 423 U.S. at 372 (holding that plaintiffs' allegations that police had engaged in widespread unconstitutional conduct aimed

at minority citizens was based on speculative fears as to what an unknown minority of individual police officers might do in the future).

Courts in this Circuit have applied *Lyons* and O'*Shea* in similar contexts to hold that plaintiffs lack standing to pursue prospective injunctive relief where they were subject to past law enforcement practices but could only speculate as to whether those practices would recur. *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (plaintiff who had previously been repeatedly detained, charged, and convicted of offenses without court-appointed counsel despite her indigence lacked injunctive standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999) (plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders"). *See also Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir. 1984) (vacating an injunction that had been entered against police use of mace, because the plaintiffs had not shown a "likelihood that these plaintiffs will again be illegally assaulted with mace"); *Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1267 (11th Cir. 2018) (plaintiff alleging that a school resource officer employed by the police unconstitutionally used an incapacitating chemical spray on her lacked standing to pursue injunctive relief, because she did not show that a likelihood that the resource officer would again unconstitutionally spray her).

Nor can plaintiffs create standing for injunctive relief by alleging that their own fear of future government action has "chilled" their willingness to engage in First Amendment activities. When a plaintiff contends that injunctive relief is supported by such an alleged "chilling effect,"

the analysis is unchanged from the *Lyons* inquiry—the supposed chilling effect will not provide standing for injunctive relief if it is "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). In other words, where a plaintiff's request for injunctive relief lacks any non-speculative basis for finding a likelihood of future harm, the plaintiff cannot circumvent Article III merely by saying that he or she is *afraid* of future harm.

Plaintiffs' motion fails under these standards. Plaintiffs' support their requested relief is seven declarations from individual plaintiffs that focus entirely on past events. They recount episodes involving alleged conflicts between protesters and law enforcement officers on particular dates (July 11, 12, 16, and 19)—and describe injuries they or others allegedly suffered (e.g., bruising from a nonlethal plastic round). Dkt. 43 (Davis Decl.);[3] Dkt. 44 (Lewis-Rolland Decl.); Dkt. 55 (Brown Decl.); Dkt. 56 (Yau Decl.); Dkt 58 (Howard Decl.); Dkt 59 (Rudoff Decl); Dkt. 60 (Tracy Decl.).[4] But these threadbare accounts of isolated incidents fail to provide any basis for concluding that plaintiffs face certainly impending injury. Indeed, the declarations make no showing that Plaintiffs are in imminent danger of again being subjected to similar events in the future. For example, the Plaintiffs would need not only to establish that "they would have another encounter with the police but also to make the incredible assertion" that the same series of events would transpire again. *See Lyons*, 461 U.S. at 106 (stating that "[i]n order to establish an actual controversy in this case" Lyons would have to allege that "*all* police

---

[3] Garrison Davis is not a plaintiff and thus cannot sustain standing in this case, but his declaration also fails to support a finding of imminent danger to any Plaintiff.

officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter")
(emphasis in original).  They have not and cannot make such a showing.  And since courts may
not simply assume that the circumstances that gave rise to an alleged constitutional violation will
recur, the absence of such evidence is fatal to their request for relief.  *See, e.g.*, *Nelsen*, 895 F.2d
at 1251; *Updike*, 870 F.3d at 947; *Murphy*, 99 F. Supp. 2d at 1259–60.

## II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THEY WILL NOT SUFFER A FIRST AMENDMENT VIOLATION AND THE INJUNCTION THEY SEEK IS LEGALLY IMPROPER.

### A.    Plaintiffs Have Not Demonstrated that Federal Defendants Violated Their Constitutional Rights, Much Less that They Will Continue To Do So.

Plaintiffs complain of two First Amendment violations.  First, Plaintiffs seek an
injunction based on a claim that Federal Defendants retaliated against Mr. Lewis-Rolland, a
journalist, for engaging in newsgathering activities protected by the First Amendment.  *See* Pls.'
Mot. at 8–12.  Plaintiffs devote substantial attention to undisputed propositions of law that
newsgathering is a protected First Amendment activity that may be exercised in public places,
subject to reasonable time, place and manner restrictions.  But the key question in a First
Amendment retaliation claim is whether the plaintiff has established that "by his actions the
defendant deterred or chilled the plaintiff's political speech and such deterrence was a substantial
or motivating factor in the defendant's conduct."  *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192
F.3d 1283, 1300 (9th Cir. 1999).

Plaintiffs have not carried their burden to establish that the use of force was "anything
other than the unintended consequence of an otherwise constitutional use of force under the
circumstances."  *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (rejecting First
Amendment retaliation claim where "protesters were warned repeatedly to clear the street or tear

gas would be deployed, and there is no dispute that a small group of the crowd became violent");
*see also Mims v. City of Eugene*, 145 F. App'x 194, 196 (9th Cir. 2005) (holding that use of a
crowd control team "in full riot gear was not a disproportionate response and does not indicate
preexisting hostility toward the protestors' views").  Given the chaotic circumstances presented
by the violent protests, Plaintiffs have not established that Defendants would not have used force
"but for" a retaliatory motive.  *Capp v. City of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019).
As the Ninth Circuit has recognized, the unlawful actions of a few may impair the ability of
others to exercise their rights:

> In balancing desired freedom of expression and the need for civic order, to
> accommodate both of these essential values, a measure of discretion
> necessarily must be permitted to a city, on the scene with direct knowledge,
> to fashion remedies to restore order once lost.  It may be that a violent
> subset of protesters who disrupt civic order will by their actions impair the
> scope and manner of how law-abiding protesters are able to present their
> views.

*Menotti v Seattle,* 409 F.3d 1113, 1155 (9th Cir. 2005) (declining "to hold unconstitutional the
City's implementation of procedures necessary to restore safety and security" when confronted
by protesters with "violent and disruptive aims" that "substantially disrupt civic order").

Second, Plaintiffs also contend that Federal Defendants have denied Plaintiffs a right of
access to observe how Federal Defendants enforce their dispersal orders.  *See* Pls.' Mot. at 12–
14.  It is important to clarify at the outset, however, that Plaintiffs appear to be requesting only a
right to observe from public streets.  Thus, even under their proposed injunction, they still must
not come so close as to trespass on federal property.  Plaintiffs accordingly recognize from the
beginning that they have no right to be wherever protesters are.  The government may certainly
prohibit a public presence on its property outside of its ordinary hours of operation—an interest
rooted in part in protecting that property—and an interest in First Amendment activities does not
permit violation of those rules.  *See Christopher*, 700 F.2d at 1259-61 (upholding conviction for

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 17

trespassing for soliciting signatures on government property outside of normal business hours). This is true even if the property functions as a traditional public forum during the hours when it is open. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding prohibition on overnight sleeping to prevent damage to park); *Occupy Sacramento v. City of Sacramento*, 878 F. Supp. 2d 1110, 1120 (E.D. Cal. 2012) (granting dismissal and rejecting injunction on claim against regulation closing park overnight in order to protect it).

Plaintiffs nevertheless argue that they have a right to continued presence on public streets surrounding the federal property, even if a lawful order to disperse has been given—indeed, they are pointedly seeking a right to ignore a lawful order to disperse and to remain in place. *See* Pls.' Mot. at 1. Yet Plaintiffs provide absolutely no support whatsoever that the press has a special right to remain in or access a location that has been lawfully closed to the general public, and in particular a place that has been lawfully closed to protesters. They argue that cases supporting press access in other contexts, specifically the Supreme Court's decision in *Press-Enterprise Co. v. Super. Ct. of Cal.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), support their right of access here. But that case is inapposite.

*Press-Enterprise II* involved a dispute over media access to a criminal judicial proceeding and that context framed the way in which the Supreme Court analyzed whether access was appropriate: whether there is a tradition of public access and whether that public access plays a significant positive role in the functioning of the particular process. *Id.* at 8-9 (noting the questions were specific to "this setting" of an in-court criminal judicial proceeding). Here, although public streets have been traditionally open to the public, the specific context is public property that has been lawfully closed to the public for the execution of law enforcement functions, including protecting against the destruction of federal property and making lawful

arrests.  There is no tradition of public access to a closed forum under such circumstances—and mandating public access under such circumstances would impede achieving the important public goals of protecting public property and the safety of law enforcement personnel.  *Cf. Perry v. Los Angeles Police Dep't*, 121 F.3d 1365, 1369 (9th Cir. 1997) ("A government interest in protecting the safety and convenience of persons using a public forum is a valid government objective."). The press may have the rights of access of the general public, but they have no special rights of access to closed fora.  *See California First Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.")).

Even assuming, however, that the *Press-Enterprise II* standard applies, it establishes only a qualified right of access that may be overcome where "closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press Enterprise II*, 478 U.S. at 9.  As an initial matter, it is not at all clear that Plaintiffs have even been denied sufficient "access." Although they argue that they have no "alternative observation opportunities," Pls.' Mot. at 13, they have not provided any argument that the vantage points they have had, much less the ones they would have in the future absent the injunction, would be insufficient.  No Plaintiff asserts that any press or legal observer was unable to observe any activities merely because of the dispersal order.  And there are no allegations that federal agents advanced, in an attempt to disperse rioters, more than a few blocks away from federal property.  Thus, it is not at all clear why reporters and observers could not see sufficiently even if moved by an order to disperse, except for the use of crowd control munitions that could still be used under the proposed injunction.  *See* Pls'. Mot. at 3 (no liability "if a Journalist or Legal Observer is incidentally

exposed to crowd-control devices after remaining in the area where such devices were deployed").

Moreover, even if Plaintiffs could demonstrate that they have been denied sufficient "access" to a "particular proceeding," *United States v. Doe*, 870 F.3d 991, 997 (9th Cir. 2017), they would fail the balancing test of *Press Enterprise II*.  Preserving order, life, and property are important values that may be preserved consistent with the First Amendment.  Police thus may, for example, impose restrictions to "contain or disperse demonstrations that have become violent or obstructive."  *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107, 119 (D.C. Cir. 1977) (stating that it is "axiomatic" that "the police may, in conformance with the First Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful and not obstructive"); *see also Madsen v Women's Health Center,* 512 U.S 753, 768 (1994) (finding the government "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks.").

Requiring journalists and legal observers to disperse along with protesters and rioters is also narrowly tailored because allowing them to remain is not a practicable option.  There is no dispute that protesters who do not disperse after a lawful order is given may be arrested.  Having an unspecified number of people who lawfully may remain, however, will not only greatly complicate efforts to clear an area and restore order, it will also present a clear risk to safety. Under the proposed injunction, there is no consistent scheme for quickly identifying individuals authorized to be present.  Plaintiffs propose a list of "indicia" that "are not exclusive," which may be as small as a press pass displayed somewhere on their body and as vague as "visual identification" or "distinctive clothing" indicating that they are press.  Pls.' Mot. at 2-3. Additionally, the proposed injunction suggests that some of these, such as press passes, are only

valid if "professional or authorized," while other items, such as a shirt that simply says "press" somewhere, may be sufficient.  Pls.' Mot. at 3.  Similarly, identifying "legal observers" by the color of their hats when they are comingled in a large crowd at night with many others wearing face and head coverings is impractical.  Searching each person who does not disperse for such indicia will be difficult, if not impossible, under the conditions causing an order to disperse to be given (*e.g.*, lasers, projectiles, and pyrotechnic mortars being used against federal officers), and such a search will also distract federal officers from protecting themselves against those same conditions.  It would be even more impracticable to verify which of those remaining actually has "professional or authorized" credentials.  Yet the risk of not verifying such individuals is grave—protesters have already attempted to interfere with arrests by federal officers, including by assaulting them, and federal officers cannot simply turn their backs to people who have "press" written somewhere on them.  Leaving press and legal observers in place would present security risks to all and would severely distract from the critical mission of restoring order and protecting life and property.  Accordingly, even under the inappropriate, stringent standard that Plaintiffs invoke, they are unlikely to succeed on any claim to have a right to remain in place.

### B.    The Legally Improper Injunction Plaintiffs Seek is Overbroad and Unworkable.

There is no basis for the Court to grant Plaintiffs' request for an overbroad and unworkable injunction that would micromanage the manner in which federal law enforcement officers respond to dynamic and chaotic situations involving violent protesters seeking to damage federal property and harm federal officers.  "It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts." *United States v. Patane*, 542 U.S. 630, 642 (2004).  Yet that is precisely what Plaintiffs' requested injunction would do here.  The federal officers protecting federal property in Portland

are doing so under difficult circumstances and must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. Those judgments should not be encumbered by the potential threat of contempt of court from a vague, overbroad, and—at bottom—legally improper injunction. Indeed, Plaintiffs identify no other case in which federal or state officers responding to large-scale, ongoing incidents by violent opportunists have been enjoined in the manner Plaintiffs propose here.

It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quotation omitted). "An injunction must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotations omitted); *see Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991). It "should be no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs' proposed injunction is legally improper in several respects. The injunction would exempt "Journalists" and "Legal Observers" from the requirements of following a lawful order to disperse, but Plaintiffs provide no authority that members of the press or legal observers are somehow immune from such a lawful order.[5] The First Amendment allows the police to impose reasonable restrictions upon demonstrations, including the right to "contain or disperse demonstrations that have become violent or obstructive." *Cullinane,* 566 F.2d at 119 (stating that it is "axiomatic" that "the police may, in conformance with the First Amendment, impose reasonable restraints upon demonstrations to assure that they be peaceful and not obstructive");

---

[5] Plaintiffs' proposed injunction provides that "such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse." *See* Pls.' Mot. at 1.

*see Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the interest of the community in maintaining peace and order on its streets."); *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) ("When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.").  Members of the press and legal observers who choose to observe the violent activities of nearby protesters are not exempt from a lawful command to disperse.  *Cf. Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972) ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded"); *id.* at 684 ("the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

The injunction would also prohibit law enforcement personnel from seizing any photographs or recordings from journalists or legal observers for any reason, even if probable cause exists to arrest them.  *See* Pls.' Mot. at 1.  Further, the injunction would require that any such property be returned immediately upon release from custody, regardless of whether the individual has been charged with a crime.  Plaintiffs cite no legal authority for such a provision and their motion does not even allege that federal officers have arrested any journalists, media members, or legal observers, let alone seized any equipment from them.

Additionally, Plaintiffs request that the Court enjoin federal officers from arresting or using physical force against a journalist or legal observer, unless probable cause exists to believe that such individual has committed a crime.  *See* Pls.' Mot. at 1.  But that proposed remedy is the type of vague, "follow the law" injunction that is disfavored because it does not comply with Rule 65(d)'s specificity requirement.  *See Cuviello v. City of Oakland*, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (holding unenforceable an injunction that "basically states that

Defendants are permitted to make only lawful arrests of Plaintiffs" and are "barred from

interfering with Plaintiffs' free speech rights").  As numerous courts have recognized,

"[i]njunctions that broadly order the enjoined party simply to obey the law . . . are generally

impermissible."  *NLRB v. USPS*, 486 F.3d 683, 691 (10th Cir. 2007); *see Burton v. City of Belle*

*Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241

F.3d 232, 240-41 (2d Cir. 2001).

Such an injunction is particularly inappropriate and unmanageable in this case where law

enforcement officers are responding to a dynamic situation involving a consistent barrage of

violent activity targeted against federal property and officers.  DHS, the Marshals Service, and

their officers should not potentially be subject to charges of contempt for violating a vague

injunction in these circumstances.  As the Supreme Court has emphasized, courts must "take care

to consider whether the police are acting in a swiftly developing situation, and in such cases the

court should not indulge in unrealistic second-guessing."  *United States v. Sharpe*, 470 U.S. 675,

686 (1985).

## III.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs argue that, because they have raised a First Amendment issue, they have

necessarily demonstrated the likelihood of irreparable injury.  But the Ninth Circuit has held that

"no presumption of irreparable harm arises in a First Amendment retaliation claim."  *Rendish v.*

*City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997).  Regardless of the nature of the alleged

injury, however, to be likely irreparable any harm must be likely to occur.  Separate from any

Article III standing concerns, where "there is no showing of any real or immediate threat that the

plaintiff will be wronged again," there is no irreparable injury supporting equitable relief.  *Lyons*,

461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985).  As shown

above, and for the same reasons that Plaintiffs lack standing to seek a an injunction in the first instance, Plaintiffs' future injuries are speculative and, therefore, also insufficient to demonstrate the likelihood of irreparable injury.

## IV.    BOTH THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Plaintiffs argue that there is a strong public interest in First Amendment principles generally, and a free press in particular.  Both are true.  But Plaintiffs have not established any violation of these First Amendment rights and, in any event, they fail to explain how the many countervailing public interests involved in the federal response to the Portland protests must be weighed.  Those interests in fact outweigh other First Amendment equities.[6]  Some of these interests are recognized in the merits of the First Amendment claims themselves, but there are many other interests weighing against the requested injunction.

Federal agents have deployed to protect various federal properties, including the Hatfield Federal Courthouse and the Edith Green Federal Building, in response to violent rioting.  Rioters have vandalized and threatened to severely damage those buildings, and they have assaulted the responding federal officers.  Plaintiffs all but concede that the government has "a valid interest in protecting public safety, preventing vandalism or looting, or protecting [federal officers]."  Pls.' Mot. at 13.  All of these public interests are substantial and can outweigh First Amendment interests premised on access to public property.  The government has a comprehensive interest in maintaining public order on public property.  *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the interest of the community in maintaining peace and order on its streets.").  There is an even more pointed public interest when disorder threatens the

---

[6] The balance of the equities and the public interest are analyzed together here because, when the government is a party, these last two factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

integrity of that public property.  *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir.

2000) ("The clear purpose of the order . . . was for reasons of health and safety, and for the

protection of property . . . . These are compelling reasons . . . and certainly represent significant

government interests.").  Congress has recognized such interests, including by making the

destruction of federal property and the assault of federal officers felonies punishable by up to ten

and twenty years of imprisonment respectively..  18 U.S.C. §§ 111, 1361.  Additionally, there is

a fundamental First Amendment right of access to the courts, *see, e.g.*, *Ringgold-Lockhart v. Cty.

of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014), which is jeopardized by the breach and

destruction of a federal court building; it is in the public interest to prevent the violation of *these*

rights, too.  Moreover, the federal government, just as any other property owner, has an interest

in "preserv[ing] the property under its control for the use to which it is lawfully dedicated"; for

government buildings, those uses are of course public uses that are in the public interest.  *Int'l

Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992).

On balance, it is clearly in the public interest to allow federal officers, to disperse violent

opportunists near courthouses and federal buildings when those events have turned and may

continue to turn violent.  *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)

("[W]here demonstrations turn violent, they lose their protected quality as expression under the

First Amendment"); *Griefen*, 200 F.3d at 1260 (upholding the relocation of protesters who "had

already shown by their destructive conduct that they presented a clear and present danger to the

safe completion of the construction project, both to other persons as well as to themselves"); *Bell

v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech may be

curtailed when an assembly stokes—or is threatened by—imminent physical or property

damage.").

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 26

Plaintiffs have not contested that the federal government has both the right and the obligation to restore order and protect federal property—an obligation that is all the more critical with respect to a federal courthouse, which must remain operational to ensure the rights of litigants including the very parties to this suit.  Instead, Plaintiffs have held up the general public interest in a free press. Pls.' Mot. at 16.  Yet, as discussed in above, the courts have already thoroughly weighed the interest of public access to a free press and found it no greater than that of the public generally.  *See, e.g.*, *Branzburg*, 408 U.S. at  684–85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded"); *Calderon*, 150 F.3d at 981.

Plaintiffs provide no rationale for why their equities are any greater or more deserving of protection than those of any member of the public exercising their First Amendment rights.  And Plaintiffs make no argument at all why special protection of legal observers is even in the public interest, much less how their interests are to be distinguished from anyone else.  Plaintiffs do argue that covering the police response in Portland is of unique public interest and importance. Pls.' Mot. at 16 ("It would be difficult to identify a situation in which the public has a greater interest in unbiased media coverage of police and Government conduct than this one.").  It is not at all clear that it is appropriate for the Court to weigh the importance of press coverage of this protest compared to others—or how one should weigh the importance of protesting versus newsgathering—but if it were, it would also be necessary to weigh the unique danger present here of over 50 nights of protests that have routinely descended into violence and the destruction of federal property and harm to federal law enforcement officers, including the attempted destruction of the *interior* of the federal courthouse.

Additionally, the hardships the injunction would impose clearly weigh against granting it. As discussed above, Plaintiffs have failed to demonstrate that the injunction would tangibly benefit their newsgathering.  By contrast, federal officers would be seriously distracted from defending themselves from attack and from restoring order and protecting property.

Accordingly, both the public interest and the balance of the equities weigh in favor of denying the injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a Temporary Restraining Order and Preliminary Injunction should be denied.


Dated:  July 21, 2020                    ETHAN P. DAVIS
                                         Acting Assistant Attorney General

                                         BILLY J. WILLIAMS
                                         United States Attorney

                                         DAVID M. MORRELL
                                         Deputy Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director, Federal Programs Branch

                                         BRAD P. ROSENBERG
                                         Assistant Director, Federal Programs Branch

                                         /S/ *Andrew I. Warden*
                                         ANDREW I. WARDEN (IN #23840-49)
                                         Senior Trial Counsel

                                         JEFFREY A. HALL
                                         JORDAN L. VON BOKERN
                                         Trial Attorneys


FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 28

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*