

U.S. Department of Homeland Security
Washington, DC 20528

Issue Date: September 7, 2018

Policy Statement 044-05

MEMORANDUM FOR:   Component Heads

FROM:   Claire M. Grady
Acting Deputy Secretary of Homeland Security and
Under Secretary for Management

SUBJECT:   Department Policy on the Use of Force

### I. Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this policy articulates Department-wide standards and guidelines related to the use of force by Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and affirms the duty of all DHS employees to report improper uses of force. All DHS Components employing LEOs are directed to implement this guidance, including investigation and documentation practices, through Component-specific policy, procedure, and training.

This memorandum supersedes the Memorandum from Secretary Tom Ridge, "Department of Homeland Security Policy on the Use of Deadly Force" (June 25, 2004).

### II. Use of Force Standard

#### A. Introduction

In determining the appropriateness of a particular use of force, the Department is guided by constitutional law, as interpreted by the U.S. Supreme Court.[1] The Fourth Amendment supplies a constitutional baseline for permissible use of force by LEOs in the course of their official duties; law enforcement agencies may adopt policies that further constrain the use of force. This policy describes the governing legal framework and articulates additional principles to which the Department will adhere.

#### B. General Statement

Unless further restricted by DHS Component policy, DHS LEOs are permitted to use force to control subjects in the course of their official duties as authorized by law, and in defense of themselves and others. In doing so, a LEO shall use only the force that is **objectively reasonable** in light of the facts and circumstances confronting him or her at the time force is applied.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

C.  Discussion: The Fourth Amendment "Reasonableness" Standard

1.  The Supreme Court has ruled that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[2]  This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness."

2.  Because this standard is "not capable of precise definition or mechanical application," its "proper application requires careful attention to the facts and circumstances of each particular case."[3]  The reasonableness of a LEO's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[4]  In determining whether the force a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.

3.  Consequently, there may be a range of responses that are reasonable and appropriate under a particular set of circumstances.

4.  Once used, physical force[5] must be discontinued when resistance ceases or when the incident is under control.

## III.  General Principles

A.  Respect for Human Life

All DHS personnel have been entrusted with a critical mission: safeguarding the American people, our homeland, and our values.  In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

---

[2] *Graham*, 490 U.S. at 396.  The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)."  Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).

[3] *Graham*. (citing *Garner*, 471 U.S at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'").  The "totality of the circumstances" refers to all factors surrounding a particular use of force.  In *Graham*, the Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight.  Other factors include, but are not limited to: the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.

[4] *Id.*

[5] Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point.  That is, once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or other control techniques" to safely and securely conclude the incident.

B.      De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, DHS Components shall provide use of force training that includes de-escalation tactics and techniques.

C.      Use of Safe Tactics

DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

D.      Additional Considerations

    1.    DHS LEOs are permitted to use force that is reasonable in light of the totality of the circumstances. This standard does not require LEOs to meet force with equal or lesser force.

    2.    DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

E.      Warnings

    1.    When feasible, prior to the application of force, a DHS LEO must attempt to identify him- or herself and issue a verbal warning to comply with the LEO's instructions. In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

        a.    Increase the danger to the LEO or others, including any victims and/or bystanders;

        b.    Result in the destruction of evidence;

        c.    Allow for a subject's escape; or

        d.    Result in the commission of a crime.

    2.    In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

F. Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is reasonable in light of the circumstances.

G. Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention. This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H. Duty to Intervene In and Report Improper Use of Force

 1. The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, DHS law enforcement Components will ensure that their policies and procedures unambiguously underscore the following:

 **The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

 2. DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

 3. **Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to his or her chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

 4. Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. DHS Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

**IV.** **Less-Lethal Force and Less-Lethal Devices**

    A.    All DHS Components employing LEOs shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques; authorized less-lethal devices; and necessary training and certifications—both initial and recurring.

    B.    DHS Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

    C.    DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

    D.    LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry. If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until he or she meets the requirements for recertification on that device.

**V.** **Warning Shots and Disabling Fire**

    A.    General Prohibition

Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

        1.    As a warning or signal ("warning shots") or

        2.    To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

    B.    Exceptions

        1.    Warning Shots

            a.    <u>Maritime Law Enforcement Operations</u>: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

    b. <u>Aviation Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

  2. Disabling Fire

    a. <u>Maritime Law Enforcement Operations</u>: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances. Such disabling fire is classified as less-lethal force.

    b. <u>Physical Protection</u>: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT: <u>Aircraft in Flight</u>: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy. This is classified as a use of deadly force.[6]

C. Safety Considerations

  1. Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care. DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

  2. When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

**VI.** **Deadly Force**

A. General Guidelines

  1. As with any use of force, a LEO's use of deadly force must be reasonable in light of the facts and circumstances confronting him or her at the time force is applied.

---

[6] As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.

6

2. A DHS LEO may use deadly force only when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

   a. <u>Fleeing Subjects</u>: Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

B. Discharge of Firearms

   1. General Guidelines

      a. Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

      b. The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

   2. Moving Vehicles, Vessels, Aircraft, or other Conveyances

      a. DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy.[9] Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of-control conveyance.

      b. Firearms shall not be discharged solely as a warning or signal or solely to disable moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

[8] *See Garner*, 471 U.S. at 11-12. To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "…if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

7

**VII.   Reporting Requirements and Incident Tracking**

    A.    Uses of force shall be documented and investigated pursuant to Component policies.

    B.    It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents. More consistent data will enable both the Department and Components to more effectively assess use of force activities, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions.

    C.    DHS Components employing LEOs shall establish internal processes to collect and report accurate data on Component use of force activities. At a minimum, Components shall report the following as a "use of force incident" when resulting from a use of force:

        1.    A less-lethal device is utilized against a person (except when the device is deployed in a non-striking control technique);

        2.    Serious bodily injury occurs;

        3.    Deadly force is used against a person, to include when a firearm is discharged at a person; or

        4.    Death occurs.

    D.    Components shall report this data to the Deputy Secretary, through the Deputy Assistant Secretary for Law Enforcement Policy, on no less than an annual basis (in accordance with a process and timeline to be determined) and to others as required for official purposes.

**VIII.   Departmental Review and Oversight**

    A.    Each DHS Component employing LEOs will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

    B.    The Office of Strategy, Policy, and Plans, working in consultation with DHS Components employing LEOs, shall establish the DHS Use of Force Council to provide a forum by which Components can share lessons learned regarding use of force policies, training, and oversight. The DHS Use of Force Council will be chaired by the Office of Strategy, Policy, and Plans and comprised of one executive-level representative from each of the following DHS Components:

        1.    Office of the Under Secretary for Management
        2.    National Protection and Programs Directorate

   3. United States Customs and Border Protection
   4. United States Coast Guard
   5. United States Secret Service
   6. Federal Emergency Management Agency
   7. Transportation Security Administration
   8. United States Immigration and Customs Enforcement
   9. Office of the General Counsel
   10. Federal Law Enforcement Training Centers
   11. Office for Civil Rights and Civil Liberties
   12. Privacy Office

 C. Representatives of affected DHS Components will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components.

## IX. Military Activities

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

## X. No Right of Action

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## XI. Definitions

 A. ***Deadly Force***:  Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury").  Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury.  In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

 B. ***De-Escalation***:  The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

 C. ***Disabling Fire***:  Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

9

D.    *__Less-Lethal Device__*:  An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury").  Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents.  These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

E.    *__Less-Lethal Force__*:  Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury").  Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

F.    *__Lessons Learned__*:  Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards.  Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

G.    *__Serious Bodily Injury__*:  Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

H.    *__Use of Force__*:  The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

I.    *__Warning Shot__*:  Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.

Distribution:

Under Secretary for Science and Technology
Under Secretary for Management
Under Secretary for National Protection and Programs Directorate
Under Secretary of Intelligence and Analysis
Commissioner, U.S. Customs and Border Protection
Commandant, United States Coast Guard
Director, United States Secret Service
Director, U.S. Citizenship and Immigration Services
Administrator, Federal Emergency Management Agency
Administrator, Transportation Security Administration
Assistant Secretary, U.S. Immigration and Customs Enforcement
General Counsel
Inspector General
Director, Federal Law Enforcement Training Centers
Assistant Secretary of Countering Weapons of Mass Destruction Office
Under Secretary for Strategy, Policy, and Plans Policy
Assistant Secretary for Legislative Affairs
Assistant Secretary for Public Affairs
Assistant Secretary for Partnership and Engagement
Director, Operations Coordination
Officer for Civil Rights & Civil Liberties
Chief Privacy Officer
Citizenship and Immigration Services Ombudsman
Military Advisor to the Secretary
Director, Community Partnerships
Executive Secretary