**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>　　　　　Defendants. | Case No. 3:20-cv-1035-SI<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS U.S. DEPARTMENT OF HOMELAND SECURITY AND U.S. MARSHALS SERVICE** |

# TABLE OF CONTENTS

Table of Contents ................................................................................................. ii

Table of Authorities............................................................................................. iii

Introduction........................................................................................................... 1

Argument ............................................................................................................... 3

I.      Plaintiffs plainly have standing to obtain an injunction.................................... 3

      A.      Plaintiffs Have Standing Because They Have Documented "Actual Repeated Incidents" of Federal Agents Targeting Journalists and Legal Observers ................................................................................. 3

      B.      Plaintiffs Have Standing Because Their Allegation of Future Harm Does Not Depend on an "Extended Chain of Highly Speculative Contingencies"................................................................................... 6

II.     The injunction is workable................................................................................ 8

III.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims ............................................................................................................. 11

      A.      Plaintiffs Are Likely to Prevail on Their Retaliation Claim ................................ 11

      B.      Plaintiffs Are Likely to Prevail on Their Access Claim........................................ 12

            1.      Press and Legal Observers Are Engaged in Activities that Pose No Threat to the Public or Law Enforcement ................................... 13

            2.      Plaintiffs Have No Alternative Forum ...................................... 17

II.     The public's interest and balance of equities weigh strongly in favor of Plaintiffs......................................................................................................... 18

Conclusion ........................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Associated Gen. Contractors of Ca., Inc. v. Coalition for Economic Equity*,
  950 F.2d 1401 (9th Cir. 1991) ............................................................. 12, 14

*Barney v. City of Eugene*,
  20 F. App'x 683 (9th Cir. 2001) ................................................................ 16

*Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987) .................................................................................. 20

*Berger v. City of Seattle*,
  569 F.3d 1029 (9th Cir. 2009) .................................................................. 20

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) .................................................................................. 10

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) .................................................................................. 22

*California First Amendment Coalition v. Calderon*,
  150 F.3d 976 (9th Cir. 1998) ............................................................... 21, 22

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) .................................................................................. 14

*Capp v. City of San Diego*,
  940 F.3d 1046 (9th Cir. 2019) .................................................................. 17

*Chavez v. United States*,
  226 F. App'x 732 (9th Cir. 2007) ............................................................. 10

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................................... 10, 11

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) .................................................................................. 19

*Courthouse News Serv. v. Planet*,
  947 F.3d 581 (9th Cir. 2020) .................................................................... 22

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) .................................................................... 16

*Eggar v. City of Livingston*,
  40 F.3d 312 (9th Cir. 1994) ...................................................................... 11

*Feiner v. New York*,
  340 U.S. 315 (1951) ............................................................................. 23, 25

*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*,
  24 F.3d 893 (7th Cir. 1994) ...................................................................... 22

*Leigh v. Salazar*,
  677 F.3d 892 (2012) ..........................................................................Passim

*Long Beach Area Peace Network v. City of Long Beach*,
  574 F.3d 1011 (9th Cir. 2009) ......................................................... 8, 11, 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................. 12

*McCullen v. Coakley*,
  573 U.S. 464 (2014) .................................................................................. 19

REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
   192 F.3d 1283 (9th Cir. 1999) ............................................................... 16
*Menotti v. Seattle*,
   409 F.3d 1113 (9th Cir. 2005) ............................................................... 17
*Mims v. City of Eugene*,
   145 F. App'x 194 (9th Cir. 2005) .......................................................... 16
*Murphy v. Kenops*,
   99 F. Supp. 2d 1255 (D. Or. 1999) .................................................. 11, 12
*Nelsen v. King Cty.*,
   895 F.2d 1248 (9th Cir. 1990) ...................................................... 10, 11, 12
*Nicacio v. I.N.S.*,
   797 F.2d 700 (9th Cir. 1985) ................................................................. 10
*Occupy Sacramento v. City of Sacramento*,
   878 F. Supp. 2d 1110 (E.D. Cal. 2012) .................................................. 19
*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ....................................................................... 10, 11
*Perry v. Los Angeles Police Department*,
   121 F.3d 1365 (9th Cir. 1997) ............................................................... 21
*Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"),
   478 U.S. 1 (1986) ............................................................... 18, 19, 24
*Thomas v. Cty. of Los Angeles*,
   978 F.2d 504 (9th Cir. 1992) ............................................................ 8, 10
*United States v. Christopher*,
   700 F.2d 1253 (9th Cir. 1983) ............................................................... 19
*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ........................................................... 20, 21
*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) .............................................................................. 20
*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .............................................................................. 11

## **RULES**

Ninth Circuit Rule 36-3 ................................................................................. 16

Plaintiffs respectfully submit this Reply in support of their motion for a temporary restraining order.

## INTRODUCTION

The federal agents' Opposition is an exercise in Trumpian argument—unburdened by citation to fact and contrary to the actual evidence. The federal agents argue that Plaintiffs lack standing, even though they admit that they do not intend to stop chilling Plaintiffs' First Amendment rights in a hail of rubber bullets and billowing clouds of tear gas rained down from Washington, D.C. Their Opposition simply ignores the mountain of declarations showing that they have been intentionally shooting, beating, and tear-gassing clearly marked journalists and legal observers, who are standing far from protesters and who pose no threat or interruption to law enforcement's unmitigated stream of violence—beyond exposing it to the world.

The federal agents claim that they are trying to bring "law and order" to Portland by attacking (and disappearing, Pinochet-style) protesters. Yet the City, the Mayor, and the State have all condemned what they are doing. As this brief was in its final stages, the City informed the Court that "[t]he actions of federal defendants are escalating violence, inflaming tensions in our City, and harming Portlanders who seek to engage in non-violent protests in support of racial justice." (City Memorandum in Support of Motion for TRO Against Federal Defendants, Dkt. 70 at 2.) Governor Kate Brown has similarly observed that "[t]his political theater from President Trump has nothing to do with public safety," and that "[t]he president is failing to lead this nation. Now he is deploying federal officers to patrol the streets of Portland in a blatant abuse of power by the federal government."[1] Most tellingly, the federal agents are unable to cite a single instance of any journalist or legal observer attacking a federal monument, harming federal property, or interfering with any law-enforcement activities.

---

[1] Aaron Mesh, *Oregon Gov. Kate Brown Says President Trump Is Invading Portland as an Election Stunt*, Willamette Week (July 16, 2020), https://www.wweek.com/news/2020/07/16/oregon-gov-kate-brown-says-president-trump-is-invading-portland-as-an-election-stunt/.

Most of the arguments mounted by the federal agents are ones this Court has already rejected. They claim that preventing reporters from documenting law enforcement's dispersal of protesters does not implicate Plaintiffs' First Amendment rights—even though the Court held that "public streets historically have been open to the press and the general public" and that "there are at least serious questions" whether violently expelling journalists and legal observers from them while enforcing a dispersal order is narrowly tailored. (*Compare* Opp. at 18-19 *with* Dkt. 33 ("TRO") at 7.) They argue that Plaintiffs cannot demonstrate irreparable harm, even though the Court held that "anytime there is a serious threat to First Amendment rights, there is a likelihood of irreparable injury." (*Compare* Opp. at 24-25 *with* TRO at 7.) They argue that "the balance of the equities and the public interest weigh against granting an injunction," even though this Court has squarely held otherwise. (*Compare* Opp. at 25-28 *with* TRO at 8.) Indeed, with the escalating violence federal agents have imported into Portland, the public's need for people to document and report these events has only intensified.

The federal agents also assert, without any evidentiary support, that Plaintiffs' requested injunctive relief is "unworkable" (Opp. at 21-24) when it has already been working against the City for 21 days. As noted in the moving papers and as unrefuted by the federal agents, the only shortcoming in the Court's extant Preliminary Injunction is that the federal agents rode into town and blatantly ignored its terms.

In a final counterfactual push, the federal agents claim that they have not retaliated against journalists and legal observers, even though multiple unrefuted declarations show that they have repeatedly targeted reporters and legal observers for gratuitous violence for no reason other than reporting and observing. In reality, after Plaintiffs moved for a TRO, federal agents ramped up their brutality against journalists and legal observers—which has resulted in the flood of declarations submitted over the last few days.

In sum, Plaintiffs have standing, seek a workable injunction, and are likely to succeed on the merits, and the public interest and balance of equities support their claim to relief. The Court should perfect its protection of Plaintiffs' rights and extend its injunction to the federal agents.

PAGE 2 -   REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
          PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

## ARGUMENT

## I.     PLAINTIFFS PLAINLY HAVE STANDING TO OBTAIN AN INJUNCTION

To obtain prospective injunctive relief, Plaintiffs must show that they are threatened with "real and immediate" future injury. *Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (quotation marks omitted). In the First Amendment context, because they challenge the federal agents' policy of violently dispersing journalists and legal observers, they need show only that "the challenged [policy] appl[ies] to [their] conduct." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009). Plaintiffs have supplied a mountain of evidence that easily makes the required showing.

### A.     Plaintiffs Have Standing Because They Have Documented "Actual Repeated Incidents" of Federal Agents Targeting Journalists and Legal Observers

Nearly every night since Plaintiffs moved to amend their complaint, federal agents have visited fresh horrors upon individual Plaintiffs and members of the plaintiff class:

- On July 15, federal agents shot a tear-gas canister at Plaintiff Yau. (Declaration of Justin Yau ("Yau Decl."), Dkt. 56 ¶ 6.)

- On July 16, federal agents shot and threatened to shoot journalists. (Declaration of Doug Brown ("Doug Brown Decl. II"), Dkt. 55 ¶¶ 11-13.)

- On July 17, federal agents threw flashbang grenades at a journalist on two separate occasions. (Declaration of Elizabeth Binford-Ross ("Binford-Ross Decl."), Dkt. 78 ¶¶ 6, 9.)

- On July 18, officers who may have been federal agents intimidated a female journalist, chasing her in a van and yelling "WE'RE GONNA GET YOU!" (Declaration of Karina Brown ("Karina Brown Decl."), Dkt. 71 ¶¶ 6-8.)

- On July 19, federal agents shot Plaintiff Rudoff in the shoulder with a 40mm rubber bullet. (Declaration of John Rudoff ("Rudoff Decl."), Dkt. 59 ¶ 7.)

- Also on July 19, federal agents shot Plaintiff Tracy in the ankle with an impact munition, causing ligament damage, and in the elbow with pepper balls. (Declaration of Alex Milan Tracy ("Tracy Decl."), Dkt. 60 ¶¶ 5, 8.)

- Also on July 19, federal agents shot a legal observer in the hand with an FN 303 riot gun. (Declaration of Nate Haberman-Ducey ("Haberman-Ducey Decl."), Dkt. 61 ¶ 4.)

- Also on July 19, federal agents shot a journalist in the chest with a marker round. (Declaration of Jungho Kim ("Kim Decl."), Dkt. 62 ¶ 7.)

- Also on July 19, federal agents shot a journalist in his camera lens and another legal observer in his hand. (Declaration of James Comstock ("Comstock Decl."), Dkt. 63 ¶¶ 4-5.)

- Also on July 19, federal agents shot a journalist with a flashbang grenade and rolled a tear gas cannister at her. (Binford-Ross Decl. ¶ 15.)

- On July 19-20, federal agents told a journalist to stay where he was and then shot him. (Declaration of Nathan Howard ("Howard Decl."), Dkt. 58 ¶¶ 6-7.)

- Also on July 19-20, federal agents shot a journalist in the stomach and the elbow, beat him with their batons, and pepper-sprayed him at point-blank range. (Declaration of Noah Berger ("Berger Decl."), Dkt. 72 ¶¶ 4-11.)

- On July 20, federal agents shot a journalist in the stomach with a rubber bullet, only a few inches to the right of where his camera was hanging. (Declaration of Jake Johnson ("Johnson Decl."), Dkt. 64 ¶¶ 6-7.)

- Also on July 20, federal agents shot a female journalist in the buttocks at near point-blank range. (Karina Brown Decl. ¶¶ 11-13.)

- Also on July 20, federal agents pepper-sprayed a journalist at point-blank range. (Declaration of Mike Bivins ("Bivins Decl."), Dkt. 73 ¶¶ 4-6.)

- On July 21, federal agents shot pepper balls and threw a tear-gas grenade at Plaintiff Lewis-Rolland. (Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland Decl."), Dkt. 77 ¶ 10.)

PAGE 4 -   REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

- On July 22, federal agents shot a flash-bang grenade at Plaintiff Tracy and another journalist, and shot a third journalist with an impact round. (Supp. Declaration of Alex Milan Tracy ("Supp. Tracy Decl."), Dkt. 79 ¶¶ 7-9.)

- Also on July 22, federal agents fired three smoke grenades at Plaintiff Mahoney, striking her left knee and right foot. She managed to dodge the third. (Declaration of Kat Mahoney ("Mahoney Decl."), Dkt 75 ¶¶ 12-13.)

Each night that protests continue, every Plaintiff and every member of the plaintiff class faces a real and immediate threat of similar violence from federal agents. *Chavez v. United States*, 226 F. App'x 732, 737 (9th Cir. 2007) (explaining that a threat of injury is sufficiently "immediate" when a plaintiff alleges that federal agents "have caused injury on numerous occasions and will continue to do so"). The possibility of recurring injury "ceases to be speculative" where "actual repeated incidents are documented." *Thomas*, 978 F.2d at 507 (quoting *Nicacio v. I.N.S.*, 797 F.2d 700, 702 (9th Cir. 1985)). Plaintiffs have documented repeated injuries, often to the same Plaintiff, night after night.

Despite this large and growing mountain of evidence, the federal agents argue that Plaintiffs "lack[] standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm." (Opp. at 11 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990).) If that were true as a general matter, a plaintiff could support her request for injunctive relief only with sheer clairvoyance. But that is not the rule: While isolated past wrongs cannot support prospective injunctive relief on their own, a *series* of such wrongs is surely evidence that "there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *Lyons*, 461 U.S. at 102 (same). Article III demands neither precognition nor the "consummation of threatened injury" before a plaintiff may obtain preventive relief. *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (quotation marks omitted).

In fact, federal agents have admitted in their Opposition that they intend to continue violently dispersing journalists and legal observers until the Court tells them otherwise. (Opp. at

PAGE 5 -   REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

20-21.) This is a policy that plainly applies to Plaintiffs' conduct. So Plaintiffs have standing to challenge it. *Long Beach Area Peace Network*, 574 F.3d at 1022. Not only have Plaintiffs shown evidence of consummated injury, but federal agents have confirmed that the beatings will continue until press coverage improves. Article III demands no more of Plaintiffs than that.

> **B.      Plaintiffs Have Standing Because Their Allegation of Future Harm Does Not Depend on an "Extended Chain of Highly Speculative Contingencies"**

The federal agents cite a litany of cases in which plaintiffs alleged "extended chain[s] of highly speculative contingencies," nearly all of which required plaintiffs to commit a future "violation of an unchallenged law" before they would suffer the injury alleged. *Nelsen v. King Cty.*, 895 F.2d 1248, 1252 (9th Cir. 1990); *see, e.g.*, *Lyons*, 461 U.S. at 105-06 (plaintiff would have to violate law, encounter police, be arrested, and either resist arrest or officers would have to disobey orders and put him in a chokehold); *O'Shea*, 414 U.S. at 496-97 (five steps including law violation); *Whitmore v. Arkansas*, 495 U.S. 149, 156-57 (1990) (five steps including obtaining federal habeas corpus relief); *Nelsen*, 895 F.2d at 1252 (ten steps including law violation); *Eggar v. City of Livingston*, 40 F.3d 312, 316-17 (9th Cir. 1994) (six steps including law violation); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259-60 (D. Or. 1999) (four steps including law violation). For sound policy reasons, federal courts refuse to assume that plaintiffs will violate a law they do not challenge. *Nelsen*, 895 F.2d at 1253 ("a claim of standing which is not only speculative, but is predicated upon the violation of an unchallenged law is insufficient"); *Eggar*, 40 F.3d at 316-17 (same).

Those cases are irrelevant here. This case involves neither an extended chain of contingencies nor Plaintiffs' future violation of an unchallenged law. The chain of events for Plaintiffs to suffer the same injury again is merely two links long. First, Plaintiffs must return to cover the protests. Nearly all of them have declared their intention to do so. (Lewis-Rolland Decl. ¶ 12.; Declaration of Doug Brown ("Doug Brown Decl. I"), Dkt. 9 ¶ 27; Rudoff Decl. ¶ 9; Tracy Decl. ¶ 12; Declaration of Sam Gehrke ("Gehrke Decl."), Dkt. 10 ¶ 10; Declaration of Steven Humphrey ("Humphrey Decl."), Dkt. 11 ¶ 5; Mahoney Decl. ¶ 17; Declaration of Sergio

Olmos ("Olmos Decl."), Dkt. 15 ¶ 8; Declaration of Tuck Woodstock ("Woodstock Decl. I"),

Dkt. 23 ¶ 11.) These are not "'some day' intentions"; they are "particularized future and

imminent plans to [cover] protest[s]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563-64

(1992); *Murphy*, 99 F. Supp. 2d at 1259.

Second, federal agents must continue to target Plaintiffs for violent reprisal. In addition to

the staggering evidence that they have targeted journalists and legal observers so far, *see* Part

I.A, *supra*, they have stated on the record their intention to continue to do so. (Opp. at 20-21

(explaining that federal agents intend to continue using force against all persons, including

journalists and legal observers)); *see also* Conrad Wilson & Jonathan Levinson, *President Trump

Says Portland Police Are Incapable of Managing Protests*, OPB (July 10, 2020) (explaining that

federal agents were sent to Portland to do—in President Trump's own words—what "[l]ocal law

enforcement has been told not to do").[2]

This two-link chain of ironclad certainty is enough by itself to remove Plaintiffs' claim

from the ambit of *Lyons* and its progeny. In addition, to the extent Plaintiffs' claim relies on their

future violation of dispersal orders, those orders are not "unchallenged." *Cf. Nelsen*, 895 F.2d at

1252-53. Plaintiffs *do* challenge dispersal orders' application to them. (Mot. at 2 (seeking an

order that Plaintiffs "shall not be required to disperse following the issuance of an order to

disperse, and such persons shall not be subject to arrest for not dispersing following the issuance

of an order to disperse").) Thus, there is ample indication here that Plaintiffs have "firm

intentions to 'take action that would trigger the challenged governmental action,'" and that when

they do, they will be "subjected to the challenged governmental action,'" i.e., the

unconstitutional use of targeted force to suppress their exercise of their First Amendment rights.

*Murphy*, F. Supp. 2d at 1260 (quoting *Associated Gen. Contractors of Ca., Inc. v. Coalition for

Economic Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991)). They therefore have standing to seek

preventive injunctive relief.

---

[2] https://www.opb.org/news/article/president-trump-portland-police-are-incapable-of-managing-protests/.

## II.      THE INJUNCTION IS WORKABLE

The federal agents claim that the injunction Plaintiffs seek is unworkable, would require micromanagement, and would endanger officers. (Opp. at 20-22.) They cite no evidence for this proposition, and ignore the evidence against it—including that the Court has already issued a TRO and preliminary injunction embodying these exact terms, and that the City has been living under the same terms for 21 days of protests now. (TRO; Dkt. 49 ("Stipulated PI").[3]) The City has even asked the Court to impose similar relief against the federal agents to protect journalists, legal observers, and the First Amendment. (City Memo at 2.)

For the 21 days, the City of Portland and the Portland police have been bound by the same injunction that Plaintiffs ask the Court to issue against the federal agents, the Portland police have largely been able to identify people they knew or should have known were press and legal observers from protesters and to avoid using force on them. For example, as recounted by Plaintiff Woodstock:

> Portland police began walking the crowd east, then suddenly executed a massed charge against the group I was covering.
>
> I was wearing a large red press badge on a lanyard and a helmet that said "PRESS" on three sides. I also yelled "PRESS" over and over and over again. As I did this, the police officers sprinted past me, going around me to chase and tackle protesters. They did not shove me or shout at me specifically.
>
> Because of this action, I was left standing behind most of the police officers. I was allowed to film from behind the group. When I was done filming from that angle, I said "I'm behind you" and came around to walk and film alongside the officers. At no point did the officers yell at me to move or attempt to prevent me from filming.

(Declaration of Tuck Woodstock ("Woodstock Decl. II"), Dkt. 76 ¶¶ 2-4.) Plaintiff Lewis-Rolland has also had a similar experience:

> After the Court issued an injunction against the City, Portland police officers' conduct towards me improved markedly. For

---

[3] The preliminary injunction to which Plaintiffs and the City stipulated includes an additional paragraph concerning property seized pursuant to lawful arrest. (Stipulated PI ¶ 3.) Plaintiffs do not object to the inclusion of a substantively identical provision in the injunction against the federal agents. This should alleviate their complaints in this regard. (*Cf.* Opp. at 23.)

example, on the night of July 4, a police officer ran at me, yelling
at me to disperse. I yelled, "I'm press! I'm press! There's a
restraining order! I have a right to be here!" and stood my ground.
The officer asked me to move 10 feet away, but let me do my job:
observing, recording, and reporting on the protesters and police. I
have been able to do this multiple times. Also, I have on occasion
been allowed to get behind Portland police's skirmish line, because
what I was doing was not a threat to them.

(Lewis-Rolland Decl. ¶ 11.)

The federal agents argue that they cannot turn their backs on journalists and legal

observers because it would present security risks "and would severely distract from the critical

mission of restoring order and protecting life and property." (Opp. at 21.) But they cite no

evidence in support of this proposition. In fact, their own internal memo admits that they are not

even trained in crowd control.[4] Moreover, as seen above, the Portland police have allowed

Plaintiffs and other journalists and legal observers to remain behind the police skirmish line

during dispersal orders without incident. (Lewis-Rolland Decl. ¶ 11; Woodstock Decl. II ¶¶ 2-5.)

Both were successfully able to assert their identity as press to avoid being harmed by the police,

and their presence behind police lines did not impair police operations. (*Id.*)

The federal agents cite *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940), for the

proposition that "[w]hen clear and present danger of riot, disorder, interference with traffic upon

the public streets, or other immediate threat to public safety, peace, or order, appears, the power

of the state to prevent or punish is obvious." (Opp. at 23.) But nothing in the proposed injunction

prevents federal agents from acting against any "threat to public safety, peace, or order." (*See*

Stipulated PI ¶ 1 (permitting police to arrest journalists of legal observers if they "have probable

cause to believe that such individual has committed a crime").) The federal agents have failed to

show what they are legitimately seeking to "prevent or punish" by pushing, beating, and shooting

---

[4] Sergio Olmos, Mike Baker, & Zolan Kanno-Youngs, *Federal Officers Deployed in Portland
Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times (July 18, 2020),
https://www.nytimes.com/2020/07/18/us/portland-protests.html; *see also*
https://int.nyt.com/data/documenttools/dh-stacticalagent-memo2/bcc35f3303958cac/full.pdf
(admitting that DHS officers assigned to Portland "do not specifically have training in riot
control or mass demonstrations").

PAGE 9 -    REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

journalists and legal observers who have committed no crime other than documenting protests and law enforcement.

Contrary to the federal agents' contention, Plaintiffs can point to recent cases in this District and others, "in which federal or state officers responding to large-scale, ongoing incidents by violent opportunists have been enjoined in the manner Plaintiffs propose here." (Opp. at 22.) In at least three cases, courts have enjoined law-enforcement officers responding to this same series of nationwide protests following the murder of George Floyd:

- the TRO already issued in this case (Dkt. 33);

- Judge Hernandez's order in the *Don't Shoot Portland* case (*Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ (D. Or. June 9, 2020), Dkt. 29 at 9-10 (ordering that "PPB be restricted from using tear gas or its equivalent except as provided by its own rules generally," "tear gas use shall be limited to situations in which the lives or safety of the public or the police are at risk," and "[t]ear gas shall not be used to disperse crowds where there is no or little risk of injury")); and

- the U.S. District Court for the District of Colorado's order granting a wide-ranging temporary restraining order against the police as well (*Abay v. City of Denver*, No. 1:20-cv-01616-RBJ (D. Colo. June 5, 2020), Dkt. 16 at 10-11 (enjoining "Denver Police Department and officers from other jurisdictions working with Denver Police Department officers from using chemical weapons or projectiles unless an on-scene supervisor at the rank of Captain or above specifically authorizes [it]"; ordering that "all other non- or less-lethal projectiles may never be discharged to target the head, pelvis, or back" and "shall not be shot indiscriminately into a crowd"; that "all orders to disperse must be followed with adequate time for the intended audience to comply, and officers must leave room for safe egress," and more)).

Not only is the injunction Plaintiffs seek workable, it *has* worked. And it has worked in other jurisdictions as well. The federal agents' assertion that it would unduly restrict their activity has no basis in reality.

PAGE 10 - REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

The federal agents ignore the Ninth Circuit's legal framework set forth in the moving papers: To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying its restriction on Plaintiffs' speech. *Id.* It has not done so.

### A.    Plaintiffs Are Likely to Prevail on Their Retaliation Claim

The federal agents argue that Plaintiffs have not shown a likelihood of establishing intent for their retaliation claim. (Opp. at 16-17.) But as the federal agents' own authority points out (Opp. at 16), Plaintiffs can establish intent through circumstantial evidence, including evidence that the federal agents engaged in conduct that would chill a reasonable person's speech without a sufficient non-retaliatory reason for doing so. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (quotation marks omitted). That standard is easily met here.

The federal agents assert that Plaintiffs have not shown "anything other than the unintended consequence of an otherwise constitutional use of force under the circumstances." (Opp. at 16 (quoting *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001).) Leaving aside that the federal agents are asking the Court to rely on uncitable authority,[5] this argument simply ignores the evidence. Plaintiffs have submitted multiple declarations from journalists and observers, all of whom were attacked by federal agents even though they were separate from protesters, clearly marked press, and in some instances, had not even been asked to leave. (*E.g.*, Bivins Decl. ¶¶ 2, 4, 6; Berger Decl. ¶¶ 3-4; Johnson Decl. ¶¶ 3, 6; Rudoff Decl. ¶¶ 3-7; Binford-Ross Decl. ¶ 15.) In two cases, federal agents deliberately shot the reporters even after they had alerted the federal agents that they were press and complied with federal agents' directives. (Howard Decl. ¶¶ 2, 5-7; Berger Decl. ¶¶ 7-9.) Several were shot above the waist, which is not how such munitions should be used. (Rudoff Decl. ¶ 7; Johnson Decl. ¶ 6.) Plaintiff Lewis-

---

[5] Ninth Circuit Rule 36-3. The federal agents also ask the Court to rely on *Mims v. City of Eugene*, 145 F. App'x 194, 196 (9th Cir. 2005), which is also not citable under C.R. 36-3.

Rolland was shot 10 times! (Declaration of Mathieu Lewis-Rolland re: July 12, Dkt. 44 ¶¶ 13-15.) Courthouse News reporter Karina Brown was shot twice in the buttocks at close range. (Karina Brown Decl. ¶ 11.) Jungho Kim was shot in the chest. (Kim Decl. ¶ 7.) These are repeated, targeted, and gratuitous attacks. There is no explanation other than intimidation and retaliation, and the federal agents offer none.

The federal agents also cite *Capp v. City of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019) (Opp. at 17), but it does not aid them. There, plaintiff alleged that the county had retaliated against his criticism by threatening to terminate his child custody, and the Ninth Circuit reversed dismissal of his claim because he *had* alleged animus. *Id.* ("Because Plaintiffs have alleged that retaliatory animus was the but-for cause of Firth's conduct, Firth is not entitled to qualified immunity.").) Plaintiffs have made at least the same showing here. Finally, the federal agents' reliance on *Menotti v. Seattle*, 409 F.3d 1113 (9th Cir. 2005), is also unavailing. (Opp. at 17.) It may be impractical to distinguish between "law-abiding protesters" and "a violent subset of protesters who disrupt civic order," *id.* at 1155, but the Court has here specifically provided indicia to "facilitate the Police's identification" of journalists and legal observers. (TRO at 9.) Those indicia have worked for the Portland police. (City of Portland's Opposition to Plaintiff's Emergency Motion for Leave to File SAC ("City Opp."), Dkt. 46 at 4 (asserting that Portland police have "complied in good faith with this court's Temporary Restraining Order").) The same indicia will work for federal agents.

### B.    Plaintiffs Are Likely to Prevail on Their Access Claim

Plaintiffs are also likely to prevail on their access claims. In their moving papers, Plaintiffs established a prima facie case for their right of access. (Mot. at 12-13.) As the Court has already held, "public streets historically have been open to the press and the general public" and "there are at least serious questions" whether violently expelling journalists and legal observers while enforcing a dispersal order is narrowly tailored. (TRO at 7.) In response to Plaintiffs' showing and the Court's TRO, the federal agents cite no evidence that would support denying access to members of the press and legal observers. The decisions they cite are also

inapposite, and do not address the situation where the government unnecessarily punishes protected activities.

> ### 1. Press and Legal Observers Are Engaged in Activities that Pose No Threat to the Public or Law Enforcement

The federal agents essentially argue that journalists and legal observers have no greater rights of access than the public, that the government may deny protesters access to the City streets or federal property, and that they may therefore shoot, tear gas, and beat members of the press with impunity once they unilaterally decide to disperse protesters. This is a false syllogism. Press and protesters are engaged in different activities. Even assuming that the federal agents had a valid reason to use violence against people exercising their right to protest, it does not follow that the same purported justifications for using violence apply to journalists and legal observers.

The federal agents argue that "the press has [no] special right to remain in or access a location that has been lawfully closed . . . to protesters." (Opp at 18.) But this misses the point: Journalists and legal observers are engaged in different conduct than protesters, and so their claims are evaluated under different standards. Protesters seek a right to speak and assemble. Plaintiffs, however, seek a right of *access*—a right to "observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (2012). Their claims are thus evaluated under the two-part test of *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1 (1986). *Leigh*, 677 F.3d at 898. But this test for a right of *access* has no bearing on others' right to *speak*—even if at the same time and in the same place. Thus, *Press-Enterprise II* established a right to access criminal proceedings in some circumstances, but it did not establish any right to heckle the judge. *See* 478 U.S. at 8-9.

Under *Press-Enterprise II*, Plaintiffs must show (1) that the place and process to which they seek access have historically been open to the press and general public and (2) that public access plays a significant positive role in the functioning of the particular process in question. *Id.* This Court has already decided both questions in Plaintiffs' favor for purposes of a TRO, and that

Plaintiffs raised serious questions whether any infringement of their qualified right of access was narrowly tailored. (TRO at 7-8.)

In response, the federal agents' first argument is that Plaintiffs are "trespass[ing] on federal property." (Opp. at 17.) This is a non sequitur. Public streets are by definition public property—i.e., government property—and that has never prevented courts from recognizing that they are traditional public fora, even when a government purports to "close" it. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 490 (2014) (closure of sidewalks adjacent to abortion clinics was overbroad). This applies with equal force to "[p]ublic open spaces" such as parks, because they are "uniquely suitable for public gatherings and the expression of political or social opinion." *Long Beach Area Peace Network*, 574 F.3d at 1022 (quotation marks omitted).

As against these bedrock First Amendment principles, the federal agents cite the government's power to stop protesters from occupying federal property for 17 days and its power to prevent overnight camping in Lafayette Park. *United States v. Christopher*, 700 F.2d 1253, 1259-61 (9th Cir. 1983); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298-99 (1984); (Opp. at 17-18). But those cases did not involve denying the press access to critical events of world importance. They all involved legitimate reasons for restricting access, such as lack of adequate toilet facilities to support overnight camping, and they left open viable alternative channels for the activity at issue, such as allowing the public to protest at the park during daytime hours. *Clark*, 468 U.S. at 297-99; *Christopher*, 700 F.2d at 1259-60.[6]

Here, in contrast, there is no legitimate justification for excluding members of the media and legal observers. The federal agents have submitted no evidence that any journalist or legal observer was involved in any of the unlawful acts discussed in the government's papers, or that

---

[6] *See also Occupy Sacramento v. City of Sacramento*, 878 F. Supp. 2d 1110, 1119 (E.D. Cal. 2012) (upholding regulation "intended to ensure the ability of the general public to enjoy the park facilities, to ensure the viability and maintenance of those facilities, to protect the public's health, safety and welfare, and to protect the City's parks and public property from overuse and unsanitary conditions, including but not limited to, camping and overnight sleeping activities in City parks not specifically designed for those purposes"); (Opp. at 18).

PAGE 14 - REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

they pose a danger that would provide a compelling basis for excluding them, and "a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F..3d at 900. A policy that directs violence at anyone who does not leave when ordered to do, sweeping in journalists and legal observers who pose no threat to safety or law enforcement, is overbroad and thus not narrowly tailored. *See, e.g.*, *Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc*., 482 U.S. 569, 574-75 (1987) (striking down ordinance that prohibited expressive activity in airport terminal because it unnecessarily swept in in protected activities such as "wearing of campaign buttons or symbolic clothing" in addition to activities that might cause congestion, such as canvassing). "Laws . . . that restrict more protected speech than is necessary violate the First Amendment." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 814 (9th Cir. 2013) (striking down as wildly overbroad a purported traffic-safety law that restricted hiring day laborers on the for the supposed reason that "day labor solicitation that blocks traffic").

Not only is such a policy overbroad, it fails to significantly advance the federal agents' stated goal of protecting officer safety and federal property. Excluding press and legal observers does not protect officer safety and federal property because journalists and legal observers pose no threat to officer safety and federal property. (Opp. at 20-21 (failing to identify a single instance in which a journalist or legal observer actually posed a threat).) That "a substantial portion of the [policy's] burden on speech does not serve to advance its goals" is a second and "particularly compelling" reason why it fails the narrow tailoring requirement. *Berger v. City of Seattle*, 569 F.3d 1029, 1045-46 (9th Cir. 2009) (en banc) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Finally, a policy of blanket exclusion is also not the least restrictive means of protecting public safety. When federal agents exclude press and legal observers, they have no viable way to cover federal agents' use of force against protesters, and the only reporting becomes that of the government itself, which is the very evil that the First Amendment prevents. *Leigh v. Salazar*,

677 F.3d 892, 900 (9th Cir. 2012).[7] Meanwhile, Portland police have been able to protect public safety at least as well as federal agents without excluding press and legal observers. (City Opp. at 4.) Thus, there exist less restrictive means of protecting public safety, which is a third reason why the government's view that it can simply attack journalists and legal observers is not narrowly tailored and does not satisfy the First Amendment. *See Valle Del Sol*, 709 F.3d at 826 ("because restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive").

The cases cited by the federal agents do not hold otherwise. They cite *Perry v. Los Angeles Police Department*, 121 F.3d 1365 (9th Cir. 1997). (Opp. at 19.) But that case underscores that the government has not met its burden here. In *Perry*, the Ninth Circuit struck down as not narrowly tailored an ordinance that prevented selling goods and soliciting money on the Venice Beach Boardwalk, except for non-profits. The Court reasoned: "There is no evidence that those without nonprofit status are any more cumbersome upon fair competition or free traffic flow than those with nonprofit status." Similarly here, the government has not presented any evidence that would support excluding the press.

Defendants also cite *California First Amendment Coalition v. Calderon*, 150 F.3d 976 (9th Cir. 1998), in which San Quentin only allowed witnesses at executions to begin viewing the execution after the inmate was strapped to the gurney and the IV was inserted. (Opp. at 19.) The regulation was justified because it was necessary to protect the anonymity of the executioners, and it still allowed access to observing and documenting the execution. The Court reasoned that the press had no greater right than the public to document and observe the execution—because they were engaged in the exact same activity. Here, in contrast, the press is documenting and observing the protests, while protesters are engaged in a different activity. *Branzburg v. Hayes*, 408 U.S. 665 (1972), cited in *Calderon*, simply held that reporters do not have a constitutional

---

[7] The federal agents' assertion that press and legal observers could do the same job from several "blocks away from federal property" defies not only federal constitutional law but the laws of physics. (Opp. at 19.)

right to refuse to testify before a grand jury. It does not support allowing a regulation that sweeps in protected activity when it need not do so.

### 2.    Plaintiffs Have No Alternative Forum

Plaintiffs are likely to prevail for the separate and independent reason that if they are excluded from observing and reporting on the government's dispersal of protesters, they have no alternative means of doing so. "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (quoting *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)).

The federal agents argue that "[n]o Plaintiff asserts that any press or legal observer was unable to observe any activities merely because of the dispersal order. And there are no allegations that federal agents advanced, in an attempt to disperse rioters, more than a few blocks away from federal property. Thus, it is not at all clear why reporters and observers could not see sufficiently even if moved by an order to disperse, except for the use of crowd control munitions that could still be used under the proposed injunction." (Opp. at 19.) These arguments make no sense. As stated in the declarations submitted with this motion, journalists and legal observers have had to stop reporting due to the severity and nature of the injuries (such as tear gas in the eyes) that federal agents have intentionally inflicted on them. (*E.g.*, Karina Brown Decl. ¶ 13; Mahoney Decl. ¶¶ 14-15.) If they are to document events, they cannot be dispersed—especially at the very time federal agents are choosing to inflict violence on protesters.

Finally, Defendants claim that the injunction against the City is unworkable and would endanger officers. (Opp. at 20.) Defendants cite no evidence for this proposition—including evidence from the City, which has been living under the injunction for 21 days of protest now. Indeed, the City has explained that Defendants' conduct is "unconstitutional." (City Opp. at 4.) Similarly, nobody from Washington has even provided a speculative, self-serving declaration to support Defendants' theory.  That is telling and fails to meet Defendants' burden of proof.

PAGE 17 - REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

## II.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

In granting the TRO against the City, the Court already held that the balance of equities and public interest favored Plaintiffs. Nothing in the federal agents' briefing changes this analysis.

The federal agents argue that "[t]he government has a comprehensive interest in maintaining public order on public property." (Opp. at 25 (citing *Feiner v. New York*, 340 U.S. 315, 320 (1951).) But that is no basis for excluding the press, who have not posed any such threat. It is against the public's interest to prevent journalists and legal observers from documenting how law enforcement is treating protesters. As the Ninth Circuit has observed, the "free press is the guardian of the public interest," and "the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 900.

Moreover, the federal agents have only escalated violence against protesters, rather than aided law and order. For this reason, Portland Mayor Ted Wheeler called "for immediate removal of the President's 'Rapid Deployment Unit' squads and for a congressional investigation of their unconstitutional terror tactics,"[8] and many other state and local leaders have condemned the federal agents' conduct and noted that their presence in Portland is a cynical political ploy.[9] Even DHS agents have decried the federal agents' conduct in Portland as unconstitutional.[10]

As the City told the Court, "the City's position with respect to the Federal Entities' conduct on and about July 12, 2020, as publicly expressed by its Mayor and commissioners, has been one of strong condemnation."[11] (City Opp. at 5; *see also id.* at 7 ("City officials have

---

[8] Twitter, July 20, 2020 at 3:27.

[9] *See, e.g.*, Mesh, *supra* note 1.

[10] Rhea Mahbubani, *DHS employees say Trump deploying federal agents to Portland is a 'blatantly unconstitutional' 'embarrassment'*, Business Insider (July 22, 2020), https://www.businessinsider.com/dhs-employees-portland-response-tarnishes-reputation-unconstitutional-2020-7.

[11] For example, Mayor Wheeler publicly condemned "the violence federal officers brought to our streets in recent days, and the life-threatening tactics [federal] agents use," and added, "We do not need or want their help." Earlier, Mayor Wheeler had publicly called for the federal government to follow the same crowd-control rules and follow the same restrictions on crowd-

PAGE 18 - REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

publicly condemned the actions of the Federal Entities in pointedly strong terms."); *id.* ("The City's position in this case is that its actions complied with the Constitution. The same cannot be said, however, about the Federal Entities' use of force.").) Governor Brown has likewise noted that "[t]his political theater from President Trump has nothing to do with public safety."[12]

On July 17, 2020, the Oregon Attorney General filed a lawsuit against the United States Marshals Service, the United States Department of Homeland Security, the United States Customs and Border Protection, and the Federal Protective Service, alleging that they have "violate[d] the state's sovereign interests in enforcing its laws and in protecting people within its borders from kidnap and false arrest, without serving any legitimate federal law enforcement purpose" (*Rosenblum v. John Does 1-10* et al., No. 3:20-cv-01161-HZ (D. Or. July 17, 2020), *Complaint*, Dkt. 1, at 3 ¶ 20.)[13]  The complaint alleges that "one or more federal defendants have engaged in actions endangering Oregon's citizens and the people walking Portland's streets." (*Id.* at 7 ¶ 32). It further alleges: "Citizens peacefully gathering on the streets of Portland to protest racial inequality have the right to gather and express themselves under the First Amendment to the United States Constitution. Defendants' actions are undertaken with the intent of discouraging lawful protest and therefore constitute an illegal prior restraint on the First Amendment right of Oregonians to peacefully protest racial inequality." (*Id.* ¶¶ 22-23.)

In sum, Defendants fail to represent "the interest of the community in maintaining peace and order on its streets." *Feiner*, 340 U.S. at 320. Whereas journalists and legal observers serve a critical public purpose of reporting the abuses perpetrated by the federal agents and decried by

---

control devices as had been placed on the City. City commissioners Hardesty and Eudaly have similarly publicly condemned the Federal Entities' "escalation of violence" and "reckless and aggressive behavior." (City Opp. at 5 (citations omitted).)

[12] See n.1, *supra*.

[13] The Oregon Attorney General also moved for a TRO restraining Defendants from "detaining, arresting, or holding individuals without probable cause or a warrant" and requiring them to "[i]dentify themselves and their agency before detaining or arresting any person" and "[e]xplain to any person detained or arrested that the person is being detained or arrested and explain the basis for that action." *Rosenblum*, *Motion for Temporary Restraining Order*, Dkt. 5, at 1.

PAGE 19 - REPLY ISO MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

public officials. The balance of equities and the public's interest weigh heavily in favor of Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this motion for a temporary restraining order and preliminary injunction be granted.

Dated: July 22, 2020                    Respectfully Submitted,


By: s/*Matthew Borden*
    Matthew Borden
    J. Noah Hagey
    Athul K. Acharya, OSB No. 152436
    Gunnar K. Martz
    BRAUNHAGEY & BORDEN LLP


    Kelly K. Simon, OSB No. 154213
    ACLU FOUNDATION OF OREGON

    *Attorneys for Plaintiffs*