IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **INDEX NEWSPAPERS LLC d/b/a PORTLAND MERCURY; DOUG BROWN; BRIAN CONLEY; SAM GEHRKE; MATHIEU LEWIS-ROLLAND; KAT MAHONEY; SERGIO OLMOS; JOHN RUDOFF; ALEX MILAN TRACY; TUCK WOODSTOCK; JUSTIN YAU;** and those similarly situated, | Case No. 3:20-cv-1035-SI **TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS** |
| Plaintiffs, | |
| v. | |
| **CITY OF PORTLAND; JOHN DOES 1-60; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. MARSHALS SERVICE,** | |
| Defendants. | |

Matthew Borden, J. Noah Hagey, Athul K. Acharya, and Gunnar K. Martz, BRAUNHAGEY & BORDEN LLP, 351 California Street, Tenth Floor, San Francisco, CA 94104; Kelly K. Simon, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON, P.O. Box 40585, Portland, OR 97240. Of Attorneys for Plaintiffs.

Denis M. Vannier and Naomi Sheffield, Senior Deputy City Attorneys; Ryan C. Bailey, Deputy City Attorney; and Youngwoo Joh, Assistant Deputy City Attorney, OFFICE OF THE CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Ethan P. Davis, Acting Assistant Attorney General; Billy J. Williams, United States Attorney for the District of Oregon; David M. Morrell, Deputy Assistant Attorney General; Alexander K. Hass, Director, Federal Programs Branch; Andrew I. Warden, Senior Trial Counsel; Jeffrey A. Hall and Jordan L. Von Bokern, Trial Attorneys; U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L. Street, NW, Washington, D.C. 20530. Of Attorneys for Defendants U.S. Department of Homeland Security and U.S. Marshals Service.

**Michael H. Simon, District Judge.**

"Open government has been a hallmark of our democracy since our nation's founding." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012). "When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Id.* at 900. "The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Id.* This lawsuit tests whether these principles are merely hollow words.

Plaintiffs Index Newspapers LLC doing business as Portland Mercury, Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau (collectively, "Plaintiffs") bring this putative class action against: (1) the City of Portland (the "City"); (2) numerous as-of-yet unnamed individual and supervisory officers of the Portland Police Bureau ("PPB") and other agencies allegedly working in concert with the PPB, (3) the U.S. Department of Homeland Security ("DHS"); and the U.S. Marshals Service ("USMS"). The Court refers to DHS and USMS collectively as the "Federal Defendants."

As alleged in the Second Amended Complaint ("SAC"), Plaintiffs seek to stop Defendants "from assaulting news reporters, photographers, legal observers, and other neutrals who are documenting the police's violent response to protests over the murder of George Floyd. The police's efforts to intimidate the press and suppress reporting on the police's own misconduct offends fundamental constitutional protections and strikes at the core of our democracy." SAC, ¶ 1 (ECF 53). Plaintiffs allege violations of the First and Fourth Amendments

PAGE 2 – TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS

of the United States Constitution and Article I, sections 8 and 26 of the Oregon Constitution. Plaintiffs request declaratory and injunctive relief and money damages.

Plaintiffs filed their original Complaint on June 28, 2020. ECF 1. On June 30th, Plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction. ECF 7. On July 2nd, the Court entered a TRO against the City. ECF 33. On July 14th, Plaintiffs moved to add the Federal Defendants to this lawsuit. ECF 42. On July 16th, the Court entered a stipulated preliminary injunction against the City. ECF 49. On July 17th, the Court granted Plaintiffs' motion to file the SAC, which added the Federal Defendants. ECF 52. Later that day, Plaintiffs filed the SAC (ECF 53) and a motion for TRO against the Federal Defendants. ECF 54. On July 22nd, the City filed a memorandum supporting Plaintiffs' motion for TRO against the Federal Defendants. ECF 70.

The Court has reviewed Plaintiffs' motion (ECF 54) and supporting declarations, the Federal Defendants' opposition memorandum and related exhibits (ECF 67), Plaintiffs' reply memorandum (ECF 79) and additional declarations, a memorandum filed by *amicus curiae* National Police Association (ECF 65), and the memorandum filed by the City in support of Plaintiffs' motion (ECF 70). On July 23, 2020, the Court heard oral argument. For the reasons that follow, Plaintiffs' motion for TRO against the Federal Defendants is GRANTED.

### STANDARDS

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show

PAGE 3 – TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS

that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable

harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and

(4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule

that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in

some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's

alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship

balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the

other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction

may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious

questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and

the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

### A. Plaintiffs

Plaintiff Index Newspapers LLC doing business as Portland Mercury ("Portland

Mercury") is an alternative bi-weekly newspaper and media company. It was founded in 2000

and is based in Portland, Oregon. ECF 53, ¶ 21.

Plaintiff Doug Brown has attended many protests in Portland, first as a journalist with the

*Portland Mercury* and later as a volunteer legal observer with the ACLU. He has attended the

George Floyd protests on several nights, wearing a blue vest issued by the ACLU that clearly

identifies him as a legal observer, for the purpose of documenting police interactions with

protesters. ECF 9, ¶¶ 1-2; ECF 53, ¶¶ 22, 97; ECF 55, ¶ 2.

Plaintiff Brian Conley has been a journalist for twenty years and has trained journalists in video production across a dozen countries internationally. He founded Small World News, a documentary and media company dedicated to providing tools to journalists and citizens around the world to tell their own stories. ECF 53, ¶ 131.

Plaintiff Sam Gehrke has been a journalist for four years. He previously was on the staff of the *Willamette Week* as a contractor. He is now a freelance journalist. His work has been published in *Pitchfork*, *Rolling Stone*, *Vortex Music*, and *Eleven PDX*, a Portland music magazine. He has attended the protests in Portland for the purpose of documenting and reporting on them, and he wears a press pass from the *Willamette Week*. ECF 10, ¶¶ 1-3; ECF 53, ¶ 23.

Plaintiff Mathieu Lewis-Rolland is a freelance photographer and photojournalist who has covered the ongoing Portland protests. He has been a freelance photographer and photojournalist for three years and is a regular contributor to *Eleven PDX* and listed on its masthead. After the Court issued its first TRO directed against the City, he began wearing a shirt that said "PRESS" in block letters on both sides. He also wears a helmet that says "PRESS" on several sides, and placed reflective tape on his camera and on wrist bands. ECF 12, ¶¶ 1-2; ECF 53 ¶ 24; ECF 77, ¶ 1, 3.

Plaintiff Kat Mahoney is an independent attorney and unpaid legal observer. She has attended the Portland protests nearly every night for the purpose of documenting police interactions with protesters. She wears a blue vest issued by the ACLU that clearly identifies her as an "ACLU LEGAL OBSERVER." ECF 26, ¶ 3; ECF 75, ¶¶ 1-2.

Plaintiff Sergio Olmos has been a journalist since 2014, when he began covering the protests in Hong Kong. He has worked for *InvestigateWest*, for *Underscore Media Collaboration*, and as a freelancer. His work has been published in the *Portland Tribune*, the

*Willamette Week*, *Reveal: The Center for Investigative Reporting*, *Crosscut*, *The Columbian*, and *InvestigateWest*. He has attended the protests in Portland as a freelance journalist for the purpose of documenting and reporting on them. When he covers the protests, he wears a press badge and a Kevlar vest that says "PRESS" on both sides. He carries several cameras, including a film camera, in part so that it is unmistakable that he is present in a journalistic capacity as a member of the press. ECF 15, ¶¶1-3; ECF 53, ¶ 26.

Plaintiff John Rudoff is a photojournalist. His work has been published internationally, including reporting on the Syrian refugee crises, the "Unite the Right" events in Charlottesville, Virginia, the Paris "Yellow Vest" protests, and the Rohingya Genocide. He has attended the protests in Portland during the past two months for the purpose of documenting and reporting on them. Since this lawsuit began, he has been published in *Rolling Stone*, *The Nation*, and on the front page of the *New York Times*. While attending the Portland protests, he carries and displays around his neck press identification from the National Press Photographers Association, of which he has been a member for approximately ten years. He also wears a helmet and vest that is clearly marked "PRESS." ECF 17, ¶¶ 1-3; ECF 53, ¶ 27; ECF 59, ¶¶ 1, 3.

Plaintiff Alex Milan Tracy is a journalist with a master's degree in photojournalism. His photographs have been published by CNN, ABC, CBS, *People Magazine*, *Mother Jones*, and *Slate*, among others. He has covered a many of the recent protests in Portland over George Floyd and police brutality. He carries a press badge and three cameras, and wears a helmet that is marked "PRESS" on the front and back. ECF 60, ¶¶ 1, 3.

Plaintiff Tuck Woodstock has been a journalist for seven years. Their work has been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They have attended the George Floyd protests several times as a freelancer for the

*Portland Mercury* and more times as an independent journalist. When they attended these protests, they wear a press pass from the *Portland Mercury* that states "MEDIA" in large block letters. They also wear a helmet that is marked "PRESS" on three sides. At all times during police-ordered dispersals, they hold a media badge over their head. ECF 23, ¶¶ 2-3; ECF 76, ¶¶ 1, 3.

Plaintiff Justin Yau is a student at the University of Portland studying communications with a focus on journalism. He previously served in the U.S. Army, where he was deployed to the Middle East. He has covered protests in Hong Kong and Portland. His work has been published in the *Daily Mail*, *Reuters*, *Yahoo! News*, *The Sun*, *Spectee* (a Japanese news outlet), and msn.com. He has attended the protests in Portland as a freelance and independent journalist for the purpose of documenting and reporting on them. He wears a neon yellow vest marked with reflective tape and a helmet that are marked "PRESS," and carries his press pass around his neck. He carries a large camera, a camera gimbal (a device that allows a camera to smoothly rotate), and his cellphone for recording. ECF 56, ¶¶ 1-2.

Plaintiffs and other declarants have submitted evidence of employees, agents, or officers of the Federal Defendants targeting journalists. They provide many examples in the materials submitted to the Court, involving Plaintiffs and other journalists. The Court highlights only a few examples below.

On July 15, 2020, Plaintiff Justin Yau, while carrying photojournalist gear and wearing clothing clearly identifying him as press, asserts that he was targeted by a federal agent and had a tear-gas canister shot directly at him. ECF 56, ¶ 3-6. At the time he was fired upon, he was taking pictures with his camera and recording with his cell phone while standing 40 feet away from protesters to make it clear that he was not part of the protests. *Id.* ¶ 5. In addition, late July

19th or early July 20th, Declarant Nathan Howard, a photojournalist who has been published in *Willamette Week*, *Mother Jones*, Bloomberg Images, Reuters, and the Associated Press, was covering the Portland protests. ECF 58, ¶¶ 1, 4. He was standing by other journalists, and no protesters, as federal agents went by. *Id.* ¶ 4. The nearest protester was a block away. *Id.* Mr. Yau held up his press pass and repeatedly identified himself as press. *Id.* ¶ 5. A federal agent stated words to the effect of "okay, okay, stay where you are, don't come closer." *Id.* ¶ 6. Mr. Yau states that another federal agent, who was standing immediately to the left of the agent who gave Mr. Yau the "okay," aimed directly at Mr. Yau and fired at least two pepper balls at him at close range. *Id.* ¶ 7.

Declarant Jungho Kim is a photojournalist whose work has been published in the *San Francisco Chronicle* and *CalMatters*, among others. ECF 62, ¶ 1. He wears a neon yellow vest marked "PRESS" and a white helmet marked "PRESS" in the front and rear. *Id.* ¶ 2. He has covered protests in Hong Kong and California. He has experience with staying out of the way of officers and with distinguishing himself from a protester, such as by never chanting or participating in protest activity. *Id.* ¶ 3. He had never been shot at by authorities until covering the Portland protests on July 19, 2020. *Id.* During the protest, federal agents pushed protesters away from the area where Mr. Kim was recording. He was around 30 feet away from federal agents, standing still, taking pictures, with no one around him. *Id.* ¶¶ 5-7. He asserts that suddenly and without warning, he was shot in the chest just below his heart with a less lethal munition. *Id.* ¶ 7. Because he was wearing a ballistic vest, he was uninjured. He also witnessed, and photographed, federal agents firing munitions into a group of press and legal observers. *Id.* ¶ 9.

Declarant Noah Berger has been a photojournalist for more than 25 years. ECF 72, ¶ 1. He has been published nationally and internationally, including for coverage of protests in San Francisco and Oakland. *Id.* He arrived in Portland on July 19, 2020, to cover the protests on assignment for the Associated Press. He notes that the response he has seen and documented from the federal agents in Portland is markedly different from even the most explosive protests he has covered in the past. *Id.* ¶ 2. He carries two large professional cameras and two press passes. *Id.* ¶ 3. He states that without any warning he was shot twice by federal agents using less lethal munitions. *Id.* ¶ 4. Later, as federal agents "rushed" an area he was photographing, he held up his press pass, identified himself as press, stated he was leaving, and moved away from the area. *Id.* ¶ 7. While holding his press pass and identifying himself as press, he was hit with a baton by one federal agent. *Id.* ¶ 8. Two others joined and surrounded him, and he was hit with batons three or four times. *Id.* One agent then deployed pepper spray against Mr. Berger from about one foot away. *Id.* ¶ 9. He was given no warning. *Id.* ¶ 11. He states that he was not demonstrating or protesting, was leaving the area, and was clearly acting as a journalist. *Id.* ¶¶ 3, 11.

**B.  Standing**

The Federal Defendants argue that Plaintiffs lack standing to seek a TRO that requests prospective injunctive relief because Plaintiffs rely on past illegal conduct and have other remedies available at law. To establish Article III standing to seek prospective injunctive relief, a plaintiff must "allege either 'continuing, present adverse effects'" of a defendant's past illegal conduct, "or 'a sufficient likelihood that [they] will again be wronged in a similar way.'" *Villa v. Maricopa Cty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974), and *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)); *see also Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (requiring "real and

immediate" threat of future injury). Although a single injury in the past is not enough to create

standing, the threat of future injury may become actionable when "actual repeated incidents are

documented." *Thomas*, 978 F.2d at 507 (quotation marks omitted). Additionally, as explained by

the Ninth Circuit:

> A plaintiff seeking prospective injunctive relief must demonstrate
> that he is realistically threatened by a *repetition* of the violation. A
> threat of repetition can be shown at least two ways. First, a plaintiff
> may show that the defendant had, at the time of the injury, a
> written policy, and that the injury stems from that policy. Second,
> the plaintiff may demonstrate that the harm is part of a pattern of
> officially sanctioned behavior, violative of the plaintiffs' federal
> rights.

*Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (emphasis in original) (simplified). The

threat of repeated future injury, however, may not be "conjectural or hypothetical." *O'Shea*, 414

U.S. at 494 (quotation marks omitted). Standing to seek equitable relief also requires "a showing

of an inadequate remedy at law and . . . a serious risk of irreparable harm." *Pulliam v. Allen*, 466

U.S. 522, 537 (1984); *see also O'Shea*, 414 U.S. at 499.

Plaintiffs have been covering or observing the protests and they all have documented

incidents of violence, threats, or intimidation by federal agents during their coverage or

observation. Federal agents have, among other acts, thrown flashbang grenades at Plaintiff

Tracy, shot smoke grenades at Plaintiff Mahoney, and shot Plaintiff Rudoff with a 40mm rubber

bullet. *See* ECF 79 ¶¶ 7-9, ECF 75 ¶¶ 12-13, ECF 59 ¶ 7. Plaintiffs intend to continue covering

and observing the protests. *See, e.g.*, ECF 53, ¶ 229; ECF 59, ¶ 9; ECF 60, ¶ 12, ECF 75, ¶17;

ECF 80, ¶ 11. The Federal Defendants intend to keep dispersing journalists and legal observers.

*See* ECF 67 at 20 (arguing that allowing journalists and legal observers to remain "is not a

practicable option"). The actions by the federal agents described by Plaintiffs are part of a pattern

of officially sanctioned conduct. The Federal Defendants argue that such conduct is necessary to

protect federal property. Absent an injunction, the Federal Defendants will continue to target journalists and legal observers and require them to disperse or face force and violence by federal officers, even when the journalists and legal observers are not engaged in any harmful or illegal conduct. The combination of the Federal Defendants' repeated past conduct, Plaintiffs' stated intentions, and the Federal Defendants' stated intentions establish the "real and immediate threat of repeated injury" sufficient to create standing. *Lyons*, 461 U.S. at 102. The threatened future harm is not speculative or hypothetical.

The cases cited by the Federal Defendants arguing against standing are distinguishable for two reasons. First, the causal chain is far longer and more speculative. As discussed above, the conduct and declared intentions of Plaintiffs and the Federal Defendants make future injury all but inevitable. Second, many of the cited cases involve government action triggered by illegal conduct. *See*, e.g. *O'Shea*, 414 U.S. at 496-97; *Lyons*, 461 U.S. at 105-06. Plaintiffs, however, are not breaking any laws—to the contrary, they are engaging in constitutionally protected First Amendment activity. It is one thing to ask citizens to obey the law in the future to avoid future alleged harm. But it is quite another for the Federal Defendants to insist that Plaintiffs must forgo constitutionally protected activity if they wish to avoid government force and interference.

The Federal Defendants also argue that Plaintiffs have legal remedies available, such as bringing a civil rights action or a lawsuit under the Federal Tort Claims Act, and thus a forward-looking equitable remedy is not appropriate. Backward-looking claims for money damages, however, would not provide the relief Plaintiffs are seeking. Plaintiffs desire access and the ability to exercise their First Amendment rights to observe and report on government misconduct. Plaintiffs and other journalists submitted evidence that they have been injured and unable to continue reporting, sometimes for a short period of time and sometimes for longer.

They also state that the fear of even worse injury makes them hesitant to continue reporting, and one national journalist stated that he will no longer cover the Portland protests because of the attacks against him by federal agents. This chilling of First Amendment rights is not adequately compensable with money damages. *Cf. Otter*, 682 F.3d at 826 (noting that the loss of First Amendment rights "unquestionably constitutes irreparable injury").

## C. TRO Factors

### 1. Likelihood of Success on the Merits

#### a. Claim for First Amendment Retaliation

The Federal Defendants argue that Plaintiffs fail to show a likelihood of success on the merits of their claim for First Amendment retaliation because they fail to show that any of the violence against Plaintiffs was substantially motivated by the intent to deter or chill First Amendment rights. At oral argument, counsel for the Federal Defendants argued that "direct evidence" was needed to show retaliatory motive and no such evidence was in the record. Retaliatory intent under the First Amendment, however, "can be demonstrated either through direct *or circumstantial evidence*." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (emphasis added)).

Plaintiffs provide sufficient circumstantial evidence of retaliatory intent to show, at the minimum, serious questions going to the merits. Plaintiffs' declarations describe situations including that they were identifiable as press, were not engaging in unlawful activity or protesting, were not standing near protesters, and yet were subject to violence by federal agents. Contrary to the Federal Defendants' arguments, this evidence does not support that the force used on Plaintiffs were "unintended consequences" of crowd control.

### b. Claim for Right of Access

The First Amendment prohibits any law "abridging the freedom of speech, or of the press[.]" U.S. Const., amend. I. Although the First Amendment does not enumerate special rights for observing government activities, "[t]he Supreme Court has recognized that newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

As the Ninth Circuit has explained: "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Leigh*, 677 F.3d at 898. By reporting about the government, the media are "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (Burger, C.J., announcing judgment); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). As further described by the Ninth Circuit, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900 (quoting Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence.")).

The Federal Defendants argue that journalists have no right to stay, observe, and document when the government "closes" public streets. This circular logic does not help the Federal Defendants. First, the Federal Defendants are not the entities that "close" state public

streets and parks; that is a local police function. Second, the point of journalists observing and documenting government action is to record whether the "closing" of public streets (*e.g.*, declaring a riot) is lawfully originated and carried out. Without journalists and legal observers, there is only the government's side of the story to explain why a "riot" was declared and the public streets were "closed" and whether law enforcement acted properly in effectuating that order. Third, the Federal Defendants conceded at oral argument that there is no evidence that any journalist or legal observer has damaged any federal property or harmed any federal officer. Thus, the stated need to protect federal property and the safety of federal officers is not directly affected by allowing journalists and legal observers to stay, observe, and record events.

The Federal Defendants argue that Plaintiffs improperly rely on *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1 (1986), to articulate the standard to apply in evaluating likelihood of success in Plaintiffs' right of access claim. The Federal Defendants argue that *Press-Enterprise II* applies only to right of access to judicial proceedings. The Ninth Circuit, however, has rejected this precise argument and applied the *Press-Enterprise II* framework to journalists requesting access to cover a government event (a horse roundup). *Leigh*, 677 F.3d at 899 ("The government argues that the *Press-Enterprise II* framework is limited to attempts to access criminal trials. We disagree."). The Government did even mention *Leigh* in its response, despite Plaintiffs' heavy reliance on *Leigh* in their motion and the Court's citation to *Leigh* in the previous TRO directed against the City. The Court finds that *Press-Enterprise II* applies.

In *Press-Enterprise II*, the Supreme Court established a two-part test for right of access claims. First, the court must determine whether a right of access attaches to the government proceeding or activity by considering (1) whether the place and process have historically been

open to the press and general public and (2) whether public access plays a significant positive

role in the functioning of the particular process in question. *Press-Enterprise II*, 478 U.S. at 8-9.

Second, if the court determines that a qualified right applies, the government may overcome that

right only by demonstrating "an overriding interest based on findings that closure is essential to

preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9 (citation omitted);

*see also Leigh*, 677 F.3d at 898 (discussing *Press-Enterprise II*). The public streets, sidewalks,

and parks historically have been open to the press and general public, and public observation of

law enforcement activities in these public fora plays a significant positive role in ensuring

conduct remains consistent with the Constitution.

The Federal Defendants argue that Plaintiffs have an alternative location, because they

can watch from a few blocks away. This argument is without merit. Federal agents are using tear

gas, which decreases visibility, and the protests are at night. Reporting from a few blocks away is

not a viable alternative location.

The Federal Defendants also argue that closure is essential because allowing some people

to remain after a dispersal order is not practicable and is unworkable. This argument is belied by

the fact that this precise remedy has been working for 21 days with the Portland Police Bureau.

Indeed, after issuing the first TRO directed against the City, the Court specifically invited the

City to move for amendment or modification if the original TRO was not working, or address

any problems at the preliminary injunction phase. Instead, the City *stipulated* to a preliminary

injunction that was nearly identical to the original TRO, with the addition of a clause relating to

seized property. The fact that the City never asked for any modification and then stipulated to a

preliminary injunction is compelling evidence that exempting journalists and legal observers is

workable. When asked at oral argument why it could be workable for City police but not federal

PAGE 15 – TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS

officers, counsel for the Federal Defendants responded that the current protests are chaotic. But as the Federal Defendants have emphatically argued, Portland has been subject to the protests nonstop for every night for more than 50 nights, and purportedly that is why the federal officers were sent to Portland. There is no evidence that the previous 21 nights were any less chaotic. Indeed, the Federal Defendants' describe chaotic events over the Fourth of July weekend through July 7th, including involving Portland police, and the previous TRO was issued on July 2nd and was in effect at that time. The workability of the previous TRO also shows that there is a less restrictive means than exclusion or force that is available.

At this stage, there are at least serious questions regarding Plaintiffs' right to access, whether the government will be able to meet its burden to overcome that right to access, the federal officers' tactics directed toward journalists and other legal observers, and whether restrictions placed upon them by the Federal Defendants are narrowly tailored. Thus, Plaintiffs' meet this TRO factor for their claim for right to access.

### 2. Irreparable Harm

The Federal Defendants argue that because there is no threat of immediate injury, there is no threat of irreparable harm, relying on their standing arguments. Because the Court rejected their standing arguments, the Court rejects this argument. The Federal Defendants also argue that because Plaintiffs allege First Amendment retaliation, there is no presumption of irreparable injury. Plaintiffs' claims, however, allege a serious threat to First Amendment rights. Under these types of claims, there is a likelihood of irreparable injury. "[U]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (quotation marks omitted); *see also Otter*, 682 F.3d at 826 (9th Cir. 2012) ("The loss

PAGE 16 – TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); 11A Charles Alan WRIGHT, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

### 3. Public Interest and Balance of the Equities

The third and fourth factors also weigh in favor of granting the TRO. As for the public interest, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment).

The Federal Defendants argue that the government's countervailing interest in maintaining public order on public property outweighs Plaintiffs' First Amendment concerns. The Federal Defendants allegedly deployed agents to protect the federal courthouse and the nearby federal building. Although the Federal Defendants assert their right to disperse "violent opportunists," there is no evidence that any journalist or legal observer—let alone any of the named Plaintiffs—has damaged federal property or acted violently towards federal officers. At oral argument, Defendants conceded that they have no such evidence. Indeed, the evidence before the Court shows that journalists and legal observers attend the protests as "guardians of the public interest," not as vandals. *Leigh*, 677 F.3d at 900. Nor is there any evidence that allowing journalists and legal observers to stay despite a dispersal order or not to be subject to violence used against protesters causes others to harm property or law enforcement or interferes

with law enforcement's ability to perform. The City's stipulation to the preliminary injunction is evidence of this workability.

The Federal Defendants' second argument, that the government's interest in preserving physical access to courts counterbalances Plaintiffs' interests, also is without merit. Additionally, the relevant protests are happening after business hours, and there is no indication that allowing journalists and legal observers to stay despite a dispersal order interferes with the public's access. None of the government's proffered interests outweigh the public's interest in accurate and timely information about how law enforcement is treating protestors. Finally, because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted).

**4. Conclusion**

Accordingly, the Court grants Plaintiffs' motion for TRO against the Federal Defendants (ECF 54) and Orders as follows:

**TEMPORARY RESTRAINING ORDER**

1.      The Federal Defendants, their agents and employees, and all persons acting under their direction are enjoined from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), unless the Federal Defendants have probable cause to believe that such individual has committed a crime. For purposes of this Order, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse. Such persons shall, however, remain bound by all other laws.

2.    The Federal Defendants, their agents and employees, and all persons acting under their direction are further enjoined from seizing any photographic equipment, audio- or video-recording equipment, or press passes from any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), or ordering such person to stop photographing, recording, or observing a protest, unless the Federal Defendants are also lawfully seizing that person consistent with this Order. Except as expressly provided in Paragraph 3 below, the Federal Defendants must return any seized equipment or press passes immediately upon release of a person from custody.

3.    If any Federal Defendant, their agent or employee, or any person acting under their direction seize property from a Journalist or Legal Observer who is lawfully arrested consistent with this Order, such Federal Defendant shall, as soon thereafter as is reasonably possible, make a written list of things seized and shall provide a copy of that list to the Journalist or Legal Observer. If equipment seized in connection with an arrest of a Journalist or Legal Observer lawfully seized under this Order is needed for evidentiary purposes, the Federal Defendants shall promptly seek a search warrant, subpoena, or other court order for that purpose. If such a search warrant, subpoena, or other court order is denied, or equipment seized in connection with an arrest is not needed for evidentiary purposes, the Federal Defendants shall immediately return it to its rightful possessor.

4.    To facilitate the Federal Defendants' identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or other official press credentials or distinctive clothing that identifies the wearer as a member of the press. These indicia are not exclusive, and a person

need not exhibit every indicium to be considered a Journalist under this Order. The Federal

Defendants shall not be liable for unintentional violations of this Order in the case of an

individual who does not carry or wear a press pass, badge, or other official press credential or

distinctive clothing that identifies the wearer as a member of the press.

5.      To facilitate the Federal Defendants' identification of Legal Observers protected

under this Order, the following shall be considered indicia of being a Legal Observer: wearing a

green National Lawyers' Guild-issued or authorized Legal Observer hat (typically a green NLG

hat) or wearing a blue ACLU-issued or authorized Legal Observer vest.

6.      The Federal Defendants are not precluded by the Order from issuing otherwise

lawful crowd-dispersal orders for a variety of lawful reasons. The Federal Defendants shall not

be liable for violating this injunction if a Journalist or Legal Observer is incidentally exposed to

crowd-control devices after remaining in the area where such devices were deployed after the

issuance of an otherwise lawful dispersal order.

7.      Because the Court considers any willful violation of this Order, or any express

direction by a supervisor or commander to disregard or violate this Order, to be a violation of a

clearly established constitutional right and thus not subject to qualified immunity in any action

brought against any individual employee, officer, or agent of the Federal Defendants under

*Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), notice of this Order must be

widely disseminated. Accordingly, the Federal Defendants are ordered to provide copies of this

Order, in either electronic or paper form, within 24 hours, to: (a) all employees, officers, and

agents of the Federal Defendants currently deployed in Portland, Oregon (or who later become

deployed in Portland, Oregon while this Order is in force), including but not limited to all

personnel in Portland, Oregon who are part of Operation Diligent Valor, Operation Legend, or

PAGE 20 – TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS

any equivalent; (b) all employees, officers, and agents of the Federal Defendants with any supervisory or command authority over any person in group (a) above; and (c) the U.S. Attorney General and the Secretary (or Acting Secretary) of the U.S. Department of Homeland Security.

8.      Plaintiffs need not provide any security, and all requirements under Rule 65(c) of the Federal Rules of Civil Procedure are waived.

9.      The Court authorizes mutual expedited discovery so that the parties can be fully prepared to present all relevant facts and legal issues at a preliminary injunction hearing. The parties shall confer and propose to the Court a schedule for briefing and hearing on whether the Court should issue a preliminary injunction against the Federal Defendants.

10.     This Order shall expire fourteen (14) days after entry, unless otherwise extended by stipulation of the parties or by further order of the Court.

**IT IS SO ORDERED**.

DATED this 23rd of July, 2020 at 5:00 p.m.

Michael H. Simon
United States District Judge