ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JOSHUA E. GARDNER
Special Counsel
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*, <br><br> Plaintiffs. <br><br> v. <br><br> CITY OF PORTLAND, *et al.*, <br><br> Defendants. | Case No. 3:20-cv-1035-SI <br><br> **FEDERAL DEFENDANTS' MOTION FOR RECONSIDERATION OF TEMPORARY RESTRAINING ORDER ENJOINING FEDERAL DEFENDANTS** |

### L.R. 7-1 Certification

Defendants conferred on this Motion with counsel for the Plaintiffs by telephone on July 30, 2020, and the parties could not reach an agreement requiring the court to resolve the matter.

### MOTION

Pursuant to Federal Rule of Civil Procedure 54(b), Defendants respectfully move the Court to reconsider its Temporary Restraining Order Enjoining Federal Defendants ("TRO"), ECF No. 84, and dissolve that Order or, in the alternative, convert the Order to a Preliminary Injunction.

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Introduction

The right to peaceful assembly and to freedom of the press, as all parties recognize, is paramount, and Defendants acknowledge the Court's order aims to protect those interests. Experience has shown over the duration of the ongoing protests that, until the early morning hours, the vast majority of participants are peaceful. Defendants have no quarrel with the peaceful exercise of these rights. This case is not about the federal response to such peaceful protests.

Starting after midnight—and escalating as the peaceful protesters depart—the character and tenor of these protests change. As the night stretches on, increasing numbers of demonstrators antagonize and attack federal officers protecting federal property, damage federal property, and engage in mayhem. This chaos and violence is, as the Supreme Court and Ninth Circuit have held, *not* protected by the First Amendment. Policing these acts, in real time, is

enormously challenging under the best conditions. And in the days since this Court's injunction issued, evidence has emerged that those same people who hijack these peaceful protests for violent ends have hijacked the TRO and now use it for cover to shield their violence. The injunction has thus proven unworkable, tying the hands of federal law enforcement officers facing a dangerous and destructive situation.

At the TRO hearing, the Court invited Defendants to move for reconsideration if the TRO proved unworkable, and circumstances have required Defendants to do exactly that. Hearing Trans., July 23, 2020, 27:5-19. For the reasons set forth below, the Court should reconsider its decision granting the TRO, find the TRO to be unworkable, and dissolve the TRO.[1]

## II.     Background

In the days since the entry of this Court's TRO, the volatile and often violent protests in the vicinity of the Portland Federal buildings—as described in Defendants' Opposition to Plaintiffs' Motion for TRO—have not abated, and have, in actuality, amplified in frequency and intensity. *See* Defs.' Opp., ECF No. 67 at 2-6; Smith Decl. ¶¶ 6-7, 9-10; CBP NZ-1 Decl. ¶¶ 8-13.[2] Defendants' TRO opposition explained that the proposed TRO would be unworkable under the circumstances of these ongoing protests for several reasons. Defs.' Opp. at 21-24. And in the days since the Court entered the TRO, numerous incidents have validated those concerns, to a degree that, on careful consideration, warrants the filing of this motion.

---

[1] Defendants note that on July 28, 2020, Plaintiffs filed a Motion for Finding of Contempt and Sanctions, alleging that Defendants violated the restrictions of the TRO on several occasions. ECF No. 85. Although some of the issues may overlap, the instant motion is not an opposition to that motion and Defendants reserve their right to respond to that motion in a separate opposition.
[2] Unredacted copies of declarations not identified by name have been filed along with a separate motion to seal.

Since the Court entered the TRO at 5:00 pm (PST) on July 23, 2020, federal officers protecting the Hatfield Courthouse have encountered crowds with of many as 2,000 to 8,000 individuals some shooting lasers, projectiles, and incendiary devices at the officers and attempting to breach the protective barrier fence around the federal buildings with power tools and coordinated tactics. *See* Smith Decl. ¶¶ 6, 9, 10; CBP NZ-1 Decl. ¶ 8; CBP SOG-1 Decl. ¶ 9. The air space near the Courthouse is frequently filled with tear gas and fireworks, and the conditions have forced officers to routinely wear gas masks and laser protection goggles, which further limit visibility. *See* CBP NZ-1 Decl. ¶ 14; CBP SOG-1 Decl. ¶ 9; Smith Decl. ¶ 6. Local law enforcement have provided no assistance in quelling the violence surrounding the Courthouse, and in fact the City Council has prohibited cooperation with federal officers. Smith Decl. ¶ 7. Federal officers have been forced to declare an unlawful assembly on all but one night since the issuance of the TRO and to disperse violent protesters every night during that period.

In addition to the ex ante concerns the Government expressed over the TRO's workability, in recent days, federal officers have observed two tactics adopted by protesters that warrant this Court's reconsideration of the TRO, namely that federal officers have identified (1) individuals pretending to be press or legal observers, and, relatedly, (2) individuals presenting indicia of press affiliation under the TRO who have engaged in unlawful actions. By way of example, reporter Sergio Olmos publicly posted a video to Twitter of a protester admitting that although he is not a member of the press he is wearing press credentials identified as sufficient by the TRO in order to evade Defendant's crowd control tactics. Russell Decl. ¶ 8(e). Similarly, an individual was filmed at the protests apparently planning to distribute press passes to protesters who are not journalists. *Id.* at ¶ 8(c). Officers have also observed numerous individuals wearing hand-written press markings or verbally claiming to be press while displaying no visible

indicia of press membership, making it impossible for officers to verify their claims. FPS Badge # 882 Decl. ¶ 5(a)-(b), (d); FPS Badge # 824 Decl. ¶ 5(c).

Other individuals purporting to be press or legal observers have been engaged directly in illegal activity. For example, a protester carrying a shield that identified him as press was taken into custody for impeding federal officers who were attempting to control the crowd, and was found to be in possession of a gun. CBP SOG-1 Decl. ¶ 10; CBP NZ-1 Decl. ¶ 9; Smith Decl. ¶ 8.[3] Another individual who self-identified as a reporter unlawfully entered federal property and, after refusing to leave, resisted arrest. CBP SOG-1 Decl. ¶ 11. A third individual wearing indicia of press membership and self-reporting as press, was arrested for failing to comply with lawful direction of a federal officer, and discovered to be carrying commercial grade fireworks, CBP NZ-1 Decl. ¶ 10, Russell Decl. ¶ 8(b), which, throughout the protests, have been used as a tactic to harass federal officers, CBP NZ-1 Decl. ¶ 8, and which are illegal in Oregon, Russell Decl. ¶ 8(b). On July 28, 2020, an officer observed an individual wearing a helmet bearing the word "PRESS" and using a power tool to attempt to breach the fence around the Courthouse. Smith Decl. ¶ 10. In the early morning on July 29, 2020, an individual wearing "press" identification on his helmet breached the security barrier around the courthouse by jumping over the perimeter fence. *Id.* ¶ 11. Most recently, on the night of July 29, 2020, an individual wearing "press" identification assisted another protester to breach the perimeter fence. *Id.* ¶ 14.

Attempting to comply with the TRO more generally has also impeded federal officers in their duties and endangered the safety of both officers and purported members of the press. Individuals identifying as members of the press have repeatedly placed themselves between

---

[3] This incident occurred on July 22, 2020, before the TRO was granted, but because of the very limited time available to the government to prepare for the hearing the information was not presented to the Court.

federal officers and protesters posing an imminent threat. CBP NZ-1 Decl. ¶ 11; Russell Decl. ¶ 8(a); FPS Badge # 824 Decl. ¶ 5(a). Such individuals are also often in the middle of crowds of violent protesters, not physically separated, impeding dispersal and endangering officers who must attempt to determine if individuals refusing lawful orders are covered by the TRO. CBP NZ-1 Decl. ¶¶ 12-13; Russell Decl. ¶ 8(a), (g); FPS Badge # 882 Decl. ¶ 5(c); FPS Badge # 824 Decl. ¶ 5(c). Indeed, officers have been assaulted by some of these individuals while attempting to determine if they are in fact journalists, impeding the officers' ability to accomplish their duties and putting them in danger. CBP NZ-1 Decl. ¶ 13. Finally, under the chaotic circumstances of the protests, it is difficult for officers, who are often wearing gas masks and laser protective goggles, to verify small indicia of press membership that may be present on certain members of crowds. *Id.* ¶ 14. It is particularly difficult for officers to make these determinations while remaining a safe distance away from crowds to employ crowd control devices in a manner that is safe for both the crowd and the officers. *Id.*

Plaintiffs' Motion for Finding of Contempt and for Sanctions, whose factual assertions Defendants intend to dispute in a separate opposition, highlights the chaos of the circumstances surrounding the protests and the unworkability of the TRO. As described above, individuals are abusing the TRO to masquerade as members of the press and evade lawful orders, or actively participating in protest activities and even illegal acts while holding themselves out to be members of the press under the protection of the TRO. Moreover, even individuals who are not expressly taking advantage of the TRO are often within crowds of protesters or between officers and active protesters making it incredibly difficult and dangerous to observe the restrictions while implementing crowd control measures. In the TRO, the Court observed that the conditions outline in the TRO must be workable because the City, though under essentially identical

restrictions, neither violated the TRO nor requested changes to the TRO. TRO at 15-16. But the City has expressly abdicated any responsibility for assisting the federal officers or otherwise quelling the nightly violence associated with these protests. *See* Smith Decl. ¶ 7. Federal officers have been uniquely responsible for the area surrounding the courthouse, where the violence and disorder are concentrated, thus the City's law enforcement officers have not been presented with the same circumstances in which the TRO has proven unworkable.

### III.     Legal Standard

Courts in this District consider motions for reconsideration of non-final orders under the authority of Federal Rule of Civil Procedure 54(b) and the Court's inherent authority, and apply a standard similar to that applied under motions for reconsideration of judgments under Rule 59(e). *See, e.g. Santoro v. Omen Loan Servicing, LLC*, No. 6:14-cv-00522-MK, 2020 U.S. Dist. LEXIS 6212, at *2 n.1 (D. Or. Jan. 8, 2020). Although reconsideration of an interlocutory order is "to be used sparingly," it is nevertheless appropriate when:

> (1) there are material differences in fact or law from that presented to the court and, at the time of the court's decision, the party moving for reconsideration could not have known the factual or legal differences through reasonable diligence;
>
> (2) there are new material facts that happened after the Court's decision;
>
> (3) there has been a change in law that was decided or enacted after the court's decision; or;
>
> (4) the movant makes a convincing showing that the court failed to consider material facts that were presented to the court before the court's decision.

*Evraz Inc., N.A. v. Riddell Williams P.S.*, No. 3:08-cv-00447-AC, 2014 U.S. Dist. LEXIS 68437, at *16-17 (D. Or. May 16, 2014) (quoting *American Rivers v. NOAA Fisheries*, No. CV-04-00061-RE, 2006 U.S. Dist. LEXIS 48195, at *6 (July 14, 2006)). "A motion for reconsideration should accomplish two goals: (1) it should demonstrate reasons why the court should reconsider

its prior decision and (2) set forth law or facts of a strongly convincing nature to induce the court to reverse its prior decision." *Yates v. United States EPA*, No. 6:17-cv-01819-AA, 2020 U.S. Dist. LEXIS 81880, at *3 (D. Or. May 8, 2020) (citation omitted).

IV.   **Argument**

    A.   **The Injunction is Unworkable and Should be Dissolved.**

On a nightly basis, typically in the earlier morning hours following the departure of many peaceful protesters, significant numbers of violent protesters attack federal officers and destroy federal property, actions not protected by the First Amendment. Protesters emboldened by the Court's TRO and seeking to use the injunction to shield their violence have created chaos and unrest in recent days. These actions, taken in direct response to the Court's injunction, clearly constitute new material facts that are sufficiently important to justify both reconsideration of the Court's order and reversal of that decision.

Occurring in the wake of this Court's entry of an injunction, which was briefed on an emergency basis between Friday July 17, and Tuesday July 22, 2020, Defendants could not have provided this information to the Court, nor could this Court have considered it, before the injunction issued. *See, e.g., American Rivers*, 2006 U.S. Dist. LEXIS 48195, at *8 ("Motions for reconsideration…may not be used to raise new arguments or present evidence that could have been raised earlier."). These incidents are material to the justification underlying the Court's TRO. And indeed, the Court inquired of counsel for the Government at the hearing whether any evidence existed concerning imposters posing as members of the press. The Government was not aware of any incidents involving imposters at that time, but in the wake of the TRO, as discussed *supra*, there have been several.

8

As a result, the Court premised its TRO, at least in part, on two findings: (1) that individuals purporting to be members of the press or legal observers are bona fide, TRO at 12,17; and (2) that individuals possessing indicia of the press or legal observers were not engaged in any illegal acts, *id.* The experiences of federal officers following entry of the Court's injunction has proven both premises wrong. Indeed, evidence in recent days confirms that individuals are pretending to be members of the press or legal observers to evade lawful actions by Defendants, and that individuals who purport to be members of the press or legal observers have engaged in illegal acts.

Amid the chaos of repeated attacks on their health and safety through use of laser pointers, fireworks, and projectiles, federal officers have defended against nightly efforts to destroy security barriers, damage the federal courthouse, and myriad other incursions. None of these actions are protected by the First Amendment. If anything, the violence has only grown since the Court entered the TRO, and the federal officers' experiences in recent days show that the Court's efforts to protect members of the press and legal observers in a chaotic and dynamic law enforcement situation have been exploited by those seeking to damage federal property and harm federal officers, not to peacefully exercise their First Amendment rights. *See, e.g.*, CBP SOG-1 Decl. ¶¶ 10-11; CBP NZ-1 Decl. ¶¶ 9-10; Smith Decl. ¶¶ 8, 10.

Notably, the TRO identifies the indicia of press membership as a trigger for the injunction's force—in particular "distinctive clothing that identifies the wearer as a member of the press," TRO ¶ 4. Yet violent protesters could, and indeed have, easily obtained or forged these same indicia in the days since the TRO was entered. *See* Russell Decl. ¶ 8(c),(e); FPS Badge # 882 Decl. ¶ 5(a); FPS Badge # 824 Decl. ¶ 5(c). There is no realistic way for federal officers to determine whether individuals with facially valid-looking credentials or vague

"distinctive clothing" are in fact members of the press, particularly when the protests descend into destruction and violence on a nightly basis. Limiting the discretion and judgment of federal officers' actions could easily allow individuals with destructive and dangerous intentions to evade crowd control measures and to perpetrate crimes.

To this point, there have been a number of incidents in which individuals purporting to be press or legal observers were directly involved in illegal activity. *See supra* at 4-5. Although these individuals are not immune under the TRO from any laws other than those related to dispersal orders, the TRO has and will undoubtedly inhibit officers from acting on their professional judgment to assess any threat press or legal observers may pose. *See* CBP NZ-1 Decl. ¶¶ 9, 12-13. These individuals will also have increased opportunities to perpetrate illegal actions, which some clearly intend to do, *see* CBP SOG-1 Decl. ¶¶ 10-11, in areas where other protesters have been barred.

Because the Court's TRO is premised at least in part on factual conclusions that have been substantially undermined by new information developed since the TRO was entered, the motion for reconsideration should be granted. Moreover, the TRO should be dissolved as unworkable on the basis of this new information. "Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.) (internal quotation marks, ellipsis, and citation omitted). Courts thus regularly dissolve injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1111 (9th Cir. 2017). The changed circumstances here demonstrate that the TRO is unworkable and that it is being abused both by

10

some members of the general public and by members of the categories of individuals whose rights it is designed to protect. Moreover, even if individuals were not blatantly abusing the TRO, the disconnect between the assumptions of the TRO about the behavior of individuals identifying as press and legal observers and the actual behavior witnessed would nevertheless demonstrate that the TRO is unworkable. *See supra* at 5. The Court should therefore dissolve the TRO.

**B. In the Alternative, the TRO Should be Converted to a Preliminary Injunction**

If the Court determines that the material facts that have occurred in recent days do not justify dissolving the TRO, the Court should instead convert the TRO to a preliminary injunction to clarify that the government may immediately appeal. First, the standard for a TRO is generally the same as for a preliminary injunction, so the parties have already briefed and argued the issue and the Court has already decided the same issues, including standing, likelihood of success on the merits, and irreparable harm. *See Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016).

Second, the issues decided by the Court in the TRO are primarily legal issues that can be resolved on appeal without further factual development beyond the record before the Court, as supplemented by this motion. "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). The TRO's analysis of likelihood of success on the merits depends on two legal questions: (1) what can function as sufficient evidence of First Amendment retaliation; and (2) what right of access do journalists have to public spaces in circumstances where law enforcement actions are being taken against violent protesters not engaged in First Amendment activity. TRO at 12-16. Defendants respectfully

maintain that the TRO improperly decides these legal issues and that, in the event the Court denies Defendants' request that the TRO be dissolved, further record development would not be relevant to their resolution on an appeal of the Court's grant of preliminary relief.

Finally, this TRO, in essence, already bears the hallmarks of a preliminary injunction, so there is no reason to wait to convert it. "An order that does not possess the essential features of a temporary restraining order will be treated like a preliminary injunction" for purposes of jurisdiction. *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 802 (9th Cir. 2002). "Ordinarily, temporary restraining orders, in contrast to preliminary injunctions, are not appealable; however…. It is the essence of the order, not its moniker, that determines [appellate] jurisdiction." *Id.* "Where a district court holds an adversary hearing and the basis for the court's order was strongly challenged, classification as a TRO is unlikely." *SEIU v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir, 2010). The Ninth Circuit thus "treat[s] a TRO as a preliminary injunction 'where an adversary hearing has been held, and the court's basis for issuing the order [is] strongly challenged.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, at *29 (9th Cir. 2018) (quoting *Bennett*, 285 F.3d at 804).

In the case of this TRO, the Court held an adversary hearing and "[i]t can be safely said that the court's basis for issuing the order [was] strongly challenged…both parties had an opportunity to file extensive written materials and present oral argument." *Bennett*, 285 F.3d at 804 (citation omitted). This was true before the filing of this motion and would be even more true if the Court were to deny Defendants' request for the TRO's dissolution.

Another "key distinction between a 'true' TRO and an appealable preliminary injunction is that a TRO may issue without notice and remains in effect for only 14 days…." *E. Bay Sanctuary Covenant*, 932 F.3d at *29. The TRO clearly did not issue without notice, and

12

although it is currently set to expire after 14 days, it may be "extended by stipulation of the parties or further order of the Court." TRO ¶ 10. While the duration of the order is a factor to be considered, it is "[m]ost important[ that] the Government had an opportunity to be heard: the district court held an adversary hearing, and the Government strongly challenged the court's basis for issuing the order." *E. Bay Sanctuary Covenant*, 932 F.3d at *30. Under the circumstances of this case, the Court's TRO is in essence a preliminary injunction and it would serve the best interests of judicial economy to allow the government to proceed as such.

***

The nightly chaos faced by federal officers in their lawful attempt to protect Portland's federal buildings from unjustifiable destruction is amplified by the TRO. The unworkable restrictions on officers' professional judgment in the constantly evolving and often violent circumstances of the protests endangers both the officers and the protesters. Officers face an untenable choice of risking contempt sanctions or letting the protests spiral out of control, resulting in danger to individuals and damage to federal property. Meanwhile savvy protesters abuse the TRO to evade lawful orders, impede law enforcement, and perpetrate crimes. The TRO has become "an instrument of wrong," and must be dissolved.

C.  **Conclusion**

The Court should reconsider its TRO based on the new material facts that have developed since entry of the Order, and dissolve the TRO as unworkable. In the alternative, the Court should convert the TRO into a preliminary injunction.

Dated:  July 30, 2020

ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

/S/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)

ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
JEFFREY A. HALL
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*