**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>        Defendants. | Case No. 3:20-cv-1035-SI<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF EXTENDING THE TRO WITH LIMITED MODIFICATIONS** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 5

ARGUMENT ..................................................................................................... 7

I.    THE COURT SHOULD EXTEND THE TRO FOR 14 DAYS........................................ 7

    A.    There is Good Cause to Protect Journalists and Legal Observers for the Same Reasons the Court Already Found and Because Defendants Repeatedly and Intentionally Violated the Court's TRO ................... 8

    B.    The TRO Is Not Moot .................................................................... 10

    C.    The Court Should Modify the TRO to Provide Additional Accountability and Protections in Light of the Federal Agents' Intentional Violations of the TRO ......................................................... 11

        1.    The Court Should Modify the TRO to Require that Federal Agents Wear Prominent Identification Numbers ..................................... 11

        2.    The Court Should Modify the TRO to Prohibit the Federal Agents from Leaving Federal Property ................................... 13

    D.    The Court Should Deny the Federal Agents' Motion for "Reconsideration" ........................................................................ 14

        1.    The TRO Is Workable ............................................................... 15

        2.    The Federal Defendants' Supposed New Evidence Does Not Show That the TRO is Unworkable..................................... 16

        3.    The Remaining Factors for Injunctive Relief Strongly Favor Plaintiffs .................................................................... 18

II.    THE COURT SHOULD NOT MAKE THE ACLU RESPONSIBLE FOR VETTING OR REGISTERING JOURNALISTS ........................................................ 18

    A.    Any Gating Mechanism Will Inhibit Protected First Amendment Activities ................................................................................... 18

    B.    Plaintiffs' Counsel Is Not Equipped to Administer a Registration and Vest-Distribution Program; Nor Should It Be Required to Pay for One...................................................................................... 21

III.    THE COURT'S TRO IS NOT A PRELIMINARY INJUNCTION ................................. 21

CONCLUSION................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Associated Press v. Otter*,
    682 F.3d 821 (9th Cir. 2012)..................................................................................18

*Bennett v. Medtronic, Inc.*,
    285 F.3d 801 (9th Cir. 2002)..................................................................................21

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ...........................................................................................7, 19

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007)................................................................................18

*Complete Distribution Servs., Inc. v. All States Transp., LLC*,
    No. 3:13-CV-00800-SI, 2015 WL 6739125 (D. Or. Nov. 2, 2015).....................16

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018)............................................................................21, 22

*Epona v. Cty. of Ventura*,
    876 F.3d 1214 (9th Cir. 2017)................................................................................18

*Freedman v. Maryland*,
    380 U.S. 51 (1965)................................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...........................................................................................6, 11

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ..............................................................................................12

*In re Pac. Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012)................................................................................10

*Knox v. Serv. Employees Int'l Union*, Local,
    1000, 567 U.S. 298 (2012) ....................................................................................11

*Lemon v. Kurtzman*,
    411 U.S. 192 (1973) ..............................................................................................12

*Nichol v. City of Springfield*,
    2015 WL 13229184 (D. Or. Dec. 18, 2015) .........................................................10

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ..............................................................................................11

*SEIU v. Nat'l Union of Healthcare Workers*,
    598 F.3d 1061 (9th Cir, 2010)................................................................................21

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ..................................................................................19, 20, 21

*United States v. Moore*,
    2010 WL 11597159 (D. Or. Apr. 28, 2010) ...................................................14, 16

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005)..................................................................................18

Statutes

40 U.S.C. § 1315(b)(1) .................................................................................................. 13

Rules

Fed. R. Civ. P. 65(b)(2) .................................................................................................. 7
Federal Rule of Civil Procedure 65(b) .......................................................................... 7

Other Authorities

11A C. Wright & A. Miller *Federal Practice and Procedure* § 2953 (3d ed. Apr. 2020) ............... 7

## MEMORANDUM OF LAW

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau respectfully submit this memorandum in support of extending the temporary restraining order against hold Defendants U.S. Department of Homeland Security ("DHS") and U.S. Marshals Service ("USMS") (together, the "federal agents") for an additional 14 days, with the first of the two modifications discussed by the Court in its order of July 31, 2020 (Dkt. 108), and the additional modification that federal agents be prohibited from leaving federal property while on duty.

## INTRODUCTION

On July 23, 2020, the Court issued a temporary restraining order ("TRO") forbidding the nameless and faceless federal agents sent to "quell" Portland's Black Lives Matter protests from attacking and dispersing journalists and legal observers. The TRO was necessary because the federal agents had repeatedly shot, tear-gassed, and beaten members of the Fourth Estate for simply trying to document how police were treating protesters. Ignoring the Court's TRO, federal agents continued to assault and disperse journalists and legal observers at the same torrid pace. By now, there are over 30 declarations in the record, along with irrefutable video evidence documenting the federal agents' violence and intimidation. Good cause exists to extend the TRO for 14 days, and to add additional protections—clear markings for agents and restrictions on their marauding through the streets of Portland—to ensure that journalists and legal observers are safe until Plaintiffs can move for a preliminary injunction.

In response to Plaintiffs' motion to hold them in contempt, the federal agents moved for reconsideration of the TRO on the grounds that it is "unworkable" and interferes with whatever they are supposed to be doing in Portland. These arguments ignore that the Portland police have been operating under an identical injunction for a month now with no such difficulties, and the arguments they raise lack merit.

First, without citing any evidence, the federal agents have asserted that any relief is moot because they have voluntarily stopped policing the protests. But self-contradictory statements emanating from the Trump propaganda machine do not amount to the unequivocal promise necessary to render a claim moot. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Only a consent decree or a definitive guarantee from the President would moot Plaintiffs' claims.

Second, the federal agents have submitted declarations purporting to show that the TRO has been misused. But none of their submissions shows that any federal officer was injured as a result of any such conduct. While a few isolated individuals who marked themselves as "press" appear to have engaged in wrongdoing, their conduct was not immunized or facilitated by the TRO, and law enforcement was able to identify and address it. The risk of a person using "press" markings to infiltrate police lines and attack them sounds bad, but is entirely hypothetical. No such event has ever occurred, and the possibility is remote because anyone who did so would be trapped between the skirmish line and rear guard and immediately apprehended. A person who would engage in such behavior poses similar risks no matter what they are wearing or where they are located. And like any hypothetical risk, it can be controlled through techniques that pose no burden on law enforcement, such as leaving an agent back to liaise with the press. The possibility that someone might do something bad cannot be the basis for suppressing reporting on the protests. The federal agents' submissions do not change the balance of equities—real harm to journalists, legal observers, and the public, as against a conjectural parade of horribles.

Finally, the Court has asked whether the TRO should be modified to require journalists to obtain a vest from the ACLU of Oregon. Such a process raises constitutional and pragmatic difficulties. Any preclearance requirement is subject to stringent scrutiny as a prior restraint. Such a process is doubly challenging because it would involve Plaintiffs' counsel deciding who is a journalist—a task the Supreme Court has called "a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes

the latest photocomposition methods." *Branzburg v. Hayes*, 408 U.S. 665, 703-04 (1972).
Further, the ACLU of Oregon does not have the resources or ability to expediently implement
such a process, its Board members have stated that such a practice is inconsistent with the
organization's goals, and its offices are closed due to the COVID-19 pandemic.

## **ARGUMENT**

Federal Rule of Civil Procedure 65(b) provides that a court may extend a TRO by 14
days if there is "good cause" to do so. Fed. R. Civ. P. 65(b)(2). If "the grounds for originally
granting the temporary restraining order continue to exist," there is good cause to extend it. 11A
C. Wright & A. Miller *Federal Practice and Procedure* § 2953 (3d ed. Apr. 2020).

## I.     THE COURT SHOULD EXTEND THE TRO FOR 14 DAYS

The reasons the Court granted the TRO in the first place continue to exist. The Court
granted the TRO because Plaintiffs had raised at least serious questions as to whether federal
agents had denied them access to protests in violation of the First Amendment and whether
federal agents had retaliated against them for their First Amendment activity; had shown that this
serious threat to their First Amendment rights had irreparably harmed them; and had shown that
the public interest and balance of equities favored granting a restraining order. (*See generally*
Dkt. 84.)

Since then, as Plaintiffs documented in their motion for a finding of contempt and
supporting declarations, the federal defendants have repeatedly and intentionally violated the
TRO. There is no evidence they are leaving Portland and good evidence they are staying. The
TRO is workable, although it could be improved with two small tweaks. And the balance of
equities and public interest continue to support Plaintiffs. Thus, the grounds for originally
granting the temporary restraining order continue to exist, and the Court should extend it with the
modifications described below.

A.    **There is Good Cause to Protect Journalists and Legal Observers for the Same Reasons the Court Already Found and Because Defendants Repeatedly and Intentionally Violated the Court's TRO**

Since the federal agents made their debut around July 4, Plaintiffs have submitted over 30 declarations documenting the tidal wave of intentional violence and intimidation that the federal agents have unleashed against journalists and legal observers. Many of the declarations document multiple incidents. For example:

- Federal agents shot Plaintiff Mathieu Lewis-Rolland 10 times in the back, all above the waist, while he was marked "press" from head to toe and snapping photos under a street lamp so they could see that he was press. (Dkt. 44 ¶¶ 3-4, 12-15.)

- They shot John Rudoff—a 72-year-old man marked press all over—near the neck, missing his head by mere inches. (Dkt. 59 ¶¶ 3-7.)

- The shot Karina Brown, a reporter for *Courthouse News*, twice in the buttocks at close range. (Dkt. 71 ¶¶ 1, 12-13.)

- They shot Jungho Kim in the chest, right on his press pass. (Dkt. 62 ¶ 7.)

- They told Nathan Howard to stay where he was, then shot him when he obeyed their orders. (Dkt. 58 ¶¶ 6-7.)

- They shot and tear-gassed journalist Amy Katz with no protesters nearby (Declaration of Amy Katz ("Katz Decl.") ¶¶ 5-9.)

- And they shoved *New York Times* and *New Republic* reporter Sarah Jeong down the courthouse steps. (Declaration of Sarah Jeong ¶¶ 5-7.)

(*See generally* Dkts. 55-64, 71-79, 80-82.)

After the Court issued its TRO, the federal agents' abuses continued unabated. For example:

- They maced ACLU legal observers Kat Mahoney and Bruce Knivila, who were clearly marked with blue ACLU vests. (Dkt. 94 ¶¶ 9-12; Dkt. 92 ¶¶ 3-10.)

- They tear-gassed a whole section of press and legal observers. (Dkt. 92 ¶ 8.)

- They shot OPB reporter Rebecca Ellis and forced her to disperse away from the scene of enforcement actions. (Dkt. 88 ¶¶ 3-5.)

- They shot Brian Conley in the chest and foot when there were no protesters near him; threw a tear-gas canister at his head; and on a different night, shot him up again and threw multiple flash-bang grenades at him. (Dkt. 87 ¶¶ 6-10, 18-24.)

- They shot OPB reporter Jonathan Levinson while there was almost no one else around. (Dkt. 92 ¶¶ 4-6.)

- They shot Kathryn Elsesser when there was no one else around at all. (Dkt. 89 ¶¶ 4-6.)

- They shot Daniel Hollis while he was with a group of press and several yards from the nearest group of protesters, who themselves were non-threatening and doing nothing illegal. (Dkt. 91 ¶¶ 4-7.)

- And they shot Haley Nicholson in the chest from four feet away. (Dkt. 95 ¶¶ 3-7.)

Since Plaintiffs moved to find the federal defendants in contempt, Plaintiffs have discovered yet more evidence that federal agents violated the TRO, including two instances when federal agents shot and tear-gassed entire groups of journalists when there were no or nearly no protesters around. (Declaration of Emily Molli ("Molli Decl.") ¶¶ 8-10; Katz Decl. ¶¶ 11-12; *see also* Molli Decl. ¶¶ 4-7 (federal agents shot journalist taking cover behind a tree).) They also pepper-sprayed Plaintiff Brian Conley at point-blank range not long after recognizing him as press. (Declaration of Brian Conley ("Conley Decl.") ¶¶ 5-7.) And as discussed at the last status conference, DHS has apparently distributed, and various federal agents relied upon, a memorandum with an overly narrow definition of "journalist" that guaranteed that they would violate the TRO.[1] (Declaration of Matthew Borden ("Borden Decl."), Ex. 1 at 4 ("The journalist

---

[1] This memorandum is not privileged for either of two independent reasons. First, a "DHS source" leaked this memorandum to the press and caused it to be widely disseminated in public. Ken Klippenstein, *How the DHS Can Still Arrest Journalists in Portland*, The Nation (July 30, 2020), https://www.thenation.com/article/society/dhs-journalists-portland-aclu. Second,

must be wearing one of these indications: press pass, press badge, or a shirt that says 'press.'").)
Thus, there continues to be a serious threat to Plaintiffs' First Amendment rights.

### B.      The TRO Is Not Moot

At a status conference on July 31, 2020, the federal defendants asserted that "the federal
police force is decreasing its deployment and will likely be interacting less with protesters in
situations that would give rise to the plaintiffs' complaints." (Status Conf. Tr. 44:12-15 (July 31,
2020).) The federal defendants have not supported that statement with any evidence.

There has been no unequivocal promise that the federal agents plan to leave Portland and
never return. To the contrary, their continued deployment here has been the subject of
contradictory propaganda statements, press releases, and perhaps most confusing of all, vacuous
tweets from President Trump.[2] *Compare* Dick VanderHart & Conrad Wilson, *Oregon Gov. Kate
Brown announces 'phased' removal of federal officers from Portland*, OPB (July 29, 2020)
(federal agents will leave Portland),[3] *with* Jemima McCoy, *Trump Contradicts Oregon
Governor: Feds Are Not Leaving Portland*, Forbes (July 30, 2020) (no they won't),[4] *and
Portland Riots Read-out: August 1*, DHS (Aug 1, 2020) (not anytime soon anyway).[5]

the federal defendants put this memorandum at issue in several declarations filed on July 31,
2020. (Russell Decl. ¶ 8; Jones Decl. ¶¶ 5-6; Benner Decl. ¶ 10; Danley Decl. ¶ 6.)

As a consequence of either action, this memorandum is not privileged. *In re Pac. Pictures Corp.*,
679 F.3d 1121, 1126-27 (9th Cir. 2012) ("voluntarily disclosing privileged documents to third
parties will generally destroy the privilege"); *Nichol v. City of Springfield*, 2015 WL 13229184,
at *5 (D. Or. Dec. 18, 2015) ("A litigant waives work product protection if she attempts to use
that protection 'as both a sword and shield' or puts at issue the content of the protected
materials.").

[2] @realDonaldTrump, Twitter (July 30, 2020, 6:20 A.M.) ("Kate Brown, Governor of Oregon,
isn't doing her job. She must clear out, and in some cases arrest, the Anarchists & Agitators in
Portland. If she can't do it, the Federal Government will do it for her. We will not be leaving until
there is safety!"), https://twitter.com/realDonaldTrump/status/1288826742539464707.

[3] https://www.opb.org/article/2020/07/29/oregon-portland-deal-announced-federal-officers-
phased-removal/.

[4] https://www.forbes.com/sites/jemimamcevoy/2020/07/30/trump-contradicts-oregon-governor-
feds-are-not-leaving-portland/#ea755f5b0e91.

[5] https://www.dhs.gov/news/2020/08/01/portland-riots-read-out-august-1.

The law in this type of situation is clear: A defendant cannot "moot" a claim by voluntarily ceasing its illegal behavior unless the defendant cannot "reasonably be expected" to resume its misconduct. *Friends of the Earth*, 528 U.S. at 189 (quotation marks omitted). This is a high bar: The party pressing the point bears a "heavy burden" of showing that supervening events have made "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quotation marks omitted).

Here, there is no reason to believe that federal agents' wrongful behavior will not recur, especially since the federal defendants "continue[] to defend the legality" of their conduct. *Knox v. Serv. Employees Int'l Union*, Local 1000, 567 U.S. 298, 307 (2012). If the Court allows the TRO to expire, the federal agents will be "free to return to [their] old ways." *Friends of the Earth*, 528 U.S. at 189 (quotation marks omitted). Heavily armed paramilitary troops remain in Portland, ready to resume their unlawful activities at a moment's notice should the political winds shift. Absent an unequivocal—and enforceable—promise from the President that his paramilitary forces will withdraw from Portland and no longer assault journalists and legal observers, the Court should extend its protection and renew the TRO.

> ### C.    The Court Should Modify the TRO to Provide Additional Accountability and Protections in Light of the Federal Agents' Intentional Violations of the TRO

The Court should modify the TRO in two ways in light of the federal agents' continuing attacks on journalists and legal observers. First, any federal agent outside the federal courthouse should be marked with large identifying codes. Second, federal agents should be prohibited from leaving the bounds of federal property. These two modifications will increase accountability, and prevent federal agents from further violating the First Amendment and the TRO.

> #### 1.    The Court Should Modify the TRO to Require that Federal Agents Wear Prominent Identification Numbers

As the Court noted, without some way of identifying a federal agent who shoots a journalist or shoves a legal observer, it is "incredibly difficult" to identify which officers should

be held in contempt or whether an entire defendant agency should be held in contempt. (Status

Conf. Tr. 28:1-9.) For that reason, the Court suggested that

> any employee, officer, or agent of any Federal Defendant who
> leaves the interior of the federal courthouse during a protest while
> carrying or using any crowd-control device must wear a clearly
> visible unique identifying code on the front and back of the outside
> of that person's clothing (with white numbers or letters not less
> than eight inches in height against a dark background) and a
> further requirement that a list matching each unique identifying
> code to the name and unit of that person shall be maintained by
> counsel for the Federal Defendants but need not be disclosed
> absent further court order after an opportunity to be heard.

(Dkt. 108.) Plaintiffs agree that this modification would improve the workability of the TRO.

"[E]quitable remedies are a special blend of what is necessary, what is fair, and what is

workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality op.) (footnote omitted). For

the reasons the Court described, both the Court and Plaintiffs need some way to identify federal

agents. The Court's proposal is also fair: Unique codes will permit Plaintiffs (and, for that matter,

the federal defendants) to correlate incidents of contempt and identify contumacious agents

without risking that an agent will be "doxed." (Status Conf. Tr. 28:20-23.) This proposal thus

appropriately "reconcile[es] . . . the public interest and private needs." *Hecht Co. v. Bowles*, 321

U.S. 321, 329-330 (1944).

It is also eminently workable for three reasons. First, the federal government already

issues uniforms to its agents, and there is no practical obstacle to its adding identifying numbers

to those uniforms. Second, whatever burden the government may face will be balanced out by a

corresponding decrease in burden to identify individual contemnors after the fact. Finally, the

federal defendants have represented that fewer federal agents will be policing the area outside the

courthouse. As the Court pointed out, "if no one has to leave the building, no one has to put on

jerseys that have these unique identifying codes." (Status Conf. Tr. 45:3-9.) Because this

proposal is necessary, fair, and workable, the Court should incorporate it into the renewed TRO.

     2.      **The Court Should Modify the TRO to Prohibit the Federal Agents from Leaving Federal Property**

The Court should separately modify the TRO to prohibit federal agents from leaving federal property. This modification, too, is necessary, fair, and workable. Foremost, the federal agents have complained that the TRO is unworkable (Dkt. 101 at 3), and they have violated it multiple times. *See generally* Part I.A, *supra*. Their own documents state that they are not trained in crowd control for protests.[6] In contrast, the TRO has not proven unworkable for the Portland police, who are actually trained and experienced in crowd control during protests. Under such circumstances, the federal agents should be confined to the most limited role possible to protect against further unnecessary violence.

Despite their limited purported objective to protect federal monuments and property, federal agents have frequently rampaged through City streets far afield of federal property. (*See, e.g.*, Declaration of Garrison Davis ("Davis Decl."), Dkt. 43 ¶¶ 21-22 (federal agents pushed protesters as far as SW Broadway, four blocks west of the federal courthouse); Molli Decl. ¶ 5 (federal agents shot at press and protesters as far away as SW 5th Avenue); Mike Baker, Thomas Fuller, & Sergio Olmos, *Federal Agents Push Into Portland Streets, Stretching Limits of Their Authority*, N.Y. Times (July 25, 2020).[7]) This has resulted in unnecessary injuries to journalists and legal observers (*e.g.*, Molli Decl. ¶ 5; Dkt. 44 ¶¶ 11-13; Dkt. 58 ¶¶ 4-7), and raises serious questions about whether the federal agents are exceeding their statutory authority. 40 U.S.C. § 1315(b)(1) (authorizing DHS agents to venture outside federal property only "to the extent necessary to protect the property and persons on the property"). Limiting their ability to rove the streets not only forecloses many of their First Amendment violations but also avoids those questions.

It is also a workable modification. It sets clear limits on what the federal agents may do, and does not inhibit them from legitimately defending federal property—as opposed to

---

[6] https://int.nyt.com/data/documenttools/dh-stacticalagent-memo1/d490e392eab7d7d6/full.pdf.

[7] https://www.nytimes.com/2020/07/25/us/portland-federal-legal-jurisdiction-courts.html.

retaliating against journalists and legal observers. If anything, being confined to defending the federal properties, as opposed to marching through the streets where they have to worry about possible attacks from different flanks, makes their job simpler and easier.

D.     **The Court Should Deny the Federal Agents' Motion for "Reconsideration"**

The federal agents seek reconsideration based on hearsay declarations from people who mostly lack personal knowledge. Those declarations do not carry the federal agents' heavy burden to "set forth law or facts of a strongly convincing nature" that compel reconsideration of the Court's order. *United States v. Moore*, 2010 WL 11597159, at *1 (D. Or. Apr. 28, 2010). The main ground the federal defendants raise is "workability." (Dkt. 101 at 3.) As they did in their opposition to the TRO, however, the federal defendants ignore that the Portland police have not had workability problems. Nor have they identified any of their own.

The federal agents still cannot identify a single instance where any person used a false marking of "press" to cause any injury to any federal agent or anyone else. Nor, after more than 60 straight days of protests, has any such incident occurred with the police. The reason that the federal agents cannot point to any such event is that, unlike throwing objects or shining lasers when concealed by a crowd, attacking law enforcement from behind their own lines ensures that the bad actor would be sandwiched between the skirmish line and the rear guard and surely be swarmed and arrested. Anyone with that kind of death-wish would just do so head on.

What the federal agents' declarations do show is that a couple of people marked as press committed misconduct for which they could be (and usually were) arrested *regardless* of the TRO. All this means is that federal agents were amply able to recognize when a person marked as press was doing something other than reporting, and were in no way prevented from keeping themselves and federal property safe if such persons were breaking the law. The federal agents' declarations also suggest that a few people may have taken advantage of the TRO to avoid dispersal orders. Weighed against the critical need for access by journalists and observers, the improper conduct of a few does not somehow reverse the balance of the equities.

### 1.    The TRO Is Workable

The TRO's core protection for journalists and legal observers is that they need not leave in response to a dispersal order, and that federal agents may not use physical force, threats of arrests, or arrests against them unless they have committed some crime other than refusing to disperse. (Dkt. 84 at 18.) The federal defendants argue this is unworkable, but these same terms *have* worked, for more than a month, for Defendant City of Portland. Substantial evidence from protests policed by Portland officers shows that law enforcement can work under the Court's terms.

The Court entered its TRO against the City on July 2, 2020. (Dkt. 33.) Portland police have been active at many protests since that time, especially in North and East Portland. (*E.g.*, Declaration of Tuck Woodstock ("Woodstock Decl."), Dkt. 76 ¶ 2; Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland Decl."), Dkt. 77 ¶¶ 11.[8]) Nevertheless, rather than argue it was unworkable, the City stipulated on July 16 to a preliminary injunction with identical operative terms. (Dkt. 48.) As the City informed the Court on July 23:

> the TRO and the stipulated preliminary injunction have not been unworkable or have not created unsurmountable problems with the City. . . . [T]here are occasional challenges with trying to identify is someone a journalist or not or a legal observer or not in a certain crowd situation. But my understanding is that it has been workable, and that is why we have stipulated to a preliminary injunction with the plaintiffs in this case.

(TRO Hrg. Tr. 30:9-19 (July 23, 2020).)

Plaintiffs' experience since the TRO went into effect against the City has confirmed that the TRO is workable. Plaintiff Tuck Woodstock was reporting on a protest in North Portland when Portland police began dispersing the crowd with massed charges. (Woodstock Decl. ¶ 2.) Woodstock was clearly marked as press and yelled "PRESS" over and over again. (*Id.* ¶ 3.) Officers respected the TRO, sprinted around them, and let them film from behind the skirmish

---

[8] *See also, e.g.*, @GriffinMalone6, Twitter (July 17, 2020, 12:53 A.M.), https://twitter.com/GriffinMalone6/status/1284033524043878403; @45thabsurdist, Twitter (Aug. 1, 10:16 P.M.), https://twitter.com/45thabsurdist/status/1289792288533577729.

line. (*Id.* ¶¶ 3-4.) When they were done capturing footage from that angle, they yelled that they were coming around to the other side, and officers permitted them to change position and film alongside the officers. (*Id.*) Plaintiff Lewis-Rolland had a similar experience. (Lewis-Rolland Decl. ¶ 11.)

On each of the above occasions, the TRO worked for both press and police—and the public was better informed as a result. Even in Hong Kong, Chinese law-enforcement officers permitted Plaintiff Justin Yau to report on their activities from behind police lines. (Declaration of Justin Yau ("Yau Decl.") ¶¶ 4.) They just went around him. (*Id.*) If a brutal totalitarian regime bent on squelching dissent in a formerly free city can allow press to continue reporting from behind police lines, so can the agents of the United States government.

### 2. The Federal Defendants' Supposed New Evidence Does Not Show That the TRO is Unworkable

In their motion for reconsideration, the federal agents asserted that BORTAC "moved past" a protester marked as press,[9] and it turned out that he had a handgun. (Dkt. 101-6 ¶ 9.) This occurred *before* the TRO was issued, yet the federal defendants failed to raise it during the TRO hearing. (*Id.* (event occurred July 22); TRO Hrg. Tr. (dated July 23).) "Arguments and evidence that could have been included when litigating the original motion are not proper grounds for reconsideration." *Complete Distribution Servs., Inc. v. All States Transp., LLC*, No. 3:13-CV-00800-SI, 2015 WL 6739125, at *2 (D. Or. Nov. 2, 2015). In any event, there is no evidence that the gun was illegal, or that this individual was charged with any gun crime. There is no evidence of whether he was behind police lines, or why BORTAC moved past him and the US Marshalls arrested him. The federal agents have not provided the best evidence of this event (e.g., an indictment, video or affidavit of the arresting officer), and their own press release about all the "violent anarchists" they confronted that night omits any discussion of anyone brandishing a

---

[9] Both accounts were hearsay, and they provided conflicting descriptions. NZ-1 testified that the person's shield was marked press. (Dkt. 101-6 ¶ 9.) Andrew Smith, on the other hand, testified that the person had a shirt marked as "press." (Dkt. 106-1 ¶ 8.)

weapon or having an unlawful firearm. *See* https://www.dhs.gov/news/2020/07/22/portland-riots-read-out-july-22. Further, a bad actor carrying a gun is equally dangerous, regardless of what they are wearing or where they are located. That some people may carry weapons is generic risk from not having gun control; it is not a basis for dissolving the TRO.

The remainder of the federal agents' declarations establish: (1) some people marked as press were intermingled with protesters and/or people engaged in wrongful conduct,[10] (2) some people marked with the word "press" engaged in wrongful conduct themselves,[11] (3) some people marked "press" avoided dispersal orders when they may not have been press,[12] and (4) a few protesters have stated that they intend to fraudulently mark themselves as press.[13]

The TRO already answers these concerns. As to (1), the TRO does not prohibit law enforcement from going after wrongdoers, even if they are standing near or behind press. As to (2), the federal agents can arrest anyone if they have probable cause, and there is no evidence in the record that by marking themselves as "press," any of the wrongdoers identified by the federal agents gained any advantage. (Dkt. 84 at 18 ¶ 1.) Indeed, protesters breaching or cutting the fence would be able to do the same thing (and be arrested) regardless of what they were wearing. As to (3) and (4), the federal agents have not submitted any evidence that any counterfeiters have caused any harm. For example, FPS 824 asserts that late on the night of July 26 he let people who claimed to be press stay when he otherwise might have dispersed them. (FPS 824 Decl. ¶ 5(c).) This declaration fails to establish that the subjects were not journalists. But even if they were not, nothing happened while he cleared the rest of the area. Obviously, protesters should not

---

[10] CBP PAO #1 Decl. ¶¶ 6-8, 10, 12; FPS 824 Decl. ¶ 5(a); FPS 882 Decl. ¶¶ 5(a), (c)-(d); Russell ¶ 8(a); CBP NZ-1 Decl. ¶¶ 11-13.

[11] CBP PAO #1 Decl. ¶ 9; FPS 824 Decl. ¶ 5(b); CBP NZ-1 Decl. ¶¶ 9-10; CBP SOG-1 Decl. ¶¶ 10-11; Smith Decl. ¶¶ 8, 10-11, 14-15; Russell Decl. ¶¶ 8(b), (f)-(h).

[12] FPS 824 Decl. ¶ 5(c); FPS 882 Decl. ¶ 5(b).

[13] Russell Decl. ¶¶ 8(c), 8(e).

be exploiting the TRO, but the actions of these few individuals does not create a manifest threat to public safety or law enforcement so as to alter the balance of the equities.

### 3.    The Remaining Factors for Injunctive Relief Strongly Favor Plaintiffs

Plaintiffs will still suffer irreparable harm without relief. For the reasons above, Plaintiffs have demonstrated that federal agents still threaten them and deprive them of their First Amendment rights absent an injunction from this Court. Under the law of this circuit, that is enough to establish irreparable injury. *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).

The balance of the equities and the public interest also still strongly favor Plaintiffs. The TRO facilitates substantial and critical reporting. (*See, e.g.*, Woodstock Decl. ¶ 4; Lewis-Rolland Decl. ¶¶ 11-12.) Without the protections of the TRO, much of that reporting will be chilled. Plaintiffs' cameras are no match for federal agents' guns. Because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted).

## II.    THE COURT SHOULD NOT MAKE THE ACLU RESPONSIBLE FOR VETTING OR REGISTERING JOURNALISTS

In an effort to devise a method to protect against individuals trying to take advantage of the TRO, the Court asked the parties to brief whether the ACLU of Oregon could register and distribute vests to journalists, so that legitimate journalists would be clearly identified. While the ACLU of Oregon supports the Court's goals, for the reasons below, such a process is fraught with both constitutional and practical concerns.

### A.    Any Gating Mechanism Will Inhibit Protected First Amendment Activities

Any type of preclearance regime for journalists poses substantial problems under the First Amendment because nobody should have to obtain a license to speak. That is why any type of licensing or permitting system for speech is evaluated as a prior restraint, and comes with a "heavy presumption" against its constitutional validity. *Epona v. Cty. of Ventura*, 876 F.3d 1214, 1221-22 (9th Cir. 2017) (quotation marks omitted). This is particularly true in the realm of

PAGE 18 - PLAINTIFFS' MEMORANDUM IN SUPPORT OF EXTENDING THE TRO

journalism because, as one prominent constitutional scholar has noted, "the First Amendment was, in part, a reaction against the licensing requirements for publication that had existed in England." Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 978 (4th ed. 2011).

Imposing a preclearance for journalists poses the added difficulty of judging who constitutes a journalist. As the Supreme Court noted in *Branzburg v. Hayes*, defining "newsmen" who enjoyed a reporter's privilege would be "a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." 408 U.S. at 703-04. The Court went on to explain:

> Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'

*Id.* (citations omitted, alterations in original). Forcing ACLU of Oregon to engage in this "questionable procedure" by deciding whose representations satisfy this standard would involve the types of value judgment and discretion that render licensing systems invalid.

Courts have allowed some licensing schemes only if "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965). Courts have also allowed them if they are content-neutral, narrowly tailored, and meet all the other First Amendment criteria. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002). A regime that lets counsel in active litigation choose who may exercise their First Amendment rights based on a standard the Supreme Court is reticent to define, while placing the burden of seeking review on the person denied access, is not salvaged by the availability of swift judicial review—which would not, in any event, be able to keep pace with the immediate need for newsgathering.

PAGE 19 - PLAINTIFFS' MEMORANDUM IN SUPPORT OF EXTENDING THE TRO

Further, as a practical matter, any registration process would additionally impinge First Amendment activities. Unlike in other well-understood permitting situations, not every journalist would know about the program. Amy Katz, for example, arrived in Portland at 2:00 a.m. and immediately began reporting. (Katz Decl. ¶ 4.) Had the restraining order included a permitting scheme, she would have run a greater risk of getting shot than if no restraining order were in place at all. Moreover, some journalists will fear that wearing a vest obtained from ACLU will compromise or appear to compromise their neutrality. And some journalists will be morally opposed to having to get a vest from ACLU—in the same way that some journalists would be morally opposed to having to obtain a license from the John Birch Society.

Further, the infringement on protected activities created by a licensing regimen is not justified by any potential benefits, as a registration process would not cure any of the supposed issues identified by the federal agents. The person who breached the courthouse fence was not aided in that activity by having a helmet marked "press." (*Cf.* Declaration of Andrew Smith ("Smith Decl."), Dkt. 106-1 ¶ 10.) There is no reason to believe that he would be somehow inhibited from doing the same thing whether or not he were wearing an ACLU vest. Further, there is no reason to believe that ACLU of Oregon would succeed in ferreting out truly malicious imposters. And if the ACLU of Oregon was merely registering journalists, as opposed to vetting them, the same small group of bad actors could exploit that process, too.

Ultimately, First Amendment rights attach to activities, not to occupations, which is why a regulation that bans people who are attending the protests only to report and observe is not narrowly tailored. The TRO contains "indicia of being a Journalist" as a heuristic for police to determine who is present to access and report, rather than to assemble. (Dkt. 84 at 19.) That is why its indicia are not "exclusive." (*Id.*) Replacing them with a single exclusive indicator dispensed by the ACLU of Oregon would be antithetical to the First Amendment.

**B.    Plaintiffs' Counsel Is Not Equipped to Administer a Registration and Vest-Distribution Program; Nor Should It Be Required to Pay for One**

Because of the First Amendment concerns raised by a preclearance regime, the ACLU of Oregon is opposed to becoming the administrator of such a process. (Declaration of Jann Carson ("Carson Decl.") ¶ 4.) Making determinations about who qualifies as press is inconsistent with the purpose and goals of ACLU of Oregon. (*Id.* ¶ 5.) In light of these concerns, all members of the ACLU of Oregon's Board of Directors who provided feedback agreed that vetting who is press was inconsistent with the purpose and goals of the ACLU of Oregon. (*Id.*)

The ACLU of Oregon is also not institutionally equipped to operate a licensing or registration system for journalists. (*Id.* ¶¶ 4, 6.) ACLU of Oregon is a non-profit with limited resources. (*Id.* ¶ 6.) None of its staff is trained to assess who is a journalist or who is not. (*Id.* ¶ 4.) Every limited dollar or rare person-hour spent on administering a licensing program would detract from ACLU's other ongoing projects and ultimately its core mission. (*Id.* ¶ 6.)

Finally, the ACLU of Oregon's office is currently closed due to the COVID-19 pandemic and is committed to ensuring the safety and health of its employees. (*Id.* ¶ 7.) Requiring a member of staff or anybody to engage in-person with journalists, some of who have been traveling from outside of the area, for the purpose of exchanging physical items such as vests could also unnecessarily expose them to viral infection. (*Id.*)

## III.    THE COURT'S TRO IS NOT A PRELIMINARY INJUNCTION

The federal defendants also argue that the TRO is in fact a preliminary injunction. (Dkt. 101 at 12-13.) Of course, if they really believed that, they would just file their notice of appeal. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763 (9th Cir. 2018) (explaining that a preliminary injunction disguised as a TRO is immediately appealable). That they did not shows how flimsy their argument is. Each of their cases involved a TRO that extended beyond the 28-day maximum authorized by Rule 65. *E. Bay Sanctuary*, 932 F.3d at 763 (30 days); *SEIU v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir, 2010) (no expiration date); *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 802 (9th Cir. 2002) ("three times the period contemplated by Rule 65").

As the Ninth Circuit said in *E. Bay Sanctuary*, a "key distinction between a 'true' TRO and an appealable preliminary injunction" is that the duration of a TRO is limited by Rule 65. 932 F.3d at 762-63. This Court's TRO has not yet run the *first* 14-day period authorized by Rule 65(b)(1), let alone the extension "for a like period." Counsel hesitates to use the word, but the federal defendants' argument on this point is frivolous.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court extend the TRO against the federal defendants for another 14 days, modified only to include (1) the requirement that "any employee, officer, or agent of any Federal Defendant who leaves the interior of the federal courthouse during a protest while carrying or using any crowd-control device must wear a clearly visible unique identifying code on the front and back of the outside of that person's clothing (with white numbers or letters not less than eight inches in height against a dark background) and a further requirement that a list matching each unique identifying code to the name and unit of that person shall be maintained by counsel for the Federal Defendants but need not be disclosed absent further court order after an opportunity to be heard" (Dkt. 108) and (2) a prohibition on federal agents' leaving federal property while on duty.

Dated: August 4, 2020                                      Respectfully Submitted,


                                              By: /s/ Matthew Borden
                                                  Matthew Borden, *pro hac vice*
                                                  J. Noah Hagey, *pro hac vice*
                                                  Athul K. Acharya, OSB No. 152436
                                                  Gunnar K. Martz, *pro hac vice*
                                                  BRAUNHAGEY & BORDEN LLP


                                                  Kelly K. Simon, OSB No. 154213
                                                  ACLU FOUNDATION OF OREGON

                                                  *Attorneys for Plaintiffs*