ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*,<br><br>Plaintiffs.<br><br>v.<br><br>CITY OF PORTLAND, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-1035-SI<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING THE TEMPORARY RESTRAINING ORDER** |

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO

## **TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Romero,*
72 F.3d 518 (7th Cir. 1995) ......................................................................... 26

*Baker v. Carr,*
369 U.S. 186 (1962)..................................................................................... 24

*Barney v. City of Eugene,*
20 F. App'x 683 (9th Cir. 2001) .................................................................. 16

*Bayer v. Neiman Marcus Grp., Inc.,*
861 F.3d 853 (9th Cir. 2017) ........................................................................ 9

*Camreta v. Greene,*
563 U.S. 692 (2011)..................................................................................... 25

*City of Los Angeles v. Lyons,*
461 U.S 95 (1983)........................................................................................ 17

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)....................................................................................... 8

*Flast v. Cohen,*
392 U.S. 83 (1968)....................................................................................... 24

*Gaines v. Wardynski,*
871 F.3d 1203 (11th Cir. 2017) ................................................................... 26

*Hawkins v. Steingut,*
829 F.2d 317 (2d Cir. 1987)......................................................................... 26

*Hines v. Youseff,*
914 F.3d 1218 (9th Cir.) .............................................................................. 25

*Index Newspapers LLC v. City of Portland,*
No. 3:20-cv-1035, 2020 WL 4220820 (D. Or. July 23, 2020) ................... 8

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
941 F.2d 970 (9th Cir. 1991) ................................................................. 18, 19

*Mathews v. Eldridge,*
424 U.S. 319 (1976)..................................................................................... 25

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) ................................................................ 16

*Morris v. Noe*,
    672 F.3d 1185 (10th Cir. 2012) .............................................................. 26

*North Dakota v. U.S. Army Corps of Engineers*,
    264 F. Supp. 2d 871 (D.N.D. 2003) ......................................................... 3

*Oregon Natural Desert Association v. Sabo*,
    84 F. Supp. 2d 889 (D. Or. 2012) .......................................................... 18

*Robinson v. Bibb*,
    840 F.2d 349 (6th Cir. 1988) ................................................................ 26

*Rosenblum v. Does 1-10*,
    No. 3:20-cv-1161-MO, 2020 WL 4253209 (D. Or. July 24, 2020) ........................ 17

*Salazar v. Buono*,
    559 U.S. 700 (2010) ................................................................... 4, 5, 6

*Selby v. Caruso*,
    734 F.3d 554 (6th Cir. 2013) ......................................................... 9, 11, 12

*Sorrels v. McKee*,
    290 F.3d 965 (9th Cir. 2002) ................................................................ 26

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ........................................................... 18, 19

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ................................................................ 24

*Transwestern Pipeline Co. v. F.E.R.C.*,
    897 F.2d 570 (D.C. Cir. 1990) ................................................................. 9

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ...................................................................... 18

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .......................................................................... 8

**RULES**

Fed. R. Civ. P. 65 ........................................................................... 3, 4

**OTHER AUTHORITIES**

Wright and Miller (Federal Practice and Procedure) ...................................................................... 3

## INTRODUCTION

When the Court considered and entered its Temporary Restraining Order, the protests at federal properties were marked by nightly violence, frequent declarations of riot, and conflict between agitators and federal law enforcement.  As Defendants' motion to reconsider and rescind the Court's Temporary Restraining Order reflects, ECF No. 101, and as shown by the declarations submitted in support thereof, the Court's TRO has proven unworkable in the chaos of the protests.  But perhaps more importantly, the necessity of the TRO has, in Defendants' view, dissipated with the marked change in circumstances since Thursday, July 30.

On that date, Oregon and local police, which previously declined to assist federal officers in the protection of federal property and the Hatfield Courthouse, assumed responsibility for policing the areas outside the Courthouse through an agreement among federal, state, and local authorities.  Since that time, conflict between protesters and Federal Defendants has been non-existent and, to Federal Defendants' knowledge, conflict between those protesters and local authorities has been minimal. While federal officers remain available to engage in partnership with local police if called upon, such engagement has not been required in the days since the announcement of the change in policing posture.  Given this fundamental change in circumstances, the Court should rescind the TRO, not extend it.

To the extent the Court does extend the TRO, the Court's proposal to require federal officers to display large numbered markings on their uniforms is unworkable, as Defendants explain below.  Law enforcement officers face a tremendously challenging task during a riot, and, in general, it is not appropriately the subject of prospective judicial intervention.  Where, as here, the threat of violent interactions with protestors involving Federal Defendants is not

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 1

imminent, and any interactions between Federal Defendants and Plaintiffs is highly speculative, such prospective judicial intervention is even more unwarranted.  The TRO should be rescinded.

## **BACKGROUND**

Since federal and state officials announced on July 29 their agreement that local, rather than federal police, would assume responsibility for policing outside of the Hatfield Courthouse, conflict between officers and protesters has almost entirely dissipated.  The declaration of Allen Scott Jones, Deputy Director for Operations for the Federal Protective Service (FPS), sets forth the contours of that agreement and describes the resulting de-escalation and calm that followed. Indeed, FPS officials have left the Courthouse since last Thursday only to extinguish two small fires.  Accordingly, federal officials "have assumed a reactionary force posture with instructions to only respond to criminal activity outside of the facility in coordination with the Oregon State Police. Federal law enforcement personnel have assumed a reactionary law enforcement presence and once the decision is made by DHS leadership that the security of the Hatfield Courthouse and the other federal facilities in Portland are not at risk, FPS will commence the release of DHS component law enforcement personnel assigned to assist FPS in protecting these facilities."[1]

For the Court's consideration, this filing is also accompanied by additional video and photographic evidence of the protests prior to last week's agreement. Federal Defendants also incorporate by reference their Motion for Reconsideration of the TRO, ECF No. 101, and the

---

[1] U.S. Marshals Service personnel remain in the courthouse but are available to assist Federal Protective Service and Oregon State Police when operationally required to quell acts of violence. Declaration of Andrew Smith ¶ 12, Assistant Director for the Tactical Operations Division, U.S. Marshals Service (Exhibit 1) ("Smith Aug. 4 Decl.").

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 2

arguments and evidence contained therein. The video and still images accompanying the

declaration of Shawn Moore show just how dangerous the situation was for federal officers

before state and local police resumed their policing obligations. Those video clips show the

powerful green lasers that protesters pointed at federal officers in an attempt to blind them.

Declaration of Shawn Moore ¶ 4, Deputy Director / Chief Broadcast Engineer, Visual

Communications Division of U.S. Customs and Border Protection Office of Public Affairs

(Exhibit 2). They show examples of the fires that protesters would start, the projectiles that

protesters would hurl at federal officers, and even a Molotov cocktail thrown by protesters. *Id.*

And the still images show not just the property damage caused by these lawless protests but also

the serious risk to officer safety; several of the photos show the sorts of projectiles that protesters

have thrown at officers, including rocks, bottles, and explosives. Moore Decl. ¶ 5. Regardless of

which clips members of the press may choose for their own purposes and for nightly newscasts,

it is beyond dispute that federal law enforcement officers faced serious threats to property and

safety during the course of thesse protests.

## **ARGUMENT**

## I.    **THIS COURT SHOULD NOT EXTEND THE TEMPORARY RESTRAINING ORDER.**

A court can extend the fourteen-day duration of a TRO "for good cause." Fed. R. Civ. P.

65(b)(2). Because the facts regarding Federal Defendants' actions in Portland have moved even

further from those alleged in the initial motion for a TRO, good cause to extend the TRO does

not exist. *See North Dakota v. U.S. Army Corps of Engineers*, 264 F. Supp. 2d 871, 879 (D.N.D.

2003) (on a motion to dissolve a TRO, "it is clear that if the federal standard for granting a

motion for a temporary restraining order is not met, the TRO should not be continued"); Wright

and Miller (Federal Practice and Procedure, § 2953) ("Although there does not seem to be any

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 3

case law on what constitutes "good cause" for purposes of extending a Rule 65(b) order, a showing that the grounds for originally granting the temporary restraining order continue to exist should be sufficient."); *cf. Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.) ("Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." (internal quotation marks, ellipsis, and citation omitted)).

There is no good cause to extend this TRO. The situation that formed the basis of Plaintiffs' case and the claims of irreparable harm Plaintiffs alleged as the basis for the TRO have abated. In the five nights since the Department of Homeland Security and the State of Portland announced a plan for state and local law enforcement to resume their traditional law enforcement obligations in the areas surrounding the federal courthouse, Federal Defendants' need to use force in response to nightly violent protests has dissipated. At this point, Plaintiffs cannot establish that violent protests surrounding the federal courthouse will erupt, let alone that Federal Defendants will need to deploy force or are likely to do so in a manner complained of by Plaintiffs.  Given the changed circumstances, Plaintiffs could not establish the likelihood of irreparable harm necessary for the Court to enter a TRO and the absence of that continued likelihood of irreparable harm alone justifies denying an extension of the TRO.

Indeed, even if Plaintiffs had had standing to request their original TRO and had shown a likelihood of irreparable harm, neither remains true now. And if events change and Federal Defendants need to defend against the sort of unabated violent protests that spawned this TRO, the TRO's terms are so unworkable that it would be improper for them to continue.

### A.   The Agreement Between the Federal Government and the State of Oregon has Fundamentally Changed the Circumstances on the Ground in Portland.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 4

Continuing the TRO is unnecessary, because Federal Defendants' presence in downtown Portland has been substantially scaled back as the state government has taken on additional responsibility.

Prior to July 29, the lack of engagement by state and local police left federal law enforcement officers largely unsupported in defending federal property and the persons within. On July 22, the Portland City Council directed the Portland Police Bureau (PPB) not to assist federal law enforcement in their efforts to protect federal property and the people within federal property. Declaration of Allen Scott Jones ¶ 6, Deputy Director for Operations, Federal Protective Service (Exhibit 3) ("Jones Aug. 4 Decl."). In response, it was necessary for the federal government to deploy large numbers of federal law enforcement officers to protect against the violent protests. *Id.* After the PPB stopped protecting federal property and persons, there was a substantial increase in violent attacks on federal law enforcement and federal property during the night after peaceful daytime protests. *Id.* ¶ 7.

On July 29, senior DHS officials and the Governor of Oregon met to work out an agreement regarding the situation in Portland. *Id.* ¶ 8. Under the plan that DHS and the state agreed to, Oregon State Police would be responsible for crowd control and law enforcement in the area surrounding the federal courthouse, which would allow federal law enforcement to limit their presence to the courthouse itself and the courthouse grounds. *Id.*  Both the Department of Homeland Security and the Governor of Oregon announced that plan on July 29.[2] As a result,

---

[2] *See* Press Release, Chad R. Wolf, Acting Secretary Wolf's Statement on Oregon Agreeing to Cooperate in Quelling Portland Violence (July 29, 2020), https://www.dhs.gov/news/2020/07/29/acting-secretary-wolfs-statement-oregon-agreeing-cooperate-quelling-portland; Press Release, Kate Brown, Governor Kate Brown Announces

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 5

DHS anticipated it would reduce the number of federal law enforcement officers deployed to Portland, and that the remaining federal officers would not have the same operational scope because the state police would be responsible for securing the surrounding areas of the city. *Id.* Although there was some public disagreement about the exact scope of the plan and its terms, both DHS and Oregon agreed that the state police would be increasing its operations and that Federal Defendants would no longer have to shoulder as much of the burden in response to violent protesters.

Since the Oregon agreement, the security situation has unfolded and improved dramatically, as anticipated. Beginning on July 30, state and local police took numerous actions to counter the nightly attacks on the federal courthouse. The morning of July 30, the PPB and the county sheriff's department dispersed the illegal encampment in Lownsdale Park across from the courthouse, which had been used as a logistics encampment and staging area for the nightly violent attacks on the federal courthouse. Jones Aug. 4 Decl. ¶ 9. And beginning at approximately 4:00 pm on July 30, the Oregon State Police took over primary law enforcement responsibility for the city property around and within the temporary federal fence line surrounding the federal courthouse. *Id.* The state police also communicated to the Federal Protective Service that the state police would respond to any instances of criminal activity directed at the federal courthouse or at the nearby Edith Green-Wendell Wyatt Federal Building. *Id.*

---

Phased Withdrawal of Federal Law Enforcement from Portland (July 29, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=37043.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 6

Since that plan went into effect on July 30, the conditions and security situation at the federal courthouse has dramatically improved, making an extension of the TRO inappropriate. Federal officers no longer face unchecked violent protests targeting the federal courthouse every night. Quite to the contrary, as the Jones declaration sets forth, there have been "no uses of force, uses of a crowd control device or arrests by a federal law enforcement officer since 4:00 p.m. on July 30, 2020." Jones Aug. 4 Decl. ¶ 12.  Indeed, "[t]he only time federal law enforcement personnel have had to exit the Hatfield Courthouse was to extinguish two small fires started at the sally port entrance on 2d Avenue SW." *Id.* ¶ 10. Federal law enforcement officers' engagement with protesters has diminished to practically nothing. Federal officers remain in a reactionary force posture, and they have instructions to respond to criminal activity outside the facility only in coordination with the Oregon State Police. *Id.* ¶ 11. DHS has reported only three incidents of vandalism on the federal courthouse, and no injuries to law enforcement personnel. *Id.* ¶ 10. When DHS leadership determines that the security of federal facilities in Portland is no longer at risk, FPS will begin to release the DHS component law enforcement personnel who are currently assigned to protecting those facilities. Jones Aug. 4 Decl. ¶ 11.

In light of these changed circumstances, there is no justification for continuing the TRO. Plaintiffs' entire request for a TRO centered on unproven allegations that federal officers defending the federal courthouse levied "attacks on journalists and legal observers," which "included indiscriminately shooting and tear-gassing them for no cause whatsoever." PI Mot. at 7. Plaintiffs claimed that they faced irreparable injury because they could be "inhibited and intimidated from exercising their First Amendment rights." *Id.* at 15. Likewise, this Court relied on Plaintiffs' particular allegations (all disputed by Federal Defendants) regarding Federal Defendants' actions outside the federal courthouse, concluding that "[t]he actions by the federal

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 7

agents described by Plaintiffs are part of a pattern of officially sanctioned misconduct." TRO

Order, *Index Newspapers LLC v. City of Portland*, No. 3:20-cv-1035, 2020 WL 4220820, at *5

(D. Or. July 23, 2020). This Court held that Plaintiffs had standing to seek injunctive relief

because, "[a]bsent an injunction, the Federal Defendants will continue to target journalists and

legal observers and require them to disperse or face force and violence by federal officers." *Id*.

The case presented to this Court, and this Court's conclusions on standing and irreparable harm,

all focused on the unique situation facing the federal courthouse in Portland.

Even had those facts been necessary and sufficient for Plaintiffs' to meet their burden of

showing standing and the likelihood of irreparable harm at any point, those facts are now absent.

With those necessary factual predicates now absent, there is no basis justifying extending the

TRO. With the winding-down of the heightened federal presence well underway, Plaintiffs

cannot show that there is a likelihood of harm that is "threatened injury" that is "*certainly*

*impending*" and not merely "*possible*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Their fear of injury, if it exists at all,

is a generalized concern relying on a highly speculative chain of events—that a protest may

happen one night, and that Plaintiffs may decide to cover it, that the protest may be marred by

violence such the state and local police will renege on their publicly announced commitment to

maintain order, that federal officers will be forced to respond to the protest and will do so by

deploying crowd-control methods on a wide scale, and in doing so federal officers will fail to

take adequate steps to ensure that peaceful protesters are unaffected by the police response. Each

step of this causal chain is speculative. Moreover, taken together, that causal chain is so

attenuated that it does not justify the continued extraordinary remedy of a temporary restraining

order. If Plaintiffs are entitled to a TRO now, it is difficult to see how every large protest won't

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 8

be preceded by, or at least immediately injected with, a prophylactic TRO because a set of protesters or observers has a generalized fear that the situation will degrade in a particular speculative manner. No court would find injunctive relief appropriate in such a situation, and it is not appropriate to continue such relief here.

For the same reason, Plaintiffs' claims for injunctive relief are moot. A request for injunctive relief is mooted when a change of circumstances makes it unlikely that the alleged harm will reoccur. *See, e.g.*, *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) ("[A] claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur.'"); *Transwestern Pipeline Co. v. F.E.R.C.*, 897 F.2d 570, 575 (D.C. Cir. 1990) ("A case is moot if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."); *Selby v. Caruso*, 734 F.3d 554, 561 (6th Cir. 2013) (prisoner's injunctive and declaratory claims relating to the conditions of confinement under administrative segregation were moot when he was released to general prison population).

As Plaintiffs will, no doubt, point out, federal officials have not yet been dismissed from the greater Portland metropolitan area to return to their normal duty stations. But those federal officers are not policing the areas around the Courthouse and instead are in a reactionary posture. Moreover, the Jones Declaration states that "and once the decision is made by DHS leadership that the security of the Hatfield Courthouse and the other federal facilities in Portland are not at risk, FPS will commence the release of DHS component law enforcement personnel assigned to assist FPS in protecting these facilities." Jones Aug. 4 Decl. ¶ 11. Against this backdrop, Plaintiffs have not shown how there is a live controversy in this case that justifies extending the

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 9

temporary restraining order. Any further injunctive relief regarding the conduct of Federal

Defendants will have no more than a speculative future effect on Plaintiffs' rights.

      **B.**      **The TRO will be unworkable if mass lawlessness again requires Federal Defendants to respond.**

Even though Federal Defendants are no longer faced with unchecked attacks on the

federal courthouse in downtown Portland, extending the TRO will hamstring police if that

situation changes. As Federal Defendants' motion for reconsideration, ECF No. 101, makes

plain, the special privileges granted to press and legal observers have created substantial

operational difficulties for officers responding to mass lawlessness. And seeing the special

privileges available to the press, some lawbreakers have donned press markings to insulate

themselves from law-enforcement activities.

This Court's TRO was premised on two assumptions: First, that law enforcement officers

would not be impeded in their duties by the special treatment mandated for people self-

identifying as press. And second, that people would mark themselves as "press" only if they

were engaged in bona fide press activities and were not engaged in lawless behavior. The

evidence supplied by Federal Defendants shows that neither assumption has borne out.

      **1.**      **Special privileges for self-designated members of the press inhibit law enforcement operations.**

If Federal Defendants once again become solely responsible for responding to

widespread lawlessness surrounding the federal courthouse (an unlikely event, considering

Oregon and local police's commitment to active policing of the area), attempting to comply with

the TRO will hamstring federal officers in their duties and endanger the safety of both officers

and purported members of the press. While federal officers were responding to the riots,

individuals identifying as members of the press repeatedly placed themselves between federal

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 10

officers and protesters posing an imminent threat. Declaration of CBP NZ-1 ¶ 11, ECF No. 101-6; Declaration of Gabriel Russell ¶ 8(a), ECF No. 101-5 ("Russell July 29 Decl."); Declaration of FPS Badge # 824 ¶ 5(a), ECF No. 101-3. Such individuals were also often in the middle of crowds of violent protesters, not physically separated, impeding dispersal and endangering officers who were attempting to determine whether individuals refusing lawful orders were covered by the TRO. CBP NZ-1 Decl. ¶¶ 12-13; Russell July 29 Decl. ¶ 8(a), (g); Declaration of FPS Badge # 882 ¶ 5(c), ECF No. 101-4; FPS Badge # 824 Decl. ¶ 5(c). Indeed, officers were assaulted by some of these individuals while attempting to determine if they are in fact journalists, impeding the officers' ability to accomplish their duties and putting them in danger. CBP NZ-1 Decl. ¶ 13. Finally, under the chaotic circumstances of the protests, it was difficult for officers, who are often wearing gas masks and laser protective goggles, to verify small indicia of press membership that may have been present on certain members of crowds. *Id.* ¶ 14. It was particularly difficult for officers to make these determinations while remaining a safe distance away from crowds to employ crowd control devices in a manner that was safe for both the crowd and the officers. *Id.*

And that difficulty is inherent in the terms of the TRO, not the result of lack of effort. Federal Defendants submitted numerous declarations to this Court in response to Plaintiffs' now-tabled motion for contempt. They document Defendants' robust efforts to ensure compliance with the TRO by Federal Defendants.

The U.S. Marshal Service (USMS) received a copy of the TRO the day it was entered and circulated it to supervisors and employees in Portland the same evening. Declaration of Andrew Smith ¶ 17, ECF No. 106 ("Smith July 30 Decl."). The TRO was also later distributed with an explanatory cover memorandum to staff stationed in or deployed to Portland. *Id.* Additionally,

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 11

the USMS employees on the ground in Portland received a briefing from the U.S. Attorney's Office regarding implementation of the TRO. *Id.* ¶ 18. On-site commanders ensured delivery and directives to operation personnel, and all Deputy U.S. Marshals assigned have been provided a copy of the TRO, have received a detailed written notice of its contents and requirements, and have been instructed as to their requirements under the TRO. *Id.* When an issue arises as to compliance with the TRO in the course of an on-site Deputy Marshal's protective duties, the Deputy's supervisor, who is aware of the TRO requirements, is informed, and the supervisor assists the Deputy with compliance. *See id.*

The Department of Homeland Security (DHS) similarly ensured that, within 24 hours, all appropriate employees had been given a copy of the TRO. Declaration of Gabriel Russell ¶ 4, ECF No. 105-7 ("Russell July 30 Decl."). On July 23, 2020, an attorney in the DHS Office of the General Counsel gave an in-person overview about the TRO at evening roll call, attended by approximately 75 to 100 agents from the Federal Protective Service (FPS), U.S. Customs and Border Patrol (CBP), U.S. Immigration and Customs Enforcement (ICE), and the U.S. Marshals Service (USMS) present. *Id.* ¶ 5. At evening roll call the next day, the same attorney provided an in-depth overview of the TRO and the discussed the TRO Instructions created by the DHS Office of the General Counsel. *Id.* ¶ 6. Again, an estimated 75 to 100 agents from the same agencies attended. *Id.*

Agencies within DHS were also immediately informed and given guidance. On July 24, 2020, an FPS-Wide notice was sent by Mr. Scott Jones, FPS Deputy Director for Operations. *Id.* ¶ 8; Declaration of Allen Scott Jones ¶ 6, ECF No. 105-6 ("Jones July 30 Decl."). That notice contained a copy of the TRO as well as the TRO Instructions prepared by DHS OGC. Jones July 30 Decl. ¶ 6. Those instructions were also provided to the Director of FPS, who had been

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 12

notified the day prior. *Id.* ¶¶ 5, 6. CBP's Senior Official Performing the Duties of the Commissioner, Deputy Commissioner, U.S. Border Patrol Chief, and Office of Field Operations Executive Assistant Commissioner were also given the TRO and instructions.  Declaration of Robert Danley ¶ 8, ECF No. 105-5 ("Danley July 30 Decl."). As noted above, CBP's agents also received these instructions and participated in the above-mentioned roll calls. *Id.* ¶¶ 5-7. Likewise, ICE sent an agency-wide email on July 24 to all ICE employees summarizing the TRO and attaching a copy of the order. Declaration of Derek Benner, ECF No.105-8 ("Benner July 30 Decl."). And ICE agents were likely at the above-mentioned roll calls. Russell July 30 Decl. ¶¶ 5–7.

Yet no amount of effort to comply with the TRO renders it workable. So long as the TRO directs officers to give special favorable treatment to individuals scattered at random throughout lawless crowds, officers will be impeded in their efforts to restore order. As discussed *infra*, that will be true whether or not this Court further defines the particular types of attire that would designate someone as entitled to those special press privileges.

### 2.    Lawbreakers are masquerading as press and legal observers.

Federal officers have also observed two tactics adopted by protesters that further undermine their ability to safely and accurately comply with the TRO while still accomplishing their duties. Federal officers have identified (1) individuals pretending to be press or legal observers, and, relatedly, (2) individuals presenting indicia of press affiliation but  who themselves have engaged in unlawful actions. By way of example, reporter Sergio Olmos publicly posted video to Twitter of a protester admitting that, although he is not a member of the press, he is wearing press credentials identified as sufficient by the TRO in order to evade Defendant's crowd control tactics. Russell July 29 Decl. ¶ 8(e). Another reporter posted a photo

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 13

of a man marked as "press" and holding a protest sign while standing against the fence, who had

told the reporter that he wore the attire to avoid police action.[3] Similarly, an individual was

filmed at the protests apparently planning to distribute press passes to protesters who are not

journalists. Russell July 29 Decl. ¶ 8(c). Officers have also observed numerous individuals

wearing hand-written press markings or verbally claiming to be press while displaying no visible

indicia of press membership, making it impossible for officers to verify their claims. FPS Badge

# 882 Decl. ¶ 5(a)-(b), (d); FPS Badge # 824 Decl. ¶ 5(c). Other individuals purporting to be

press or legal observers have been engaged directly in illegal activity. For example, a protestor

carrying a shield that identified him as press was taken into custody for impeding federal officers

who were attempting to control the crowd, and was found to be in possession of a gun. CBP

SOG-1 Decl. ¶ 10, ECF No. 101-7; CBP NZ-1 Decl. ¶ 9; Smith July 30 Decl. ¶ 8.[4] Another

individual who self-identified as a reporter entered federal property and, after refusing to leave,

resisted arrest. CBP SOG-1 Decl. ¶ 11. A third individual wearing indicia of press membership

and self-reporting as press, was arrested for failing to comply with lawful direction and was

discovered to be carrying commercial grade fireworks, CBP NZ-1 Decl. ¶ 10, Russell July 29

Decl. ¶ 8(b), which, throughout the protests, have been used as a tactic to harass federal officers,

CBP NZ-1 Decl. ¶ 8, and which are illegal in Oregon, Russell July 29 Decl. ¶ 8(b). On July 28,

2020, an officer observed an individual wearing a helmet bearing the word "PRESS" and using a

power tool to attempt to breach the fence around the Courthouse. Smith July 30 Decl. ¶ 10. Most

---

[3] https://twitter.com/Julio_Rosas11/status/1289547507819675648.
[4] This incident occurred on July 22, 2020, before the TRO was granted, but because of the very
limited time available to the government to prepare for the hearing the information was not
presented to the Court.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 14

recently, on July 29, 2020, an individual wearing "press" identification on his helmet breached the security barrier around the courthouse by jumping over the perimeter fence. Smith July 30 Decl. ¶ 11. And the Portland Police, who are bound by preliminary injunction of a similar nature, publicly reported in regard to an August 1st violent protest that "[p]eople with 'press' written on their outer garments repeatedly threw objects at officers."[5]

The TRO gives individual protestors special privileges, including an exemption from lawful orders to disperse. It is no surprise that protestors who seek to violate the law will take advantage of that opportunity. If protesters who want an easier time breaking the law can easily designate themselves as press, and can do so falsely with no repercussions, it remains unclear what incentive there is for those criminal actors not to falsely label themselves. That license for lawbreaking is dangerous and should not be extended.

## C.    The TRO remains inappropriate for the same reasons that were true at the outset.

Extending the TRO would also be inappropriate because the TRO was unwarranted in the first instance. Plaintiffs failed to show a likelihood of success on the merits of their First Amendment claims, they failed to establish standing to pursue injunctive relief, and they failed to show a likelihood of irreparable harm.

Extending the TRO is unwarranted, because Plaintiffs' underlying legal theory remains fatally deficient. As discussed in Federal Defendants' original opposition to the issuance of a TRO, ECF No. 67, Plaintiffs' First Amendment claims were not supported by law. Their claim

---

[5] Press Release, Portland Police Bureau, Two Arrests Made After Unlawful Assembly, But Second March Peaceful (Aug. 2, 2020), https://www.portlandoregon.gov/police/news/read.cfm?id=251060.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 15

of First Amendment retaliation is fatally flawed, because they have never raised even an inference that Federal Defendants' issuance of dispersal orders and use of crowd-control methods had as "a substantial or motivating factor" the purpose of "deter[ing] or chill[ing] the plaintiff's political speech." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). Their claim required accepting that self-described reporters and legal observers have a First Amendment right to ignore orders to disperse and to not be subjected to crowd-control methods when present at unlawful protests, and that any deviation from that preferred course of action must have been motivated by a desire to suppress speech. But Plaintiffs failed to establish that the use of force was "anything other than the unintended consequence of an otherwise constitutional use of force under the circumstances." *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001). Now that Federal Defendants have gladly accepted the state and local governments' commitment to resume ordinary policing activities that protect federal officers and property, there is even less reason to think that a First Amendment retaliation claim could ever be proved.

The same deficiency is true in Plaintiffs' First Amendment claim for denial of the "right of access." Plaintiffs claimed that the right to access public proceedings—a right at issue when the press observes the operations of a courtroom—entitled members of the press to special access on the scene of unlawful and violent protests as well. But there was no legal basis to extend that narrow First Amendment doctrine to that inapposite context, nor do the press have any special entitlement to exemption from generally applicable laws. But even if the press were entitled to remain on the scene of lawless protests, the reduction in federal operations around the federal courthouse means that Plaintiffs cannot plausibly claim a risk of being excluded from a scene by Federal Defendants.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 16

Entering the TRO was also improper because Plaintiffs could not show standing to pursue injunctive relief and could not show a likelihood of irreparable harm. Their claim for injunctive relief was based entirely on past allegations of harm, which is insufficient to show standing for prospective injunctive relief. *See, e.g.*, *Rosenblum v. Does 1-10*, No. 3:20-cv-1161-MO, 2020 WL 4253209 at *6 (D. Or. July 24, 2020) ("[I]njunctive relief requires more than a showing that a plaintiff has been harmed; it requires a showing that she will likely be harmed again."). And Plaintiffs' claims of looming harm were purely speculative, insufficient to show a likelihood of irreparable harm. Separate from any Article III standing concerns, where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *City of Los Angeles v. Lyons*, 461 U.S 95, 111 (1983).

The expiration of the TRO is the perfect opportunity for this Court to reconsider its exercise of equitable power. Plaintiffs' claims were insufficient at the outset to justify entering a TRO, and now that the situation in Portland has changed and vitiated what little remained of Plaintiffs' claim to future injury, allowing the TRO to expire is appropriate.

## II.     THIS COURT SHOULD NOT IMPOSE ADDITIONAL RESTRICTIONS THROUGH THE TEMPORARY RESTAINING ORDER.

Because new circumstances have made the continuation of the TRO unnecessary, it is even more inappropriate to impose additional constraints on federal law enforcement. The Court's proposal that officers wear large tags of eight-inch letters with a unique identifier is improper, as it does not relate to Plaintiffs' case and is not tailored to respond to any harm. And the imposition of such a policy would pose serious operational problems that more than outweigh the benefits contemplated from this proposal. The limitation of the TRO's protection to only a limited class of accredited press members would not solve the problems imposed by the TRO,

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 17

notwithstanding that the Court's proposal derives from the Court's appreciation for the unmanageable situation that will meet Federal Defendants under the TRO if events in Portland were to revert.

**B.    The proposal to tag federal officers is improper.**

Tagging federal officers with unique identifiers is outside the scope of this case and is thus improper. Furthermore, doing so would impose serious operational risks.

**1.    This relief is outside the scope of the TRO and unrelated to the nature of the case.**

Modifying the TRO to require large officer identification numbers would be inappropriate because it would not remedy any of the alleged harms that form the basis of the TRO. Injunctive relief "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)); *see also Oregon Natural Desert Association v. Sabo*, 84 F. Supp. 2d 889, 897 (D. Or. 2012) ("Any injunctive relief ordered must be tailored to remedy the specific harm alleged."). Modifying the TRO in the fashion suggested would be a *sua sponte* discovery of a new harm, unrelated to the Plaintiffs' complaint and not designed to remedy any harm alleged by Plaintiffs. That is inappropriate. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1580 (2020) (courts should "normally decide only questions presented by the parties," not "look[] for wrongs to right").

Plaintiffs' claims against Federal Defendants are unrelated to any alleged difficulties in distinguishing among individual law enforcement officers. They have never claimed to have a right to have each individual law enforcement officer identified by a large unique identifier. Nor have they claimed that the alleged lack of sufficient distinguishing identifiers harms Plaintiffs in any way. The issue did not come up in Plaintiffs' Second Amended Complaint, in their TRO

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 18

motion, or in this Court's opinion. In short, the Court's suggestion regarding the need to mark each federal officer individually is a new introduction to this case, divorced from Plaintiffs' theories of harm or recovery. Accordingly, the suggestion is not "tailored to remedy the specific harm alleged." *Stormans*, 586 F.3d at 1140 (quoting *Lamb-Weston*, 941 F.2d at 974).

### 2.  The proposal would burden law enforcement.

The evidence shows that it is impracticable to require federal law enforcement officers to append a large identification number to their uniforms as part of this TRO.[6] Officers' uniforms cannot accommodate that identification scheme without blocking access to officers' vital equipment, endangering officer safety. And the identifiers would allow criminal protesters to retaliate against individual officers and track the size of the law enforcement force, putting officers in jeopardy.

Perhaps most crucially, the Court's proposal would put officer safety in jeopardy. None of the agency uniforms could accommodate an eight-inch-high identifier without blocking an officer's ability to access operational equipment such as intermediate use-of-force tools, restrains, and communications. Smith Aug. 4 Decl. ¶ 6; Declaration of Robert Danley ¶¶ 4–5, Associate Chief, U.S. Border Patrol (Exhibit 4) ("Danley Aug. 4 Decl."); Declaration of Derek Benner ¶¶ 5–7, U.S. Immigration and Customs Enforcement's (ICE) Senior Official Performing the Duties of Deputy Director (Exhibit 5) ("Benner Aug. 4 Decl."); Declaration of David Olson ¶¶ 4–5, Assistant Director of the Rapid Protection Force, Federal Protective Service (Exhibit 6).

---

[6] For the US Marshals Service, identifying numbers are unnecessary because USMS SOG officers have unique identifying numbers in reflective print on the back of their helmets, and that same number appears on each SOG member's uniform sleeve. Smith Aug. 4 Decl. ¶ 8.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 19

Requiring officers to block access to crucial operational equipment will risk the safety of officers and of the people they are trying to protect.

Even if identification numbers could be accommodated, requiring officers to display them as proposed by the Court would further harm law enforcement officers' safety and their ability to do their jobs. Violent protesters could use the identification numbers to track individual officers for violent retaliation. Olson Decl. ¶ 6; Danley Aug. 4 Decl. ¶ 6; Benner Aug. 4 Decl. ¶ 7. And because the violent protesters often substantially outnumber federal officers, giving each officer a visible, unique identification number could enable violent protesters to better estimate the size of the police force at a given time. Olson Decl. ¶ 7; Danley Aug. 4 Decl. ¶ 7; Benner Aug. 4 Decl. ¶ 8. Furthermore, to the extent any Federal Defendant uses officers who need to be inconspicuous—such as to observe protests without engaging with protesters—the requirement of large identification numbers would prevent that. Smith Aug. 4 Decl. ¶ 10. The Court's proposal to require conspicuous markings on all officers would impede operations that rely on observation or other inconspicuous actions.

In short, Federal Defendants' law enforcement uniforms cannot readily accommodate the Court's proposal without endangering officers and their operations. The proposal would also permit dangerous protesters to identify particular officers for retaliation and to estimate the size of the law enforcement force deployed. Those are high prices to pay for a proposal not related to the alleged harms in the case at hand.

### C.    Press certification would not fix the TRO's problems.

Plaintiffs appreciate that the Court has taken to heart the concerns that people may improperly mark themselves as press to get themselves some exemptions from generally applicable laws or to impede the actions of law enforcement. But the Court's proposal would do

little to stop the issue of imitators, and it would do nothing to address the operational impediments created by a special caste of privileged protesters. If this Court decides to extend the TRO, Federal Defendants take no position on the Court's proposal to limit the press's special privilege to some category of verified journalists. But Federal Defendants believe that the Court's proposal also raises serious constitutional questions.

As discussed *supra* and in Federal Defendants' motion for reconsideration, the special privileges created by the TRO pose two major problems. First, the TRO requires federal law enforcement officers—in a dark, chaotic, dangerous environment that requires split-second decisions—to carve out for preferential treatment a random scattering of self-proclaimed journalists. That approach is not feasible, because those people with special protections are often mingled among unlawful protestors or between police and unlawful protestors, and law enforcement officers risk contempt every time they attempt to handle an unruly crowd. Second, individuals marked as press have been involved in the lawbreaking, which gives special privileges and access to people who will use that status to impede law enforcement. The proposed solution does little for either the workability or the exploitation issue.

On the workability issue, the issuance of ACLU vests to members of the press will not solve the problems that are created by granting special privileges to a group of protest attendees. If members of the press continue to stand among lawbreaking protestors or between those protestors and law enforcement officers, those officers will have to perform an unmanageable contempt analysis every time they attempt to use crowd-control methods—they will be forced to question whether each pepper ball or tear gas canister will come too close to a member of the press that they might be in contempt under the aggressive reading of the TRO reflected in Plaintiffs' contempt motion. There is no dispute in the record that federal officers have often

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 21

needed to use crowd-control methods to protect federal officers and federal property, so hamstringing that split-second decision making could lead to destruction of property and loss of life. So long as members of the press intermingle with criminal protesters or place themselves between criminal protesters and law enforcement, it is not feasible to give them special protections from the methods being used to disperse such lawlessness.

On the exploitation issue, the proposed modification would not prevent individuals marked as press from instead acting as criminal protesters. First, even if an individual obtains an official journalism vest, it is not clear what prospective or retrospective methods would exist for preventing that person from acting as an ordinary criminal protester instead of a bona fide journalist. The Court proposes delegating this certification function to the ACLU—the same organization representing Plaintiffs, and an organization that does not appear to serve as an accreditation body for journalists. There is no proposal to require the ACLU to follow a particular process in vetting would-be journalists, and there's no proposal to hold the ACLU accountable if the organization knowingly, recklessly, or negligently distributes vests in a manner than puts them in the hands of lawbreakers. A grant of official status by the ACLU would apparently be a matter of grace, and poor performance by the ACLU would have consequences only for the federal officers forced to handle another barrage of criminals masked as journalists.

Second, the same false self-designation that happens now could easily happen under the Court's proposed plan. If the ACLU began distributing blue vests to its preferred journalists, any protester interested in getting special treatment from law enforcement could easily obtain a

similar one, quickly and at a low cost.[7] As discussed *supra*, lawless protesters are not above falsely presenting themselves as journalists to obtain the special privileges this Court granted to self-identified journalists in its TRO. And for officers who face potential contempt sanctions if they make a mistake, it is unreasonable to insist they differentiate in a split-second among types of blue vest. Again, even with this proposal, officers would be put in a situation where they risk contempt simply for doing their job.

Although Federal Defendants do not believe that the Court's proposal would cure the problems inherent in the TRO, Federal Defendants appreciate any effort to ensure that law enforcement officers are able to safely and effectively perform their jobs. As such, Federal Defendants take no position on the appropriateness of the Court's proposal. But it is worth noting that, in addition to the workability and exploitation issues that would persist after the Court's order, there are substantial questions regarding the propriety of order the relief the Court proposes. Because the Court's TRO is founded on the conclusion that the First Amendment protects journalists' rights to access protest spaces without application of certain laws or exposure to certain crowd-control methods, it is questionable whether and to what extent the First Amendment permits the Court to condition those First Amendment protections on preapproval. And the proposal to outsource the approval of journalists to the ACLU, a private entity with ideological positions, likewise raises concerns. Although Federal Defendants take no position on the Court's proposal except to note that it would not cure the TRO's problems, those concerns merit further consideration.

_____

[7] A search of online retailers shows that vests are available for sale in a wide variety of colors, styles, and sizes, often with expedited shipping. *See, e.g.*, https://www.amazon.com/dp/B07ZYXDMG1/.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 23

**III.    TO THE EXTENT THE TRO PURPORTS TO DETERMINE ISSUES OF QUALIFIED IMMUNITY FOR POTENTIAL FUTURE INDIVIDUAL-CAPACITY DEFENDANTS, IT IS IMPROPER AND SHOULD BE MODIFIED.**

Finally, Defendants raise for the Court's consideration another problematic aspect of the Court's TRO. This Court's assertion that any potential future violation of the restraining order is a "violation of a clearly established right and thus not subject to qualified immunity" in potential future individual-capacity claims, ECF No. 84 at 20, ¶ 7, is improper for two overarching reasons. First, such a position amounts to an advisory opinion, which, under Article III, federal courts may not issue. Second, a single district court opinion does not clearly establish constitutional law. This portion of the Order should therefore be removed.

The role of federal courts "is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Article III's case-or-controversy requirement recognizes that suits seeking advisory opinions "often are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests." *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968) (internal citation and quotation omitted). *See also Baker v. Carr*, 369 U.S. 186, 204 (1962) (in discussing standing, noting a party must have "alleged such a personal stake in the outcome of a controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions").

Here, the Court's statement regarding qualified immunity is an advisory opinion. No case or controversy is before the Court for which any defendants have raised the defense of qualified

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 24

immunity. Nor are there any alleged facts before the Court that any specific, identified individual defendant violated a plaintiff's constitutional rights. In short, the case before this Court does not "precisely frame[]" the question of qualified immunity, nor does it present the "clash of adversary argument" or the "concrete adverseness" upon which this Court could rule on such a question. The Court's statement is therefore beyond its jurisdiction.

This is particularly so with respect to a federal official's qualified immunity defense to a possible future claim seeking damages from that official's personal assets. A court's preemptory adjudication of an individual's legal defense to a claim against his or her assets—without the opportunity to be heard in response to such a claim—may implicate due process concerns. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal citation and quotation omitted)). Indeed, the government is unaware of any case in which a court has ruled, in advance, that a possible future violation of a restraining order would constitute a clearly established constitutional violation, thereby effectively abrogating an official's qualified immunity defense.

Nor is the government aware of any case in which a violation of an already-existing restraining order by a district court was held to be a clearly established constitutional violation, which leads to the second reason the Court's statement should be removed. A single district court decision does not clearly establish the law for qualified immunity purposes. "[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Rather, in the Ninth Circuit, the law is clearly established by "controlling authority or a robust consensus of cases of persuasive authority." *Hines v. Youseff*, 914 F.3d

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 25

1218, 1229-30 (9th Cir.), *cert. denied sub nom. Smith v. Schwarzenegger*, 140 S. Ct. 159 (2019); *see also Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002) ("[I]t will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only."). Other circuits take a similar approach. *See Gaines v. Wardynski*, 871 F.3d 1203, 1211 (11th Cir. 2017) ("[A] district court case cannot clearly establish the law for qualified immunity purposes . . . ." (citation omitted)); *Morris v. Noe*, 672 F.3d 1185, 1197 (10th Cir. 2012) ("[A] single unpublished district court opinion is not sufficient to render the law clearly established."); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) ("[D]istrict court decisions cannot clearly establish a constitutional right."); *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988) ("In order to be clearly established, a question must be decided either by the highest state court in the state where the case arose, by a United States Court of Appeals, or by the Supreme Court."); *Hawkins v. Steingut,* 829 F.2d 317, 321 (2d Cir. 1987) ("[A] district court decision does not 'clearly establish' the law even of its own circuit, much less that of other circuits.").

Because the only court purporting to hold that federal officials' potential future violation of this Court's restraining order is a clearly established violation is this very Court, under both Ninth Circuit and other precedent, the law simply is not clearly established. This Court should therefore modify its restraining order to remove the statement regarding qualified immunity.

## **CONCLUSION**

For the foregoing reasons, this Court should dissolve its temporary restraining order or allow the order to expire. If this Court extends the temporary restraining order, it should not add new terms relating to the attire of federal law enforcement officers, and it should clarify that the TRO does not purport to resolve any issue relating to qualified immunity for future cases.

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 26

Dated:  August 4, 2020

ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

ANDREW I. WARDEN
Senior Trial Counsel

JEFFREY A. HALL
/s/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

FEDERAL DEFENDANTS' OPPOSITION TO EXTENDING TRO – 27