Duane A. Bosworth, OSB #825077
DAVIS WRIGHT TREMAINE LLP
1300 S.W.  Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
duanebosworth@dwt.com
*Counsel of Record for Amici*

*Katie Townsend
*Gabe Rottman
*Adam A. Marshall
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org
grottman@rcfp.org
amarshall@rcfp.org
*Of counsel for Amici*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, et al. | Case No. 3:20-cv-1035-SI |
| Plaintiffs, | |
| **v.** | **UNOPPOSED MOTION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 16 NEWS MEDIA ORGANIZATIONS FOR LEAVE TO SUBMIT BRIEF AS AMICI CURIAE AND SUPPORTING MEMORANDUM** |
| **CITY OF PORTLAND**, et al., | |
| Defendants | |

Page 1 - UNOPPOSED MOTION FOR LEAVE TO SUBMIT BRIEF AS AMICI CURIAE AND SUPPORTING MEMORANDUM

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Proposed *amici curiae* Reporters Committee for Freedom of the Press, Eugene Weekly, Gales Creek Journal, KPTV-KPDX Broadcasting Corporation, Malheur Enterprise, News-Register Publishing Co., Oregon Association of Broadcasters, Oregon Newspaper Publishers Association, Oregon Public Broadcasting, The Oregonian, Pamplin Media Group, Portland Business Journal, Reuters News & Media Inc., Salem Reporter, Society of Professional Journalists Oregon Territory Chapter, TEGNA Inc. / KGW-TV (Portland), and Underscore.news (collectively, the "News Media Amici") hereby move the Court for leave to submit the attached brief to address the Court's July 31, 2020 Order (ECF No. 108).

Pursuant to Federal and Local Civil Rule 7, counsel for the News Media Amici informed counsel for Plaintiffs and Defendants of their intent to file this motion and requested their position. Plaintiffs consent to the motion, the Federal Defendants do not oppose, and the City of Portland likewise does not oppose.

## IDENTITY OF PROPOSED NEWS MEDIA AMICI AND CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press ("Reporters Committee") is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. The Reporters Committee is an unincorporated association of reporters and editors with no parent corporation and no stock.

Eugene Weekly, locally owned since 1982, is an alternative news weekly covering news, arts and entertainment in Lane County, Oregon. EW focuses on investigative and solutions journalism that affect the community and the state. What's Happening Inc, DBA Eugene Weekly

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

is a privately owned news organization that has no parent company and issues no stock.

The Gales Creek Journal (formally, Gales Creek Journal LLC) is a news organization headquartered in Gales Creek, Oregon.  It publishes the Gales Creek Journal, the Banks Post, and the Salmonberry Magazine.  Gales Creek Journal LLC is a wholly-owned subsidiary of Firestarter Media LLC, a holding company owned by Jacob Hundley.  Gales Creek Journal LLC and Firestarter Media LLC are both privately held companies with no securities in the hands of the public.

KPTV-KPDX Broadcasting Corporation owns and operates KPTV (Fox) and KPDX (MyNetwork) in the Portland, Oregon Designated Market Area.  KPTV-KPDX Broadcasting Corporation is a wholly owned subsidiary of Meredith Corporation.  Meredith Corporation is a publicly traded company on the New York Stock Exchange under the symbol MDP.  Black Rock, Inc., publicly traded on  the New York Stock Exchange under the symbol BLK, owns ten percent (10%) or more of Meredith Corporation's stock.

The Malheur Enterprise is a news organization based in Vale, Oregon, that operates a news website and publishes a weekly newspaper primarily serving Malheur County.  The Enterprise is represented by its publisher Les Zaitz.  The Malheur Enterprise is a wholly owned subsidiary of Wheatland Publishing Corp., an Oregon corporation engaging in the news business since 1987.

The News-Register Publishing Company, family-owned since 1928, publishes the twice-weekly News-Register community newspaper, in print and online, from offices in McMinnville, OR.  We are an active member of Oregon Newspaper Publishers Association, the National Newspaper Association and America's Newspapers, and our journalism interests extend to print services for other newspapers and our own production of specialty publications.  Oregon Lithoprint, Inc., dba News-Register Publishing Co. — wholly-owned by members of the Bladine

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

family — has no parent corporation or outside stock issue.

The Oregon Association of Broadcasters ("OAB") is a non-profit trade organization representing approximately 100 radio stations and 25 television stations in Oregon.  The Oregon Association of Broadcasters ("OAB") has no parent corporation and issues no stock.

Oregon Newspaper Publishers Association is a trade association organized to represent the common interests of Oregon newspapers.  One of those interests is to further the public's understanding that strong newspapers are the cornerstone of a democratic society. ONPA represents all the dailies and most of the weeklies in Oregon, currently 96 publications.  ONPA has no parent corporation and issues no stock.

Oregon Public Broadcasting (OPB) is a nationally-recognized leader in public media, reaching 1.5 million people across Oregon and southwest Washington each week through its network of television and radio stations, and robust online programming.  With award-winning journalists and original series, OPB's mission is to illuminate the people, places, and issues of the region and put stories into context.  OPB is a nonprofit public benefit corporation with no parent corporation and issues no stock.

The Oregonian/OregonLive (formally, Advance Local d/b/a Oregonian Media Group) is a news organization based in Portland, Oregon.  It publishes The Oregonian newspaper and the website www.oregonlive.com and publishes a variety of digital and mobile news applications.  The Oregonian has won Pulitzer Prizes for its journalism, including the award for breaking news reporting in 2007.  Advance Local d/b/a Oregonian Media Group is a wholly owned subsidiary of Newark Morning Ledger Co., a New Jersey corporation.  No publicly traded corporation owns 10% or more of the stock of Oregonian Media Group or of Newark Morning Ledger Co.

Pamplin Media Group is a news organization that publishes the Portland Tribune and 24

Page 4 - UNOPPOSED MOTION FOR LEAVE TO SUBMIT BRIEF AS AMICI CURIAE AND SUPPORTING MEMORANDUM

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

other physical newspapers and digital content in Oregon.  Pamplin Media Group is an assumed business name for Oregon Publications Corp., which is a wholly owned subsidiary of the R.B. Pamplin Corp, which is a privately owned company wholly controlled by Robert B. Pamplin Jr. and his family.

The Portland Business Journal, published by American City Business Journals, Inc., is Portland's premier business publication providing comprehensive coverage of the local economic landscape with breaking news, in-depth industry analysis, market leads, and over 35 annual award and networking events.  American City Business Journals, Inc. is a wholly owned subsidiary of Advance Publications, Inc., a privately-held company with no parent corporation.  No publicly held corporation owns any of its stock.

Reuters, the world's largest international news agency, is a leading provider of real-time multi-media news and information services to newspapers, television and cable networks, radio stations and websites around the world. Through Reuters.com, affiliated websites and multiple online and mobile platforms, more than a billion professionals, news organizations and consumers rely on Reuters every day. Its text newswires provide newsrooms with source material and ready-to-publish news stories in nine languages and, through Reuters Pictures and Video, global video content and over 1,600 photographs a day covering international news, sports, entertainment, and business.  In addition, Reuters publishes authoritative and unbiased market data and intelligence to business and finance consumers, including investment banking and private equity professionals. Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company.  Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

Salem Reporter is an all-digital news organization based in Salem, Oregon, that operates a news website serving the state's capital city.  Salem Reporter is owned by Salem Reporter LLC, a privately held Oregon corporation established in 2018.

The Oregon Territory Chapter of the Society of Professional Journalists ("SPJ Oregon") is dedicated to improving and protecting journalism.  It is a chapter of the national Society of Professional Journalists, the nation's most broad-based journalism organization.  Founded in 1909 as Sigma Delta Chi, the Society of Professional Journalists promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists, and protects the First Amendment guarantees of freedom of speech and press.  SPJ Oregon maintains a Freedom of Information committee, lobbies on behalf of open records and government transparency and defends press freedom.  The Oregon Territory Chapter of the Society of Professional Journalists has no parent corporation and issues no stock.

TEGNA Inc. owns or services (through shared service or similar agreements) 64 television stations in 52 markets, including KGW-TV, the NBC affiliate in Portland.  TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

Underscore Media Collaboration, Inc., is a nonprofit news organization based in Portland, Oregon.  We publish investigative reporting including coverage of Indian Country and disseminate our work by partnering with other media including broadcast, online and print.  Our work can be found on our website, underscore.news.  Underscore began operations on January 15, 2019.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Underscore.news is a nonprofit organization that has no parent company and issues no stock.

## **ARGUMENT**

Federal district courts have inherent authority to consider submissions from *amicus curiae* in connection with proceedings pending before them.   *See, e.g., Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) (overruled on other grounds) ("The district court has broad discretion to appoint amici curiae.").   Indeed, "[d]istrict courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (quotation and citation omitted). *Accord Greater Hells Canyon Council v. Stein*, No. 2:17-CV-00843-SU, 2018 WL 438924, at *1 (D. Or. Jan. 16, 2018) (granting motion to file amicus brief that would provide "useful additional analysis", interpretations of law, and factual information).

The proposed News Media Amici request leave to submit the attached brief to address a question posed by the Court's July 31, 2020 Order: whether it should amend the temporary restraining order, ECF No. 84 (the "TRO") to, *inter alia*, "restrict the definition of 'Journalist'" to "professional or authorized journalists" who have been given a vest by the ACLU of Oregon. Order, ECF No. 108.  The News Media Amici are well-positioned to address this question, as they consist of members and representatives of the press.  Accordingly, they not only have a strong interest in ensuring that their constitutional rights are protected, but also can offer "useful additional analysis" and unique insight into the question posed by the Court.  *Greater Hells Canyon Council*, 2018 WL 438924, at *1.

As set forth in the attached brief, the Court cannot and should not adopt the proposed restriction on the definition of "Journalist" in the TRO.  The First Amendment bars any system that would require journalists to be licensed—by the government, third party, or otherwise—to gather and report the news.  And a regime that outsources registration or licensing to a non-governmental entity, like the ACLU, pursuant to an order of the Court, would pose the same constitutional concerns as any direct governmental licensing regime, one of the primary constraints on an independent press that the First Amendment was ratified to prohibit.

The proposed News Media Amici appreciate that the Court is concerned with how to effectively ensure compliance with its TRO.  For the reasons detailed in the attached brief, if the Court determines that a modification to the TRO is needed, the News Media Amici urge the Court to adopt a test that asks whether, under the totality of the circumstances, an officer knows or has reason to know that a person is a journalist.  The News Media Amici set forth additional detail about why this test is appropriate, and how it would function, in the attached brief.

## **CONCLUSION**

For the foregoing reasons, the News Media Amici respectfully request leave to file the attached brief.

Dated: August 5, 2020                                       Respectfully submitted,

/s/ Duane A. Bosworth
Duane A. Bosworth, OSB #825077
DAVIS WRIGHT TREMAINE LLP
1300 S.W.  Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
duanebosworth@dwt.com

*Counsel of Record for Amici*

Page 8 - UNOPPOSED MOTION FOR LEAVE TO SUBMIT BRIEF AS AMICI CURIAE AND SUPPORTING MEMORANDUM

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Katie Townsend
Gabe Rottman
Adam A. Marshall
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org
grottman@rcfp.org
amarshall@rcfp.org
*Of counsel for Amici*

Page 9 - UNOPPOSED MOTION FOR LEAVE TO SUBMIT BRIEF AS AMICI CURIAE AND SUPPORTING
MEMORANDUM

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Duane A. Bosworth, OSB #825077
DAVIS WRIGHT TREMAINE LLP
1300 S.W.  Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
duanebosworth@dwt.com
*Counsel of Record for Amici*

*Katie Townsend
*Gabe Rottman
*Adam A. Marshall
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org
grottman@rcfp.org
amarshall@rcfp.org
*Of counsel for Amici*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, et al. | Case No. 3:20-cv-1035-SI |
| Plaintiffs, | |
| v. | **BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 16 NEWS MEDIA ORGANIZATIONS** |
| **CITY OF PORTLAND**, et al., | |
| Defendants | |

Pursuant to the Court's Scheduling Order of July 31, 2020, *amici* the Reporters Committee for Freedom of the Press, Eugene Weekly, Gales Creek Journal, KPTV-KPDX Broadcasting Corporation, Malheur Enterprise, News-Register Publishing Co., Oregon Association of Broadcasters, Oregon Newspaper Publishers Association, Oregon Public Broadcasting, The Oregonian, Pamplin Media Group, Portland Business Journal, Reuters News & Media Inc., Salem Reporter, Society of Professional Journalists Oregon Territory Chapter, TEGNA Inc. / KGW-TV (Portland), and Underscore.news respectfully submit this brief opposing any modification of the Court's Temporary Restraining Order (ECF No. 84) (the "TRO") that would amend the definition of "Journalist" to include only individuals authorized by the ACLU of Oregon.

The Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of journalists and news organizations.

Eugene Weekly, locally owned since 1982, is an alternative news weekly covering news, arts and entertainment in Lane County, Oregon.  EW focuses on investigative and solutions journalism that affect the community and the state.

The Gales Creek Journal (formally, Gales Creek Journal LLC) is a news organization headquartered in Gales Creek, Oregon.  It publishes the Gales Creek Journal, the Banks Post, and the Salmonberry Magazine.

KPTV-KPDX Broadcasting Corporation owns and operates KPTV (Fox) and KPDX (MyNetwork) in the Portland, Oregon Designated Market Area.

The Malheur Enterprise is a news organization based in Vale, Oregon, that operates a news website and publishes a weekly newspaper primarily serving Malheur County. The Enterprise is represented by its publisher Les Zaitz.

The News-Register Publishing Company, family-owned since 1928, publishes the twice-weekly News-Register community newspaper, in print and online, from offices in McMinnville, OR. We are an active member of Oregon Newspaper Publishers Association, the National Newspaper Association and America's Newspapers, and our journalism interests extend to print services for other newspapers and our own production of specialty publications.

The Oregon Association of Broadcasters ("OAB") is a non-profit trade organization representing approximately 100 radio stations and 25 television stations in Oregon.

Oregon Newspaper Publishers Association is a trade association organized to represent the common interests of Oregon newspapers. One of those interests is to further the public's understanding that strong newspapers are the cornerstone of a democratic society. ONPA represents all the dailies and most of the weeklies in Oregon, currently 96 publications.

Oregon Public Broadcasting (OPB) is a nationally-recognized leader in public media, reaching 1.5 million people across Oregon and southwest Washington each week through its network of television and radio stations, and robust online programming. With award-winning journalists and original series, OPB's mission is to illuminate the people, places, and issues of the region and put stories into context.

The Oregonian/OregonLive (formally, Advance Local d/b/a Oregonian Media Group) is a news organization based in Portland, Oregon. It publishes The Oregonian newspaper and the website www.oregonlive.com and publishes a variety of digital and mobile news applications. The Oregonian has won Pulitzer Prizes for its journalism, including the award for breaking news

reporting in 2007.

Pamplin Media Group is a news organization that publishes the Portland Tribune and 24 other physical newspapers and digital content in Oregon.

The Portland Business Journal, published by American City Business Journals, Inc., is Portland's premier business publication providing comprehensive coverage of the local economic landscape with breaking news, in-depth industry analysis, market leads, and over 35 annual award and networking events.

Reuters, the world's largest international news agency, is a leading provider of real-time multi-media news and information services to newspapers, television and cable networks, radio stations and websites around the world. Through Reuters.com, affiliated websites and multiple online and mobile platforms, more than a billion professionals, news organizations and consumers rely on Reuters every day. Its text newswires provide newsrooms with source material and ready-to-publish news stories in nine languages and, through Reuters Pictures and Video, global video content and over 1,600 photographs a day covering international news, sports, entertainment, and business. In addition, Reuters publishes authoritative and unbiased market data and intelligence to business and finance consumers, including investment banking and private equity professionals.

Salem Reporter is an all-digital news organization based in Salem, Oregon, that operates a news website serving the state's capital city.

The Oregon Territory Chapter of the Society of Professional Journalists ("SPJ Oregon") is dedicated to improving and protecting journalism. It is a chapter of the national Society of Professional Journalists, the nation's most broad-based journalism organization. Founded in 1909 as Sigma Delta Chi, the Society of Professional Journalists promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists,

and protects the First Amendment guarantees of freedom of speech and press. SPJ Oregon maintains a Freedom of Information committee, lobbies on behalf of open records and government transparency and defends press freedom.

TEGNA Inc. owns or services (through shared service or similar agreements) 64 television stations in 52 markets, including KGW-TV, the NBC affiliate in Portland.

Underscore Media Collaboration, Inc., is a nonprofit news organization based in Portland, Oregon. We publish investigative reporting including coverage of Indian Country and disseminate our work by partnering with other media including broadcast, online and print. Our work can be found on our website, underscore.news. Underscore began operations on January 15, 2019.

## INTRODUCTION

For weeks, journalists have been covering protests in Portland and around the country, fulfilling their constitutionally recognized role as the "watchful eyes" and "guardian of the public interest." TRO at 2 (quoting *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012)). As the Court noted, federal agents of Defendants U.S. Department of Homeland Security and the U.S. Marshals Service (collectively, the "Federal Defendants") have engaged in "violence, threats, or intimidation" towards journalists, including the named Plaintiffs in this matter. *See* TRO at 10. Such conduct, as this Court rightly recognized, poses a "real and immediate threat of repeated injury" to Plaintiffs' First Amendment rights. TRO at 11. Accordingly, the TRO enjoined the Federal Defendants and their agents and employees from interfering with journalists' newsgathering. *Id.* at 18–19.

Following the Federal Defendants' motion for modification of the TRO, ECF No. 101, and a hearing on July 31, 2020, the Court invited briefing on whether it should, *inter alia*, "restrict the definition of 'Journalist'" to a "professional or authorized journalist" who has been given a vest

by the ACLU of Oregon.  Order, ECF No. 108.  The Court cannot and should not adopt such a restriction.  A regime that outsources registration or licensing to a non-governmental entity like the ACLU, pursuant to an order of this Court, would pose the same constitutional concerns as any direct governmental licensing regime, one of the *primary constraints* on an independent press that the First Amendment was ratified to prohibit.

Not only would such a regime itself be injurious to the First Amendment and journalists' ability to engage in newsgathering, but it would not solve the practical issues complained of by the Federal Defendants; indeed, it could exacerbate them by creating a single indicator of one's status as a journalist.  Instead, to the extent the Court believes clarification of the TRO is necessary, it should evaluate the Federal Defendants' compliance according to whether a reasonable officer, under the totality of the circumstances, knew or should have known that they were interacting with a member of the press.

*Amici* provide a non-exhaustive list of indicia below strongly suggestive of an individual's status as a member of the press.  None are dispositive, and other indicia could exist whereby a reasonable officer should know or would have reason to know an individual is a journalist.  But, to the extent the Court is seeking clarity on what a member of the press covering a protest "looks like," *amici* offer these examples for the Court's consideration.

*Amici* appreciate that this Court has recognized the importance of the First Amendment issues at stake and is striving to ensure such rights are protected in the context of multifaceted and quickly-evolving events.  *Amici* also recognize that officers face complicated issues while policing protests.  But law enforcement's challenges must not supersede the freedoms protected by the First Amendment.  Indeed, those rights must be respected all the more in times of crisis.

## ARGUMENT

**I.**     **Journalists are defined by the function they perform, not governmental registration or licensing.**

"The First Amendment prohibits any law 'abridging the freedom of speech, or of the press[.]'" TRO at 13 (citing U.S. Const., amend. I).  Thus, it is well-settled that any prior restraint against the press faces "a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (quotation omitted).   Indirect restrictions on the press have long (and appropriately) been viewed with the same skepticism.[1]  For example, citing England's many efforts to restrict freedom of the press, including the required licensing of printers, the Supreme Court has overturned laws that have similar restrictive effects on members of the press as violative of the First Amendment.  *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) (holding unconstitutional a 2% tax on gross receipts of newspapers with circulation of more than 20,000 per week).

The First Amendment bars any system that would require journalists to be licensed—by the government, third party, or otherwise—to gather and report the news.  Such a system would constitute both an unconstitutional prior restraint and an unacceptable impediment to the public's right to know.  *See*, *e.g.*, *New York Times Co.*, 403 U.S. at 714; *Grosjean*, 297 U.S. at 250 (tax on press was unconstitutional because it would "limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties.").  Indeed, licensing is often used by repressive regimes around the world "to control the press[,]" for example, by "issu[ing] press cards

---

[1] The application of the 1712 Stamp Act to the American colonies was opposed by John Adams on the grounds that it was part of "a design . . . to strip us, in a great measure, of the means of knowledge, by loading the press, the colleges, and even an almanac and a newspaper, with restraints and duties."  Eric Neisser, *Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas*, 74 Geo. L.J. 257, 263–64 (1985).

only to journalists certified to follow the official line."  Steven Strasser, *Registering Reporters: How Licensing of Journalists Threatens Independent News Media* at 4, National Endowment for Democracy (Nov. 23, 2010), https://perma.cc/W67T-4UWY.  The power to license is "the power to shape the national agenda, to provide the raw material of history books—in short, to dictate the news."  *Id.* at 6.  The First Amendment was enacted precisely to prevent such restrictions.

Credentialing of journalists in the United States is usually reserved for specific situations where there are physical limitations, such as allocating space in a briefing room or assigning a pool reporter to accompany a political official in a plane.  *See, e.g.*, Don Gonyea, *Reporters Give Unique Peek of White House*, NPR (Jul. 23, 2007), https://perma.cc/V8RJ-LBLU.  In such situations, it is often the press themselves—not the government entity or third parties—that organize these efforts, such as the White House press corps or correspondents' organizations who rotate pool reporters.  And, in any event, such processes *do not* define "journalism" or "journalist."

To the extent the law in the United States engages in an inquiry of who is a journalist, it does so functionally, considering the activity being performed and its role in a democratic society.  Oregon's shield law, for example, protects "person[s] connected with, employed by or engaged in any medium of communication to the public."  Or. Rev. Stat. § 44.520(1).  The federal Privacy Protection Act, likewise, protects the work product of persons "reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication[.]" 42 U.S.C.A. § 2000aa(a).  And the federal Freedom of Information Act defines a "representative of the news media" as someone who "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."  5 U.S.C. § 552(a)(4)(A)(ii)(III).  These flexible, functional tests appropriately include not just reporters who are employed by major news outlets, but

freelancers and independent media across a wide spectrum of publishing platforms.

The functional role of the press, as this Court rightly recognized, is essential for the public to be informed about the workings of their government. *See* TRO at 13 ("By *reporting* about the government, the media are 'surrogates for the public.'" (emphasis added) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)); *Id.* ("'[t]he Supreme Court has recognized that newsgathering is *an activity* protected by the First Amendment.'" (emphasis added) (quoting *United States v. Sherman,* 581 F.2d 1358, 1361 (9th Cir. 1978)). That role is fundamentally incompatible with any licensing, pre-approval, or authorization regime.

## II.    The Court cannot require a private organization to credential journalists; to the extent the TRO needs clarification, the Court should evaluate Defendants' compliance according to an objective, totality of the circumstances test.

Following the Federal Defendants' motion for reconsideration of the TRO, ECF No. 101, the Court requested briefing on whether it should "restrict the definition of 'Journalist' covered by the TRO to a person who is a professional or authorized journalist and who has been issued a colored and distinctive vest prominently indicating 'ACLU Authorized Press' (or other similar words) by the ACLU of Oregon." Order, ECF No. 108. It cannot and should not, for the reasons set forth in Section II(A) below. If the Court believes additional clarity is needed for the purposes of enforcing the TRO, it should adopt a totality of the circumstances test to determine whether an officer knows or has reason to know a person is a journalist, as set forth in Section II(B).

A.    The ACLU cannot be required to license journalists.

Any mandatory licensing regime for journalists would be presumptively unconstitutional. It is of no moment whether such licensing is conducted by the government or a third party. It is well-established that the press and public have "a First Amendment right to record police activity in public." *Fields v. City of Philadelphia*, 862 F.3d 353, 355 (3d Cir. 2017) (collecting cases from

First, Fifth, Seventh, Ninth, and Eleventh Circuit Courts of Appeal).  The Court's TRO properly recognizes that right, enjoining the Federal Defendants from violating Plaintiffs' and other journalists' constitutional rights.  But limitations on *which* members of the press are protected by the Court's TRO would also effectively limit those constitutional rights.  And as this Court recognized, any limitation on that right can only come if there is an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  TRO at 15 (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986)); *see also New York Times Co.*, 403 U.S. at 714; *Grosjean*, 297 U.S. at 250.  The Federal Defendants have come nowhere close to showing there is an "overriding interest" that would warrant such a limitation.  Putting the onus on journalists to "establish" their right to engage in newsgathering impermissibly flips this burden.

Further, as the ACLU of Oregon/Plaintiffs themselves recognize, *see* Pls.' Mem., ECF No 112 at 18–21, they are not qualified, and have no desire, to operate a licensing regime for journalists.  As set forth above, journalism is an activity that is performed, not a status that is bestowed.  Any criteria by which the ACLU might try to decide, *a priori*, who qualifies as a journalist would misconstrue the nature of the press and run headlong into serious First Amendment concerns, as such a licensing program would be both under- and over-inclusive.  On the one hand, news organizations need flexibility to assign reporters based on what is happening in any given moment, and where and when it is happening.  If a demonstration spontaneously erupts outside the home of an *Oregonian* reporter, they may well need to cover it but not have time to be "licensed" by the ACLU or receive a vest.  That reporter is no less deserving of protection for their newsgathering.  Indeed, in such a situation the effective *elimination* of the ability to gather information is not only injurious to the First Amendment, but also raises due process concerns.

*See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (finding likelihood that revocation of White House press pass violated due process, and noting "stringent vagueness [and fair-notice] test" when "important first amendment rights" are at stake (citations omitted)); *Sherrill v. Knight*, 569 F.2d 124, 130–31 (D.C. Cir. 1977) (holding reporters have liberty interest in White House press passes, the removal of which implicates due process requirements).

On the other hand, in the absence of any meaningful basis to determine who is or is not a journalist, the ACLU would be likely to simply "approve" everyone who asks, which would do nothing to help the Court, law enforcement, or the press. For instance, any "colored and distinctive vest" the ACLU would hand out to "authorized" journalists would likely be easily replicated, further confusing the situation on the ground. And, at the end of the day, having or not having a vest has no effect on law enforcement's ability to arrest someone if there is probable cause they have committed a crime. *See* TRO at 18. Thus, any attempt to license journalists as "authorized" would be both be over- and under-inclusive and possibly counter-productive.

B.  <u>To the extent clarity is needed, the Court should adopt an objective, totality of the circumstances test to determine whether an officer knows or has reason to know a person is a journalist.</u>

*Amici* appreciate that the Court is concerned with how to effectively ensure compliance with its TRO. If a modification is needed to assist in determining who should be protected by the TRO, the Court should adopt a test that asks whether, under the totality of the circumstances, an officer knows or has reason to know that a person is a journalist. Such a test would be fact-specific, and evaluate a number of factors, including (but not limited to):

- Whether the individual is carrying a press pass or badge, or have other written material on their person or clothing identifying them as a member of the press, such as a business card or letter from their employer;

- Whether the individual orally identifies themselves as a member of the press;

- Whether the individual's dress suggests that the individual is engaged in newsgathering, such as wearing reflective materials;

- Whether the individual is carrying and/or using audio, photo, or video recording equipment (and there should be a presumption that individuals carrying professional recording equipment are members of the press[2]);

- Whether the individual is actively engaged in newsgathering, such as conducting interviews, broadcasting, or documenting events;

- Whether the individual generally is physically separated from protesters, when possible; and

- Whether the individual is compliant with lawful police orders.[3]

Crucially, this list of indicia is not exhaustive, and no one indicator should be dispositive. Ultimately, the test is whether a reasonable officer—with appropriate training—would know, or should know, that an individual is a working journalist. While there may be cases on the margins where this determination becomes fact-specific, in many of the cases documented in Portland and around the country, it has not been. For instance, targeting a clearly identifiable journalist with less-lethal munitions, *see, e.g.*, TRO at 7–9 (recounting shootings of photojournalists Justin Yau, Jungho Kim, and Noah Berger with less-lethal munitions) or arresting a reporter wearing a press badge, who is otherwise compliant with lawful police orders, are not close cases.[4]

Such a test would have several benefits. First, it appropriately places the burden of

---

[2] Which is not to say that individuals using personal mobile phones or other equipment to document police activity—conduct that has become routine during the protests—should not be protected; they should. There have, however, been instances where camera crews have been arrested or targeted, which is a clear constitutional violation, and therefore warrants an affirmative presumption that they are press.

[3] Recognizing the important role of the press, the TRO properly states that members of the news media are not required to disperse following the issuance of an order to disperse, and cannot be arrested for not dispersing. TRO at 18.

[4] *See, e.g.*, *Minnesota police arrest CNN team on live television*, CNN (May 29, 2020), https://www.cnn.com/videos/us/2020/05/29/minneapolis-protests-omar-jimenez-arrested-newday-vpx.cnn.

compliance with the Constitution on the Federal Defendants, not the press. *Cf. Press-Enterprise Co.*, 478 U.S. at 9; *New York Times Co.*, 403 U.S. at 714; *Grosjean*, 297 U.S. at 250. That burden is not only constitutionally appropriate, but it also leverages the abilities of the Federal Defendants, who describe themselves as "specially trained" and "capable of conducting complex and sensitive operations." Decl. of Andrew Smith, ECF No. 101-1 at ¶ 5.

Second, this test aligns with both the nature of newsgathering and the First Amendment, *see supra* Section I, by not limiting, *a priori*, which journalists qualify for constitutional protections. It also avoids the inevitable line-drawing problems associated with having a third-party attempt to credential the press before covering an event.

Third, it provides flexibility for a wide array of circumstances. As noted, it might be perfectly clear that an individual is a member of the press—for example, they are set up with a camera and tripod, have press badges, and are filming protesters from across a street. Such persons should clearly not be targeted by officers of Federal Defendants. In other, closer, circumstances, an objective test that evaluates what the officer knew or should have known aligns with other tests, such as whether a defendant is entitled to qualified immunity. *See, e.g.*, *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citation omitted)). The Court itself suggested a similar approach in the TRO, enjoining interference with persons who the Federal Defendants "know[s] or reasonably should know" is a journalist. TRO at 18–19. Thus, if there is a question about compliance with the TRO, both sides may present evidence and argument concerning the facts on the ground for the Court to evaluate whether the officer's interpretation of who they were interacting with was reasonable.

Fourth, this test ensures that even in close cases, law enforcement may still arrest persons if there is probable cause they have committed a crime. *Id.* Journalists are trained not to engage in illegal conduct, but if someone who purports to be a member of the press does so, they would be subject to arrest just like anyone else.

Finally, in addition to the test outlined above, there is nothing constitutionally suspect about inviting members of the press to voluntarily inform the Federal Defendants or local law enforcement that they intend to cover an event and to provide their names and contact information. Such a voluntary system would provide greater clarity, at least in some instances, without the constitutional issues associated with licensing. That said, failure to provide one's name or affiliation to Federal Defendants in advance cannot obviate the constitutional protections for newsgathering articulated above.

## **<u>CONCLUSION</u>**

For the reasons stated herein, *amici* oppose any modification of the TRO that is not fully compatible with, and supportive of, the First Amendment rights of the press.

DATED: August 5, 2020                                  Respectfully submitted,

/s/ Duane A. Bosworth
Duane A. Bosworth, OSB #825077
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 241-2300
duanebosworth@dwt.com
*Counsel of Record for Amici*

Katie Townsend
Gabe Rottman
Adam A. Marshall
THE REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org
grottman@rcfp.org
amarshall@rcfp.org
*Of counsel for Amici*