**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>        Defendants. | Case No. 3:20-cv-1035-SI<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF EXTENDING THE TRO WITH LIMITED MODIFICATIONS** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 5

ARGUMENT..................................................................................................................... 6

I.      THIS CASE IS FAR FROM MOOT............................................................. 6

II.     COMPLYING WITH THE TRO NEITHER INHIBITS LAW
        ENFORCEMENT NOR EXPOSES FEDERAL AGENTS TO ANY
        DANGER....................................................................................................... 9

III.    THE COURT SHOULD MODIFY THE TRO AS PLAINTIFFS
        REQUESTED ................................................................................................13

IV.     THE COURT CORRECTLY DETERMINED THAT OFFICIALS
        WOULD NOT ENJOY QUALIFIED IMMUNITY FOR VIOLATIONS
        OF THE TRO................................................................................................17

CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ...........................................................................................19
*Bayer v. Neiman Marcus Grp., Inc.,*
  861 F.3d 853 (9th Cir. 2017).........................................................................8, 10
*Bennett v. Williams,*
  464 U.S. 932 (1983) ...........................................................................................19
*Bivens v. Six Unknown Narcotics Agents,*
  403 U.S. 388 (1971) ...........................................................................................18
*City of Los Angeles v. Lyons,*
  461 US. 95 (1983)..................................................................................8, 11, 12
*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..............................................................................................8
*Dolihite v. Maughon By & Through Videon,*
  74 F.3d 1027 (11th Cir. 1996)............................................................................19
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000).........................................................................................7, 8
*Gates v. Collier,*
  349 F. Supp. 881 (N.D. Miss. 1972) ..................................................................18
*Gompers v. Buck's Stove & Range Co.,*
  221 U.S. 418 (1911) ...........................................................................................17
*Hartnett v. Pennsylvania State Educ. Ass'n,*
  963 F.3d 301 (3d Cir. 2020)................................................................................8
*Hines v. Youseff,*
  914 F.3d 1218 (9th Cir. 2019)............................................................................20
*Hundley v. Parker,*
  69 F.3d 537 (6th Cir. 1995)................................................................................19
*In re Crowley,*
  2012 WL 4038445 (W.D. Mich. Sept. 13, 2012).........................................18, 19
*Jackson v. Mississippi,*
  644 F.2d 1142 (5th Cir. 1981)............................................................................18
*Klemp v. Columbia Collection Serv., Inc.,*
  2014 WL 204013 (D. Or. Jan. 17, 2014) ............................................................8
*Leigh v. Salazar,*
  677 F.3d 892 (9th Cir. 2012)..............................................................................20
*Lemon v. Kurtzman,*
  411 U.S. 192 (1973) ...........................................................................................14
*Mitchell v. Forsyth,*
  472 U.S. 511 (1985) ...........................................................................................18
*Pugh v. Locke,*
  406 F. Supp. 318 (M.D. Ala. 1976) ..............................................................18, 19

*Rambo v. Morehouse Par. Sch. Bd.*,
    37 F. Supp. 2d 482 (W.D. La. 1999).................................................................................18
*Salazar v. Buono*,
    559 U.S. 700 (2010) .........................................................................................................8
*Williams v. Bennett*,
    689 F.2d 1370 (11th Cir. 1982) .......................................................................................19

Statutes

18 U.S.C. § 401(3) .................................................................................................................17

Rules

Fed. R. Civ. P. 65(d)(2)...................................................................................................19, 20

Plaintiffs respectfully submit this reply in support of their motion to extend and modify the temporary restraining order against the federal agents.

## **INTRODUCTION**

The federal agents' main argument against extending the TRO is that it is moot. This is, to borrow a term, fake news. In their own words:

> There has been no reduction in federal presence; federal law enforcement officers remain in Portland at augmented levels. Reports and implications to the contrary are irresponsible and dishonest.

(Declaration of Athul Acharya ("Acharya Decl."), Ex. 1 at 1 (copy of DHS's August 4 press release).) This is a legal proceeding, not a PR tweetstorm. It does not become moot simply by the federal agents' own say-so, especially not when the same parties assert in other fora that "the situation remains dynamic and volatile, with acts of violence still ongoing, and no determination of timetables for reduction of protective forces has yet been made." (*Id.* at 2.) That federal agents have stopped policing the protests for now does not meet the stringent standard for mootness—especially not when they are saying publicly that they can and will resume their mayhem in the streets of Portland whenever the spirit takes them.

The federal agents' next argument, that the TRO is unworkable, is simply a rehash of their motion for reconsideration. Commanding officer Gabriel Russell admitted under oath that wearing "press" insignia neither immunizes people who break the law nor hinders agents from arresting such people. The federal agents still cannot identify any instance where someone marked as "press" used that identification to harm people, avoid arrest, or obtain any type of advantage.

Discovery and investigation have also shown that the declarations submitted with the motion for "reconsideration" are misleading. For example, Mr. Russell admitted under oath that he had not seen in person any of the acts he described in the declaration he submitted to the Court, and that he knew nothing about many of the videos he claimed he had watched. And the federal agents' scary story about a person with a firearm getting behind BORTAC lines is a fabrication. Video evidence shows that the individual who was arrested was *outside* the perimeter

established by the federal agents, and their own complaint concedes that the gun was legal—a

fact they neglected to mention in their reconsideration motion.

Although the federal defendants argue that "tagging" federal agents would be improper,

they also admit that U.S. Marshals are so tagged. Nor is it impracticable. There are many ways to

ensure that each agent is marked with a visible number that neither are costly nor interfere with

functionality, including painting numbers over their existing uniforms.

Finally, the federal agents argue that the portion of the Court's order relating to qualified

immunity is contrary to law. But qualified immunity has never been available in contempt

proceedings. And the Fifth, Sixth, and Eleventh Circuits have all held that a remedial injunction

can clearly establish the rights of those it protects against the specific parties it binds. This

portion of the TRO was thus neither an advisory opinion nor a due-process violation. At worst, it

was dicta—helpful dicta, because it helped the federal agents avoid individual liability.

## ARGUMENT

## I.    THIS CASE IS FAR FROM MOOT

The federal defendants argue that because "the winding-down of the heightened federal

presence [is] well underway," this case—or at least Plaintiffs' request for injunctive relief—is

moot. (Dkt. 113 at 8; *see also* Declaration of Andrew Smith, Dkt. 113-1 ¶ 12; Declaration of

Allen Jones, Dkt. 113-3 ¶¶ 10-12.) But even as they told the Court they were leaving, they told

the public that DHS's withdrawal is a "myth." (Acharya Decl., Ex. 1 at 1.) "Reports and

implications to the contrary," they cautioned, "are irresponsible and dishonest." (*Id.*) Indeed.

Plaintiffs had the opportunity yesterday to depose Gabriel Russell, tactical commander of

all of DHS's forces in Portland. (Acharya Decl., Ex. 2 ("Russell Dep.") at 8:17-23, 16:17-21.) On

the subject of the supposed drawdown, he was unequivocal:

Q: Is Diligent Valor over?

A: It is not.

(*Id.* at 27:8-9.) Nor could he say when it would *be* over. (*Id.* at 45:13-15.) The federal agents

argue that Plaintiffs' fear of injury is speculative, but the true speculation is when (or whether)

they will withdraw from Portland. (*Cf.* Dkt. 113 at 12.) Such hypothetical possibilities cannot suffice to carry the federal agents' "heavy burden" to show that this case is moot. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Mr. Russell's testimony also amply demonstrated that the threat of irreparable harm to Plaintiffs is alive and well. He stated that he is responsible for "making sure that people that [he] tactically command[s] don't use excessive force" and for making sure that they follow the Court's TRO. (Russell Dep. at 72:2-5, 88:2-6.) But neither he nor anyone else at DHS disciplined a single agent for the uses of force described in Plaintiffs' declarations. (*Id.* at 76:20-22 ("Q: Ultimately, zero agents were disciplined? A: I don't know."); Acharya Decl., Ex. 4 at 5 ("DHS admits that it has not disciplined any of its employees related to their treatment of a journalist or legal observer in Portland since May 26, 2020.").) Mr. Russell stated that he did not know which officers or agents were involved in those incidents, but he also took no steps to make it easier to identify agents who harmed journalists in the future.[1] (Russell Dep. at 76:13-19, 94:25-95:4.) Most concerning of all, he could not "say one way or the other" whether the dectuple shooting of Plaintiff Lewis-Rolland would be permissible in the absence of the TRO, or whether the wanton pepper-spraying of Plaintiff Mahoney violated the TRO. (*Id.* at 93:6-13, 99:9-12.)

This is not the testimony of a commander serious about preventing federal agents from intimidating, beating, and shooting journalists and legal observers. Mr. Russell's conduct reflects his agency's attitude. DHS's official guidance to its agents is that if a journalist is not wearing a "press pass, press badge, or a shirt that says 'press,'" agents can "treat them as a normal protestor while dispersing the crowd." (Declaration of Matthew Borden, Ex. 1, Dkt. 120-1 at 2.[2]) That is a

---

[1] He also stated that he had read the declarations in support of Plaintiffs' motion for a TRO and Plaintiffs' motion for contempt, but when questioned on Plaintiff Lewis-Rolland's declaration in support of the former and Plaintiff Mahoney's declaration in support of the latter, he had read neither. (Russell Dep. at 75:13-16, 82:6-9, 95:5-7, 96:4-97:10; *cf.* Dkts. 77, 94.) Nor had he watched the "entire" one-minute video of a federal agent pepper-spraying Ms. Mahoney and her fellow legal observers. (*Id.* at 101:23-24; *cf.* https://tinyurl.com/FedsMaceLOs2.)

[2] The federal defendants will argue, no doubt, that this document is subject to the attorney-client privilege. For the reasons stated in Plaintiffs' opening brief, it is not. (Dkt. 112 at 9-10 n.1.) Mr. Russell provided an additional reason during his deposition. He acknowledged that DHS's

significantly narrower definition of "journalists" than in the Court's TRO, and as such it virtually guarantees that federal agents will violate the TRO. (*Cf.* Dkt. 84 at 19-20 ¶ 4.)

The federal agents argue that for six days, state and local police have handled operations outside the Hatfield Courthouse. (Dkt. 113 at 6.) But, as Mr. Russell acknowledged in his declaration, federal agents were stationed here for *five weeks* before they began their reign of terror. (Declaration of Gabriel Russell ("Russell Decl."), Dkt. 101-5 ¶ 5.) The federal agents argue that if the Court extends this TRO, "every large protest [will] be preceded by, or at least immediately injected with, a prophylactic TRO because a set of protesters or observers has a generalized fear that the situation will degrade in a particular speculative manner." (Dkt. 113 at 8-9.) But only *this* city has seen 68 days of protest and 26 days of non-stop federal violence.

Article III does not demand that the Court blind itself to such fresh history. The federal agents' continued presence and flip attitude towards Plaintiffs' First Amendment rights would be sufficient to give Plaintiffs standing to file suit today. But even if the prospect that federal agents will resume their harmful conduct were "too speculative to support standing, [it would not be] too speculative to overcome mootness." *Friends of the Earth*, 528 U.S. at 190.[3] The federal agents rely on *Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (plurality op.), but that case involved an Act of Congress that vitiated the plaintiff's original argument—and even then the Court merely remanded for the lower courts to analyze the case under the right standard. *Id.* at 721-22. Here, the federal agents have hardly "made clear" that their conduct "could not reasonably be expected to recur." (*Cf.* Dkt. 113 at 13 (quoting *Bayer v. Neiman Marcus Grp.*,

---

general counsel had provided instructions to comply with the TRO, and that DHS agents follow those instructions; stated his view that if they follow those instructions they will not violate the TRO; and confirmed that he would rely on those instructions to evaluate an allegation that an agent had violated the TRO. (Russell Dep. at 87:8-19, 88:20-19:4.) In so doing, Mr. Russell "put[] the privileged information at issue and, therefore, impliedly waive[d] the privilege." *Klemp v. Columbia Collection Serv., Inc.*, 2014 WL 204013, at *3 (D. Or. Jan. 17, 2014).

[3] The federal agents also rely on *City of Los Angeles v. Lyons*, 461 US. 95, 111 (1983), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), but those are standing cases, and standing and mootness are "two distinct justiciability doctrines." *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020) (quotation marks omitted).

*Inc.*, 861 F.3d 853, 864 (9th Cir. 2017)).) Indeed, their statements and actions only *support* the continued vitality of Plaintiffs' claim. (Acharya Decl., Ex. 1.)

As long as the situation in Portland remains—in DHS's words—"dynamic and volatile," Plaintiffs need the Court's protection to continue their vital reporting and observing. (*Id.* at 2; *see, e.g.*, Russell Dep. at 115:19-116:3 (agreeing that a local freelance journalist's reporting on the protests was "[a]bsolutely" a good thing).) The federal agents have not carried their heavy burden to show that this case or Plaintiffs' need for injunctive relief are moot. Not even close.

## II.   COMPLYING WITH THE TRO NEITHER INHIBITS LAW ENFORCEMENT NOR EXPOSES FEDERAL AGENTS TO ANY DANGER

With regard to workability, the federal agents argue, first, that attempting to comply with the TRO "will hamstring federal officers in their duties." (Dkt. 113 at 10-13.) They argue next that lawbreakers are pretending to be press using indicia set forth in the TRO. (*Id.* at 13-15.) If these arguments sound familiar, they are. They are exactly the same arguments the federal agents made in their motion for reconsideration. (*See generally* Dkt. 101.) What is more, these arguments rely on exactly the same evidence.[4] And they have exactly the same flaw: The federal agents still have not identified a single instance of a person masquerading as press harming a federal agent or anyone else. Plaintiffs' opening brief explains why: The TRO already contains the necessary safety valves to permit officers to enforce the law, which is why the Portland police seemingly have had few of the workability issues that federal agents describe. (Dkt. 112 at 14-18.)

Since Plaintiffs filed their opening brief, additional discovery and investigation have revealed several inconsistencies, omissions, and even some falsehoods in the federal agents' submissions to the Court. The federal agents claim, for instance, that "individuals purporting to

---

[4] The federal agents offer one new citation: A tweet attaching a photo of a protester wearing a hardhat with the word "press" scrawled on it in black marker. (Dkt. 113 at 13-14 & n.3 (citing @Julio_Rosas11, Twitter (Aug. 1, 2020, 6:04 A.M.), https://twitter.com/Julio_Rosas11/status/1289547507819675648).) They do not explain what law the protester broke, how his "press" hat prevented them from enforcing any such law, or any other operational difficulty he created.

be press or legal observers have been engaged directly in illegal activity." (Dkt. 113 at 18.) They

cite one example from July 22 that, on paper, sounds legitimately scary:

> BORTAC SOG members observed a subject holding a shield with "PRESS"
> written on it. After seeing the word "PRESS" the BORTAC SOG team moved
> past the individual. After moving past the subject, the BORTAC team lead looked
> back and observed U.S. Marshal Service employees taking the subject into
> custody. The subject was later reported to have a .380 ACP caliber pistol in their
> possession.

(NZ-1 Decl., Dkt. 101-6 ¶ 9.[5]) But this is a far cry from what happened.

Plaintiffs' investigation established that the individual in question is one Taylor Lemons.

(Acharya Decl., Ex. 3.) His criminal complaint describes how, before he was arrested, "the

USMS tactical team established a perimeter in front of the [Hatfield Courthouse]." (*Id.* at 4 ¶ 7.)

It explains that Mr. Lemons never breached that perimeter. (*Id.* ¶ 8.) It also says that he charged

at police. (*Id.*) The video of his arrest, however, tells a different tale. It shows that a federal agent

actually charged at Mr. Lemons, apparently with neither warning or provocation. (Acharya Decl.

¶ 7.[6])

The federal agents' declarations omit all these key facts. (Dkt. 101-7 ¶ 10; Dkt. 101-6 ¶ 9;

Dkt. 106-1 ¶ 8.) They also omit that "[s]imultaneous to the weapon being found," Mr. Lemons

told the federal agents that he had the weapon. (Acharya Decl., Ex. 3 at 5 ¶ 10.)  Finally, the

complaint—unlike the federal defendants—notes that "[i]nitial checks indicate that [Mr.

Lemons] has a valid [concealed-carry] permit." (*Id.*) Plaintiffs explained yesterday that there was

no evidence that the gun was illegal, that this individual was charged with any gun crime, or that

he was behind police lines. (Dkt. 112 at 16-17.) The publicly available facts about this arrest—

which the federal defendants failed to disclose—bear this out.

---

[5] This incident took place *before* the Court issued the TRO against the federal defendants. If it is
the TRO that has made things unworkable, it is unclear why the BORTAC team would have
allowed someone holding a shield to move past them pre-TRO. In fact, the video of this arrest,
described below, casts serious doubt on CBP NZ-1's description of this incident.

[6] https://youtu.be/1vcM5KMAwkY.

More infelicities can be found in Mr. Russell's sworn declaration. He recounted seven "incidents" involving alleged lawbreakers and miscreants in press insignia that he "personally observed." (Russell Decl. ¶ 8(b)-(h).) During Mr. Russell's deposition, however, it quickly became apparent that he had "personally observed" only videos that others had taken.[7] (Russell Dep. at 118:12-18.) But even with that caveat, his personal knowledge contained curious gaps:

- Mr. Russell stated that he watched "the entire" video he cited in ¶ 8(c).[8] (Russell Dep. at 108:18-20.) He was unaware, however, that it was a compilation of other videos that had been edited together, even though it contains over a dozen cuts, rewinds, and slowdowns. (*Id.* at 108:21-109:1, 119:4-8.) He was also under the impression that the video was a livestream or a livestream aggregator. (*Id.* at 111:5-7.) Again, the video rewinds several times.

- Mr. Russell was also unaware that the link he provided in ¶ 8(d)[9] was the homepage for the channel that posted the video in ¶ 8(c). (Russell Dep. at 109:5-11.) When shown the webpage at the link in ¶ 8(d), he did not recognize it, even though he said he had visited that link. (Russell Dep. at 109:19-25; Acharya Decl., Ex. 5.)

- Mr. Russell stated in ¶ 8(g) that he viewed a video[10] of a person in a "press" helmet who was "participating in the destruction of . . . the security fence around the federal facility." Upon questioning, however, he admitted that the individual in question was not actually cutting the fence. (Russell Dep. at 115:2-3.) He testified that they were shielding the destruction of the fence with an umbrella. (*Id.* at 114:16-115:1). That is not borne out by the video either. Finally, he admitted that he couldn't tell whether they were taking photos or recording video because "[t]heir hands are kind of

---

[7] Mr. Russell's reliance on these videos is ironic given his reluctance to make judgments about incidents involving his agents that were captured on video. (*E.g.*, Russell Dep. at 119:9-14.)

[8] https://m.youtube.com/watch?v=Xw0oBvnDIF0.

[9] https://www.youtube.com/channel/UCrd8pqGrih24-HBofVYgDDg.

[10] https://twitter.com/itsmikebivins/status/1287280283037741064.

obscured in front." (*Id.* at 115:4-16.) In sum, over the course of the discussion, the person with the "press" helmet transformed from an impostor helping others destroy the fence, into someone doing nothing illegal, into someone who may indeed have been recording video or taking photos.

In addition, Mr. Russell confirmed in a number of ways that he videos he watched did not evince any difficulties for law enforcement. For example, in ¶ 8(e)-(f), he cited two videos[11] posted by Plaintiff Sergio Olmos to Twitter in which a protester admitted to wearing a shirt that said "press" in an effort to avoid being (repeatedly) assaulted by federal agents. Mr. Russell could not explain, however, how the protester's running toward the fence was illegal or how his wearing the "press" shirt hampered law enforcement. (Russell Dep. at 113:10-114:4.) And the federal agents omit that within *twelve hours* of Mr. Olmos posting the video, this individual had transformed his position:[12]



So quick and resounding was the public outcry against this behavior that it made Mr. Paape undertake a complete 180° and advocate for the opposite position—again, less than twelve hours

---

[11] https://twitter.com/MrOlmos/status/1286944321107763200; https://twitter.com/MrOlmos/status/1286937714483314690.

[12] @TheBrandonPaape, Twitter (July 26, 2020, 1:28 P.M.), https://twitter.com/TheBrandonPaape/status/1287485051899277312.

after he went viral. This is all public information, and it happened *three days* before the federal agents filed Mr. Russell's declaration.

Similarly, in ¶ 8(h), Mr. Russell cited a video[13] showing an individual wearing a helmet with the word "press" written on the side who had crossed the barrier protecting the Hartfield Courthouse and was calling on others to come join him. As the Court observed, this is the individual who said, "That's why we have a Second Amendment." (Status Conf. Tr. 8:4-12 (July 31, 2020).) But Mr. Russell admitted under questioning that the press helmet did not change the legality of hopping over the fence, did not affect officers' ability to determine that there was probable cause to arrest that person, and would not have prevented officers from arresting the person. (Russell Dep. at 117:6-118:5.) He was unable to say, however, whether the person was actually arrested, and he "d[id]n't believe" the person had been charged with any crime. (*Id.* at 118:6-11.)

In sum, contrary to the federal agents' arguments, the TRO is perfectly workable. If federal agents have probable cause to believe a person is committing a crime, the TRO grants that person no immunity. If federal agents choose to arrest a person, the TRO offers that person no invulnerability. If a person wearing press indicia is mingled with protesters lawfully being dispersed, the TRO shields federal agents from liability for incidentally exposing that person to crowd-control devices. The safety valves are built in. The only workability issue under the TRO has been the federal defendants' failure to comply with its terms.[14]

## III.    THE COURT SHOULD MODIFY THE TRO AS PLAINTIFFS REQUESTED

Plaintiffs asked the Court to modify the TRO to require federal agents who leave federal property while on duty to mark themselves with large identifying codes. The federal agents argue that this relief is irrelevant to the case and harmful to officer safety. Neither assertion is true. In

---

[13] https://twitter.com/i/status/1288381715153477632.

[14] Without a hint of irony, the federal defendants argue that their "attempting to comply with the TRO will . . . endanger the safety of . . . members of the press." (Dkt. 113 at 10.) This defies both logic and experience. The record is replete with declarations of legal observers and journalists who suffered grievous injuries at the hands of the federal defendants. (*See, e.g.*, Dkt. 112 at 8-9.)

addition, Plaintiffs have new evidence to support prohibiting federal agents from leaving federal property entirely while on duty.

**The ability to identify agents who violate the TRO is necessary to grant Plaintiffs effective relief.** The federal agents argue that requiring them to wear identifying codes is unrelated to the "specific harm alleged." (Dkt. 113 at 18.) The specific harm Plaintiffs allege is that federal agents are violating Plaintiffs' First Amendment rights by shooting, beating, and intimidating them. The Court has ordered the federal agents to stop. If the federal agents may police the protests as nameless, faceless specters in camouflage and tactical gear, that order is toothless. It will never be enforceable against any particular agent. To make it effective, the agents must be identifiable.

**Making agents identifiable would not jeopardize officer safety.** The federal agents admit that agents of the U.S. Marshals Service SOG are already at least partially identifiable by "unique identifying numbers in reflective print on the back of their helmets" that also appear "on each SOG member's uniform sleeve." (Dkt. 113 at 19 n.6.) That alone belies the federal agents' assertion that making agents identifiable will "allow criminal protesters to retaliate against individual officers and track the size of the law enforcement force, putting officers in jeopardy." (*Id.* at 19.) If being identifiable does not jeopardize agents of the U.S. Marshals Service SOG, it will not jeopardize any other federal agent.

The federal agents also argue that 8-inch-tall identifiers will overly burden them by impeding access to equipment and functionality. As Plaintiffs observed in their opening brief, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality op.) (footnote omitted). If the problem is that "there is no single 8-inch area of *flat* surface" (Dkt. 113-4 ¶ 4 (emphasis added)), then the federal agents can just paint identifiers over the pockets. This photo of the DHS agents who shot Plaintiff Lewis-Rolland 10 times shows at least 8 inches of space on each agent's torso where identifiers could be painted (Dkt. 44 ¶ 11):



Similarly, this photo of a U.S. Marshal aiming a live-ammunition assault rifle into a crowd shows at least 8 inches of area on the thigh where an identifier could be painted (Dkt. 77 ¶ 8):



If the federal agents reject that idea too, there are other ways to address functionality concerns, such as using identifiers that are slightly shorter than 8 inches but still visible and easily readable from afar. Plaintiffs do not demand 8-inch-tall letters. They demand only that the distance at which an agent is identifiable be commensurate with the range at which the agent can strike a target. For example, for crowd-control weapons with around 200 feet of range, such as the FN303 launcher,[15] at least one online source suggests that a letter height of 6 inches may be sufficient.[16]

---

[15] *FN 303*, Wikipedia (July 8, 2020), https://en.wikipedia.org/w/index.php?title=FN_303&oldid=966684708.

[16] *Sign Letter Height Visibility Chart*, Signazon.com, https://www.signazon.com/help-center/sign-letter-height-visibility-chart.aspx (last visited Aug. 5, 2020).

Finally, Ken Cuccinelli, the senior official performing the duties of the Homeland Security deputy secretary, has stated in testimony to Congress that DHS intends to replace the uniforms of its law-enforcement personnel.[17] In that testimony, he stated that DHS law enforcement officers who interact with crowds are—or ought to be—identifiable "both by their law enforcement agency and individually." Thus, if the Court's order requires any design changes to the uniforms, they are already being redesigned anyway.

**Federal agents have no authority to police protests past federal property.** In their opening brief, Plaintiffs document a number of times federal agents enforced dispersal orders far afield of federal property, resulting in unnecessary injuries to journalists and legal observers. (Dkt. 112 at 13.) For that reason, Plaintiffs asked the Court to prohibit federal agents from leaving federal property while on duty.

During Mr. Russell's deposition, he was asked about federal agents' power to enforce dispersal orders outside federal property. He admitted that they have none:

> Q. Does FPS have authority to enforce a dispersal order against an unlawful assembly on Southwest Fourth Street?
>
> A. On Southwest Fourth Street?
>
> Q. That's one street west of the federal courthouse.
>
> A. Generally, no.

(Russell Dep. at 59:17-23.) Thus, the tactical commander of all non-Marshals federal forces agrees that their policing protests one block past the federal courthouse is *ultra vires*. That only confirms that this modification is necessary, fair, and workable.

## IV.    THE COURT CORRECTLY DETERMINED THAT OFFICIALS WOULD NOT ENJOY QUALIFIED IMMUNITY FOR VIOLATIONS OF THE TRO

If a federal official violates the Court's TRO, there are two paths to enforcing it. The first is a contempt proceeding between the parties. *See* 18 U.S.C. § 401(3); *Gompers v. Buck's Stove*

---

[17] Geneva Sands & Priscilla Alvarez, *DHS to replace military-style uniforms for federal police officers*, CNN (Aug. 4, 2020), https://www.cnn.com/2020/08/04/politics/dhs-replace-military-style-uniforms/index.html.

& *Range Co.*, 221 U.S. 418, 444-45 (1911) ("Proceedings for civil contempt are between the original parties, and are instituted and tried as part of the main cause."). Qualified immunity is irrelevant in such proceedings: It is an "immunity from suit," so if there was no immunity as to the original suit, there is no immunity as to the contempt proceeding. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Rambo v. Morehouse Par. Sch. Bd.*, 37 F. Supp. 2d 482, 488-490 (W.D. La. 1999); *In re Crowley*, 2012 WL 4038445, at *5 (W.D. Mich. Sept. 13, 2012) ("Common sense dictates that qualified immunity was never meant to apply in a civil contempt proceeding.") To the extent the Court was stating that the federal agents would have no qualified immunity in a contempt motion brought by Plaintiffs, it was merely stating a truism.

The second path to enforcement is for a nonparty protected by the TRO to bring an independent action alleging a violation of the same First Amendment rights as those Plaintiffs claim. That appears to be what the Court intended by its reference to *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971). (Dkt. 84 at 20-21 ¶ 7.) In such a case, as the Court surmised, the Court's prior order would serve to clearly establish the constitutional rights of those it protected against the federal defendants. A few examples follow:

- In *Jackson v. Mississippi*, a prisoner was injured by a fellow prisoner whom the prison had designated a prison guard and trusted with a gun. 644 F.2d 1142, 1143-44 (5th Cir. 1981). Some five months earlier, in *Gates v. Collier*, 349 F. Supp. 881 (N.D. Miss. 1972), a separate case, a district court had ordered the *same prison* to eliminate this "trusty shooter" program. *Jackson*, 644 F.2d at 1146. Jackson filed his own suit, and in response to the defendants' claim of qualified immunity, he "invoke[d] . . . the injunction" entered in *Green*. *Id.* at 1145-46. The Fifth Circuit, reasoning that "the *Gates* order clearly established Jackson's constitutional right to be free from cruel and unusual punishment in the form of trusty shooters," denied the defendants qualified immunity.

- Similarly, in *Pugh v. Locke*, 406 F. Supp. 318 (M.D. Ala. 1976), a district court entered injunctive relief against a prison and its officials concerning living conditions

for inmates. *Id.* at 331-33. In *Williams v. Bennett*, a different inmate filed suit against prison officials for damages resulting from violation of that order. 689 F.2d 1370, 1374 (11th Cir. 1982). The Eleventh Circuit, like the Fifth in *Jackson*, held that "the *Pugh* order not only clearly defined the constitutional rights of the Alabama prisoners, but also served to put the defendant officials on notice of the continuing violations," and so denied them qualified immunity. *Id.* at 1385-86.[18] The Supreme Court denied certiorari. 464 U.S. 932 (1983).

- In *Hundley v. Parker*, 69 F.3d 537 (6th Cir. 1995), too, the plaintiff relied on a consent decree entered in an earlier case against the same prison. *Id.* at *2. The Sixth Circuit recognized that a consent decree *could* clearly establish constitutional rights for purposes of qualified immunity, but held that that consent decree did not clearly establish the precise right the plaintiff was seeking to vindicate, and so granted the defendants qualified immunity. *Id.* at *4-6.

What these examples show is that when a defendant is bound by a remedial order protecting constitutional rights, his or her violation of the order as to a nonparty is a violation of that nonparty's clearly established constitutional right. And this only stands to reason: Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation marks omitted). A court order binds only those who receive "actual notice" of it. Fed. R. Civ. P. 65(d)(2). Thus, anyone who violates a court order that binds them is either knowingly violating the law, plainly incompetent, or both. Either way, they are not entitled to qualified immunity for the violation.

The federal agents argue that in stating this legal principle, the Court announced an "advisory opinion." (Dkt. 113 at 28.) Not so. At most, the Court offered dicta—helpful dicta, inasmuch as it incentivized the federal agents to ensure their employees, officers, and agents

---

[18] The Eleventh Circuit revisited this holding as recently as 1996 and declined to retreat from it. *Dolihite v. Maughon By & Through Videon*, 74 F.3d 1027, 1055 (11th Cir. 1996).

were aware of the TRO. Nor, for the same reason, did the Court violate anyone's right to due process. (*Cf. id.* at 29.)

Finally, the federal agents' contention that "[a] single district court decision does not clearly establish the law for qualified immunity purposes" is irrelevant. (*Id.* at 29-30.) The Court did not purport to clearly establish "the law" for any person not covered by Rule 65(d)(2). If police officers in the City of Yakima, for instance, began targeting journalists covering protests, the Court's TRO would not and did not purport to deprive them of their right to argue that they have qualified immunity. *Hines v. Youseff*, 914 F.3d 1218, 1229-30 (9th Cir. 2019). What the Court's TRO clearly established is the federal agents' legal obligations and journalists' and legal observers' rights against them. The power to define the rights and obligations of parties before it is the essence of what it means to be a court. This Court was well within its power to do so here.

* * *

At his deposition, Mr. Russell agreed that presence of a free and independent press at protests is "[a]bsolutely" a good thing. (Russell Dep. at 115:19-116:3.) That was noteworthy, in context: It came on the heels of a discussion that had illuminated some material inaccuracies in Mr. Russell's description of an event. (*Id.* at 114:5-115:16.) This brief has chronicled several such inaccuracies—or worse. They showcase the danger that when the government is allowed to use violence and threats to chill reporting—especially where the people assemble to petition their government, *especially* when the people assemble to *criticize* their government—then only the government gets to tell the story. That is not how American democracy works. It is at such moments, more than any other, that the free press requires the protection of the independent judiciary. *See Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court extend the TRO against the federal defendants for another 14 days, with the modifications described in Plaintiffs' opening brief (Dkt. 112).

PAGE 20 - PLAINTIFFS' REPLY IN SUPPORT OF EXTENDING THE TRO

Dated: August 5, 2020                              Respectfully Submitted,


By: /s/ Matthew Borden
    Matthew Borden, *pro hac vice*
    J. Noah Hagey, *pro hac vice*
    Athul K. Acharya, OSB No. 152436
    Gunnar K. Martz, *pro hac vice*
    BRAUNHAGEY & BORDEN LLP


    Kelly K. Simon, OSB No. 154213
    ACLU FOUNDATION OF OREGON

    *Attorneys for Plaintiffs*