# EXHIBIT 2

1              UNCERTIFIED ROUGH DRAFT TRANSCRIPT

2             VIDEO DEPOSITION OF RUSSELL GABRIEL

3                  TUESDAY, AUGUST 4, 2020

4          This transcript is a rough draft only, not

5     certified in any way and cannot be used for reading

6     and signing by a witness or filed with any court.

7     All parties receiving this it agree that it will not

8     be shared, given, copied, scanned, faxed, e-mailed,

9     sold or in any way distributed in any form by any

10    party to anyone except their own experts,

11    co-counsel, or staff, and agree to destroy this

12    rough draft in any form and replace it with the

13    final certified transcript, if ordered.

14         There will be discrepancies as to page and

15    line numbers when comparing the rough-draft

16    transcript and the final transcript, and that the

17    rough-draft transcript may contain untranslated

18    steno, incorrect punctuation, an occasional

19    reporter's note, and/or nonsensical English word

20    combinations.  All such entries will be corrected on

21    the final transcript.  The rough draft transcript

22    will not include title pages, appearance pages,

23    examination or exhibit indexes, or a certificate.

24    Exhibits will not be included.  This document has

25    not been proofread.

Rough Draft - Gabriel Russell - 08-04-2020

```
 1        TUESDAY, AUGUST 4, 2020; AUBURN, WASHINGTON
 2             THE VIDEOGRAPHER:  We are now on the
 3    record.  Here begins the Zoom videotaped deposition
 4    of Gabriel Russell in the matter of Index Newspapers
 5    LLC versus City of Portland, in the U.S. District
 6    Court, District of Oregon, Portland Division, case
 7    number 3:20-cv-01035-SI.
 8             Today is August 4th, 2020.  The time is
 9    11:13.  This deposition is being taken over Zoom at
10    the request of BraunHagey & Borden LLP.  The
11    videographer is Emily Walter of Magna Legal
12    Services, and the court reporter is Marilynn Hoover
13    of Magna Legal Services.
14             All counsel will be noted on the steno
15    graphic record.
16             Will the court reporter please swear in
17    the witness.
18             THE REPORTER:  The attorneys participating
19    in this deposition acknowledge that I am not
20    physically present in the deposition room and that I
21    will be swearing in the witness and reporting this
22    deposition remotely.  The parties and their counsel
23    consent to this arrangement and waive any objections
24    to this manner of reporting.
25             Please indicate your agreement by stating
```

1   facilities across the United States.

2       Q.   So what are your sort of duties, more

3   specifically, in your current position, normally?

4       A.   I am responsible for overseeing and

5   managing, hiring, evaluation, supervision of all the

6   personnel in Region 10; oversight of contracts,

7   assigning work, evaluating subordinate performance,

8   things of that nature.

9       Q.   Anything else that comes to mind?

10      A.   (No audible response.)

11      Q.   And what are your --

12               (Reporter request.)

13               (Record read.)

14           THE WITNESS:  It's a -- It's a management

15  -- it's an executive level position that has a lot

16  of responsibilities.

17      Q.   BY MR. ACHARYA:  Okay.  And what are your

18  duties with respect to these protests?

19      A.   With regards to protection of federal

20  facilities, I might not --

21      Q.   With regard to -- With regard to the

22  protests in downtown generally, whatever the mission

23  may be there.

24      A.   My job is to protect federal facilities

25  from being taken over, from being significantly

Rough Draft - Gabriel Russell - 08-04-2020

1       Q.    BY MR. ACHARYA:  I believe that's a term

2   that's used within FPS for private contracting

3   forces.  Is that -- Am I mistaken?

4       A.    We -- We have PSOs that are -- that are in

5   Portland as part of their normal duties.  They

6   continued to perform their normal duties.  They did

7   not have additional, you know, duties that were

8   related to operation Diligent Valor.

9       Q.    Understood.  And to be clear:  PSOs are

10  privately contracted security officers?

11      A.    Yes.

12      Q.    What companies in Portland?

13      A.    I believe the contract in Portland,

14  Oregon, is by a company named Maxent.

15      Q.    M-A-X-E-N-T?

16      A.    I'm not sure of the exact spelling.

17      Q.    And you command all of the forces sent

18  here as part of Diligent Valor?

19      A.    I have tactical control of all of the DHS

20  forces that are -- that are part of operation

21  Diligent Valor.

22      Q.    And when you say "tactical control," what

23  do you mean by that?

24      A.    That means that I am responsible for just,

25  you know, kind of strategy and tactics for those

1  forces; but I am not responsible for their

2  administrative control, so I don't -- I do not write

3  their evaluations or do discipline for forces that

4  are outside of FPS.  I do not, you know, process

5  their paperwork.  I'm not responsible for review of

6  their paperwork.

7      Q.   So you don't do their discipline?

8      A.   Correct.

9      Q.   I see.  Who does their discipline?

10     A.   Each individual component is responsible

11 for their own disciplinary processes.

12     Q.   Okay.  So you have tactical control over

13 the CBP forces in Diligent Valor?

14     A.   Yes.

15     Q.   You have tactical control over the ICE

16 forces in Diligent Valor?

17     A.   Yes.

18     Q.   And you have tactical -- tactictal control

19 over the new FPS forces in Diligent Valor?

20     A.   Yes.

21     Q.   And just to be clear:  Do you discipline

22 the new FPS forces in Diligent Valor?

23          MR. GARDNER:  Objection, vague.  Also

24 objection, lack of foundation.

25     Q.   BY MR. ACHARYA:  There are new FPS forces

Rough Draft - Gabriel Russell - 08-04-2020

```
 1       Q.   BY MR. ACHARYA:  Well, yeah, answer the

 2   question.

 3            You said you have situation -- seen

 4   situations where...

 5       A.   Where deploying additional forces resulted

 6   in enhanced protection, which was the goal of the

 7   operation.

 8       Q.   I see.   Is Diligent Valor over?

 9       A.   It is not.

10       Q.   So the extra CBP forces are still here?

11            MR. GARDNER:  Objection.  To the extent

12   that you can answer counsel's question without

13   divulging information that is subject to the law

14   enforcement privilege, you may do so.  To the extent

15   you cannot answer his question without divulging

16   such information, I instruct you not to answer.

17            THE WITNESS:  I'm not going to answer that

18   question.

19       Q.   BY MR. ACHARYA:  Are the extra ICE forces

20   still here?

21            MR. GARDNER:  Same objection and same

22   instruction.

23            THE WITNESS:  Same answer.

24       Q.   BY MR. ACHARYA:  When will the extra

25   forces leave?
```

Rough Draft - Gabriel Russell - 08-04-2020

1  presence is not leaving Portland until local police

2  complete cleanup of anarchists and agitators?

3     A.   Give me a second to -- That's -- That's a

4  hypothetical and I don't...

5     Q.   That's not a hypothetical.  That's a

6  question about what -- what Homeland Security is

7  going to do.

8          Are they -- Is DHS's enhanced presence

9  leaving Portland -- is not leaving Portland until

10 local police complete cleanup of anarchists and

11 agitators?  Is that true?

12    A.   I don't know the answer to that.

13    Q.   So you don't know when Homeland Security's

14 enhanced presence will leave?

15    A.   That's correct.

16         MS. TONELLI:  Objection.  Law enforcement

17 privilege.  We're -- We're going into -- it's the

18 same idea of when our officers may withdraw.

19         MR. ACHARYA:  Yeah, I think this tweet

20 waives that privilege.

21         MS. TONELLI:  No, because you're asking

22 for more detail.

23         MR. GARDNER:  Yeah, it does not waive any

24 privilege about the details of the law enforcement

25 efforts in Portland.

1      Q.    BY MR. ACHARYA:  Under what circumstances

2   would FPS have power to enforce an unlawful assembly

3   order on Fourth Street?

4      A.    The FPS jurisdiction has authority allows

5   FPS law enforcement officers to taken forcement

6   action on and around federal property for the

7   protection of federal property and people on it.  So

8   if there was for example someone was off a federal

9   property and they were committing assaults against

10  federal officers using projectiles or something of

11  that nature federal officers could taken forcement

12  action.

13     Q.    Understood.  But I'm asking about

14  dispersal orders, which are dispersal orders to

15  unlawful assembly; so we're not talking about any

16  actions against federal officers.

17         Does FPS have authority to enforce a

18  dispersal order against an unlawful assembly on

19  Southwest Fourth Street?

20     A.    On Southwest Fourth Street?

21     Q.    That's one street west of the federal

22  courthouse.

23     A.    Generally, no.

24     Q.    So you've policed protests, many protests?

25     A.    Yes.

Rough Draft - Gabriel Russell - 08-04-2020

```
1        Q.   Sure.  Understood.
2             So you're a supervisor.  Are you
3   responsible for making sure that people that you
4   tactically command don't use excessive force?
5        A.   Yes.
6        Q.   Okay.  Do you see what -- what federal
7   agents did to the guy wearing the Navy shirt
8   Christopher David?
9        A.   Yes.
10       Q.   Did you think that was excessive force?
11       A.   Counsel, should I answer this.
12            MR. GARDNER:  I mean if you can do so
13   without disclosing information that is subject to
14   the law enforcement privilege or other privileges
15   you may if you need to consult we can also do that.
16            THE WITNESS:  Can we consult briefly.
17            MR. GARDNER:  Absolutely you know what
18   we've been going for a while anyway why don't we
19   take like a five minute break.
20            MR. ACHARYA:  Okay so it's 1245 by my
21   clock so we'll be on 1250.
22            MR. GARDNER:  Assuming we get through our
23   consultation sure.
24            MR. ACHARYA:  Okay thanks.
25            THE VIDEOGRAPHER:  Off the record at
```

Rough Draft - Gabriel Russell - 08-04-2020

1      A.    They don't -- I don't believe that they

2  belong to the Department of Homeland Security and

3  we're not operating under my control or supervision.

4      Q.    Were they part of the United States

5  marshall service?

6      A.    I've been told that I don't know that for

7  sure but I've been told that.

8      Q.    Thank you.  So as supervisor you're

9  responsible for making sure that people you're

10  supervising conduct themselves according to the

11  rules; is that correct?

12      A.    Yes.

13      Q.    Have you read the declarations that we

14  submitted in support of the temporary restraining

15  order?

16      A.    Yeah, I believe so.

17      Q.    Okay.  And you imposed and then those

18  declarations all refer to incidents where members of

19  the press were shot or beaten or intimidated.

20  That's your recollection?

21      A.    Yes.

22      Q.    Okay.  And you imposed discipline on the

23  agents involved in every single one of those cases;

24  right?

25            MR. GARDNER:  Objection.  Mischaracterizes

1   the witness's previous testimony.

2        Q.   BY MR. ACHARYA:  I'm not characterizing

3   your testimony at all.  I'm asking if you imposed

4   discipline on the agents involved in every single

5   one of those cases, in the declarations we submitted

6   in support of the TRO.

7             MR. GARDNER:  And his previous testimony

8   -- Please.

9             THE WITNESS:  I don't know what agents or

10  officers were involved in uses of force against the

11  declarants or even if they weren't injured by other

12  protesters.

13       Q.   BY MR. ACHARYA:  Okay.  So you -- in fact,

14  you didn't impose discipline on a single agent for

15  the incidents described in those declarations, did

16  you?

17       A.   I don't know what officers or agents were

18  involved in the uses of force that you're referring

19  to.

20       Q.   Sure.  But, so, ultimately, zero agents

21  were disciplined?

22       A.   I don't know.

23            MR. GARDNER:  Objection.  Lack of

24  foundation.

25       Q.   BY MR. ACHARYA:  Do you know if any agents

1    Do you have information sufficient to know

2   which agents were present at that place, time, and

3   location?

4    MR. GARDNER:  I see.  I understand the

5   question now.

6    Objection.  Mischaracterizes the documents

7   you're referring to.  No further objections.

8    Q.   BY MR. ACHARYA:  Please answer.

9    A.   I believe I already answered that, just

10  that I believe it's seven incidents that reported to

11  and we compared those with our -- with our FPS use

12  of force, and we did not find a direct correlation

13  between the complaints and FPS use of force.  There

14  may be other agencies involved in the operation that

15  that used a similar type of analysis and discovered

16  a match.

17   Q.   BY MR. ACHARYA:  So CBP and ICE uses of

18  force, do you have any ability to look at those?

19   A.   No.  They have their own computer systems.

20   Q.   So I'm going to put a declaration into the

21  record here.  This is the declaration of Matthew

22  Lewis-Rolland, signed on July 22nd, 2020, docket

23  number 77.  Tell me when you have it open.

24   THE REPORTER:  Marked next order, counsel?

25   MR. ACHARYA:  Sorry.  Yeah, next in order.

1  So what was that Exhibit 5?

2                    (Exhibit 5 marked.)

3            THE REPORTER:  Correct.

4            THE WITNESS:  So where I have it, what

5  paragraph are you looking at?

6        Q.   BY MR. ACHARYA:   Yeah, so I'm looking

7  at -- Well, first off, just have you read this

8  declaration before today?

9        A.   I don't believe so.

10       Q.   I see.  Okay.  So if you'd go to page 3,

11  there's a photo of an agent pointing a gun at

12  someone.

13       A.   Yes, I see it.

14       Q.   Is that agent under your tactical command?

15       A.   I don't know that I can --

16            MR. GARDNER:  And I would just say:

17  Officer Russell, take the time you need to read the

18  declaration, to the extent it gives you context

19  necessary to answer counsel's question.

20            THE WITNESS:  I can't see the picture.

21  There's a patch on officer's shoulder that's

22  depicted there, and it's not clear enough or large

23  enough for me to identify exactly the agency, but it

24  appears likely to be U.S. Marshall's patch.

25            MR. ACHARYA:  I see.

1    chat.  And so this is declaration of Gabriel

2    Russell -- This is going to be Exhibit 7,

3    declaration of Gabriel Russell, submitted or signed

4    on July 30th, 2020; document number 105-7.

5                    (Exhibit 7 marked.)

6         Q.    BY MR. ACHARYA:  Do you have it open?

7         A.    I have a copy here.

8         Q.    Okay.  Great.  And so if you look at

9    paragraph six it says that the DHS office of general

10   counsel provided TRO instructions and discussed them

11   at the roll call; correct?

12        A.    Yes.  It's not exactly the word it says

13   but it has words to that effect, yes.

14        Q.    To that effect and your agents follow

15   those instructions?

16        A.    To the best of my knowledge, yes.

17        Q.    And if they follow those instructions they

18   won't violate the TRO?

19        A.    Generally, yes.

20        Q.    And you're in charge of making sure that

21   your agents follow that instruction?

22        A.    Yes.

23        Q.    That means all Region 10 FPS agents and

24   all.

25                    (Reporter request.)

Rough Draft - Gabriel Russell - 08-04-2020

1        Q.    BY MR. ACHARYA:   Sorry madam court

2    reporter.   I said you're in charge of making sure

3    that all Region 10 FPS agents and all agents

4    deployed here for Diligent Valor follow those

5    instructions?

6        A.    Yes.

7        Q.    And you're aware that we moved for

8    contempt saying that federal agents had violated the

9    TRO?

10        A.    Yes.

11        Q.    And you would rely on those instructions

12    to figure out if they had in fact violated the TRO?

13        A.    To rely on which instructions?

14        Q.    The instructions that you discuss in

15    paragraph six?

16            MR. GARDNER:   Objection, mischaracterizes

17    the witness's testimony.

18            THE WITNESS:   Can you ask that question

19    again.

20            MR. ACHARYA:   Sure.   So with respect to

21    any allegation that your agents had violated the

22    TRO, you would rely on the policy in paragraph six

23    the instructions in paragraph six to figure out if

24    they had actually violated the TRO; is that correct?

25            MR. GARDNER:   Objection.

1        A.    Generally.

2              MR. GARDNER:   Go ahead.

3                    (Reporter request.)

4              THE WITNESS:   Generally, yes.

5        Q.   BY MR. ACHARYA:   And it is your

6   understanding that as long as federal agents don't

7   disperse anyone with a press pass press badge or a

8   shirt that says press they won't violate the TRO?

9              MR. GARDNER:   Objection we're now getting

10  into a place where you're calling for information

11  subject to the attorney-client privilege and at this

12  point I would instruct the witness not to answer and

13  as you know this is the subject of motions practice

14  before the court.

15             THE WITNESS:   I will not answer.

16       Q.   BY MR. ACHARYA:   Okay.  I'm not asking for

17  what the instructions say I'm asking for your

18  understanding of the TRO.

19             MR. GARDNER:   Well, that is not the

20  question you asked.  If you want to ask him about

21  what his understanding of the TRO is ask him that

22  question.

23             MR. ACHARYA:   Yeah.  Let me -- let me say

24  it again.

25       Q.   BY MR. ACHARYA:   Your understanding of the

1  TRO is that as long as federal agents don't dispurse

2  anyone with a press pass press badge or a shirt that

3  says press they won't violate the TRO?

4       A.   I would have to go back and read the TRO

5  to see if there were other conditions in there, but.

6       Q.   Okay.  So did we put so yeah let's go to

7  Exhibit 6, it's tab 13 it's got the 13 in brackets

8  it's the second to last one that I put in the chat

9  if you see it.

10      A.   What's it titled.

11      Q.   It's titled, brackets, 13, 2020-07-14-44

12 Lewis-Rolland declaration.

13      A.   This is the one we looked at previously.

14      Q.   It is, yes.

15      A.   Yeah.  What paragraph do you want to go

16 to?

17      Q.   I'm looking at paragraph -- paragraph 13.

18      A.   Okay.

19      Q.   And, actually, if you would, yeah, if you

20 would read paragraph -- yeah, read paragraph 13 --

21 or, actually, I'll just read it into the record.

22           At 3:10 to 3:11 in the video, around 1:58

23 a.m., I turned so that my right side was facing

24 Agent Doe.  At that point, I was shot ten times from

25 Agent Doe's direction.  I was hit on my right elbow,

1    the right side of my torso, and my back.  The areas

2    where I was shot are all above my waist.  At the

3    time I was shot, I was photographing what other

4    officers and protesters were doing.  I was not

5    posing any type of threat to Agent Doe or anyone

6    else.  I was not even facing him.

7            That's what that paragraph says; correct?

8        A.   Correct.

9        Q.   Okay.  Is it your understanding as a

10   person in charge of TRO compliance that shooting a

11   journalist who's just taking photographs ten times

12   while he has his back turned would that violate the

13   TRO?

14           MR. GARDNER:  Objection to the extent it

15   calls for a legal conclusion.

16           THE WITNESS:  I'd say that there might be

17   other you know whatever video pictures in a thorough

18   investigation might be you know might reveal

19   information that would lead me to believe that that

20   was not a violation of the TRO, but it is certainly

21   concerning the way it's reported there.

22       Q.   BY MR. ACHARYA:  Thank you.  Do you think

23   it would be acceptable conduct if there weren't a

24   TRO?

25       A.   It just depends on -- It depends on what

Rough Draft - Gabriel Russell - 08-04-2020

1   the other facts and circumstances of the case.

2       Q.   Of course.  But based on the declaration

3   that's in front of you, would that be acceptable

4   conduct just based on those facts, if there were a

5   TRO?

6       A.   There.

7           MR. GARDNER:   Objection objection asked

8   and answered.

9           MR. ACHARYA:   No he answered a different

10  question that I asked the question I asked just

11  based on the facts that are in front of you not

12  taking into context not taking the possibility of

13  other facts would that be acceptable conduct if that

14  weren't a TRO.

15      A.   I'd say there are always other facts that

16  declaration is one person's characterization of a

17  complex and dynamic event there would you know a

18  thorough investigation might reveal contradictory

19  facts other video or pictures that's -- that's the

20  type of investigation that would need to be

21  conducted prior to making that determination.

22      Q.   Okay.  So you cannot say as you sit here

23  today that shooting a photographer while he's

24  photographing what other officers and protesters are

25  doing while he's not posing any type of threat you

Rough Draft - Gabriel Russell - 08-04-2020

 1   can't say that that is unacceptable absent the TRO?

 2           MR. GARDNER:  Objection.  Mischaracterizes

 3   the witness's testimony.

 4           MR. ACHARYA:  Is that true?

 5       A.   Is what true?

 6       Q.   Is it true that you cannot say whether the

 7   conduct in paragraph 13 would be acceptable or not

 8   acceptable without the TRO?

 9       A.   There are other there may well be other

10   facts that would lead me to conclude that the

11   behavior was acceptable.

12       Q.   So you can't say one way or another?

13       A.   Correct.

14       Q.   So after the TRO was issued did you begin

15   doing anything more to help you identify what agents

16   are at a given location at a given date and time?

17           MR. GARDNER:  Objection, vague.

18           MR. ACHARYA:  Do you understand the

19   question?

20       A.   We did we did.  Are you talking

21   specifically just in response to the TRO?

22       Q.   BY MR. ACHARYA:  Yeah I'm asking you if

23   after the TRO you tried harder to figure out what

24   agents are at places and times?

25       A.   After the complaint about violations of

Rough Draft - Gabriel Russell - 08-04-2020

1   the TRO we did we used a procedure that I previously

2   explained where we you know compared use of force

3   reporting with.

4        Q.   Yeah.  I understand that's?

5        MR. GARDNER:  Hey wait counsel you cut the

6   witness off.  He was finishing his answer.  Please,

7   Officer Russell, you had an answer to finish.

8   Please complete it.

9        A.   Yes.  I explained previously that when we

10  received complaints about violation of the TRO, that

11  we compared the -- you know, the times and dates and

12  locations inncluded in those complaints with the use

13  of force reporting, to determine if we needed to

14  take investigative or disciplinary action.

15       Q.   BY MR. ACHARYA:  Right.  So I understand

16  that.  I am asking sort of not retrospectively, not

17  based on the complaint, but prospectively:  Did you

18  do anything to make it easier to figure out in the

19  future who where and when so that you could

20  correlate an incident report with an officer?

21       A.   That's kind of a hypothetical.  I don't

22  really --

23       Q.   No, it's not a hypothetical.  I'm asking

24  what you did.

25            Did you do anything to make it easier to

Rough Draft - Gabriel Russell - 08-04-2020

1   figure out who did a thing that gets reported to

2   you?

3        A.   We have the same -- We have the same

4   policies and procedures we had.

5        Q.   Okay.  Thank you.  And so you've read the

6   declarations we submitted with the contempt motion?

7        A.   I -- Yes.

8        Q.   Yes.  Did you impose discipline on any of

9   the agents involved in those cases?

10        A.   I believe I've already answered this

11   question.

12        Q.   I asked with respect to the TRO.  This is

13   the contempt.

14        A.   We have not -- We -- The specific

15   incidents have not been reported to us in a manner

16   that we've so far that I'm aware of and that's

17   possible but we have a secure portal site where

18   misconduct is reported and it's possible that an

19   allegation of misconduct would have been submitted

20   in that portal site and I would not be made aware of

21   it, but I'm not aware of any disciplines.

22        MR. ACHARYA:  Okay.  I'm going put another

23   declaration into the chat and it's going to be

24   Exhibit 8.

25                    (Exhibit 8 marked.)

1        Q.    BY MR. ACHARYA:  Tell me when you've got

2   it in front of you.  And I'm looking at paragraph 9.

3        A.    Okay.  I'm looking at it.

4        Q.    Have you read this declaration before

5   today?

6        A.    I don't believe so.

7        Q.    So you haven't watched this video that's

8   in paragraph 9?

9        A.    I don't know.

10       Q.    So if you look at look at paragraphs 11

11   and 12.  Tell me when you've finished reading those

12   I'll read them into the record actually one federal

13   agent walked along the fence watering a line of

14   flowers.  Me and three other legal observers were

15   recording.  The protesters he maced had not done

16   anything to merit such treatment one may have

17   touched the fence but not in any kind of threatening

18   or violent way this agent stopped before he reached

19   us these events take colon zero six to zero ten

20   above the video then next paragraph then another

21   federal agent walked up with a can of mace, pointed

22   it at roughly head level, and casually pulled the

23   trigger, even though we were pointing to our

24   respective legal observers.  We were inundated with

25   mace.  When he was done covering us in mace, he

Rough Draft - Gabriel Russell - 08-04-2020

1   stepped back into his formation.   These events take

2   place from 0:13 to 0:20 of the above video.

3           That's what that says; is that right?

4       A.   Yes.

5       Q.   Yes.   And you hadn't read that before

6   today?

7       A.   No.

8       Q.   Were you aware of this allegation of

9   improper use of force before today?

10      A.   No.

11      Q.   Okay.  As a person in charge of TRO

12  compliance, do you think walking up to a group of

13  legal observers wearing ACLU vests and NLG hats,

14  whom a different agent has just been able to avoid

15  spraying, and specifically pepper spraying that

16  group, do you think that would violate the TRO?

17      A.   I think --

18          MR. GARDNER:   Objection -- Objection,

19  hypothetical.  Objection, lack of foundation.

20  Objection, calls for a legal conclusion.

21      Q.   BY MR. ACHARYA:   It's not a hypothetical.

22  I'm talking about the events in paragraphs 11 and

23  12.  Do you think they would violate the TRO?

24          MR. GARDNER:   Well, then objection, lack

25  of foundation.

Rough Draft - Gabriel Russell - 08-04-2020

```
 1        Q.    BY MR. ACHARYA:  Do you know whether they
 2   would violate the TRO?
 3             MR. GARDNER:  Same objection, and also
 4   calls for a legal conclusion.
 5        Q.    BY MR. ACHARYA:  Do you understand that
 6   the TRO has something to say about paragraphs 11 and
 7   12.  Do you understand that the TRO is relevant to
 8   those paragraphs?
 9             MR. GARDNER:  Same objection.
10                  (Reporter request.)
11             THE WITNESS:  Say that again.
12                  (Reporter request.)
13             THE WITNESS:  Okay.  Can we get the last
14   question again.
15        Q.    BY MR. ACHARYA:  The last question is:  Do
16   you understand that the TRO has something to say
17   about paragraphs 11 and 12 that the TRO is relevant
18   to those paragraphs?
19             MR. GARDNER:  Same.
20             THE WITNESS:  I do.
21             MR. GARDNER:  Same objections.
22             THE WITNESS:  Okay.
23        Q.    BY MR. ACHARYA:  Do you understand whether
24   the TRO would permit or prohibit the events in
25   paragraphs 11 and 12?
```

Rough Draft - Gabriel Russell - 08-04-2020

```
 1              MR. GARDNER:  Same objection.  Lack of
 2    foundation.  Calls for a legal conclusion.
 3        Q.   BY MR. ACHARYA:  Okay.  You have to
 4    answer.
 5        A.   That would depend on a full and thorough
 6    investigation that would reveal all the facts in
 7    this case, not just those represented in the
 8    declaration.
 9        Q.   Okay.  And you cannot say, sitting here
10    today, whether just those facts on their own would
11    or would not violate the TRO?
12        A.   Correct.
13              MR. ACHARYA:  I'm going to put a
14    declaration -- or, sorry -- I'm going to put an
15    e-mail into the chat.
16              This is going to be Exhibit 9, I believe.
17              THE REPORTER:  Correct.
18                   (Exhibit 9 marked.)
19        Q.   BY MR. ACHARYA:  And tell me when you have
20    it open.
21        A.   This is the RD e-mail?
22        Q.   Yes.
23        A.   Okay.  I have it open.
24        Q.   So if you see in paragraph 5, I'll read it
25    into the record:  "All our officers/agents on the
```

 1   declaration.

 2        Q.   Okay.  By the way, have you seen this

 3   e-mail before?

 4        A.   I don't believe so.

 5        Q.   It wasn't forwarded to you?

 6        A.   I don't know.  I don't recall.  I don't

 7   recall seeing this specific e-mail.

 8        Q.   Okay.  Did you instruct your agents on the

 9   ground in Portland to exercise maximum caution with

10   respect to legal observers and journalists?

11        A.   Yes.

12        Q.   Okay.  Did you also restrict authority to

13   deploy crowd control devices such as CS gas

14   canisters to an appropriate supervisory level?

15   That's paragraph 9.

16        A.   Let me read this whole thing.  I don't

17   know who this -- Who is Richard Donohue?

18        Q.   He's someone -- you know, I'm honestly not

19   sure.

20        A.   This is not someone who's in my chain of

21   command I believe this person works for the

22   Department of Homeland Security.  This is not a

23   female that's familiar to me and I haven't watched

24   the entire video but at first glance it does not

25   appear to depict people that work for me.

1      A.    Paragraph 8.  So the incident command post

2   refers to the federal command post in the emergency

3   operations center refers to, you know, a joint

4   command post that was previously operated by

5   Portland Police Bureau before they kicked the Feds

6   out basically.

7      Q.    Understood.  So I'm looking at paragraph 8

8   and you said that you personally observed all of the

9   following incidents; is that right?

10     A.    Observed on, yeah, video or other, you

11  know, social media.

12     Q.    I see.  So you didn't observe the actual

13  event take place?

14     A.    I was watching -- well, typically watching

15  live video or in some cases it's referring to things

16  that were we saw and claims that were made on

17  Twitter.

18     Q.    So did you personally observe the arrest

19  of the man identified as Knudsen?

20     A.    I saw video.

21     Q.    You saw video of it.

22           Did you -- Yeah, let's go on to 8C on the

23  next page.  So this is about an individual on the

24  live stream video who identifies as Ari.

25     A.    Yes.

1        Q.   Did you personally observe this incident?

2        A.   I watched it.  I watched the video.

3        Q.   You watched the video.  So you're familiar

4    with the video?

5        A.   I am.  I am familiar with the video.  I

6    haven't memorized, but I have.

7        Q.   Sure.  Did you make it?

8        A.   Did I make the video?

9        Q.   Yeah.

10       A.   No.

11       Q.   No.  You watched it?

12       A.   Yes.

13       Q.   Okay.  Did you watch it before or after

14   July 17th?

15       A.   I don't recall.

16       Q.   You have no idea when you watched it?

17       A.   I believe I watched it July 17th, but I --

18   I actually I don't recall when I watched the video.

19       Q.   Okay.

20       A.   I believe I watched it the day that it

21   happened is.

22       Q.   Okay.  And who made this video?

23       A.   I don't know.  It's just an identified

24   user who's.

25       Q.   Are you aware that it's a compilation of

1  videos?

2          MR. GARDNER:  Objection.  Lack of

3  foundation.

4          MR. ACHARYA:  You've seen the video?

5      A.   The specific the declaration is referring

6  to a specific time stamp where that behavior occurs,

7  not where that voice is heard, not the other

8  portions of the video.

9      Q.   Yeah, it refers to a specific time stamp

10  but it does refer to other portions of the video.

11  It refers to a specific time where she say she has a

12  bunch more press passes, but it refers to earlier

13  portions where she, I guess, is encouraging violent

14  opportunists to tamper with a government owned

15  security barricade, and also a different portion

16  where she's claiming to be a member of the media

17  organization (indiscernible) and GIA.

18          So you've watched -- Have you watched the

19  entire video?

20      A.   I believe so.

21      Q.   Okay.  And are you aware that it's a

22  compilation of videos?

23      A.   I -- I don't know.  I don't.

24      Q.   You're not aware of whether it is or is

25  not a compilation of videos?

1        A.    Correct.

2        Q.    Okay.  Do you know how you came to watch

3   it rather than the original videos?

4        A.    I don't know.

5        Q.    Okay.  Are you aware that the link in 8D,

6   the following paragraph, where you said you observed

7   multiple live videos is the that is the channel

8   which is to say the collection of videos uploaded by

9   the same user that uploaded the video in

10  paragraph C?

11       A.    I'm not aware of that, no.

12       Q.    You're not aware of that.  I'm going to

13  put a PDF in the chat.  This is going to be

14  Exhibit 10.

15                  (Exhibit 10 marked.)

16       Q.    BY MR. ACHARYA:  Tell me when you've got

17  it open, please.

18       A.    Okay.

19       Q.    So this is the -- this is what shows up

20  when you go to link in paragraph D.

21             Does this look familiar to you?

22       A.    It does not look familiar to me, no.

23       Q.    Okay.  But you visited the link in

24  paragraph D, because it's in your declaration?

25       A.    Yes.

1      Q.    Okay.  But this is the -- this is what's
2   not in the link, and it doesn't look familiar to
3   you?
4      A.    This is like a home page or something.
5   It's -- you know, I am familiar with YouTube.  This
6   is a home page, obviously, where there are multiple
7   videos have been posted.  This does not --
8      Q.    Right.
9      A.    I may have visited it, but it is not --
10      Q.    Do you -- Do you often go to Portland
11   Protesters Exposed?
12      A.    No.
13      Q.    Did you personally observe any of the
14   incidents in the videos available at that channel?
15      A.    I don't know.  I would have to.
16      Q.    Okay.  Because those are the incidents
17   that you referred to in paragraph D?
18      A.    Sorry.  Now I have a bunch of tabs and
19   stuff open.  Sorry.
20          So in that video -- in paragraph D -- So,
21   generally, in the either in the incident command
22   post or the emergency operation center, there would
23   be people -- not people -- there'd be live stream
24   aggregators, if you know what this is.  You know,
25   basically there are, you know, these channels where

1    they're kind of importing and collating multiple

2    live streams.  And I observed that multiple -- when

3    it says multiple live videos of that incident in 8D,

4    on multiple live streams I observed that.

5         Q.   Okay.  Are you aware that the video in 8C

6    is not a live stream or a live stream aggregator?

7         A.   I'm not aware of that, no.

8         Q.   Okay.  Paragraph 8E, you talk about MSNBC

9    reporter Sergio almost tweeting out video and

10   statements that he observed a person masquerading as

11   press to protect himself from federal officers.

12             Did you personally observe the underlying

13   incident?

14        A.   I did not, but I observed the Twitter

15   post.

16        Q.   You observed the Twitter post?

17        A.   There's a -- Typically, there's -- I don't

18   know what you call it -- I think a social media

19   dashboard used very commonly in EOCs, incident

20   command posts, called Tweet Deck --

21        Q.   Right.

22        A.   -- where you search terms and it brings

23   up, I guess, collections of tweets that, you know,

24   match whatever search terms you've used.

25        Q.   Sure.  And the reason I'm asking you these

1  questions by the way is I think you have indicated

2  you have been on the ground sometimes at some of

3  these protests?

4      A.   Yes, that's correct.

5      Q.   So I just want to make sure that which

6  ones you did or did not personally observe.

7           So going on to 8F, the incident involving

8  Brandon Peep wearing a black shirt with the word

9  "press" on the front and back, running towards the

10  security fence.

11          Did you personally observe that underlying

12  incident?

13      A.   Back to the -- Okay.  I've got all of

14  these documents open now.

15      Q.   Sure.

16      A.   I don't -- I think I accidentally closed

17  out.

18      Q.   I mean, I think you have this document in

19  paper in front of you, don't you?

20      A.   I think I've got the other one.  I've got

21  the other, of my declaration paper.

22      Q.   I see.

23      A.   Where?

24      Q.   Here, why don't I put it back in the chat.

25  This is Exhibit 1, the second time.

1      A.    I can go through the document, if I can

2   grab it.   All right.   We're in 8D?

3      Q.    No, I'm looking at 8F now.

4      A.    8F.

5      Q.    So it's a video posted by Mr. --

6      A.    No, I observed this -- As I explained

7   earlier, I observed -- I saw this Twitter post; I

8   was not personally present while this video was

9   reported.

10     Q.    Okay.   But you're familiar with the video:

11  You watched it?

12     A.    Yes.

13     Q.    And it shows the man with the press shirt

14  running towards the fence?

15     A.    Yes.

16     Q.    So it shows him doing something illegal?

17     A.    It shows him with a shield it shows him it

18  shows behavior appears to be cooperating with these

19  other people who were involved in unlawful behavior.

20     Q.    So it shows him with his shield?

21     A.    It appears it shows him -- He appears to

22  be cooperating with these other individuals who are

23  engaged in unlawful behavior.

24     Q.    Are you aware of Brandon Peep doing

25  anything illegal himself?

1        A.   Not specifically.

2        Q.   Okay.  Is running towards the security

3   fence illegal?

4        A.   Not on its own.

5        Q.   Sure.  How about 8G?  Did you personally

6   observe this incident where a helmet with the word

7   press written on the back was participating in the

8   destruction of government property to wit the

9   security fence around the federal facility?

10       A.   I -- I witnessed this video on Twitter.  I

11   was not -- I was not personally present while it

12   occurred.

13       Q.   You're familiar with the video because you

14   watched it?

15       A.   Yes.

16       Q.   So this person was participating in the

17   destruction of government property so they were

18   doing something illegal?

19       A.   It appeared to be participating in the

20   destruction of government property, yes.

21       Q.   What were they doing?

22       A.   Shielding the destruction of government

23   property from observation by federal officers.

24       Q.   Oh, how were they shielding it?

25       A.   With the use of the umbrellas and

1    surrounding it so that it couldn't be observed.

2         Q.    I see.   Were they cutting the fence?

3         A.    Not that I can -- No.

4         Q.    Could you see in the video whether they

5    were recording video or taking photos?

6         A.    Could I see in the video if they were

7    recording video or taking they were posting video

8    that they appeared to be taking if that's what

9    you're asking I don't.

10        Q.    No, no.   I'm not asking about the person

11   who took the video.   I'm asking about the person in

12   the video with the record written press on the back

13   with the helmet could you see if that person was

14   taking video or taking video in the photos?

15        A.    Their hands are kind of obscured in front

16   I don't know I can't see it.

17        Q.    All right.   Do you know who posted the

18   video?

19        A.    The -- get back to that one it's not a

20   person that I know personally but I believe it's a

21   known you know media source from.

22        Q.    Right?

23        A.    The Portland area.

24        Q.    Mike Bivens, a freelance journalist?

25        A.    Yes.

Rough Draft - Gabriel Russell - 08-04-2020

 1      Q.    It's good that press were there to take

 2   that video; right?

 3      A.    Absolutely.

 4      Q.    Okay.  And let's look at 8H real quick.

 5           This is the individual wearing a helmet

 6   with the word "press" written on the side, who had

 7   crossed the barrier protecting the Hatfield

 8   Courthouse and was calling on others to come join

 9   him.

10           Did you personally observe this incident?

11      A.    I observed that on video from the command

12   post.

13      Q.    Okay.  And do you know who made that

14   video?

15      A.    There were -- We observed -- That video,

16   there were multiple live streams.  He was in that.

17   He was in that area for an extended period of time.

18   So I don't know who made that particular video, but

19   there were multiple similar videos of that incident.

20      Q.    So that -- that link in paragraph H goes

21   to a video posted by Andy Ngo.

22           Are you aware of that?

23      A.    I am not.

24      Q.    Okay.  Do you watch a lot of --

25      A.    I see him here, yes.

Rough Draft - Gabriel Russell - 08-04-2020

```
1        Q.   Do you watch a lot of Andy Ngo's video?
2        A.   He's a known -- I watch no more of Andy
3   Ngo's videos than I do the other journalists that
4   cover Portland protests.  He's a known journalist
5   that covers Portland protests.
6        Q.   Okay.  Is it illegal to hop the fence?
7        A.   Yes.  It's trespassing.
8        Q.   And it's illegal if he's wearing a gorilla
9   suit?
10       A.   Say -- If he's what?
11       Q.   It's illegal if he's wearing a gorilla
12   suit?
13       A.   That's a hypothetical question.  I don't
14   see how it relates to this.
15       Q.   I'm just asking:  Does the wearing of the
16   gorilla suit change that it's trespassing?
17       A.   No.
18       Q.   It's illegal if he's buck naked?
19       A.   That's correct.
20       Q.   And it's illegal if he's wearing a press
21   helmet?
22       A.   That's correct.
23       Q.   You'd have probable cause to believe that
24   he's committing a crime?
25       A.   That's correct.
```

1       Q.   You could arrest him?

2       A.   That is correct.

3       Q.   The press helmet wouldn't stop you from

4   arresting him?

5       A.   That is correct.

6       Q.   Was this person arrested?

7       A.   I don't know the answer to that question.

8       Q.   Was he charged?

9       A.   I don't believe so, but I don't know the

10   answer to that question I don't know that person's

11   identity here with me.

12       Q.   And just to be clear when you said that

13   you personally observed the following incidents what

14   you meant for 8B, C, D, E, F, G, and H was that you

15   personally watched the videos of those incidents?

16       A.   Either videos or Twitter posts.   Correct.

17       Q.   Videos that other people took?

18       A.   Correct.

19       Q.   Videos that other people may have edited?

20       A.   I'm sorry.   Say the last part again.

21       Q.   Videos that other people may have edited?

22            MR. GARDNER:   Objection.

23            THE WITNESS:   That's correct.

24            MR. GARDNER:   Calls for speculation.

25       Q.   BY MR. ACHARYA:   Videos that other people

1    did in fact edit, at least in the case of C?

2              MR. GARDNER:  Objection, lack of

3    foundation.

4         Q.   BY MR. ACHARYA:   You've watched the video

5    in C.

6         A.   Yes.   I have no way of knowing the day

7    whether the videos were edited or not.   That's

8    correct.

9         Q.   Okay.   And it has been your testimony

10   earlier in this deposition that videos often lack

11   context leave out details and that you are

12   uncomfortable evaluating situations for legality or

13   illegality without more details?

14        A.   That's correct.

15             MR. GARDNER:  Objection.

16        Q.   BY MR. ACHARYA:  Do you see any issues

17   with using tear gas at protests during a pandemic?

18             MR. GARDNER:  Objection, vague.

19        Q.   BY MR. ACHARYA:  Does it concern you that

20   police including federal police are using tear gas

21   at protests during a pandemic?

22        A.   Again, I don't have any specific you know

23   medical information to believe that tear gas is or

24   is not you know deploying tear gas would be

25   different or not during a pandemic as opposed to