**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>　　　　　　　Defendants. | Case No. 3:20-cv-1035-SI<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS** |

# TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities............................................................................................... iii

Motion for Preliminary Injunction........................................................................ 1

Memorandum of Law ............................................................................................ 5

Introduction............................................................................................................ 5

Factual Background ............................................................................................... 6

Argument ............................................................................................................... 12

I.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment
      Claims .......................................................................................................... 12

      A.    Federal Agents Unlawfully Retaliated Against Journalists and
            Legal Observers ................................................................................. 13

            1.    Plaintiffs Were Engaged in Constitutionally Protected
                  Activities................................................................................. 13

            2.    Federal Agents' Use of Violent Force Has Chilled Plaintiffs
                  from Exercising Their First Amendment Rights..................... 14

            3.    Plaintiffs' Protected Activities Were a Substantial
                  Motivating Factor in the Federal Agents' Conduct................. 15

      B.    Plaintiffs Are Likely to Prevail on Their Access Claim....................... 18

            1.    Plaintiffs Have a Right to Observe and Report on Protests..... 18

            2.    The Federal Agents Have No Legitimate Interest in
                  Denying Plaintiffs Access....................................................... 20

            3.    Denying Plaintiffs Access is Not Narrowly Tailored............... 21

            4.    Denying Plaintiffs Access Leaves Them No Alternative
                  Observation Opportunities...................................................... 23

II.   Plaintiffs Will Suffer Irreparable Harm Without the Court's Intervention ...... 23

III.  The Public's Interest and Balance of Equities Weigh Strongly in Favor of
      Plaintiffs....................................................................................................... 26

A.    The Public Has an Unassailable Interest in a Free Press ...................................... 26

B.    A Preliminary Injunction Would Be Workable ..................................................... 27

C.    The Court Should Require That Federal Agents Be Marked With
Large Identifying Codes ........................................................................................ 30

D.    The Court Should Prohibit Federal Agents from Leaving Federal
Property While Carrying or Using Any Crowd-Control Device.......................... 31

E.    Plaintiffs Do Not Object to Adding an Indicium That Journalists
Stand to One Side................................................................................................... 31

F.    The Balance of Equities Weighs Strongly in Favor of Plaintiffs ........................ 32

Conclusion ..................................................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abudiab v. Georgopoulos,*
   586 F. App'x 685 (9th Cir. 2013) .......................................................................... 15

*Adkins v. Limtiaco,*
   537 F. App'x 721 (9th Cir. 2013) .......................................................................... 14

*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents,*
   824 F.3d 858 (9th Cir. 2016) ................................................................................. 15

*Associated Press v. Otter,*
   682 F.3d 821 (9th Cir. 2012) ................................................................................. 26

*Barich v. City of Cotati,*
   2015 WL 6157488 (N.D. Cal. Oct. 20, 2015) ..................................................... 24

*Bay Area Peace Navy v. United States,*
   914 F.2d 1224 (9th Cir. 1990) ............................................................................... 23

*Berger v. City of Seattle,*
   569 F.3d 1029 (9th Cir. 2009) ............................................................................... 23

*Bivens v. Six Unknown Narcotics Agents,*
   403 U.S. 388 (1971) ............................................................................................... 3

*Black Lives Matter Seattle—King Cty. v. City of Seattle,*
   2020 WL 3128299 (W.D. Wash. June 12, 2020) ........................................... 15, 24

*Board of Airport Commissioners v. Jews for Jesus, Inc.,*
   482 U.S. 569 (1987) ............................................................................................... 21

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ............................................................................................... 13

*Brown v. Entm't Merch. Ass'n,*
   564 U.S. 786 (2011) ............................................................................................... 27

*California First Amendment Coalition v. Calderon,*
   150 F.3d 976 (9th Cir. 1998) ................................................................................. 20

*Capp v. City of San Diego,*
   940 F.3d 1046 (9th Cir. 2019) ............................................................................... 17

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010) ............................................................................................... 27

*City of Houston v. Hill,*
   482 U.S. 451 (1987) ............................................................................................... 14

*Cmty. House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007) ............................................................................... 32

*Courthouse News Serv. v. Planet,*
   947 F.3d 581 (9th Cir. 2020) ................................................................................. 24

*Cox Broad. Corp. v. Cohn,*
   420 U.S. 469 (1975) ......................................................................................... 14, 19

*Doe v. Harris,*
   772 F.3d 563 (9th Cir. 2014) ................................................................................. 13

*F.T.C. v. Affordable Media*,
  179 F.3d 1228 (9th Cir. 1999) ........................................................................ 26
*Fields v. City of Philadelphia*,
  862 F.3d 353 (3d Cir. 2017) .......................................................................... 14
*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) .......................................................................... 14
*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ............................................................. 14, 19, 22
*Globe Newspaper Co. v. Superior Court*,
  457 U.S. 596 (1982) ..................................................................................... 27
*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014) ........................................................................ 12
*Grosjean v. Am. Press Co.*,
  297 U.S. 233 (1936) ..................................................................................... 26
*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*,
  24 F.3d 893 (7th Cir. 1994) .......................................................................... 24
*Hartman v. Moore*,
  547 U.S. 250 (2006) ..................................................................................... 13
*Jamison v. McClendon*,
  2020 WL 4497723 ..................................................................................... 6, 7
*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ................................................................................. 27
*Knox v. Serv. Employees Int'l Union, Local*,
  567 U.S. 298 (2012) ..................................................................................... 26
*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) .................................................................. Passim
*Lemon v. Kurtzman*,
  411 U.S. 192 (1973) ..................................................................................... 31
*Long Beach Area Peace Network v. City of Long Beach*,
  574 F.3d 1011 (9th Cir. 2009) ...................................................................... 19
*McComas v. City of Rohnert Park*,
  2017 WL 1209934 (N.D. Cal. Apr. 3, 2017) ................................................ 14
*McCullen v. Coakley*,
  573 U.S. 464 (2014) ..................................................................................... 18
*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ........................................................................ 27
*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
  192 F.3d 1283 (9th Cir. 1999) ........................................................... 13, 15, 16
*Menotti v. Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ...................................................................... 17
*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..................................................................................... 27
*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ..................................................................................... 27
*Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"),
  478 U.S. 1 (1986) .................................................................................... 18, 20

*Reed v. Lieurance,*
  863 F.3d 1196 (9th Cir. 2017) ..................................................................... 5, 19, 23, 24
*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) ....................................................................................... 21
*Stephens v. Union Pac. R.R. Co.,*
  935 F.3d 852 (9th Cir. 2019) ......................................................................... 17
*the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011)......................................................................... 12
*Ulrich v. City & Cty. of S.F.,*
  308 F.3d 968 (9th Cir. 2002) .......................................................................... 16
*United States v. Sherman,*
  581 F.2d 1358 (9th Cir. 1978) ........................................................................ 13
*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013) ..................................................................... 21, 22
*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ....................................................................................... 23
*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ..................................................................... 12, 23

## STATUTES

U.S. Const. amend. I ............................................................................................. 12

## RULES

Federal Rule of Civil Procedure 65 .................................................................... 1

## OTHER AUTHORITIES

*Newsgathering, Press Access, and the First Amendment,*
  44 Stan. L. Rev. 927 (1992) ........................................................................... 21

## **MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau hereby move for a preliminary injunction. This motion is based on Federal Rule of Civil Procedure 65 and the First and Fourth Amendments to the United States Constitution. Plaintiffs support this motion with the accompanying memorandum of law and declarations.

Plaintiffs specifically seek an order enjoining Defendant Department of Homeland Security ("DHS"), Defendant U.S. Marshals Service ("USMS"), and their agents and employees (collectively, the "federal agents") as follows:

1.      The federal agents are enjoined from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), unless the federal agents have probable cause to believe that such individual has committed a crime. For purposes of this injunction, such persons shall not be required to disperse following the issuance of an order to disperse, and such persons shall not be subject to arrest for not dispersing following the issuance of an order to disperse. Such persons shall, however, remain bound by all other laws.

2.      The federal agents are further enjoined from seizing any photographic equipment, audio- or video-recording equipment, or press passes from any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below), unless the federal agents are also lawfully seizing that person consistent with this injunction. Except as expressly provided in paragraph 4 below, the federal agents must return any seized equipment or press passes immediately upon release of a person from custody.

3.      The federal agents are further enjoined from ordering any person whom they know or reasonably should know is a Journalist or Legal Observer (as explained below) to stop photographing, recording, or observing a protest or law-enforcement action, or to move to a

location or distance from which that person cannot reasonably photograph, record, or observe a protest or law-enforcement action.

4.      If any federal agent seizes property from a Journalist or Legal Observer who is lawfully arrested consistent with this injunction, such federal agent shall, as soon thereafter as is reasonably possible, make a written list of things seized and shall provide a copy of that list to the Journalist or Legal Observer. If equipment seized in connection with an arrest of a Journalist or Legal Observer lawfully seized under this injunction is needed for evidentiary purposes, the federal agents shall promptly seek a search warrant, subpoena, or other court order for that purpose. If such a search warrant, subpoena, or other court order is denied, or equipment seized in connection with an arrest is not needed for evidentiary purposes, the federal agents shall immediately return it to its rightful possessor.

5.      To facilitate the federal agents' identification of Journalists protected under this injunction, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass or wearing a professional or authorized press badge or other official press credentials or distinctive clothing that identifies the wearer as a member of the press. In addition, some degree of physical separation from protesters is an indicium of being a Journalist under this injunction, but Journalists are not required to maintain such distance. These indicia are not exclusive, a person need not exhibit every indicium to be considered a Journalist under this injunction, and no one indicium is dispositive. The federal agents shall not be liable for unintentional violations of this injunction in the case of an individual who does not carry a press pass or wear a press badge or other official press credentials or distinctive clothing that identifies the wearer as a member of the press.

6.      To facilitate the federal agents' identification of Legal Observers protected under this injunction, the following shall be considered indicia of being a Legal Observer: wearing a National Lawyers' Guild issued or authorized Legal Observer hat (typically a green NLG hat) or wearing a blue ACLU issued or authorized Legal Observer vest.

PAGE 2 -   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
              FEDERAL DEFENDANTS

7.     Any federal agent who leaves the interior of a federal building during a protest while carrying or using any crowd-control device must wear a clearly visible unique identifying code on the front and back of the outside of his or her clothing (with white numbers or letters not less than eight inches in height against a dark background). Counsel for the federal agents shall maintain a list matching each unique identifying code to the name and unit of that person. The contents of this list need not be disclosed absent further court order after an opportunity to be heard.

8.     The federal agents are prohibited from leaving federal property while carrying or using any crowd-control device.

9.     The federal agents are not precluded by this injunction from issuing otherwise lawful crowd-dispersal orders for a variety of lawful reasons. The federal agents shall not be liable for violating this injunction if a Journalist or Legal Observer is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed after the issuance of an otherwise lawful dispersal order.

10.    Because any willful violation of this injunction, or any express direction by a supervisor or commander to disregard or violate this injunction, shall be considered a violation of a clearly established constitutional right and thus not subject to qualified immunity in any action brought against any individual employee, officer, or agent of the federal agents under *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), notice of this injunction must be widely disseminated. Accordingly, the federal agents are ordered to provide copies of this injunction, in either electronic or paper form, within 24 hours, to: (a) all federal agents currently deployed in Portland, Oregon (or who later become deployed in Portland, Oregon, while this injunction is in force), including but not limited to all personnel in Portland, Oregon, who are part of Operation Diligent Valor, Operation Legend, or any equivalent; (b) all employees, officers, and agents of the federal agents with any supervisory or command authority over any person in group (a) above; and (c) the U.S. Attorney General and the Secretary (or Acting Secretary) of the U.S. Department of Homeland Security.

PAGE 3 -   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
           FEDERAL DEFENDANTS

The materials submitted in support of this motion demonstrate that Plaintiffs and those similarly situated are threatened with irreparable harm, that they are likely to succeed on the merits, that the balance of this harm against any harm an injunction may inflict on other parties weighs in favor of granting it, and that the public interest favors issuing an injunction. For the reasons argued in the memorandum of law, the Court should enter an order granting this relief.

## MEMORANDUM OF LAW

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau respectfully submit this memorandum in support of their motion for a preliminary injunction.

## INTRODUCTION

Federal agents have repeatedly targeted journalists and legal observers for trying to document the Black Lives Matter protests in Portland. They admittedly have a policy of violently dispersing journalists and legal observers when they decide to break up protests. Through guns, tear gas, grenades, truncheons, and intimidation, the federal agents seek to create a government-controlled narrative about the protests. Using paramilitary troops to throttle newsgathering like this shatters the foundations of our democracy and strikes at the core of the First Amendment.

Plaintiffs are likely to prevail on the merits. The federal agents' complete shutdown of any First Amendment activity on their say-so is not narrowly tailored to achieve any legitimate government interest because journalists and legal observers pose no threat to public safety or law enforcement. It infringes Plaintiffs' right of access and leaves them no alternative forum for their protected activities. *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012); *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017).

For the reasons already found by the Court, the balance of equities and public interest strongly weigh in favor of protecting journalists and legal observers. Every second that Plaintiffs are prevented from recording, reporting and observing, both they and the public suffer irreparable harm. (Order Granting Temporary Restraining Order, Dkt. 84 at 16-17 (collecting authorities).)

Accordingly, the Court should issue a preliminary injunction similar to the TRO it has already put in place with two modifications. First, the federal agents should be required to wear visible, unique identification so that they are accountable to the Court and to the public. Second, the federal agents should be precluded from leaving federal property while carrying or using any

PAGE 5 -   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
          FEDERAL DEFENDANTS

crowd-control device. Such relief is necessary given their lack of proper training and history of mayhem in the streets of Portland.

The federal agents have argued that injunctive relief is unnecessary because state police have recently been patrolling the area outside the courthouse, and also claim that an injunction is "unworkable." The evidence shows otherwise. The Department of Homeland Security has issued a press release calling it a "myth" that "[s]tate and local police are replacing federal officers as DHS forces are standing down and withdrawing." (Dkt. 124-1 at 1.) And the terms of the injunction have proven workable in Portland and in other cities with civil unrest. That is because workability turns on a commitment to facilitating First Amendment activity, not suppressing it.

For all these reasons and those below, the Court should issue a preliminary injunction.

## FACTUAL BACKGROUND

On May 25, 2020, Minneapolis police killed George Floyd. He was but one of many Black people unjustly killed by the police. *See, e.g.*, *Jamison v. McClendon*, 2020 WL 4497723, at *1-2 & nn.1-19 (S.D. Miss. Aug. 4, 2020) (listing 19 such killings in the last five years). His murder prompted protests nationwide.

Every night since May 28, Portlanders have gathered around the city to protest against police brutality and insist that Black lives matter.[1] These protests have often been met with even more police violence. (Dkt. 9 ¶ 9.) To avoid accountability and prevent them from reporting on what the police were doing, the Portland police began targeting and dispersing journalists and legal observers with tear gas, munitions, truncheons, threats, and arrests. (*E.g.*, *id.* ¶¶ 13, 15-16, 18; Dkt. 12 ¶¶ 8-12; Dkt. 15 ¶ 5; Dkt. 22 ¶¶ 8-12.) Plaintiffs, who are a newspaper, journalists, and legal observers, filed this action to protect their right to record, document and observe these important events.

On June 30, Plaintiffs moved for a temporary restraining order against Defendant City of Portland. (Dkt. 7.) On July 2, the Court entered an order forbidding the police from "arresting,

---

[1] Dave Killen, *Portland protests continue for 72nd night*, The Oregonian (Aug. 8, 2020), https://www.oregonlive.com/galleries/VPE2KCL2UBG4LHDEMYZJXA24YU/.

PAGE 6 -   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
            FEDERAL DEFENDANTS

threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer." (Dkt. 33 at 2.) Two weeks later, the City stipulated to a preliminary injunction containing materially identical terms. (Dkt. 49.)

Almost as soon as the protests began, President Trump deployed troops to Portland from Immigrations and Customs Enforcement, Customs and Border Patrol, the Federal Protective Service, and the U.S. Marshals Service to, in his words, "dominate" the protesters and "quell" the Black Lives Matter protests. He called this operation "Diligent Valor." (Declaration of Gabriel Russell ("Russell Decl."), Dkt. 101-5 ¶¶ 2, 5.)

On July 4, federal agents began policing the protests, unleashing toxic clouds of tear gas and countless munitions on the streets of Portland. (*See id.*) They were aware of the Court's injunction, but took the position that they need not comply, and began targeting and dispersing journalists and legal observers to prevent them from reporting on what the federal agents were doing. After Plaintiffs added the federal agents as defendants and moved for a temporary restraining order, they redoubled their assaults on the media and legal observers. (Dkt. 79 at 6-9.) Examples of their violence before the TRO hearing include:

- Federal agents shot Plaintiff Mathieu Lewis-Rolland ten times in the back and side, all above the waist, even though he was marked "PRESS" from head to toe and snapping photos in a lighted area so that they could see that he was press. (Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland July 13 Decl."), Dkt. 44 ¶¶ 13-16.)

- They shot journalist Garrison Davis in the back with a tear-gas canister and sprayed him with pepper bullets even though he was wearing a helmet marked "PRESS" and displaying his press pass. (Declaration of Garrison Davis ("Davis Decl."), Dkt. 43 ¶¶ 4, 13-14.)

- They chased legal observers wearing green NLG hats away from the courthouse, threatening to beat them. (*Id.* ¶ 16.)

- They shot a tear-gas canister at Plaintiff Justin Yau, even though he was also marked "press" all over. (Declaration of Justin Yau ("Yau July 17 Decl."), Dkt. 56 ¶¶ 3, 6.)

- They shot and threatened to shoot Plaintiff Doug Brown, an ACLU legal observer, and several journalists. (Declaration of Doug Brown ("Doug Brown July 17 Decl."), Dkt. 55 ¶¶ 11-13.)

- They threw flashbang grenades at journalist Eddy Binford-Ross on three separate occasions and rolled a tear-gas canister at her. (Declaration of Elizabeth Binford-Ross ("Binford-Ross Decl."), Dkt. 78 ¶¶ 6, 9, 15.)

- They shot Plaintiff John Rudoff near the neck with a 40mm rubber bullet, barely missing his head, even though he too was marked "PRESS" all over. (Declaration of John Rudoff ("Rudoff July 20 Decl."), Dkt. 59 ¶¶ 3-7.)

- They shot Plaintiff Alex Milan Tracy in the ankle with an impact munition, causing ligament damage, and in the elbow with pepper balls. (Declaration of Alex Milan Tracy ("Tracy July 20 Decl."), Dkt. 60 ¶¶ 5, 8.)

- They shot NLG legal observer Nate Haberman-Ducey in the hand with an FN 303 riot gun. (Declaration of Nate Haberman-Ducey ("Haberman-Ducey Decl."), Dkt. 61 ¶ 4.)

- They shot clearly marked journalist Jungho Kim in the chest with a marker round. (Declaration of Jungho Kim ("Kim Decl."), Dkt. 62 ¶¶ 2, 7.)

- They shot legal observer James Comstock in his hand and a journalist in his camera lens. (Declaration of James Comstock ("Comstock Decl."), Dkt. 63 ¶¶ 4-5.)

- They told journalist Nathan Howard to stay where he was, and then shot him. (Declaration of Nathan Howard ("Howard Decl."), Dkt. 58 ¶¶ 6-7.)

- They shot journalist Noah Berger in the stomach and the elbow, beat him with their batons, and pepper-sprayed him at point-blank range. (Declaration of Noah Berger ("Berger Decl."), Dkt. 72 ¶¶ 4-11.)

- They shot journalist Jake Johnson in the stomach with a rubber bullet, only a few inches to the right of where his camera was hanging. (Declaration of Jake Johnson ("Johnson Decl."), Dkt. 64 ¶¶ 6-7.)

- They shot a female journalist in the buttocks at near point-blank range. (Declaration of Karina Brown ("Karina Brown Decl."), Dkt. 71 ¶¶ 11-13.)

- They pepper-sprayed journalist Mike Bivins at point-blank range. (Declaration of Mike Bivins ("Bivins Decl."), Dkt. 73 ¶¶ 4-6.)

- They shot pepper balls and threw a tear-gas grenade at Plaintiff Lewis-Rolland. (Declaration of Mathieu Lewis-Rolland ("Lewis-Rolland July 22 Decl."), Dkt. 77 ¶ 10.)

- They shot a flash-bang grenade at Plaintiff Tracy and another journalist, and shot a third journalist with an impact round. (Supp. Declaration of Alex Milan Tracy ("Tracy July 22 Decl."), Dkt. 79 ¶¶ 7-9.)

- They fired three smoke grenades at Plaintiff Mahoney, striking her left knee and right foot. She managed to dodge the third. (Declaration of Kat Mahoney ("Mahoney July 22 Decl."), Dkt 75 ¶¶ 12-13.)

- They shot journalist Steve Hickey in the head, twice. The first time, he managed to block it with his arm. The second time, he wasn't so lucky. (Declaration of Steve Hickey ("Hickey Decl."), Dkt. 81 ¶¶ 5-13.)

- They shot Plaintiff Rudoff again, this time in the shin. (Declaration of John Rudoff ("Rudoff July 22 Decl."), Dkt. 80 ¶¶ 5-7.)

- They shot journalist Gabriel Trumbly in the hand. (Declaration of Gabriel Trumbly ("Trumbly Decl."), Dkt. 82 ¶ 5.)

Based on these incidents, Plaintiffs sought, and the Court granted, a TRO against the federal agents. (Dkt. 84.) But the federal agents' campaign of violence and intimidation against journalists continued unabated:

- They shot Ms. Mahoney and Rachelle Collins in the head with paint bullets. Both were wearing blue ACLU vests. (Declaration of Kat Mahoney ("Mahoney July 26 Decl."), Dkt. 94 ¶¶ 5-8.)

- They maced Ms. Mahoney and Bruce Knivila, who were again wearing blue ACLU vests, along with two other legal observers wearing green NLG hats. (Mahoney July 26 Decl. ¶¶ 9-12; Declaration of Bruce Knivila ("Knivila Decl."), Dkt. 92 ¶¶ 3-10.)

- They tear-gassed a whole section of press and legal observers. (Knivila Decl. ¶ 8.)

- They shot OPB reporter Rebecca Ellis and forced her away from the scene of enforcement actions. (Declaration of Rebecca Ellis ("Ellis Decl."), Dkt. 88 ¶¶ 3-5.)

- They shot Brian Conley in the chest and foot when there were no protesters near him; threw a tear-gas canister at his head; and on a different night, shot him up again and threw multiple flash-bang grenades at him. (Declaration of Brian Conley ("Conley July 28 Decl."), Dkt. 87 ¶¶ 6-10, 18-24.)

- They shot OPB reporter Jonathan Levinson while there was almost no one else around. (Declaration of Jonathan Levinson ("Levinson Decl."), Dkt. 92 ¶¶ 4-6.)

- They shot Agence France-Presse Kathryn Elsesser when there was no one else around at all. (Declaration of Kathryn Elsesser ("Elsesser Decl."), Dkt. 89 ¶¶ 4-6.)

- They shot VICE reporter Daniel Hollis while he was with a group of press and several yards from the nearest group of protesters, who were themselves neither threatening nor doing anything illegal. (Declaration of Daniel Hollis ("Hollis Decl."), Dkt. 91 ¶¶ 4-7.)

- They shot NLG legal observer Haley Nicholson in the chest from four feet away. (Declaration of Haley Nicholson ("Nicholson Decl."), Dkt. 95 ¶¶ 3-7.)

- They kicked a flash-bang grenade and shot tear gas at *PSU Vanguard* managing editor Justin Grinnell. Both times, he was among only journalists, with no protesters around. (Declaration of Justin Grinnell ("Grinnell Decl."), Dkt. 90 ¶¶ 3-8.)

Plaintiffs accordingly moved for a finding of contempt and sanctions. (Dkt. 85.) The federal agents, meanwhile, argued that the Court should lift the TRO. (Dkt. 101.) At a status conference, the Court suspended briefing on Plaintiffs' motion for findings of contempt, authorized expedited discovery, and ordered the parties to focus on briefing whether the TRO should be extended. Plaintiffs submitted declarations evincing still more violations of the TRO:

- Federal agents shot and tear-gassed journalist Amy Katz with no protesters nearby. (Declaration of Amy Katz ("Katz Decl."), Dkt. 117 ¶¶ 5-9.)

- They shoved *New York Times* and *New Republic* reporter Sarah Jeong down the courthouse steps. (Declaration of Sarah Jeong ("Jeong Decl."), Dkt. 116 ¶¶ 5-7.)

- They pepper-sprayed Plaintiff Brian Conley at point-blank range not long after recognizing him as press. (Declaration of Brian Conley ("Conley Aug. 4 Decl."), Dkt. 115 ¶¶ 5-7.)

- They shot journalist Emily Molli in the arm while she was recording them. (Declaration of Emily Molli ("Molli Decl."), Dkt. 118 ¶¶ 5-7.)

- They shot a group of clearly marked journalists—all of whom were holding up their press passes, yelling that they were press, and taking pictures—with a barrage of impact munitions and tear gas. (Katz Decl. ¶¶ 11-12; Molli Decl. ¶¶ 8-9.)

- And they shot tear gas at a group of journalists three times on July 29, the evening after the federal government supposedly reached its deal with the State of Oregon. (Molli Decl. ¶ 10; Declaration of Andrew Jones ("Jones Aug. 4 Decl."), Dkt. 113-3 ¶ 8.)

In addition, Plaintiffs brought to the Court's attention official DHS guidance that federal agents need treat as journalists only those wearing a "press pass, press badge, or a shirt that says 'press'"—a definition significantly narrower than the TRO's, guaranteeing that agents would violate the TRO. (Dkt. 120-1 at 2; *cf.* Dkt. 84 at 19-20 ¶ 4.) The federal agents argued that they were on the verge of leaving Portland, obviating the need for the TRO to continue, but discovery showed that that was not true. (*Compare* Dkt. 113 at 8 *with* Declaration of Matthew Borden

PAGE 11 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
               FEDERAL DEFENDANTS

("Borden Decl."), Ex. 1 ("Russell Dep.") at 30:7-8, 48:22-24.) On August 6, the Court extended the TRO for another 14 days. (Dkt. 126.)

Since then, nothing has changed. The Portland protests have continued. The federal agents have not left. Journalists and legal observers still need the Court's protection.

## <u>ARGUMENT</u>

Under the traditional four-factor test, plaintiffs may obtain a preliminary injunction if they show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). Alternatively, in the Ninth Circuit, plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotation marks omitted)). Here, Plaintiffs easily meet either bar.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS

The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. amend. I. To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the Government bears the burden of justifying the restriction on Plaintiffs' speech. *Id.*

The substantive First Amendment issues here are essentially the same as those the Court has decided twice already, first when it granted the TRO against the City and a second time when it granted the TRO against the federal agents. Federal agents have retaliated against journalists and legal observers for reporting on their campaign of terror in downtown Portland. They have also illegally denied journalists and legal observers access to document and record what they are

doing to protesters. Thus, Plaintiffs satisfy the likelihood-of-success prong and the Court should enjoin the federal agents from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a journalist or legal observer.

### A.    Federal Agents Unlawfully Retaliated Against Journalists and Legal Observers

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). These elements are easily satisfied here.

### 1.    Plaintiffs Were Engaged in Constitutionally Protected Activities

Plaintiffs and the other declarants all easily satisfy the first prong of a retaliation claim because they were engaged in the core First Amendment activities of newsgathering and recording federal agents at protests.

The First Amendment protects newsgathering because freedom of the press lies at the heart of the First Amendment. *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). When the media reports on "the proceedings of government," it acts as "surrogates for the public," so the First Amendment's protection is at its zenith. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975); *Leigh*, 677 F.3d at 900 (quotation marks omitted). Here, at the time federal agents shot, beat, or intimidated them, Plaintiffs were doing just that: reporting on protests against the government and government agents' violent dispersal of the protesters.[2]

---

[2] Lewis-Rolland July 13 Decl. ¶¶ 2-3; Doug Brown July 17 Decl. ¶¶ 1-3; Yau July 17 Decl. ¶¶ 1-2; Rudoff July 20 Decl. ¶¶ 1, 3; Tracy July 20 Decl. ¶¶ 1, 3-5; Tracy July 22 Decl. ¶¶ 1, 3-4; Mahoney July 22 Decl. ¶¶ 1-2, 5-6; Lewis-Rolland July 22 Decl. ¶¶ 1-3; Rudoff July 22 Decl.

Plaintiffs' activity was constitutionally protected for a separate and independent reason: For 25 years, the Ninth Circuit has recognized that people have the right to film "public officials performing their official duties in public." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).[3] In the decades since *Fordyce*, courts have continued to recognize this clearly established right. *See, e.g.*, *McComas v. City of Rohnert Park*, 2017 WL 1209934, at *7 (N.D. Cal. Apr. 3, 2017) (holding that there is a clearly established right against retaliation for "peacefully filming [an] officer"); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (First Amendment protects filming of "government officials engaged in their duties in a public place, including police officers performing their responsibilities"); *Fields v. City of Philadelphia*, 862 F.3d 353, 355 (3d Cir. 2017) (collecting cases from the Courts of Appeals for the First, Fifth, Seventh, Ninth, and Eleventh Circuits). Here, Plaintiffs were gathering news, recording public demonstrations on public streets, and documenting protest activities and police conduct, just as Jerry Fordyce did 25 years ago.[4] *Fordyce*, 55 F.3d at 439. For this reason, Plaintiffs were engaged in constitutionally protected activity.

### 2.    Federal Agents' Use of Violent Force Has Chilled Plaintiffs from Exercising Their First Amendment Rights

Plaintiffs have submitted multiple declarations from journalists and legal observers, all of whom were attacked by federal agents even though they were clearly marked as press or observers and no one else was around.[5] These are repeated, targeted, painful, and gratuitous

---

¶¶ 1-3; Conley July 28 Decl. ¶¶ 1-2, 11-12, 18; Mahoney July 26 Decl. ¶¶ 1-3, 9; Conley Aug. 4 Decl. ¶¶ 1-3; *see also, e.g.*, Elsesser Decl. ¶ 2; Nicholson Decl. ¶ 2; Jeong Decl. ¶¶ 1, 4.

[3] This remains true even if a person directs "a significant amount of verbal criticism and challenge" at officers. *Adkins v. Limtiaco*, 537 F. App'x 721, 722 (9th Cir. 2013) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (allowing retaliation claim for photographing police officers to proceed)).

[4] *See* n.2, *supra*.

[5] *E.g.*, Bivins Decl. ¶¶ 2, 4, 6; Berger Decl. ¶¶ 3-4; Johnson Decl. ¶¶ 3, 6; Rudoff July 20 Decl. ¶¶ 3-7; Binford-Ross Decl. ¶ 15; Levinson Decl. ¶¶ 4-6; Mahoney July 26 Decl. ¶¶ 9-13; Knivila Decl. ¶¶ 8-10; Howard Decl. ¶¶ 2, 5-7; Berger Decl. ¶¶ 7-9; Conley July 28 Decl. ¶¶ 6-9; Katz Decl. ¶¶ 11-12; Molli Decl. ¶¶ 8-10; Elsesser Decl. ¶¶ 2, 4-6; Hollis Decl. ¶¶ 2, 4-7; Grinnell Decl. ¶¶ 2-3, 8.

PAGE 14 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
        FEDERAL DEFENDANTS

attacks. They are easily enough to chill a reasonable person's speech. *Mendocino*, 192 F.3d at

1300-01. Courts have had no trouble finding that similar uses of force would deter a person of

ordinary firmness from exercising their constitutional rights. *See, e.g.*, *Black Lives Matter

Seattle—King Cty. v. City of Seattle*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020)

(holding that using tear gas, pepper spray, and rubber bullets would "surely chill[] speech");

*Abudiab v. Georgopoulos*, 586 F. App'x 685, 686 (9th Cir. 2013) (denying qualified immunity for

retaliation where officer pepper-sprayed and punched plaintiff). Indeed, they have actually

prevented several declarants from continuing to attend and document the protests. (*E.g.*, Conley

July 28 Decl. ¶ 25 ("I want to continue covering the protests, but after what happened on July 27-

28, I can barely walk."); Elsesser Decl. ¶ 13 ("If I am asked to cover the protests again, I would

refuse unless I had a bulletproof vest"); Katz Decl. ¶ 15 ("Because of how federal agents treated

me, I have stopped covering the Portland protests.").) Even the ones who return fear that they

will once again be punished by federal agents. (*E.g.*, Karina Brown Decl. ¶ 14; Mahoney July 22

Decl. ¶ 17; Molli Decl. ¶ 11; Lewis-Rolland July 22 Decl. ¶ 12.)

> ### 3.    Plaintiffs' Protected Activities Were a Substantial Motivating Factor in the Federal Agents' Conduct

The last element of a retaliation claim is that a plaintiff's protected activity must be "a

substantial motivating factor" in federal agents' conduct—that is, there must be some "nexus

between [federal agents'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd.

Of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). This nexus may be shown with circumstantial as

well as direct evidence. *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002). For

example, evidence that federal agents engaged in speech-chilling conduct without a good non-

retaliatory reason for doing so is circumstantial evidence that an intent to chill speech was a

substantial motivating factor. *Mendocino*, 192 F.3d at 1300-01.

Plaintiffs easily meet this standard here. As noted above, Plaintiffs have documented

dozens of incidents where federal agents shot, beat, or intimidated someone clearly marked as a

reporter or legal observer, and in many of those instances, there was no conceivable alternative

target.[6] All of these uses of force were excessive. (Declaration of Gil Kerlikowske ("Kerlikowske Decl.") ¶¶ 30-41.) This continued after the TRO was entered. (*Id*. ¶¶ 40-41.) In several cases, federal agents deliberately attacked reporters or groups of reporters even after they had *alerted* the federal agents that they were press.[7] Nathan Howard was shot after he screamed that he was press and complied with agents' commands to stay where he was. (Howard Decl. ¶¶ 6-7.) Jungho Kim was shot in the chest right on his press pass. (Kim Decl. ¶ 7.)

Several were shot in the back. *Courthouse News* reporter Karina Brown was shot by a skilled marksman twice in the buttocks at close range. (Karina Brown Decl. ¶ 11.) Plaintiff Lewis-Rolland was shot 10 times with his back turned. (Lewis-Rolland July 13 Decl. ¶¶ 13-15.) Kathryn Elsesser was also shot from behind, when she was all alone, simply walking away from federal agents she had photographed. (Elsesser Decl. ¶¶ 4-6.) But federal agents have admitted that shooting people in the back is wrong:



(Borden Decl., Ex. 2 ███████████████.; *see also* Borden Decl., Ex. 3 ██████████

Haley Nicholson was carefully shot in the heart. (Nicholson Decl. ¶¶ 3-7.) Several others were also shot in inappropriate areas—some in the head—which is not how such munitions should be used. (Lewis-Rolland July 13 Decl. ¶¶ 13-16; Rudoff July 20 Decl. ¶ 7; Johnson Decl.

---

[6] *See* n.4, *supra*.

[7] *E.g.*, Howard Decl. ¶¶ 2, 5-7; Berger Decl. ¶¶ 7-9; Conley July 28 Decl. ¶¶ 6-9; Ellis Decl. ¶ 5; Katz Decl. ¶¶ 11-12; Molli Decl. ¶¶ 8-10.

¶ 6; Hickey Decl. ¶¶ 5-13; Mahoney July 26 Decl. ¶¶ 5-8; Nicholson Decl. ¶¶ 5-7; Kerlikowske Decl. ¶¶ 31, 33.) Indeed, several were shot with munitions that should not be shot at the body at all, such as pepper balls, tear-gas canisters, and flash-bang grenades. (Davis Decl. ¶¶ 4, 13-14; Tracy July 20 Decl. ¶ 5; Karina Brown Decl. ¶¶ 10-13; Howard Decl. ¶ 7; Conley July 28 Decl. ¶¶ 20, 24; Kerlikowske Decl. ¶¶ 32, 34.) There is no explanation for such conduct other than intimidation and retaliation, and the federal agents offer none.

In earlier briefing, the federal agents cited *Capp v. City of San Diego*, 940 F.3d 1046, 1059 (9th Cir. 2019), for the proposition that retaliatory intent must be a "but for" cause of the speech-chilling conduct. (Dkt. 67 at 17.) *Capp* says nothing of the sort. The plaintiffs there *did* allege that retaliation was a but-for cause, but the court was clear that the First Amendment required only that retaliation be a "substantial or motivating factor." *Id.* at 1055, 1059 (quotation marks omitted); *see Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 855 (9th Cir. 2019) ("The substantial-factor test is more permissive than the 'but-for' test applied in cases involving only a single possible cause.").

The federal agents have also argued that it is impractical to distinguish between law-abiding protesters" and "a violent subset of protesters who disrupt civic order." (Dkt. 67 at 17 (quoting *Menotti v. Seattle*, 409 F.3d 1113 (9th Cir. 2005).) But the declarations Plaintiffs have submitted were not, for the most part, close cases. In no instances were the victims protesting, much less doing anything violent, and almost all of them were not near any protesters, much less anyone engaged in violence. The federal agents are highly skilled marksmen with accurate weapons. (FPS 824 Dep. at 15:25-16:21, 22:15-22; *see also* Declaration of Andrew Smith ("Smith Decl."), Dkt. 106-1 ¶ 5 (explaining that the federal agents are "specially trained" and "capable of conducting complex and sensitive operations throughout the globe in furtherance of the rule of law"); Kerlikowske Decl. ¶¶ 27, 37.) Before they shoot, they are capable of assessing whom they are shooting. (FPS 824 Dep. at 25:2-16.) If they hit a journalist or legal observer, it is because they intend to do so.

### B.    Plaintiffs Are Likely to Prevail on Their Access Claim

The federal agents have admitted that their policy is to disperse everyone at the protests, without differentiating among protesters, rioters, journalists, and legal observers. As explained above, they have carried out that policy with deadly efficacy. But the federal agents can have no legitimate interest in excluding press and legal observers when they execute dispersal orders against protesters. Their stated policy is to protect federal property and law enforcement, but a policy of dispersing the press as well is not narrowly tailored and violates the First Amendment.

### 1.    Plaintiffs Have a Right to Observe and Report on Protests

Plaintiffs assert the right to observe, record, and report on how the federal agents police protests, interact with protesters, and enforce their dispersal orders. To vindicate that right, Plaintiffs must show (1) that the place and process to which they seek access have historically been open to the press and general public and (2) that public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 8-9 (1986); *Leigh*, 677 F.3d at 900.

As the Court has already held, both elements are met here: "The public streets, sidewalks, and parks historically have been open to the press and general public[.]" (Dkt. 84 at 14-15; Dkt. 33 at 7.) The federal agents have previously argued that Plaintiffs are "trespass[ing] on federal property" (Dkt. 67 at 17), but this is a non sequitur. Public streets are by definition public property—*i.e.*, government property—and that has never prevented courts from recognizing that they are traditional public fora, even when a government purports to "close" it. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 490 (2014) (closure of sidewalks adjacent to abortion clinics was overbroad). This applies with equal or greater force to "[p]ublic open spaces" such as parks, because they are "uniquely suitable for public gatherings and the expression of political or social opinion." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) (quotation marks omitted).

Moreover, permitting Plaintiffs to observe and report on how federal agents police protests and disperse crowds facilitates federal agents' accountability to the public. (Dkt. 84 at

PAGE 18 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
        FEDERAL DEFENDANTS

14-15; Dkt. 33 at 7.) People have "but limited time and resources with which to observe at first hand the operations of [their] government." *Cox Broad. Corp.*, 420 U.S. at 490-91. If they want to know what their public servants are doing in their name, they necessarily must rely upon the press. *Id.* That is why "the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." *Glik*, 655 F.3d at 82. Thus, Plaintiffs have a qualified right of access to law-enforcement activity at protests on public streets, sidewalks, and parks.

In earlier briefing, the federal agents argued that despite *Press-Enterprise II* and *Leigh*, they may lawfully disperse press and legal observers when they disperse protesters, because the First Amendment gives press and legal observers no greater rights than anyone else. (Dkt. 67 at 18.) This is a false syllogism. Press and protesters are engaged in different activities. Even assuming that the federal agents had a valid reason to use violence against people exercising their right to protest, it does not follow that the same purported justifications for using violence apply to journalists and legal observers.

Journalists and legal observers are engaged in different conduct than protesters, and so their claims are evaluated under different standards. Protesters seek a right to speak and assemble. Such claims are evaluated under the familiar forum-analysis framework.[8] Plaintiffs, however, seek a right to access and "observe government activities." Access claims are evaluated under the two-part test of *Press-Enterprise II*. *Leigh*, 677 F.3d at 898 & n.3. The latter test has no bearing on others' right to speak, even if at the same time and in the same place. That is why *Press-Enterprise II* established a right to access certain criminal proceedings, but not a right to heckle the judge. *See* 478 U.S. at 8-9. If a journalist seeks to engage in protest, she has no more

---

[8] Even if Plaintiffs' claims were evaluated under forum analysis, Plaintiffs would be likely to prevail for substantially the same reasons as stated here: Excluding journalists and legal observers is not narrowly tailored and leaves no alternative observation opportunities. *Reed v. Lieurance*, 863 F.3d 1196, 1211-12 (9th Cir. 2017).

right than the public.[9] But here, Plaintiffs seek to observe and report on protests, and under *Press-Enterprise II* and *Leigh*, they have a qualified right to do so even if the federal agents may lawfully disperse the public.

### 2. The Federal Agents Have No Legitimate Interest in Denying Plaintiffs Access

The federal agents can defeat Plaintiffs' qualified right of access only if they show "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 9. But the federal agents have no legitimate interest, much less an "overriding interest," in shooting people clearly marked as press or legal observers, who are committing no crime but simply documenting how federal agents interact with protesters. Federal agents might have a valid interest in protecting federal property or protecting themselves—but media and neutral observers present no threat to such interests. To the contrary, as the Ninth Circuit explained in *Leigh*:

> By reporting about the government, the media are "surrogates for the public." When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate. If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press. Thus, courts have a duty to conduct a thorough and searching review of any attempt to restrict public access.

677 F.3d at 900 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)); *see also* Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real

---

[9] Thus, for example, in *California First Amendment Coalition v. Calderon*, the Ninth Circuit permitted San Quentin to allow witnesses at executions to begin viewing the execution only after the inmate was strapped to the gurney and the IV was inserted. 150 F.3d 976, 981-82 (9th Cir. 1998). The regulation was justified because it was necessary to protect the anonymity of the executioners, and it still allowed access to observing and documenting the execution. *Id.* The Court reasoned that the press had no greater right than the public to document and observe the execution—because they were engaged in the exact same activity. *Id.* Here, in contrast, the press is documenting and observing the protests, while protesters are engaged in a different activity.

PAGE 20 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
    FEDERAL DEFENDANTS

motive may be to prevent the gathering of information about government abuses or incompetence.").

### 3.    Denying Plaintiffs Access is Not Narrowly Tailored

The federal agents' stated purpose for dispersing people is to protect federal property and law enforcement. (Russell Dep. at 12:16-13:1, 23:1-5.) But the Court has already held that "there are at least serious questions" about whether it is narrowly tailored for law enforcement to exclude journalists and legal observers at the same time. (Dkt. 84 at 16; Dkt. 33 at 7.) Effecting that exclusion with the kind of extreme violence federal agents have used against Plaintiffs and other journalists and legal observers[10] can never be narrowly tailored.

To be narrowly tailored, a policy must not "restrict more protected speech than is necessary." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 814 (9th Cir. 2013). Thus, in *Board of Airport Commissioners v. Jews for Jesus, Inc*., the Supreme Court struck down an ordinance that prohibited "all 'First Amendment activity'" in an airport terminal. 482 U.S. 569, 570, 574-75 (1987). The ordinance was aimed at activities that might cause congestion, such as canvassing, but the Court held that it was not narrowly tailored because it unnecessarily swept in protected activities such as "wearing of campaign buttons or symbolic clothing." *Id*. Similarly, the Ninth Circuit struck down a purported traffic-safety law that restricted hiring day laborers on the street because it prohibited "all in-street solicitation, regardless of whether the solicitation blocked traffic." *Valle del Sol*, 709 F.3d at 814, 825-27.

Here, the federal agents' admitted policy is to direct violence at *anyone* who does not leave when ordered to do so:

- "DHS admits that it does not have policies that differentiate between protesters, rioters, and people present for other reasons, such as journalists or legal observers." (Dkt. 124-4 at 4.)

---

[10] *See* nn.4 & 6, *supra*, and accompanying text.

- "DHS admits that before the issuance of the TRO, DHS did not direct its officers to exempt journalists and legal observers from dispersal orders, tear gas, munitions, and other crowd control techniques." (*Id.*)

Like the ordinance in *Board of Airport Commissioners*, this complete ban on First Amendment activities on public streets broadly sweeps in journalists and legal observers who pose no threat to the federal agents' stated objectives.

The federal agents have argued that "allowing journalists and legal observers to remain is not a practicable option." (Dkt. 67 at 20.) But "a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F.3d at 900. The federal agents have still offered no evidence, despite several opportunities, that any person marked as a journalist or legal observer has harmed a federal agent or anyone else. (*Cf.* Dkt. 67 (opposition to TRO); Dkt. 101 (motion for reconsideration); Dkt. 113 (opposition to extending TRO).) Allowing press to remain, unharmed, is something other police departments have safely done in hundreds of similarly chaotic protests. (Kerlikowske Decl. ¶¶ 3-4, 9, 15-19, 21, 28.) Police have several options for doing so safely, and if they actually perceived any risk, they could leave an officer back to liaise with press who are behind a skirmish line. (*Id.* ¶¶ 16-17.) The "availability of [such] obvious less-restrictive alternatives renders [the federal agents' blanket-exclusion policy] overinclusive." *Valle Del Sol*, 709 F.3d at 826; *see Glik*, 655 F.3d at 84 ("peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation").

Not only is the federal agents' policy overinclusive, it also fails to significantly advance its stated goal of protecting officer safety and federal property. Law-enforcement officers protecting a building usually create a perimeter around it, and from there they would have "no reason to target journalists or legal observers or disperse them." (Kerlikowske Decl. ¶ 8.) █████

████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████ Ignoring all these options and simply firing at journalists and legal observers does not advance the federal agents' stated goal because journalists and legal observers are not threats to officer safety and federal property. (CBP NZ-1 Dep. at 72:10-73:1, 84:20-85:3.) That "a substantial portion of the [policy's] burden on speech does not serve to advance its goals" is a second and "particularly compelling" reason why it fails the narrow tailoring requirement. *Berger v. City of Seattle*, 569 F.3d 1029, 1045-46 (9th Cir. 2009) (en banc) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990) (government "is not free to foreclose expressive activity in public areas on mere speculation about danger").

### 4. Denying Plaintiffs Access Leaves Them No Alternative Observation Opportunities

Excluding journalists and legal observers from the scene of protests and law-enforcement activities also fails to leave them any "alternative observation opportunities," much less "ample" ones. *See Reed*, 863 F.3d at 1211-12. The federal agents argue that Plaintiffs can just observe and report from "a few blocks away from federal property." (Dkt. 67 at 19.) This argument defies both constitutional law and the laws of physics. As the Court reasoned, "[f]ederal agents are using tear gas, which decreases visibility, and the protests are at night. Reporting from a few blocks away is not a viable alternative location." (Dkt. 84 at 15.) This is a third reason that denying journalists and legal observers access to protests is impermissible under the First Amendment. *Reed*, 863 F.3d at 1211-12.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION

"[A]nytime there is a serious threat to First Amendment rights, there is a likelihood of irreparable injury." (Dkt. 33 at 7 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005)).) Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their constitutionally protected right to record government activity in public has been infringed, they have satisfied the irreparable-injury requirement. (*See id.*) As long as federal agents are free to

shoot and arrest journalists and legal observers, Plaintiffs' exercise of their First Amendment rights will "surely [be] chilled." *Black Lives Matter*, 2020 WL 3128299, at *3; *Barich v. City of Cotati*, 2015 WL 6157488, at *1 (N.D. Cal. Oct. 20, 2015) ("No reasonable trier of fact could doubt that a person of ordinary firmness would be deterred by the threat of arrest.").

What is more, in the newsgathering context, the Ninth Circuit has recognized that time is of the essence and that any delay or postponement "undermines the benefit of public scrutiny and may have the same result as complete suppression." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (quoting *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). Thus, every minute that Plaintiffs are inhibited and intimidated from exercising their First Amendment rights, they suffer irreparable injury. (Dkt. 33 at 7.)

The federal agents have argued that because "the winding-down of the heightened federal presence [is] well underway," Plaintiffs are no longer in danger of suffering irreparable injury. (Dkt. 113 at 8.) This argument fails for at least two reasons. First, there is no evidence that the federal agents are going to stand down and withdraw from Portland, and DHS has publicly stated just the opposite. Second, in any event, FPS agents are always stationed in Portland.

Federal agents' supposed withdrawal from Portland is—to use DHS's word—a "myth." (Acharya Decl., Ex. 1 at 1.) According to DHS's own press report, reports and implications that it is leaving are "irresponsible and dishonest." (*Id.*) Mr. Russell, too, was unequivocal on the subject of the supposed drawdown:

> Q: Is Diligent Valor over?
>
> A: It is not.

(Russell Dep. at 30:7-8.) Nor could he say when it would be over. (*Id.* at 48:22-24.) ███████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ The federal agents argue that Plaintiffs' fear of injury is speculative, but the true speculation is when (or whether) they will withdraw from Portland. (*Cf.* Dkt. 113 at 12.)

In any event, their "heightened federal presence" is a red herring. Federal Protective Service agents are stationed in Portland year-round. (Russell Dep. at 11:16-12:7, 20:24-21:4; NZ-1 Dep. at 29:20-24.) These forces police "as many as a hundred [protests] a year." (*Id.* at 63:19-64:4.) Even if Operation Diligent Valor ends and all the excess troops are sent home, these regulars will remain.

And these troops remain a threat to Plaintiffs. They are under Mr. Russell's tactical and administrative command. (*Id.* at 11:16-22, 19:16-20:10, 20:24-21:9.) He is responsible for "making sure that [they] don't use excessive force" and for making sure that they follow the Court's TRO. (Russell Dep. at 76:9-12, 92:23-93:2.) But neither he nor anyone else at DHS disciplined a single agent for the uses of force described in Plaintiffs' declarations. (*Id.* at 81:8-10 ("Q: Ultimately, zero agents were disciplined? A: I don't know"); Dkt. 124-4 at 5 ("DHS admits that it has not disciplined any of its employees related to their treatment of a journalist or legal observer in Portland since May 26, 2020."); NZ-1 Dep. at 62:7-15.)

Mr. Russell stated that he did not know which officers or agents were involved in those incidents. (Russell Dep. at 81:1-7.) But he also took no steps to make it easier to identify agents who harmed journalists in the future. (*Id.* at 98:23-100:8.) He had not even read or watched the videos of two of the most egregious uses of force, the dectuple shooting of Plaintiff Lewis-Rolland and the wanton pepper-spraying of Plaintiff Mahoney. (*Id.* at 87:1-4, 101:8-102:16, 105:15-23; *but cf. id.* at 79:25-80:3, 100:9-11.) He was not even aware of the allegations. (*Id.* at 102:15-17.) Most concerning of all, even with the allegations before him, he could not "say one way or the other" whether they would be permissible in the absence of the TRO, or whether they violated the TRO. (*Id.* at 98:7-14, 104:16-19.)

This is not the testimony of a commander serious about preventing federal agents from intimidating, beating, and shooting journalists and legal observers. As long as FPS regulars remain here—and the government has given no indication that it intends to withdraw them, retrain them, or replace Mr. Russell with someone who will be attentive to their discipline—they will threaten Plaintiffs with irreparable harm.

PAGE 25 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
        FEDERAL DEFENDANTS

In sum, the heightened federal presence remains in Portland and continues to threaten Plaintiffs. The regular FPS presence also continues to threaten Plaintiffs. Mr. Russell, a commander with no interest in disciplining his troops, continues to command them all. And the situation in Portland remains "dynamic and volatile." (Dkt. 124-1 at 2.) So, there is at least a "possibility of recurrence," if not an outright likelihood that the federal defendants will be "free to return to their old ways" if the Court does not issue a preliminary injunction. *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) (quotation marks and alteration omitted).[11] That is especially true because the federal defendants "continue[] to defend the legality" of their conduct. *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Thus, the threat to Plaintiffs of irreparable injury is alive and well, and Plaintiffs need the Court's protection to continue their vital reporting and observing. (*See, e.g.*, Russell Dep. at 121:10-21 (agreeing that a local freelance journalist's reporting on the protests was "[a]bsolutely" a good thing).)

## III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

### A. The Public Has an Unassailable Interest in a Free Press

In the context of a preliminary injunction, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Not only do speakers have a right to speak and press a right to observe, but the public has a right to *know*. *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) (striking down tax on press because it would "limit the circulation of *information to which the public is entitled* in virtue of the constitutional guaranties" (emphasis added)). And it is "always in the public interest to prevent the violation of a party's constitutional

---

[11] Although this case speaks in terms of mootness, it involves precisely the same factual scenario as here: The defendants "contend[ed] that [their] 'voluntary cessation of an unlawful course of conduct preclude[d] the issuance of an injunction [because there was] no cognizable danger of recurrent violations.'" *Affordable Media*, 179 F.3d at 1237 (alteration omitted).

rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment).

It would be difficult to identify a situation in which the public has a greater interest in unbiased media coverage of police and Government conduct than this one. The protests are rooted in an incident of shocking police brutality, and how the police and federal agents respond to the protesters is of critical importance to how and whether the community will be able to move forward. "The press was protected [by the First Amendment] so that it could bare the secrets of government and inform the people." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). Although the protests began in Minneapolis, they have now spread across the country and the globe. The public interest in press coverage of these events cannot reasonably be questioned.

"The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citation omitted), and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

## B.    A Preliminary Injunction Would Be Workable

The federal agents argue that attempting to comply with the TRO "will hamstring federal officers in their duties" because lawbreakers are pretending to be press using indicia set forth in the TRO. (Dkt. 113 at 10-15.) But well-trained police are more than capable of using the indicia

in the Court's TRO and similar indicia to safely avoid hitting journalists and legal observers.
(Kerlikowske Decl. ¶¶ 3-4, 9, 15-19, 21, 23, 28.)

The federal agents still have not identified a single instance of a person masquerading as
press harming a federal agent or anyone else. Nor, after more than 60 straight days of protests,
has any such incident occurred with the local police. The reason that the federal agents cannot
point to any such event is that, unlike throwing objects or shining lasers when concealed by a
crowd, attacking law enforcement from behind their own lines ensures that the bad actor would
be sandwiched between the skirmish line and the rear guard and surely be swarmed and arrested.
(Kerlikowske Decl. ¶ 16.) Anyone with that kind of death-wish would just do so head on.

The federal agents have, so far, submitted several declarations that purport to show the
danger in permitting press and legal observers to report after a dispersal order. But in the most
dangerous such supposed incident, involving a person with a gun, video evidence shows that the
person did not cross the federal agents' perimeter, federal agents actually attacked the person
unprovoked, and the person had a valid license to carry the firearm. (Dkt. 124-3 at 5 ¶ 10; Dkt.
124 ¶ 7.[12]) Much of the federal agents' other evidence contains similar factual infirmities. (*See*
Dkt. 123 at 11-13 (explaining that Mr. Russell testified that he was unaware of many of the
events recounted in his declaration and had misstated significant facts of the videos he
watched).)

The remainder of the federal agents' declarations establish: (1) that some people marked
as press were intermingled with protesters and/or people engaged in wrongful conduct,[13] (2) that
some people marked with the word "press" engaged in wrongful conduct themselves,[14] (3) that

---

[12] https://youtu.be/1vcM5KMAwkY.

[13] CBP PAO #1 Decl. ¶¶ 6-8, 10, 12; FPS 824 Decl. ¶ 5(a); FPS 882 Decl. ¶¶ 5(a), (c)-(d);
Russell Decl. ¶ 8(a); CBP NZ-1 Decl. ¶¶ 11-13.

[14] CBP PAO #1 Decl. ¶ 9; FPS 824 Decl. ¶ 5(b); CBP NZ-1 Decl. ¶¶ 9-10; CBP SOG-1 Decl. ¶¶
10-11; Smith Decl. ¶¶ 8, 10-11, 14-15; Russell Decl. ¶¶ 8(b), (f)-(h).

PAGE 28 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
        FEDERAL DEFENDANTS

some people marked "press" avoided dispersal orders when they may not have been press,[15] and (4) that a few protesters have stated that they intend to fraudulently mark themselves as press.[16]

The TRO already answers these concerns. As to (1), the TRO does not prohibit law enforcement from going after wrongdoers, even if they are standing near or behind press. As to (2), the federal agents can arrest anyone if they have probable cause (Dkt. 84 at 18 ¶ 1),[17] and there is no evidence in the record that by marking themselves as "press," any of the wrongdoers identified by the federal agents gained any advantage. (Kerlikowske Decl. ¶ 14; FPS 824 Dep. at 54:1-56:22.) Indeed, protesters breaching or cutting the fence would be able to do the same thing (and be arrested) regardless of what they were wearing. (Russell Dep. at 122:24-123:23 (admitting that when an individual wearing a press helmet hopped the courthouse fence, the helmet did not affect officers' ability to determine that there was probable cause to arrest that person, and would not have prevented officers from arresting the person).)

As to (3) and (4), the federal agents have not submitted any evidence that any counterfeiters have caused any harm. For example, ████████████████████████ ████████████████████████████████████████████████ ████████████████ This declaration fails to establish that the subjects were not journalists. But even if they were not, ████████████████████████████ ████████████ He expressly testified: ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████ Obviously, protesters should not be exploiting the TRO, but the actions of these few

_____

[15] FPS 824 Decl. ¶ 5(c); FPS 882 Decl. ¶ 5(b).

[16] Russell Decl. ¶¶ 8(c), 8(e).

[17] ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

individuals does not create so manifest a threat to public safety or law enforcement as to alter the balance of the equities.

In sum, contrary to the federal agents' arguments, the TRO is perfectly workable. If federal agents have probable cause to believe a person is committing a crime, the TRO grants that person no immunity. If federal agents choose to arrest a person, the TRO offers that person no invulnerability. If a person wearing press indicia is mingled with protesters lawfully being dispersed, the TRO shields federal agents from liability for incidentally exposing that person to crowd-control devices. The safety valves are built in. The only workability issue under the TRO has been the federal agents' failure to comply with its terms.

### C.    The Court Should Require That Federal Agents Be Marked With Large Identifying Codes

When the federal agents were sent from Washington, they were told to police anonymously. This was the equivalent of telling them they would not be held accountable for the violence they were encouraged to inflict on Portland. "Having easily identifiable information specific to individual officers is a hallmark of professional policing." (Kerlikowske Decl. ¶ 42.) Adding prominent, visible numbers to the uniforms of any federal officer policing the protests would increase transparency and accountability, promote good behavior and deter misconduct without impeding the officers' abilities to do their jobs. (*Id.*)

For the preliminary injunction to be enforceable, there must be some way to identify federal agents who violate it. With that in mind, the Court suggested that any federal agent "who leaves the interior of the federal courthouse during a protest while carrying or using any crowd-control device must wear a clearly visible unique identifying code [at least 8 inches high] on the front and back of the outside of that person's clothing." (Dkt. 108.)

This modification would improve the workability of the preliminary injunction. To avoid burdening the Court with duplicative briefing, Plaintiffs incorporate the arguments and suggestions made at pages 11-12 of their memorandum in support of extending the TRO (Dkt. 112) and pages 14-17 of their reply brief (Dkt. 123). Plaintiffs also met and conferred with

PAGE 30 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
    FEDERAL DEFENDANTS

counsel for the federal agents on August 9 to explore the possibility of a mutually acceptable compromise, but the federal agents were unwilling to agree to any suggestion made by Plaintiffs thus far and did not have any new suggestions of their own. (Borden Decl. ¶ 5.) Because this proposal is necessary, fair, and workable, the Court should incorporate it into the preliminary injunction. *See Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality op.).

> ### D. The Court Should Prohibit Federal Agents from Leaving Federal Property While Carrying or Using Any Crowd-Control Device

Prohibiting federal agents from leaving federal property while on duty to police protests is also necessary, fair, and workable. To avoid burdening the Court with duplicative briefing, Plaintiffs incorporate the arguments made at pages 13-14 of their memorandum (Dkt. 112) and page 17 of their reply (Dkt. 123). In addition, while "police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers," that appears not to be true of the federal agents. (Kerlikowske Decl. ¶ 19.) They lack unity of command; they lack the training and experience to police civil disturbances; their conduct evinces no plan to facilitate rather than suppress First Amendment activities; and they seem to have provided less-lethal weaponry to every agent rather than "a small group of well-trained people who are familiar with the restraint necessary for policing this type of situation." (*Id.* ¶¶ 20-29.) For all these reasons, they should be limited to the minimum ambit necessary to execute their supposed mission of protecting federal property.

> ### E. Plaintiffs Do Not Object to Adding an Indicium That Journalists Stand to One Side

At the hearing on extending the TRO, the Court suggested that "perhaps one of the indicia of being a journalist or a protester[,] but not a requirement[,] is that they stand off to the side of the protests or the demonstration and not intermingle with the protesters," "when feasible and when it doesn't otherwise interfere with their journalistic or legal observer duties." (TRO Extension Hrg. Tr. at 7:7-15, 49:10-14 (Aug. 6, 2020)). As the Court seemed to recognize, journalists and legal observers often do not have the option of standing to one side, especially when police and federal agents seek to block their view of arrests and other enforcement actions.

PAGE 31 - PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST
      FEDERAL DEFENDANTS

But Plaintiffs do not object to this addition as stated and have incorporated it into their relief requested. Commensurately, however, Plaintiffs also ask the Court to clarify that federal agents may not order a journalist or legal observer to move to a location or distance from which that person cannot reasonably photograph, record, or observe a protest or law-enforcement action.

### F.    The Balance of Equities Weighs Strongly in Favor of Plaintiffs

Because Plaintiffs have "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted). Plaintiffs' evidence—both video and testimony—shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish journalists for recording government conduct and that their unlawful policy is aimed toward the same end. In contrast to the substantial and irreparable injuries to Plaintiffs, any harm to the Government would be negligible. The Government has no legitimate interest in preventing journalists from reporting on what it is doing to protesters. While the Government might have an interest in protecting federal buildings and property, that interest is not served by using force against individuals who are identified as journalists, or who are merely recording events and present no threat of harm to police or the public.

The balance of equities weighs heavily in favor of Plaintiffs.

\* \* \*

The Government's attempts to shield its violence against protesters from public scrutiny by targeting press and legal observers shows, once again, that "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh*, 677 F.3d at 900. But just as the "free press is the guardian of the public interest," so "the independent judiciary is the guardian of the free press." *Id.* To protect the press—and ultimately, the public's power to govern its public servants—this Court should enjoin the police from dispersing and retaliating against press and legal observers.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction against the federal agents.


Dated: August 10, 2020                          Respectfully Submitted,


                                                By: /s/ Matthew Borden
                                                        Matthew Borden, *pro hac vice*
                                                        J. Noah Hagey, *pro hac vice*
                                                        Athul K. Acharya, OSB No. 152436
                                                        Gunnar K. Martz, *pro hac vice*
                                                        BRAUNHAGEY & BORDEN LLP


                                                        Kelly K. Simon, OSB No. 154213
                                                        ACLU FOUNDATION OF OREGON

                                                        *Attorneys for Plaintiffs*