**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>　　　　　Defendants. | Case No. 3:20-cv-1035-SI<br><br>**DECLARATION OF GIL KERLIKOWSKE** |

PAGE 1　　DECLARATION OF GIL KERLIKOWSKE

I, Gil Kerlikowske, declare:

1.  I am the former Senate-confirmed Commissioner of U.S. Customs and Border Protection. I served as the Chief of Police in Seattle from 2000 through 2009.

2.  I received a BA and MA from the University of South Florida in Tampa. I also graduated from the Executive Institute at the Federal Bureau of Investigation Academy in Quantico, Virginia. I served in the United States Army and Military Police from 1970 through 1972, where I was awarded the Presidential Service Badge, and where I began training in crowd control, riots, and civil disturbances. I have worked in law enforcement and policy for 47 years. I also have served as the Director of the Office of National Drug Control Policy. I have also served as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. I have been an IOP Fellow at Harvard Kennedy School of Government and teach as a distinguished visiting fellow and professor of the Practice in Criminology and Criminal Justice at Northeastern University. A true and correct copy of my curriculum vitae is attached as **Exhibit 1**.

3.  During my tenure as Chief of Police in Seattle, I led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were considerably larger than the recent protests in Portland. I did the same thing when I was Police Commissioner in Buffalo.

4.  I have been asked to evaluate whether the relief stated in the temporary restraining order issued by the Court ("TRO") is safe and workable from a law enforcement perspective, whether the force that federal authorities used against journalists and legal observers complainants was reasonable and whether it is advisable to prominently mark federal agents. My conclusions are as follows:

- **Opinion No. 1**: The TRO is safe for law enforcement. Defending the federal courthouse mainly involves establishing a perimeter around the building, and there is no reason to target or disperse journalists from that position. To the extent officers leave federal property, the TRO is also safe. We did not target or disperse journalists

in Seattle, and there were no adverse consequences. To my knowledge, the Portland police similarly have not suffered any injuries as a result of the TRO.

- **Opinion No. 2**: The TRO is workable. Trained and experienced law enforcement are able to protect public safety without excluding journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control. Any difficulties to federal authorities arise from lack of training, experience and leadership that is experienced in civil disturbances/unrest.

- **Opinion No. 3**: Virtually all the injuries suffered by the complaining journalists were the result of improper use of force, including shooting people who were not engaged in threatening acts and misuse of crowd-control munitions.

- **Opinion No. 4**: A key duty and responsibility of law enforcement is to be properly and easily identified specific to the organization and the individual. Camouflage uniforms are inappropriate for urban settings. If a decision is made to remove a name tag, it must be replaced with some other identifying label, badge or shield number for example. Such markings increase accountability and act as a check against misconduct.

## MATERIALS REVIEWED

5. The evidence and materials I reviewed in connection with preparing this declaration are: the depositions of FPS 824, NZ-1, Gabriel Russell, declarations and video evidence submitted by the plaintiffs (Dkt. Nos. 43-44, 55-56, 58-64, 71-78, 80-82, 86-95, 114-120, 124), declarations and video evidence submitted by the federal defendants (Dkt. Nos. 67, 101, 105-106, 113), pleadings (Dkt. Nos. 42, 46-47, 53-54, 67, 70, 79, 84-85, 101, 112-113, 121-123), discovery responses, and redacted policies and procedures produced by the federal defendants.

## DISCUSSION AND ANALYSIS

6. As detailed below, it is my opinion that the terms of the TRO are safe for law enforcement and can be followed by trained law enforcement with leadership that is experienced

in civil disturbances and unrest. To date, the federal defendants have repeatedly employed undisciplined, unnecessary and excessive force against journalists and legal observers. Being clearly marked with identification numbers is a best practice that would increase accountability and could help deter misconduct.

**Opinion 1.      The TRO Is Safe for Law Enforcement**

7.      The federal defendants' stated purpose of coming to Portland is to defend federal property and in specific, the Mark O. Hatfield Courthouse.

8.      Generally, in defending a property like the courthouse, police form a perimeter around the property. In Portland, law enforcement has constructed a fence around the property, and the federal agents are able to create their perimeter inside the fence. In this defensive stance, law enforcement officers (LEOs) would have no reason to target journalists or legal observers or disperse them. Complying with the relief ordered by the Court under these circumstances would not be unsafe or burdensome for law enforcement trained to deal with situations involving large, and sometimes unruly crowds.

9.      In some of their declarations,[1] federal agents have claimed that they often have to make split-second decisions about who to target and have suggested that they are incapable of distinguishing journalists and legal observers from protesters. This is not consistent with my understanding of the capabilities of police officers who have received proper training in these situations. It is also inconsistent with the testimony of FPS 824, who testified that he assesses what a person is doing and whether that person poses a threat before shooting at anyone.[2]

10.      In sum, based on the evidence I have seen and my personal experience with volatile protests, the protections for journalists and legal observers ordered by the Court pose no threat or even a risk to law enforcement in the situation where LEOs have formed a perimeter around the federal property and are defending from that position.

---

[1] Dkt. Nos. 67, 101, 105-106, 113.
[2] FPS 824 deposition at 27:3-18, 27:25-28:10.

11. There have also been some situations where federal officers leave federal property and engage with protesters in the streets of Portland. The TRO is also safe for law enforcement in this situation for at least four separate reasons.

12. First, the Portland Police Bureau and other local law enforcement agencies have been operating under the terms of the TRO for over a month. I am unaware of any officer being injured as a result of an individual posing as press to infiltrate police skirmish lines. I also have not seen any evidence of any incident where pretending to be a journalist enabled someone to cause any harm to anyone in law enforcement.

13. Similarly, press and legal observers have been going behind the federal officers' lines,[3] and there has been no reported instance of anyone disguising themselves as press to get behind the federal officers' lines to ambush or otherwise injure them.

14. None of the evidence submitted by the federal defendants suggests that anyone pretending to be press was able to harm law enforcement as a result of the TRO. The declarations submitted by the federal defendants showed that a few people who had marked themselves as press engaged in criminal acts. But law enforcement was not fooled that these people were journalists and judged them by their unlawful conduct, as is not prohibited by the TRO.[4]

15. Second, it is common for police to allow journalists behind their lines. We did so at the massive protests in Seattle. In the hundreds of protests I was responsible for, I do not recall any instance where someone pretended to be media so that they could get behind police lines and attack the police.

16. Third, as a practical matter, there is no significant risk in allowing anyone behind a skirmish line because the skirmish line is always followed by a second wave of officers. Thus, getting behind the initial line would not do much good for anyone planning to attack law enforcement because they would simply be surrounded by LEOs.

---

[3] FPS 824 deposition at 58:4-16.
[4] FPS 824 deposition at 54:1-56:22.

PAGE 5     DECLARATION OF GIL KERLIKOWSKE

17. Fourth, there are many well-known techniques that the federal officers could use to mitigate any possible risk, such as leaving an officer back to act as a liaison with press who are behind a skirmish line. Another option is to request meetings with journalists and freelancers (and organizations where they are employed) ahead of the protest. I am unaware of the federal defendants taking these, or any other steps to mitigate any risk that someone with ill will might attack or injure them by pretending to be press.

18. Protecting the officers working for you is one of the most critical functions of leadership in law enforcement. As a person who has been responsible for policing hundreds of chaotic protests, if I had believed there was any risk to any of my officers, I would have taken proactive steps to eliminate it. The fact that the federal defendants have not taken any risk mitigation measures strongly suggests that they do not perceive any actual risk.

**Opinion 2.    The TRO Is Workable**

19. As noted above, police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers or violating any of the other restrictions in the TRO. I have not seen any evidence that suggests otherwise. It appears that there were a few incidents where someone identifying themselves as press was engaged in a crime, but there is nothing in the TRO to prevent such an individual, regardless of press identification, from being arrested and charged.  It is quite common in some protests for violators to commit a criminal act and then use the anonymity of the crowd to blend back in, as some of the federal defendants have noted in their declarations.[5] But those are just the general nature of some protests. They do not have anything to do with the TRO.

20. Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities. I have not seen such plans for the federal defendants in this case, which helps explain why they have been so unsuccessful in their policing efforts.

---

[5] Dkt. Nos. 67, 101, 105-106, 113.

PAGE 6    DECLARATION OF GIL KERLIKOWSKE

21. As discussed above, police who are experienced with dealing with protests, and in specific protests where some individuals have engaged in violent and destructive acts (such as the police in Seattle and Portland), are capable of assessing and managing the risks posed in these unique circumstances.

22. It does not appear that the officers managing the federal response are similarly prepared. Foremost, it is a basic principle of policing, that in any situation like this, there must be unity of command. Here, Gabriel Russell, the person in charge of the Department of Homeland Security (DHS) forces testified that he has no command over the United States Marshalls who are also out policing the protests. This has led to chaotic and dangerous policing.

23. Unlike local police, most of the personnel in the federal agencies that were sent to Portland appear to lack training and experience dealing with the types of protests ongoing in Portland. Putting less-lethal weapons in their hands and sending them to police the protests is a dangerous and ill-conceived policy.

24. When I was Chief of Police in Seattle, protesters would often march past the federal office building, and Seattle Police would coordinate with FPS who generally remained inside the building because the local police had far more experience in dealing with the specific types of issues that arose in the local protests.

25. A DHS memo states that the agents "do not specifically have training in riot control and mass demonstrations."[6] DHS has tried to skirt this conclusion by citing to its training in responding to disturbances in confinement facilities. But there is no comparison between policing a civil disturbance on the street and in a confinement facility, where, for example, First Amendment issues, much less the rights of the press and legal observers, are not a consideration.

26. Similarly, CBP operates primarily on the border, where Fourth Amendment issues do not often arise. Taking enforcement action against people charging to a border wall/fence to

---

[6] https://int.nyt.com/data/documenttools/dh-stacticalagent memo1/d490e392eab7d7d6/full.pdf.

PAGE 7     DECLARATION OF GIL KERLIKOWSKE

cross illegally is very different than policing people on a city street, who are exercising their First Amendment rights.  Further, in their daily jobs, members of CBP operate independently, or at most, sometimes with a partner. They are taught to take individual initiative to deal with threats, as opposed to what happens in a protest. In policing crowds/civil unrest, officers work in large formations and are instructed *not* to take individual actions, to essentially not break ranks.  This discipline requires on-going training for the law enforcement personnel and their leadership.

27. BORTAC is the equivalent of SWAT for the Border Patrol, and they participate in actions such as serving a search warrant at a "stash house" location where human traffickers are holding people, and other high-risk assignments. It is my understanding that the US Marshals Special Operations Group (SOG) is a similar tactical unit that among other things, apprehends dangerous fugitives, escorts dangerous prisoners, and provides security in terrorism trials or high-profile cases like the El Chapo trial. While they are excellent marksman and can surely distinguish journalists and legal observers from protesters in the heat of the moment, their skills are not particularly useful for the situation in Portland because the techniques used against the threats posed by heavily-armed and dangerous criminals are far different than what is appropriate to use against the threats posed by people throwing bottles or fireworks.

28. It also appears that all the federal officers policing the protests were given less-lethal munitions. In dealing with this type of protest, it is critically important that only a small group of well-trained people who are familiar with the restraint necessary for policing this type of situation be given such weapons (for example, in Seattle, I limited such weapons to members of the SWAT team).

29. In sum, the protections in the TRO are workable for trained law enforcement, as seen with the Portland police. To the extent that the federal agents are having any difficulties, such problems arise from the failure of supervision and leadership, lack of experience, and failure of leadership to ensure that the agents are properly trained for civil disturbances/unrest.

**Opinion 3.  The Federal Defendants Have Used Excessive and Unnecessary Force against Journalists and Legal Observers**

30. I have reviewed the declarations that have been submitted by journalists and legal observers, but have not seen any explanation or refutation. Based on my review of the unrefuted declarations, there appears to be widespread intentional, or willfully reckless misuse of force against journalists and legal observers both before and after the Court issued the TRO.

    A.    **Pre-TRO Conduct**

31. A federal agent or agents shot Plaintiff Mathieu Lewis-Rolland ten times in the back and side, all above the waist, even though he was marked "PRESS" on his shirt and was taking photos in a lighted area so that they could see that he was press. (Dkt. 44 ¶¶ 13-16.) Under these circumstances, shooting Mr. Lewis-Rolland was more likely than not excessive use of force because (1) he was not doing anything to threaten law enforcement or dangerous to others, (2) he was shot 10 times, (3) he was shot in the back so it is not arguable that he posed any immediate threat, (4) he was not given any warning, and (5) he was clearly marked as press. Given that all the federal agents deployed in Portland have had extensive marksmanship training, it is also unlikely that they were somehow firing at anyone else.

32. Federal agents shot journalist Garrison Davis in the back with a tear-gas canister and shot at him with pepper balls when he was merely taking video of federal officers, and there were no protesters around him. (Dkt. 43 ¶¶ 4, 13-14.) Under these circumstances, these acts more likely than not constitute excessive use of force because (1) he was not doing anything threatening and was "moving back" from the federal officers when he was shot with the tear gas cannister, (2) it is inappropriate and dangerous to shoot anyone with a tear gas cannister, (3) he was shot in the back so it is not arguable that he posed an immediate threat, (4) it is inappropriate and dangerous to shoot at anyone with pepper balls, as they are supposed to be shot at the ground so that they explode and release the contents,[7] (5) when the pepper balls were shot at him, he was

---

[7] The dangers of shooting pepper balls at people became widespread public knowledge in 2004, after Victoria Snelgrove was killed by a pepper ball fired by a Boston police officer after the Red Sox beat the Yankees in the American League Playoffs.

taking videos from the side of the protest, and no protesters were near him, and (6) at the time all these events occurred, he was wearing a helmet marked "PRESS" and displaying his press pass.

33. A federal agent shot John Rudoff in the right shoulder with a 40mm rubber bullet. (Dkt. 59 ¶ 7.) Mr. Rudoff was carrying a press pass, wearing a vest that said "PRESS" in big block letters and a helmet that also said "PRESS" in big block letters. (*Id*. ¶¶ 3-5.) He was standing in an open well-lit area away from any arrest or skirmish line. (*Id*. ¶ 6.) Under these circumstances, these acts more likely than not constitute excessive use of force because (1) Mr. Rudoff was not doing anything threatening, (2) it is inappropriate and dangerous to shoot anyone above the waist, much less near the head, with a rubber bullet, (3) at the time all these events occurred, he was very clearly marked as "PRESS" and was displaying his press pass. In addition, from the declaration, it does not appear that Mr. Rudoff was near anyone who would be a legitimate target, and given the marksmanship training and skills possessed by the federal agents, it is unlikely that whoever shot Mr. Rudoff actually intended to shoot someone else.

34. A federal officer shot Plaintiff Alex Milan Tracy in the ankle with an impact munition, and in the elbow with pepper balls. (Dkt. 60 ¶¶ 5, 8.) He "was standing in an open, well-lit area, not behind any protestors." (*Id*. ¶ 4.) He was wearing a "PRESS" helmet, using professional photography equipment and displaying a press card. (*Id*. ¶ 3.) Under these circumstances, these acts more likely than not constitute excessive use of force because (1) Mr. Milan Tracy was taking videos and photographs of the protest and was not doing anything threatening, (2) it is inappropriate and dangerous to shoot anyone with pepper balls, (3) at the time all these events occurred, he was very clearly marked as "PRESS" and was displaying his press pass, and (4) he was not near protesters and was in a well-lit area such that a reasonable officer, and especially one trained in marksmanship, could see that he was press and was not doing anything threatening.

35. A federal agent shot journalist Jungho Kim in the chest with a marker round, while he was standing to the side of the protest, away from protesters, taking photos. (Dkt. 62 ¶¶ 2, 7.) Under these circumstances, this shooting more likely than not constituted excessive use

of force because (1) Mr. Kim was not doing anything threatening, (2) at the time all these events occurred, he was clearly marked as "PRESS" and was displaying his press pass, (3) whoever shot him likely saw his press pass and press vest in the sight of their gun, (4) there was no need to mark him for any reason, and (5) he was not near protesters. Given the marksmanship training and skills possessed by the federal officers on the scene, it appears unlikely that whoever shot Mr. Kim actually intended to shoot someone else.

36. I have seen several unrefuted accounts of federal officers threatening and attacking NLG and ACLU legal observers, who are easily identifiable from their green hats and blue ACLU vests.[8] Those incidents appear more likely than not to be excessive force.

37. For similar reasons above (absence of behavior necessitating the use of force, the absence of legitimate targets nearby, the fact that the federal officers are highly skilled marksmen, the misuse of less-lethal munitions, and that the journalists were clearly marked press), I believe that it is more likely than not that at least the following incidents also constituted the excessive use of force: Dkt. 56 ¶¶ 3, 6 (firing tear gas cannister at journalist filming from the side, 40 feet from protesters); Dkt. 78 ¶¶ 9 (throwing flash bang at journalist off to the side); Dkt. 63 ¶ 5 (shooting legal observer when he was away from the protest taking notes on his phone); Dkt. 71 ¶¶ 11-13 (shooting female journalist twice in the buttocks at close range); Dkt. 72 ¶¶ 8-9 (beating and pepper spraying journalist who stated he was leaving protests in response to threats from federal agents and was holding up press pass); Dkt. 64 ¶¶ 5-6 (shooting journalist with rubber bullet, with no warning or provocation, when he was not near any protesters); Dkt. 73 ¶¶ 4-6 (pepper spraying journalist with press pass without provocation or warning); Dkt. 81 ¶¶ 4-15 (shooting journalist twice in head with rubber bullet, once when nobody else was around); Dkt. 82 ¶ 5 (shooting journalist with 40mm round when he was not near protesters); Dkt. 116 ¶¶ 5-7 (shoving journalist down courthouse steps).

---

[8] For example, Dkt. 43 ¶ 16; Dkt. 55 ¶¶ 11-13; Dkt. 61 ¶ 4.

PAGE 11   DECLARATION OF GIL KERLIKOWSKE

38.  It is my understanding that DHS and the US Marshals do not differentiate between press and protesters when executing dispersal orders.[9] Even if such a practice were legal, it still would not justify the deliberate attacks on non-threatening journalists and legal observers described above, which FPS 824 testified was contrary to his practice of only shooting at people who were attacking him or other LEOs.[10]

39.  My conclusion that at least some federal officers were intentionally targeting journalists and legal observers with excessive force before the TRO is further supported by the fact that a federal officer told journalist Nathan Howard to stay where he was, and then the officer next to him shot Mr. Howard. (Dkt. 58 ¶¶ 6-7.) Based on my review of the evidence, each of the incidents discussed above was more likely than not intentional, rather than the result of federal officers firing with cause at a protester and missing.

B.  **Post-TRO Conduct**

40.  I have not analyzed whether the federal defendants have violated the Court's TRO. However, it is more likely than not that the following events constitute unnecessary and excessive use of force against journalists and legal observers: Dkt. 94 ¶¶ 5-8 (shooting clearly marked legal observers in the head and neck); Dkt. 94 ¶¶ 9-12 and Dkt. 92 ¶¶ 3-10 (spraying legal observers in the face with mace); Dkt. 92 ¶ 8 (tear-gassing whole section of press and legal observers); Dkt. 87 ¶¶ 6-10, 18-24 (shooting journalist when there were no protesters near him, and throwing tear gas and flash bangs at journalist); Dkt. 92 ¶¶ 4-6 (shooting journalist's camera when there was almost nobody else around and there was no other apparent target); Dkt. 89 ¶¶ 4-6 (shooting journalist walking away from protest when there was no one else around); Dkt. 91 ¶¶ 4-7 (shooting journalist several yards away from nearest protesters, who were not engaged in dangerous or violent activity); Dkt. 95 ¶¶ 3-7 (shooting clearly marked legal observer in chest from close range); Dkt. 118 ¶¶ 5-7 (shooting journalist who was filming protests when no other

---

[9] DHS and US Marshals' Response to Plaintiffs' Requests for Admission Nos. 4 and 5.

[10] FPS 824 deposition at 25:2-16, 27:3-18. 28:1-10. 34-14:21, 35:7-36:19.

targets were present); Dkt. 90 ¶¶ 3-8 (kicking a flash-bang grenade and shooting tear gas at journalist when he was only among journalists, and no protesters were around); Dkt. 117 ¶¶ 11-14 (shooting journalist in group of journalists with no violent conduct nearby); Dkt. 115 ¶¶ 5-8 (pepper spraying journalist).

41.     While some situations described by journalists and legal observers may be more ambiguous than others, virtually all the use of force against journalists and legal observers stated in the declarations filed by Plaintiffs was undisciplined, unwarranted and unnecessary.

**Opinion 4.    The Federal Defendants Should Clearly Identify Themselves**

42.     Having easily identifiable information specific to individual officers is a hallmark of professional policing. Adding prominent, visible numbers to the uniforms of any federal officer policing the protests would increase transparency and accountability, promote good behavior and deter misconduct. Adding prominent numbers would not impede the officers' abilities to do their jobs.

Dated:  August 9, 2020                                          _____
                                                                                       Gil Kerlikowske

# EXHIBIT 1



**R. Gil Kerlikowske** has a distinguished 40-year career as an urban law enforcement executive and leading the nation's largest law enforcement organization. Appointed by President Obama, Gil has served as the only Senate-confirmed Commissioner of U.S. Customs and Border Protection (CBP) 2014-2017. CBP has 60,000 employees at 338 Ports of Entry and over 800 employees in 40 nations.  As Commissioner, Gil guided CBP's mission to secure the nation's borders while facilitating lawful international trade and travel.  The largest components of the organization are Air and Marine Operations, the U.S. Border Patrol, Customs and Border Protection, and Agriculture Inspection.  The Agency has an annual budget of $13 billion.

Prior to his appointment to CBP, Gil served as the Senate-confirmed Director, White House Office of National Drug Control Policy, 2009-2014, a cabinet-level position.  In his role, he initiated the first *President's Strategy on Prescription Drugs,* authored the *President's National Drug Control Strategy,* and co-authored (with John Brennan) the *President's Trans-National Organized Crime Strategy.*

Under the Clinton Administration, Gil was the Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services 1998-2000 where he oversaw $6 billion of government assets aimed at reforming law enforcement policy and operations.

Gil served as the Chief of Police in two large, urban organizations where he instituted significant organizational change.  In Seattle (WA), between 2000-2009, he oversaw the organization in the aftermath of the World Trade Organization disorder—completely    restructuring Seattle's response to major international incidents and demonstrations.  In Buffalo (NY), between 1994-1998, Gil was the first "outside" (the Buffalo Police Department) Commissioner in 30 years.  He transformed the Department to a community policing organization, winning the praise of both local residents and national leaders.  He was twice elected President of the Major Cities Chiefs Association, comprised of the largest law enforcement agencies in the U.S. and Canada.  He is the recipient of numerous awards and recognition for his leadership and innovation.

Most recently, Gil was a Resident Fellow at Harvard University, John F. Kennedy School of Government, Institute of Politics (Spring 2017).

Currently, Gil's consulting practice provides strategic advice to U.S. companies.  He is also a Distinguished Fellow at the Global Resilience Institute and a Professor of Practice, Northeastern University.   He serves as a non-resident Fellow at the Baker Institute, Rice University and a member of the Council on Foreign Relations. He has been and continues to be a frequent speaker at national and international forums.

Gil earned a BA and MA from the University of South Florida which also bestowed an Honorary Doctorate, Humane Letters in 2010.  He is also the recipient of the Army's Presidential Service Badge.