**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated, | Case No. 3:20-cv-1035-SI |
| Plaintiffs, | **DECLARATION OF MATTHEW BORDEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS** |
| v. | |
| **CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**, | |
| Defendants. | |

I, Matthew Borden, declare:

1.      I am counsel of record for the Plaintiffs and have been admitted *pro hac vice* to practice before the Court in this matter. I make this declaration based on personal knowledge. If called as a witness, I could and would testify competently to the facts below.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the transcript from the deposition of Gabriel Russell, dated August 4, 2020.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the transcript from the deposition of Federal Protective Services Officer Badge 824, dated August 5, 2020.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the transcript from the deposition of Customs and Border Protection Officer NZ-1, dated August 6, 2020.

5.      Plaintiffs also met and conferred with counsel for the federal agents on August 9 to explore the possibility of a mutually acceptable compromise regarding identification of federal agents, but the federal agents were unwilling to agree to any suggestion made by Plaintiffs thus far and did not have any new suggestions of their own.


I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct.

Dated:  August 9, 2020

Matthew Borden

# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


INDEX NEWSPAPERS LLC,

et al.,

       Plaintiffs,

   v.                     No. 3:20-cv-01035-SI

CITY OF PORTLAND, et al.,

       Defendants.



VIDEO DEPOSITION OF GABRIEL RUSSELL

Taken in behalf of Plaintiffs

Tuesday, August 4, 2020








Reported by:   Marilynn Hoover, RPR

Oregon CSR No. 04-0387



Page 2

 1      BE IT REMEMBERED THAT, pursuant to the Federal

 2  Rules of Civil Procedure, the deposition of GABRIEL

 3  RUSSELL was taken via Zoom video before Marilynn

 4  Hoover, Oregon CSR No. 04-0387; on Tuesday, August

 5  4, 2020, commencing at the hour of 11:13 a.m.; the

 6  witness testifying from Auburn, Washington.

 7

 8                APPEARANCES

 9  BRAUNHAGEY & BORDEN LLP

10    BY MR. ATHUL K. ACHARYA

11      MR. GUNNAR K. MARTZ

12    351 California Street, 10th Floor

13    San Francisco, California 94104

14    Telephone:  415-963-4493

15    E-mail:  Acharya@braunhagey.com

16    On behalf of Plaintiffs

17

18  UNITED STATES DEPARTMENT OF JUSTICE

19    BY MR. JOSHUA E. GARDNER

20    20 Massachusetts Avenue N.W., Room 6106

21    Washington, D.C. 20530

22    Telephone:  205-305-7583

23    E-mail:  Joshua.E.Gardner@usdoj.gov

24    On behalf of Defendants

25



Page 3

```
 1              APPEARANCES (CONT.)
 2   UNITED STATES DEPARTMENT OF HOMELAND SECURITY
 3      BY MS. MICHELLE TONELLI
 4      800 N. Capitol Street N.W.
 5      Washington, D.C. 20002
 6      Telephone:  202-732-8287
 7      E-mail:  Michelle.Tonelli@dhs.gov
 8      On behalf of Defendant DHS
 9
10   UNITED STATES DEPARTMENT OF HOMELAND SECURITY
11   FEDERAL PROTECTIVE SERVICE
12      BY MR. FRANK R. LEVI
13      2707 Martin Luther King Jr. Avenue S.E.
14      Washington, D.C. 20528
15      Telephone:  202-732-8113
16      E-mail:  Frank.Levi@fps.dhs.gov
17      On behalf of Defendant Federal Protective Service
18
19   ALSO PRESENT:  Emily Walter, videographer
20
21
22
23
24
25
```



```
                                                    Page 4
 1                  EXAMINATION INDEX

 2                                                  PAGE

 3   Examination by Mr. Acharya                        6

 4

 5                      *   *   *

 6

 7                   EXHIBIT INDEX

 8   EXHIBIT NO.  DESCRIPTION                        PAGE
```

```
 9   Exhibit 1    2020-07-29 Russell declaration       27

10   Exhibit 2    2020-07-29 Trump tweet               45

11   Exhibit 3    2020-07-31 Trump tweet               48

12   Exhibit 4    2020-07-31 [105-3] Andrew Smith

13                declaration                          57

14   Exhibit 5    2020-07-22 [77] Lewis-Rolland

15                declaration                          86

16   Exhibit 6    2020-07-14 [44] Lewis-Rolland

17                declaration                          89

18   Exhibit 7    2020-07-30 Russell declaration       92

19   Exhibit 8    2020-07-28 [94] Mahoney declaration 101

20   Exhibit 9    2020-07-24 RD e-mail                104

21   Exhibit 10   2020-08-03 Portland Protest Exposed 115
```

```
22

23

24

25
```



Page 5

```
 1        TUESDAY, AUGUST 4, 2020; AUBURN, WASHINGTON
 2             THE VIDEOGRAPHER:  We are now on the
 3    record.  Here begins the Zoom videotaped deposition
 4    of Gabriel Russell in the matter of Index Newspapers
 5    LLC versus City of Portland, in the U.S. District
 6    Court, District of Oregon, Portland Division, case
 7    number 3:20-cv-01035-SI.
 8             Today is August 4th, 2020.  The time is
 9    11:13.  This deposition is being taken over Zoom at
10    the request of BraunHagey & Borden LLP.  The
11    videographer is Emily Walter of Magna Legal
12    Services, and the court reporter is Marilynn Hoover
13    of Magna Legal Services.  All counsel will be noted
14    on the stenographic record.
15             Will the court reporter please swear in
16    the witness.
17             THE REPORTER:  The attorneys participating
18    in this deposition acknowledge that I am not
19    physically present in the deposition room and that I
20    will be swearing in the witness and reporting this
21    deposition remotely.  The parties and their counsel
22    consent to this arrangement and waive any objections
23    to this manner of reporting.
24             Please indicate your agreement by stating
25    your name and agreement on the record.
```



Page 6

1          MR. ACHARYA:  This is Athul Acharya for

2  plaintiffs, and I agree.

3          MR. GARDNER:  This is Josh Gardner on

4  behalf of the defendants, and I agree as well.

5          THE REPORTER:  Michelle, please.

6          MS. TONELLI:  Michelle Tonelli for

7  defendants.  I agree as well.

8                  GABRIEL RUSSELL,

9  called as a witness, being duly sworn on oath, was

10  examined and did testify as follows:

11          MR. GARDNER:  Ms. Hoover, before we begin:

12  The defendants reserve the right to have the witness

13  read and sign.

14          THE REPORTER:  So noted.

15          MR. GARDNER:  Thank you.

16          THE REPORTER:  You may begin, counsel.

17                  EXAMINATION

18  BY MR. ACHARYA:

19      Q.  Good morning, Officer Russell.  How are

20  you today?

21      A.  Good.  How are you?

22      Q.  Doing well.  Is it morning where you are?

23      A.  It is 11:16 a.m., so it's still morning

24  here.

25      Q.  You're -- You're in Portland?



Page 7

1         A.    No.  I drove up to Auburn, Washington,
2    early this morning.
3         Q.    Okay.
4         A.    On-site tech support in Portland, Oregon,
5    so...
6         Q.    Is Auburn where you live?
7         A.    No.
8         Q.    So have you ever been deposed before?
9         A.    No.
10        Q.    Okay.  So I'm just going to give you some
11   sort of ground rules.
12               So I'm going to ask questions, Ms. Hoover
13   and Ms. Walter will record.  We'll need you to speak
14   up.  No nods or shaking of the head, because those
15   don't make it onto the stenographic record.
16               Can you do that?
17        A.    Yes.
18        Q.    Also, please don't talk over me, and I'll
19   try not to talk over you.  Let's let each other
20   finish so that there's a clean record.
21               Can you do that?
22        A.    Yes.
23        Q.    Great.  So you understand that you are
24   under oath for this deposition?
25        A.    Yes.



Page 8

```
 1          Q.   And you understand that that's the same
 2     oath as you would take if you were in court?
 3          A.   Yes.
 4          Q.   And you understand that this oath means
 5     you have to give me the whole truth?
 6          A.   Yes.
 7          Q.   Full and complete answers?
 8          A.   Yes.
 9          Q.   If you don't understand the question that
10     I ask, please say so, and I will ask a better
11     question.
12               Breaks are fine, but let me finish my line
13     of questioning.
14               Your lawyer's here.  He may object to a
15     question, but you still have to answer.
16               Does that all make sense?
17          A.   Yes.
18               MR. GARDNER:  Unless the government
19     instructs the witness not to answer for an
20     appropriate reason.
21          Q.   BY MR. ACHARYA:  Correct.  If you want to
22     talk to your lawyer, at least answer the pending
23     question, unless the question is about privilege.
24               Will you do that?
25          A.   Yes.
```



Page 9

1        Q.    Great.  And if certain documents would
2    help you give your answer, then please tell me that
3    and tell me which documents.
4        A.    The only document that I have with me
5    relevant to this is my declaration that everybody
6    has.
7        Q.    Great.  I just mean if any other documents
8    come up in the course of questioning.
9        A.    Very well.
10       Q.    Is there any reason -- sickness,
11   medication, anything else -- that you can't give
12   full, complete, and accurate testimony today?
13       A.    No.
14       Q.    Great.  So what did you do to prepare for
15   this deposition?
16       A.    I spoke with counsel.
17       Q.    Great.  What documents have you reviewed
18   in preparation for this deposition?
19       A.    I have reviewed my declaration, which I
20   have with me.
21       Q.    Great.  You have two declarations in this
22   case; is that correct?
23       A.    Yes --
24       Q.    And you reviewed them both?
25       A.    -- I believe so.



Page 10

1      Q.   And you reviewed them both?

2      A.   Yes.

3      Q.   Okay.  So you are the regional director

4  for the Department of Homeland Security Federal

5  Protective Service?

6      A.   Yes.

7      Q.   Where is your office?

8      A.   Auburn, Washington.

9      Q.   Do you have any other titles in your

10  position?

11      A.   I am currently the commander of the DHS

12  rapid deployment force.

13      Q.   For Diligent Valor?

14      A.   Yes.

15      Q.   And you're also the founder of Takouba

16  Security; is that right?

17      A.   I sold my company and it's shut down, so

18  I'm no longer --

19      Q.   I see.

20      A.   -- involved in that.

21      Q.   What -- What was it?

22      A.   A consulting company.

23      Q.   A security consulting company?

24      A.   Security and other things, yes.

25      Q.   Just looking at your employment history on



Page 11

1    LinkedIn, can you tell me what you did from 2012 to

2    2015?  I think that's blank there.

3            A.    From 2012 until 2015?

4            Q.    Yeah.

5            A.    I was the regional director for the

6    Federal Protective Service.

7            Q.    Okay.  So what do you do as the regional

8    director for FPS, normally?

9            A.    I supervise law enforcement, physical

10   security, and investigative operations for the

11   Federal Protective Service over the four-state

12   region comprised of Washington, Oregon --

13                    (Reporter request.)

14            THE WITNESS:  So are we doing the question

15   over again as well, or...

16            Q.    BY MR. GARDNER:  Well, what do you do as

17   the regional director of FPS?

18            A.    I supervise law enforcement, security,

19   physical security, and investigative operations for

20   the Department of Homeland Security's Federal

21   Protective Service for the states of Washington,

22   Oregon, Idaho, and Alaska.

23            Q.    And what is FPS's mission?

24            A.    We secure almost 9000 GSA owned or leased

25   facilities across the United States.



Page 12

1      Q.   So what are your sort of duties, more
2  specifically, in your current position, normally?
3      A.   I am responsible for overseeing and
4  managing, hiring, evaluation, supervision of all the
5  personnel in Region 10; oversight of contracts,
6  assigning work, evaluating subordinate performance,
7  things of that nature.
8      Q.   Anything else that comes to mind?
9      A.   (No audible response.)
10     Q.   And what are your --
11               (Reporter request.)
12               (Record read.)
13          THE WITNESS:  It's a -- It's a management
14  -- It's an executive level position that has a lot
15  of responsibilities.
16     Q.   BY MR. ACHARYA:  Okay.  And what are your
17  duties with respect to these protests?
18     A.   With regards to protection of federal
19  facilities, I might not --
20     Q.   With regard to -- With regard to the
21  protests in downtown generally, whatever the mission
22  may be there.
23     A.   My job is to protect federal facilities
24  from being taken over, from being significantly
25  damaged, to protect the federal employees inside


MAGNA
LEGAL SERVICES

Page 13

1    them from being killed or assaulted.

2         Q.    Your duties are also to ensure that your

3    officers follow the law, applicable standards,

4    procedures, and practices and policies; is that

5    right?

6              MR. GARDNER:  Objection; compound.

7         Q.   BY MR. ACHARYA:  Do you understand the

8    question?

9         A.    Could you -- Could you break it up into

10   separate questions, please.

11        Q.    Sure.  Your job is to also ensure that

12   your officers follow the applicable law; is that

13   right?

14        A.    Yes.

15        Q.    Also the applicable standards and

16   practices?

17        A.    Yes.

18        Q.    And any policies?

19        A.    Yes.

20        Q.    Okay.  And your duties include drafting

21   policies?

22        A.    Yes.

23        Q.    And you've drafted policies on use of

24   force?

25        A.    I don't recall that.



1  that's used within FPS for private contracting

2  forces.  Is that -- Am I mistaken?

3      A.   We -- We have PSOs that are -- that are in

4  Portland as part of their normal duties.  They

5  continued to perform their normal duties.  They did

6  not have additional, you know, duties that were

7  related to operation Diligent Valor.

8      Q.   Understood.  And to be clear:  PSOs are

9  privately contracted security officers?

10     A.   Yes.

11     Q.   What companies in Portland?

12     A.   I believe the contract in Portland,

13  Oregon, is by a company named MaxSent.

14     Q.   M-A-X-E-N-T?

15     A.   I'm not sure of the exact spelling.

16     Q.   And you command all of the forces sent

17  here as part of Diligent Valor?

18     A.   I have tactical control of all of the DHS

19  forces that are -- that are part of operation

20  Diligent Valor.

21     Q.   And when you say "tactical control," what

22  do you mean by that?

23     A.   That means that I am responsible for just,

24  you know, kind of strategy and tactics for those

25  forces; but I am not responsible for their



Page 20

1   administrative control, so I don't -- I do not write

2   their evaluations or do discipline for forces that

3   are outside of FPS.   I do not, you know, process

4   their paperwork.   I'm not responsible for review of

5   their paperwork.

6        Q.   So you don't do their discipline?

7        A.   Correct.

8        Q.   I see.  Who does their discipline?

9        A.   Each individual component is responsible

10   for their own disciplinary processes.

11        Q.   Okay.  So you have tactical control over

12   the CBP forces in Diligent Valor?

13        A.   Yes.

14        Q.   You have tactical control over the ICE

15   forces in Diligent Valor?

16        A.   Yes.

17        Q.   And you have tactical -- tactical control

18   over the new FPS forces in Diligent Valor?

19        A.   Yes.

20        Q.   And just to be clear:  Do you discipline

21   the new FPS forces in Diligent Valor?

22             MR. GARDNER:  Objection; vague.  Also

23   objection; lack of foundation.

24        Q.   BY MR. ACHARYA:  There are new FPS forces

25   that are sent to Portland as part of Diligent Valor?



Page 21

1      A.   I don't know what you mean by "new."

2      Q.   In addition to the ones regularly

3  stationed there.

4      A.   Yes.

5      Q.   And do you -- do you handle the discipline

6  of those forces?

7      A.   Typically, they would be returned to their

8  home region to receive discipline if it were

9  necessary.

10      Q.   You said "typically."  Is there an

11  exception to that?

12      A.   Not that I know of.

13      Q.   So there are a number of officers whose

14  job it is to -- You understand what I mean when I

15  say "boots on the ground"; right?

16      A.   I --

17           MR. GARDNER:  Objection; vague.

18           THE WITNESS:  No.  It's a military term,

19  but I don't think it's appropriate here, and I don't

20  -- I think you should be more specific with your

21  questioning.

22      Q.   BY MR. ACHARYA:  Great.  Do you understand

23  what I mean when I say that there are a number of

24  officers that are patrolling the interior and

25  exterior of the federal properties as part of



Page 23

1    Q.    So what is the mission of Diligent Valor?
2    A.    To protect federal buildings, monuments,
3    things of that nature.
4    Q.    Was it sent here to quell the protests?
5    A.    No.
6          MR. GARDNER:  Objection; vague.
7    Q.    BY MR. ACHARYA:  If someone said Diligent
8    Valor was sent here to quell the protests, they'd be
9    lying; right?
10         MR. GARDNER:  Objection; form.
11   Q.    BY MR. ACHARYA:  Answer the question,
12   please.
13   A.    I'm sorry, I couldn't hear Josh's
14   objection.
15         MR. GARDNER:  It's objection, form.  The
16   form of the question is objectionable.
17   Q.    BY MR. ACHARYA:  But you still have to
18   answer.
19         So if someone said that Diligent Valor was
20   sent here to quell the protests, they'd be lying;
21   right?
22   A.    It would not be -- I mean, I think you're
23   asking me to characterize someone's motivation in
24   answering the question.  It's a theoretical
25   question.  I don't -- I don't know who would be



Page  30

1    question.

2             You said you have situations -- seen

3    situations where...

4         A.   Where deploying additional forces resulted

5    in enhanced protection, which was the goal of the

6    operation.

7         Q.   I see.  Is Diligent Valor over?

8         A.   It is not.

9         Q.   So the extra CBP forces are still here?

10            MR. GARDNER:  Objection.  To the extent

11   that you can answer counsel's question without

12   divulging information that is subject to the law

13   enforcement privilege, you may do so.  To the extent

14   you cannot answer his question without divulging

15   such information, I instruct you not to answer.

16            THE WITNESS:  I'm not going to answer that

17   question.

18        Q.   BY MR. ACHARYA:  Are the extra ICE forces

19   still here?

20            MR. GARDNER:  Same objection and same

21   instruction.

22            THE WITNESS:  Same answer.

23        Q.   BY MR. ACHARYA:  When will the extra

24   forces leave?

25            MR. GARDNER:  Same objection, same



Page 48

1             I'm going to put another Donald Trump
2    tweet into the chat.  This is going to be Exhibit 3.
3                    (Exhibit 3 marked.)
4        Q.   BY MR. ACHARYA:  And while -- while you've
5    done all that, I'll read it into the record.
6             It says:  "Homeland Security is not
7    leaving Portland until local police complete cleanup
8    of anarchists and agitators."
9             Is it accurate to say that DHS's enhanced
10   presence is not leaving Portland until local police
11   complete cleanup of anarchists and agitators?
12       A.   Give me a second to -- That's -- That's a
13   hypothetical and I don't...
14       Q.   That's not a hypothetical.  That's a
15   question about what -- what Homeland Security is
16   going to do.
17             Are they -- Is DHS's enhanced presence
18   leaving Portland -- is not leaving Portland until
19   local police complete cleanup of anarchists and
20   agitators?  Is that true?
21       A.   I don't know the answer to that.
22       Q.   So you don't know when Homeland Security's
23   enhanced presence will leave?
24       A.   That's correct.
25             MS. TONELLI:  Objection; law enforcement



Page 49

1    privilege.  We're -- We're going into -- it's the

2    same idea of when our officers may withdraw.

3            MR. ACHARYA:  Yeah, I think this tweet

4    waives that privilege.

5            MS. TONELLI:  No, because you're asking

6    for more detail.

7            MR. GARDNER:  Yeah, it does not waive any

8    privilege about the details of due law enforcement

9    efforts in Portland.

10           MR. ACHARYA:  That's a -- No, that's the

11   sword and shield situation.  If the --

12           MR. GARDNER:  It's not a sword and shield

13   at all, sir.  We'll have to agree to disagree.

14       Q.   BY MR. ACHARYA:  Let's talk about

15   coordination of forces.

16           How do you coordinate field operations

17   with the Marshals Service?

18       A.   There's a tactical command post at the --

19   at the federal courthouse, where the tactical

20   commanders of DHS and the tactical commanders of the

21   Marshals Service coordinate activities.

22       Q.   Do you -- Are you ever in that tactical

23   command post?

24       A.   I have been, yes, several times.

25       Q.   Are you -- Are you usually in that command



Page 63

1    action on and around federal property for the

2    protection of federal property and people on it.

3            So if there was, for example, someone who

4    was off a federal property and they were committing

5    assaults against federal officers, using projectiles

6    or something of that nature, federal officers could

7    take enforcement action.

8        Q.    Understood.  But I'm asking about

9    dispersal orders, which are dispersal orders to

10   unlawful assembly; so we're not talking about any

11   actions against federal officers.

12           Does FPS have authority to enforce a

13   dispersal order against an unlawful assembly on

14   Southwest Fourth Street?

15       A.    On Southwest Fourth Street?

16       Q.    That's one street west of the federal

17   courthouse.

18       A.    Generally, no.

19       Q.    So you've policed protests, many protests?

20       A.    Yes.

21       Q.    Have you personally policed them on the

22   ground?

23       A.    Yes.

24       Q.    Can you tell me when and where?

25       A.    I -- The Federal Protective Service in



1   know, if a protest becomes violent, they have the

2   ability to move protesters -- you know, I don't want

3   to say anywhere they want, but a lot of different

4   areas in the city, while the federal authorities

5   are, you know, required to operate within a

6   reasonable distance of a federal facility.  So that

7   just -- So it necessitates different tactics.

8        Q.   Sure.  Understood.

9             So you're a supervisor.  Are you

10  responsible for making sure that the people that you

11  tactically command don't use excessive force?

12       A.   Yes.

13       Q.   Okay.  Do you see what -- what federal

14  agents did to the guy wearing the navy shirt,

15  Christopher David?

16       A.   Yes.

17       Q.   Did you think that was excessive force?

18            THE WITNESS:  Counsel, should I answer

19  this?

20            MR. GARDNER:  I mean, if you can do so

21  without disclosing information that is subject to

22  the law enforcement privilege or other privileges,

23  you may.  If you need to consult, we can also do

24  that.

25            THE WITNESS:  Can we consult briefly?



Page 79

1   of the incident that I believe you're referring to,

2   and a thorough investigation might reveal

3   information that I don't know of, or other video,

4   but the -- but the video that I saw, it did appear

5   to me to be excessive force.

6          Q.   BY MR. ACHARYA:   Okay.   Did you train

7   those officers to do that?

8          A.   The officers involved in that did not --

9   did not work for me, did not answer to me.

10         Q.   Who do they work for?

11         A.   They don't belong -- I don't believe that

12  they belong to the Department of Homeland Security

13  and were not operating under my tactical control or

14  supervision.

15         Q.   Were they part of the United States

16  Marshals Service?

17         A.   I've -- I've been told that.   I don't -- I

18  don't know that for sure, but I've -- I've been told

19  that.

20         Q.   Thank you.   So, as a supervisor, you're

21  responsible for making sure that people you're

22  supervising conduct themselves according to the

23  rules; is that correct?

24         A.   Yes.

25         Q.   Have you read the declarations that we



Page 80

1    submitted in support of the temporary restraining

2    order?

3         A.    Yeah, I believe so.

4         Q.    Okay.  And you imposed -- And then -- And

5    those declarations all refer to incidents where

6    members of the press were shot or beaten or

7    intimidated.

8              That was your recollection?

9         A.    Yes.

10        Q.    Okay.  And you imposed discipline on the

11   agents involved in every single one of those cases;

12   right?

13             MR. GARDNER:  Objection; mischaracterizes

14   the witness's previous testimony.

15        Q.    BY MR. ACHARYA:  I'm not characterizing

16   your testimony at all.  I'm asking if you imposed

17   discipline on the agents involved in every single

18   one of those cases, in the declarations we submitted

19   in support of the TRO.

20             MR. GARDNER:  And his previous testimony

21   -- Please.

22             THE WITNESS:  I don't know what agents or

23   officers were involved in uses of force against the

24   declarants or even if they weren't injured by other

25   protesters.



Page 81

1          Q.    BY MR. ACHARYA:    Okay.    So you didn't --
2     In fact, you didn't impose discipline on a single
3     agent for the incidents described in those
4     declarations, did you?
5          A.    I don't know what officers or agents were
6     involved in the uses of force that you're referring
7     to.
8          Q.    Sure.    But, so, ultimately, zero agents
9     were disciplined?
10         A.    I don't know --
11              MR. GARDNER:    Objection; lack of
12    foundation.
13         Q.    BY MR. ACHARYA:    Do you know if any agents
14    were disciplined for those uses of force?
15         A.    I would have no way of knowing that.
16    There are multiple agencies involved here.    There --
17    It is impossible that, you know, one of the other
18    components or agencies has initiated disciplinary --
19    disciplinary proceedings.    I have no way of knowing
20    that.
21         Q.    Your -- Okay.    Did you even try to find
22    out who those agents were?
23         A.    I -- What we did was we compared our use
24    of force reporting with the -- you know, with the
25    incidents that were reported; and we did not receive



Page 85

```
 1        Q.   In this operation, you have not used tear
 2   gas.
 3             So do you do anything to help you identify
 4   what FPS agents are at a given location at a given
 5   date and time?
 6             MR. GARDNER:  Objection; vague.  Also, I'm
 7   not sure I understand the question; but to the
 8   extent it's calling for information that would be
 9   subject to the law enforcement privilege, I would
10   instruct you not to answer.
11             Maybe you could rephrase it.
12             MR. ACHARYA:  Sure.
13        Q.   BY MR. ACHARYA:  The question is:  You
14   know, we have about 30 declarations now of uses of
15   force that are unlawful and in violation of the
16   First Amendment.  I think you've said you've read at
17   least the ones submitted in support of the TRO.
18             So my question is:  A lot of those talked
19   about a place, a time, a location.  Do you have
20   information sufficient to know which agents were
21   present at that place, time, and location?
22             MR. GARDNER:  I see.  I understand the
23   question now.
24             Objection.  Mischaracterizes the documents
25   you're referring to.  No further objections.
```



Page 86

1          Q.    BY MR. ACHARYA:  Please answer.

2          A.    I believe I already answered that, that I

3    believe it's seven incidents that reported to, and

4    we compared those with our -- with our FPS use of

5    force reports, and we did not find a direct

6    correlation between the complaints and FPS use of

7    force.  There may be other agencies involved in the

8    operation, that that used a similar type of analysis

9    and discovered a match.

10          Q.    So CBP and ICE uses of force, do you have

11    any ability to look at those?

12          A.    No.  They have their own computer systems.

13              MR. ACHARYA:  So I'm going to put a

14    declaration into the record here.  This is the

15    declaration of Mathieu Lewis-Rolland, signed on July

16    22nd, 2020, docket number 77.

17              Tell me when you have it open.

18              THE REPORTER:  Marked next in order,

19    counsel?

20              MR. ACHARYA:  Sorry.  Yeah, next in order.

21    So what was that, Exhibit 5?

22              THE REPORTER:  Correct.

23                  (Exhibit 5 marked.)

24              THE WITNESS:  So where -- I have it.  What

25    paragraph are you looking at?



Page 87

1        Q.   BY MR. ACHARYA:   Yeah.   So I'm looking
2    at -- Well, first off, just have you read this
3    declaration before today?
4        A.   I don't believe so.
5        Q.   I see.  Okay.  So if you'd go to page 3,
6    there's a photo of an agent pointing a gun at
7    someone.
8        A.   Yes, I see it.
9        Q.   Is that agent under your tactical command?
10       A.   I don't know that I can...
11            MR. GARDNER:  And I would just say,
12   Officer Russell:  Take the time you need to read the
13   declaration to the extent it gives you context
14   necessary to answer counsel's question.
15            THE WITNESS:  I can't see the -- There's a
16   picture -- There's a patch on the officer's shoulder
17   that's depicted there, and it's not clear enough or
18   large enough for me to identify exactly the agency,
19   but it appears likely to be a U.S. Marshals patch.
20            MR. ACHARYA:  I see.
21            THE WITNESS:  So I don't --
22            MR. ACHARYA:  Understood.
23            THE WITNESS:  But I can't -- I don't know
24   if you can read it.
25            MR. ACHARYA:  Yeah, it does say U.S.



Page 91

1        A.    Yes.

2        Q.    And your policy with respect to

3   journalists and legal observers at protests changed

4   after the TRO?

5        A.    I don't know that we -- We didn't write a

6   specific policy.  Our policy is to comply with TROs.

7        Q.    Sure.  Did it change at any point before

8   the TRO?

9             MR. GARDNER:  Objection; vague.

10       Q.    BY MR. ACHARYA:  Did your policy with

11  respect to journalists and legal observers at

12  protests change during the 2020 Portland protests at

13  any time before the TRO?

14            MR. GARDNER:  Objection; mischaracterizes

15  the record.  You can answer.

16            THE WITNESS:  I believe I've already

17  answered that we don't have a specific policy

18  regarding journalists or legal observers.

19            MR. ACHARYA:  Okay.  And your -- So

20  let's -- I'll put your second declaration into the

21  chat.

22            And so this is declaration of Gabriel

23  Russell -- this is going to be Exhibit 7 --

24  declaration of Gabriel Russell submitted -- or

25  signed on July 30th, 2020.  Document number 105-7.



Page 92

```
 1                    (Exhibit 7 marked.)

 2         Q.   BY MR. ACHARYA:  Do you have it open?

 3         A.   I have a copy here.

 4         Q.   Okay.  Great.  And so if you look at

 5   paragraph 6, it says that the DHS office of general

 6   counsel provided TRO instructions and discussed them

 7   at the roll call; correct?

 8         A.   Yes.  It's not exactly the word it says;

 9   but it has words to that effect, yes.

10         Q.   To that effect.  And your agents follow

11   those instructions?

12         A.   To the best of my knowledge, yes.

13         Q.   And, if they follow those instructions,

14   they won't violate the TRO?

15         A.   Generally, yes.

16         Q.   And you're in charge of making sure that

17   your agents follow that instruction?

18         A.   Yes.

19         Q.   That means all Region 10 FPS agents and

20   all agents --

21                    (Reporter request.)

22         MR. ACHARYA:  Sorry, madam court reporter.

23         Q.   BY MR. ACHARYA:  I said:  You're in charge

24   of making sure that all Region 10 FPS agents and all

25   agents deployed here for Diligent Valor follow those
```



Page 93

1    instructions?

2         A.    Yes.

3         Q.    And you're aware that we moved for

4    contempt, saying that federal agents had violated

5    the TRO?

6         A.    Yes.

7         Q.    And you would rely on those instructions

8    to figure out if they had in fact violated the TRO?

9         A.    To rely on which instructions?

10        Q.    The instructions that you discuss in

11   paragraph 6.

12             MR. GARDNER:  Objection; mischaracterizes

13   the witness's testimony.

14             THE WITNESS:  Can you ask that question

15   again.

16        Q.    BY MR. ACHARYA:  Sure.  So with respect to

17   any allegation that your agents had violated the

18   TRO, you would rely on the policy in paragraph 6,

19   the instructions in paragraph 6, to figure out if

20   they had actually violated the TRO; is that correct?

21             MR. GARDNER:  Objection.

22             THE WITNESS:  Generally, yes.

23             MR. GARDNER:  Go ahead.

24                  (Reporter request.)

25             THE WITNESS:  Generally, yes.



Page 94

1      Q.   BY MR. ACHARYA:  And it is your

2    understanding that, as long as federal agents don't

3    disperse anyone with a press pass, press badge, or a

4    shirt that says "press," they won't violate the TRO?

5            MR. GARDNER:  Objection.  We're now

6    getting into, I think, a place where you're calling

7    for information subject to the attorney-client

8    privilege; and, at this point, I would instruct the

9    witness not to answer.  And, as you know, this is

10    the subject of motions practice before the court.

11            THE WITNESS:  I will not answer.

12      Q.   BY MR. ACHARYA:  Okay.  I'm not asking for

13    what the instructions say.  I'm asking for your

14    understanding of the TRO.

15            MR. GARDNER:  Well, that is not the

16    question you asked.  If you want to ask him about

17    what his understanding of the TRO is, ask him that

18    question.

19            MR. ACHARYA:  Yeah.  Let me -- Let me say

20    it again.

21      Q.   BY MR. ACHARYA:  Your understanding of the

22    TRO is that, as long as federal agents don't

23    disperse anyone with a press pass, a press badge, or

24    a shirt that says "press," they won't violate the

25    TRO?



Page 95

1        A.   I would have to go back and read the TRO

2    to see if there were other conditions in there,

3    but...

4        Q.   Okay.  So did we put -- So, yeah, let's go

5    to Exhibit 6.  It's tab 13.  It's got the 13 in

6    brackets.  It's the -- It's the second to last one

7    that I put in the chat, if you see it.

8        A.   What's it -- What's it titled?

9        Q.   It's titled, brackets, 13, 2020-07-14-44

10   Lewis-Rolland declaration.

11       A.   This is the one we looked at previously?

12       Q.   It is, yes.

13       A.   Yeah.  What paragraph do you want me to go

14   to?

15       Q.   I'm looking at paragraph -- paragraph 13.

16       A.   Okay.

17       Q.   And, actually, if you would -- yeah, if

18   you would read paragraph -- yeah, read paragraph

19   13 -- or, actually, I'll just read it into the

20   record.

21            "At 3:10 to 3:11 in the video, around 1:58

22   a.m., I turned so that my right side was facing

23   Agent Doe.  At that point, I was shot ten times from

24   Agent Doe's direction.  I was hit on my right elbow,

25   the right side of my torso, and my back.  The areas



Page 96

1    where I was shot are all above my waist.  At the

2    time I was shot, I was photographing what other

3    officers and protesters were doing.  I was not

4    posing any type of threat to Agent Doe or anyone

5    else.  I was not even facing him."

6                That's what that paragraph says; correct?

7         A.   Correct.

8         Q.   Okay.  Is it your understanding, as a

9    person in charge of TRO compliance, that shooting a

10   journalist, who's just taking photographs, ten times

11   while he has his back turned -- would that violate

12   the TRO?

13               MR. GARDNER:  Objection to the extent it

14   calls for a legal conclusion.

15               THE WITNESS:  I'd say that there might be

16   other -- you know, whatever video pictures, that a

17   thorough investigation might be -- you know, might

18   reveal information that would lead me to believe

19   that that was not a violation of the TRO; but it is

20   certainly concerning, the way it's reported there.

21        Q.   BY MR. ACHARYA:  Thank you.  Do you think

22   it would be acceptable conduct if there weren't a

23   TRO?

24        A.   It just depends on -- It depends on what

25   the other facts and circumstances of the case.



Page 97

1      Q.   Of course.  But, based on the declaration

2   that's in front of you, would that be acceptable

3   conduct, just based on those facts, if there were

4   not a TRO?

5      A.   There --

6           MR. GARDNER:  Objection.  Objection; asked

7   and answered.

8           MR. ACHARYA:  No.  He answered a different

9   question than I asked.

10     Q.   BY MR. ACHARYA:  The question I asked was:

11  Just based on the facts that are in front of you,

12  not taking into context the possibility of other

13  facts, would that be acceptable conduct if that

14  weren't a TRO?

15     A.   Like I said, there are always other facts

16  and there are always -- That declaration is one

17  person's characterization of a complex and dynamic

18  event.  There would -- you know, a thorough

19  investigation might reveal contradictory facts,

20  other video or pictures.  That's the type of

21  investigation that would need to be conducted prior

22  to making that determination.

23     Q.   Okay.  So you cannot say, as you sit here

24  today, that shooting a photographer while he's

25  photographing what other officers and protesters are



1   doing, while he's not posing any type of threat, you

2   can't say that that is unacceptable, absent the TRO?

3           MR. GARDNER:  Objection; mischaracterizes

4   the witness's testimony.

5       Q.   BY MR. ACHARYA:  Is that true?

6       A.   Is what true?

7       Q.   Is it true that you cannot say whether the

8   conduct in paragraph 13 would be acceptable or not

9   acceptable without the TRO?

10      A.   There are other -- There may well be other

11  facts that would lead me to conclude that the

12  behavior was acceptable.

13      Q.   So you can't say one way or another?

14      A.   Correct.

15      Q.   So after the TRO was issued, did you begin

16  doing anything more to help you identify what agents

17  are at a given location at a given date and time?

18          MR. GARDNER:  Objection; vague.

19      Q.   BY MR. ACHARYA:  Do you understand the

20  question?

21      A.   We did.  We did.  Are you talking about

22  specifically or just in response to the TRO?

23      Q.   BY MR. ACHARYA:  Yeah.  I'm asking you if,

24  after the TRO, you tried harder to figure out what

25  agents are at places and times.



Page 99

1        A.   After the complaint about violations of

2   the TRO, we did -- we used a procedure that I

3   previously explained, where we, you know, compared

4   use of force reporting with --

5        Q.   Yeah.  I understand.  That's after the

6   fact.

7             MR. GARDNER:  Hey, wait.  Counsel, you cut

8   the witness off.  He was finishing his answer.

9             Please, Mr. -- Officer Russell, you had an

10  answer to finish.  Please complete it.

11            THE WITNESS:  Yes.  I explained previously

12  that when we received complaints about violation of

13  the TRO, that we compared the -- you know, the

14  times, the dates, and locations included in those

15  complaints with our use of force reporting, to

16  determine if we needed to take, you know,

17  investigative or disciplinary action.

18       Q.   BY MR. ACHARYA:  Right.  So I understand

19  that.

20            I am asking, sort of not retrospectively,

21  not based on the complaint, but prospectively, did

22  you do anything to make it easier to figure out in

23  the future who was where and when, so that you could

24  correlate an incident report with an officer?

25       A.   That's kind of a hypothetical.  I don't



Page 100

1    really --

2        Q.    No, it's not a hypothetical.  I'm asking

3    what you did.

4              Did you do anything to make it easier to

5    figure out who did a thing that gets reported to

6    you?

7        A.    We have the same -- We have the same

8    policies and procedures we had.

9        Q.    Okay.  Thank you.  And so you've read the

10   declarations we submitted with the contempt motion?

11       A.    I -- Yes.

12       Q.    Yes.  Did you impose discipline on any of

13   the agents involved in those cases?

14       A.    I believe I've already answered this

15   question.

16       Q.    I asked with respect to the TRO.  This is

17   the contempt.

18       A.    We have not -- We -- The specific

19   incidents have not been reported to us in a manner

20   that we've -- so far, that I'm aware of; and that's

21   possible -- but we have a secure portal site where

22   misconduct is reported, and it's possible that an

23   allegation of misconduct would have been submitted

24   in that portal site and I would not be made aware of

25   it, but I'm not aware of any disciplines.



Page 101

```
 1              MR. ACHARYA:  Okay.  I'm going to put
 2    another declaration into the chat, and it's going to
 3    be Exhibit 8.
 4                      (Exhibit 8 marked.)
 5         Q.   BY MR. ACHARYA:  Tell me when you've got
 6    it in front of you.  And I'm looking at paragraph 9.
 7         A.   Okay.  I'm looking at it.
 8         Q.   Have you read this declaration before
 9    today?
10         A.   I don't believe so.
11         Q.   So you haven't watched this video that's
12    in paragraph 9?
13         A.   I don't know.
14         Q.   So if you look at -- Look at paragraphs 11
15    and 12.  Tell me when you've finished reading those.
16    I'll read them into the record, actually.
17              "One federal agent walked along the fence,
18    spraying mace at protesters as though he were
19    watering a line of flowers.  Me and three other
20    legal observers were recording.  The protesters he
21    maced had not done anything to merit such treatment.
22    One may have touched the fence, but not in any kind
23    of threatening or violent way.  This agent stopped
24    before he reached us.  These events take place from
25    0:06 to 0:10 of the above video."
```



Page 102

1        "Then" -- Next paragraph:  "Then another
2    federal agent walked up with a can of mace, pointed
3    it at roughly head level, and casually pulled the
4    trigger, even though we were pointing to our
5    respective legal observer indicia and yelling that
6    we were legal observers.  We were inundated with
7    mace.  When he was done covering us in mace, he
8    stepped back into his formation.  These events take
9    place from 0:13 to 0:20 of the above video."
10            That's what that says; is that right?
11   A.    Yes.
12   Q.    Yes.  And you hadn't read that before
13   today?
14   A.    No.
15   Q.    Were you aware of this allegation of
16   improper use of force before today?
17   A.    No.
18   Q.    Okay.  As a person in charge of TRO
19   compliance, do you think walking up to a group of
20   legal observers wearing ACLU vests and NLG hats,
21   whom a different agent has just been able to avoid
22   spraying, and specifically pepper spraying that
23   group, do you think that would violate the TRO?
24   A.    I think --
25            MR. GARDNER:  Objection -- Objection;



Page 103

1    hypothetical.  Objection; lack of foundation.

2    Objection; calls for a legal conclusion.

3        Q.   BY MR. ACHARYA:  It's not a hypothetical.

4    I'm talking about the events in paragraphs 11

5    and 12.

6              Do you think they would violate the TRO?

7              MR. GARDNER:  Well, then objection, lack

8    of foundation.

9        Q.   BY MR. ACHARYA:  Do you know whether they

10   would violate the TRO?

11             MR. GARDNER:  Same objection, and also

12   calls for a legal conclusion.

13       Q.   BY MR. ACHARYA:  Do you understand that

14   the TRO has something to say about paragraphs 11

15   and 12?  Do you understand that the TRO is relevant

16   to those paragraphs?

17             MR. GARDNER:  Same objection.

18                  (Reporter request.)

19             THE WITNESS:  Say that again.

20                  (Reporter request.)

21             THE WITNESS:  Okay.  Can we get the last

22   question again.

23       Q.   BY MR. ACHARYA:  The last question is:  Do

24   you understand that the TRO has something to say

25   about paragraphs 11 and 12, that the TRO is relevant



Page 104

1    to those paragraphs?

2         A.   I do.

3              MR. GARDNER:  Same -- Same objections.

4              THE WITNESS:  Okay.

5         Q.   BY MR. ACHARYA:  Do you understand whether

6    the TRO would permit or prohibit the events in

7    paragraphs 11 and 12?

8              MR. GARDNER:  Same objections.  Lack of

9    foundation, calls for a legal conclusion.

10        Q.   BY MR. ACHARYA:  Okay.  You have to

11   answer.

12        A.   That would depend on a full and thorough

13   investigation that would reveal all the facts in

14   this case, not just those represented in the

15   declaration.

16        Q.   Okay.  And you cannot say, sitting here

17   today, whether just those facts on their own would

18   or would not violate the TRO?

19        A.   Correct.

20             MR. ACHARYA:  I'm going to put a

21   declaration -- or, sorry -- I'm going to put an

22   e-mail into the chat.

23             This is going to be Exhibit 9, I believe.

24             THE REPORTER:  Correct.

25                  (Exhibit 9 marked.)



Page 105

1          Q.   BY MR. ACHARYA:   And tell me when you have
2     it open.

3          A.   This is the RD e-mail?

4          Q.   Yes.

5          A.   Okay.   I have it open.

6          Q.   So if you see in paragraph 5 -- I'll read
7     it into the record:  "All our officers/agents on the
8     ground in Portland are familiar with the," quote,
9     "legal observer indicia noted in paragraph 5 of the
10    TRO, specifically the National Lawyers Guild issued
11    green hat and the ACLU issued blue vests."  And it
12    says:  "Officers/agents should exercise maximum
13    caution with regard to all such persons, absent a
14    strong need to make a valid arrest."

15               Now, going back to the previous exhibit:
16    Is it your understanding that walking up to a group
17    of legal observers wearing ACLU vests and NLG hats
18    and specifically pepper spraying them is exercising
19    maximum caution with regards to such persons?

20               MR. GARDNER:   Objection; lack of
21    foundation.

22               THE WITNESS:   So I'm -- I haven't actually
23    observed the video.

24          Q.   BY MR. ACHARYA:   Okay.   But there are
25    facts in the -- the facts in the declaration.   Can



Page 106

1    you say based on those?

2         MR. GARDNER:  Objection; lack of

3    foundation.

4         Q.   BY MR. ACHARYA:  Please answer.

5         A.   I believe I've already answered this.  I

6    think, you know, a full and thorough investigation

7    might reveal facts other than what's claimed in the

8    declaration.

9         Q.   Okay.  By the way, have you seen this

10   e-mail before?

11        A.   I don't believe so.  I don't --

12        Q.   It wasn't forwarded to you?

13        A.   I don't know.  I don't recall.  I don't

14   recall seeing this specific e-mail.

15        Q.   Okay.  Did you instruct your agents on the

16   ground in Portland to exercise maximum caution with

17   respect to legal observers and journalists?

18        A.   Yes.

19        Q.   Okay.  Did you also restrict authority to

20   deploy crowd control devices such as CS gas

21   canisters to an appropriate supervisory level?

22   That's paragraph 9.

23        A.   Let me read this whole thing.  I don't

24   know who this -- Who is Richard Donoghue?

25        Q.   He's someone -- you know, I'm honestly not



Page 107

1    sure.

2         A.    This is not someone who's in my chain of

3    command.  I believe this person works for the

4    Department of Homeland Security.  This is not an

5    e-mail that's familiar to me.  And I haven't watched

6    the entire video, but when I -- at first glance, it

7    does not appear to depict people that work for me.

8         Q.    Okay.

9         A.    Let me read this.  Hold on.

10        Q.    It was sent to John Gountanis, by the way,

11   who's at DHS.

12        A.    Okay.

13        Q.    Are you familiar with John Gountanis?

14        A.    I've heard of him.  We received a verbal

15   instruction from Bill Williams, who's on -- who's on

16   this, who's one of the recipients of this e-mail.

17   Billy Williams is the U.S. attorney of the District

18   of Oregon, and we did receive a verbal instruction

19   from him that the -- I believe, if this is the

20   deputy attorney general, and I don't know -- I don't

21   know Mr. Richard Donoghue, but if that's the deputy

22   attorney general, it was relayed to me verbally that

23   the deputy attorney general's office, you know, was

24   emphasizing, you know, that the order needed to be

25   complied with.  I don't recall seeing this actual --



Page 111

1            Okay.  Let's go to your declaration.

2    Let's go to 101-5, your July 29 declaration.

3            So I'm looking at paragraph 8.  And this

4    is back to Exhibit 1, for the record.  I'm looking

5    at paragraph 8 on page 2, mislabeled page 3.

6            It says you have personally observed the

7    following incidents while at the incident command

8    post or emergency operations center.

9            What is the incident command post?

10   A.   Give me the paragraph again, please.

11   Q.   Paragraph 8.

12   A.   Paragraph 8.  So the incident command post

13   refers to the federal command post, and the

14   emergency operations center refers to the -- you

15   know, a joint command post that was previously

16   operated by Portland Police Bureau before they

17   kicked the Feds out, basically.

18   Q.   Understood.  So I'm looking at

19   paragraph 8B.

20           And you said that you personally observed

21   all of the following incidents; is that right?

22   A.   Observed on, yeah, video or other, you

23   know, social media.

24   Q.   I see.  So you didn't observe the actual

25   event take place?



Page 112

1          A.   I was watching -- yeah, typically watching

2     live video, or in some cases it's referring to

3     things that were -- we saw in claims that were made

4     on Twitter.

5          Q.   Um-hum.  So did you personally observe the

6     arrest of the man identified as Knudson?

7          A.   I saw a video.

8          Q.   You saw a video of it.

9               Did you -- Yeah, let's go on to 8C on the

10    next page.  So this is about an individual on the

11    live stream video who identifies as Ari.

12         A.   Yes.

13         Q.   Did you personally observe this incident?

14         A.   I watched the -- I watched the video.

15         Q.   You watched the video.  So you're familiar

16    with the video?

17         A.   I am.  I am familiar with the video.  I

18    don't -- you know, I haven't memorized it, but I

19    have.

20         Q.   Sure.  Did you make it?

21         A.   Did I make the video?

22         Q.   Yeah.

23         A.   No.

24         Q.   No.  You watched it?

25         A.   Yes.



Page 113

1      Q.   Okay.  Did you watch it before or after

2  July 17th?

3      A.   I don't recall.

4      Q.   You have no idea when you watched it?

5      A.   I believe I watched it July 17th, but I --

6  I shouldn't -- I don't recall when I watched the

7  video.

8      Q.   Okay.

9      A.   I believe I watched it the day that it

10  happened.

11      Q.   Okay.  And who made this video?

12      A.   I don't know.  It's just an unidentified

13  user who was...

14      Q.   Are you aware that it's a compilation of

15  videos?

16           MR. GARDNER:  Objection; lack of

17  foundation.

18      Q.   BY MR. ACHARYA:  You've seen the video?

19      A.   The specific -- The declaration is

20  referring to a specific time stamp where that

21  behavior occurs; not where that voice is heard, not

22  the other portions of the video.

23      Q.   Yeah, no.  It refers to a specific time

24  stamp, but it does refer to other portions of the

25  video too.  It refers to a specific time stamp where



Page 114

1    she says she has a bunch more press passes, but it

2    refers to earlier portions where she, I guess, is

3    encouraging violent opportunists to tamper with a

4    government owned security barricade, and also a

5    different portion where she's claiming to be a

6    member of the media organizations Halospace and GIA.

7            So you've watched -- Have you watched the

8    entire video?

9        A.   I believe so.

10       Q.   Okay.  And are you aware that it's a

11   compilation of videos?

12       A.   I -- I don't know.  I don't --

13       Q.   You are not aware of whether it is or is

14   not a compilation of videos?

15       A.   Correct.

16       Q.   Okay.  Do you know how you came to watch

17   it rather than the original videos?

18       A.   I don't know.

19       Q.   Okay.  Are you aware that the link in 8D,

20   the following paragraph where you said you observed

21   multiple live videos, is the -- that is the channel,

22   which is to say the collection of videos uploaded by

23   the same user that uploaded the video in

24   paragraph C?

25       A.   I'm not aware of that, no.



Page 115

1           MR. ACHARYA:  You're not aware of that.

2           I'm going to put a PDF in the chat.  This

3    is going to be Exhibit 10.

4                (Exhibit 10 marked.)

5       Q.   BY MR. ACHARYA:  Tell me when you've got

6    it open, please.

7       A.   Okay.

8       Q.   So this is the -- This is what shows up

9    when you go to the link in paragraph D.

10           Does this look familiar to you?

11       A.   It does not look familiar to me, no.

12       Q.   Okay.  But you visited the link in

13    paragraph D, because it's in your declaration?

14       A.   Yes.

15       Q.   Okay.  But this is the -- this is what's

16    at the link and it doesn't look familiar to you?

17       A.   This is like a home page or something.

18    It's -- you know, I am familiar with YouTube.  This

19    is a home page, obviously, where there are multiple

20    videos that have been posted.  I don't -- This does

21    not --

22       Q.   Right.

23       A.   I may have visited it, but it does not --

24       Q.   Do you -- Do you often go to Portland

25    Protesters Exposed?



Page 116

1        A.   No.

2        Q.   Did you personally observe any of the

3   incidents in the videos available at that channel?

4        A.   I don't know.  I would have to --

5        Q.   Okay.  Because those are the incidents

6   that you refer to in paragraph D.

7        A.   Sorry.  Now I have a bunch of tabs and

8   stuff open.  Sorry.

9             So in that video -- in paragraph D -- So,

10  generally, in the -- either in the incident command

11  post or the emergency operations center, there would

12  be people -- not people -- there would be live

13  stream aggregators, if you -- if you know what this

14  is.  You know, basically there are, you know, these

15  channels where they're kind of importing and

16  collating multiple live streams.  And I observed

17  that multiple -- when it says "multiple live videos"

18  of that incident in 8D, on multiple live streams I

19  observed that.

20        Q.   Okay.  Are you aware that the video in 8C

21  is not a live stream or a live stream aggregator?

22        A.   I'm not aware of that, no.

23        Q.   Okay.  Paragraph 8E, you talk about MSNBC

24  reporter Sergio Olmos tweeting out video and

25  statements that he observed a person masquerading as



Page 117

1    press to protect himself from federal officers.

2              Did you personally observe the underlying

3    incident?

4         A.   I did not, but I observed the Twitter

5    post.

6         Q.   You observed the Twitter post?

7         A.   There's a -- Typically, there's -- I don't

8    know what you call it -- I think a social media

9    dashboard used very commonly in EOCs and incident

10   command posts called Tweet Deck --

11        Q.   Right.

12        A.   -- where you enter search terms and it

13   brings up, you know, I guess, you know, collections

14   of tweets that, you know, match whatever search

15   terms you've used.

16        Q.   Sure.  And the reason I'm asking you these

17   questions, by the way, is because I think you have

18   represented that you have been on the ground

19   sometimes at these protests.

20        A.   Yes, that's correct.

21        Q.   Yes.  So I just want to make sure that --

22   which ones you did or did not personally observe.

23              So going on to 8F, the incident involving

24   Brandon Peape, wearing a black shirt with the word

25   "press" on the front and back, running toward the



Page 118

1   security fence.

2            Did you personally observe that underlying

3   incident?

4        A.   Let me go back to the -- Okay.  I've got

5   all of these documents open now.

6        Q.   Sure.

7        A.   I don't -- I think I accidentally closed

8   out.

9        Q.   I mean, I think you have this document in

10  paper in front of you, don't you?

11       A.   I think I've got the other one.  I've got

12  the other -- of my declaration paper.

13       Q.   I see.

14       A.   Where?

15       Q.   Here, why don't I put it back in the chat.

16  This is Exhibit 1, the second time.

17       A.   I can -- I can go to the document.

18            All right.  We're in 8D?

19       Q.   No, I'm looking at 8F now.

20       A.   8F.

21       Q.   So it's a video posted by Mr. --

22       A.   No, I observed this -- As I explained

23  earlier, I observed -- I saw this Twitter post; I

24  was not personally present while this -- when this

25  video was reported.



Page 119

1      Q.    Okay.  But you're familiar with the video?
2  You watched it?
3      A.    Yes.
4      Q.    And it shows the man with the press shirt
5  running towards the fence?
6      A.    Yes.
7      Q.    So it shows him doing something illegal?
8      A.    It shows him with a shield, it shows him
9  -- it shows behavior that appears to be cooperating
10  with these other people who were involved in
11  unlawful behavior.
12      Q.    So it shows him with a shield?
13      A.    It appears it shows him -- He appears to
14  be cooperating with these other individuals who are
15  engaged in unlawful behavior.
16      Q.    Are you aware of Brandon Peape doing
17  anything illegal himself?
18      A.    Not specifically.
19      Q.    Okay.  Is running towards the security
20  fence illegal?
21      A.    Not on its own.
22      Q.    Sure.  How about 8G?  Did you personally
23  observe this incident where a helmet with the word
24  "press" written on the back was participating in the
25  destruction of government property, to wit, the



Page 120

1    security fence around the federal facility?

2        A.   I -- I witnessed this video on Twitter.  I

3    was not -- I was not personally present while this

4    occurred.

5        Q.   You're familiar with the video because you

6    watched it?

7        A.   Yes.

8        Q.   So this person was participating in the

9    destruction of government property, so they were

10   doing something illegal?

11       A.   It appeared to be participating in the

12   destruction of government property, yes.

13       Q.   What were they doing?

14       A.   Shielding the destruction of government

15   property from observation by federal officers.

16       Q.   Oh, how were they shielding it?

17       A.   With the use of umbrellas and surrounding

18   it so that it couldn't be observed.

19       Q.   I see.  Were they cutting the fence?

20       A.   Not that I can see, no.

21       Q.   Could you see in the video whether they

22   were recording video or taking photos?

23       A.   Could I see in the video if they were

24   recording video or taking -- They were posting video

25   that they appeared to be taking, if that's what



Page 121

1    you're asking.  I don't...

2         Q.    No, no.  I'm not asking about the person

3    who took the video.  I'm asking about the person in

4    the video with the word "press" written on the back

5    of the helmet.

6              Could you see if that person was taking

7    video or taking photos in the video?

8         A.    Their hands are kind of obscured in front

9    of them.  I don't know.  I can't see it.

10        Q.    Right.  Do you know who posted the video?

11        A.    The -- Let's get back to that one.

12             It's not a person that I knew personally,

13   but I believe it's a known, you know, media source

14   from --

15        Q.    Right.

16        A.    -- the Portland area.

17        Q.    Mike Bivins, a freelance journalist?

18        A.    Yes.  Yes.

19        Q.    It's good that press were there to take

20   that video; right?

21        A.    Absolutely.

22        Q.    Okay.  And let's look at 8H real quick.

23             This is the individual wearing a helmet

24   with the word "press" written on the side, who had

25   crossed the barrier protecting the Hatfield



Page 122

1    Courthouse and was calling on others to come join

2    him.

3            Did you personally observe this incident?

4        A.    I observed that on video from the command

5    post.

6        Q.    Okay.  And do you know who made that

7    video?

8        A.    There were -- We observed -- That video --

9    There were multiple live streams.  He was in that --

10   He was in that area for an extended period of time.

11   So I don't know who made that particular video, but

12   there were multiple similar videos of that incident.

13       Q.    So that -- that link in paragraph H goes

14   to a video posted by Andy Ngo.

15           Are you aware of that?

16       A.    I am not.

17       Q.    Okay.  Do you watch a lot of --

18       A.    And I see it here, yes.

19       Q.    Do you watch a lot of Andy Ngo's videos?

20       A.    He's a -- He's a known -- I watch no more

21   of Andy Ngo's videos than I do the other journalists

22   that cover Portland protests.  He's a known

23   journalist that covers Portland protests.

24       Q.    Okay.  Is it illegal to hop the fence?

25       A.    Yes.  It's trespassing.



Page 123

1      Q.   And it's illegal if he's wearing a gorilla
2   suit?
3      A.   I'm sorry?  If he's what?
4      Q.   It's illegal if he's wearing a gorilla
5   suit?
6      A.   That's a hypothetical question.  I don't
7   see how it relates to this.
8      Q.   I'm just asking:  Does the wearing of the
9   gorilla suit change that it's trespassing?
10     A.   No.
11     Q.   No.  It's illegal if he's buck naked?
12     A.   That's correct.
13     Q.   And it's illegal if he's wearing a press
14  helmet?
15     A.   That's correct.
16     Q.   You'd have probable cause to believe that
17  he's committing a crime?
18     A.   That's correct.
19     Q.   You could arrest him?
20     A.   That is correct.
21     Q.   The press helmet wouldn't stop you from
22  arresting him?
23     A.   That is correct.
24     Q.   Was this person arrested?
25     A.   I don't know the answer to that question.



Page 124

1      Q.   Was he charged?

2      A.   I don't believe so, but I don't -- I don't

3  know the answer to that question.   I don't have that

4  person's identity here with me.

5      Q.   And just to be clear:   When you said that

6  you personally observed the following incidents,

7  what you meant for 8B, C, D, E, F, G, and H was that

8  you personally watched the videos of those

9  incidents?

10     A.   Either videos or Twitter posts.   Correct.

11     Q.   Videos that other people took?

12     A.   Correct.

13     Q.   Videos that other people may have edited?

14     A.   I'm sorry?  Say the last part again.

15     Q.   Videos that other people may have edited.

16          MR. GARDNER:  Objection; calls for

17  speculation.

18          THE WITNESS:  That's correct.

19     Q.   BY MR. ACHARYA:  Videos that other people

20  did in fact edit, at least in the case of C?

21          MR. GARDNER:  Objection; lack of

22  foundation.

23     Q.   BY MR. ACHARYA:  You've watched the video

24  in C?

25     A.   Yes.  I have no way of knowing that they



Page 125

1    -- whether the videos were edited or not.  That's

2    correct.

3        Q.   Okay.  And it has been your testimony

4    earlier in this deposition that videos often lack

5    context, leave out details, and that you are

6    uncomfortable evaluating situations for legality or

7    illegality without more details?

8        A.   That's correct.

9             MR. GARDNER:  Objection.

10       Q.   BY MR. ACHARYA:  Do you see any issues

11   with using tear gas at protests during a pandemic?

12            MR. GARDNER:  Objection; vague.

13       Q.   BY MR. ACHARYA:  Does it concern you that

14   police, including federal police, are using tear gas

15   at protests during a pandemic?

16       A.   Again, I don't have any specific, you

17   know, medical information to believe that tear gas

18   is or is not, you know -- the deployment of tear gas

19   would be different or not during a pandemic as

20   opposed to some other non-pandemic time.

21       Q.   Okay.  Do you agree that graffiti and

22   vandalism -- and I'm quoting you here -- are truly

23   minor crimes?

24       A.   Where are you quoting me from?

25       Q.   I'm quoting you from a podcast that you



Page 132

1                    REPORTER CERTIFICATE

2

3        I, MARILYNN HOOVER, CSR No. 04-0387 for the

4   State of Oregon, do hereby certify:

5        That prior to being examined, the witness named

6   in the foregoing deposition was duly sworn to

7   testify the truth, the whole truth, and nothing but

8   the truth;

9        That said deposition was taken down by me in

10  shorthand at the time and place therein named, and

11  thereafter reduced by me to typewritten form; and

12  that the same is a true, correct, and complete

13  transcript of the said proceedings.

14       Before completion of the deposition, review of

15  the transcript [X] was [ ] was not requested.  If

16  requested, any changes made by the deponent (and

17  provided to the reporter) during the period allowed

18  shall be appended hereto.

19       I further certify that I am not interested in

20  the outcome of the action.

21       Witness my hand this 6th day of August 2020.

22

23                    _____

24                    MARILYNN HOOVER, RPR

25                    CSR No. 04-0387; Exp. 03/31/2023



# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL