**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **SAM GEHRKE**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated,<br><br>              Plaintiffs,<br><br>        v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**,<br><br>              Defendants. | Case No. 3:20-cv-1035-SI<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS** |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AGAINST FEDERAL DEFENDANTS

## **TABLE OF CONTENTS**

Introduction ............................................................................................................... 1

Argument ................................................................................................................... 3

I.     Plaintiffs have shown an overwhelming likelihood of success .......................... 4

      A.     Plaintiffs Are Likely to Prevail on Their Retaliation Claims .................. 4

      B.     Plaintiffs Are Likely to Succeed on Their Access Claims ................... 11

             1.     Public Streets, Parks, and Sidewalks Have Historically
                    Been Open to the Press and General Public ............................... 12

             2.     Public Access Plays a Significant Positive Role in the
                    Functioning of Law Enforcement-Activity in Public Fora ...................... 13

             3.     Closure is Neither Essential Nor Narrowly Tailored to
                    Preserve Any Legitimate Interest ............................................... 14

             4.     Closure Would Leave Plaintiffs With No Alternative
                    Opportunity to Observe and Report ......................................... 15

II.    Without an injunction, federal agents are liklely to irreparably harm
      Plaintiffs ........................................................................................................ 16

III.   The balance of equities favors Plaintiffs ........................................................ 20

IV.   Plaintiffs' proposed injunction is lawful and workable .................................. 21

      A.     The Court Should Prohibit Federal Agents from Leaving Federal
           Property ..................................................................................... 21

      B.     The Court Should Require That Federal Agents Be Marked with
           Large Identifying Codes ............................................................ 23

      C.     The Federal Agents' Remaining Arguments Are Without Merit ........................... 26

Conclusion ............................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Americans for Prosperity Found. v. Harris,*
  809 F.3d 536 (9th Cir. 2015) .................................................................. 9

*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents,*
  824 F.3d 858 (9th Cir. 2016) .................................................................. 5

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................... 7

*Barney v. City of Eugene,*
  20 F. App'x 683 (9th Cir. 2001) ............................................................. 5

*Bay Area Peace Navy v. United States,*
  914 F.2d 1224 (9th Cir. 1990) .............................................................. 15

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) .............................................................. 20

*Brinton Bus. Ventures, Inc. v. Searle,*
  248 F. Supp. 3d 1029 (D. Or. 2017) ...................................................... 9

*Castro v. Cty. of Los Angeles,*
  833 F.3d 1060 (9th Cir. 2016) (en banc ............................................... 11

*Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,*
  751 F. Supp. 218 (D.D.C. 1990) ............................................................. 8

*Colten v. Kentucky,*
  407 U.S. 104 (1972) ......................................................................... 12, 13

*Courthouse News Serv. v. Planet,*
  947 F.3d 581 (9th Cir. 2020) ........................................................... 12, 14

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014) ........................................................... 4, 20

*Elrod v. Burns,*
  427 U.S. 347 (1976) .............................................................................. 16

*Estate of Shafer ex rel. Shafer v. City of Elgin,*
  2014 WL 6633106 (D. Or. Nov. 21, 2014) ............................................. 8

*F.T.C. v. Affordable Media,*
  179 F.3d 1228 (9th Cir. 1999) .............................................................. 17

*First Nat'l Bank of Bos. v. Belotti,*
  435 U.S. 765 (1978) ......................................................................... 21, 22

*Flynt Distributing Co. Inc. v. Harvey,*
  734 F.2d 1389 (9th Cir. 1984) ................................................................ 9

*For The Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) .............................................................. 16

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.,*
  457 U.S. 596 (1982) .............................................................................. 12

*Gomez v. Vernon,*
  255 F.3d 1118 (9th Cir. 2001) .............................................................. 11

*Greenpeace Found. v. Daley,*
  122 F. Supp. 2d 1110 (D. Haw. 2000) ............................................... 9, 10

*Greer v. Amesqua,*
   22 F. Supp. 2d 916 (W.D. Wis. 1998)..........................................................16
*Hicks v. City of Portland,*
   2006 WL 3311552 (D. Or. Nov. 8, 2006)...................................................13
*Houdini, Inc. v. Goody Baskets, LLC,*
   166 F. App'x 946 (9th Cir. 2006) .................................................................9
*Kumho Tire Co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999) .....................................................................................8
*Leigh v. Salazar,*
   677 F.3d 892 (9th Cir. 2012) ......................................................................12
*Lemon v. Kurtzman,*
   411 U.S. 192 (1973) ...................................................................................24
*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
   192 F.3d 1283 (9th Cir. 1999) ......................................................................5
*Menotti v. City of Seattle,*
   409 F.3d 1113 (9th Cir. 2005)........................................................................5
*Mims v. City of Eugene,*
   145 F. App'x 194 (9th Cir. 2005) .................................................................5
*Norsworthy v. Beard,*
   87 F. Supp. 3d 1164 (N.D. Cal. 2015)..........................................................9
*Phelps-Roper v. Heineman,*
   57 F. Supp. 3d 1146 (D. Neb. 2014) (denying motion .................................8
*Press-Enter. Co. v. Superior Court of California,*
   464 U.S. 501 (1984) ...................................................................................12
*Press-Enterprise Co. v. Superior Court of California,*
   478 U.S. 1 (1986)..................................................................................Passim
*Reed v. Lieurance,*
   863 F.3d 1196 (9th Cir. 2017) ....................................................................15
*Sanders Cty. Republican Cent. Comm. v. Bullock,*
   698 F.3d 741 (9th Cir. 2012) ......................................................................16
*Smith v. City of Hemet,*
   394 F.3d 689 (9th Cir. 2005) ........................................................................8
*Stormans, Inc. v. Selecky,*
   586 F.3d 1109 (9th Cir. 2009) ....................................................................24
*United States v. Cole,*
   84 F. Supp. 3d 1159 (D. Or. 2015) ................................................17, 20, 26
*United States v. Laerdal Mfg. Corp.,*
   73 F.3d 852 (9th Cir. 1995) ...................................................................17, 18
*United States v. Stevens,*
   559 U.S. 460 (2010)....................................................................................20
*United States v. W.T. Grant Co.,*
   345 U.S. 629 (1953)...............................................................................Passim
*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .......................................................................................17

**<u>RULES</u>**

Fed. R. Civ. P. 65(d)(1)(C) ........................................................................................................ 26

**<u>OTHER AUTHORITIES</u>**

11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995) ...................................................................................................................................... 17

Plaintiffs respectfully submit this reply in support of their motion for a preliminary injunction.

## INTRODUCTION

The federal agents' Opposition presents the same legal arguments that the Court has already rejected, offers no new evidence on the merits or irreparable harm, and largely does not respond to the arguments and facts in the moving papers. The entire outpouring of journalist and legal observer declarations remains uncontroverted. The expert testimony from Gil Kerlikowske, the former Senate-approved Commissioner of U.S. Customs and Border Patrol and Police Chief of Seattle during hundreds of volatile protests, is uncontroverted.

Plaintiffs are likely to win on their retaliation claims. Without submitting any evidence, the federal agents assert that their repeated attacks on journalists and legal observers—often when nobody else was around—were "inadvertent." But their theory makes no sense, and their own heavily-redacted documents tell a different story. For example, in writing to Acting Commissioner of CBP Mark Morgan, Acting Deputy Secretary Ken Cuccinelli opined that although the Court's TRO was "offensive," it "shouldn't affect anything we're doing."



(Declaration of Athul K. Acharya ("Acharya Decl."), Ex. 6 at 2.) Mr. Morgan's response was to warn his boss not to commit such plans to writing:



(*Id.* at 1.) This sort of insouciance and furtiveness shows that the retaliatory intent came from the top down.

Plaintiffs are likely to prevail on their access claims. The federal agents do not refute that in hundreds of similar protests in Seattle, police did not disperse journalists or legal observers after declaring an unlawful assembly, that Seattle's policy never resulted in any harm to law enforcement, that no such harm has occurred in Portland, and that Portland police have been capable of allowing journalists and legal observers to do their jobs during dispersals. As such, the federal agents' blanket policy of violently dispersing journalists and legal observers, who pose no threat to law enforcement or public safety, unnecessarily deprives Plaintiffs of their First Amendment rights. Nor does their policy provide for an alternative opportunity to observe and report—a point the federal agents do not even address in their Opposition.

The federal agents assert that the likelihood of irreparable harm to Plaintiffs' First Amendment rights is "too remote," but this ignores their own binding interrogatory responses in which they admit that they have not stood down from Portland and have no intention of doing so. Just yesterday, the Oregon State Police withdrew from policing the federal courthouse, making it even more likely that the federal agents will resume their assault on the Fourth Estate.

For reasons that the Court has already articulated, the balance of equities and public interest also strongly favor injunctive relief: "[T]he evidence before the Court shows that

journalists and legal observers attend the protests as 'guardians of the public interest,' not as vandals." (Dkt. 84 at 17.) Nothing in U.S. law (as opposed to North Korean or Russian law) permits the government to use violence and intimidation to unilaterally control the news, right at the critical point that it decides to use paramilitary force against its citizens. The First Amendment acts as a structural check against government power so that this never occurs. And it is the federal courts that must enforce this structural protection.

On the shape of appropriate injunctive relief, the federal agents also do not dispute that they lack the training to constitutionally police on the streets of Portland. And their arguments that they should be allowed to continue policing the protests without any accountability are factually and legally unsupported.

For all these reasons, the Court should issue the preliminary injunction requested by Plaintiffs.

## **ARGUMENT**

At the TRO hearing, the federal agents attempted to stipulate that the TRO would serve as a preliminary injunction. After the Court denied this request and ordered expedited discovery, the federal agents refused to extend the hearing date for this motion, while at the same time slow-rolling document productions, producing the first small tranche of custodial documents just two days ago, improperly objecting at depositions, and redacting their documents into oblivion. (Acharya Decl. ¶ 10 & Ex. 9; *see, e.g.*, *id.*, Ex. 8.) Despite the federal agents' efforts to frustrate the Court's TRO by achieving de facto what the Court had denied, Plaintiffs easily meet the standard for a preliminary injunction. Plaintiffs' unrefuted evidence, including Mr. Kerlikowske's expert declaration, federal agents' deposition testimony, the federal defendants' written discovery responses, and an avalanche of unrebutted declarations from journalists and legal observers, all show that Plaintiffs are likely to win on the merits, have proven irreparable harm, and that the balance of equities and public interest overwhelmingly militate in favor of prohibiting federal agents from targeting and dispersing journalists and legal observers.

In contrast, the federal agents have not submitted any new evidence on the merits or irreparable injury and have chosen, instead, to rely on the same materials and arguments that the Court already has rejected. While it has been said that there is no new thing under the sun, those tactics should fail here for all the reasons already given by the Court.

## I.    PLAINTIFFS HAVE SHOWN AN OVERWHELMING LIKELIHOOD OF SUCCESS

Plaintiffs are overwhelmingly likely to succeed on their claims for retaliation and denial of their right of access under the First Amendment. To obtain a preliminary injunction, Plaintiffs need only "mak[e] a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014). After that, the government bears the burden of justifying the restriction on Plaintiffs' speech. *Id.* The federal agents have not come close to meeting that burden here, because they have offered no new evidence and scant new argument on either claim.

### A.    Plaintiffs Are Likely to Prevail on Their Retaliation Claims

The federal agents offer no evidence to controvert the substantial evidence that they retaliated against Plaintiffs. Instead, they offer legal arguments that the Court already rejected, such as that that the First Amendment does not apply here. (Opp. at 15-16.) They claim that all of Plaintiffs' evidence of intent is "circumstantial," even though intent is almost always proven circumstantially, and even though they refused to produce the best evidence of their intent— emails and text messages from the line agents policing the protests. (Opp. at 16-17; Acharya Decl. ¶ 10 & Ex. 9.) They offer attorney argument in an attempt to explain away Plaintiffs' video evidence, but they ignore the declarations to which the videos were attached and offer no *evidence* to rebut them. (Opp. at 17-19.) Finally, they attempt to impugn their former commanding officer, Mr. Kerlikowske, by claiming that he is not an expert but merely a "retired police chief." (Opp. at 20, 32.) These redux arguments lack merit and further fail in light of the new evidence now in the record.

The federal agents' legal arguments fail for the reasons the Court gave in granting and extending the TRO. The federal agents' first and foremost response to Plaintiffs' retaliation claim is to contend simply that "[t]here is . . . no First Amendment inquiry to be made." (Opp. at 15; *but see* Dkt. 84 at 12 (analyzing Plaintiffs' retaliation claims under the First Amendment).) Similarly, their second argument relies on cases about *indiscriminate* crowd control against protesters to respond to Plaintiffs' claims about *targeted* retaliation against journalists and legal observers. (Opp. at 15-16; *but see* Dkt. 84 at 12 ("this evidence does not support that the force used on Plaintiffs were 'unintended consequences' of crowd control").) None of those cases is relevant to whether federal agents used targeted force to retaliate against journalists and legal observers. *Cf. Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (protester's claim about tear gas); *Mims v. City of Eugene*, 145 F. App'x 194, 196 (9th Cir. 2005) (protester's claim about police wearing riot gear); *Menotti v. City of Seattle*, 409 F.3d 1113, 1124-25, 1155 (9th Cir. 2005) (protester's claim about curfew and exclusion orders).

The federal agents argue next that "Plaintiffs' case is entirely circumstantial," but ignore that retaliation cases expressly permit circumstantial evidence to prove retaliatory intent. (*Compare* Opp. at 17, *with* Mot. at 15 (citing *Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858, 867 (9th Cir. 2016); *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999)), *and* Dkt. 84 at 12.) They also ignore the testimony of their own agents that indicates that when skilled marksmen like the federal agents, using accurate weapons like those the federal agents wield, shoot a journalist or legal observer, it is because they intended to do so. (Mot. at 17; *see also* ████████████████████████████ ████████████████████████████.)

The federal agents argue that Plaintiffs have "mustered no direct evidence" about the agents' intent. (Opp. at 17.) But when Plaintiffs attempted to *obtain* direct evidence—text messages and emails from agents on the ground—the federal agents refused to produce it under any circumstances. (Acharya Decl. ¶ 10.) Nevertheless, the federal agents' production two days ago did reveal some more direct evidence of retaliatory intent, in the form of DHS's institutional

attitude toward journalists it dislikes: When Acting Secretary Chad Wolf read an unflattering article by Buzzfeed journalist Hamed Aleaziz, he responded that Mr. Aleaziz was a part of the "[d]eep state" and "not a real journalist." (Acharya Decl., Ex. 10 (citing Hamed Aleaziz, *"Disturbing And Demoralizing": DHS Employees Are Worried The Portland Protest Response Is Destroying Their Agency's Reputation*, Buzzfeed News (July 21, 2020)).[1]

Next, the federal agents attempt to explain away what Plaintiffs' and Plaintiffs' declarants' videos show, without offering contrary evidence. (Opp. at 17-19.) The federal agents have known about many of these incidents for several weeks and have not submitted even one declaration attempting to explain them from any of their agents who was involved. In fact, the evidence suggests that they did not even investigate those claims. (*E.g.*, Russell Dep., Dkt. 137-1 at 79:25-80:3, 87:1-4, 100:9-11, 101:8-102:16, 105:15-23 (admitting that, contrary to his own representations earlier in the deposition, Mr. Russell had not reviewed at least two of Plaintiffs' declarations, had not viewed cited video, and was unfamiliar with their allegations).[2]) They had the opportunity to depose Plaintiffs and their declarants but did not do that either. Nor do they offer any rebuttal evidence of any type for the Court to consider. Instead, they seek to interpose only their own selective interpretations of the videos—pure attorney argument—and ignore what the declarants had to say about setting and context. For just a few examples:

- They argue that Daniel Hollis's video "shows a large crowd behind him," but do not rebut his testimony that those protesters were "several yards behind [him] and not doing anything threatening whatsoever." (*Compare* Opp. at 18 n.3, *with* Dkt. 91 ¶ 7.) A careful examination of Mr. Hollis's video bears this testimony out.

---

[1] https://www.buzzfeednews.com/article/hamedaleaziz/dhs-employee-anger-over-portland-protest-response.

[2] The federal agents neglect to discuss these discrepancies when they assert that Plaintiffs' accusations of mendacity are "unfounded." (Opp. at 24-25.) They gloss over many other discrepancies too, especially the stark difference between their own account of an arrest of a person marked "press" and that person's video, which shows that they attacked him unprovoked. (Mot. at 28 & n.12.)

PAGE 6 -   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

- They argue that Plaintiff Kat Mahoney and Bruce Knivila's videos show protesters near them, but do not rebut their testimony (or their video evidence) that after one federal agent stopped pepper-spraying when he got to them, another federal agent strolled up and corrected the oversight.[3] (*Compare* Opp. at 17 n.3, *with* Dkt. 94 ¶¶ 9-12, *and* Dkt. 92 ¶¶ 4, 9-10.) This was after the Court had issued its TRO.

- They argue that Plaintiff Mathieu Lewis-Rolland was between federal agents and protesters when federal agents shot him, but ignore his testimony and photographs showing that the agent who shot at him had taken aim at him only two minutes earlier. (*Compare* Opp. at 18, *with* Dkt. 44 ¶¶ 9, 11-13.)

They close this passage by suggesting that these attorney arguments, which are not competent evidence, serve also to rebut Plaintiffs' declarations that lack video, which are evidence even without video. (Opp. at 18); *cf.* Ninth Circuit Jury Instructions Committee, *Manual of Model Civil Jury Instructions* § 1.10 (2017 ed., 2019 update) ("Arguments and statements by lawyers are not evidence."); *id.* § 1.9 (evidence includes "the sworn testimony of any witness").[4]

Next, the federal agents purport to address Mr. Kerlikowske's expert testimony that virtually all the incidents cataloged in Plaintiffs' declarations are unnecessary and constitute excessive force. (Kerlikowske Decl., Dkt. 135 ¶¶ 30-41; *cf.* Opp. at 20.) But they do not rebut it. Instead, they assert incorrectly that Plaintiffs have not offered Mr. Kerlikowske's opinion as an expert. (Opp. at 20.) Mr. Kerlikowske was asked to render expert opinions on four topics and did so. (Kerlikowske Decl. ¶ 4.) Mr. Kerlikowske's testimony is well within his expertise. As a person who oversaw hundreds of chaotic protests in Seattle and trained police officers on how to police such protests, and as the former Senate-confirmed boss of many of the federal agents

---

[3] The notion that this use of force was "*inadvertent*" beggars belief. (*Cf.* Opp. at 18.)

[4] Their error on this evidentiary point is explained on the following page, where they confuse allegations in a complaint with sworn testimony in a declaration. (Opp. at 19 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).)

PAGE 7 -   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
           INJUNCTION AGAINST FEDERAL DEFENDANTS

here,[5] Mr. Kerlikowske is an expert on policing protests and law-enforcement training. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *id*. at 150 ("In [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience."). The federal agents are obviously aware of their former boss's credentials, which, for example, include 47 years of law-enforcement experience in hundreds of protests similar to Portland's, studying crowd-control during protests in Northern Ireland, and years of work in Internal Affairs and other management positions where he routinely reviewed and analyzed use of force and formulated and approved hundreds of policies and procedures related to crowd control and use of force. (Reply Declaration of Gil Kerlikowske ("Kerlikowske Reply Decl.") ¶¶ 1-5.)

Mr. Kerlikowske's opinions are the type of expert testimony based on law-enforcement experience that courts have repeatedly allowed. *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (admitting an expert declaration on "the training of police dogs and police dog handlers" and "whether the officers' conduct comported with law enforcement standards"); *Estate of Shafer ex rel. Shafer v. City of Elgin*, No. 2:12-cv-00407-SU, 2014 WL 6633106, *8-9 (D. Or. Nov. 21, 2014) (permitting expert testimony on excessive force by longstanding members of law enforcement). Courts have admitted crowd-control experts with less experience and credentials than Mr. Kerlikowske. *See, e.g.*, *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F. Supp. 218, 222 (D.D.C. 1990) (granting preliminary injunction based, in part, on "affidavit and testimony by Robert Klotz, an independent consultant and a nationally recognized expert in crowd control and a former Deputy Chief of the District of Columbia Metropolitan Police Department who helped manage or was responsible for police protection during demonstrations and marches from 1971 to 1980."); *Phelps-Roper v. Heineman*, 57 F. Supp. 3d 1146, 1165 (D. Neb. 2014) (denying motion to exclude crowd control expert

[5] The federal agents' characterization of Mr. Kerlikowske as "a retired police chief" is incomplete, to say the least. (*Compare* Opp. at 32, *with* Kerlikowske Decl. ¶ 1.)

where plaintiff "acknowledge[d] [expert's] general experience in law enforcement and crowd control" and all her objections went to weight, rather than admissibility).

The federal agents' objections that Mr. Kerlikowske's testimony is "not appropriate or helpful" or that he does not sufficiently explain his methods (Opp. at 20) go to weight, rather than admissibility. In any event, courts may consider inadmissible evidence in ruling on a motion for a preliminary injunction, and assign it whatever weight they deem appropriate. *See Greenpeace Found. v. Daley*, 122 F. Supp. 2d 1110, 1114 (D. Haw. 2000) (citing *Flynt Distributing Co. Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)) (refusing to strike expert declaration because "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings in general" and "[t]he Court may consider inadmissible evidence to determine the likelihood of irreparable harm in deciding a motion for a preliminary injunction"); *Americans for Prosperity Found. v. Harris*, 809 F.3d 536, 540 n.3 (9th Cir. 2015) ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." (quotation marks omitted)); *Houdini, Inc. v. Goody Baskets, LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("the rules of evidence do not strictly apply to preliminary injunction proceedings"); *Brinton Bus. Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1032 (D. Or. 2017) ("in deciding a motion for a preliminary injunction, the Court has broad discretion to consider all arguments and evidence, including hearsay and other inadmissible evidence, declarations from interested parties, and arguments raised for the first time in a reply").[6]

Because the federal agents do not even try to rebut Mr. Kerlikowske's opinions, his analysis that the federal agents repeatedly used unnecessary force against journalists and legal observers (Kerlikowske Decl. ¶¶ 30-41), which is strong circumstantial proof of intent, is unrefuted. For example, they do not contest that:

---

[6] "In view of the streamlined and expedited nature of preliminary injunction proceedings," expert declarations at the preliminary injunction stage need not comply with the requirements of Rule 26. *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1182 (N.D. Cal. 2015).

PAGE 9 -   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION AGAINST FEDERAL DEFENDANTS

Federal agents shot journalist Garrison Davis in the back with a
tear-gas canister and shot at him with pepper balls when he was
merely taking video of federal officers, and there were no
protesters around him. (Dkt. 43 ¶¶ 4, 13-14.) Under these
circumstances, these acts more likely than not constitute excessive
use of force because (1) he was not doing anything threatening and
was "moving back" from the federal officers when he was shot
with the tear gas cannister, (2) it is inappropriate and dangerous to
shoot anyone with a tear gas cannister, (3) he was shot in the back
so it is not arguable that he posed an immediate threat, (4) it is
inappropriate and dangerous to shoot at anyone with pepper balls,
as they are supposed to be shot at the ground so that they explode
and release the contents, (5) when the pepper balls were shot at
him, he was taking videos from the side of the protest, and no
protesters were near him, and (6) at the time all these events
occurred, he was wearing a helmet marked "PRESS" and
displaying his press pass.

(Kerlikowske Decl. ¶ 32.)

It is similarly unrefuted that "police forces under leadership trained and experienced in

civil disturbances are able to protect public safety without excluding press and legal observers";

that "most of the personnel in the federal agencies that were sent to Portland appear to lack

[such] training and experience"; and that rather than give less-lethal weaponry to every federal

agent policing the protests, "only a small group of well-trained people who are familiar with the

restraint necessary" to use such weapons should be given them. (Kerlikowske Decl. ¶¶ 19, 23,

28.) These are unrefuted facts that the Court can, and should, take into account in its findings and

conclusions. *See Greenpeace Found. v. Daley*, 122 F. Supp. 2d at 1114.

Finally, the federal agents argue that the constitutional violations to which Plaintiffs'

declarants have testified are "ad hoc" occurrences for which Plaintiffs cannot seek injunctive

relief against DHS and USMS. (Opp. at 20.) In addition to disregarding all the other unrefuted

evidence in the record, this argument ignores the sheer *volume* of supposedly inadvertent

headshots, butt shots, heart shots, press-pass shots, and more. (*E.g.*, Dkt. 94 ¶ 5 (head); Dkt. 87

¶ 9 (head); Dkt. 81 ¶ 7 (arm, but aimed at head); *id.* ¶¶ 12-13 (head); Dkt. 71 ¶ 11 (buttocks);

Dkt. 95 ¶ 5 (heart); Dkt. 62 ¶ 7 (press pass, just below the heart).) Moreover, it ignores that not

one federal agent has been disciplined for any of the incidents to which Plaintiffs and declarants

testified. (Dkt. 124-4 at 6 ("DHS admits that it has not disciplined any of its employees related to their treatment of a journalist or legal observer in Portland"); Dkt. 101-1 ¶ 19.)

"[A] policy-marker's pronouncement that he has not . . . discipline[d] officers that retaliated against" individuals exercising First Amendment rights is evidence of a policy or custom sufficient to hold the entity he represents accountable. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001). The federal agents attempt to interpose their "formal use-of-force policies" (Opp. at 21), but a defendant cannot escape its "actual routine practices" by "pointing to a pristine set of policies." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (en banc).[7] Thus, the federal agents' final argument against retaliation also fails, and the Court should find that Plaintiffs are likely to succeed on their retaliation claim.

### B.    Plaintiffs Are Likely to Succeed on Their Access Claims

The federal agents' argument that Plaintiffs have no right of access relies on distorting the caselaw and ignoring Plaintiffs' arguments. Most of their brief on this topic simply adheres to the same arguments they made at the TRO stage—such as that the right of access is limited to criminal trials or that protesters have masqueraded as press—without addressing the Court's holdings or Plaintiffs' arguments and evidence since then. The Court should reject these arguments as foreclosed by the Court's prior decisions. What remains is a tortured, circular reading of *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986) ("*Press-Enterprise II*") that no court has ever adopted, as well as a last-ditch resort to caselaw that predates *Press Enterprise II* by more than a decade and is consistent with it anyway. The Court should reject these, too.

---

[7] For the same reason, the federal agents' argument that Plaintiffs "admit that their [retaliation] claim is [not based] on an official policy of retaliation" because Plaintiffs do not identify a "written policy" is wide of the mark. (Opp. at 10.)

1.    **Public Streets, Parks, and Sidewalks Have Historically Been Open to the Press and General Public**

The federal agents first argue that "an *unlawful gathering subjected to a legitimate dispersal order* is [not] a 'place and process' that has 'historically been open to the press and general public.'" (Opp. at 12 (emphasis added).) By that logic, preliminary criminal hearings subjected to a legitimate closure order, voir dire hearings that have been subjected to a legitimate closure order, criminal trials that have been subjected to a legitimate closure order, horse gathers for which access has been limited to designated viewing areas, and newly filed nonconfidential civil complaints that have not yet been the subject of judicial action—all of these fall outside the doctrinal framework of *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986) ("*Press-Enterprise II*").

Unsurprisingly, no court has taken such a circular view of the right of access. *Press-Enterprise II*, 478 U.S. at 10 (considering whether "the right of access applies to preliminary hearings" generally); *Press-Enter. Co. v. Superior Court of California*, 464 U.S. 501, 505 (1984) ("*Press-Enterprise I*") ("the process of selection of jurors" generally); *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 605 (1982) ("criminal trials" generally); *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) ("horse gathers" generally); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 590-92 (9th Cir. 2020) ("no court has held or even suggested that the public character of judicial records depends on whether the proceedings have progressed to a stage requiring a judge to act on the papers"). Nor does it matter if a statute permits closure, or if closure is permissible under circumstances other than those at issue. *Press-Enterprise II*, 478 U.S. at 3-4, 13-15 (finding a right of access even though California law permitted closure for the sake of fairness to the defendant); (*cf.* Opp. at 10-12 (arguing that federal cases and statutes permit dispersal of "a criminal gathering")).

The correct analysis is the one this Court conducted—whether "[t]he public streets, sidewalks, and parks historically have been open to the press and general public." (Dkt. 84 at 14-15.) Of course, they have. The federal agents cite only two new cases to support their arguments to the contrary. The first, *Colten v. Kentucky*, 407 U.S. 104 (1972), is not relevant because it

involved a challenge to a state law governing interfering with the police that had a *mens rea* requirement, which the state courts had found the individual's conduct had met. *Id.* at 108-09. In other words, the individual's intent was not to exercise any constitutionally protected freedom at all—it was only to "cause inconvenience and annoyance." *Id.* (quotation marks omitted). The federal agents do not argue that that is Plaintiffs' purpose, and *Colten* does not stand for the proposition that federal agents can disperse journalists and legal observers who are legitimately exercising their First Amendment rights. *Id.*; (*cf.* Opp. at 12-13). (Also, *Colten* was decided 13 years before *Press-Enterprise II*.)

The federal agents also cite *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552 (D. Or. Nov. 8, 2006) (Opp. at 11), which held that a protestor had no right to disobey a lawful order to disperse. But that was not a right-of-access case, and it had nothing to do with newsgathering, reporting, and observing by individuals who pose no threat to public safety or law enforcement. *Id.* at *12. The federal agents' argument on this point only illustrates the broader flaw with their argument: As they did in the TRO briefing, they do not accept that *Press-Enterprise II* controls this case, that press and protesters are engaged in different activities and therefore judged under different standards, or that Plaintiffs' right of access is independent of others' right to speak or assemble, even if at the same time and in the same place. (*See* Opp. at 11-14; *cf.* Mot. at 19-20.)

### 2. Public Access Plays a Significant Positive Role in the Functioning of Law Enforcement-Activity in Public Fora

Because public streets, sidewalks, and parks have historically been open to the public, the next question is whether "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. On this question, the federal agents fail entirely to grapple with Plaintiffs' argument that public observation of law-enforcement activity in public fora facilitates direly needed public accountability for law-enforcement officials. (Mot. at 18-19.) Instead, the federal agents respond with arguments about where members of the press and legal observers might stand. (Opp. at 13-

14.) Plaintiffs have stated that they do not object to adding standing to the side, when possible, as one non-exclusive indicium that a person is a journalist. (Mot. at 31-32.)

### 3.    Closure is Neither Essential Nor Narrowly Tailored to Preserve Any Legitimate Interest

The final question is whether "closure is essential to preserve higher values and is narrowly tailored to serve those interests." *Courthouse News*, 947 F.3d at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13-14)). On this point, the federal agents do not meaningfully engage with the arguments or evidence in the moving papers. Instead, they repeat the same arguments about workability and narrow tailoring that this Court already rejected in granting Plaintiffs' motion for a TRO. (Opp. at 14-15.) The federal agents' arguments are even weaker now in light of the undisputed expert testimony that police did not disperse journalists in hundreds of equally, if not more, chaotic protests in Seattle (Kerlikowske Decl. ¶ 15), and the representations by co-defendant the City of Portland that not dispersing reporters is workable:

> My understanding from talking to my client is, no, the TRO and the stipulated preliminary injunction have not been unworkable or have not created unsurmountable problems with the City.
>
> My understanding is, yes, there are occasional challenges with trying to identify is someone a journalist or not or a legal observer or not in a certain crowd situation. But my understanding is that it has been workable, and that is why we have stipulated to a preliminary injunction with the plaintiffs in this case.

(Fed. TRO Hrg. Tr. at 30:10-19.[8]) These two facts alone show that the federal agents' policy of indiscriminately dispersing everyone is not narrowly tailored because it needlessly sweeps in Plaintiffs' protected activities.

In contrast, the federal agents have submitted no new evidence on narrow tailoring or workability since the TRO. (*Cf.* Dkts. 138-1 to 138-7.) Instead, they argue that "[t]ear gas, for

---

[8] In a parting shot, the federal agents insinuate that Plaintiffs have chosen for nefarious reasons not to bring recent violations of the preliminary injunction by Portland police officers to the Court's attention. (Opp. at 35 & n.12.) In reality, the reason is much more anodyne: These events are recent, under investigation, and do not relate to workability; and, in stark contrast to the federal agents, the City is productively meeting and conferring with Plaintiffs on this issue. (Acharya Decl. ¶ 14.)

example, cannot be aimed at protesters but not the adjacent press representatives," ignoring yet
again the injunctive relief sought expressly exempts federal agents from liability for "incidentally
expos[ing]" a journalist or legal observer to tear gas. (Opp. at 14; *cf.* Mot. at 3 ¶ 9.) In any event,
rubber bullets, flash-bang grenades, paint bullets, pepper balls, and pepper spray all *can* be
aimed. (*E.g.*, ███████████████████████; Mot. at 17.)

       Similarly, the federal agents argue that Plaintiffs identify no alternatives to dispersing
press and protesters alike, but in fact, the unrefuted expert testimony is that declining to disperse
protesters creates no risk to law enforcement and that the police did not disperse reporters and
legal observers in hundreds of similar protests in Seattle. (Kerlikowske Decl. ¶¶ 3, 15-17.) The
federal agents could have taken added steps to mitigate risk if they perceived any, such as
leaving an officer back to liaise with press who are behind a skirmish line or requesting meetings
with journalists and freelancers before a protest takes place, but they admittedly have not done
so. (Mot. at 15; Kerlikowske Decl. ¶¶ 16-17.) Like many things, the federal agents ignore this
expert testimony. (Opp. at 14-15.) They also ignore that they still cannot identify any instance
where any federal agent was injured by someone who somehow gained an advantage by falsely
identifying themselves as press. (Opp. at 10-15.)

       **4.    Closure Would Leave Plaintiffs With No Alternative Opportunity to
Observe and Report**

       Finally, the federal agents offer no response to the separate and independent reason why
their policy violates the First Amendment—it leaves Plaintiffs with no alternative opportunity to
observe and report on protests and law-enforcement activity at protests. (Mot. at 23); *cf. Reed v.
Lieurance*, 863 F.3d 1196 (9th Cir. 2017); *Bay Area Peace Navy v. United States*, 914 F.2d 1224,
1229 (9th Cir. 1990) ("The Peace Navy cannot employ effective alternative water-borne methods
of communicating with the audience on the pier . . . ."). As the Court observed in its TRO,
"[f]ederal agents are using tear gas, which decreases visibility, and the protests are at night.
Reporting from a few blocks away is not a viable alternative location." (Dkt. 84 at 15.)

*  *  *

PAGE 15 - PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION AGAINST FEDERAL DEFENDANTS

Each of above reasons—that the protests are taking place in public spaces that have historically been open to press, that public access plays a significant positive role in ensuring law-enforcement accountability to the people, that blanket closure is neither essential nor narrowly tailored to a legitimate government interest, and that blanket closure leaves Plaintiffs with no alternative observation opportunity—is a separate and independent reason why Plaintiffs have shown a likelihood of success on their access claims.

## II.    WITHOUT AN INJUNCTION, FEDERAL AGENTS ARE LIKLELY TO IRREPARABLY HARM PLAINTIFFS

The irreparable-harm requirement has two components: The harm asserted must be "irreparable" and it must be "likely to result." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The federal agents briefly argue that First Amendment injuries are not irreparable,[9] but the core of their argument is (1) that protests outside the Hatfield Courthouse have abated, and (2) that even if they resume, federal agents are unlikely to police them because state and local police will do so in their stead. (Opp. at 22-23.) But the federal agents are bound by their sworn admissions that they have not left Portland, have no idea when they are leaving, and will leave only when the protests end. (Acharya Decl., Ex. 2 at 2; *id.*, Ex. 4 at 3.) In any event, their factual premises are false: The protests have returned to the federal courthouse, and the Oregon State Police have announced that they are leaving, making irreparable harm even more imminent than when the Court extended the TRO.[10]

---

[9] The federal agents cite *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) to argue that retaliation claims are carved out of the blackletter rule that injuries to First Amendment rights are irreparable. (Opp. at 22.) This argument is inapplicable to Plaintiffs' access claims. And in any event, *Rendish* involved the unusual context of an employment claim by a public employee, and does not purport to overrule the "long line of precedent establishing that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (quotation marks and alteration omitted; ultimately quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[10] Maxine Bernstein, *State police pull troopers out of Portland, return them to regular assignments*, OregonLive (Aug. 13, 2020), https://www.oregonlive.com/crime/2020/08/state-police-pull-troopers-out-of-portland-return-troopers-to-regular-assignments.html.

The federal agents argue that there is no imminent threat to Plaintiffs' First Amendment rights because federal agents have stopped trying to quell the protests. (Opp. at 9-11, 21-25.) But an alleged wrongdoer must satisfy a high bar to "moot the need for injunctive relief" by his or her own conduct. *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999). Once Plaintiffs meet their initial burden to show that there exists "some cognizable danger" that the federal agents' conduct will irreparably harm them (*see* Mot. at 23-26), the federal agents must "carry the 'heavy' burden of showing that there is 'no reasonable expectation that the wrong will be repeated'" if they wish to avoid an injunction. *United States v. Cole*, 84 F. Supp. 3d 1159, 1169-70 (D. Or. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *Affordable Media*, 179 F.3d at 1237-38. This burden-shifting framework makes sense: otherwise, a defendant could always defeat a motion for preliminary injunctive relief by temporarily stopping the conduct that gave rise to the suit. *See Affordable Media*, 179 F.3d at 1238. The law does not require courts to countenance this sort of "cat-and-mouse game[smanship]." *Cole*, 84 F. Supp. 3d at 1170.

In determining whether the federal agents have met their heavy burden, courts may consider:

> the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations.

*United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 855 (9th Cir. 1995) (quotation marks omitted); *Cole*, 84 F. Supp. 3d at 1170; *see also W.T. Grant*, 345 U.S. at 633 (courts may consider "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations").[11] All of these factors militate against finding that the federal agents have mooted Plaintiffs' need for injunctive relief:

---

[11] *W.T. Grant*, *Cole*, and *Laerdal* are all in the context of permanent injunctions, but the preliminary-injunction context merely changes the timeframe: Plaintiffs must show that they are likely to suffer irreparable harm "before a decision on the merits can be rendered." *Winter v. Nat.*

- The federal agents violated journalists' and legal observers' rights dozens of times. (*See generally* Dkts. 43-44, 55-64, 71-78, 80-82, 87-95, 115-118); *Laerdal*, 73 F.3d at 855 (considering "the isolated or recurrent nature of the infraction").

- Their supposed voluntary cessation has lasted a mere 16 days as of this filing, and it includes "six of use of force incidents (including less than lethal use of force), two deployments of the Quick Response Force (QRF), and six Task Force arrests." (Jones Aug. 11 Decl. ¶ 11.)

- Rather than recognize the wrongful nature of their conduct, the federal agents have insisted they have every right to disperse journalists. (Opp. at 16-21; Opp. TRO Extension, Dkt. 113 at 16-17; Opp. TRO, Dkt. 67 at 18-21.) This "repeated self-justification is sufficient to show a likelihood of future violation." *Laerdal*, 73 F.3d at 856.

- Upon hearing of the TRO, Acting Deputy Secretary Ken Cuccinelli opined that although it was "offensive," it "shouldn't affect anything we're doing." (Acharya Decl., Ex. 6 at 2.) In response, Acting CBP Commissioner Mark Morgan said: "I recommend we take this off email and have a call." (*Id.* at 1.) This shows that "the defendant's professional and personal characteristics might enable or tempt him to commit future violations." *W.T. Grant*, 345 U.S. at 634.

- The federal agents also sought to short-circuit this Court's jurisdiction so that they could seek a stay in the Court of Appeals, further calling into question the sincerity of their assurances against future violations. (Fed. TRO Hrg. Tr. 28:3-10, 36:12-24; Mot. Reconsideration, Dkt. 101 at 12-13.)

- Rather than comply with the TRO, the federal agents essentially ignored it and continued to shoot journalists and legal observers. (*See generally* Dkts. 87-95.) Their

---

*Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995)).

following "one adjudicated violation with [several] others" is also sufficient to show a likelihood of future violation. *W.T. Grant*, 345 U.S. at 634.

- Finally, the federal agents' own discovery responses state that they "reserve the right" to use force against "any participant in a protest [who] breaks the law, including journalists or legal observers." (Acharya Decl., Ex. 1 at 2; *id.*, Ex. 3 at 2.) And they consider a journalist who continues reporting after an dispersal order a "lawbreak[er]." (Opp. at 34.) So they have expressly reserved the "right" to violently disperse journalists and legal observers.

All of this goes to show that if they step outside the courthouse, federal agents fully intend to use violence to disperse journalists and legal observers—and they have refused to limit or even explain what will cause them to do so, other than their (unilateral) decision that state and local police have failed to meet their (undisclosed) performance standards. (Acharya Decl., Ex. 1 at 2; *id.*, Ex. 3 at 2.[12]) In sworn discovery responses, the federal agents have admitted that as long as there is "any threat" to federal property, Diligent Valor troops will be standing by to quell the protests, because they "cannot know" whether state and local police will "sufficiently protect federal property" from such threats. (Acharya Decl., Ex. 1 at 2; *id.*, Ex. 2 at 2; *id.*, Ex. 3 at 2; *id.*, Ex. 4 at 3; *see also id.*, Ex. 7 at 4 (similar).) Meanwhile, even as the federal agents were filing their brief from Washington, D.C., protests resumed outside the Hatfield Courthouse in Portland, complete with tear gas and riot police. *See* n.10, *supra*. And yesterday, the Oregon State Police have announced that they are leaving, further heightening the likelihood that the federal agents will soon be policing protests in Portland again. *Id.*

When the vaunted July 30 deal was struck between federal and state authorities, Governor Kate Brown initially announced that Diligent Valor troops were "leav[ing] downtown

---

[12] The federal agents produced to Plaintiffs an email that may contain more detail on this point, but—like much of their production—most of it is improperly redacted. (Acharya Decl., Ex. 8.)

Portland"[13] She was soon forced to clarify that they were merely starting a "phased withdrawal." *Id.* Stephen Miller's retort speaks volumes: "It's not a phased withdrawal either." (Acharya Decl., Ex. 5.) Just so: it is not a withdrawal at all, and these recent events only highlight the imminent danger that the federal agents will return to their unlawful activities.

Plaintiffs have therefore more than met their burden to show that there exists "some cognizable danger" that they will once again unlawfully be subjected to violent reprisal and dispersal by the federal agents "before a trial on the merits [can] be held." *Cole*, 84 F. Supp. 3d at 1169 (quoting *W.T. Grant*, 345 U.S. at 633); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). And the federal agents have fallen far short of their heavy burden to moot Plaintiffs' need for injunctive relief.[14] *Cole*, 84 F. Supp. 3d at 1169.

"[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Doe*, 772 F.3d at 581 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). Just as the Court would not "uphold an unconstitutional statute merely because the Government promised to use it responsibly," so it should not refrain from enjoining unconstitutional conduct merely because the government promises never to do it again—and the federal agents have not even done that. *See id.*; (Acharya Decl., Exs. 1-4). The Court should disregard their tenuous assertions to the contrary and find that Plaintiffs have shown a likelihood of irreparable harm.

## III.    THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

The federal defendants argue that "[o]n balance," the equities and public interest favor denying an injunction. (Opp. at 26.) But in truth, the federal agents "balance" nothing. They

---

[13] Brakkton Booker, *Oregon Gov. Says Federal Officers Will Begin Phased Withdrawal From Portland*, NPR (July 29, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/07/29/896638122/oregon-gov-says-federal-officers-will-begin-phased-withdrawal-from-portland.

[14] They also argue that Plaintiffs lack standing. (Opp. at 6-10.) This argument appears to be made purely to ensure it is preserved for appeal, and is mistaken for all the reasons this Court stated in its TRO. (Dkt. 84 at 9-12.)

consider only the public's interest in protecting federal property and federal courts. (Opp. at 25-26.) They do not even discuss, let alone balance, that interest against the constitutional rights of journalists or the public's interest in a free press. *Cf. First Nat'l Bank of Bos. v. Belotti*, 435 U.S. 765, 783 (1978) ("the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw"). But these are not incommensurable or irreconcilable interests. Mr. Kerlikowski's unrebutted expert testimony explains that well-trained, competently led police forces can protect *both* interests. (Kerlikowske Decl. ¶ 19.) This reason, in addition to those discussed in Plaintiffs' opening brief (Mot. at 26-27), shows that the balance of equities and public interest favor granting a preliminary injunction.

## IV.    PLAINTIFFS' PROPOSED INJUNCTION IS LAWFUL AND WORKABLE

The federal agents close their brief with a blunderbuss of arguments on workability that are already refuted or easily refuted. Only two bear particular note. First, the Court should prohibit federal agents from leaving federal property to engage with protesters because they are not properly trained in policing crowds and will be less likely to violate Plaintiffs' constitutional rights if they remain in a defense posture by forming a perimeter inside the courthouse fence. Second, the Court should require federal agents who police protests to bear large identifying codes would because it would facilitate accountability to the Court. The federal agents' arguments that it would be unworkable do not hold water.

### A.    The Court Should Prohibit Federal Agents from Leaving Federal Property

The federal agents offer one paragraph in opposition to Plaintiffs' request that the federal agents be prohibited from leaving federal land. (Opp. at 29.) That paragraph does not address any of the arguments in the moving papers. (Mot. at 31.)

Instead, the federal agents argue that "the relief is not tailored to the harms alleged in this case." (Opp. at 29.) But that is untrue. There is now undisputed expert testimony that it is easier to avoid shooting or harming journalists and legal observers when defending the courthouse by forming a perimeter inside the courthouse fence. (Kerlikowske Decl. ¶¶ 8-10.) Because in this

PAGE 21 - PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION AGAINST FEDERAL DEFENDANTS

defensive posture they can more easily target wrongdoers and avoid hurting press and legal observers standing to the side, preventing federal agents from raging through the streets of Portland makes it far less likely that they will "inadvertent[ly]" harm journalists or legal observers. (*Cf.* Opp. at 18.)

Conversely, there is unrebutted testimony that the federal agents are not properly trained in dealing with civil disturbances out in the streets. Mr. Kerlikowske has offered unrefuted testimony that "police forces under leadership trained and experienced in civil disturbances are able to protect public safety without excluding press and legal observers or violating any of the other restrictions in the TRO." (*Id.* ¶ 19.) The federal defendants' own briefing claims that it is impossible for them to meet this standard. (Opp. at 17-20 (arguing that shooting, tear-gassing, and bombing dozens of reporters and legal observers within the short span before and after the Court issued its TRO was "inadvertent").)

The federal agents offer no defense to Mr. Kerlikowske's criticisms of their operations and training.[15] Mr. Kerlikowske explains: "Effective crowd control in the context of volatile protests involves constructing plans to minimize conflict, and to facilitate rather than suppress First Amendment activities. I have not seen such plans for the federal defendants in this case, which helps explain why they have been so unsuccessful in their policing efforts." (*Id.* ¶ 20.) Mr. Kerlikowske further provides numerous unrefuted reasons why the federal agents were unprepared and unequipped to safely engage with the crowds, including:

- There is no single federal agent running their operation. (*Id.* ¶ 22.)
- "Most of the personnel in the federal agencies that were sent to Portland appear to lack training and experience dealing with the types of protests ongoing in Portland.

---

[15] ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ In light of their objections, they cannot argue that they were properly trained or controvert Mr. Kerlikowske declaration. If anything, their improper objections and improper redactions in the training materials they produced should give rise to the inference that the materials they are concealing undermine their claims.

Putting less-lethal weapons in their hands and sending them to police protests is a
dangerous and ill-conceived policy." (*Id.* ¶ 23.)

- And many of the federal agents are trained to use force in situations where the people
  they are confronting are all engaged in wrongdoing and have few rights, such as
  people in a prison riot, people trying to run across the border, people guarding stash
  houses, or heavily-armed criminals and fugitives. (*Id.* ¶ 26-27.)

Mr. Kerlikowske's unrebutted declaration concludes: "To the extent that the federal
agents are having any difficulties, such problems arise from the failure of supervision and
leadership, lack of experience, and failure of leadership to ensure that the agents are properly
trained for civil disturbances/unrest." (*Id.* ¶ 29.) Prohibiting the federal agents from policing
outside the bounds of federal property, when they have already shown that they are incapable of
safely doing so in a manner that keeps them from unnecessarily assaulting journalists and legal
observers, is entirely tailored to the harms at issue. It is also consonant with DHS Commander
Gabriel Russell's testimony that FPS does not have the authority to issue dispersal orders off
federal property. (Dkt. 123 at 17 (citing Mr. Russell's testimony).) The evidence in the record
fully supports such relief, and the federal agents should be so enjoined.

### B.    The Court Should Require That Federal Agents Be Marked with Large Identifying Codes

The federal agents do not address the harm posed by anonymous policing. (*Cf.* Mot. at
30; Kerlikowske Decl. ¶ 42.) They offer a handful reasons for not wanting prominent markings.
They argue that the relief is "not tailored to the alleged harm," that some of them already have
markings, that numbers would interfere with their access to gear, expose them to retaliation, and
allow people to estimate their numbers. (Opp. at 28.) None of these arguments has merit.

First, the harm, as stated in the moving papers, is that when law enforcement is permitted
to 'turn around their badges,' metaphorically speaking, this tells them that they will not be held
accountable for their conduct and, according to the federal agents, they have no way of telling
which of them has violated the Court's TRO. (Mot at 30-31.) Making them wear prominent

markings is tailored to preventing the federal agents from anonymously attacking Plaintiffs and avoiding responsibility for violating the Court's injunction. It is a necessary and proper corollary to the relief the Court granted Plaintiffs in the TRO, to ensure that such relief is actually effective. (Fed. TRO Ext. Hrg. Tr. 27:23-30:9.)

The case that the federal defendants rely on for the principle that an injunction should be tailored to the harm to the plaintiffs is not on point. Rather, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009), dealt with vacating a rule regarding the day-after pill as to a whole industry as opposed to ruling on an as-applied challenge by one religious objector. It did not purport to straitjacket district courts. As repeatedly explained by Plaintiffs and still unaddressed by the federal agents, equity permits federal courts to fashion remedies that are necessary, fair and workable, such as this one. (Mot. at 30-31 (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality op.)).)

Second, as shown by their own declarations, the markings federal agents currently have make it impossible to identify them as they appear to journalists and legal observers. (*E.g.*, CBP SOG-1 Decl., Dkt. 138-3, Ex. 1 (small marking on back of helmet), Ex. 4 (small marking in colors that blend into uniform), Ex. 5 (small marking on shoulder), Ex. 13 (similar), Ex. 15 (small marking on lapel), Ex. 17 (small marking on side of helmet); CBP SOD-1. Decl., Dkt. 138-7, Ex. 3 (small, uniform-colored marking on shoulder).) With two exceptions, these markings are not visible from the front and even then, hardly visible at all—much less from 200 feet, the range of the weapons they are using. (Plaintiffs' Reply iso Extending TRO, Dkt. 123 at 16.)

Third, the federal agents' arguments that putting on a jersey would interfere with the functionality of their uniforms (*e.g.*, Olson Decl., Dkt. 138-5 ¶ 5) is misplaced. Prominent marking could simply be painted on, as shown below:



(*Cf.* Olson Decl. ¶ 10; CBP SOG-1 Decl. at 6, 8, 11.)

Finally, the federal agents' arguments that "violent protesters" would count federal agents or retaliate them (Opp. at 28) only show that right now their identification system is set up to ensure that nobody can see their markings. There is no reason to believe that someone who wanted to would be incapable of counting (or reasonably estimating) the number of federal agents present. Nor is there reason to believe that any protestor would want to retaliate against

any specific federal agent, and the federal agents are unable to identify any instance of this occurring. Such harms are entirely speculative, and do not counterbalance the compelling need for accountability—especially given what the federal agents have done to date.[16]

### C.    The Federal Agents' Remaining Arguments Are Without Merit

The federal agents argue that the provision of the proposed injunction relating to making arrests and seizing equipment is unwarranted without a showing that they have arrested or seized the equipment of a journalist or legal observer. (Opp. at 27.) But Plaintiffs "need not show that violations of the law are ongoing, or even that they ever began: 'the purpose of an injunction is to prevent *future* violations.'" *Cole*, 84 F. Supp. 3d at 1170 n.15 (quoting *W.T. Grant Co.*, 345 U.S. at 633) (emphasis added in original). Given that the federal agents have notoriously arrested protesters in unmarked vans, and their own argument that they will not differentiate between protesters and press absent an injunction, this relief is appropriate.

The federal agents argue that the portions of the proposed injunction setting forth indicia of being a journalist or a legal observer "do not 'describe in reasonable detail . . . the act or acts restrained or required.'" (Opp. at 28 (quoting Fed. R. Civ. P. 65(d)(1)(C)).) In fact, this injunction is much more detailed than ones other courts have entered in similar situation, such as the two injunctions the U.S. District Court for the Eastern District of Missouri entered in cases related to media at the Ferguson protests. (*Hussein v. Cty. of St. Louis*, No. 4:14-cv-1410-JAR (Nov. 21, 2014), Dkt. 39;[17] *Hussein v. Cty. of St. Louis*, No. 4:14-cv-1410-JAR (Nov. 21, 2014), Dkt. 40.[18])

Finally, the federal agents' argument about the qualified-immunity provision is fully refuted in Plaintiffs' Reply in Support of Extending the TRO (Dkt. 123 at 17-20).

---

[16] As noted above, the only evidence in the record is that federal agents have repeatedly retaliated against journalists and legal observers, not *vice versa*.

[17] *Available at* https://www.aclu-mo.org/sites/default/files/field_documents/039_-_order_regarding_city_of_ferguson.pdf.

[18] *Available at* https://www.aclu-mo.org/sites/default/files/field_documents/040_-_order_regarding_county_0.pdf.

PAGE 26 - PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction against the federal agents.

Dated: August 14, 2020                              Respectfully Submitted,


By: /s/ Matthew Borden
     Matthew Borden, *pro hac vice*
     J. Noah Hagey, *pro hac vice*
     Athul K. Acharya, OSB No. 152436
     Gunnar K. Martz, *pro hac vice*
     BRAUNHAGEY & BORDEN LLP


     Kelly K. Simon, OSB No. 154213
     ACLU FOUNDATION OF OREGON

     *Attorneys for Plaintiffs*