DECLARATION OF CHRIS A. BISHOP

I, Chris A. Bishop, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. Before drafting this declaration, I read the declaration of former CBP Commissioner R. Gil Kerlikowske.

3. I am the Acting Director/Deputy Director, for the U.S. Department of Homeland Security, U.S. Customs and Border Protection (CBP), Law Enforcement Safety and Compliance Directorate (LESC). In that role, I oversee the readiness, accountability, and operational performance of CBP law enforcement personnel. LESC is responsible for articulating CBP's Use of Force Policy, establishing appropriate controls and standards, and training CBP personnel on issues relating to weapons and other tactical equipment.

4. LESC is also responsible for tracking CBP uses of force in the Enforcement Action Statistical Analysis Reporting (E-STAR) database. The E-STAR database is CBP's system of record for tracking uses of force.

5. CBP's Use of Force Policy, Guidelines and Procedures Handbook (CBP Use of Force Policy) is the current applicable CBP Use of Force Policy and was created, approved, and signed by former Commissioner R. Gil Kerlikowske.

6. CBP's Use of Force Policy is based on constitutional law principles, including Fourth Amendment principles, as interpreted by cases such as *Graham v. Conner*, 490 U.S. 386 (1989).

7. Pursuant to the Fourth Amendment, the reasonableness of a particular use of force is based on the totality of the circumstances known by the officer or agent at the time of the use of force. In determining the reasonableness of a use of force, the actions of the officer/agent are weighed against the rights of the subject, in light of the circumstances surrounding the event, including the risks posed to the officer/agent. This reasonableness inquiry is evaluated from the perspective of the officer/agent.

8. In addition to addressing reasonable use of force, CBP's Use of Force Policy addresses what an officer/agent must do before utilizing a use of force device, to include required training.

9. CBP's Use of Force Policy requires all officers/agents who may be called upon to use less-lethal devices, including less-lethal munitions, be trained to use those devices before deploying them.

10. Less-lethal devices may be used pursuant to CBP's Use of Force Policy where empty-hand techniques are not sufficient to control disorderly or violent subjects.

11. Furthermore, CBP's Use of Force policy, as articulated by Mr. Kerlikowske in the policy's forward, states officers/agents should employ enforcement tactics that effectively bring an incident under control, while minimizing the risk of injury or property damage. It also states that by conforming to standard use of force policies, procedures, training and equipment, officers/agents can more effectively protect themselves and the public they serve.

12. Pursuant to CBP's Use of Force policy, procedures, and training, authorized officers/agents may use objectively reasonable force when it is necessary to carry out their duties. In his declaration, Mr. Kerlikowske seems to suggest that officers/agents can avoid difficult split-second use of force decisions.[1] As someone who has worked in law enforcement and the training of law enforcement officers/agents for many years, this is unfortunately not always true. Officers/agents must sometimes make difficult split-second use of force decisions, especially in chaotic circumstances such as those regularly present outside the federal courthouse in Portland. For this reason, the law and CBP's Use of Force Policy, signed by Mr. Kerlikowske, recognize that officers/agents may need to make such split-second decisions and any analysis of the objective reasonableness of a use of force must take this into account.

13. Mr. Kerlikowske states the TRO is safe as he is unaware of any officer being injured as a result of an individual posing as a member of the press.[2] However, objectively reasonable use of force is based on imminent threats, not completed past crimes. Neither the Constitution nor CBP's Use of Force Policy require law enforcement to make use of force decisions based on what occurred in past incidents. Rather, the CBP Use of Force and other trainings require officers to constantly assess and reassess a situation. By basing his opinion only on past incidents and not acknowledging the fluid ever-evolving scenario in Portland, Mr. Kerlikowske fails to follow his own policies.

14. Mr. Kerlikowske alleges that properly trained officers/agents should trust that criminal activities during the Portland protests will be limited to harmless non-violent activities. This is completely at odds with the information I have reviewed in E-STAR and the information I have heard from our officers/agents about the conditions outside the federal courthouse in Portland. There have been many documented assaults against our officers/agents with improvised explosive devices (IEDs), Molotov cocktails, lasers, and blunt objects, all of which can cause serious injury or death. Indeed, the agitators in Portland have inflicted serious injuries on our officers/agents in Portland.

15. Mr. Kerlikowske alleges that virtually all of the injuries suffered by the complaining journalists were the result of improper uses of force.[3] However, Mr. Kerlikowske has only reviewed one side of the story; he does not state he has reviewed any articulation of these incidents from a CBP officer/agent.[4] The use of force policy requires, when determining whether a use of force is objectively reasonable, that an officer/agent give careful attention to the totality of the facts and circumstances of each particular case. These facts and circumstances include: (1) the severity of the crime being committed by the subject at issue; (2) whether the subject of the force is actively resisting seizure; (3) whether the subject of the

---

[1] Declaration of Gil Kerlikoske, filed 8/10/20 at pg. 4.
[2] Id at pg. 5.
[3] Id at pg. 3.
[4] Id.

2

force poses an imminent threat; and (4) the foreseeability of the risk of injury to the involved subjects and others.

16. Under Mr. Kerlikowske's leadership, CBP established the National Use of Force Review Board (NUFRB) in December 2014 as part of a series of initiatives adopted to increase accountability and transparency.  Building upon the investigative work of the CBP Use of Force Incident Team (UFIT) process, the NUFRB meets regularly to review and provide recommendations following significant use of force incident investigations.  The Board reviews cases after completion of the investigative process and after the cases have been declined for prosecution by either a U.S. Attorney, state, or local prosecutor.[5]  The CBP Local Use of Force Review Board (LUFRB) addresses uses of intermediate force.  Both boards consider whether use of force is within policy; whether there is possible misconduct associated with the application of force; and whether lessons can be learned from the incident in terms of techniques, tactics, policy, training and equipment.[6]  The NUFRB or a LUFRB have not yet reviewed any cases stemming from the Portland protests.  Without a full investigation of these incidents and adequate development of the factual record, it is inappropriate for Mr. Kerlikowske, or anyone else, to make a determination concerning the propriety of CBP's use of force and doing so would run counter to the very principles Mr. Kerlikowske instituted during his tenure at CBP.

17. Mr. Kerlikowske's contention that allowing unknown people behind a skirmish line poses no significant risk because a second wave of officers can protect the first line, completely misunderstands or conflates the differences of a moving, multi-waved, skirmish line and a semi-static defensive perimeter around a structure.  CBP's protective responsibilities created a static perimeter with the backing of a non-moving structure (the fence).  This means that when CBP officers are operating between a fence and the courthouse, it creates a cage-like environment.  With the introduction of IED and laser assault weapons, both frequent occurrences in Portland,[7] officers/agents find themselves without much ability to escape these harmful and dangerous occurrences.  This environment also allows assailants to rely on the courthouse exterior to redirect missed projectiles and IEDs towards officers/agents.  Thus, officers/agents must keep an area fully cleared in order to ensure their own safety and the integrity of the courthouse.  Additionally, static positions allow for the planning and execution of elaborate attacks against the officers/agents and the courthouse that may only be thwarted through the removal of people.  By allowing unknown people behind them, officers/agents would be introducing another potential danger, and further decreasing their already limited ability to avoid serious bodily injury.

18. Mr. Kerlikowske states as fact "that the federal defendants have not taken any risk mitigation measures strongly suggests that they do not perceive any actual risk."[8]  It is unclear where Mr. Kerlikowske derives this information, he retired from CBP in 2017 and is not privy to any of its current mitigation strategies.  Temporary fencing, jersey walls, the ready availability of fire extinguishing equipment, the painting of structures in fire-retardant paint,

---

[5] https://www.cbp.gov/newsroom/national-media-release/cbp-releases-seven-national-use-force-review-board-case-summaries
[6] Id.
[7] Declaration of Gil Kerlikoske, filed 8/10/20 at 2, 4.
[8] Id at 6.

protective laser eyewear, protective gear to include helmets, face shields and hand-held shields, less-lethal devices and munitions, and the identification of imposter press, are all forms of mitigating measures undertaken by CBP and other federal entities.

19. Mr. Kerlikowske states in his declaration that CBP operates primarily on the border, where Fourth Amendment issues do not often arise.[9] This is not true. The Fourth Amendment still applies at the border and applies anywhere in the United States. Our officers/agents are trained to know this. Further, our officer/agents at the border deal with Fourth Amendment issues on a daily basis: from the appropriate application of handcuffs on the arm of drug smuggler to the search of traveler's bag for contraband.

20. In his declaration, Mr. Kerlikowske states that it is "inappropriate" to shoot "a 40mm rubber bullet" at anyone "above the waist, much less near the head."[10] However, CBP's Use of Force Policy, signed by him, simply states that an officer/agent shall not intentionally target the head, neck, groin, or female breast with less-lethal impact munitions.[11]

21. In his declaration, Mr. Kerlikowske states that it is "inappropriate" and "dangerous" to shoot at anyone with pepper balls."[12] However, CBP's Use of Force Policy, signed by Mr. Kerlikowske, has always allowed for direct impact with "pepper balls" when officers/agents are faced with assaultive resistance.[13] His statements are therefore completely at odds with his actions as Commissioner of CBP.

22. In his declaration, Mr. Kerlikowske further states that BORTAC is not an appropriate entity to be involved with federal government operations in Portland, namely because they usually deal with "heavily armed" individuals or "dangerous criminals," not persons "throwing bottles or fireworks."[14] While it true that BORTAC is called upon to deal with serious and dangerous situations, the protests in Portland are such a situation. Between July 4 to August 12, our officers/agents were assaulted 390 times while defending the courthouse in Portland. These assaults involved commercial-grade fireworks, lasers (which can cause permanent eye damage), IEDs (fireworks wrapped in scrap metal, nails, and tacks), and thrown Molotov cocktails, frozen water bottles, canned goods, paint cans, rocks.

23. BORTAC is also appropriate for this operation because they are trained to deal with launched or thrown projectiles. Our officers/agents routinely deal with launched or thrown projectiles. Indeed, it is such a common occurrence that CBP Use of Force Policy explicitly addresses the proper use of safe tactics in response to the threat posed by launched or thrown projectiles. From early 2016 to the present day there have been over 970 assaults on CBP officers/agents by rocks or other thrown or launched projectiles.

24. Mr. Kerlikowske states that CBP BORTAC is the equivalent of a SWAT team for the Border Patrol, and that "their skills are not particularly useful for the situation in

---

[9] Id at 7.
[10] Id at 10.
[11] U.S. Customs and Border Protection, *Use of Force Policy, Guidelines and Procedures Handbook*, Office of Training and Development, HB 4500-C, signed May 2014 by R. Gil Kerlikowske at 31-32.
[12] Declaration of Gil Kerlikoske, filed 8/10/20 at 10.
[13] CBP Use of Force Policy at 30.
[14] Declaration of Gil Kerlikoske, filed 8/10/20 at 8.

Portland….”[15]  This ignores BORTAC's qualifications discussed in the previous two paragraphs and the fact that its members receive specialized and extensive crowd management training.

25.  Mr. Kerlikowske also takes issue with CBP's use of less-lethal munitions, pointing out that he reserved the use of such devices to the SWAT team during his time in Seattle.[16]  Although he implemented that limitation in Seattle, he did not do so while Commissioner of CBP.  The CBP Use of Force Policy, signed by Mr. Kerlikowske, allows for less-lethal munitions to be used by CBP Officers and Agents as long as they receive the proper training and certification.  All of the officers/agents in Portland that used less-lethal munitions were properly trained.

26.  Finally, Mr. Kerlikowske suggests that CBP officers/agents should have numbers on their uniforms.  To begin, officers/agents already wear unique identifying numbers on their uniforms.[17]  I would also note to the extent Mr. Kerlikowske is advocating for larger numbers on officers/agents uniforms, it appears he is taking that position solely for the purposes of this litigation.  I am not personally aware of any request during his time as Commissioner in which he requested bigger numbers on officers/agents uniforms.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 18, 2020

*Chris A. Bishop*

Chris A. Bishop (LESC1)
Acting Director
U.S. Department of Homeland Security
U.S. Customs and Border Protection
Law Enforcement Safety and Compliance

---

[15] Id.
[16] Id.
[17] Id at 13.