# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **INDEX NEWSPAPERS LLC d/b/a PORTLAND MERCURY; DOUG BROWN; BRIAN CONLEY; SAM GEHRKE; MATHIEU LEWIS-ROLLAND; KAT MAHONEY; SERGIO OLMOS; JOHN RUDOFF; ALEX MILAN TRACY; TUCK WOODSTOCK; JUSTIN YAU;** and those similarly situated, | Case No. 3:20-cv-1035-SI **OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION AGAINST FEDERAL DEFENDANTS** |
| Plaintiffs, | |
| v. | |
| **CITY OF PORTLAND; JOHN DOES 1-60; U.S. DEPARTMENT OF HOMELAND SECURITY;** and **U.S. MARSHALS SERVICE**, | |
| Defendants. | |

Matthew Borden, J. Noah Hagey, Athul K. Acharya, and Gunnar K. Martz, BRAUNHAGEY & BORDEN LLP, 351 California Street, Tenth Floor, San Francisco, CA 94104; Kelly K. Simon, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON, P.O. Box 40585, Portland, OR 97240. Of Attorneys for Plaintiffs.

Denis M. Vannier and Naomi Sheffield, Senior Deputy City Attorneys; Ryan C. Bailey, Deputy City Attorney; and Youngwoo Joh, Assistant Deputy City Attorney, OFFICE OF THE CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Ethan P. Davis, Acting Assistant Attorney General, Civil Division; Billy J. Williams, United States Attorney for the District of Oregon; David M. Morrell, Deputy Assistant Attorney General, Civil Division; Alexander K. Hass, Director, Federal Programs Branch; Brigham J. Bowen, Assistant Director, Federal Programs Branch; Joshua E. Gardner, Special Counsel, Federal Programs Branch; Andrew I. Warden, Senior Trial Counsel; Jeffrey A. Hall, Jordan L. Von Bokern, and Keri L. Berman, Trial Attorneys; U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L. Street, NW, Washington, D.C. 20530. Of Attorneys for Defendants U.S. Department of Homeland Security and U.S. Marshals Service.

James L. Buchal, MURPHY & BUCHAL LLP, 3425 SE Yamhill Street, Suite 100, Portland, OR 97214. Of Attorney for *Amicus Curiae* National Police Aassociation.

Duane A. Bosworth, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201; Katie Townsend, Gabe Rottman, and Adam A. Marshall, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, 1156 15th Street NW, Suite 1020, Washington, D.C. 20005. Of Attorneys for *Amici Curiae* Reporters Committee for Freedom of the Press and 16 News Media Organizations.

**Michael H. Simon, District Judge.**

"Open government has been a hallmark of our democracy since our nation's founding." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012). "When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Id*. at 900. "The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Id*. This lawsuit tests whether these principles are merely hollow words.

Plaintiffs Index Newspapers LLC doing business as Portland Mercury, Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau (collectively, "Plaintiffs") bring this putative class action against: (1) the City of Portland (the "City"); (2) numerous as-of-yet unnamed individual and supervisory officers of the Portland Police Bureau ("PPB") and other agencies allegedly working in concert with the PPB; (3) the U.S. Department of Homeland Security ("DHS"); and (4) the U.S. Marshals Service ("USMS"). The Court refers to DHS and USMS collectively as the "Federal Defendants." Plaintiffs are journalists and authorized legal

observers. They allege violations of the First and Fourth Amendments of the United States

Constitution and Article I, sections 8 and 26 of the Oregon Constitution. Plaintiffs seek

declaratory and injunctive relief and money damages.

Before the Court is Plaintiffs' motion for preliminary injunction against the Federal

Defendants. Plaintiffs allege that agents of the Federal Defendants from around the United

States, specially deployed to Portland, Oregon to protect the federal courthouse, have repeatedly

targeted and used physical force against journalists and authorized legal observers who have

been documenting the daily Black Lives Matter protests in this city. These federal agents include

special tactical units from U.S. Customs and Border Protection under the U.S. Department of

Homeland Security ("BORTAC") and other special tactical units from the U.S. Marshals Service

under the U.S. Department of Justice ("Special Operations Group" or "SOG").

Although these federal agents are highly trained in some areas of law enforcement,

Plaintiffs contend that neither these agents nor their commanders have any special training or

experience in civilian crowd control. Plaintiffs allege that some of these officers have

intentionally targeted and used physical force and other forms of intimidation against journalists

and authorized legal observers for the purpose of preventing or deterring them from observing

and reporting on unreasonably aggressive treatment of lawful protesters. In response, the Federal

Defendants argue that they are merely protecting the federal courthouse and its personnel from

potential or actual violence and that any interference with protected First Amendment activity is

merely incidental.

The Ninth Circuit has stated:

> Demonstrations can be expected when the government acts in
> highly controversial ways, or other events occur that excite or
> arouse the passions of the citizenry. The more controversial the
> occurrence, the more likely people are to demonstrate. Some of

> these demonstrations may become violent. The courts have held
> that the proper response to potential and actual violence is for the
> government to ensure an adequate police presence and to arrest
> those who actually engage in such conduct, rather than to suppress
> legitimate First Amendment conduct as a prophylactic measure.

*Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) (citation omitted). Here, the actions of the

Federal Defendants, or at least some of their officers, prevent, deter, or otherwise chill the

constitutionally protected newsgathering, documenting, and observing work of journalists and

authorized legal observers, who peacefully stand or walk on city streets and sidewalks during a

protest. As further explained by the Ninth Circuit in *Collins*:

> It has been clearly established since time immemorial that city
> streets and sidewalks are public fora. Restrictions on First
> Amendment activities in public fora are subject to a particularly
> high degree of scrutiny.

*Id*. at 1371 (citations and quotation marks omitted).

The Federal Defendants also argue that Plaintiffs are seeking special protections for

journalists and legal observers under the First Amendment but that journalists and legal

observers are entitled to no greater rights than those afforded to the public generally. In support,

the Federal Defendants cite *Branzburg v. Hayes*, 408 U.S. 665, 680-82 (1972), which held that

although the First Amendment protects news gathering, it does not provide a reporter's privilege

against testifying before a grand jury. In that case, the Supreme Court noted: "It has generally

been held that the First Amendment does not guarantee the press a constitutional right of special

access to information not available to the public generally." *Id*. at 684; *see also Cal. First

Amendment Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) (same). The Federal

Defendants argue, in essence, that Plaintiffs' requested preliminary injunction violates the traditional "nondiscrimination" interpretation of the First Amendment's Press Clause.[1]

At first glance, one might think that the journalists and legal observers here are seeking protection against having to comply with an otherwise lawful order to disperse from city streets after a riot has been declared, when the public generally does not have that protection. When local law enforcement lawfully declares a riot and orders people to disperse from city streets, generally they must comply or risk arrest. The question of whether journalists have any greater rights than the public generally, however, is not actually presented in the pending motion for preliminary injunction. That is because the *Federal Defendants* are not asserting that *they* have the legal authority to declare a riot and order persons to disperse from the city streets in Portland; nor does the authority they cite for their presence and actions in Portland so provide.[2] It is only

---

[1] This traditional interpretation may be undergoing a reevaluation. *See, e.g.,* Sonja R. West, *Favoring the Press*, 106 Cal. L. Rev. 91, 94 (2018) ("The nondiscrimination view of the Press Clause is deeply flawed for the simple reason that the press is different and has always been recognized as such."). "Barring the government from recognizing the differences between press and non-press speakers threatens to undermine the vital role of the Fourth Estate." *Id.* (footnote omitted). "It is, therefore, entirely in keeping with the text, history, and spirit of the First Amendment's Press Clause for the government to, at times, treat press speakers differently." *Id.* at 95. "Rather than lump the press together with other speakers, the Supreme Court has historically done just the opposite." *Id.*

[2] The Federal Defendants cite 40 U.S.C. § 1315 and its implementing regulations. That statute authorizes DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." § 1315(a). The governing regulations prohibit, as relevant here: (1) disorderly conduct for persons "entering in or on Federal property," 41 C.F.R. § 102-74.390; (2) persons "entering in or on Federal property" from improperly disposing of rubbish on property, willfully damaging property, creating a hazard on property, or throwing articles at a building or climbing on any part of a building, 41 C.F.R. § 102-74.380; and (3) requiring that "[p]ersons in and on property" must obey "the lawful direction of federal police officers and other authorized individuals." 41 C.F.R. § 102-74.385. This latter regulation, although not specifically stating on "federal" property, has been construed as including this requirement, that the persons be on federal property. *See United States v. Baldwin*, 745 F.3d 1027, 1029 (10th Cir. 2014) (then-Circuit Judge, now Justice Gorsuch) ("The first says '[p]ersons in and on [Federal] property must at all times comply . . . with the lawful direction of Federal police officers and other authorized individuals.'" (alterations in original) (quoting 41

---

PAGE 5 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

state and local law enforcement that may lawfully issue an order declaring a riot or unlawful assembly on city streets. That is simply part of a state or city's traditional police power.

Here, Plaintiffs and the City have already *stipulated* to a preliminary injunction that provides that the Portland Police will not arrest any journalist or authorized legal observer for failing to obey a lawful order to disperse. Thus, the question of whether an otherwise peaceful and law-abiding journalist or authorized legal observer has a First Amendment right not to disperse when faced with a general dispersal order issued by state or local authorities does not arise in this motion.[3]

---

C.F.R. § 102-74.385); *see also United States v. Estrada-Iglesias*, 425 F. Supp. 3d 1265, 1270 (D. Nev. 2019). Thus, 40 U.S.C. § 1315 and its regulations give federal officers broad authority *on federal property*. They do not, however, give federal officers broad authority off federal property. The authority granted off federal property is limited—to perform authorized duties "outside the property to the extent necessary to protect the property and persons on the property." § 1315(b)(1). These authorized duties include enforcing federal laws (which as relevant here are laws limited to persons on federal property), making arrests if federal crimes are committed in the presence of an officer, and conducting investigations on and off the property for crimes against the property or persons on the property. § 1315(b)(2). None of these powers include declaring a riot or an unlawful assembly on the streets of Portland, closing the streets of Portland, or otherwise dispersing people off the streets of Portland (versus dispersing people off federal property).

The Federal Defendants appear to acknowledge this limitation in their powers. DHS Operation Diligent Valor commander Gabriel Russell states in his declaration that in response to violent protests, Federal Protective Services ("FPS") officers warned protesters to "stay off federal property," used tear gas to "push protesters back from the [federal] courthouse," contacted the PPB who were about to declare an unlawful assembly, the Portland Police "arrived and closed all roads in the vicinity of the facilities[,] . . . . declared an unlawful assembly and began making arrests for failure to disperse," and the FPS only "made dispersal orders on federal property and cleared persons refusing to comply with these orders." ECF 67-1 at 2. He also testified at deposition that generally FPS does not have authority to enforce a dispersal order against an unlawful assembly on Fourth Street, one block from the federal courthouse. ECF 136-1 at 22 (63:12-18). The Federal Defendants also cite to statutes and regulations that authorize the USMS to protect federal courthouses and other federal property, including 28 U.S.C. § 566(a), 28 U.S.C. § 566(i), 28 C.F.R. § 0.111(f). As with the statutes and regulations governing DHS's authority, these authorities focus on federal property, not on city streets or state or local property.

[3] Someday, a court may need to decide whether the First Amendment protects journalists and authorized legal observers, as distinct from the public generally, from having to comply with

PAGE 6 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Plaintiffs and the Federal Defendants have stipulated that an evidentiary hearing with live witness testimony is unnecessary and that the Court may base its decision on the written record and oral argument of counsel. For the reasons that follow, the Court GRANTS Plaintiffs' motion for preliminary injunction against the Federal Defendants.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

---

an otherwise lawful order to disperse from city streets when journalists and legal observers seek to observe, document, and report the conduct of law enforcement personnel; but today is not that day.

## BACKGROUND

### A.  Procedural History

Plaintiffs filed their original Complaint against the City on June 28, 2020. On June 30th, Plaintiffs moved for a TRO. On July 2nd, the Court entered a TRO against the City. On July 14th, Plaintiffs moved to file a Second Amended Complaint ("SAC"), adding the Federal Defendants to this lawsuit. On July 16th, the Court entered a stipulated preliminary injunction against the City. On July 17th, the Court granted Plaintiffs' motion to file the SAC. Later that day, Plaintiffs filed their SAC and moved for a TRO against the Federal Defendants, which the City supported shortly thereafter. On July 23rd, the Court granted Plaintiffs' motion for a TRO against the Federal Defendants, including many of the same terms contained in the TRO and stipulated preliminary injunction entered against the City. The TRO against the Federal Defendants was set to expire by its own terms on August 6th. On July 28th, Plaintiffs moved for a finding of contempt and imposition of sanctions against the Federal Defendants, alleging several violations of the Court's TRO. On July 30th the Federal Defendants moved for reconsideration of the TRO, requesting that it be dissolved. On July 31st the Court stayed briefing on Plaintiffs' contempt motion. On August 4th, Plaintiffs moved to extend the TRO against the Federal Defendants for an additional 14 days. On August 6th, after finding good cause, the Court granted Plaintiffs' motion and extended the TRO against the Federal Defendants through August 20th and denied the Federal Defendants' motion for reconsideration.

### B.  Plaintiffs

Plaintiff Index Newspapers LLC doing business as Portland Mercury ("Portland Mercury") is an alternative bi-weekly newspaper and media company. It was founded in 2000 and is based in Portland, Oregon. ECF 53, ¶ 21.

Plaintiff Doug Brown has attended many protests in Portland, first as a journalist with the *Portland Mercury* and later as a volunteer legal observer with the ACLU. He has attended the George Floyd protests on several nights, wearing a blue vest issued by the ACLU that clearly identifies him as a legal observer, for the purpose of documenting police interactions with protesters. ECF 9, ¶¶ 1-2; ECF 53, ¶¶ 22, 97; ECF 55, ¶ 2.

Plaintiff Brian Conley has been a journalist for twenty years and has trained journalists in video production across a dozen countries internationally. He founded Small World News, a documentary and media company dedicated to providing tools to journalists and citizens around the world to tell their own stories. ECF 53, ¶ 131.

Plaintiff Sam Gehrke has been a journalist for four years. He previously was on the staff of the *Willamette Week* as a contractor. He is now a freelance journalist. His work has been published in *Pitchfork*, *Rolling Stone*, *Vortex Music*, and *Eleven PDX*, a Portland music magazine. He has attended the protests in Portland for the purpose of documenting and reporting on them, and he wears a press pass from the *Willamette Week*. ECF 10, ¶¶ 1-3; ECF 53, ¶ 23.

Plaintiff Mathieu Lewis-Rolland is a freelance photographer and photojournalist who has covered the ongoing Portland protests. He has been a freelance photographer and photojournalist for three years and is a contributor to *Eleven PDX* and listed on its masthead. After the Court issued its TRO directed against the City, he began wearing a shirt that said "PRESS" in block letters on both sides. He also wears a helmet that says "PRESS" on several sides, and placed reflective tape on his camera and wrist bands. ECF 12, ¶¶ 1-2; ECF 53 ¶ 24; ECF 77, ¶ 1, 3.

Plaintiff Kat Mahoney is an independent attorney and unpaid legal observer. She has attended the Portland protests nearly every night for the purpose of documenting police

interactions with protesters. She wears a blue vest issued by the ACLU that clearly identifies her as an "ACLU LEGAL OBSERVER." ECF 26, ¶ 3; ECF 75, ¶¶ 1-2.

Plaintiff Sergio Olmos has been a journalist since 2014, when he began covering protests in Hong Kong. He has worked for *InvestigateWest* and *Underscore Media Collaboration*, and as a freelancer. His work has been published in the *Portland Tribune*, *Willamette Week*, *Reveal: The Center for Investigative Reporting*, *Crosscut*, *The Columbian*, and *InvestigateWest*. He has attended the protests in Portland as a freelance journalist for the purpose of documenting and reporting on them. He wears a press badge and a Kevlar vest that says "PRESS" on both sides. He carries several cameras, including a film camera, in part so that it is unmistakable that he is present in a journalistic capacity as a member of the press. ECF 15, ¶¶1-3; ECF 53, ¶ 26.

Plaintiff John Rudoff is a photojournalist. His work has been published internationally, including reporting on the Syrian refugee crises, the "Unite the Right" events in Charlottesville, Virginia, the Paris "Yellow Vest" protests, and the Rohingya Genocide. He has attended the protests in Portland during the past two months for the purpose of documenting and reporting on them. Since this lawsuit began, he has been published in *Rolling Stone*, *The Nation*, and on the front page of the *New York Times*. While attending the Portland protests, he carries and displays around his neck press identification from the National Press Photographers Association, of which he has been a member for approximately ten years. He also wears a helmet and vest that is clearly marked "PRESS." ECF 17, ¶¶ 1-3; ECF 53, ¶ 27; ECF 59, ¶¶ 1, 3.

Plaintiff Alex Milan Tracy is a journalist with a master's degree in photojournalism. His photographs have been published by CNN, ABC, CBS, *People Magazine*, *Mother Jones*, and *Slate*, among others. He has covered many of the recent protests in Portland over George Floyd

and police brutality. He carries a press badge and three cameras, and wears a helmet that is marked "PRESS" on the front and back. ECF 60, ¶¶ 1, 3.

Plaintiff Tuck Woodstock has been a journalist for seven years. Their work has been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*. They have attended the George Floyd protests several times as a freelancer for the *Portland Mercury* and more times as an independent journalist. When they attended these protests, they wear a press pass from the *Portland Mercury* that states "MEDIA" in large block letters and a helmet that is marked "PRESS" on three sides. At all times during police-ordered dispersals, they hold a media badge over their head. ECF 23, ¶¶ 2-3; ECF 76, ¶¶ 1, 3.

Plaintiff Justin Yau is a student at the University of Portland studying communications with a focus on journalism. He previously served in the U.S. Army, where he was deployed to the Middle East. He has covered protests in Hong Kong and Portland. His work has been published in the *Daily Mail*, *Reuters*, *Yahoo! News*, *The Sun*, *Spectee* (a Japanese news outlet), and msn.com. He has attended the protests in Portland as a freelance and independent journalist for the purpose of documenting and reporting on them. He wears a neon yellow vest marked with reflective tape and a helmet that are marked "PRESS," and carries his press pass around his neck. He carries a large camera, a camera gimbal (a device that allows a camera to smoothly rotate), and his cellphone for recording. ECF 56, ¶¶ 1-3.

## C.  Plaintiffs' Alleged Harm

Plaintiffs and other declarants have provided numerous declarations describing events in which they assert that employees, agents, or officers of the Federal Defendants targeted journalists and legal observers and interfered with their ability to engage in First Amendment-protected activities. As discussed below, Plaintiffs provide many compelling examples in the record, some from before the Court entered the TRO against the Federal Defendants and some

after. The following are just several examples selected by the Court from the extensive evidence provided by Plaintiffs. There are more.

### 1. Before the TRO was Issued

On July 15, 2020, Plaintiff Justin Yau asserts that, while carrying photojournalist gear and wearing reflective, professional-looking clothing clearly identifying him as press, he was targeted by a federal agent and had a tear gas canister shot directly at him. ECF 56, ¶¶ 3-6. Two burning fragments of the canister hit him. *Id.* ¶ 6. At the time he was fired upon, he was taking pictures with his camera and recording with his cell phone while standing 40 feet away from protesters to make it clear that he was not part of the protests. *Id.* ¶ 5. Mr. Yau notes that from his experience covering protests in Hong Kong, "Even Hong Kong police, however, were generally conscientious about differentiating between press and protesters—as opposed to police and federal agents in Portland." *Id.* ¶ 7.

Declarant Noah Berger has been a photojournalist for more than 25 years. ECF 72, ¶ 1. He has been published nationally and internationally, including for coverage of protests in San Francisco and Oakland. *Id.* On July 19, 2020, he covered the protests on assignment for the Associated Press. He notes that the response he has seen and documented from the federal agents in Portland is markedly different from even the most explosive protests he has covered. *Id.* ¶ 3. He carries two large professional cameras and two press passes. *Id.* He states that without any warning he was shot twice by federal agents using less lethal munitions. *Id.* ¶ 4. Later, as federal agents "rushed" an area he was photographing, he held up his press pass, identified himself as press, stated he was leaving, and moved away from the area. *Id.* ¶ 7. While holding his press pass and identifying himself as press, he was hit with a baton by one federal agent. *Id.* ¶ 8. Two others joined and surrounded him, and he was hit with batons three or four times. *Id.* One agent then deployed pepper spray against Mr. Berger from about one foot away. *Id.* ¶ 9. He was given no

warning. *Id.* ¶ 11. He states that he was not demonstrating or protesting, was leaving the area, and was clearly acting as a journalist. *Id.* ¶¶ 3, 11.

Late July 19th or early July 20th, Declarant Nathan Howard, a photojournalist who has been published in *Willamette Week*, *Mother Jones*, Bloomberg Images, Reuters, and the Associated Press, was covering the Portland protests. ECF 58, ¶¶ 1, 4. He was standing by other journalists, and no protesters, as federal agents went by. *Id.* ¶ 4. The nearest protester was a block away. *Id.* Mr. Howard held up his press pass and repeatedly identified himself as press. *Id.* ¶ 5. A federal agent stated words to the effect of "okay, okay, stay where you are, don't come closer." *Id.* ¶ 6. Mr. Howard states that another federal agent, who was standing immediately to the left of the agent who gave Mr. Howard the "okay," aimed directly at Mr. Howard and fired at least two pepper balls at him at close range. *Id.* ¶ 7.

Declarant Jungho Kim is a photojournalist whose work has been published in the *San Francisco Chronicle* and *CalMatters*, among others. ECF 62, ¶ 1. He wears a neon yellow vest marked "PRESS" and a white helmet marked "PRESS" in the front and rear. *Id.* ¶ 2. He has covered protests in Hong Kong and California. He has experience with staying out of the way of officers and with distinguishing himself from a protester, such as by not chanting or participating in protest activity. *Id.* ¶ 3. He had never been shot at by authorities until covering the Portland protests on July 19, 2020. *Id.* During the protest, federal agents pushed protesters away from the area where Mr. Kim was recording. He was around 30 feet away from federal agents, standing still, taking pictures, with no one around him. *Id.* ¶¶ 5-7. He asserts that suddenly and without warning, he was shot in the chest just below his heart with a less lethal munition. *Id.* ¶ 7. Because he was wearing a ballistic vest, he was uninjured. He also witnessed, and photographed, federal agents firing munitions into a group of press and legal observers. *Id.* ¶ 9.

PAGE 13 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Declarant Nate Haberman-Ducey is a law student at Lewis and Clark Law School. ECF 61, ¶ 1. He completed training with the National Lawyers Guild ("NLG") and attended the protests several times as a legal observer. *Id.* He states that on July 19, 2020, while wearing his green, NLG-issued authorized legal observer hat, he was shot in the hand with a paint-marking round by a federal agent, while walking his bicycle through the park across from the federal courthouse. *Id.* ¶¶ 3-4. At the time, there were no other protestors or other people around Mr. Haberman-Ducey at whom the federal agent might have been aiming. *Id.* ¶ 5. The pain from injury to Mr. Haberman-Ducey's right hand was so severe that he had to stop observing the protests and go to the emergency room, where doctors put his broken hand in a splint. *Id.* ¶¶ 7-8. He would like to keep observing the protests but is concerned that residue from tear gas fired by the federal agents will contaminate his splint, which he has to wear for four to six weeks. *Id.* ¶ 9.

Declarant Amy Katz is a photojournalist whose work has been published in the *Wall Street Journal*, the *New York Daily News*, the *Guardian*, *TIME*, *Mother Jones*, the *Independent*, the *New York Times*, and has been featured on Good Morning America and ABC News. ECF 117, ¶ 1. While covering the protests, she wears a hat and tank top marked with "PRESS" in bold letters and carries a camera with a telephoto lens. *Id.* ¶ 2. Early in the morning of July 21st, she was filming from the side while federal agents dispersed protestors. *Id.* ¶ 4-6. Several agents tried to disperse her, but she displayed her press pass and they left her alone. *Id.* ¶ 6. She asserts that a federal agent approached and motioned for her to disperse again a few minutes later. *Id.* ¶ 7. Ms. Katz again held up her press pass, but before she could process what was happening another agent fired pepper balls or similar munitions at her. *Id.* The first agent then dropped a tear gas grenade directly at her feet as Ms. Katz ran away, yelling that she was press. *Id.* She notes that there were no protestors the agents could have been aiming at because the protesters

had already dispersed. *Id.* ¶ 8. The effects of the tear gas forced her to stop reporting and return to her hotel. *Id.* ¶ 9. The next day her eyes and lips burned, sunlight hurt her eyes, her tongue was swollen, and she had diarrhea. *Id.*

Declarant Sarah Jeong is an attorney, a columnist for *The Verge*, and a contributing writer to the *New York Times* Opinion section. ECF 116, ¶ 1. She attended the protests solely as a journalist, wore her press badge, and wore a helmet with "PRESS" in black letters on a white background on three sides. *Id.* ¶ 4. On the night of July 21st, Ms. Jeong was covering the protests from the steps of the courthouse when federal agents emerged from the building and charged the crowd. *Id.* ¶ 5. Ms. Jeong walked slowly backward, holding her press pass up in one hand and her phone in the other. *Id.* ¶ 6. With no warning and for no apparent reason, a federal agent shoved Ms. Jeong so forcefully that both her feet left the ground. *Id.* ¶ 7. She kept reporting that night but left much earlier than she had planned. *Id.* ¶ 8. Although she plans to keep covering the protests, she is fearful for her safety. *Id.*

Declarant James Comstock is a legal observer with the NLG. ECF 63, ¶ 1. On July 19th, a few minutes before midnight, he was watching the protests from the park across the street from the protests. *Id.* ¶ 2-3. He was wearing the standard NLG-issued green hat provided to legal observers. *Id.* ¶ 2. As protestors started to push the fence, he put on his gas mask and started to move away from the courthouse because he did not want to get tear gassed. *Id.* ¶ 3. He stopped on the opposite side of 4th Avenue, about 375 feet away from the front door of the courthouse. *Id.* He went to speak to a press member standing on the intersection of SW 4th and Main. *Id.* ¶ 4. After finishing his conversation with the press member, Mr. Comstock was standing in the same location alone with his back up against the wall. *Id.* Without warning, a federal agent shot Mr. Comstock in the hand with an impact munition while he was making notes on his phone. *Id.* ¶ 5.

PAGE 15 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

There were no protestors around and he was at least 6 feet from the reporter with whom he had just been speaking. *Id.* ¶ 6. Mr. Comstock states that he would like to keep attending the protests as a legal observer but that he is afraid of injury and fearful that he will be wrongfully arrested, endangering his job as a criminal defense investigator. *Id.* ¶¶ 8-9.

Early morning on July 22nd, Plaintiff Alex Milan Tracy was standing in the street and filming a group of federal officers who were standing on the sidewalk in front of the courthouse. ECF 74, *Id.* ¶ 4. Two of the officers from that group waved their batons at him and gestured for him to move back. *Id.* He retreated, and one of the officers briefly charged at him. Mr. Tracy then moved back farther into the middle of the street. *Id.* A few minutes later, he was filming the same group of federal officers from the same spot in the middle of the street. *Id.* ¶ 6. Agents from that same group raised their weapons and launched a flashbang at Mr. Tracy and another journalist, hitting them both. *Id.* ¶ 7. Mr. Tracy continued documenting the scene but finally left because the federal officers kept looking and pointing directly at him. *Id.* ¶¶ 7, 10. He was "genuinely terrified" of standing in front of the federal officers. *Id.* ¶ 10.

### 2. After the TRO was Issued

Plaintiff Brian Conley has worked in war zones such as Iraq, Afghanistan, Libya, and Burundi. ECF 87, ¶ 1. He also has covered protests for many years in places such as Beijing, New York, Washington, D.C., Miami, Quebec City, and Oaxaca, Mexico. *Id.* He has encountered agents of the Federal Defendants in Portland on multiple days. At all times he was wearing a photographer's vest with "PRESS" written on it and a helmet that said "PRESS" in large block letters across the front. *Id.* ¶ 2. He was also carrying a large camera with an attached LED light and telephoto lens. *Id.*

Early in the morning of July 24th, Mr. Conley filmed federal agents seizing a woman who was dancing with flowers in front of the officers. *Id.* ¶ 3-4. At that point, the crowd was

PAGE 16 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

mostly press and a few individual protestors. *Id.* ¶ 3. Federal agents launched tear gas into the streets, and Mr. Conley yelled that he was press to avoid being further tear gassed. *Id.* ¶ 6. Mr. Conley was then shot with impact munitions in the chest and foot. *Id.* ¶ 7. Video of this event shows that the situation grew tense as a protester attempted to interfere with the agents' seizure of the woman. As the agents finalized the seizure of the woman and the interfering protester and retreated into the federal courthouse with the woman and the interfering protester, they laid sweeping cover fire into the remaining crowd, which included Mr. Conley and other press members, even though no protester was near Mr. Conley at the time. After the officers were safely within the building, Mr. Conley continued recording. The video shows that Mr. Conley was outside next to another photographer. A medic and his protector were behind a shield on one side several yards away and a protester yelling taunts was on the other side several yards away. As Mr. Conley was filming, a federal agent on the other side of the courthouse fence shone a bright light at Mr. Conley. Shortly thereafter, without warning, a federal agent shot a tear gas canister above Mr. Conley's head. Mr. Conley also describes this in his declaration. *Id.* ¶ 9.

Mr. Conley took the next two nights off and returned to cover the protests the night of July 27th. *Id.* ¶¶ 17, 18. He was documenting a line of federal agents advancing on a group of six protestors with shields who were standing behind him. *Id.* ¶ 18. He yelled that he was press, but the federal agents unleashed a barrage of munitions at him. *Id.* ¶ 19. He moved to the side, away from the protestors, and continued to yell that he was press. *Id.* ¶ 20. The federal agents briefly stopped firing, one shone a flashlight at him, and resumed fire directly at him, striking him multiple times—although by this point there was nobody else near him. *Id.* Another federal agent threw a flashbang grenade directly at him. *Id.* Mr. Conley could "barely walk" after the events of July 27-28. *Id.* ¶ 25.

Mr. Conley was covering the protests again just before midnight on July 29th. ECF 115, ¶ 4. He had replaced the "PRESS" lettering on his helmet because the concussion and flashbang grenades thrown at him the night before had blown off one of the letters. *Id.* ¶ 2. He was filming federal agents on SW Salmon Street between SW 2nd and SW 3rd Avenue. *Id.* ¶ 4. There was one other photographer between him and the small group of agents. *Id.* One of the agents shone a light on Mr. Conley and fired a munition just beside him. *Id.* Another federal agent with an assault rifle approached Mr. Conley and told him to stay on the sidewalk. *Id.* ¶ 5. Later that night, without warning, federal agents pepper sprayed Mr. Conley at point blank range. *Id.* ¶ 6. Video of this event shows that while Mr. Conley was filming a line of federal officers moving down the street pepper spraying peaceful protesters, including spraying a woman in the face at point blank range who was on her knees with her hands up in the middle of the street, an officer pepper sprayed Mr. Conley at point blank range along with indiscriminately pepper spraying other press and the protesters. Mr. Conley states that he fears for his safety but plans to keep covering the protests because he believes "it is critically important to do so." *Id.* ¶ 11.

Declarant Amy Katz again covered the protests on the early morning of July 27th. ECF 117, ¶ 10. She witnessed a federal agent push a man down a flight of stairs while arresting him and photographed the incident. *Id.* An agent physically blocked her and tried to stop her from photographing the arrest. *Id.* When she stepped to the side to get another angle, the federal agent physically shoved her away. *Id.* Later that night, she approached a group of federal officers with a group of press, all of whom had their press badges up and their hands in the air. *Id.* ¶ 12. The video of this event shows that many of the group were calling out "press." Ms. Katz describes that she and the group of press were at least 75 feet away from most of the protestors when federal agents bombarded their group with munitions, hitting her in the side and causing a

large contusion. *Id.* The video shows the group of press moving together off to the far side of the sidewalk, holding their passes up along with cameras, shouting press and saying "hold your passes up." The group is moving toward the federal officers, recording events, when they are fired upon with various munitions. Ms. Katz stopped covering the Portland protests after that incident because of how the federal agents treated her. *Id.* ¶ 15.

Declarant Rebecca Ellis is a staff reporter for Oregon Public Broadcasting ("OPB"). ECF 88, ¶ 1. She attended the protests the night of July 23rd wearing her OPB press pass, which shows her name, her photograph, and the OPB logo. *Id.* ¶ 2-3. Around 1:30 a.m. she was in a small group of press members filming federal agents exiting the federal courthouse. *Id.* ¶ 3. One agent fired a munition directly at her, hitting her in the hand. *Id.* Video of this incident shows that she is hit when agents advance in a group and fire multiple munitions. Ms. Ellis appears to be in the middle of the street when she is hit. There are also persons crossing in front of Ms. Ellis, who appear also to be press, at the time she is shot. It is unclear who is behind her when she is hit. Ten minutes later, however, federal agents forced her and other press to disperse from near the courthouse. *Id.* ¶ 5. One agent walked towards them shouting "MOVE, MOVE" and "WALK FASTER" in their faces while another agent kept pace next to him, holding his gun. *Id.* Video of this dispersal shows that it is directed at press, in an intimidating manner, despite a press person stating, "You can't do that." The video does not seem to support that the press were in the way or otherwise impeding law enforcement actions. Ms. Ellis states that the federal agents prevented her from doing her job and reporting on what was going on behind them. She intends to keep covering the protests but is fearful for her safety. *Id.* ¶ 6.

Declarant Kathryn Elsesser is a freelance photographer whose photographs of the Portland protests have been published by Bloomberg, CBS News, and Yahoo, among others,

including many international publications. ECF 89, ¶ 1. She covered the protests the night of July 24th on assignment from a French news agency. *Id.* ¶ 2. She carried a large camera, wore a press pass from the American Society of Media Photographers, and wore a helmet with "PRESS" written in big letters across the front. *Id.* Around 2 a.m. on July 25th, Ms. Elsesser decided to end her coverage early because she did not have a bullet-proof vest and was afraid federal agents would hurt her. *Id.* ¶ 4. She was standing by herself, across the street from the courthouse, at the edge of the park. *Id.* There was nobody else near her. *Id.* A federal agent shot her in the arm with an impact munition as she was walking away. *Id.* ¶ 5. She believes that the federal agents targeted her because she was taking photographs. *Id.* ¶ 6. Ms. Elsesser states that she would refuse to cover the protests again unless she had a bullet-proof vest because she is afraid that federal agents will injure her or worse. *Id.* ¶ 13.

Declarant Emily Molli is a freelance photojournalist whose photographs have been published in the *New York Times*, the *Wall Street Journal*, the *Guardian*, *ProPublica*, and others. ECF 118, ¶ 1. She is experienced in covering civil unrest, riots, and other dangerous situations. She has reported on the protests in Hong Kong over the course of six months, the "Yellow Vests" in France over the course of a year, the Catalan independence movement, and the protests and riots in Greece. *Id.* ¶ 2. She understands the risk of getting hit by less lethal munitions while standing with protesters, but she objects to federal officers targeting press, which she states she has witnessed happening in Portland. *Id.* She wears a helmet with "PRESS" in big block letters and carries two press passes and a large professional-grade video camera. *Id.* ¶ 3. Early in the morning of July 27, 2020, after getting shot and injured when she had been approximately 75 yards from protesters, Ms. Molli decided to stick with a group of only journalists. *Id.* ¶¶ 7-8. The video of this event shows that they were holding their press passes up, mostly staying together as

a group, and staying toward the side of a street that appears otherwise empty. Federal officers fired munitions at the group of journalists. *Id.* ¶ 8. On July 29, 2020 and into the early morning of July 30th, Ms. Molli recorded another encounter between journalists and federal officers on SW Main Street. *Id.* ¶ 10. Video of this event shows that there were numerous law enforcement personnel, several journalists, and no protesters on that section of the street. Journalists are taking pictures and video of a tear gas canister that had been fired by federal agents when a federal agent fires another tear gas round at the journalists. Ms. Molli intends to keep covering the protests, but she fears for her safety because she has seen the federal agents disobey a court order. *Id.* ¶ 11.

Declarant Daniel Hollis is a videographer for VICE News. ECF 91, ¶ 1. He has covered many chaotic and dangerous situations, including conflict zones in Iraq and Syria, former Taliban areas in Pakistan, child sex-trafficking raids in the Philippines, Iranian militias, gangs, mafia, domestic terrorism, and armed militias. *Id.* He covered the Portland protests for two nights. *Id.* ¶ 2. During the protests, he carried a VICE press pass and a helmet with "PRESS" on it in bright orange tape. *Id.* He also carried a large, professional video-recording camera. *Id.* On July 26th, Mr. Hollis was filming wide-angle footage of a mass of protestors in front of the courthouse. *Id.* ¶ 4. The people closest to him were press and legal observers—the nearest protestors were several yards behind him. *Id.* ¶ 7. He then turned to record a group of federal agents massed outside the courthouse. *Id.* ¶ 5. Almost immediately, the agents shot at him, striking him just to the left of his groin. *Id.* He turned to run away, and another munition hit him in the lower back. *Id.* ¶ 6. Video of this event shows that Mr. Hollis was positioned between the federal agents and those few protesters (not the mass of protesters who were around the building), but the video does not reflect any violent or riotous behavior by anyone near Mr.

PAGE 21 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Hollis. After the federal agents shot him, Mr. Hollis went back to his hotel. *Id.* ¶ 8. He states that he is more concerned for his personal safety than he was during the month he spent covering ISIS sleeper cells in Northern Syria. *Id.* ¶ 9. He states: "I have been around heavily armed soldiers, militias, and gangs countless times, but have never had weapons aimed or discharged directly at me. The federal agents I have seen in Portland have been less willing to distinguish between press and putative enemies than any armed combatants I have seen elsewhere." *Id.*

Declarant Jonathan Levinson is an Oregon resident who lives in Portland. ECF 93, ¶ 1. He is a staff reporter for OPB. His work also has appeared on NPR and ESPN, and in the *Washington Post*, the *Wall Street Journal*, and *Al Jazeera. Id.* He has experience in conflict zones. He spent five years as an infantry officer in the U.S. Army, with two deployments to Iraq. *Id.* ¶ 2. As a reporter, he has covered the Libyan civil war and done work in Afghanistan, Yemen, Gaza, and the West Bank. *Id.* He has covered the Portland protests for a majority of the nights. When covering the protests, he wears his press pass issued by OPB, which contains his name, photograph, the OPB logo, and the word "MEDIA." *Id.* ¶ 3. He also wears a helmet that says "PRESS" in large letters on the front and back and carries two professional cameras. *Id.* At around 1:00 a.m. on July 24th, the federal agents had cleared the area next to the courthouse so he decided to take pictures of the agents through the courthouse fence. *Id.* ¶ 4. There were very few protesters anywhere nearby. As he was trying to focus his professional camera, he could see a federal agent raise and aim his weapon and fire several rounds directly at Mr. Levinson. *Id.* ¶ 5. His camera and lens were covered in paint from the agent's rounds. Mr. Levinson states that he intends to continue covering the protests because he believes they are of historic significance, but that he is fearful for his safety because within hours of the Court issuing its restraining order, he "saw federal agents brazenly violate it." *Id.* ¶ 7.

**D.  Declarations of Plaintiffs' Expert Witness Gil Kerlikowske[4]**

Plaintiffs submitted two declarations from Mr. Gil Kerlikowske, whom the Court finds to be a qualified, credible, and persuasive expert witness. ECF 135, 145. Mr. Kerlikowske is a former Commissioner of U.S. Customs and Border Protection, and he was confirmed by the U.S. Senate. Mr. Kerlikowske also served as the Chief of Police in Seattle, Washington from 2000 through 2009, and the Police Commissioner in Buffalo, New York. He has worked in law enforcement for 47 years. He served in the United States Army and Military Police from 1970 through 1972, where he began training in crowd control, riots, and civil disturbances. He also has served as the Director of the Office of National Drug Control Policy and as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. He has been an IOP Fellow at Harvard Kennedy School of Government and teaches as a distinguished visiting fellow and professor of the Practice in Criminology and Criminal Justice at Northeastern University. During his tenure as Chief of Police in Seattle, Mr. Kerlikowske led and orchestrated the policing of hundreds of large and potentially volatile protests, many of which were considerably larger than the recent protests in Portland. He did the same thing when he was Police Commissioner in Buffalo. Mr. Kerlikowske has had substantial training and experience with crowd control and civil unrest in the context of protests, use of force in that context, and use of force generally.

---

[4] After oral argument, the Federal Defendants filed the Declaration of Chris A. Bishop, the "Acting Director/Deputy Director," for the U.S. Department of Homeland Security, U.S. Customs and Border Protection (CBP). ECF 152. The Federal Defendants offer this declaration as an expert rebuttal to the two declarations of Mr. Kerlikowske. Plaintiffs have moved to strike Mr. Bishop's declaration as untimely. ECF 154. The Court denies Plaintiffs' motion to strike. The Court finds the declaration of Mr. Kerlikowske to be more persuasive than the declaration of Mr. Bishop.

Plaintiffs asked Mr. Kerlikowske to evaluate whether the relief stated in the TRO against the Federal Defendants is both safe and workable from a law enforcement perspective, whether the force that federal authorities used against journalists and legal observer complainants was reasonable, and whether it is advisable to prominently mark federal agents with unique identifying letters or numbers. First, Mr. Kerlikowske opined that the prohibitions contained in the TRO are safe for law enforcement personnel. Defending the federal courthouse in Portland mainly involves establishing a perimeter around the building, and there is no reason to target or disperse journalists from that position. Additionally, to the extent officers leave federal property, the TRO is also safe for federal law enforcement officers, according to Mr. Kerlikowske.

Second, Mr. Kerlikowske stated his expert opinion that the TRO is workable. He states that trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control. He adds that any difficulties that may be faced by federal authorities arise from their lack of training, experience, and leadership with experience in civil disturbances and unrest.

Third, Mr. Kerlikowske explains that based on his review of the record evidence virtually all the injuries suffered by the complaining journalists were the result of improper use of force, including shooting people who were not engaged in threatening acts and misuse of crowd-control munitions by federal law enforcement personnel. For example, Mr. Kerlikowske opines that tear gas canisters and pepper balls should not be fired directly at people. He also opines that rubber bullets should not be shot above the waist, and certainly not near the head. He further opines that in these circumstances, it is inappropriate to shoot someone in the back because at that point they are not a threat.

Finally, Mr. Kerlikowske asserts that in his expert opinion a key duty and responsibility of law enforcement is to be properly and easily identifiable specific to the organization and the individual. He notes that if a decision is made to remove a name tag, it must be replaced with some other identifying label, badge, or shield number. Mr. Kerlikowske explains that such markings increase accountability and act as a check and deterrent against misconduct. He adds that camouflage uniforms are inappropriate for urban settings.

As noted, the Court finds Mr. Kerlikowske to be a well-qualified expert whose opinions are relevant, helpful, and persuasive.

**E.  The Situation Faced by Law Enforcement**

After the killing of George Floyd on Memorial Day, there have been consistent protests against racial injustice and police brutality in Portland. ECF 67-1, Russell Decl. ¶ 3. The protesters generally are peaceful, particularly during the day and early evening. *See* ECF 113-3, Jones Decl. ¶ 7. Late at night, however, there are incidents of vandalism, destruction of property, looting, arson, and assault. ECF 67-1, ¶ 3. While protestors originally gathered outside the Justice Center (PPB headquarters), some protestors soon directed their attention to the Mark O. Hatfield Federal Courthouse, across the street from the Justice Center. After additional federal officers were deployed to Portland to support existing Federal Protective Service ("FPS") and USMS personnel, the protests grew larger and more intense, and the federal courthouse became a focus of attention. *Id*. at ¶ 5.

In early July, a group of people broke the glass doors at the entryway of the federal courthouse. *Id*. Members of this group used accelerant and commercial fireworks in an apparent attempt to start a fire inside the courthouse. *Id*. On other nights in July, various objects were thrown at law enforcement, such as rocks, glass bottles, and frozen water bottles. *Id*. at ¶ 6; ECF 101-6, CBP NZ-1 Decl. ¶ 8. Assistant Director for the Tactical Operations Division of the

PAGE 25 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

USMS Andrew Smith describes the environment of the protests as "extremely chaotic and dynamic" and emphasizes that law enforcement must make split-second decisions. ECF 101-1, Smith Decl., ¶ 6. A DHS Public Affairs Specialist identified as CBP PAO #1 states that he observed a person holding a Molotov cocktail. ECF 101-2, ¶ 7. Officers have had to extinguish fires and flaming debris, some of which has been thrown over the fence in officers' direction. *See* ECF 106-1, Smith Am. Decl. ¶ 15; ECF 101-3, FPS No. 824 Decl. ¶ 5.

The situation has been dangerous for federal agents, in addition to protesters, journalists, and legal observers. Gabriel Russell, FPS Regional Director for Region 10 and commander of DHS's Rapid Deployment force for Operation Diligent Valor in Portland, notes that as of his declaration submitted on July 29th, 120 federal officers had experienced some kind of injury, including broken bones, hearing damage, eye damage, a dislocated shoulder, sprains, strains and contusions. ECF 101-5, ¶ 4. The Patrol Agent in Charge of Customs and Border Protection, U.S. Border Patrol, identified as CBP NZ-1, describes agents being hit with rocks and ball bearings from sling shots, improvised explosives, commercial grade aerial fireworks, high intensity lasers targeting officer's eyes, thrown rocks, full and empty glass bottles, frozen water bottles, and balloons filled with paint and feces. ECF 101-6, ¶ 8. He notes that one officer was hit by a projectile that caused a wound that required multiple stitches and one officer was struck in the head and shoulder by a protester wielding a sledgehammer when the officer tried to prevent the protester from breaking down the courthouse door. *Id.* Another federal officer states that he has suffered numerous injuries during the protests, including being struck in the shins by tear gas canisters, suffering temporary hearing loss from commercial fireworks, and suffering temporary blindness from lasers. ECF 101-3, FPS No. 824 Decl. ¶ 6. The Federal Defendants do not assert

that journalists or legal observers caused these injuries. *See, e.g.*, ECF 136-3 at 10-11, CBP NZ-1 Dep. Tr. 72:10-73:1.

The Federal Defendants, however, do assert that some persons wearing the indicia of press have engaged in violent or unlawful behavior. Mr. Smith states that USMS personnel witnessed a person with a helmet marked "press" use a grinder to attempt to breach the fence surrounding the courthouse. ECF 106-1, ¶ 10. Another person wearing a press helmet entered courthouse property, either by climbing the perimeter fence or crossing when the fence was breached. *Id*. ¶ 11. A different person with press clothing helped a protestor climb the perimeter fence. *Id*. at ¶ 14. Mr. Smith also received a report that a staff member was kicked by someone wearing clothing marked "press." *Id.* at ¶ 15.

Mr. Russell submitted links to several videos purporting to show improper conduct by persons with indicia of press. ECF 101-5, ¶ 8. The Court reviewed those videos and did not find persuasive evidence of any wrongdoing related to persons wearing indicia of press with two exceptions. The first are the videos of Mr. Brandon Paape, who admits that he is not press but is wearing clothing marked "press" because he was assaulted by federal agents and hoped wearing clothing that indicates he is press would protect him from further violence. *Id.* ¶ 8(e), (f). The videos, however, do not provide evidence that Mr. Paape did anything unlawful. He masqueraded as press for personal protection. Additionally, shortly thereafter, he posted on Twitter that he will no longer wear indicia of press. *See* ECF 123 at 12. The videos of Mr. Paape do show, however, that persons other than actual journalists have worn indicia of press. The second is the video of a person wearing a "press" helmet who entered courthouse property and encouraged others to join. ECF 101-5, ¶ 8(h). He states: "They can't arrest us all." This, however, is the same person from Mr. Smith's photograph, ECF 106-1 ¶ 11 (Exhibits B and C).

The Federal Defendants also provide additional declarations describing further conduct. A man wearing a vest stating "press" threw a hard object toward police. ECF 101-3, FPS No. 824 Decl., ¶ 5. Another such person shielded from police a woman who was shining strobe lights into the eyes of an officer. *Id*. One person with handwritten markings reading "PRESS" directed a powerful flashlight at a law enforcement helicopter overhead but was not filming or taking photos or notes. ECF 101-2, CBP PAO #1 Decl. ¶ 9. A photo of this man depicts him standing very close to another man holding a camera. *Id*. It is unclear if the man with the powerful light was lighting for the cameraman or was masquerading as press to use light as a law enforcement irritant. Another federal officer states that on one occasion he witnessed persons wearing press indicia shield other persons who were throwing objects at law enforcement. ECF 101-4, FPS No. 882 Decl. ¶ 5. Finally, CBP PAO #1 notes that people self-identified as press are frequently in the midst of crowds near individuals breaking laws, which makes it difficult to disperse protestors without dispersing journalists as well. ECF 101-2, ¶ 12. The Federal Defendants also consistently note that press intermingle with protesters and stand by (or perhaps record) when protesters engage in purportedly wrongful conduct.

## DISCUSSION

### A. Standing

The Federal Defendants argue that Plaintiffs do not have standing to request injunctive relief. The Federal Defendants concede that "the standing inquiry is focused on the filing of the lawsuit" but then assert that standing must be proven at "successive stages of the litigation" and make the same standing arguments that they made during the TRO. In issuing the Temporary Restraining Order Enjoining Federal Defendants, the Court rejected the Federal Defendants' arguments regarding standing and found that Plaintiffs had Article III standing. *See Index Newspapers LLC v. City of Portland*, --- F.3d ---, 2020 WL 4220820, at *4-5 (D. Or. July 23,

2020). To the extent the Federal Defendants request reconsideration of that decision, arguing that based on facts as they existed at the time of the filing of the Complaint Plaintiffs do not have standing, reconsideration is denied.[5] The Federal Defendants provide no compelling basis for the Court to modify its previous determination.

To the extent the Federal Defendants argue that Plaintiffs must continue to prove standing as this lawsuit continues and the facts evolve, the Federal Defendants misunderstand the doctrines of standing and mootness. Article III standing is evaluated by considering the facts as they existed at the time of the commencement of the action. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (noting that "we have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation"); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.").

Whether standing and the other requirements for a live case or controversy exists throughout the entirety of a case is considered under the doctrine of mootness. *See Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016) ("To uphold the constitutional requirement that federal courts hear only active cases or controversies, as required by Article III, section 2 of the federal constitution, a plaintiff must have a personal interest at the commencement of the litigation (standing) that continues throughout the litigation (lack of mootness)."); *Vasquez v. Los Angeles*

---

[5] The Federal Defendants offer no authority for the notion that this Court must repeatedly litigate the same issue. The Federal Defendants are bound by the "law of the case" doctrine for determinations made by this Court, absent reconsideration or changed circumstances such as if new Plaintiffs were added who the Federal Defendants contended did not have standing. At any appeal stage of this litigation, however, "the standing requirement therefore must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (simplified).

*Cty.*, 487 F.3d 1246, 1253 (9th Cir. 2007) (noting that mootness is the doctrine under which courts ensure that "a live controversy [exists] at all stages of the litigation, not simply at the time plaintiff filed the complaint"); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (noting that *Lujan* "clearly indicat[es] that standing is to be 'assessed under the facts existing when the complaint is filed'" and that evaluating standing thereafter "conflates questions of standing with questions of mootness: while it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter"); *McFalls v. Purdue*, 2018 WL 785866, at *8-10 (D. Or. Feb. 8, 2018) (discussing the difference between standing and mootness). Therefore, the Federal Defendants' arguments that Plaintiffs must demonstrate standing at "all stages of the litigation," fail to do so now, and thus fail to present a case or controversy are more appropriately raised under the doctrine of mootness, to which the Court now turns. *See, e.g.*, *Barry*, 834 F.3d at 714; *Vasquez*, 487 F.3d at 1253; *Becker*, 230 F.3d at 386 n.3; *Tellis v. LeBlanc*, 2020 WL 1249378, at *5 (W.D. La. Mar. 13, 2020); *Rhone v. Med. Bus. Bureau, LLC*, 2019 WL 2568539, at *3 (N.D. Ill. June 21, 2019); *Fancaster, Inc. v. Comcast Corp.*, 2012 WL 815124, at *5 (D.N.J. Mar. 9, 2012).

## B.  Mootness

The Federal Defendants do not specifically argue that Plaintiffs' claims are moot based on any new facts or circumstances. Because the Federal Defendants appear to argue that Plaintiffs now lack standing based on changed circumstances, the Court considers whether the Federal Defendants' voluntary change in enforcement tactics moots Plaintiffs' claims. The augmented force of federal enforcement officers currently remain in Portland, ready to deploy whenever ordered, but have recently deployed only in limited circumstances and have not

recently engaged in the crowd control tactics that supported the Court's original TRO in this case.

For a short time, the Oregon State Police took the lead in enforcing crowd control in Portland. That appears to have ended, and the Portland Police have now resumed performing that role. The out-of-town agents and officers of the Federal Defendants who have been deployed to Portland, however, and whose actions were the basis of the Court's TRO, remain in Portland. Further, they have no scheduled date of departure.

To determine mootness, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (emphasis in original) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)). If a course of action is mostly completed but modifications can be made that could alleviate the harm suffered by the plaintiff's injury, the issue is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks omitted). The party alleging mootness bears a "heavy burden" to establish that a court can provide no effective relief. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quoting *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)).

Further, voluntary cessation of conduct moots a claim only in limited and narrow circumstances. As explained by the Supreme Court:

> The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways. A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to

> recur. Of course it is still open to appellees to show, on remand,
> that the likelihood of further violations is sufficiently remote to
> make injunctive relief unnecessary. This is a matter for the trial
> judge. But this case is not technically moot, an appeal has been
> properly taken, and we have no choice but to decide it.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (simplified); *see also*

*F.T.C. v. Affordable Media*, 179 F.3d 1228, 1238 (9th Cir. 1999) ("A case may become moot as

a result of voluntary cessation of wrongful conduct only if 'interim relief or events have

completely and irrevocably eradicated the effects of the alleged violation.'" (quoting *Lindquist v.

Idaho State Bd. of Corr.*, 776 F.2d 851, 854 (9th Cir. 1985))). The Ninth Circuit has noted that

"an executive action that is not governed by any clear or codified procedures cannot moot a

claim." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015). The Ninth Circuit also

advises courts to be "less inclined to find mootness where the new policy could be easily

abandoned or altered in the future." *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014)

(simplified).

The Federal Defendants' voluntary change in enforcement tactics does not moot

Plaintiffs' claims. There remains effective relief that the Court can provide for Plaintiffs. Further,

the change in enforcement tactics is not part of any clear or codified procedures. It could easily

be abandoned or altered in the future. Indeed, the Federal Defendants have stated that they

specifically intend to abandon or alter in the future the current posture and become actively

involved again if local police do not perform in a manner acceptable to the Federal Defendants or

are otherwise unable to secure the federal courthouse in Portland in a manner acceptable to the

Federal Defendants.[6] Whether this current and potentially temporary change in enforcement

tactics affects Plaintiffs' likelihood of irreparable harm is addressed in Section D.2 below.

---

[6] *See, e.g.*, ECF 147-1 at 3 (USMS responding to a Request for Admission that it would
no longer police Portland protests by stating: "USMS cannot know whether state law

## C. Factors for Preliminary Injunctive Relief

### 1. Likelihood of Success on the Merits

Plaintiffs allege both First Amendment retaliation and a violation of their First Amendment right of access.[7] Plaintiffs must show a likelihood of success on the merits (or at least substantial questions going to the merits) on at least one of these two claims. Plaintiffs satisfy this requirement.

### a. First Amendment Retaliation

To establish a claim of First Amendment retaliation, Plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) the Federal Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and

_____

enforcement efforts will continue or whether those efforts will sufficiently protect federal property" and providing a nearly identical response in denying a request for admission that USMS would not engage with journalists or legal observers at a Portland protest); ECF 147-2 at 3 (USMS responding to an interrogatory regarding its plans to remove the additional support personnel sent to Portland: "With respect to the withdrawal of additional personnel deployed to Portland, their withdrawal will depend on unknown future circumstances in Portland and presence of any threat to the federal judiciary or property."); ECF 147-3 at 3 (DHS providing nearly identical responses to the similar Requests for Admission); ECF 147-4 at 4 (DHS responding that the "cessation of Operation Diligent Valor will depend on unknown future circumstances in Portland. . . . The other DHS officers and agents deployed to Portland to assist FPS in the protection of the Hatfield U.S. Courthouse and federal facilities in Portland will remain in Portland until the Department makes an operational security determination that their presence is no longer required to protect federal facilities there."); ECF 147-4 at 3 (DHS affirming as truthful the statements in the press release filed with the Court in ECF 124-1, including the statement from Acting Secretary Chad Wolf that "the increased federal presence in Portland will remain until [DHS] is certain the federal property is safe and a change in posture will not hinder DHS's Congressionally mandated duty to protect it. While the violence in Portland is much improved, the situation remains dynamic and volatile, with acts of violence still ongoing, and no determination of timetables for reduction of protective forces has yet been made. Evaluations remain ongoing.").

[7] Plaintiffs also allege claims under the Fourth Amendment and Oregon's state Constitution, but did not argue those claims in their motion for preliminary injunction. Thus, the Court only considers Plaintiffs' likelihood of success on their First Amendment claims.

(3) the protected activity was a substantial or motivating factor in the Federal Defendants'

conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). For the first

factor, Plaintiffs have shown that they are engaged in constitutionally protected activity under the

First Amendment. Plaintiffs are engaged in newsgathering, documenting, and recording

government conduct. *See, e.g.*, *Leigh*, 677 F.3d at 898 (recognizing First Amendment protection

for "the press and public to observe government activities"); *United States v. Sherman*, 581

F.2d 1358, 1360 (9th Cir. 1978) (noting that the "ability to gather the news" is "clearly within the

ambit of the First Amendment"). The Federal Defendants do not dispute this factor.

Regarding the second factor, the Federal Defendants argue that Plaintiffs' assertion that

they intend to continue to cover the protests in Portland or that they have a continuing fear of

future physical force or threat by the Federal Defendants is subjective and insufficient. The Court

rejects that argument. The enforcement tactics of the Federal Defendants would chill a person of

ordinary firmness from continuing to engage in the protected activity. "Ordinary firmness" is an

objective standard that will not "allow a defendant to escape liability for a First Amendment

violation merely because an unusually determined plaintiff persists in his protected activity."

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). Before the TRO

was in place, Plaintiffs submitted numerous declarations, photographs, and videos describing and

depicting instances when journalists and legal observers were targeted. This includes

Mr. Howard being shot at close range despite complying with a federal officer's order to stay

where he was. It also includes Mr. Kim and Mr. Yau being shot when they were not near

protesters. It further includes Mr. Berger being beaten with a baton.

The Court also has reviewed all of the testimony and videos submitted by Plaintiffs after

the Court issued its TRO. Although some of that evidence is ambiguous or less persuasive, some

of it describes or shows conduct that appears to target journalists and legal observers, as opposed to incidentally or inadvertently reaching them as part of reasonable crowd control or enforcement against violent offenders. This evidence includes a federal officer forcing reporter Ms. Ellis to disperse on July 24, 2020 in a manner that would be intimidating to a reasonable person, despite the Court's TRO providing that press shall not be required to disperse. It also includes a federal officer spraying mace or pepper spray directly into the faces of clearly marked legal observers from only a few feet away. The evidence further includes a federal officer shooting a less lethal munition on July 23rd directly at Mr. Conley and another photographer, both clearly identifiable as press, after shining a bright light on them to identify them, and when the person nearest to them was a clearly identified medic standing behind a shield several feet away. It also includes video from Ms. Molli in the early morning of July 30, 2020, one week after the TRO was issued, showing law enforcement agents firing on a group of journalists when only other law enforcement agents were nearby.

The declarations submitted both before and after the TRO also describe that because of the Federal Defendants' conduct, journalists and legal observers were forced to stop newsgathering, documenting, and observing for minutes, hours, or days due to injury and trauma. This includes Mr. Haberman-Ducey being unable to observe due to his broken hand, Mr. Rudoff being unable to return for two days due to being shot in the leg, Mr. Conley having to take some time away because he could "barely walk" after his injuries, Ms. Elsesser stating that she would refuse further assignments in Portland unless she was provided with a bullet proof vest because of her injuries, Mr. Hollis leaving early after he was shot, and Ms. Jeong leaving earlier than she had planned.

Indeed, some journalists decided never to return because of fear for their personal safety. *See, e.g.*, ECF 81 at 4 (Mr. Steve Hickey stating: "I do not intend to continue covering the protests in Portland after tonight, in part because I am fearful that federal agents will injure me even more severely than they did on the night of July 19 and morning of July 20 when they intentionally shot at my face, twice, when I was not even near any protestors."); ECF 117 at 5 (Ms. Katz stating: "Because of how federal agents treated me, I have stopped covering the Portland protests."). Most of the declarants, however, emphasize that they intend to continue covering or observing the protests despite their fear of continued injury or targeting by the Federal Defendants. This fear is not unreasonable or speculative. Plaintiffs and the other declarants were repeatedly subject to violent encounters with federal officers when covering the Portland protests. It is not hypothetical or mere conjecture. Instead, it is likely that they and other journalists and legal observers will face such treatment again if they cover protests in Portland policed by agents of the Federal Defendants. Moreover, the mere threat of harm, without further action, can have a chilling effect. *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).

The Court recognizes that that there are some violent individuals at these protests, including some who throw dangerous items at law enforcement officers, such as rocks, frozen water bottles, fireworks, and Molotov cocktail-type devices. Law enforcement also face arson events, including in dumpsters and debris being piled and set on fire. The situation can be dangerous and difficult for law enforcement. The fact that there are some violent offenders, however, does not give the Federal Defendants carte blanche to attack journalists and legal observers and infringe their First Amendment rights. *See Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020). Further, many declarants note that they have covered protests in war zones around the world and

in areas with riotous protests such as Hong Kong, Oakland, and Seattle, and have never been subjected to the type of egregious and violent attacks by law enforcement personnel as they have suffered in Portland. If military and law enforcement personnel can engage around the world without attacking journalists, the Federal Defendants can respect Plaintiffs' First Amendment rights in Portland, Oregon.

In addition, the change in enforcement tactics does not serve to remove the chilling effect of the Federal Defendants' conduct for the same reason it does not moot Plaintiffs' claims. It is subject to change without notice and whenever the Federal Defendants assert that it is needed. It also has been the subject of conflicting public statements, which would not give a person of ordinary firmness confidence that the Federal Defendants are not poised and ready to return to the streets of Portland at any moment and to continue with the previous modus operandi.

Regarding the third factor, the Federal Defendants argue that Plaintiffs fail to show that any protected activity was a substantial or motivating factor in any purported conduct. The Federal Defendants assert that in every video submitted by Plaintiffs after the TRO went into effect, every journalist or authorized legal observer who was purportedly targeted was standing between law enforcement officers and protesters and sometimes also standing next to or behind protesters. Thus, argue the Federal Defendants, legal observers and journalists were not being intentionally targeted but merely were "inadvertently" hit. The Federal Defendants conclude that the circumstantial evidence does not support any retaliatory intent, and Plaintiffs have not shown a likelihood of success on the merits.

The Court reaches a different conclusion from the evidence. The issue is not as simple as whether a legal observer is standing "between" law enforcement personnel and protesters. For example, the Court's view of the two videos showing the pepper spray or mace attack on the

legal observers reveals that this evidence supports the finding that journalists or legal observers were targeted and not inadvertently hit. They were standing together along the fence protecting the courthouse. There may have been protesters at some point standing behind them, although not close behind them, based on the video. Thus, the journalists or legal observers may have been "between" the law enforcement at the fence and some set of protesters further back from the fence. But based on the video, it is clear that the pepper spray was not aimed at protesters standing further back from the fence. The spray appears to have been intentionally directed at close range into the faces and eyes of the journalists or legal observers.

Additionally, from the Court's review, there are videos showing journalists not standing in between law enforcement and protesters, yet they also appear to have been targeted by agents of the Federal Defendants. For example, the video from Mr. Conley from July 24, 2020, from the time count of approximately 6:30 to 7:40, supports the finding that he was targeted. Federal agents fired on him when he was not near protesters, after he had repeatedly identified himself as press, after many federal officers had returned to the courthouse and were safe from the volatile situation of apprehending the woman and the man who had attempted to interfere with the woman's apprehension, and after the pan of Mr. Conley's camera showed that the nearest person was another photographer. The next two nearest people were yards away and were on one side a medic behind a shield and on the other side a single protester yelling taunts. A federal officer shone a bright light at Mr. Conley, making his and his neighboring photographer's press status even more identifiable, and then fired at Mr. Conley.

The Court also finds it to be a reasonable interpretation[8] that Ms. Ellis and another journalist were targeted when on July 24, 2020, they were forced to disperse, despite the TRO and their clearly identifiable status as press. Further, the Court finds that the video posted by Ms. Molli from early morning on July 30th supports a finding of targeting. This video shows journalists taking video and pictures of a munition that had been fired by federal officers. There were only a handful of journalists and many law enforcement officers, no protesters. Suddenly, one officer fired a less-lethal munition directly at the journalists recording the events.

Moreover, there are declarations that do not have video. The Federal Defendants do not address these. For example, Ms. Elsesser states that on July 25th she was standing by herself, across the street from the courthouse, with no protesters around when she was shot with a munition in the back of her arm. Ms. Katz states that on July 27th she was attempting to photograph the arrest of a protester when a federal agent physically blocked her. When she took a step to the side to get another angle, he physically shoved her away. These videos and declarations are all circumstantial evidence supporting retaliatory animus.

The Federal Defendants cite two unpublished Ninth Circuit decisions in support of their argument that in responding to some violent offenders in protesting crowds, any incidental burden on the First Amendment rights of journalists and legal observers is acceptable. These unpublished—and thus non-precedential—cases are unpersuasive. The Court follows published Ninth Circuit precedent, including *Collins*, which instructs that the proper response to violence is to arrest the violent offenders, not prophylactically suppress First Amendment rights. *See Collins*, 110 F.3d at 1372.

---

[8] The Court makes no determination regarding clear and convincing evidence needed for a finding of contempt.

The Federal Defendants also argue that they have a formal policy of supporting First Amendment rights and contend that Plaintiffs fail to show otherwise. The Federal Defendants may not, however, hide behind a formal policy if in practice they do not conform to that policy. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (en banc) (noting that a defendant cannot escape its "actual routine practices" by "pointing to a pristine set of policies"). At this stage of the litigation, the Court is persuaded by the number of alleged acts and the expert testimony of Mr. Kerlikowske that the conduct of the federal officers has not been reflective of a policy or practice of respecting First Amendment rights. Mr. Kerlikowske opines that the federal officers repeatedly have engaged in excessive force against journalists and legal observers, have not used appropriate crowd control tactics, and improperly have fired at the head, heart, and backs of journalists and legal observers when such conduct is generally not permitted. Even the Federal Defendants' own witnesses have conceded that shooting persons in such a manner is inappropriate. *See, e.g.*, ECF 136-2 at 13, FPS 824 Dep. Tr. 34:14-21 (testifying that shooting a person in the back who is not doing anything violent is not appropriate); ECF 136-3 at 8, CBP NZ-1 Dep. Tr. 37:18-25 (testifying that shooting a person in the back is not something that an agent or officer should do). Mr. Kerlikowske also opines that the augmented federal force deployed in Portland does not have the appropriate training for policing urban protests and crowd control and does not have the appropriate supervision and leadership. The Court finds these opinions persuasive, and they provide further circumstantial evidence of retaliatory intent.

In sum, Plaintiffs provide substantial circumstantial evidence of retaliatory intent to show, at the minimum, serious questions going to the merits. Plaintiffs submit numerous declarations and other video evidence describing and showing situations in which the declarants

PAGE 40 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

were identifiable as press, were not engaging in unlawful activity or even protesting, were not standing near protesters, and yet were subjected to violence by federal agents under circumstances that appear to indicate intentional targeting. Contrary to the Federal Defendants' arguments, this evidence does not show that the force used on Plaintiffs was merely an "inadvertent" consequence of otherwise lawful crowd control. Also, Plaintiffs submit expert testimony opining about repeated instances of excessive force being used against journalists and legal observers and failures of training and leadership with the augmented federal force sent to Portland, which is further circumstantial evidence supporting Plaintiffs' claim. Thus, Plaintiffs' have shown the elements of First Amendment retaliation.

### b.  Right of Access to Public Streets and Sidewalks

The First Amendment prohibits any law "abridging the freedom of speech, or of the press[.]" U.S. Const., amend. I. Although the First Amendment does not enumerate special rights for observing government activities, "[t]he Supreme Court has recognized that newsgathering is an activity protected by the First Amendment." *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see Branzburg*, 408 U.S. at 681 ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

As the Ninth Circuit has explained: "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Leigh*, 677 F.3d at 898. By reporting about the government, the media are "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (Burger, C.J., announcing judgment); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). As further described by the Ninth Circuit, "[w]hen wrongdoing is

underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate."
*Leigh*, 677 F.3d at 900 (quoting Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV. 927, 949 (1992) (alteration in original) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence.")).

The Federal Defendants argue that journalists have no right to stay, observe, and document when the government "closes" public streets. This argument is not persuasive. First, the Federal Defendants are not the entities that "close" state and local public streets and parks; that is a local police function.[9] Second, the point of a journalist observing and documenting government action is to record whether the "closing" of public streets (*e.g.*, declaring a riot) is lawfully originated and lawfully carried out. Without journalists and legal observers, there is only the government's side of the story to explain why a "riot" was declared and the public streets were "closed" and whether law enforcement acted properly in effectuating that order. Third, the Federal Defendants have not shown that any journalist or legal observer has harmed any federal officer or damaged any federal property, and if any journalist, legal observer, or person masquerading as a journalist or legal observer were to attempt to do so, the preliminary injunction would not protect them. Thus, the stated need to protect federal property and the safety of federal officers is not directly affected by allowing journalists and legal observers to stay, observe, and record events.

The Federal Defendants argue that Plaintiffs improperly rely on *Press-Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1 (1986), to articulate the standard to apply in

---

[9] *See* n.2, *supra*.

evaluating likelihood of success in Plaintiffs' claim of right of access. The Court rejects this aregument.

In *Press-Enterprise II*, the Supreme Court established a two-part test for a claim of violation of the right of access. First, the court must determine whether a right of access attaches to the government proceeding or activity by considering whether the place and process have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise II*, 478 U.S. at 8-9. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. at 9 (citation omitted); *see also Leigh*, 677 F.3d at 898 (discussing *Press-Enterprise II*). The public streets, sidewalks, and parks historically have been open to the press and general public,[10] and public observation of law enforcement activities in these public fora plays a significant positive role in ensuring conduct remains consistent with the Constitution.

The Federal Defendants argue that they have a strong and overriding government interest in protecting federal property. The Court agrees that protecting federal property is a strong

---

[10] The Federal Defendants argue that the proper question is whether there historically was access after the closure order that is at issue—the unlawful assembly declaration and dispersal order. The Court disagrees that access is evaluated after the closure that is challenged. Access is considered before the closure that is challenged to determine whether the closure is unduly burdening First Amendment rights. For example, the Supreme Court in *Press-Enterprises II* did not evaluate whether the press and public had access to preliminary criminal proceedings that were subject to a legitimate closure order, but whether they had access to preliminary criminal proceedings generally. 478 U.S. at 10. Even if the Federal Defendants' assertion of how to frame the first question in *Press-Enterprises II* is correct, however, as noted above, it is not at issue in this motion because the City previously has stipulated that even after it has declared an unlawful assembly and issued a lawful dispersal order on state and local property, journalists and authorized legal observers may remain.

government interest, but the Federal Defendants must craft a narrowly tailored response to achieve that government interest without unreasonably burdening First Amendment rights. The Federal Defendants simply assert that dispersing everyone is as narrowly tailored as possible and to allow anyone to stay after a dispersal order is not practicable or workable. The record, however, belies this assertion.

The City, by stipulated preliminary injunction, does not require journalists and authorized legal observers to disperse, even when there has been an otherwise lawful general order of dispersal. After issuing the first TRO directed against the City, the Court specifically invited the City to move for amendment or modification if the original TRO was not working or to address any problems at the preliminary injunction phase. Instead, the City *stipulated* to a preliminary injunction that was nearly identical to the original TRO, with the addition of a clause relating to seized property. The fact that the City did not ask for any modification and then stipulated to a preliminary injunction is compelling evidence that exempting journalists and legal observers is workable.[11] Moreover, the City supports Plaintiffs' request for an injunction against the Federal Defendants, both the TRO and this preliminary injunction. Additionally, as discussed previously, Plaintiffs' expert witness Mr. Kerlikowske provides qualified, relevant, and persuasive testimony

---

[11] At oral argument, counsel for the City noted that the City might request from Plaintiffs a possible modification to the stipulated preliminary injunction. The City noted it had encountered some issues with persons with "press" markings intermingling with protesters and interfering with law enforcement. The Federal Defendants argue that this is "proof" that the preliminary injunction is "unworkable." Whether the City might request a modification at some point in the future, however, is not evidence of unworkability. Additionally, the City's stipulated preliminary injunction does not contain the indicia of journalists and legal observers that they "stay to the side" and not intermix with protesters, which is included in the preliminary injunction below, and does not contain the express prohibition on press and legal observers impeding, blocking, or interfering with law enforcement activities, which also is included below. Further, the fact that there might be room for improvement of a preliminary injunction does not make it unworkable. The Court is mindful not to let the perfect be the enemy of the good.

showing that the relief provided in the TRO against the Federal Defendants is workable. He also explains that during his tenure in Seattle, law enforcement did not target or disperse journalists and there were no adverse consequences. Numerous declarants also testified that they were not dispersed during protests in other locations. Thus, it is workable and feasible to disperse protesters generally but not require the dispersal of journalists and authorized legal observers. The Federal Defendants' blanket assertion that federal officers must disperse everyone is rejected.

Further, the Federal Defendants' objections to the workability of the TRO primarily focus on concerns regarding when journalists and legal observers "intermingle" with protesters. The first concern is that federal officers will violate the injunction if a journalist or legal observer is subject to crowd control tactics when mixed with the crowd. The preliminary injunction contains protections for this scenario. It adds, different from the TRO, the indicia of a journalist and legal observer that they stay to the side of the protest and not intermix with protesters. It also retains the protection for law enforcement that the incidental exposure of journalists and legal observers to crowd control devices is not a violation of the injunction.

The Federal Defendants' second concern with the intermingling of journalists and legal observers and protesters is that journalists and legal observers may interfere with law enforcement, particularly if allowed to stay after dispersal order. The preliminary injunction, however, retains the TRO's instruction that journalists and legal observers must comply with all laws other than general dispersal orders. For further clarity, the preliminary injunction expressly adds the provision that journalists and legal observers may not impede, block, or otherwise interfere with the lawful conduct of the federal officers.

The Federal Defendants also express concern that persons may disguise themselves as press and commit violent or illegal acts. The preliminary injunction, however, does not protect anyone who commits an unlawful act. The Federal Defendants have the same authority to arrest or otherwise engage with persons who commit unlawful acts, regardless of their clothing. Moreover, most of this concern expressed by the Federal Defendants focuses on persons self-identifying as press who are mixed with protesters or interfering with law enforcement. The preliminary injunction's addition of the indicia of press as staying to the side and not intermixing with protesters and express prohibition on interfering with law enforcement further addresses this concern. Further, Mr. Kerlikowske's declarations containing his expert opinions are persuasive in discounting this possibility.

The Federal Defendants also argue that requiring federal officers to wear larger unique identifying markings is not workable and is not connected to Plaintiffs' claims in this case. The Federal Defendants assert that such markings will interfere with an officer's ability to reach necessary equipment and are unnecessary because most officers already wear some unique identifying number somewhere on their uniform. The Federal Defendants were unable, however, to identify specific officers from videos when asked to do so by the Court. The current identifying markings are not of sufficient visibility. The Court does not find it credible that there is no possible location on the helmet or uniforms on which more visible markings can be placed. The Court is persuaded by Mr. Kelikowske's expert opinion that unique identifying markings are feasible, important, and will not interfere with the federal officers' ability to perform their duties. The Court also finds that such a requirement is related to Plaintiffs' claims because, as noted by Mr. Kerlikowske, these markings would deter the very conduct against which Plaintiffs have filed suit.

At this stage of the lawsuit, there are at least serious questions regarding Plaintiffs' right of access, whether the government will be able to meet its burden to overcome that right of access, the federal officers' tactics directed toward journalists and other legal observers, and whether restrictions placed upon them by the Federal Defendants are narrowly tailored. Thus, Plaintiffs' meet this factor for their claim alleging a violation of their right of access.

### 2. Irreparable Harm

Plaintiffs also must show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *See Winter*, 555 U.S. at 20. The Ninth Circuit has explained that "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original) (simplified).

The Federal Defendants argue that Plaintiffs face no threat of immediate injury, particularly because of the changed enforcement tactics. The Federal Defendants assert that Plaintiffs have provided no evidence that the chances of encountering a federal officer at a protest is higher in August 2020 than it was in August 2019 or August 2018.

The Federal Defendants' latter assertion is without merit. The Federal Defendants have sent numerous additional federal officers to Portland with the stated mission to protect federal property and persons. Plaintiffs provide evidence that these officers routinely have left federal property and engaged in crowd control and other enforcement on the streets, sidewalks, and parks of the City of Portland. Plaintiffs' expert Mr. Kerlikowske opines that the federal officers and supervisors have insufficient and improper experience and leadership to handle the conditions during the Portland protests. Additionally, Plaintiffs provide evidence that the

augmented federal police force has remained in Portland, that it will stay in Portland ready to

deploy at any moment, and that there are no plans for any officers to withdraw from Portland, at

least not until it is "certain" that federal property is "safe." This provides significant evidence

that journalists and legal observers are more likely to encounter a federal officer during a protest

in August 2020 than in 2019 or 2018, when there was no augmented federal police force or

Operation Diligent Valor.

Regarding the Federal Defendants' argument that the voluntary change in tactics has

decreased the immediacy of any claim of injury, thereby mitigating irreparable harm, the Ninth

Circuit has rejected a similar argument. In *Boardman*, the defendants argued that there was no

immediate danger of harm because the defendants had voluntarily ceased certain conduct. 822

F.3d at 1023. The defendants had voluntarily terminated a disputed merger and entered into a

stipulation not to enter into a purchase transaction while the Oregon Attorney General's

investigation was ongoing. *Id.* The stipulation was terminable upon 60-days' notice to the

District Court and the Oregon Attorney General. The Ninth Circuit concluded that the District

Court did not abuse its discretion in finding irreparable harm. *Id.*

The Ninth Circuit focused on the fact that the voluntarily stipulation was terminable with

60-days' notice, the defendants had a history of negotiating in secret, the stipulation was limited

to a "purchase transaction" and the transaction could take other contractual forms, and the

exclusive marketing agreement between the two defendants had expired (thereby incentivizing a

merger). *Id.* The Ninth Circuit noted: "A threat of irreparable harm is sufficiently immediate to

warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a

decision on the merits can be rendered.'" *Id.* (quoting *Winter*, 555 U.S. at 22). For the plaintiff to

be injured in *Boardman*, the defendants would have had to give 60-days' notice and then not

have the district court otherwise intervene, or negotiate in secret and reach a form of deal not

considered a "purchase agreement," or other steps that arguably were attenuated or provided the

plaintiffs some opportunity to request emergency relief. Nonetheless, the Ninth Circuit agreed

that the potential injury was immediate and irreparable for purposes of preliminary injunctive

relief.

Plaintiffs' irreparable injury here is not nearly as attenuated as *Boardman* and indeed is

much more immediate because it could happen without any prior notice to the Court. The Court

has already found that Plaintiffs face irreparable harm from the Federal Defendants' conduct.[12]

---

[12] The Federal Defendants cite *Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997), for the proposition that claims alleging First Amendment retaliation are not entitled to a presumption of irreparable harm. *Rendish* involved a public employee who was terminated and alleged First Amendment retaliation. *Id.* at 1218. The district court found that the plaintiff was *not* likely to succeed on the merits of her claim. *Id.* at 1226. The Ninth Circuit concluded: "Because the district court's assessment that Rendish did not show a likelihood of success was accurate, it did not abuse its discretion in finding no irreparable harm based on a loss of her constitutional rights." *Id.* The court rejected the plaintiff's argument that despite the district court's conclusion that the plaintiff would not have succeeded on the merits, the district court was required to presume irreparable harm, noting that there is no such presumption. *Id.*

*Rendish* provides no support for the contention that when a court concludes that plaintiffs *are* likely to succeed on the merits of a claim that their constitutional rights have been violated, the plaintiffs are not entitled to a presumption of irreparable harm. Indeed, the opposite is true. *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'" (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005)) (affirming grant of preliminary injunction); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (noting that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and reversing and remanding for entry of preliminary injunction (alteration in original) (quoting *Elrod*)); *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) ("Both this court and the Supreme Court have repeatedly held that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (simplified) (reversing and remanding for entry of preliminary injunction)); *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, 2020 WL 3128299, at *4 (W.D. Wash. June 12, 2020) (citing *Melendres* and *Otter* and finding irreparable harm for First Amendment retaliation claims because "[t]he use of less-lethal, crowd control weapons has

After the Court's initial finding of irreparable harm to support the TRO, Plaintiffs provided even more evidence that journalists' First Amendment rights have been chilled, including declarations in which journalists describe being subject to less lethal munitions that required the journalist to stop covering the protests for the night or for some period of time, or chilled the journalist from returning to cover the protests in the future. *See, e.g.*, ECF 88 at 2 (Ellis Decl. ¶ 6, "Federal agents prevented me from doing my job twice on the night of July 23-24."); ECF 89 at 4 (Elsesser Decl. ¶ 13, "If I am asked to cover the protests again, I would refuse unless I had a bulletproof vest (which are in short supply in Portland at the moment) to wear because I am fearful that federal agents would injure me or worse."); ECF 91 at 3 (Hollis Decl. ¶ 8, "After the federal agents shot me, I turned and ran and returned to my hotel."); ECF 116 at 3 (Jeong Decl. ¶¶ 7-8, noting that because she was shoved down to the ground by a federal officer she "ultimately left much earlier than I had planned" with respect to covering that night's protest); ECF 117 at 5 (Katz Decl. ¶ 15, "Because of how federal agents treated me, I have stopped covering the Portland protests.").

---

already stifled some speech even if momentarily"); *Freedom for Immigrants v. U.S. Dep't of Homeland Sec.*, 2020 WL 2095787, at *5 (C.D. Cal. Feb. 11, 2020) ("Because FFI has demonstrated that DHS's conduct likely contravenes its First Amendment rights, FFI satisfies the irreparable harm requirement for preliminary injunctive relief."); *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 938-39 (C.D. Cal. 2019) ("In this case, Plaintiffs have sufficiently demonstrated that they are likely to be deprived of their First Amendment rights—the deprivation of which is 'well established' to constitute irreparable harm. Defendants' primary argument to the contrary is that Plaintiffs have not provided admissible evidence of irreparable harm. But Plaintiffs have provided ample evidence of a likely First Amendment violation, which is enough to satisfy the *Winter* standard." (citations omitted) (granting preliminary injunction)); *see also* 11A Charles Alan Wright, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Plaintiffs have demonstrated that they are likely to be deprived of their First Amendment rights and that is sufficient to show irreparable harm.

The only change is the Federal Defendants' "agreement" with Oregon Governor Kate Brown and voluntarily cessation of certain enforcement tactics. This change in enforcement is replete with caveats. It is terminable at any time and without any notice to this Court or Plaintiffs if the Federal Defendants believe that federal property or persons are not secure. *See* n. 6, *supra*. It is also subject to the federal officers being able to leave the building at any time for a specific incident of enforcement, even if the agreement itself has not changed. For example, although the federal officers' modified enforcement role was announced on July 29, 2020, to begin the next day, Plaintiffs have submitted testimony and video evidence from that night (to be precise, from the early morning on July 30, 2020), of federal officers firing tear gas and flash bang munitions at journalists. *See* ECF 118 at 4. There was no one nearby on the street but numerous federal enforcement officers and six journalists when the munitions were deployed.

Moreover, the Federal Defendants have emphatically and repeatedly denied that they have engaged in any wrongful or unlawful conduct. Thus, there is no indication that their crowd control tactics, which the Court has already found to support both a finding of success on the merits and likelihood of irreparable harm, and which Plaintiffs' expert has characterized as including excessive force, would change if they re-engage in crowd control enforcement and the Court's injunctive relief is no longer in place.

Indeed, the Court has serious concerns that the Federal Defendants have not fully complied with the Court's original TRO. The Court has reviewed all of the testimony and videos submitted by Plaintiffs after the Court issued its TRO, and although some of the evidence is ambiguous or less persuasive, some of the evidence describes and shows at least some conduct that appears to target journalists and legal observers, as opposed to incidentally or inadvertently reaching them as part of crowd control or enforcement against violent offenders.

PAGE 51 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

Further, the Court does not agree with the Federal Defendants that given the magnitude of irreparable injury at stake in this case, the Court is required to wait until new and additional irreparable injury is inflicted on Plaintiffs to issue prospective injunctive relief. As the Ninth Circuit emphasized in *Boardman*, a threat of irreparable injury is sufficiently immediate if it is likely to occur before a decision on the merits can be issued. *Boardman*, 822 F.3d at 1023. Given the Federal Defendants' public statements and discovery responses relating to Operation Diligent Valor, the current situation relating to the protests in Portland, and the current situation regarding the local police presence in Portland, the Court finds that it is sufficiently likely that federal officers will re-engage in "protecting federal property and persons" and will return to enforcement tactics before a decision on the merits in this case can be issued. Thus, Plaintiffs have sufficiently shown irreparable injury.

Moreover, the Court takes guidance from the Supreme Court and Ninth Circuit's discussions regarding the Court's authority relating to issuing injunctions generally and predicting future violations in this context. The Supreme Court has noted that in addition to a court retaining the ability to hear a case after voluntarily cessation (considerations of mootness), "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* In making this determination, the district court's "discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.* The Ninth Circuit has

discussed "the factors that are important in predicting the likelihood of future violations" as

follows:

> the degree of scienter involved; the isolated or recurrent nature of
> the infraction; the defendant's recognition of the wrongful nature
> of his conduct; the extent to which the defendant's professional
> and personal characteristics might enable or tempt him to commit
> future violations; and the sincerity of any assurances against future
> violations.

*Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989). These factors are in

addition to "the commission of past illegal conduct, [which] is highly suggestive of the

likelihood of future violations." *Id.*

Considering these factors, whether as articulated by the Supreme Court in *W.T. Grant* or

the Ninth Circuit in *Furgatch*, the Federal Defendants' voluntary cessation of conduct[13] does not

demonstrate effective discontinuance and serious questions remain with respect to the likelihood

of Plaintiffs' future injury. In addition, under the *W.T. Grace* factors, there has been no expressed

intent by the Federal Defendants to comply with the Court's TRO. To the contrary, the Federal

Defendants have stated that the order is "offensive" and that it "shouldn't affect anything [the

Federal Defendants are ] doing" in Portland. ECF 147-6 at 3 (statement by Acting Deputy

---

[13] The Federal Defendants argue that they have not voluntarily ceased conduct because
they dispute that they have engaged in any unlawful conduct. Regardless of how they
characterize the lawfulness of their conduct, however, their argument is that because of the
changed circumstances, Plaintiffs can no longer show irreparable injury. The changed
circumstances on which the Federal Defendants rely, however, is the agreement between state
and federal authorities that the federal officers would "stay in the building" and state and local
police would take over more direct policing. The specifics of this agreement have been redacted
by the Federal Defendants. *See* ECF 147-8 at 2. According to White House Senior Advisor
Stephen Miller, however, the agreement does not include a "phased withdrawal." ECF 147-5
at 2. Nonetheless, this agreement and the Federal Defendants' voluntary change in enforcement
as a result of the agreement is the voluntary cessation triggering the changed circumstances on
which the Federal Defendants rely. Thus, the Court must analyze whether it supports the Federal
Defendants' assertion that there no longer exists a cognizable risk of recurrent violations.

Secretary Ken Cuccinelli). Also, as reflected in Plaintiffs' motion for contempt, despite the issuance of the TRO, the Federal Defendants appear to have engaged in at least some conduct that continues to target journalists and legal observers in violation of the Court's TRO. This raises concerns regarding future conduct if there is no injunction in place, because even with a Court order in place, improper conduct appears to have continued. Regarding the effectiveness of the Federal Defendants' stated discontinuance, as discussed above, it is not very effective while the out-of-town federal agents remain in Portland because the discontinuance is terminable at will by the Federal Defendants and, thus, only temporary. Finally, the character of the recent past violations by the Federal Defendants in Portland is particularly egregious.

Considering the Ninth Circuit's *Furgatch* factors, first, the Federal Defendants' past violations are highly suggestive of future harm. Second, the degree of scienter involved is high for violations triggering the requested injunctive relief, because it relates to targeting of journalists and legal observers and not merely incidental harm to them during crowd control. Further, because Plaintiffs agreed to the modification to the injunction that journalists and legal observers stay to the side, the risk of incidental targeting is diminished. Third, the occurrences were not isolated—Plaintiffs provided significant evidence of numerous journalists and legal observers who were targeted by the Federal Defendants. Indeed, several of the witnesses have experience reporting in war zones around the world and at violent protests in Hong Kong, Oakland, and Seattle. They emphasize how they have never been shot at or tear gassed until coming to Portland. Fourth, the Federal Defendants have not recognized the wrongful nature of their conduct but instead assert that they have only engaged in lawful conduct. They have not disciplined any federal agent or officer for any conduct. They moved to dissolve the TRO after Plaintiffs moved for contempt. The Federal Defendants, unlike the City of Portland, also did not

stipulate to preliminary injunctive relief. Fifth, given the disdainful comments publicly made by the highest officials at the Federal Defendants with respect to journalists, legal observers, Plaintiffs, protesters, and the City of Portland, the professional and personal characteristics of the Federal Defendants show that they are likely to be enabled or tempted to engage in future violations. Finally, there have not been sincere assurances given against future violations. Accordingly, considering these factors, the Court finds that Plaintiffs have made a sufficient showing of threatened future violations by the Federal Defendants causing sufficiently likely irreparable injury to Plaintiffs before a decision on the merits can be issued.

### 3. Public Interest and Balance of the Equities

When the government is a party, the last two factors of the injunction analysis merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Regarding the public interest, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment). Regarding balancing the equities, when a plaintiff has "raised serious First Amendment questions," the balance of hardships "tips sharply in [the plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (alterations in original) (quotation marks omitted).

The Federal Defendants argue that the normal evaluation of these factors in favor of a plaintiff who is likely to succeed on a First Amendment claim does not apply in this case because the government's countervailing interests outweigh Plaintiffs' First Amendment concerns. The Federal Defendants assert the government's interest in protecting federal property, ensuring the

safety of federal officers and other personnel, maintaining public order on federal property, and securing the federal courthouse so that it remains open and accessible to the public. The first three relate to protecting the courthouse and federal officers, and the final interest relates to providing access to the public.

Regarding protection of the courthouse and officers, the Federal Defendants rely on evidence that persons self-identifying as press have engaged in purported misconduct. The Court has reviewed all the video and other evidence submitted by the Federal Defendants in support of their contentions relating to alleged misconduct of persons self-identifying as press after the issuance of the TRO on July 23, 2020. Much of this evidence is ambiguous or shows that persons self-identifying as press have intermixed with protesters, have run toward the fence around the federal courthouse and stopped, have not actually been press but merely donned clothing (for one night) marked "press" hoping to avoid violence by federal officers, or simply have stood by while unlawful conduct was engaged in by others. This is not unlawful conduct.

There is evidence, however, that a few individual persons wearing press indicia on their clothing or hats or helmets (often handwritten), who generally are described by the Federal Defendant declarants as not otherwise engaging in any conduct such as reporting, notetaking, photographing, or recording, have engaged in the following activities: entering courthouse property after the fence was breached and encouraging others to do the same; helping another person to breach the fence; shining a flashlight at a police helicopter; kicking a police officer; shielding protesters from law enforcement; and throwing an object at law enforcement. This is inappropriate conduct, and much of it may be unlawful. The Court shares the Federal Defendants' concerns for the safety of federal officers, particularly considering the more than 100 injuries that have been sustained by federal offices to date. But as discussed above in the

context of workability, the preliminary injunction does not protect unlawful conduct, and federal officers may arrest anyone, even persons with indicia of press, who are engaging in such conduct.

Further, the preliminary injunction has provisions that expressly address these concerns, including providing that one indicia of press or authorized legal observer status is that they stay to the side and do not intermix with protesters and that press and legal observers may not impede, block, or interfere with law enforcement. Concern over potential unlawful conduct thus does not alter the analysis of traditional public interest factors or the balance of equities.

Moreover, the Court must balance and weigh the equities and public interest. The fact that a few people may have engaged in some unlawful conduct does not outweigh the important First Amendment rights of journalists and legal observers and the public for whom they act as surrogates. Further, there is no evidence that any of the named Plaintiffs engaged in any of the purported unlawful conduct described by the Federal Defendants.

The Federal Defendants' final argument is that the government's interest in preserving physical access to courts outweighs Plaintiffs' interests. That argument also is without merit. The relevant protests are happening after business hours, and there is no indication that allowing journalists and legal observers to stay despite a general dispersal order interferes with public access. Thus, none of the government's proffered interests outweigh the public's interest in receiving accurate and timely reporting, video, and photographic information about the protests and how law enforcement is treating protestors. There also is no need to alter the traditional analysis recognizing the significant public interest in First Amendment rights and that in such cases the balance of the equities tips sharply in favor of the plaintiff. *See Otter*, 682 F.3d at 826; *Cmty. House*, 490 F.3d at 1059.

**4.  Conclusion**

The Court GRANTS Plaintiffs' motion for preliminary injunction against the Federal

Defendants (ECF 134) and Orders as follows:

**PRELIMINARY INJUNCTION**

1.      The Federal Defendants, their agents and employees, and all persons acting under

their direction are enjoined from arresting, threatening to arrest, or using physical force directed

against any person whom they know or reasonably should know is a Journalist or Legal Observer

(as explained below), unless the Federal Defendants have probable cause to believe that such

individual has committed a crime. For purposes of this Order, such persons shall not be required

to disperse following the issuance of an order to disperse, and such persons shall not be subject

to arrest for not dispersing following the issuance of an order to disperse. Such persons shall,

however, remain bound by all other laws. No Journalist or Legal Observer protected order this

Order, however, may impede, block, or otherwise physically interfere with the lawful activities

of the Federal Defendants.

2.      The Federal Defendants, their agents and employees, and all persons acting under

their direction are further enjoined from seizing any photographic equipment, audio- or video-

recording equipment, or press passes from any person whom they know or reasonably should

know is a Journalist or Legal Observer (as explained below), or ordering such person to stop

photographing, recording, or observing a protest, unless the Federal Defendants are also lawfully

seizing that person consistent with this Order. Except as expressly provided in Paragraph 3

below, the Federal Defendants must return any seized equipment or press passes immediately

upon release of a person from custody.

3.      If any Federal Defendant, their agent or employee, or any person acting under

their direction seize property from a Journalist or Legal Observer who is lawfully arrested

consistent with this Order, such Federal Defendant shall, as soon thereafter as is reasonably possible, make a written list of things seized and shall provide a copy of that list to the Journalist or Legal Observer. If equipment seized in connection with an arrest of a Journalist or Legal Observer lawfully seized under this Order is needed for evidentiary purposes, the Federal Defendants shall promptly seek a search warrant, subpoena, or other court order for that purpose. If such a search warrant, subpoena, or other court order is denied, or equipment seized in connection with an arrest is not needed for evidentiary purposes, the Federal Defendants shall immediately return it to its rightful possessor.

4.       To facilitate the Federal Defendants' identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass, carrying professional gear such as professional photographic equipment, or wearing a professional or authorized press badge or other official press credentials, or distinctive clothing, that identifies the wearer as a member of the press. It also shall be an indicium of being a Journalist under this Order that the person is standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements. These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order. The Federal Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not carry or wear a press pass, badge, or other official press credential, professional gear, or distinctive clothing that identifies the person as a member of the press.

5.       To facilitate the Federal Defendants' identification of Legal Observers protected under this Order, the following shall be considered indicia of being a Legal Observer: wearing a

PAGE 59 – OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

green National Lawyers Guild-issued or authorized Legal Observer hat (typically a green NLG hat) or wearing a blue ACLU-issued or authorized Legal Observer vest. It also shall be an indicium of being a Legal Observer protected under this Order that the person is standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements.

6.      The Federal Defendants are not precluded by the Order from issuing otherwise lawful crowd-dispersal orders for a variety of lawful reasons. The Federal Defendants shall not be liable for violating this injunction if a Journalist or Legal Observer is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed after the issuance of an otherwise lawful dispersal order.

7.      Plaintiffs and the Federal Defendants shall promptly confer regarding how the Federal Defendants can place unique identifying markings (using numbers and/or letters) on the uniforms and/or helmets of the officers and agents of the Federal Defendants who are specially deployed to Portland so that they can be identified at a reasonable distance and without unreasonably interfering with the needs of these personnel. Based on the Court's understanding that Deputy U.S. Marshals and Courtroom Security Officers stationed in Portland who are under the direction of the U.S. Marshal for the District of Oregon are not part of the force that has given rise to events at issue in the lawsuit, they are exempt from this requirement. Agents wearing plain clothes and assigned to undercover duties also are exempt from this requirement. If the parties agree on a method of marking, they shall submit the terms of their agreement in writing to the Court, and the Court will then issue a modified preliminary injunction that incorporates the parties' agreement. If the parties cannot reach agreement within 14 days, each party may submit its own proposal, and each side may respond to any other party's proposal

within seven days thereafter. The Court will resolve any disputes on this issue and modify this preliminary injunction appropriately.

8.     To promote compliance with this Preliminary Injunction, the Federal Defendants are ordered to provide copies of the verbatim text of the first seven provisions of this Preliminary Injunction, in either electronic or paper form, within 14 calendar days to: (a) all employees, officers, and agents of the Federal Defendants currently deployed in Portland, Oregon (or who later become deployed in Portland, Oregon while this Preliminary Injunction is in force), including but not limited to all personnel in Portland, Oregon who are part of Operation Diligent Valor, Operation Legend, or any equivalent; and (b) all employees, officers, and agents of the Federal Defendants with any supervisory or command authority over any person in group (a) above.

9.     Plaintiffs need not provide any security, and all requirements under Rule 65(c) of the Federal Rules of Civil Procedure are waived.

10.     The Court denies the oral motion by the Federal Defendants to stay this preliminary injunction.

**IT IS SO ORDERED**.

DATED this 20th day of August, 2020.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge