ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JOSHUA E. GARDNER
Special Counsel
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*, <br><br>　　　　Plaintiffs. <br><br><br> v. <br><br> CITY OF PORTLAND, *et al.*, <br><br>　　　　Defendants. | Case No. 3:20-cv-1035-SI <br><br> **FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS** |

## INTRODUCTION

Federal Defendants have repeatedly been called upon to respond to the proposal, first made by this Court and later adopted by Plaintiffs, that this Court should redesign the uniforms of federal law enforcement officers in Portland. The Plaintiffs have never alleged or offered evidence that the lack of larger unique identifying markers has injured their First Amendment rights or poses some risk of First Amendment injury in the future. Indeed, federal law enforcement officers already have unique identifying markers on their uniforms. And Federal Defendants have repeatedly offered unrebutted evidence showing the serious problems that would be posed by dictating federal uniform policy from the bench. Against that, Plaintiffs have offered only two sentences from a retired police chief, who asserts without elaboration that unique identifying markers generally "increase transparency and accountability, promote good behavior and deter misconduct" and would "not impede the officers' abilities to do their jobs." ECF No. 135 at 13. That declaration did not assert that existing unique identifying markers were inadequate, and it did not identify or address any of the evidence submitted by Federal Defendants showing that the proposed modification of the uniforms was unnecessary, inappropriate, and ultimately dangerous.

Nevertheless, this Court has instructed the parties to "confer regarding how the Federal Defendants can place unique identifying markings (using numbers and/or letters) on the uniforms and/or helmets of the officers and agents of the Federal Defendants who are specially deployed to Portland so that they can be identified at a reasonable distance and without unreasonably interfering with the needs of these personnel." ECF No. 157 at 60. The parties conferred, and Plaintiffs repeated the proposal from their preliminary injunction briefing that officers use an unspecified paint over their uniforms and operational gear to identify themselves. ECF No. 144

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 1

at 24–25. Federal Defendants presented information from DHS relating to that proposal. Plaintiffs responded that hook-and-loop fasteners ("Velcro") could also be used to affix markers to the chest. Because the parties have been unable to "reach agreement within 14 days," DHS now "submit[s] its own proposal." ECF No. 157 at 60.

In the interest of mitigating the serious and unjustified damage that is unavoidable from the proposed judicial intrusion into the Executive Branch's prerogative of outfitting federal law enforcement officers, Federal Defendants believe that any proposal adopted by this Court should take into account the important law enforcement interests at stake that are outlined in this submission. But Federal Defendants believe the soundest proposal would be to defer to the agencies' current uniform design, which already accommodates the use of agencies' existing unique identifying markers.

## ARGUMENT

The DHS law enforcement components who are deployed to Portland have identified serious operational concerns that this Court should take into account if it chooses to modify federal law enforcement officers' uniforms. Plaintiffs have failed to adequately account for these limitations, although Federal Defendants contend that the current uniforms already have the ability to display unique identifying markers that reflect the expert judgment of law enforcement agencies regarding what identifiers are feasible in accordance with operational needs. Federal Defendants also renew their argument that a preliminary injunction term addressed to federal uniforms would be unjustifiable under both the facts and the law.

**I.    The Concerns Identified by Federal Defendants Caution Against Uniform Modifications**

**A.    Federal Defendants have identified serious concerns with the proposed modifications.**

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 2

Throughout this litigation, Federal Defendants have identified problems that would arise from court-ordered modification of federal law enforcement officers' uniforms. The evidence in this case, including the declarations submitted with this filing, shows that there are numerous serious considerations that would need to factor into any modification of federal law enforcement officers' uniforms. If this Court decides to impose redesigns of federal law enforcement uniforms, that modification of the preliminary injunction must take account of the vital concerns implicated by that decision.

Preliminarily, officers must be able to access all operational gear. As discussed at length in Federal Defendants' declarations, a great deal of the officers' body is covered by equipment for communications, first aid, nonlethal force, and restraint, and other items. *See, e.g.*, ECF No. 113-4 at ¶¶ 4–5; ECF No. 113-5 at ¶¶ 5–6; ECF No. 113-6 at ¶¶ 4–5; ECF No. 138-5 at ¶ 5. Any proposal that would obstruct that operational gear is unjustifiably dangerous to law enforcement officers and to the public. Plaintiffs' assertion that ample physical space remains free on federal officers' torsos for large identifying markers lacks support in the record. Indeed, Plaintiffs' own selective presentation of the evidence belies their assertions. For example, Plaintiffs reproduce a picture of a ballistic-vest-clad officer from a past declaration, ECF No. 138-5, and use a photo-editing program to superimpose a large number "10" over the pictured officer's ballistic vest. ECF No. 144 at 25. But the very next photo in that declaration, which features the officer with the addition of his other equipment, shows exactly the problem described in the text of that declaration—the officer's entire front is covered with "intermediate use of force tools, mechanical restraints, and/or communications." ECF No. 138-5 at ¶ 5. And the declarations submitted with this filing reiterate that large markings on officers' chests would necessarily cover vital operational equipment. Decl. of David Olson, Assistant Director, Federal Protective

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 3

Service Rapid Protection Force ¶ 4(b) (Exhibit 1); Decl. of CBP SOG-1 ¶¶ 5–6 (Exhibit 2); Decl. of Patrick D. McKenna, Special Agent/Criminal Investigator, Immigration and Customs Enforcement Homeland Security Investigations ¶ 9 (Exhibit 3); Decl. of Brian S. Acuna, Acting Deputy Assistant Director, ICE Fugitive Operations Division ¶ 14 (Exhibit 4). A proposal that would block an officer's access to those tools—such as painting them closed, taping over them, or using hook-and-loop fasteners to affix markers over that equipment—would be an unconscionably dangerous intrusion by this Court into the safety and effectiveness of carefully designed federal law enforcement uniforms and tactical equipment.

Officers must be able to cycle among unique identifying markers if operational concerns require it. As discussed at length in this litigation and unaddressed by Plaintiffs, large unique identifiers pose a risk to officers because they allow violent opportunists to target individual team members. ECF No. 113-4 at ¶ 6; Olson Decl. ¶ 4(c). Additionally, large identifiers risk allowing violent opportunists to "force count" to estimate the size of the force they face, which is dangerous in light of the limited numbers of federal law enforcement officers deployed relative to the large number of individuals in violent crowds. ECF No. 113-4 at ¶¶ 7; ECF No. 113-5 at ¶¶ 8; ECF No. 113-6 at ¶¶ 7. One way to mitigate some of that risk would be to ensure that any proposal adopted by this Court uses a marking system that allows for cycling among identifiers within a single night and across nights, if the agency believes that such a system is appropriate and necessary. Olson Decl. ¶ 4(c). For that reason, it would be inappropriate to adopt a marking system that requires individual uniforms to be permanently altered or to be altered in a fashion that cannot be changed. For that reason, any proposal to paint over officers' uniforms would expose officers and the public to serious harm.

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 4

Officers must be provided with maximally safe equipment, including uniforms. Any proposal must take account of the safety concerns that guide uniform design. In response to this Court's proposal that law enforcement officers wear jerseys or similar garments with eight-inch-high lettering, Federal Defendants expressed a concern that federal law enforcement officers—who have often been targeted with explosives and incendiary devices—would risk burns if their flame-resistant uniforms were modified on an ad hoc basis, such as with flammable paint. ECF No. 113-4 at ¶ 5; ECF No. 113-5 at ¶ 6; ECF No. 113-6 at ¶ 5, Olson Decl. ¶ 4(a); McKenna Decl. ¶ 9; Acuna Decl. ¶ 9. Likewise, the use of harsh chemicals might cause uniform degradation and risk the integrity of life-saving equipment. Olson Decl. ¶ 4(a); McKenna Decl. ¶ 9; Acuna Decl. ¶ 10. And uniform modifications to the upper legs, for example, could restrict range of movement. CBP SOG-1 Decl. ¶ 8. Any uniform-modification requirement issued by this Court should not mandate the use of any material or method that could reduce the fire resistance of an officer's uniform, and the Court should delay the effective date of any modification of the preliminary injunction to ensure that Federal Defendants have sufficient time to locate and obtain materials that can be used safely.

Officers must be protected from risking contempt for matters outside of their control or for taking steps necessary to protect themselves. Setting aside that law-abiding officers are already at risk of contempt for doing their jobs, as demonstrated by the litigation history of this case, any preliminary injunction should specify that actions by protesters, violent opportunists, or other third parties that obscure an officer's markings are an intervening cause that does not render an officer's uniform noncompliant. For example, officers are sometimes hit with paint by violent opportunists, which could obscure the paint markings proposed by Plaintiffs. Olson Decl. ¶ 4(a); CBP SOG-1 Decl. ¶ 9; Acuna Decl. ¶¶ 9, 13. And paint—especially paint applied over

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 5

operational gear—can flake and peel, especially when an officer is attacked. Olson Decl. ¶ 4(a); Acuna Decl. ¶ 13. Indeed, it is unclear that paint applied over an officer's equipment-laden front would remain legible at all, even if such a proposal were shown not to pose any risk of impeding access to equipment, which is also a serious concern. McKenna Decl. ¶ 9; CBP SOG-1 Decl. ¶ 6; Acuna Decl. ¶¶ 9, 12. Any preliminary injunction that contemplates contempt for an officer whose markings degrade, or who is assaulted by violent opportunists, would not be appropriate.

Likewise, in recognition of the dangerous situation facing officers when responding to violent opportunists and unlawful gatherings, any preliminary injunction should make clear that officers are permitted to take operationally important actions that might incidentally obscure a unique identifier. For example, if this Court orders law enforcement officers to wear markings on the backs of their uniforms, it would be dangerous to law enforcement officers and to the public if officers were put at risk of contempt if they then had to equip extra gear on their back, such as a backpack. Olson Decl. ¶ 4(b); Acuna Decl. ¶¶ 14, 16. An officer's decision regarding what equipment is most necessary to protect the public, him or herself, and federal law enforcement officers, should not be overridden by this Court's decision to dictate federal attire through a preliminary injunction. We request that this Court not force officers to choose between forgoing important equipment that might save a life or risking contempt.

Officers must be able to protect federal property and respond to criminal activity while the Federal Defendants implement any modification imposed by this Court. This Court should understand that modifying federal law enforcement uniforms requires significant time and consideration, including procuring appropriate materials and making the physical modifications to uniforms. Any proposal that relies on obtaining additional items such as new patches, or on modifying existing uniforms, must be timed appropriately to allow Federal Defendants to make

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 6

the necessary procurements and modifications. Likewise, this Court should be aware that uniforms are expensive, and that unique identifiers that permanently alter officer uniforms or equipment—such as the proposal to paint over officers' uniforms—could incur substantial costs and make those uniforms unsuitable for additional use outside of Portland. Olson Decl. ¶ 4(c); McKenna Decl. ¶ 9; CBP SOG-1 Decl. ¶ 7; Acuna Decl. ¶¶ 11, 18.

In sum, there are numerous serious considerations that go into designing the uniforms and tactical gear worn by federal law enforcement officers. The agencies use their expert judgment to determine what design is appropriate, what materials to use, what equipment to accommodate, and numerous other concerns. They have, through that process, designed uniforms that meet their needs while also allowing for the display of unique identifying markers that have already been designed for these uniforms. This Court should not insert itself into that process and begin redesigning federal law enforcement uniforms from the bench. But, if it does so, any proposal must take account of all these safety concerns.

Because Federal Defendants have presumably not seen the entire range of proposals Plaintiffs might choose to advance during these proceedings, or the full range of proposals this Court might ultimately consider, there may be numerous additional considerations that become relevant. Likewise, because equipping and protecting federal law enforcement officers is such a complicated process with many serious considerations that factor into the decision making, Federal Defendants cannot at this juncture anticipate all of the risks and obstacles that could be involved in the abstract. If this Court chooses to adopt a proposal recommended by a party or by the Court, Federal Defendants respectfully request that the Court give Federal Defendants an opportunity to evaluate a detailed description of that proposal and to be heard regarding whether and how specifically that proposal could be accomplished.

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 7

### B.    Plaintiffs' proposals fail to address these concerns.

As discussed *supra*, Plaintiffs' proposals so far fail to address these concerns. They have proposed that federal officers use paint to apply large markings to officers' chests or thighs or, failing that, that federal officers' chests use hook-and-loop fasteners ("Velcro") to affix markings.

The paint proposal is untenable for numerous reasons. As discussed, officers wear operational gear on their chests, and often gear or pouches that hang down over officers' thighs, so the paint would not be visible unless applied over the top of that gear. Painting over the gear would be risky, because it is unclear how different gear—like communications equipment— would be affected by being covered in paint. Even if applied over the officer's gear, there is no reason to believe that the marking would be particularly legible, especially as officers open pockets and pouches and use or shift gear, and because paint flakes and chips. Federal officers would thus risk having contempt motions brought against them simply because painting uniforms has serious technical limitations. That paint would also expose officers to potential hazard from the incendiaries and explosives used against federal officers, and it could cause unpredictable degradation of the officers' uniforms. Federal Defendants would also be unable to use these uniforms again outside of Portland, causing substantial expense.

Plaintiffs' fallback proposal, that Velcro be used in some fashion, fares no better. The marking would still have to go over an officer's critical gear to be visible, but affixing physical markings across that gear using Velcro would mean that officers' gear is blocked. With this suggestion, what Plaintiffs are insisting on is essentially a complete redesign of federal uniforms from the ground up, with officers' access to their life-saving equipment playing second fiddle to the display of larger unique identifying markers.

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 8

**C.     The Court should consider the agencies' potential solutions.**

In an effort to identify changes that might improve the visibility of officer markings while mitigating some of the attendant harms, several component law enforcement agencies of DHS deployed to Portland have attempted to put forth potentially acceptable examples. These examples are offered only to illustrate the agencies' best efforts to provide some solution that addresses the Court's concern while mitigating some of the harms that a modification order would impose. By offering these proposals, Federal Defendants do not consent to their imposition, nor do Federal Defendants agree that the adoption of any proposal or mitigation measure suggested anywhere in this brief is justified under any legal theory, reduces the likelihood of irreparable harm to Federal Defendants from a modification of the preliminary injunction, or diminishes the harm to the public interest from such a modification. Additionally, because each component's uniforms are different, the proposal are unique to each component and cannot be applied to the other components.

Immigration and Customs Enforcement ("ICE") has put forward such a proposal for the Special Response Teams ("SRTs") that two of its components have deployed in Portland— Enforcement and Removal Operations ("ERO"), Acuna Decl. ¶ 19, and Homeland Security Investigations ("HSI"), McKenna Decl. ¶ 1. ERO is considering placing identifiers on the helmet and/or the back of officers' vest, though those places offer limited space (on the helmet) or space that may be obscured by equipment (on the back), and such placement may require relocating the Individual First Aid Kit. Acuna Decl. ¶¶ 16–17. HSI proposes a three-to-four-character alpha-numeric identifier placed on the back of the helmet and on the upper-left-hand shoulder, in an IR/GLO style that glows at night. McKenna Decl. ¶ 10. That is the maximum size identified by

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 9

HSI as not impeding range of motion or access to equipment, and not risk catching on triggers or creating snag points that would become caught on environmental hazards. McKenna Decl. ¶ 11.

CBP has put forward a proposal that it could increase the size of the lettering on its shoulder identifiers and alter the color scheme to make those identifiers easier to read. CBP SOG-1 Decl. ¶ 12. CBP has also stated that it may be possible to affix unique identifiers to the sides of helmets, CBP SOG-1 Decl. ¶ 12, an option that is not available for all DHS law enforcement components. Olson Decl. ¶ 4(b).

These proposals highlight the difficulty in redesigning federal law enforcement uniforms. This Court should decline to undertake that task itself. But if Federal Defendants are subjected to a modified preliminary injunction addressed to officer uniforms, the Court should not adopt any proposal absent certainty that Federal Defendants can implement it safely.

## II.    Modifying the Injunction is Inappropriate and Unwarranted.

Federal Defendants renew and incorporate by reference the arguments made in their preliminary injunction briefing regarding the inappropriateness of granting injunctive relief relating to officer uniforms. ECF No. 138 at 28–29. Although this Court has indicated that it has already decided to modify the preliminary injunction to require some redesign of federal law enforcement officers' uniforms, Federal Defendants believe that the soundest proposal relating to "how Federal Defendants can place unique identifying markings" (ECF No. 157 at 60) on federal law enforcement officers is to defer to how the agencies are already able to place unique identifying markers.

In addition to the many problems discussed above, another reason not to adopt any proposal to modify uniforms is that Plaintiffs cannot satisfy any of the criteria necessary to show an entitlement to a preliminary injunction on this point. A plaintiff seeking the extraordinary

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 10

relief of a preliminary injunction must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Plaintiffs have shown none of those with respect to their request for modifications to federal law enforcement uniforms.

First, Plaintiffs are unlikely to succeed on the merits, because the request for uniform modifications is entirely unrelated to Plaintiffs' claims and they will therefore never show that they are likely to succeed on any claim for which uniform modifications would be an appropriate remedy. Their motion for a preliminary injunction pressed only their claims of First Amendment retaliation and First Amendment right of access; Plaintiffs have not alleged or provided evidence showing that the lack of larger unique identifiers caused retaliation or a denial of a right of access. And Plaintiffs cannot carry their burden here with Gil Kerlikowske's one conclusory and irrelevant sentence that says uniform identifiers—which Federal Defendants already have available—"deter misconduct." ECF No. 135 at ¶ 42. He doesn't even contend that uniform identifiers deter First Amendment retaliation or the denial of a First Amendment right of access. If Plaintiffs' First Amendment claims in fact relied on showing that Federal Defendants' uniform identifiers were not sufficiently large, it is curious that this Court, not Plaintiffs, first brought up the issue of unique identifiers weeks into this litigation.

Second, Plaintiffs cannot show that they will suffer irreparable harm absent the larger unique identifiers. Again, because Plaintiffs have never attempted a serious justification of seeking this relief, which was proposed *sua sponte* by this Court, they have never explained how the absence of larger unique identifiers will irreparably harm their First Amendment rights. Plaintiffs' preliminary injunction against the City of Portland, ECF No. 49—which Plaintiffs

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 11

have repeatedly accused the City of violating, *e.g.*, ECF No. 138 at 35—does not contain any provision requiring officer markings, yet Plaintiffs have not requested that this Court modify that injunction or explained why the presence of such a term in the stipulated injunction would be improper. Nor have Plaintiffs explained how the absence of larger identifying markings is any more imminently harmful here than in the mine run of cases alleging improper actions by individual law enforcement officers, where identifying the allegedly at-fault officers is often a necessary task—indeed, Plaintiffs must be well familiar with this problem, as they have sued sixty John Doe defendants as part of their claims against the City. ECF No. 53 at 8–9.

Third, the balance of the equities and the public interest decisively favor Federal Defendants. The past briefing in this case and the discussion and declarations supplied with this submission show the serious risks attendant upon attempting to redesign federal uniforms from the bench. It is difficult to see how the public will benefit from having their federal law enforcement officers exposed to increased danger without any demonstrated benefits.

Even if Plaintiffs were entitled to some injunctive relief, the proposed relief would be inappropriate because they have not shown it is "tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). As discussed, Plaintiffs have not shown that the absence of larger unique identifying marks has harmed them or will harmed them, so requiring larger unique identifiers cannot be tailored to the harms alleged by Plaintiffs. And the proposed preliminary injunction on uniform markers is not designed to "preserve the status quo ante litem," which must be the purpose of a preliminary injunction. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016). Plaintiffs are not seeking to force Federal Defendants to resume a practice they abandoned pending disposition by the courts; Plaintiffs instead want an

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 12

entirely new and more favorable status quo than they allege ever existed, which is inappropriate. This Court should therefore reject Plaintiff's request for a preliminary injunction.

## <u>CONCLUSION</u>

This Court should not modify its preliminary injunction to mandate a redesign of federal law enforcement officers' uniforms, but any such modification must take account of the serious concerns that Federal Defendants have identified.

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 13

Dated:  September 3, 2020          ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

ANDREW I. WARDEN
Senior Trial Counsel

JEFFREY A. HALL
/s/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

FEDERAL DEFENDANTS' PROPOSAL ON UNIFORM MARKINGS – 14

<u>Declaration of David L. Olson</u>

I, David Olson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2.  I am the Assistant Director of the Federal Protective Service (FPS) Rapid Protection Force (RPF), and I have served in that position since October 1, 2016.  The RPF is FPS's tactical response unit.

3.  In my official capacity, I previously provided an affidavit, dated August 12, 2020, describing the logistical and operational safety issues that I identified with a proposal to alter FPS tactical uniforms by adding markings eight inches in height to display an FPS officer's badge number or some other unique alpha-numerical identifier.  I specifically identified the logistical and operational safety concerns associated with adding either large alpha-numeric markings on, or a separate additional garment to existing FPS uniforms as follows:

   a.  Due to the amount of equipment, tools, and technological devices being worn/utilized by FPS personnel, there is no single 8-inch area of flat surface to incorporate 8-inch lettering.

   b.  Any garment bearing the 8-inch lettering would have to be worn over an operator's body armor.  This would negate his/her access to intermediate use of force tools, mechanical restraints, and/or communications, all of which, can be lifesaving interventions.  Additionally, there is a concern that the material used for the lettering would be susceptible to ignition (and/or propensity to cause secondary burn injuries) given the amount of incendiary devices being utilized in these environments.

   c.  The FPS uniforms worn by officers protecting federal property, facilities, and personnel in Portland already display unique individual officer identifiers in the form of a name badge or alpha-numeric identifier as explained more comprehensively in paragraphs five and six below.

4.  In my official capacity, I reviewed the proposal submitted by Plaintiffs in Document No. 144, filed August 14, 2020, on pages 28-31, stating large, prominent, alpha-numeric markings can be painted-on existing FPS uniforms instead of requiring FPS officers to wear an additional garment that displays the suggested markings.  Upon careful review and consideration, I identify the following logistical and operational safety concerns with the "paint-on" proposal:

   a.  Uniform Degradation: Manipulating FPS officer uniforms by painting body armor or other equipment is not an action that should be undertaken on an ad hoc basis.  Applying paint may degrade the uniform and body armor system and may also alter the flame resistance of these uniform items depending on the chemical composition of the paint.  The use of incendiary devices against federal officers and facilities has been widespread to such an extent that on or about July 23, 2020, FPS issued special fire extinguishing equipment to officers for use if an officer's uniform or person is ignited and burned by an

1

incendiary device.  At least one FPS officer has already suffered serious burns from such a device.  It is also uncertain that painting large alpha-numeric markings on the exterior of FPS uniform items is durable enough to survive the rigors of public order policing while protecting federal property and occupants, to include both flaking or peeling incident to normal wear-and-tear, and damage caused by the physical and assaultive acts directed at federal officers.  To that end, federal officers have been targeted with paint filled balloons during civil unrest activities in Portland as demonstrated by the photo below taken on or about July 30, 2020 at the Hatfield Federal District Courthouse in Portland.  This assaultive paint-balloon tactic both endangers federal officers by obscuring vision and operability of equipment, and, specific to the proposal at issue, may obscure the visibility of any alpha-numeric markings painted on the uniforms so as to render the proposed method of individual officer identification ineffective.



b.  Tactical Interference: There is no space available on the front of the FPS body armor to add the proposed large, prominent alpha-numeric markings due to the essential tactical gear carried by FPS officers, such as the radio, magazines, restraints, and munitions as demonstrated by the photos below that depict FPS officers deployed to protect federal property and persons thereon in Portland on or about August 1, 2020.  While there may be some physical space available on the backside of some FPS body-armor, such space is not consistently available across the entire landscape of FPS officers given some officers wear backpacks, Camelbacks, munitions carriers, and other similar equipment.  As seen in the photograph above, there is no space on the front or side of the protective helmet to place larger numbers due to the equipment mounted there.  The upper leg area of some

officers' pants is not covered by gear, while others, like canine officers will have drop down holsters and gear pouches mounted there.





c. Logistical Challenges: Given the doxing and other targeted attacks directed at FPS officers in Portland, any meaningful implementation of the proposed large, prominent

alpha-numeric uniform marking imposes a significant burden of creating and tracking a separate marking system in addition to the existing unique identifiers already provided to FPS officers and displayed on their uniforms as described in greater detail in paragraphs five and six below.  Officer safety concerns likely require changing or rotating the proposed alpha-numeric markings to prevent or mitigate further targeted attacks.  To that end, physically changing the assigned and painted-on identification markings from FPS officer uniforms, night-to-night or week-to-week, to avoid targeting of specific officers for retaliation is practically unworkable and creates an administrative burden designed to fail.  In addition, the proposal to paint numbers on the outermost layer of FPS uniforms permanently defaces the uniform and creates an unprofessional appearance that, more significantly, renders the uniform useless for other wear outside the current operational environment in Portland.  The latter defacement also creates new financial burden as the approximate cost to replace a single uniform shirt is $98.00; the approximate cost of single pair of uniform trousers is $55.00 and the approximate cost to replace a helmet is $450.00.

5.  FPS officers deployed to Portland continue to wear the Class C Tactical Duty Uniform (TDU). This uniform shirt and pants are dark blue, and the shirt displays the officer's name or badge number in gold above the right breast pocket and the FPS law enforcement shield over the left breast pocket. Male and female uniforms are identical in appearance. As of July 2020, due to doxing concerns, FPS law enforcement officers are given the option of displaying their unique badge number in bright gold instead of their name on their uniform.

6.  FPS officers deployed to Portland also continue to wear DHS ballistic vests, enclosed in a protective cover which is also dark blue, with a blue and gold DHS law enforcement badge and panels stating, "POLICE Homeland Security" in bold gold lettering on the back and "POLICE DHS" with the officer's badge number displayed in bright gold lettering on the front.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 3, 2020

DAVID L
OLSON

Digitally signed by DAVID L OLSON
Date: 2020.09.03 09:07:27 -05'00'

DAVID L. OLSON

<u>DECLARATION OF</u> ▮▮▮▮▮▮▮▮▮▮▮ (CBP SOG-1)

I, ▮▮▮▮▮▮▮▮ (CBP SOG-1)[1], pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am a Chief Patrol Agent with the Department of Homeland Security, U.S. Customs and Border Protection, U.S. Border Patrol. Specifically, I am the Chief Patrol Agent of the Border Patrol Special Operations Group (SOG).

3. In the role of Chief Patrol Agent at SOG, I supervise all Border Patrol Tactical unit (BORTAC) SOG members headquartered out of El Paso, Texas. I also oversee BORTAC SOG members deployed as part of Operation Diligent Valor in Portland, Oregon.

4. As part of my duties as Chief Patrol Agent, I provided the attached photos 1 - 4 depicting the multi-cam uniform of the SOG members deployed in response to the protests in Portland, Oregon.

5. The proposal to wear large identifying markings on the chest and the upper leg will require SOG members to remove or relocate operational equipment, the placement of which is demonstrated by the attached photos. Removing or relocating operational equipment will result in SOG members being unable to quickly access operational equipment that they use to protect themselves and others, as well as protect federal property.

6. The photos provided by the Plaintiffs in Document No. 144, filed August 14, 2020, on pages 28-31, do not depict typical pouches and equipment that would likely be attached to the webbing system on the plate carriers on SOG members' chests. The proposal to wear large identifying markings on the chest and upper leg is problematic in that the painted numbers would be obstructed by the pouches and items inserted into pouches that are located on the plate carriers worn on SOG members' chests. Painting over the plate carriers with the pouches or equipment attached would result in irregularly-shaped or indecipherable lettering or numbering.

7. In addition, painting over the plate carriers and equipment on SOG members' chests would likely render the equipment unusable for normal operations, and would likely result in the necessity to replace equipment with more frequency and cost than is normally expected.

8. The proposal to wear large identifying markings on the upper leg would require a platform of some sort attached to belts, plate carriers, or legs, which would restrict SOG members'

---

[1] I am uncomfortable disclosing my name in this Declaration because I am concerned about a doxing attack, where my name could be used by individuals with malicious intent to find personal information about me, such as my home address and the identities of my family members. I am willing to disclose my name to the Court provided the information is kept under seal.

movement. Restricting SOG members' movement limits their ability to protect themselves and others, as well as federal property.

9. Protestors in Portland regularly use paint to assault law enforcement personnel. Pink paint is the current color of choice for many protestors, as depicted in the attached photos. The proposal to paint large identifying markings on the chest and upper leg is problematic in that the painted identifying markings would be obscured by paint used by protestors to assault law enforcement personnel, which may result in misidentification of personnel.

10. Based on my training and experience, I do not believe that the proposed large identifying markings on the chest and upper leg would be visible at a 200 foot distance, as suggested by Plaintiffs in Document No. 144, filed August 14, 2020, on pages 29.

11. The current agent/officer markings are clearly identifiable when considering most encounters with agitators or violent protestors. However, much of the video provided by plaintiffs and taken from unknown sources, shows grainy images of law enforcement which suggests to some viewers that the current identifiers are inadequate. There is also video in similar circumstances that clearly shows law enforcement personnel with agency/component patches, law enforcement badges, and individual identifiers that are easily identifiable.

12. A potential solution for large identifying markings on law enforcement personnel is to incorporate larger and contrasting individual identifiers consistent with the current placement. For example, the lettering size on the individual identifiers placed on shoulders can be increased to nearly twice the size while maintaining the same placement. Additionally, the color scheme for the individual identifiers can be adjusted to a color scheme that is more visible (ex. USBP agents will use patches with gold lettering over a blue background while OFO officers use white lettering over a blue background). The numbers would be nearly twice the size and very visible in most circumstances. The colors gold/blue and white/blue are also consistent with the CBP agency colors and would allow for immediate agency or component identification. Similar patches may also be attached to the sizes of ballistic helmets. The helmet identifiers would be a new identifiers that are currently not required for civil disturbance operations in Portland, Oregon. All of these options will take approximately 1-2 months to implement because the patches are custom made. Additionally, it would cost CBP approximately $7,125.00.

## CERTIFICATE OF SERVICE

I hereby declare under penalty of perjury that the foregoing DECLARATION OF ██████████ ███████ (CBP SOG-1) is true and correct. Executed this 3rd day of September 2020.

Respectfully,

██████████ (CBP SOG-1)
Chief Patrol Agent
U.S. Border Patrol
Special Operations Group









UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| INDEX NEWSPAPERS LLC, *et al*., | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 3:20-cv-1035-SI |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PORTLAND, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DECLARATION OF PATRICK D. MCKENNA**

I, Patrick D. McKenna, declare as follows:

1.      I am employed by the U.S. Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) as a

Special Agent/Criminal Investigator.  Since August 2020, I have served as the Unit Chief (UC)

for the Special Activities Unit (SAU), which oversees HSI's Special Response Team (SRT)

Program, within the Investigative Services Division (ISD) in Washington, D.C.  Prior to this

assignment, I was the UC for the Parole and Law Enforcement Programs Unit, from August

2019 to July 2020.

2.      During my tenure as a Special Agent, I have served as a member of HSI

Phoenix's SRT, where I held the positions of Operator, Breacher, Assistant Team Leader, Team

Leader, and Assistant SRT Commander. To perform the duties associated with each of the

aforementioned positions, I received certification through the national SRT Training Program,

offered by ICE's Office of Firearms & Tactical Program (OFTP).  Additionally, I attended and

successfully completed the Pima County, Arizona Sheriff's Department SWAT School.  Prior to

being a Special Agent, I was a State Trooper for the Arizona Department of Public Safety and a
Pima County Sheriff's Deputy in Arizona.

3.      HSI's ISD oversees all HSI SRTs from a national/programmatic level.  Upon
activation, HSI SRTs receive direct and immediate oversight from an on-scene SRT Commander
(Supervisory Special Agent), who is required to complete an OFTP delivered SRT Commander's
Certification Course in addition to completing all requisite requirements to be a certified member
of an HSI SRT.

4.      ICE's OFTP provides training for HSI SRTs, which are utilized to conduct high-
risk operations in those instances where the perceived risk/threat associated with the action
exceeds the capabilities of HSI's non-SRT work force.

5.      HSI SRT staffs each of its eighteen (18) teams with certified law enforcement
personnel, who volunteer for the duty of being an SRT member.  These 18 teams are assigned to
various HSI offices throughout the United States.  Prospective SRT members complete a selection
process, consisting of an initial field assessment and training period, prior to attending the HSI
SRT's Initial Certification Course (ICC), as well as conducting 16 hours of monthly training and
submitting to annual physical skills and firearms assessment(s).

6.       Based on my experience and training as an HSI SRT member and SAU UC, I am
familiar with the uniform that HSI SRT members are required to use when deployed.
Specifically, I have knowledge of the uniforms that HSI SRT members wore who deployed to
protect federal buildings in Portland, Oregon. HSI SRT members wear prescribed uniforms and
identifying markings when performing official duty.

7.      The purpose of the markings on the HSI SRT uniform is to identify HSI personnel
as law enforcement. HSI SRT uniforms may contain National and Team patches, "HSI" patches,

"SRT" patches, American Flag patches, or call-sign (unique alpha-numeric identifier individually attributed to SRT personnel) patches on the sleeves of the uniform.  All HSI SRT personnel deployed to Portland as part of Operation Diligent Valor have worn such alphanumeric identifiers.

8.      I am familiar with the fact that, on August 20, 2020, this Court issued a Preliminary Injunction (PI) in the above-captioned matter, and I am familiar with its contents, including the requirement that Plaintiffs and the Federal Defendants promptly confer regarding the placement of unique identifying markings on the uniforms and/or helmets of federal officers deployed to Portland, and that, if the parties cannot agree on a method of marking, each party may submit its own proposal, and each side may respond to any other party's proposal.

9.      In my official capacity, I reviewed the Plaintiffs' August 14, 2020, Reply in Support of Motion for Preliminary Injunction Against Federal Defendants, specifically pages 28-31, including its suggestions for modifications that could be made to the uniforms of SRT members in Portland.  Plaintiffs have suggested that "prominent markings could simply be painted on" uniforms or safety equipment.  This is unworkable, for several reasons involving both safety and practicality.  HSI SRT uniforms are deliberately designed to have as little flammable material as possible.  Paint is flammable.  With dangerous devices like Molotov cocktails and fireworks being aimed at Federal Officers, the addition of flammable material to a uniform simply presents too high a risk, regardless of the location of the identifier.  Additionally, the armor plates worn by HSI SRT members are comprised of ceramic and polyethylene, and are encased in plate carriers, which make up the exterior of the vests.  Without testing, it cannot be known what effect the paint will have on the outer carrier.  In a worst-case scenario, the paint could possibly eat away at the carrier, potentially endangering the structural integrity of

lifesaving equipment. Additionally, paint on the carrier may have a negative impact on the manufacturer's warranty. Permanent labels, such as marker, could possibly have other, longer-term disadvantages. If HSI were to follow Plaintiffs' suggestion to use paint, and if that paint were permanent, some or all of the uniform components would need to be replaced when Officers rotated out of Portland. Finally, it is entirely possible that, if paint were to be applied as Plaintiffs have suggested, it would not render the unique identifiers more legible. HSI SRT members carry many items on both the front and back of their uniforms, and on their belts. The photos on page 30 of Plaintiffs' filing is not an accurate depiction of the tactical gear that HSI SRT members wear. If the numbers were painted on these vests as suggested by Plaintiffs and the gear were applied, the paint would no longer be legible. If the paint were applied on top of the gear – across multiple pouches containing, pistol and rifle magazines, handcuffs, first aid kits, radios, munitions and other miscellaneous equipment – there is no way to ensure that it would be at all legible. Additionally, by painting over the pouches, the paint may render the pouches unusable.

10.    HSI proposes that the unique identifier for each SRT member be a three-to-four character ALPHA NUMERIC identifier, placed on the back of the helmet and the upper-left shoulder of the agency-approved SRT uniform via a two-inch by four-inch placard. HSI SRTs will be mandated to list these unique identifiers on all operational plans and rosters next to the SRT operator's name, so that it will be memorialized for future reference. An "HSI" patch can also be worn on the upper-right shoulder or the right side of the helmet, this will allow the agency name to be seen on multiple areas of the SRT operator. HSI is currently working with a vendor to determine what agency identifier patch works best with the space provided on the SRT body armor. The identifiers and POLICE/HSI markings will be in the IR/GLO style. The

IR/GLO style of marking can be seen with night vision devices, and they will also glow at night, making them more visible to all parties. The IR/GLO style is better suited for civil unrest deployments based on visibility. Based on initial discussions which are subject to change, the vendor has advised that it could take between four and six weeks for the identifiers to be delivered once ordered and the proposed order may cost $120,000 or more depending on the order.

11. The unique identifier cannot be of a size that would impede the HSI SRT member's ability to retrieve intermediate use of force equipment, ammunition, communications equipment, or individual lifesaving first aid kits. It is imperative that the unique identifier not exceed the uniform and/or body armor's usable space and impede the HSI SRT member's range of motion, articulation, or create a snag point whereby the operator could become caught on environmental hazards. HSI SRT members employ every precaution to avoid excess materials which could cause unintentional discharges by becoming lodged inside the trigger well of issued firearms. The unique identifier cannot be affixed by any adhesive such as glue, sticky backed tape or paint, as it creates flame unresistant properties and introduces the capacity to transfer to an operator's gloved hands which could result in the inability to properly draw and wield issued equipment.

12. The unique identifiers must have the ability to be easily donned and doffed with each uniform change in a repeatable fashion as each operator is issued only one set of identifiers to use on their uniforms. Additionally, per the manufacturer, machine washing of the IR/GLO identifiers may cause degradation of the IR/GLO properties. As such, they cannot be permanently affixed to any one uniform or helmet. They must also be consistent with our DHS and federal tactical team counterparts, particularly during large civil unrest whereby we can

seamlessly integrate and identify law enforcement personnel from civilians in both daylight and under darkness via Night Vision devices.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration is based on my personal knowledge, as well as the information provided to me by other employees of the Department of Homeland Security.

DATED:

PATRICK D MCKENNA

Digitally signed by PATRICK D MCKENNA
Date: 2020.09.03 20:45:17 -04'00'

Patrick D. McKenna
Unit Chief
Special Activities Unit
Homeland Security Investigations
U.S. Immigration and Customs Enforcement

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| INDEX NEWSPAPERS LLC, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 3:20-cv-1035-SI |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PORTLAND, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DECLARATION OF BRIAN S. ACUNA**

I, Brian S. Acuna, declare as follows:

1.      I am employed by the U.S. Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), office of Enforcement and Removal

Operations (ERO).  Since July 2020, I have been serving as the Acting Deputy Assistant

Director, ICE Fugitive Operations Division, within the Enforcement Division within the

Washington D.C.  Prior to this position, I held the position of Unit Chief, National Fugitive

Operations Division, within ERO's Enforcement Division, from December 2019 to July 2020.

2.      My other positions with ICE include those of a Deportation Officer in El Paso,

Texas, a Detention and Deportation Officer at ICE Headquarters, a Supervisory Detention and

Deportation Officer in Baltimore, Maryland, as well as an Assistant Field Office Director in New

Orleans, Louisiana.

3.      During my tenure as a Deportation Officer, I was a member of the El Paso Field

Office ERO Special Response Team (SRT) where I held the position of Operator and Team

Leader.  To perform the duties of this position, I attended the ICE SRT Basic Operator's Course in Ft. Benning, Georgia; qualification training sessions with the U.S. Bureau of Prisons Disturbance Control school at the Federal Law Enforcement Training Center in Artesia, New Mexico; the Doña Ana County Sheriff's Office SWAT course; and the Texas Tactical Police Officer's Association SWAT school in Grapevine, Texas.

4.      ICE ERO Enforcement Division oversees ERO's SRTs on a national level.  ERO SRT teams when deployed report and receive direct oversight from a Tactical Supervisor, who must complete all training requirements for SRT participants and may attend other courses, including Disturbance Control Tactics (DCT), in order to familiarize him/herself with all other ERO tactical programs.  ERO SRT Team Leaders and Operators likewise must attend the ERO SRT Basic Operators Course in Ft. Benning, Georgia.

5.      Based on my experience and training as an SRT operator and team leader, as well as the Acting Deputy Assistant Director for Fugitive Operations Division, I am familiar with the mandatory protective equipment/gear that ERO SRT members are required to use when deployed under hazardous conditions such as those prevailing in a riot.  The equipment serves to allow the SRT operators to safely perform their mission, while having the appropriate intermediate and less lethal devices and communications available to each individual.

6.      In my official capacity, I previously provided an affidavit concerning ICE ERO Special Response Team (SRT) Identifying Marks, dated August 4, 2020, describing the logistical and operational safety issues that I identified with a proposal to alter ICE ERO SRT tactical uniforms by adding markings eight (8) inches in height to display a unique alpha-numerical identifier.

7.      I am familiar with the fact that, on August 20, 2020, this Court issued a

Preliminary Injunction (PI) in the above-captioned matter, and I am familiar with its requirement

that Plaintiffs and the Federal Defendants promptly confer regarding the placement of unique

identifying markings on the uniforms and/or helmets of federal officers deployed to Portland, and

that, if the parties cannot agree on a method of marking, each party may submit its own proposal,

and each side may respond to any other party's proposal.

8.      I have also reviewed the Plaintiffs' August 14, 2020 Reply in Support of Motion

for Preliminary Injunction Against Federal Defendants; specifically, its suggestions for

modifications that could be made to the uniforms of federal law enforcement officers in

Portland.  Plaintiffs have suggested that "[p]rominent marking could simply be painted on"

uniforms or safety equipment.  This is unworkable, for several reasons involving both safety and

practicality.

a  The bottom left image with a suggested identifier depicts the FPS

officer without the safety gear attached to the DHS ballistic vest carrier.

b  The agent / officer depicted at the top right image has a suggestion

to paint an identifier on the individual's legs.  As I have described below this

suggestion is unworkable for ICE ERO, namely a damaging effect on the

uniform and the consequences of minimizing fire retardance properties.

c  The agent / officer depicted in the top left image has a suggestion

to paint an identifier on the individual's DHS ballistic vest *attachments*.  If

such a suggestion was directed, due to the need to possibly relocate individual

pouches on the DHS ballistic vest, and the placement of mandatory

equipment such as firearms and – depending on the ICE ERO SRT officer's

role on the team – Less-Lethal munitions equipment - in practice would not remain or be visible.  In addition, due to the attacks on federal law enforcement occurring daily, and the damaging effect of paint on these pouches, this suggestion is unworkable.

d  The agent / officer at the bottom right is depicted with a suggestion to paint an identifier on the *back* of the DHS ballistic vest.  As discussed further below, ICE ERO is exploring an option to place an identifier on the back of the DHS ballistic vest.


9.    SRT uniforms are deliberately designed to have as little flammable material as possible.  Paint is flammable.  With dangerous devices like Molotov cocktails and fireworks being aimed at Federal Officers, the addition of flammable material to a uniform simply presents too high a risk, regardless of the location of the identifier.   At least one ICE ERO officer has already suffered minor injuries from such a device when on July 30, 2020, a fireworks mortar exploded near two ICE ERO officers.  Over the period of time from July 22, 2020, through July 29, 2020, ICE ERO officers were targeted and attacked with fireworks mortars, paint balloons and unknown liquid projectiles. Given these factors it is uncertain that painting large alpha-numeric markings on the exterior of ICE ERO SRT uniform items is durable enough to survive the rigors of public order policing while protecting federal property and occupants, to include both flaking or peeling incident to normal wear-and-tear, and damage caused by the physical and assaultive acts directed at federal officers.

10.    Additionally, the body armor worn by SRT officers is encased in envelopes/sleeves, which make up the exterior of the vests.  Without testing, it cannot be known

what effect the paint will have on the outer envelope.  In a worst-case scenario, the paint could eat away at the envelope, potentially endangering the structural integrity of lifesaving equipment.

11.    Permanent labels, such as marker, could have other, longer-term disadvantages.  Portland has become a symbol, and it is entirely possible that federal officers known to have been deployed there as part of Operation Diligent Valor could be targeted for harassment, doxing, or even violence.  I addressed this possibility in my August 12 declaration.  If ICE were to follow Plaintiffs' suggestion to use paint, and if that paint were permanent, some or all of the uniform components would need to be replaced when Officers rotated out of Portland, lest they be subject to harassment.

12.    Additionally, it is entirely possible that, if paint were to be applied as Plaintiffs have suggested, it would not render the unique identifiers more legible.  SRT Officers carry many items on both the front and back of their uniforms, and on their belts.  Three of the photos on page 30 of Plaintiffs' filing show uniforms that are not configured with all required tactical gear applied.  If the numbers were painted on these vests as suggested by Plaintiffs and the gear were applied, the paint would no longer be legible.  If the paint were applied on top of the gear – across multiple pouches containing handcuffs, TASER and/or collapsible steel baton; as well as an Individual First Aid Kit (if the individual officer wore the item in front), there is no way to ensure that it would be at all legible.

13.    It is also uncertain that painting large alpha-numeric markings on the exterior of ICE ERO SRT uniform items is durable enough to survive the rigors of public order policing while protecting federal property and occupants, to include both flaking or peeling incident to normal wear-and-tear, and damage caused by the physical and assaultive acts directed at federal

officers.  To that end, federal officers have been targeted with paint-filled balloons during civil

unrest activities in Portland.  This assaultive paint-balloon tactic both endangers federal officers

by obscuring vision and operability of equipment, and, specific to the proposal at issue, may

obscure the visibility of any alpha-numeric markings painted on any part the uniforms so as to

render the proposed method of individual officer identification ineffective.  The paint-balloon

tactic would have the same effect of obscuring alpha-numeric markings painted on the helmet.

14.    Tactical Interference: There is no space available on the front of the ICE ERO

SRT body armor to add the proposed large, prominent alpha-numeric markings due to the

essential tactical gear carried by ERO SRT officers, such as the radio, magazines, restraints, and

munitions.  While there may be some physical space available on the backside of some ICE ERO

SRT body-armor, such space is not consistently available across the entire landscape of ICE

ERO SRT officers given some officers wear backpacks, Camelbaks, munitions carriers, and

other similar equipment.



15.    Any attachment to the helmet would be Velcro only.  There is no fastening system

for the helmet.  For the Velcro- attachment to the helmet, due to the size and shape of the helmet,

there is limited surface area for the unique identifying code.  While the helmet could

accommodate a Velcro-attached unique identifier, the size would need to be approximately two

(2) inches high by four (4) inches wide.  There is simply no room on the helmet for an identifier

that is eight (8) inches or larger in either height or width.  A close-up of the ERO SRT helmet is

below.

 

16.    While ICE ERO SRT officers are required to carry specified gear during

deployment, the individual officer determines the placement of specific item of mandated gear

depending on a variety of factors including whether the officer is right or left-handed, how long a

reach the officer has, and whether the officer is a medic, in which case there is additional gear

that would be required.  While it is possible to instruct officers to alter the placement of the gear

so as to create space on the back, the space made available cannot exceed eight (8) inches in

height by five (5) inches width.  Even then, the space on the back could be obscured by the cross-

body strap attached to munitions equipment necessary to the mission.  If placement is dictated by

the plaintiffs or the court, without considering the operational exigencies that ICE ERO SRT

officers operate under, ICE should not be held responsible if their agency-issued equipment

obstructs visibility.

17.    Any proposal as to placement of the unique identifier must ensure that officers are

able to put on or change protective gear rapidly.  ICE ERO is exploring the idea of placing

Velcro identifiers on the officers helmet and/or securely fastened identifiers on the back of their

vest to allow for the greatest flexibility when adjusting protective equipment in response to varying levels and types of threats. However, as explained above, due to the shape of the helmet and the mandatory gear that ERO SRT officers must carry on their uniforms, the space available for the identifier is limited.

18.     Given the doxing and other targeted attacks directed at federal law enforcement officers in Portland, any meaningful implementation of the proposed large, prominent alpha-numeric uniform marking imposes a significant burden of creating and tracking an identifier system.  The proposal to paint numbers on the outermost layer of ICE ERO SRT uniforms permanently defaces the uniform and creates an unprofessional appearance that, more significantly, renders the uniform useless for other wear outside the current operational environment in Portland.  The latter defacement also creates new financial burden as the cost to replace a single uniform shirt is $233.00, and to replace a single uniform pants is $295.00.  The cost to replace the body armor carrier set is $282.00.

19.     ERO SRT officers deployed to Portland also continue to wear prescribed uniform from its SRT Handbook, obtained through the ERO Uniform Program.  During ICE ERO SRT deployments to Portland this uniform shirt and pants has been both "Multicam" (a type of camouflage pattern) and Olive Drab Green.  The uniforms currently have ERO/SRT patches, ICE patch, ERO Officer badge, name tape, a place for name tape on the uniform, and SRT insignia patch.   ICE ERO SRT officers deployed to Portland also continue to wear DHS ballistic vests, enclosed in a protective cover.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration is based on my personal knowledge, as well as the information provided to me by other employees of the Department of Homeland Security.

Signed on this 3[d] day of September 2020.

_____
Brian S. Acuna
Acting Deputy Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement