JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
JOSHUA E. GARDNER
Special Counsel
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| INDEX NEWSPAPERS, LLC, *et al.*,<br><br>Plaintiffs.<br><br>v.<br><br>CITY OF PORTLAND, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-1035-SI<br><br>**FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSAL ON UNIFORM MARKINGS** |

**INTRODUCTION**

Plaintiffs have failed at every stage of this litigation to show any entitlement to the proposed preliminary injunctive relief of redesigning federal law enforcement uniforms. Most apparent in Plaintiffs' latest proposal (ECF No. 165) is that they lack even a clear idea of their requested relief. Their proposals are internally inconsistent and seem increasingly unmoored from one of their stated purposes, which is to facilitate later legal actions against individual officers accused of wrongdoing. Plaintiffs' continued failure to define and justify their desired relief is further proof that ordering a redesign of federal law enforcement uniforms is unjustified and cannot be appropriately accomplished.

**ARGUMENT**

**I.     Plaintiffs Have Not Identified An Appropriate Proposal To Modify Federal Law Enforcement Uniforms**

Plaintiffs have not shown an entitlement to additional preliminary injunctive relief to mandate the redesign of federal law enforcement officers' uniforms. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). As discussed in Federal Defendants' initial filing regarding uniform markings, Plaintiffs have failed to show that they are entitled to a preliminary injunction governing how the Executive Branch outfits its law enforcement officers. ECF No. 162 at 10–13. And Plaintiffs' latest proposal—a combination of making federal law enforcement officers *less* distinguishable from the surrounding rioters, and sewing patches under equipment and in other inappropriate places—shows how unprincipled and untethered Plaintiffs' demands are from their legal claims.

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 1

Plaintiffs apparently have abandoned their proposal—which they previously advanced in their reply in support of their original preliminary injunction motion (ECF No. 144 at 24–25) and repeated in the parties' meet-and-confer last week (ECF No. 166-2)—that federal law enforcement officers paint over their uniforms and equipment. Federal Defendants have explained at length why that proposal likely would not achieve any improved outcomes and would put officers at risk. ECF No. 162 at 3–8. That proposal would obstruct access to crucial equipment, expose officers to potential retaliation, risk officer safety, subject officers to accusations of contempt for the actions of third parties, and increase costs for the agencies. *Id.* Plaintiffs concede (ECF No. 165 at 1–2; ECT No. 166-3) that many of these concerns were raised during the parties' meet-and-confer and during past briefing, and Plaintiffs' only response is to propose the use of hook-and-loop fasteners ("Velcro") instead, so it appears Plaintiffs are not attempting to claim an entitlement to a preliminary injunction on their paint proposal.

The new proposal that Plaintiffs put forward appears to have two components: First, Plaintiffs propose removing the existing markings that identify federal law enforcement officers as federal law enforcement officers, replacing those markings with large numbers. Second, Plaintiffs propose sewing patches of Velcro onto other uniform surfaces that Plaintiffs think look promising. Both proposals present serious safety and operational concerns, and both proposals are in tension with Plaintiffs' own arguments.

Plaintiffs' suggestion to strip officers of federal law enforcement markings in favor of officer-specific unique identifiers is dangerous and irresponsible. Federal law enforcement officers' uniforms publicly mark those individuals as officers of the law, distinguishing them from the surrounding protesters who are frequently wearing clothing and tactical gear that otherwise may resemble law enforcement officers' own equipment. Decl. of David Olson,

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 2

Assistant Director, Federal Protective Service Rapid Protection Force ¶ 8(b) (Exhibit 1); Decl. of CBP SOD-1, Director, Special Operations Division of U.S. Customs and Border Protection § 7 (Exhibit 2); Decl. of Patrick D. McKenna, Special Agent/Criminal Investigator, Immigration and Customs Enforcement Homeland Security Investigations ¶ 10 (Exhibit 3); Decl. of Brian S. Acuna, Acting Deputy Assistant Director, ICE Fugitive Operations Division ¶ 8 (Exhibit 4). Plaintiffs are asking this Court to declare that it is more important for federal law enforcement officers to be distinguishable from one another for purposes of enforcing the preliminary injunction than to be distinguished from members of the public for purposes of enforcing federal law and protecting the safety of all parties.

Distinguishing uniformed law enforcement officers from members of the public is vital to enforcing the law and protecting the safety of the public and the officers. Those law enforcement markings are signals of the officers' authority. Olson Decl. ¶ 8(b)(i); Decl. of CBP SOD-1 ¶ 3. They put the public on notice of their obligation to obey the lawful commands of the person wearing that uniform, which protects both law enforcement officers and members of the public. Olson Decl. ¶ 8(b)(i); Decl. of CBP SOD-1 ¶ 4; McKenna Decl. ¶ 10. And in the dangerous nighttime riots that have marred the streets of Portland, which have already seen protesters commit violence (including assault resulting in death), an officer's uniform and markings distinguish him from potentially dangerous protesters; if an officer approaches a person or group of people to protect them against violence or to render first aid, the law enforcement uniform is one of the signals to those people that the approaching armed individual is an officer of the law and not another armed protester. McKenna Decl. ¶ 10. Plaintiffs' proposal would deprive members of the public of any assurance that there are federal officers present who are looking after the public's safety.

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 3

Removing the police markings would also put officers at risk. The law enforcement markings allow federal law enforcement officers to easily identify one another, which is important for numerous purposes such as rendering aid to other officers. Olson Decl. ¶ 8(b)(i); Decl. of CBP SOD-1 ¶ 3. Members of the public, meanwhile, might erroneously conclude that an unmarked law enforcement officer is another protester; this could cause members of the public to attack that officer if he is engaging in law enforcement activities such as detaining criminals. McKenna Decl. ¶ 10. And violent opportunists—many of whom already marked themselves as "press" to obtain special privileges—would find it easier to impersonate law enforcement officers if doing so did not require law enforcement markings; as discussed, many members of the crowd at these events are already wearing police-style gear and attire. Decl. of CBP SOD-1 ¶ 6–8.

This Court should reject Plaintiffs' request that federal law enforcement officers be stripped of their police markings. It would be grave error to elevate the enlargement and relocation of officer-specific markings—which remain completely unrelated to the alleged legal claims in this case—over the important public interests served by having uniformed law enforcement officers clearly identifiable as law enforcement officers. Indeed, Plaintiffs' own purported expert declarant, Gil Kerlikowske, stated that "[a] key duty and responsibility of law enforcement is to be properly and easily identified specific to the organization[.]" ECF No. 135 at 3. It strains credulity for Plaintiffs to suggest that the situation in Portland would be improved if all federal law enforcement officers wore clothing that did not clearly indicate they are federal law enforcement officers.

As for Plaintiffs' proposal to eyeball each uniform with a sewing kit and a basket of Velcro patches, it only highlights the risk of this attempt at a judicial redesign of federal law

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 4

enforcement uniforms. As discussed in Federal Defendants' initial filing regarding uniform markings, federal law enforcement uniforms are carefully designed, functional, expensive pieces of equipment. Ad hoc modification of those uniforms will undermine important interests to no clear end. Plaintiffs' proposal to sew patches onto the uniforms at random is not a process of reasoned decision-making, and this Court should reject it.

Further highlighting just how unmoored Plaintiffs' proposals have become, the proposals and their justifications are not even internally consistent. Plaintiffs contend that Federal Defendants are required to identify a means of having large unique identifiers "prominently displayed on the **front** of each agent so they can be readily identified by the people with whom they are engaging." ECF No. 165 at 1. But Plaintiffs' own proposals show that Plaintiffs don't believe such large frontal markings are necessary; many of the proposed markings would appear on federal law enforcement officers' backs, triceps, or even the backs of their knees. If Plaintiffs believe that the absence of larger identifiers "prominently displayed on the **front** of each agent" will cause irreparable injury, they have belied those assertions with their own proposals.

The particular spaces Plaintiffs identify in their photo gallery have a litany of problems, many already discussed in Federal Defendants' previous filing (ECF No. 162). Numerous pictures show officers in their base uniform but without the full set of equipment that an officer might wear, which can affect what spaces are available and will remain unobscured, and which can vary depending on an officer's assigned tasks. Olson Decl. ¶ 8(a); Decl. of CBP SOD-1 ¶ 11; Acuna Decl. ¶¶ 10–11; McKenna Decl. ¶ 11; *see also, e.g.*, ECF No. 162-1 at ¶ 4(b) (The upper leg area of some officers' pants is not covered by gear, while others, like canine officers will have drop down holsters and gear pouches mounted there."). For example, Plaintiffs propose large markings on officers' backs several times, even though officers may wear backpacks and

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 5

other equipment. Olson Decl. ¶ 8(c); ECF No. 162-4 at ¶ 14. And some of the space that appears unused in the pictures may also be obscured by additional protective equipment, such as elbow pads and knee pads, or may block access to internal compartments necessary for the use of safety equipment. McKenna Decl. ¶ 12; Acuna Decl. ¶¶ 10–11.

Plaintiffs' proposal to sew Velcro patches over officers' uniforms at or near officers' joints—such as their upper thighs, the backs of their shoulders, and the backs of their knees— could risk officers' safety by impeding their range of motion. Olson Decl. ¶ 8(b)(ii); McKenna Decl. ¶ 11; ECF No. 162-2 at ¶ 8. Officers must have the mobility necessary to access equipment and to block incoming projectiles. Olson Decl. ¶ 8(b)(ii). Plaintiffs' proposal to restrict officers' movement is dangerous and should not be accepted.

Additionally, Plaintiffs fail to explain how many of their proposals would even improve identification of individual officers. The premise underlying the Court's and Plaintiffs' proposal has been that federal law enforcement officers need large identifiers so that individual litigants, the Court, or a special prosecutor could easily identify and take action against individual officers who might not otherwise be identifiable with the agencies' existing unique identifiers. *See, e.g.*, Transcript of Motion Hearing, at 29–30 (July 31, 2020). But for large identifiers on officers' fronts and backs, Plaintiffs have proposed markings that would be frequently covered by operational gear if the spaces are available at all. And other spaces proposed by Plaintiffs—often replacing existing shoulder patches, or in one instance located on the back of the officer's knees—seem to offer insufficient improvement to officer identification to justify the major costs that would be associated with this judicial redesign.

That failure to show a superior alternative just highlights Plaintiffs' continued failure to show that existing identifiers are inadequate. Plaintiffs have repeatedly accused the City of

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 6

Portland of violating the preliminary injunction entered by this Court, and yet Plaintiffs have never asked this Court to modify that preliminary injunction to require more prominent identifying markers for Portland police officers. Indeed, Plaintiffs and the City of Portland just submitted a request that this Court modify the stipulated preliminary injunction (ECF No. 168), but absent from that request was any mention of larger markings. Plaintiffs must show a likelihood of irreparable harm in the absence of larger markings on federal law enforcement officers, and the failure to even allege that issue with respect to the City of Portland raises the inference that the lack of larger markings does not in fact risk irreparable harm.

## II. Federal Defendants Met and Conferred With Plaintiffs as Required Under the Preliminary Injunction

Plaintiffs contend that Federal Defendants failed to confer as ordered by the Court. But by Plaintiffs' own admission, Federal Defendants laid out numerous operational concerns during the meet-and-confer regarding potential modifications to federal law enforcement officers' uniforms, including the particular problems posed by Plaintiffs' proposal to have officers paint over their uniforms and equipment. ECF No. 165 at 2–3. That plainly satisfies the requirement that the parties "confer regarding how the Federal Defendants can place unique identifying markings (using numbers and/or letters) on the uniforms and/or helmets of the officers and agents of the Federal Defendants who are specially deployed to Portland so that they can be identified at a reasonable distance and without unreasonably interfering with the needs of these personnel." ECF No. 157 at 60. If Plaintiffs believe that this Court's opinion required Federal Defendants to present a proposal that Plaintiffs find acceptable, they are mistaken. This Court's opinion does not purport to compel Federal Defendants to consent to a modification of the preliminary injunction, nor does it put Plaintiffs in charge of determining the scope of a proposed modified preliminary injunction. Neither order would be appropriate. Plaintiffs will have to

FEDERAL DEFENDANTS' REPONSE ON UNIFORM MARKINGS – 7

prove their entitlement to a modification of the preliminary injunction through party presentation and adversarial testing, as any party must for any claim of entitlement to relief. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

## **CONCLUSION**

This Court should deny Plaintiffs' requested modification of the preliminary injunction.

Dated:  September 10, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

ANDREW I. WARDEN
Senior Trial Counsel

JEFFREY A. HALL
/s/ Jordan L. Von Bokern
JORDAN L. VON BOKERN (DC 1032962)
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 305-7919
Fax:    (202) 616-8460

*Attorneys for Defendants*

Declaration of David L. Olson

I, David Olson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2.  I am the Assistant Director of the Federal Protective Service (FPS) Rapid Protection Force (RPF), and I have served in that position since October 1, 2016.  The RPF is FPS's tactical response unit.

3.  In my official capacity, I previously provided affidavits, dated August 12, 2020 and September 3, 2020, describing the logistical and operational safety issues that I identified with proposals to alter the FPS uniforms worn by officers performing official duties to protect federal property, facilities, and personnel in Portland during ongoing civil unrest activities by adding large, prominent markings either directly on, or to a separate additional garment worn over existing FPS uniforms.

4.  I specifically identified logistical concerns with the lack of open, available, unutilized space or surface area on the FPS uniforms to add additional large, prominent markings given the essential tactical and safety gear FPS officers either already wear, or, depending on evolving threats and tactics presented by violent opportunists, may need to wear in, on, or around their chest, back, waist, arm, leg, or helmet areas.  Essential tactical gear worn by FPS officers in Portland includes: radios, magazines, restraints, fire extinguishing equipment (improvised incendiary device countermeasure) and munitions worn on the chest and waist areas; backpacks, Camelbacks, munitions carriers, and other similar equipment worn on the back area; lights, face shields, and protective gas masks worn or mounted on and around the head and helmet areas; drop-down holsters, gear pouches, protective gas mask carrier and cargo/utility pockets worn on or affixed to the leg area; and official police and agency identifying patches and insignia on the shoulders.  For clarification, the photos embedded in paragraph 10 of my August 12, 2020 affidavit depict generic photos of relatively, if not entirely, brand-new, out-of-the box FPS uniforms worn by officers in a non-operational environment and without the law enforcement gear described above.  Conversely, the photos embedded in paragraph four of my September 3, 2020 affidavit accurately depict the type and amount of law enforcement gear currently worn by FPS officers performing official duties in Portland.

5.  I also identified operational safety concerns with adding large, prominent markings, whether by paint or some other application, with limiting or otherwise interfering with an officer's ability to access the essential tactical gear on his/her uniform, as well as the safety risk associated with any uniform alteration material, such as paint, that is susceptible to ignition or is non-fire retardant.  Notably, any alteration or modification of existing FPS uniforms that limits, obstructs, or otherwise interferes with range of motion of body parts or with the ability to wear and operate the essential law enforcement gear described in paragraph four above, to include protective eyewear and fire extinguishing devices, presents untenable life-safety and health risks for federal officers in Portland given the violent, assaultive acts directed at officers inclusive of directing high-intensity lasers at officers' eyes, and throwing glass and frozen bottles, fireworks, Molotov-cocktails, and other incendiary devices at officers.

6.  Finally, I noted the proposed uniform alterations were largely redundant in achieving the stated purpose to identify individual officers given the existing FPS uniforms already include unique officer identifiers, either by name or alpha-numeric markings, in bright gold lettering or numbering as depicted by photographs embedded in paragraph four and described in the text of paragraphs five and six of my September 3, 2020 affidavit.

7.  In my official capacity, I reviewed the most recent proposal submitted by Plaintiffs in Document No. 165, filed September 3, 2020, on pages four through 17, stating existing FPS officer-specific identifiers and uniform markings can either be removed and replaced with the markings proposed and preferred by Plaintiffs, or otherwise placed in open areas on the uniforms with sewing or Velcro.  Upon careful review and consideration, I identify several logistical and operational safety concerns.

8.  The arguments and photos advanced by the Plaintiffs in Document No. 165 do not accurately state, depict, or otherwise account for the FPS uniforms and uniform variations currently worn and required by FPS officers performing official duties for the protection of federal property, facilities, and personnel in Portland because there is no accounting for the accompanying tactical gear and officer/public recognition.  As stated in paragraph four above, and accurately depicted in photographs embedded in paragraph four of my September 3, 2020 affidavit, there is a significant lack of open, available, unutilized space or surface area on the FPS uniforms to add additional large, prominent markings given the essential tactical gear FPS officers either already wear, or, depending on evolving threats and tactics, may need to wear in, on, or around their chest, back, waist, arm, leg, or helmet areas.  Notably, Document No. 165 contains three embedded photos of the FPS uniform on pages four and five as follows:

a.  The first FPS uniform photo embedded on page four is a generic, relatively new or out-of-the box FPS uniform that is entirely absent the tactical gear worn by FPS officers, and the superimposed number "12" in the center of the chest area is not realistic or otherwise likely to achieve the stated purpose given the actual tactical gear worn by FPS officers, to include tactical vests, munitions, and radios, largely, if not entirely, covers this area.  Any proposed covering of the tactical gear presents untenable officer safety and health risks by limiting access to or operability of essential equipment, to include communication tools and fire-retardant devices.

b.  The second FPS uniform photo embedded on page five superimposes the number "12" in two places: over an existing FPS, DHS uniform identifier on the upper-chest area, and on a small space near the upper shoulder-blade area.  This proposal is not realistic or likely to achieve the stated purpose given FPS officer tactical needs, to include immediate recognition of fellow officers.

i.  First, requiring FPS to remove existing unique officer and agency identifiers on the front upper-chest area in favor of new markings preferred by the Plaintiffs creates an unnecessary burden that introduces the risk of increasing both officer safety in quickly and accurately recognizing and responding to fellow law enforcement personnel and similar confusion incurred by the public given the familiarity with the existing FPS uniform markings.  Officer and public confusion by the proposed alterations is re-enforced by the prevalent practice in Portland of

private persons wearing similarly dark-colored clothing and tactical gear that might be more easily mistaken absent the existing and recognized FPS, DHS uniform markings in bright gold lettering and numbering. The FPS uniform markings were designed to ensure that indicia of law enforcement authority were visible from all aspects—front, back, and sides—so that all could easily identify the wearer as a law enforcement officer.

    ii.    Second, placing a large, prominent Velcro or sewn marking on the small space near the upper shoulder-blade area potentially limits the range of mobility for an officer needing full-range and freedom of movement with his arms, up to and including the shoulder-blade area, for purposes of utilizing and securing tactical gear, communicating on the radio, and, perhaps most significantly, retaining the ability to make dynamic, split-second movements and motions essential for officer safety – to include the ability to physically dodge or block incoming projectiles some of which may present imminent life-safety risks when incendiary and/or explosive devices are thrown at officers.

c.    The third FPS uniform photo, also embedded on page five, superimposes the number "12" on the lower-back of an FPS tactical vest. This proposal is also not realistic or likely to achieve the stated purpose given FPS officer tactical needs and safety considerations. Placing markings on the lower-back area of the tactical vest entirely fails to account for officers that wear backpacks, Camelbacks, munitions carriers, and other similar equipment as operational needs dictate for officer safety.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 10, 2020

DAVID L OLSON

Digitally signed by DAVID L OLSON
Date: 2020.09.10 09:27:22 -05'00'

_____
DAVID L. OLSON

DECLARATION OF ██████████████ (CBP SOD-1)

I, ███████████ (CBP SOD-1)[1], pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am the Director of the Special Operations Division of U.S. Customs and Border Protection (CBP). In that role, I have programmatic and operational oversight of the Office of Field Operations (OFO), Special Response Team (SRT). This oversight includes the strategic direction of the program, operational review/approval, the deployment of personnel to meet operational needs, and the management of resources that support SRT.

3. The current "Police" and Agency identifiers displayed on officers' and agents' uniforms are used to clearly identify them as law enforcement / police officers. The removal of the "Police" marking or any other agency identifiers would make it very difficult for the public, as well as other law enforcement officers, to readily identify them as a Law Enforcement official.

4. The identification of a law enforcement officer by "Police" and Agency identifiers is important because it gives the public the ability to identify law enforcement / police officers and provides the public with an opportunity to comply with lawful orders upon recognizing that the officers and agents giving the orders are law enforcement / police officers.

5. Throughout my more than 16 years of law enforcement experience, whether serving a warrant, responding to an active shooter situation, or conducting regular law enforcement functions, it has always been essential that law enforcement officers should be clearly identifiable by the branding on their external uniform and/or plate carriers; to include the word Police and agency specific markings.

6. The police and agency brandings used by our officers and agents are widely used amongst all law enforcement agencies. If our agents and officers used an alphanumeric identifier (which does not indicate law enforcement authority) instead of a Police identifier (which does indicate law enforcement authority), there would be a risk that members of the public would wear alphanumeric identifiers to impersonate law enforcement; this would make it difficult for law-abiding citizens to differentiate between law enforcement and non-law enforcement.

7. Throughout the protests in Portland, members of the public have worn uniform/tactical style clothing; without a Police/Agency identifier it would be very easy for a member of the public

---

[1] I am uncomfortable disclosing my name in this Declaration because I am concerned about a doxing attack, where my name could be used by individuals with malicious intent to find personal information about me, such as my home address and the identities of my family members. I am willing to disclose my name to the Court provided the information is kept under seal.

to impersonate a law enforcement officer, especially if there are no agency or law enforcement-specific brandings on officers' and agents' uniforms.

8. An alphanumeric identifier, whether painted or velcro, would be easily replicated by members of the public seeking to cause harm or instigate violence by representing themselves as law enforcement; to include being able to more easily impersonate a law enforcement officer and do harm to law-abiding citizens.

9. Current agency markers and identifiers are specifically placed to ensure they are visible during operations.

10. The current placement of "Police" and agency identifiers are strategically placed to ensure officers and agents have maximum mobility and efficient access to operational gear and equipment, while still easily identifiable by the public as law enforcement.

11. Based on an officer's or agent's assigned task or operation, they may carry numerous and varying-sized pouches on the front, back, and sides of their body, while ensuring they do not cover the agency identifiers. The purposes of these additional pouches include carrying medical supplies, attaching additional gear and equipment (flashlights, radios, intermediate use of force devices, handcuffs, gloves, etc.), providing hydration, and storing additional less lethal munitions.

12. If large identifiers were either painted on or attached to the external uniform or plate carriers, they would prevent officers and agents from carrying necessary operational equipment, lifesaving supplies, and equipment needed to safely conduct their law enforcement duties.

13. The photographs of uniforms provided in CBP's previous uniform declarations were provided to demonstrate the different uniforms worn by our officers and agents, as well as agency identifiers. The photographs relied upon by the Plaintiffs in demonstrating their proposed unique identifying marks do not depict the normal equipment load of our agents and officers, and the photographs used by the Plaintiffs do not provide an accurate depiction of what each officer or agent would carry during an operation.

14. Altering the uniforms of our officers and agents in Portland by adding an alphanumeric identifier, whether painted or Velcro, would render the uniforms unusable for normal operations. As a result, CBP would incur a cost to replace the equipment and uniforms of officers and agents in Portland.

15. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  September 10, 2020



(CBP SOD-1)

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

INDEX NEWSPAPERS LLC, *et al.*,           )
                                          )
                    *Plaintiffs*,         )      Case No. 3:20-cv-1035-SI
                                          )
                    v.                    )
                                          )
CITY OF PORTLAND, *et al.*,               )
                                          )
                    *Defendants*.         )
                                          )

**DECLARATION OF PATRICK D. MCKENNA**

I, Patrick D. McKenna, declare as follows:

1.      I am employed by the U.S. Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) as a

Special Agent/Criminal Investigator.  Since August 2020, I have served as the Unit Chief (UC)

for the Special Activities Unit (SAU), which oversees HSI's Special Response Team (SRT)

Program, within the Investigative Services Division (ISD) in Washington, D.C.  Prior to this

assignment, I was the UC for the Parole and Law Enforcement Programs Unit, from August

2019 to July 2020.

2.      During my tenure as a Special Agent, I have served as a member of HSI

Phoenix's SRT, where I held the positions of Operator, Breacher, Assistant Team Leader, Team

Leader, and Assistant SRT Commander. To perform the duties associated with each of the

aforementioned positions, I received certification through the national SRT Training Program,

offered by ICE's Office of Firearms & Tactical Program (OFTP).  Additionally, I attended and

successfully completed the Pima County, Arizona Sheriff's Department SWAT School.  Prior to

being a Special Agent, I was a State Trooper for the Arizona Department of Public Safety and a Pima County Sheriff's Deputy in Arizona.

3.    HSI's ISD oversees all HSI SRTs from a national/programmatic level.  Upon activation, HSI SRTs receive direct and immediate oversight from an on-scene SRT Commander (Supervisory Special Agent), who is required to complete an OFTP delivered SRT Commander's Certification Course in addition to completing all requisite requirements to be a certified member of an HSI SRT.

4.    ICE's OFTP provides training for HSI SRTs, which are utilized to conduct high-risk operations in those instances where the perceived risk or threat associated with the action exceeds the capabilities of HSI's non-SRT work force.

5.    HSI SRT staffs each of its eighteen (18) teams with certified law enforcement personnel, who volunteer for the duty of being an SRT Member.  These 18 teams are assigned to various HSI offices throughout the United States.  Prospective SRT members complete a selection process, consisting of an initial field assessment and training period, prior to attending the HSI SRT's Initial Certification Course (ICC), as well as conducting 16 hours of monthly training and submitting to annual physical skills and firearms assessment(s).

6.    Based on my experience and training as an SRT operator and SAU UC, I am familiar with the uniform that HSI SRT members are required to use when deployed. Specifically, I have knowledge of the uniforms that HSI SRT members wore who deployed to protect federal buildings in Portland, Oregon. HSI SRT members wear prescribed uniforms and identifying markings when performing official duty.

7.    I am familiar with the fact that, on August 20, 2020, this Court issued a Preliminary Injunction (PI) in the above-captioned matter, and I am familiar with its contents,

including the requirement that Plaintiffs and the Federal Defendants promptly confer regarding

the placement of unique identifying markings on the uniforms and/or helmets of federal officers

deployed to Portland, and that, if the parties cannot agree on a method of marking, each party

may submit its own proposal, and each side may respond to any other party's proposal.

8.      In my official capacity, I previously provided an affidavit concerning ICE HSI

SRT identifying markings, dated September 3, 2020, wherein I stated that, due to operational and

safety considerations, Plaintiffs' specific proposals for additional or different ICE HSI SRT

identifying markings were not feasible.

9.      Further, I became familiar with the Plaintiffs' Supplemental Brief filed on

September 3, 2020, arguing that existing uniform patches could be replaced with unique

identifiers as proposed by Plaintiffs, and/or additional VELCRO® patches sewn onto the ICE

HSI SRT uniforms to accommodate unique identifiers.

10.     As I previously stated in my September 3, 2020 declaration, the purpose of the

markings on the HSI SRT uniform is to identify HSI personnel as law enforcement.  Agency

identifiers – including "POLICE" and "HSI" – are necessary to identify who is law enforcement

and who is not.  As it has been publicized there are protestors who wear carriers/vests and

helmets similar to law enforcement, replacing existing law enforcement markings with unique

identifiers risks misidentifying law enforcement personnel.  This could have dire consequences.

If an innocent bystander needs assistance from a law enforcement officer, he or she may not be

able to easily differentiate between a protestor and a law enforcement officer.  This may delay or

event prevent law enforcement personnel from rendering aid to bystanders.  Depending upon the

severity of the situation, this could be life threatening to the bystander and/or the law

enforcement officer, if the bystander could not easily identify the law enforcement officer and felt threatened by the armed individual.

11.    As I previously stated in my September 3, 2020 declaration, HSI proposes that the unique identifier for SRT members be the ALPHA NUMERIC identifiers, and they will be placed on the back of the helmet and the upper-left shoulder of the existing agency-approved SRT uniform.  The unique identifier cannot be of a size that would impede the operator's ability to retrieve intermediate use of force equipment, ammunition, communications equipment, or individual lifesaving first aid kits. It is imperative that the unique identifier not exceed the uniform and/or body armor's usable space and impede the operator's range of motion, articulation, or create a snag point whereby the operator could become caught on environmental hazards. SRT operators employ every precaution to avoid excess materials which could cause unintentional discharges becoming lodged inside the trigger well of issued firearms.

12.    The adding of VELCRO® to already approved agency SRT uniforms will be impractical due the number of pockets and/or compartments that are already on the uniform. Adding more VELCRO® would affect the functionality of the uniform, restrict the mobility of the HSI SRT member, and make the pockets and compartments unusable as designed.  There are compartments for internal and/or external kneepads on the pants; adding VELCRO® to this area would result in the kneepads not fitting as designed.  Attaching additional VELCRO® to uniform shirts would potentially prevent pockets and compartments, to include a compartment for elbow pads, from being utilized as designed.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration is based on my personal

knowledge, as well as the information provided to me by other employees of the Department of

Homeland Security.

DATED:

PATRICK D MCKENNA

Digitally signed by
PATRICK D MCKENNA
Date: 2020.09.10 12:11:38
-04'00'

Patrick D. McKenna
Unit Chief
Special Activities Unit
Homeland Security Investigations
U.S. Immigration and Customs Enforcement

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| INDEX NEWSPAPERS LLC, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 3:20-cv-1035-SI |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PORTLAND, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DECLARATION OF BRIAN S. ACUNA**

I, Brian S. Acuna, declare as follows:

1.    I am employed by the U.S. Department of Homeland Security (DHS),

Immigration and Customs Enforcement (ICE), office of Enforcement and Removal

Operations (ERO).  Since July 2020, I have been serving as the Acting Deputy Assistant

Director, ICE Fugitive Operations Division, within the Enforcement Division within the

Washington D.C.  Prior to this position, I held the position of Unit Chief, National Fugitive

Operations Division, within ERO's Enforcement Division, from December 2019 to July 2020.

2.    My other positions with ICE include those of a Deportation Officer in El Paso,

Texas, a Detention and Deportation Officer at ICE Headquarters, a Supervisory Detention and

Deportation Officer in Baltimore, Maryland, as well as an Assistant Field Office Director in New

Orleans, Louisiana.

3.    During my tenure as a Deportation Officer, I was a member of the El Paso Field

Office ERO Special Response Team (SRT) where I held the position of Operator and Team

Leader.  To perform the duties of this position, I attended the ICE SRT Basic Operator's Course in Ft. Benning, Georgia; qualification training sessions with the U.S. Bureau of Prisons Disturbance Control school at the Federal Law Enforcement Training Center in Artesia, New Mexico; the Doña Ana County Sheriff's Office SWAT course; and the Texas Tactical Police Officer's Association SWAT school in Grapevine, Texas.

4.      ICE ERO Enforcement Division oversees ERO's SRTs on a national level.  ERO SRT teams when deployed report and receive direct oversight from a Tactical Supervisor, who must complete all training requirements for SRT participants and may attend other courses, including Disturbance Control Tactics (DCT), in order to familiarize him/herself with all other ERO tactical programs.  ERO SRT Team Leaders and Operators likewise must attend the ERO SRT Basic Operators Course in Ft. Benning, Georgia.

5.      Based on my experience and training as an SRT operator and team leader, as well as the Acting Deputy Assistant Director for Fugitive Operations Division, I am familiar with the mandatory protective equipment/gear that ERO SRT members are required to use when deployed under hazardous conditions such as those prevailing in a riot.  The equipment serves to allow the SRT operators to safely perform their mission, while having the appropriate intermediate and less lethal devices and communications available to each individual.

6.      In my official capacity, I previously provided an affidavit concerning ICE ERO SRT Identifying Marks, dated August 12, 2020, describing the logistical and operational safety issues with adding markings eight (8) inches in height to display a unique alpha-numerical identifier.  I also provided an affidavit, dated September 3, 2020, wherein I stated that ICE ERO SRT Identifying Marks would have to differ from the ones proposed by Plaintiffs due to ICE ERO SRT operational and safety concerns.

7.     Further, I became familiar with the Plaintiffs' Supplemental Brief filed on September 3, 2020, arguing that existing uniform patches could be replaced with unique identifiers as proposed by Plaintiffs, and/or additional **VELCRO**® patches sewn onto the ICE ERO SRT uniforms to accommodate unique identifiers.

8.     As I previously stated in my August 12, 2020 declaration, the purpose of the existing overall identifying markings on the ERO SRT uniform is to clearly and visibly identify the ERO SRT Operators as a specialized tactical team conducting Agency-assigned High-Risk Enforcement actions.  The agency patches, badges, and SRT patches, in combination with the word "POLICE" on the SRT vests, clearly identify the SRT members as federal law enforcement during the performance of their duties, including during the unrest in Portland.  In a situation where protestors have increasingly worn tactical gear, it is critical that federal law enforcement officers not be mistaken for protesters.  Removing these existing identifiers would therefore further confuse and obscure the identities of the ICE ERO SRT team members operating as federal law enforcement in Portland.  In addition, as I stated in my prior declaration on August 12, 2020, the ICE ERO SRT Handbook has a policy mandating these identifiers for our teams.

9.     In my official capacity as the ERO official responsible for coordinating a rapid and adequate response to High-risk enforcement actions, I consulted the ERO National Uniform Program on the following steps that would be involved with changes in applying extra **VELCRO**® area(s) on the ICE ERO SRT uniforms:

a.     To ensure consistency with the multiple ICE ERO SRT units that may be assigned to Portland, the national program management office at ICE ERO Headquarters would need to set up the design for the new

area on the uniform, featuring fire retardant **VELCRO®** or hook and loop product.

        b.      The approach for altering the uniforms may take place through the ERO National Uniform Program, or an authorization may be issued to use a local professional vendor to complete the sewing job.

        c.      Using the ERO National Uniform Program will involve submitting detailed specifications and modifying the federal contract to ensure the services are completed according to the operational needs of ICE ERO.  Sending the ICE ERO SRT uniforms to the federal vendor would also likely result in loss of time and lack of available uniform stock for ICE ERO SRT members.  Having available ICE ERO SRT uniforms is a critical to SRT deployment to a local area of operation or to Portland.

        d.      Using a local professional vendor may reduce time and shipment costs somewhat for these alterations.

        e.      However, the ICE ERO SRT members have to be in non-deployable status while their uniforms are unavailable during the time required for any alteration work.  Since there is no way to accurately forecast a given unit or member's assignments to High-risk SRT missions, whether it be in their local area or in Portland, the standing down of an ICE ERO SRT or its member(s) due to the time required for the uniform alteration will have an unacceptable operational impact on ICE ERO and its SRT capacity.

        f.      Finally, the alterations to the uniforms would involve a cost to the taxpayer that may exceed the simpler and faster option that ERO is

exploring—to securely fasten identifiers on the back of the DHS ballistic vest, and/or to place a smaller unique identifier on helmets.

10.    As shown in the photographs contained in my previous declaration dated September 3, 2020, SRT Officers carry many items on both the front and back of their uniforms, and on their belts.  Therefore, the ICE ERO SRT uniform has no available space on the front of the uniform and tops of the shoulders (picture on the left below) with the required agency and law enforcement patches on the uniform top and DHS ballistic vest.

11.    In addition, regarding the proposal to place identifiers on the legs, for reasons previously covered in my declarations, there is little to no available space to clearly display identifiers or to sew on additional **VELCRO**® areas.  ICE ERO SRT uniforms also require external or internal knee pads in addition to the munitions carriers, firearms holsters and associated straps to secure them (picture on the right below), and the DHS ballistic vest carrier's extended piece covering the officers' upper leg areas and femoral arteries.



12.    Taking all these factors and the information from my previous declarations into account, the Plaintiffs' proposal to remove the existing required ICE ERO SRT patches or to sew additional identifiers on the legs of the ICE ERO SRT uniform is a much less practical idea than acquiring the unique identifiers that ERO is exploring to securely fasten on the back of the DHS

ballistic vest, and / or to place a smaller unique identifiers on helmets, neither of which would

require any substantial time nor alteration of the uniform. ICE ERO SRT officers would also

maintain the full deployable status of entire ICE ERT SRT teams. As a less-preferred alternative,

ERO can explore and implement the alteration of the ICE ERO SRT uniform tops to have extra

places for unique identifiers on the lower portion of the arms.


I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and

correct to the best of my knowledge and belief, and that this declaration is based on my personal

knowledge, as well as the information provided to me by other employees of the Department of

Homeland Security.

Signed on this 10th day of September 2020.

Brian S. Acuna
Acting Deputy Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement