**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Ellen V. Leonida**, admitted *pro hac vice*
leonida@braunhagey.com
**Athul K. Acharya**, OSB No. 152436
acharya@braunhagey.com
**Gunnar K. Martz**, admitted *pro hac vice*
martz@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

**Kelly K. Simon**, OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY**; **DOUG BROWN**; **BRIAN CONLEY**; **MATHIEU LEWIS-ROLLAND**; **KAT MAHONEY**; **SERGIO OLMOS**; **JOHN RUDOFF**; **ALEX MILAN TRACY**; **TUCK WOODSTOCK**; **JUSTIN YAU**; and those similarly situated, | Case No. 3:20-cv-1035-SI |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR INDICATIVE RULING** |
| v. | |
| **CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. MARSHALS SERVICE**, | |
| Defendants. | |

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR INDICATIVE RULING

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ..................................................................................................... 10

I.    THE COURT SHOULD DECLINE TO ISSUE AN ADVISORY
      OPINION .................................................................................................. 10

II.   PLAINTIFFS' CLAIMS AGAINST THE FEDERAL AGENTS ARE NOT
      MOOT ....................................................................................................... 12

      A.    Plaintiffs Continue to Have a Concrete Interest in the Outcome of
            the Litigation .................................................................................. 13

      B.    The Federal Agents' Voluntary Cessation Cannot Moot This Case ..... 16

      C.    The Federal Agents' Other Mootness Arguments Also Fail ............... 18

            1.    Other Cases Involving Different Plaintiffs and Different
                  Legal Theories Do Not Help the Federal Agents ...................... 18

            2.    The Change in Administration Does Not Help the Federal
                  Agents. ....................................................................................... 20

            3.    That Protests Now Take Place Outside the ICE Facility
                  Does Not Help the Federal Agents ............................................ 21

III.  THE FEDERAL AGENTS' "CHANGED CIRCUMSTANCES"
      ARGUMENTS ALSO FAIL ....................................................................... 22

      A.    Plaintiffs Need Not Identify a Written Policy of Retaliation Against
            Journalists and Legal Observers .................................................... 23

      B.    Sovereign Immunity is No Bar to Plaintiffs' Suit ............................. 25

            1.    When Federal Agents Shoot, Beat, Arrest, or Threaten to
                  Arrest Someone, They Are Taking "Agency Action" ............... 25

            2.    Shooting, Beating, Arresting, or Threatening to Arrest
                  Someone is a "Final" Agency Action ........................................ 27

IV.   THE FEDERAL AGENTS FAIL TO PROVE THAT THE INJUNCTIVE
      FACTORS NOW WEIGH IN THEIR FAVOR ........................................... 28

      A.    Plaintiffs Are Still Overwhelming Likely to Prevail on the Merits ..... 28

B.     The Federal Agents Have Not Proven that Plaintiffs Will No
       Longer Suffer Irreparable Injury ........................................................................ 29

C.     The Balance of Equities and Public's Interest Favor Continuing the
       Injunction ............................................................................................................ 31

CONCLUSION .................................................................................................................. 33

## **TABLE OF AUTHORITIES**

### **CASES**

*Associated Press v. Otter*,
　682 F.3d 821 (9th Cir. 2012) ................................................................. 31

*Bennett v. Spear*,
　520 U.S. 154 (1997) ................................................................................ 27

*Best Odds Corp. v. iBus Media Ltd.*,
　655 F. App'x 582 (9th Cir. 2016) ......................................................... 10

*Block v. Washington State Bar Ass'n*,
　2021 WL 1192407 (W.D. Wash. Mar. 30, 2021) ................................. 11

*Bowser v. United States*,
　2019 WL 12378993 (C.D. Cal. Apr. 23, 2019) .................................... 11

*C.Q. v. River Springs Charter Sch.*,
　2018 WL 7461689 (C.D. Cal. Nov. 27, 2018) ..................................... 10

*Castro v. Cty. of Los Angeles*,
　833 F.3d 1060 (9th Cir. 2016) .............................................................. 24

*Chafin v. Chafin*,
　568 U.S. 165 (2013) ......................................................................... 13, 15

*Cmty. House, Inc. v. City of Boise*,
　490 F.3d 1041 (9th Cir. 2007) .............................................................. 31

*Fed. Election Comm'n v. Furgatch*,
　869 F.2d 1256, 1263 n.5 (9th Cir. 1989) ............................................. 30

*Dixit v. Dixit*,
　796 F. App'x 561 (11th Cir. 2019) ....................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
　528 U.S. 167 (2000) .................................................................. 17, 18, 22

*Hawaii v. Trump*,
　871 F.3d 646 (9th Cir. 2017) .......................................................... 22, 23

*Index Newspapers LLC v. City of Portland*,
　480 F.3d 1120 (D. Or. Aug. 20, 2020) .................................................. 4

*Index Newspapers LLC v. U.S. Marshals Serv.*,
　977 F.3d 817 (9th Cir. 2020) ......................................................... passim

*Index Newspapers*,
　480 F. Supp. 3d ............................................................................. passim

*Karnoski v. Trump*,
　926 F.3d 1180 (9th Cir. 2019) ......................................... 10, 22, 28, 29

*Karuk Tribe v. U.S. Forest Serv.*,
　681 F.3d 1006 (9th Cir. 2012) .............................................................. 10

*Knox v. Serv. Emps. Int'l Union, Loc.*,
　1000, 567 U.S. 298 (2012) ......................................................... 2, 12, 16, 17

*Lawson v. Grubhub, Inc.*,
　2018 WL 6190316 (N.D. Cal. Nov. 28, 2018) ..................................... 10

*Lucas v. Youngblood*,
    2019 WL 6523258 (E.D. Cal. Dec. 4, 2019)..........................................................10

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)............................................................................................26

*Martinez Banos v. Godfrey*,
    2019 WL 2357871 (W.D. Wash. June 4, 2019) ....................................................11

*McCormack v. Herzog*,
    788 F.3d 1017 (9th Cir. 2015) ......................................................................17, 22

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..............................................................................31

*NewGen, LLC v. Safe Cig, LLC*,
    840 F.3d 606 (9th Cir. 2016)...............................................................................11

*Nw. Envtl. Def. Ctr. v. Gordon*,
    849 F.2d 1241 (9th Cir. 1988) ................................................................12, 15, 16

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006)...............................................................................27

*Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*,
    737 F. App'x 304 (9th Cir. 2017) ........................................................................10

*Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*,
    100 F.3d 1451 (9th Cir. 1996).............................................................................18

*Rosebrock v. Mathis*,
    745 F.3d 963 (9th Cir. 2014) ..................................................................16, 17, 22

*S.F. Herring Ass'n v. Dep't of the Interior*,
    946 F.3d 564 (9th Cir. 2019)..................................................................25, 26, 27

*Sackett v. E.P.A.*,
    566 U.S. 120 (2012)............................................................................................27

*Salazar v. Deasey*,
    2018 WL 4850379 (C.D. Cal. June 6, 2018) ......................................................11

*Shelby Cty. v. Holder*,
    570 U.S. 529 (2013)............................................................................................15

*Thomas v. Cty. Of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992) ..............................................................................21

*Tyler v. Cuomo*,
    236 F.3d 1124 (9th Cir. 2000) ............................................................................15

*U.S. Army Corps. of Engineers v. Hawkes Co.*,
    136 S. Ct. 1807 (2016)..................................................................................26, 27

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953)..................................................................................16, 30, 31

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021)....................................................................................15, 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................15

*Walsh v. Nevada Dep't of Hum.*,
    *Res.*, 471 F.3d 1033 (9th Cir. 2006) ...................................................................15

*Western States Ctr., Inc. v. United States Dep't of Homeland Sec.*,
    2021 WL 1896965 (D. Or. May 11, 2021)....................................................18, 19

*Whitman v. American Trucking Ass'ns*,
  531 U.S. 457 (2001)....................................................................................... 25, 26
*Wise v. City of Portland*,
  2021 WL 1950016 (D. Or. May 15, 2021)........................................................ 18, 19

## **STATUTES**

5 U.S.C. § 551...................................................................................................... 25, 26

## **RULES**

Fed. R. Civ. P. 62.1.............................................................................................. 9, 10

Plaintiffs respectfully oppose the federal agents' request for an indicative ruling dissolving the preliminary injunction (Dkt. 209).

## **INTRODUCTION**

This case seeks to protect the First Amendment right of journalists and legal observers to document the government's use of force to break up protests. This Court protected that right in a 61-page Injunction that was based on over a month of intense hearings and voluminous evidence. The Ninth Circuit upheld that injunction in a 70-page published opinion, which found that the federal agents are unlikely to prevail on their argument that they are free to disperse or arrest journalists and legal observers who pose no legitimate threat to law enforcement.

The federal agents now seek an advisory opinion that the Court would dissolve its Injunction if the Ninth Circuit remands the case for that purpose. But their argument is at war with itself. They claim that the Court's injunction is "moot," but at the same time assert that abiding by its terms is somehow causing them irreparable injury. Neither is true. Nor are the federal agents any more correct on the law than they were when this Court issued its Injunction or when the Ninth Circuit upheld it. Under these circumstances, the Court need not, and should not, undertake the "extraordinary" task of preparing an advisory opinion.

In their motion, the federal agents admit that they have not changed their policy and want to be free to return to using force on journalists and legal observers simply for trying to do their jobs. The thrust of their position is that because there are now fewer opportunities to violate the constitutional rights of journalists and legal observers, and because a change in administration occurred, the Court should simply trust the government to use its power more judiciously. But that is not how constitutional protections or the doctrine of mootness operate. Nor is this argument grounded in fact. Despite the new administration's public posture in favor of freedom of the press and the right to assembly, it has privately supported the misguided policies of former President Trump—from defending the government's attacks on protesters at Lafayette Square to seeking to preserve its ability to monopolize the marketplace of ideas by violently dispelling journalists and legal observers here.

PAGE 1 -   PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR
             INDICATIVE RULING

Under established law, the federal agents cannot prove mootness, *i.e.*, that there is no set of circumstances that would entitle Plaintiffs to relief. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012). Portland has always been a hub of protest and expression. Protests still occur often, and will continue to recur. The federal agents will still engage with the protesters. And the press will still report. Under these circumstances—and especially given the continued and ongoing conflicts with federal agents documented below—the federal agents cannot meet their heavy burden of proving mootness.

Nor have the federal agents offered any proof or reason why they should now be allowed to resume violating the First Amendment rights of journalists and legal observers. Absent the relief the Court has put in place, Plaintiffs will suffer the same chilling of their First Amendment rights that gave rise to the injunction in the first place. This is all the more true given the federal agents' refusal to discipline or even investigate any of the officers who previously attacked Plaintiffs, and their steadfast position that their policing of the protests is proper.

## FACTUAL BACKGROUND

Portland has a long and beautiful history of protests and expression.[1] In 1913, female cannery workers marched in the streets to demand a living wage and better working conditions. "[W]ithin weeks, dozens of strikers had been brutally beaten and arrested by Portland police."[2] Five years later, "[s]ix mounted patrolmen charged upon a crowd of 150 pickets and sympathizers, men and women … in front of the Oregon packing company's plane in forcing

---

[1] *See*, *e.g.*, John Killen, *Portland Protests through the Years: A Decade of Free Speech in the Rose City*, Oregon Live (Dec. 1, 2014) (noting that "Protests and demonstrations are as much a part of Portland as beer, bikes, coffee and roses" and documenting history of protests in Portland from 2004 to 2014),
https://www.oregonlive.com/multimedia/2014/12/portland_protests_through_the.html.

[2] Heather Arndt Anderson, *Fruit Punch and Rebel Girls: The Women's Fruit Cannery Strike of 1913 and the Birth of a Portland Radical*, Portland Mercury (Jan. 8, 2014),
https://www.portlandmercury.com/portland/fruit-punch-and-rebel-girls/Content?oid=11441905.

them to obey police orders to 'keep off the street.'"[3] In 1934, longshoremen took to the streets of

Portland to demand reduced hours, increased pay, and recognition for their union.[4]



        There were protests when Medgar Evers was murdered, protests over the Vietnam War,

the Iraq War, the Afghanistan War and U.S. policy in Central America, the Battle of Park Blocks,

May Day, Earth First, Occupy Portland, the Women's March Against Trump, Indigenous

Peoples' Day, protests over state pay, immigration policy, police misconduct, taxes, the inhumane

---

[3] *Cannery Strikers are Charged by Police*, Oregon Journal (July 13, 1918),
https://www.newspapers.com/image/?clipping_id=8876949&fcfToken=eyJhbGciOiJIUzI1NiIsIn
R5cCI6IkpXVCJ9.eyJmcmVlLXZpZXctaWQiOjc4MzM3NTkxLCJpYXQiOjE2MjY5NzU5Mz
UsImV4cCI6MTYyNzA2MjMzNX0.xnyu7pL7qltgXNnvVcwotI3OejemduPYiwFOxCaKBwg.

[4] *Longshoremen's Strike of 1934*, Oregon History Project (Mar. 17, 2018),
https://www.oregonhistoryproject.org/articles/historical-records/longshoremen39s-strike-of-
1934/.

treatment of animals, the inauguration of President Bush, Walmart, and of course the more recent

Black Lives Matter protests, to name just a few.[5] Many took place right in front of the federal

courthouse. This history has been captured by the press—which, as both this Court and the Ninth

Circuit have explained, plays a vital role in the social and political discourse of our nation. *Index*

*Newspapers LLC v. City of Portland*, 480 F.3d 1120, 1147 (D. Or. Aug. 20, 2020); *Index*

*Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020).



---

[5] *See* n.1, *supra*; *see also*, *e.g.*, Ken Boddie, *Surprised about Portland protests? 'You don't know Portland'*, KOIN (May 11, 2021), https://www.koin.com/is-portland-over/surprised-about-portland-protests-you-dont-know-portland/; Douglas Perry, *'Little Beirut' legacy: 21 of the most memorable protests in Portland history*, The Oregonian (May 18, 2019), https://www.oregonlive.com/living/2016/04/little_beirut_legacy_20_of_the.html; Arlo Voorhees, *Takin' It to the Streets: Portland's Protest History*, Portland Monthly (Feb. 20, 2017), https://www.pdxmonthly.com/news-and-city-life/2017/02/takin-it-to-the-streets-portland-s-protest-history; *History of Protest*, PCC (July 19, 2021), https://guides.pcc.edu/c.php?g=1066288&p=7761704.



Many of the events from last year's protests that transfixed the nation occurred after law enforcement had issued a general dispersal order and were captured by journalists protected by this Court's Injunction.[6]

Gabriel Russell, the federal agents' commander under former President Trump—and still apparently their commander now—has testified that the agents under his command respond to "as many as a hundred" protests in the region every year. (Declaration of Matthew Borden ("Borden Decl."), Dkt. 225, Ex. 1 (Russell Dep.) at 63:19-64:4; *id.*, Ex. 2 (Russell remains "Regional Director at FPS").) Following the change in administration, protests against or adjacent to federal property in Portland have included at least the following events:

---

[6] *See, e.g.*, Zane Sparling, *Portland Protester Describes Beating by Federal Officers*, Portland Tribune (July 19, 2020), https://pamplinmedia.com/pt/474091-383299-portland-protester-describes-beating-by-federal-officers-.

- As recently as June 3, federal agents pepper-sprayed an individual "filming [a protest] from the sidewalk in [her] own neighborhood."[7]

- On May 28-29, protesters demonstrated outside the southwest Portland ICE facility; federal agents arrested one protester and shot another with impact rounds from less than a yard away.[8]

- On May 27-28, federal agents arrested two protesters at the ICE facility.[9] Protesters also demonstrated outside the Edith Green – Wendell Wyatt Federal Building. (Supplemental Declaration of Craig Dobson ("Dobson Decl."), *Wolfe v. City of Portland*, No. 3:20-cv-1882-BR (Jul. 9, 2021), Dkt. 110 ¶ 26.)

- On May 25, about 75 protesters gathered in Chapman Square, blocked an intersection next to the Hatfield Courthouse, and set a dumpster on fire. Local police responded and declared an unlawful assembly. (Dobson Decl. ¶ 24.)

- On May 1, federal agents responded to an afternoon protest outside the ICE facility.[10] They shot pepperballs and other munitions at the crowd. (Declaration of John Rudoff ("Rudoff Decl."), Dkt. 222 ¶ 6.) Later that evening, they "brutalize[d] an indigenous person."[11]

- On April 22, 100 people protested the killing of Ma'Khia Bryant outside the Pioneer Courthouse. (Dobson Decl. ¶ 19.)

---

[7] @cozca503, Twitter (June 4, 2021, 12:12 P.M.), https://twitter.com/cozca503/status/1400893293202866179.

[8] @Claudio_Report, Twitter (May 28, 2021, 9:07 P.M.), https://twitter.com/Claudio_Report/status/1398491206112317441; @cozca503, Twitter (May 29, 2021, 3:38 A.M.), https://twitter.com/cozca503/status/1398589584808628232

[9] @Johnthelefty, Twitter (May 28, 2021, 12:30 A.M.), https://twitter.com/Johnnthelefty/status/1398181228767977472.

[10] @isabellagarcia, Twitter (May 1, 2021, 4:39 P.M.), https://twitter.com/isabellaaliciaa/status/1388639360866684931; @Claudio_Report, Twitter (May 1, 2021, 4:18 P.M.), https://twitter.com/Claudio_Report/status/1388633843893096450.

[11] @Claudio_Report, Twitter (May 1, 2021, 11:46 P.M.), https://twitter.com/Claudio_Report/status/1388746771849875460.

- On April 21, protesters demonstrated outside the Multnomah County Justice Center and blocked an intersection next to the Hatfield Courthouse. (Dobson Decl. ¶ 18.)

- On April 20, protesters demonstrated outside the Justice Center and in Pioneer Square. Local police declared an unlawful assembly and arrested two individuals. (Dobson Decl. ¶ 17.)

- On April 18, during a protest near the Hatfield Courthouse, individuals started a fire at SW 3rd Avenue and SW Main Street. (Dobson Decl. ¶ 15.)

- On April 13-14, protesters assembled outside the ICE facility. A few individuals pushed a burning dumpster against the building, and both local police and federal agents responded. (Dobson Decl. ¶ 12.) One federal agent shot Plaintiff Justin Yau with multiple pepperballs, even though he was well-marked and nowhere near protesters. (Declaration of Justin Yau ("Yau Decl."), Dkt. 224 ¶ 6.)

- On April 11, "direct action" demonstrators vandalized the Justice Center. (Dobson Decl. ¶ 9.)

- On April 10-11, protesters gathered at the ICE facility. (Dobson Decl. ¶ 8.) Federal agents shot at least one journalist in the knee with an impact round.[12] They also shot another attendee in the head.[13]

- On April 1, protesters demonstrated outside the ICE facility. (Dobson Decl. ¶ 6.)

- On March 11-12, federal agents reenacted the gas- and smoke-drenched scenes of summer 2020 through several blocks of downtown Portland around the Hatfield Courthouse.[14] They shot Plaintiff Justin Yau with pepperballs, even though he was

---

[12] @jwcroxton, Twitter (April 11, 2021, 1:33 A.M.), https://twitter.com/jwcroxton/status/1381163470264037382.

[13] @JuniperLSimonis, Twitter (April 11, 2021, 3:38 A.M.), https://twitter.com/JuniperLSimonis/status/1381194874909720578.

[14] *See, e.g.*, @hungrybowtie, Twitter (Mar. 11, 2021, 9:53 P.M.), https://twitter.com/hungrybowtie/status/1370251624963317761; @hungrybowtie, Twitter (Mar. 11, 2021, 10:09 P.M.), https://twitter.com/hungrybowtie/status/1370255526102102018.

(again) well-marked and nowhere near protesters. (Yau Decl. ¶ 4.) Other agents shot a dozen or more pepperballs at ACLU legal observer and Plaintiff Kat Mahoney and a group of press who were documenting a spent munition. (Declaration of Kat Mahoney ("Mahoney Decl."), Dkt. 221 ¶¶ 13-16.[15]) They also hit another ACLU legal observer, Sage Mist, in the back with a smoke grenade. (*Id.* ¶¶ 10-12.) Suzette Smith, a journalist for *Willamette Week*, reported that federal agents "ke[pt] shooting press people with munitions."[16]

- On February 5, federal agents shot pepperballs and tear gas at protesters outside the ICE facility.[17]

- On January 27, federal agents responded with force to a Holocaust Remembrance Day vigil outside the ICE facility.[18] They targeted at least one ACLU legal observer, Caitlyn Wong, shooting her phone out of her hand and then shooting at her head as she bent down to pick it up. (Mahoney Decl. ¶¶ 5-8; Declaration of Caitlin Wong ("Wong Decl."), Dkt. 223 ¶¶ 5-8.)

- On January 23, federal agents shot munitions and used tear gas against a crowd of protesters and press outside the ICE facility. Agents ordered press to disperse, fired munitions at them, and threw a flash-bang grenade at them; one agent, with his

---

[15] *Feds shoot ACLU legal observer & press documenting spent munition*, YouTube (Mar. 11, 2021), https://www.youtube.com/watch?v=8igUuBalXZg; @MasonLakeMedia, Twitter (Mar. 12, 2021, 12:55 A.M.), https://twitter.com/MasonLakePhoto/status/1370297427782111235.

[16] @suzettesmith, Twitter (Mar. 11, 2021, 11:35 P.M.), https://twitter.com/suzettesmith/status/1370277185760600069.

[17] @Claudio_Report, Twitter (Feb. 6, 2021, 12:34 A.M.), https://twitter.com/Claudio_Report/status/1357970821541625856.

[18] @AlissaAzar, Twitter (Jan. 27, 2021, 11:59 P.M.), https://twitter.com/AlissaAzar/status/1354700694842826752; @cozca503, Twitter (Feb. 23, 2021, 7:56 P.M.), https://twitter.com/cozca503/status/1364424015046090759 (posted several weeks later).

callsign insignia obscured by duct tape, pushed Plaintiff John Rudoff.[19] Another agent, bearing callsign NZ-30, walked with tear-gas fogger to a group composed primarily of members of the press and doused them with tear gas.[20]

- On January 20—the night after President Biden was inaugurated—federal agents responding to a protest outside the ICE facility targeted photographer Mason Lake with a canister of "Instant Blast" pepper spray.[21] They also engulfed several blocks of southwest Portland in tear gas.[22]

As these incidents demonstrate, protests at federal property and at the Justice Center—which can easily morph, as they did last summer, into protests at the Hatfield Courthouse next door—continue. (Mahoney Decl. ¶¶ 10, 13; Yau Decl. ¶ 4.) Plaintiffs and other journalists and legal observers continue to attend, observe, and report. (Mahoney Decl. ¶¶ 1, 4, 19; Rudoff Decl. ¶¶ 5, 9; Wong Decl. ¶ 13.) Thus far, the injunction has protected them. (Mahoney Decl. ¶¶ 17-19; Rudoff Decl. ¶¶ 7-8; Wong Decl. ¶¶ 3, 13; Yau Decl. ¶¶ 7-8.) Without it, the federal agents' stated position is that they will forcibly disperse press and legal observers along with everyone else. (Mot. at 20.)

---

[19] *Federal agents push, shoot, and disperse press*, YouTube (Jan. 23, 2021), https://www.youtube.com/watch?v=ajhAVbd_uFs at 0:15 (pushing John Rudoff), 0:33 (firing at group of press), 0:36 (tossing flash-bang grenade at press), 0:42 (firing flash-bang grenade at press).

[20] *DHS agent teargasses group of press*, YouTube (Jan. 23, 2021), https://www.youtube.com/watch?v=hBz-AR4VBaY.

[21] @MasonLakePhoto, Twitter (Jan. 30, 2021, 11:35 A.M.), https://twitter.com/MasonLakePhoto/status/1355600531553615875.

[22] @GriffinMalone6, Twitter (Jan. 20, 2021, 9:54 P.M.), https://twitter.com/GriffinMalone6/status/1352132514496671746; @jwcroxton, Twitter (Jan. 20, 2021, 9:48 P.M.), https://twitter.com/jwcroxton/status/1352130819912924116; @Claudio_Report, Twitter (Jan. 20, 2021, 10:46 P.M.), https://twitter.com/Claudio_Report/status/1352145524783136768.

PAGE 9 -   PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR
           INDICATIVE RULING

## ARGUMENT

The federal agents have moved under Federal Rule of Civil Procedure 62.1 for an advisory opinion that the Court would, if it had jurisdiction, grant a motion to dissolve its preliminary injunction. (Dkt. 209 ("Mot.") at 1.) Issuing such a ruling is "extraordinary" relief that the Court should decline to grant here.

If the Court is inclined to address the merits of the motion, the federal agents advance two theories on both of which they bear the burden of proof. First, they assert that this case is moot. The party alleging mootness bears a "heavy burden" to establish that a court can provide no effective relief. *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quotation marks omitted). Second, they argue that "changed circumstances" warrant dissolving the Court's Injunction. On this claim, they first "bear[] the burden of establishing … a significant change in facts or law," and if they can prove changed circumstances, they bear the burden of proving that that each of the four factors for injunctive relief now favors them. *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019). They cannot meet any of these burdens.

## I.    THE COURT SHOULD DECLINE TO ISSUE AN ADVISORY OPINION

Formally, Rule 62.1 authorizes no "standalone" motion for an indicative ruling. *Lucas v. Youngblood*, 2019 WL 6523258, *1 (E.D. Cal. Dec. 4, 2019). Rather, it permits a district court to issue an indicative ruling in response to a motion "for [substantive] relief that the court lacks authority to grant." *Id.*; Fed. R. Civ. P. 62.1(a). Without an underlying substantive motion, some courts deny standalone motions for indicative rulings outright, while others construe them as motions for substantive relief accompanied by a request for an indicative ruling. *Compare, e.g.*, *Lucas*, 2019 WL 6523258, at *1 (denying such a motion outright), *and Best Odds Corp. v. iBus Media Ltd.*, 655 F. App'x 582, 583 (9th Cir. 2016) (affirming such a denial), *with Lawson v. Grubhub, Inc.*, 2018 WL 6190316, at *2 (N.D. Cal. Nov. 28, 2018) (treating a standalone motion for indicative relief as a motion for substantive relief).

Even if the Court is inclined to construe the federal agents' motion as one for substantive relief, Rule 62.1 contains no requirement that the Court engage with its merits. *Dixit v. Dixit*, 796

PAGE 10 - PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR INDICATIVE RULING

F. App'x 561, 563 n.1 (11th Cir. 2019). An indicative ruling is "incredibly rare" relief that a district court should grant only in "extraordinary circumstances." *C.Q. v. River Springs Charter Sch.*, 2018 WL 7461689, *2 (C.D. Cal. Nov. 27, 2018) (declining to issue indicative ruling). Instead, the Court has broad discretion to deny the motion or defer considering the issue until it regains jurisdiction. *Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*, 737 F. App'x 304, 305 (9th Cir. 2017); *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 612 n.1 (9th Cir. 2016). Because the government has deprived the Court of jurisdiction over the Injunction by maintaining its appeal, a decision not to issue an advisory opinion would not be subject to appeal.

No extraordinary circumstances compel the Court to issue an indicative ruling. The federal agents' primary argument is that protest activity has undergone such a "precipitous" decline that federal agents today "rarely" engage in public-order policing in Portland. (*E.g.*, Mot. at 2-3.) As Plaintiffs explain above, that picture is not entirely accurate. But even taking the federal agents at their word, there is no reason to short-circuit the ordinary process of resolving the "emergency" appeal that they themselves sought. *See, e.g.*, *Martinez Banos v. Godfrey*, 2019 WL 2357871, *3 (W.D. Wash. June 4, 2019) (declining to grant indicative ruling, despite "the Government's year-long track record of compliance" with injunction, because burden of continued compliance during pendency of appeal was "minimal").

The federal agents' motion is simply an attempt to get two bites at the apple.[23] Heads, they win; tails, they ask the Ninth Circuit to re-calendar their fully briefed appeal. Courts routinely decline to indulge such gamesmanship. *See, e.g.*, *Block v. Washington State Bar Ass'n*, 2021 WL 1192407, *1 (W.D. Wash. Mar. 30, 2021) (declining to issue indicative ruling when requesting party's motion was "primarily aimed at delaying or disrupting her pending appeal before the Ninth Circuit"); *Salazar v. Deasey*, 2018 WL 4850379, at *2 (C.D. Cal. June 6, 2018) (declining to issue indicative ruling because "Defendants have unnecessarily placed the same

---

[23] Two *new* bites—on top of the TRO, the TRO extension, the preliminary injunction, and the motion for a stay, all of which involved near-identical issues.

issue before two courts at the same time"); *Bowser v. United States*, 2019 WL 12378993, *3 (C.D. Cal. Apr. 23, 2019) (declining to issue indicative ruling because the "complex issues at play" weighed in favor of appellate resolution); Order Den. Mot. for Indicative Ruling, *Uniloc USA, Inc. v. Apple Inc.*, 3:18-cv-358-WHA (N.D. Cal. Jan. 17, 2019), Dkt. 113 (declining to issue "burden[some]" indicative ruling when the case had "already involved heavy motion practice") (attached as Borden Decl., Ex. 5).

This Court, too, should decline to indulge the federal agents' gamesmanship. Instead, it should defer considering dissolving the Preliminary Injunction until it regains jurisdiction, either through the federal agents' dismissing their appeal or the Ninth Circuit's resolving it on the merits.

## II. PLAINTIFFS' CLAIMS AGAINST THE FEDERAL AGENTS ARE NOT MOOT

The federal agents seek an advisory opinion that the Preliminary Injunction should be dissolved because "drastically changed circumstances" in Portland render Plaintiffs' claims moot. (Mot. at 6.) If this argument sounds familiar, it should. The federal agents have advanced it, in one form or another, at every stage of this litigation. When opposing the extension of the TRO, they claimed that harm to Plaintiffs had become "a remote and speculative theoretical possibility" because the "security situation at the federal courthouse ha[d] dramatically improved," reducing "[f]ederal law enforcement officers' engagement with protestors" to "practically nothing." (Dkt. 122 at 7; Dkt. 113 at 7.) They later opposed the Preliminary Injunction because, they claimed, Plaintiffs' "speculation of future harm" relied on an "uncertain" "chain of contingencies." (Dkt. 138 at 9.) Now, seeking to dissolve the injunction, they recycle these arguments yet again, insisting that judicial oversight is unnecessary in Portland because "factual developments" have rendered any harm to Plaintiffs "highly speculative." (Mot. at 21.) These arguments are no more meritorious now than they were then.

A.     **Plaintiffs Continue to Have a Concrete Interest in the Outcome of the
       Litigation**

As this Court recognized in its August 2020 Order, a case is not moot simply because
"the precise relief sought at the time the application for an injunction was filed" is no longer
available. *Index Newspapers*, 480 F. Supp. 3d at 1140 (quoting *Nw. Envtl. Def. Ctr. v. Gordon*,
849 F.2d 1241, 1244-45 (9th Cir. 1988)). Rather, it is moot "only when it is *impossible* for a
court to grant any effectual relief whatever to the prevailing party." *Knox*, 567 U.S. at 307
(emphasis added) (quotation marks omitted). "[A] case is not moot," in other words, "[a]s long
as the parties have a concrete interest, however small, in the outcome of the litigation." *Chafin v.
Chafin*, 568 U.S. 165, 172 (2013).

As explained in the Factual Background above, the federal agents' description of the facts
on the ground is far from complete. But even if, as they claim, protests in Portland today are
smaller and less frequent than last summer, and even if some out-of-town federal agents have left
the city (Mot. at 2-4), that does not moot Plaintiffs' claims. There can be no question that
Plaintiffs have a concrete interest in the maintenance of the Court's Injunction. First, as the
federal agents acknowledge, "protest activity continues in Portland." (Declaration of Patrick J.
Zitny ("Zitny Decl."), Dkt. 205 ¶ 5.) Some protests are small, but others are large. (*E.g.*, Dobson
Decl. ¶ 24 (protest of 75-300 people at Chapman Square as recently as May 25).) Like last
summer, some of the larger protests are "held in conjunction with" nationwide movements
"focused on the same issues." (Zitny Decl. ¶ 5.) And while they may not be a daily occurrence,
protests today are hardly infrequent. By the federal agents' count, since November 1, 2020, 23
protests—or, on average, just under one per week—have been "declared unlawful due to
violen[t] activity," requiring some response. (Zitny Decl. ¶ 6.)

Second, federal agents "continue to provide protective security and law enforcement
services" during these protests. (Zitny Decl. ¶ 11.) As many as 60 federal officers have been
called to respond to a single protest (Zitny Decl. ¶ 6)—including the one on March 11-12, when
Plaintiff Justin Yau and other journalists documented dozens of officers dispersing crowds

outside the Hatfield Courthouse.[24] And though the federal agents claim that "FPS [has] terminated Operation Diligent Valor," as many as a dozen out-of-region officers remain in Portland, ready to engage crowds. (Zitny Decl. ¶ 11.)

Third, and perhaps most important, the circumstances that purportedly triggered the federal agents' illegal conduct last summer—"dynamic and chaotic situations involving violent protesters seeking to damage federal property and harm federal officers" (Dkt. 67 at 21)—continue today. In the federal agents' own words, "criminal actors" continue to "*regularly* target … federal facilities" with "violent, destructive, and assaultive acts." (Zitny Decl. ¶¶ 11, 18 (emphasis added).) Like last summer, the federal agents say, they lack "consistent, regular support from state/local law enforcement," so they must police these demonstrations themselves. Like last summer, they do that with "force," including "dispersal orders," "pushbacks," and "less-than-lethal munitions." (Zitny Decl. ¶¶ 6, 7, 8, 18; *see* supra n.24.) And like last summer, the federal agents lack any policy respecting journalists' right to report on protests and law enforcement's response to them. (Mot. at 13 (denying "any change in a policy or practice at issue in this lawsuit").)

Still, the federal agents insist there is little chance today that federal law enforcement will interact with the press while dispersing violent crowds. (Mot. at 7-8.) Their argument rests primarily on the reduced frequency and size of protests compared to last summer. (*Id.*) To be sure, Lownsdale Square no longer sees thousands of people protesting every night. But the Court's equitable power does not disappear when national headlines move on. As explained above, protests near federal property continue on a near-weekly basis. They are likely to continue at that level. (*See* Borden Decl., Ex. 1 (Russell Dep.) at 63:19-64:4 (explaining that FPS polices "as many as a hundred" protests every year in the Pacific Northwest).) They may be smaller, but

---

[24] @PDocumentarians, Twitter (Mar. 11, 2021, 11:46 P.M.), https://mobile.twitter.com/PDocumentarians/status/1371714441616650240; @suzettesmith, Twitter (Mar. 11, 2021, 10:56 P.M.), https://twitter.com/suzettesmith/status/1370267405218279425.

federal agents continue to use chemical and impact munitions against protesters—and, on occasion, journalists and legal observers, despite the Court's Injunction. (*See, e.g*., Mahoney Decl. ¶¶ 8, 12, 15; Wong Decl. ¶ 12; *supra*, nn. 15-16, 19 and accompanying text.) Even if there are fewer such occasions than at the height of the protests in July 2020, journalists and legal observers continue to need the Court's protection to report on the protests that occur. Throwing out the injunction now would be "like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).[25]

In sum, even if it is true that protests at federal property have been "intermittent" (rather than constant), "the size and strength of the protests has been shrinking" (rather than growing), "uses of force … by federal officers … have declined" (rather than increased), and some (rather than many) out-of-town agents are now deployed to Portland (Mot. at 2, 3, 7, 8), this case still is not moot. At most these things show, as the federal agents put it, "steps" toward "a return to normalcy." (Mot. at 3.) But an "issue is not moot" just because "a course of action is mostly completed." *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). If it is possible to grant relief "that could alleviate the harm suffered by the plaintiff's injury," then the case remains live. *Id.* Here, even by the federal agents' lights, the protests continue, federal agents continue to police them, and Plaintiffs continue to exercise their First Amendment right to cover them. (*See* Mahoney Decl. ¶¶ 4, 17-19; Rudoff Decl. ¶¶ 5, 9-10; Wong Decl. ¶¶ 4, 13; Yau Decl. ¶¶ 3, 8.) Plaintiffs therefore retain a "concrete interest" in how the federal agents conduct themselves.

---

[25] Nor is this motion the first time the federal agents have mistaken a temporary lull for an end to protests. When USMS removed the security fence surrounding the Hatfield Courthouse in March, protests spiked and USMS was forced to quickly reinstall the fence. (Declaration of Pete Cajigal ("Cajigal Decl."), Dkt. 204 ¶¶ 9-11.) Acting U.S. Marshal Cajigal reports that, one week after these events, the ICE Enforcement and Removal Operations Special Response Team deployed to Portland for nine days. (Cajigal Decl. ¶ 6.) He does not say why. In their moving papers, the federal agents make much of the fact that special enforcement teams like this "ha[ve] not had staff deployed to Portland to respond to criminal activity aimed at federal property" in recent months. (Mot. at 4.) As Marshal Cajigal's declaration shows, however, the "stated discontinuance" of such forces "is not very effective" when it is "is terminable at will by the Federal Defendants" at any time. *Index Newspapers*, 480 F. Supp. 3d at 1153.

*Chafin*, 568 U.S. at 172. By regulating that conduct, the Court continues to provide "effective relief." *Gordon*, 849 F.2d at 1244-45.[26]

### B.    The Federal Agents' Voluntary Cessation Cannot Moot This Case

For the reasons above, this case is not moot under even the ordinary mootness standard. However, because any improvements in the circumstances in Portland are based in part on changes in the federal agents' own conduct, they must meet an even higher standard. *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (noting that "[t]he party asserting mootness bears a 'heavy burden' in meeting" the "'stringent' standard" imposed by voluntary cessation); *Index Newspapers*, 480 F. Supp. 3d at 1141 ("[V]oluntary cessation of conduct moots a claim only in limited and narrow circumstances."); Mot. at 13 (conceding that voluntary cessation imposes a "higher bar" on the moving party).

The federal agents argue that they are not subject to this heightened standard because they "have not claimed any change in a policy or practice at issue in the lawsuit." (Mot. at 13.) At the same time, however, they argue that they no longer intend to retaliate against journalists because of the change in Executive Branch administration; that "entire federal law enforcement agencies have stood down" from responding to protests; and that "Operation Diligent Valor has ended." (Mot. at 17-18, 21.) These are voluntary changes, and if the federal agents wish to rely on them, they must meet the higher standard to show mootness by voluntary cessation.

---

[26] The cases the federal agents cite (Mot. at 7)—*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 365 (2011), *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1036-37 (9th Cir. 2006), and *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)—only support Plaintiffs' position. Setting aside that *Dukes* and *Walsh* both discuss standing, not mootness—*cf. Index Newspapers*, 480 F. Supp. 3d at 1139 (noting that the federal agents repeatedly relitigate whether "Plaintiffs must continue to prove standing")—the plaintiffs in *Dukes* and *Walsh* had no concrete interest in enjoining their former employers' employment practices because they no longer worked for those employers and had not indicated that they wished to return. An injunction, therefore, could not provide "*any* effective relief." *Gordon*, 849 F.2d at 1244-45. And in *Uzuegbunam*, the injunctive relief was "no longer available" because the defendant "g[ot] rid of the challenged policies." 141 S. Ct. at 797. Here, by contrast, Plaintiffs are still subject to the federal agents' illegal conduct, and the federal agents, by their own admission, "have not claimed any change in a policy or practice at issue in this lawsuit." (Mot. at 13.)

Ordinarily, voluntary cessation does not render a case moot, "because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox*, 567 U.S. at 307. Where nothing outside the injunction ensures that the offending party will not "return to [its] old ways," *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953), the party asserting mootness must "make it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) (emphasis added).

The federal agents do not come close to meeting this "stringent" standard. *Rosebrock*, 745 F.3d at 971. As an initial matter, they continue to maintain that the Injunction was improper (Mot. at 20)—a telltale sign that they would resume their illegal conduct were the Injunction dissolved. *See Knox*, 567 U.S. at 307 (offending party would likely "resum[e] … the challenged conduct as soon as the case is dismissed" in part because it "continues to defend [its] legality"). The federal agents also expressly decline to claim "any change in a policy … at issue in this lawsuit." (Mot. at 13, 20.) That, too, undermines their motion.[27] See *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) ("[A]n executive action that is not governed by any clear or codified procedures cannot moot a claim.")

More tellingly, the federal agents' own declarants—high ranking officers across the various federal enforcement teams—could not have been clearer that they will happily revert to their old ways the moment the Injunction is dissolved. Director Zitny, for example, would like the Injunction dissolved because it "forc[es]" law enforcement officers to "differentiate" between protestors and "those who self-identify a[s] press or legal observers," and to allow the latter to

---

[27] On this point, it appears the federal agents have made no progress at all. As this Court observed in its 2020 Order: "[T]he Federal Defendants have emphatically and repeatedly denied that they have engaged in any wrongful or unlawful conduct. Thus, there is no indication that their crowd control tactics, which the Court has already found to support both a finding of success on the merits and likelihood of irreparable harm, and which Plaintiffs' expert has characterized as including excessive force, would change if they re-engage in crowd control enforcement and the Court's injunctive relief is no longer in place." *Index Newspapers*, 480 F. Supp. 3d at 1152.

"remain in the area despite dispersal orders"—all of which, he claims, makes it harder for FPS to "effectively … secur[e] the property." (Zitny Decl. ¶¶ 18, 19, 20; *accord* Declaration of Patrick D. McKenna ("McKenna Decl."), Dkt. 208 ¶ 5 (claiming it is too difficult to "differentiate legitimate Journalists and Legal Observers from imposters"); Declaration of Brian S. Acuna ("Acuna Decl."), Dkt. 207 ¶ 9 (complaining that officers under the Injunction must "second-guess" their actions).)

These are not the statements of supervisors who intend to comply with the terms or the spirit of the Injunction after it is lifted. Rather, these declarants would like the Court to dissolve the Injunction so they can return to their "sustained pattern of conduct" from last summer—conduct that may make their agents' lives easier, but that also "resulted in numerous injuries to members of the press." *Index Newspapers*, 977 F.3d at 826. This is precisely why courts will not adjudge a case moot unless the offending party has made it "absolutely clear" that it will not take up where it left off before the injunction issued. *Friends of the Earth*, 528 U.S. at 189. Here, the federal agents have all but said that they will do exactly that.[28]

### C.    The Federal Agents' Other Mootness Arguments Also Fail

#### 1.    Other Cases Involving Different Plaintiffs and Different Legal Theories Do Not Help the Federal Agents

The recent decisions in *Wise v. City of Portland*, No. 3:20-CV-01193-IM, 2021 WL 1950016 (D. Or. May 15, 2021) and *Western States Ctr., Inc. v. United States Dep't of Homeland*

---

[28] Defendants claim that, under *Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1460 (9th Cir. 1996), "the voluntary cessation doctrine [is] inapplicable where the actions of a third party are responsible for the change in Defendants' actions." (Mot. at 13.) What *Pub. Utilities Comm'n* actually says, however, is that the voluntary cessation exception applies only where the defendant modified its conduct "*because of* the litigation." *Pub. Utilities Comm'n*, 100 F.3d at 1460 (emphasis in original). Here, there can be no question that the exception applies. Setting aside that the Court has already recognized "Federal Defendants' voluntary change in enforcement tactics," *Index Newspapers*, 480 F. Supp. 3d at 1140, Director Zitny testified that the Preliminary Injunction has "hampered" federal officers' response to the ongoing protests in Portland—something that would be impossible unless the conduct of federal officers changed "*because of* the litigation."

*Sec.*, No. 3:20-CV-01175-JR, 2021 WL 1896965 (D. Or. May 11, 2021) are no help to the federal agents.

The plaintiffs in *Wise* were self-described "protest medics," none of whom were licensed medical professionals in the state of Oregon. *Wise*, 2021 WL 1950016 at *1. The court denied their motion for injunctive relief for lack of standing, *id.* at *8, finding several deficiencies that do not apply here. For instance, the medics could not "demonstrate a substantial risk of targeting or retaliation in the future" because "'protest medics'" is not "a readily identifiable and distinct group capable of being 'targeted' by law enforcement." *Id.* at *5. They also "position[ed] themselves right next to protesters in areas which pose the most risk of harm, rather than standing apart from the crowd, undermining the suggestion their harm was the result of intentional targeting." *Id.* And "over half of the incidents of alleged targeting and retaliation described appear to have occurred after Plaintiffs resisted law enforcement efforts to disperse an area," which no "established legal authority suggest[ed] … protest medics … were entitled to [do]." *Id*. None of this is true about Plaintiffs in this case.

The *Wise* court also found that, even if the plaintiffs had had standing, their claims would have been moot. *Id.* at *8. But again, its reasons do not apply here. The *Wise* plaintiffs claimed that the defendants were acting pursuant to a "policy of unlawful conduct" that traced back to "public statements from former President Trump and former Acting Secretary of DHS Chad Wolf," as well as "President Trump's Executive Order on 'Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence,'" which the plaintiffs had incorporated into their complaint. *Id.* at *7 & n.2. But as the court found, the statements from former President Trump and Mr. Wolf bore "no apparent nexus" to the medics' claims, *id.* at *7, and because they were no longer in office, the plaintiffs' legal theory—which depended on those statements—was no longer tenable. Also, the Executive Order the plaintiffs had incorporated into their complaint was no longer in effect: The provision they had relied on had "expired by its own terms on December 31, 2020," and on May 14, 2021, "President Biden revoked the Executive

Order in its entirety." *Id*. at *9. Again, none of this applies here, as Plaintiffs' claims in this case do not depend on executive orders or statements from administration.

*Western States* is even less analogous. As that one-page order makes clear, former-President Trump's tweets were "critical to [the court's] original holding." 2021 WL 1896965 at *1. Since those tweets were "not only erased but utterly repudiated by th[e] change in administration," the court found the injunction moot. *Id.* ("It took the tweets to make their case, and they are gone.") Because the Court's Injunction in this case did not turn on tweets or any other communications from former President Trump or his administration, *Western States* also does not apply.

### 2.    The Change in Administration Does Not Help the Federal Agents

For the same reason, the federal agents' argument that President Biden's election undermines the Court's finding of retaliatory animus (Mot. at 9-11) falls flat. First, retaliation was only one basis for the Court's Injunction. The Court also issued its Injunction to protect Plaintiffs' right of access to report on the protests. *See Index Newspapers*, 480 F. Supp. 3d at 1146-49. The Ninth Circuit affirmed that ground. *Index Newspapers*, 977 F.3d at 829-34. And the change in administration has yielded no change in the federal agents' position here. At the time, they argued that "the press is not entitled to any special First Amendment right of access to observe and record the protests taking place on Portland's streets and sidewalks." *Index Newspapers*, 977 F.3d at 829. Now, they continue to argue that "the First Amendment … permit[s] federal law enforcement officers to use crowd-dispersal tactics … without exempting self-described journalists and legal observers." (Mot. at 20.) On this point, the Biden administration walks in lockstep with the Trump administration.

Even as to retaliation, the change in administration makes no difference. The federal agents' argument that former President Donald Trump's tweets and former Acting Secretary Chad Wolf's emails were the sole basis for the Court's finding of retaliatory animus blinks reality. (*Cf.* Mot. at 9.) The Court's finding was based on "numerous declarations and other video evidence describing and showing situations in which the declarants were identifiable as press,

were not engaging in unlawful activity or even protesting, were not standing near protesters, and yet were subjected to violence by federal agents under circumstances that appear to indicate intentional targeting." *Index Newspapers*, 480 F. Supp. 3d at 1145-46. The Ninth Circuit agreed. *Index Newspapers*, 977 F.3d at 829 ("Because the district court's findings include so many instances in which plaintiffs were standing nowhere near protesters while photographing and observing the Federal Defendants' actions, they provide exceptionally strong evidentiary support for the district court's finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights.") The change in administration is simply immaterial.[29]

### 3.  That Protests Now Take Place Outside the ICE Facility Does Not Help the Federal Agents

The federal agents' remaining mootness arguments are also unpersuasive. The Injunction was not limited to their conduct outside the Hatfield Courthouse, *Index Newspapers*, 480 F. Supp. 3d at 1155-57, so even if "the bulk of the … unlawful gatherings" has shifted from the Courthouse to an ICE facility a mile and a half away (Mot. at 8-9), that simply has no bearing on whether the Injunction is moot.

Even if the location of protests were relevant to the Injunction, *Thomas v. Cty. Of Los Angeles*—which does not deal with mootness—is nothing like this case. (*See* Mot. at 9.) The plaintiffs there "alleg[ed] that deputy sheriffs at the Lynwood station of the Los Angeles County Sheriff's Department were mistreating minority citizens." 978 F.2d 504, 505 (9th Cir. 1992), *as amended* (Feb. 12, 1993). For that reason, the plaintiffs proposed an injunction that was limited to "Department personnel acting 'within the jurisdiction of the Lynwood station.'" *Id.* at 509. After *the defendants* objected that limiting the injunction to the Lynwood station would "interject

---

[29] In any case, a change in the party that controls the White House hardly entails a wholesale change in the attitudes of personnel actually policing protests. After all, the City's administration has been run by Democrats throughout this litigation, and indeed for the entire time the Court has had to superintend the Portland Police Bureau in *United States v. City of Portland*, 3:12-cv-02265-SI (D. Or.).

confusion into law enforcement operations," *id.* at 507, the court removed the geographic limitation, leaving an injunction that applied to all of Los Angeles rather than the single station against which the plaintiffs had expressly alleged claims. Plaintiffs in this case, by contrast, did not even mention the Hatfield Courthouse in their complaint. (*See* Dkt. 53 (SAC).) And while they did describe the "Justice Center" in downtown Portland (which is near the Courthouse) as "[o]ne focal point" of the protests, they in no way limited their claims to federal agents in that location. Indeed, the complaint does not even specify where in Portland Plaintiffs were when federal agents assaulted them.

Finally, even if the U.S. Marshals Service has not recently deployed outside the Hatfield Courthouse (Mot. at 12), that is no reason to find Plaintiffs' claims moot. As explained above, the party seeking dissolution of the injunction must make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. The most the federal agents can say, however, is that USMS's "current assignment and posture is to protect the interior of the building, and [that] they do not anticipate exiting the building to respond to criminal activity." (Mot. at 12.) That is simply not enough. The Ninth Circuit discourages findings of mootness where a "new policy could be easily abandoned or altered in the future." *Rosebrock*, 745 F.3d at 972. Here, USMS's "discretionary decision" not to engage outside the Courthouse "is neither 'entrenched' nor 'permanent.'" *McCormack*, 788 F.3d at 1025. In fact, the federal agents do not even suggest that a formal policy stands in its way should it desire to change its approach. (Mot. at 13.) Again, mootness demands far more. *See Index Newspapers,* 480 F. Supp. 3d at 1140 (finding that "the change in enforcement tactics does not … moot Plaintiffs' claims" because "[i]t is subject to change without notice and whenever the Federal Defendants assert that it is needed").

## III.  THE FEDERAL AGENTS' "CHANGED CIRCUMSTANCES" ARGUMENTS ALSO FAIL

Recognizing that Plaintiffs' claims are not "formally" moot, the federal agents offer a gallimaufry of arguments that the Court should dissolve the injunction because of "changed

circumstances." (Mot. at 15.) Showing changed circumstances is a threshold burden for the federal agents; unless they can demonstrate a "significant change in facts or law," the Court need not even address the four factors for injunctive relief. *Hawaii v. Trump*, 871 F.3d 646, 654 (9th Cir. 2017) (quotation marks omitted); *Karnoski*, 926 F.3d at 1198.

The federal agents cannot meet that burden. In an indication of how little has truly changed, almost none of their arguments have to do with changed circumstances. They argue that Plaintiffs must identify a written policy of retaliation. But the Court has already rejected that argument. They argue that the political officeholders with retaliatory intent have departed. But the Court relied on the conduct of agents on the ground—and the federal agents do not argue that those personnel have changed. Finally, they concoct a new legal argument that the United States' sovereign immunity bars the Court from granting equitable relief. But while this argument is new to this litigation, neither the Administrative Procedure Act nor the law of sovereign immunity have changed during the pendency of this litigation, so this argument, too, fails to address changed circumstances. It is also mistaken. The federal agents fail to show changed circumstances and the Court may end its analysis there.

### A.    Plaintiffs Need Not Identify a Written Policy of Retaliation Against Journalists and Legal Observers

The federal agents argue—for the umpteenth time[30]—that Plaintiffs must identify some "policy of Federal Defendants[] that directed individual federal law enforcement officers to retaliate against First Amendment activities." (Mot. at 16.) They ignore, of course, that in seeking to dissolve the Injunction, *they* bear the burden of showing changed circumstances. *Hawaii*, 871 F.3d at 654. They fail to meet that burden for at least two reasons.

First, the Injunction is predicated on the federal agents' policy of violating Plaintiffs' right of access by subjecting reporters and legal observers to general dispersal orders. These circumstances—which the federal agents neglect to address in their motion—have not changed.

---

[30] As the federal agents acknowledge, they have essayed the same argument "[t]hroughout this litigation." (Mot. at 16.)

PAGE 23 - PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR
INDICATIVE RULING

To the contrary, as explained above in Part II.C.2, the federal agents expressly declare that their policy remains the same as ever. (Mot. at 20.) For this reason alone, the federal agents fail to carry their burden of proving that the most material circumstance giving rise to the Injunction has changed. In fact, they concede that it has not.

Second, the Court has already held that Plaintiffs need not identify a written policy to hold the federal agents liable for their actual routine practices:

> The Federal Defendants also argue that they have a formal policy of supporting First Amendment rights and contend that Plaintiffs fail to show otherwise. The Federal Defendants may not, however, hide behind a formal policy if in practice they do not conform to that policy. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (en banc) (noting that a defendant cannot escape its "actual routine practices" by "pointing to a pristine set of policies"). At this stage of the litigation, the Court is persuaded by the number of alleged acts and the expert testimony of Mr. Kerlikowske that the conduct of the federal officers has not been reflective of a policy or practice of respecting First Amendment rights.

(Dkt. 157 at 40.)

In response, the federal agents argue that any "*de facto* policy … of tolerating retaliation" disappeared when "the political officeholders who allegedly harbored retaliatory intent [were] replaced." (Mot. at 17-18.) But, as explained above in Part II.C.2, this Court based its decision largely on the retaliatory conduct of agents on the ground, not on statements by the prior administration. *See Index Newspapers*, 480 F. Supp. 3d at 1145-46. The federal agents do not argue that those agents (or their immediate superiors) have departed. (Mot. at 15-18.) Indeed, their commanding officer then appears still to be their commanding officer now. (Borden Decl., Ex. 2.) And the federal agents do not deny that they *still* have not disciplined any agent for retaliating against journalists and legal observers last summer, and they *still* argue that such conduct was justified because of the "chaotic and unique circumstances" of the nightly protests. (Mot. at 16-18.)

The mere fact of a change in political administration cannot suffice to meet the federal agents' burden to show changed circumstances. All the more so when federal agents have, since the change in administration, continued to target journalists and legal observers, including named plaintiffs in this case. (Mahoney Decl. ¶¶ 7-8, 12, 15-16; Wong Decl. ¶¶ 8, 12; Yau Decl. ¶¶ 4, 6; *supra* nn.15-16, 19 and accompanying text). All the more so when the federal agents argue, strenuously, that they have made no "change in a policy or practice at issue in this lawsuit." (Mot. at 13.) And all the more so when, even if the Court accepts everything the federal agents say, they still maintain that journalists and legal observers have no right of access that they are bound to respect.

### B.      Sovereign Immunity is No Bar to Plaintiffs' Suit

The federal agents also offer a new argument—purely a legal one, albeit camouflaged within "changed circumstances"—that sovereign immunity bars Plaintiffs' suit. They argue that federal agents taking action against reporters and legal observers at protests is not a "final agency action" that the Court may review under the Administrative Procedure Act's waiver of sovereign immunity. (Mot. at 18-20.) Their position that the Court is powerless to enjoin the government from violating the First Amendment at protests is mistaken.

### 1.      When Federal Agents Shoot, Beat, Arrest, or Threaten to Arrest Someone, They Are Taking "Agency Action"

"Agency action" broadly includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 701(b)(2). "Sanctions" include, among other things, "the whole or a part of an agency … prohibition, requirement, limitation, or other condition affecting the freedom of a person, … or taking other compulsory or restrictive action." *Id.* § 551(10)(A), (G). "Orders" include "the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than a rule making but including licensing." *Id.* § 551(6). In short, "agency action" covers "comprehensively every manner in which an agency may exercise its power." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

Importantly here, "agency action" is not limited to formal or informal rules or policies. *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 577, 579-80 (9th Cir. 2019). It includes federal agents' "application and enforcement" of rules and policies against individuals. *Id.* (emphasis omitted). In *S.F. Herring Association*, rangers of the National Park Service ordered the plaintiffs not to fish in the Golden Gate National Recreation Area (GGNRA). *Id.* at 576-77. At least one plaintiff understood that if he disobeyed the rangers' orders, he would be subject to federal prosecution. *Id.* The court held that the rangers' orders easily qualified as agency action. *Id.* at 577. Just so here. If "ordering fishermen not to fish on pain of fines and imprisonment" is agency action—and it is, because it is both an "order" and a "prohibition … affecting the freedom of a person"—then so is ordering journalists and legal observers to disperse from the scene of a protest on pain of shootings and beatings. *See id.* at 577; 5 U.S.C. §§ 551(10), (13). So too is actually shooting, beating, arresting, or threatening to arrest a journalist for failure to follow such an order. After all, violence is the ultimate "exercise" of an agency's power. *See Whitman*, 531 U.S. at 478.

The federal agents argue that under *Lujan v. Nat'l Wildlife Fed'n*, their challenged conduct is not "agency action" at all, but merely unreviewable "operations." (Mot. at 27.) This argument stretches credulity. The plaintiffs in *Lujan* sought review not of any regulation, order, sanction, or other disposition, but of the "continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." 497 U.S. 871, 890 (1990). Likening this to seeking a "general judicial review of the BLM's day-to-day operations," the Court held that the Plaintiffs had not identified any agency action they were challenging. *Id.* at 899. The analogy might be apt if Plaintiffs were challenging, say, FPS's "public-order policing operations." But Plaintiffs are not. Plaintiffs have challenged, specifically, federal agents' denying them access to report on protests and federal agents' retaliating against them for reporting on protests. As in *S.F. Herring Association*, those are specific "agency actions" within the purview of the APA's judicial-review provisions. 946 F.3d at 577.

2.     **Shooting, Beating, Arresting, or Threatening to Arrest Someone is a "Final" Agency Action**

The Supreme Court has set forth "two conditions that generally must be satisfied for agency action to be 'final' under the APA": "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps. of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quotation marks omitted). This is a "pragmatic" standard whose goal is to protect "merely tentative" decisions from judicial review until they reflect "the consummation of the agency's decisionmaking process." *Id.*; *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

In *S.F. Herring Association*, the agency had for years issued statements asserting jurisdiction over the waters of the GGNRA. 946 F.3d at 578. But the "critical[]" juncture, in the court's analysis, came when the agency's officers "took to the waters to order herring fishermen to stop fishing in the GGNRA." *Id.* At that point, the agency's position "was a fait accompli." *Id.* at 578-79; *see also Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The issuance of the compliance order also marks the consummation of the agency's decisionmaking process." (quotation marks omitted)). In like manner, federal agents' issuance of dispersal orders—and their enforcement of such orders against journalists and legal observers—made the agencies' position a fait accompli. "[N]ot much about [ten pepperballs to the back] fe[els] 'merely tentative.'" *S.F. Herring Ass'n*, 946 F.3d at 578; (*see* Declaration of Mathieu Lewis-Rolland, Dkt. 44 ¶¶ 7-14).

Shooting, beating, arresting, or threatening to arrest someone also satisfies the requirement that the agency action be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. As in *S.F. Herring Association*, "there is no suggestion that compliance with the [federal agents' dispersal] orders … was somehow optional, and neither the [federal agents] nor [Plaintiffs] treated them that way." 946 F.3d at 580. The dispersal orders "were instead a display of 'legal force'"—often followed with physical force—"where 'immediate compliance' was expected." *See id.* (quoting *Oregon*

*Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006)). The federal agents'
"position was definitive and the legal consequences for [journalists and legal observers] were
real—'the hallmarks of APA finality.'" *Id.* at 581 (quoting *Sackett*, 566 U.S. at 126). Just as the
in-water enforcement orders were final agency action in *S.F. Herring Association*, the federal
agents' dispersal orders and their enforcement of them against journalists and legal observers
were final agency action here.

## IV. THE FEDERAL AGENTS FAIL TO PROVE THAT THE INJUNCTIVE FACTORS NOW WEIGH IN THEIR FAVOR

Even if the federal agents could prove that circumstances have "significant[ly] changed,
they must still prove that the four-factor injunctive test now favors them rather than Plaintiffs.
*Karnoski*, 926 F.3d at 1199. They cannot make this showing, much less offer any cogent
argument as to why they should be allowed to violate the First Amendment in discharging their
obligation to protect federal property. For all the reasons given by this Court and the Ninth
Circuit, none of which have changed, Plaintiffs are still likely to prevail on the merits. Plaintiffs
are still likely to suffer irreparable harm without an injunction given that protests continue to
occur and Plaintiffs' will be chilled from reporting and observing them. The balance of equities
still tips sharply in favor of protecting Plaintiffs' exercise of their First Amendment rights. And
the public interest is still best served by permitting journalists and legal observers to report on
protests.

### A. Plaintiffs Are Still Overwhelming Likely to Prevail on the Merits

Few if any issues remain to be decided regarding Plaintiffs' First Amendment right-of-
access claim. The elements of such a claim are (1) that the place or process to which access is
sought have "historically been open to the press and general public"; (2) that "public access
plays a significant positive role in the functioning of the particular process in question." *Index
Newspapers*, 977 F.3d at 829 (quotation marks omitted). If both elements are met, then the
burden shifts to the government to show that "it has an overriding interest based on findings that
closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.*

The Ninth Circuit has already held that the first two elements are met. *Id.* at 829-31. It also held that this Court's conclusion that "the Federal Defendants' response to the plaintiffs was [not] essential or narrowly tailored to serve the government's interests" was "well-supported." *Id.* at 832-33. The federal agents have offered no reason to doubt the factual basis for that conclusion, including Mr. Kerlikowske's opinion that "trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control," which this Court found credible and persuasive. *Id.* at 833.

Plaintiffs' retaliation claim is similarly robust. The first two elements of retaliation are that Plaintiffs were engaged in protected First Amendment activity and that the government's conduct would have chilled a person of ordinary firmness from continuing to engage in such activity. *Id.* at 827. The Ninth Circuit held that the federal agents had no good-faith basis for contesting those elements. *Id.* The Ninth Circuit also held that the fact that Plaintiffs were shot, beaten, arrested, or threatened with arrest while engaging only in protected activity and while located away from protesters or rioters sufficed as to the third element. *Id.* at 827-28. All that has changed in the political administration of the Executive Branch—but, as explained above, federal agents have continued to target journalists and legal observers even after the turnover at the top.

## B.    The Federal Agents Have Not Proven that Plaintiffs Will No Longer Suffer Irreparable Injury

As this Court recognized in granting the Injunction, the federal agents' conduct caused irreparable injury by chilling Plaintiffs' First Amendment rights. (Dkt. 157 at 50 ("After the Court's initial finding of irreparable harm to support the TRO, Plaintiffs provided even more evidence that journalists' First Amendment rights have been chilled, including declarations in which journalists describe being subject to less lethal munitions that required the journalist to stop covering the protests for the night or for some period of time, or chilled the journalist from returning to cover the protests in the future.").) Dissolving the Injunction when the federal agents

will still engage with Plaintiffs would cause the same chilling effect. (Mahoney Decl. ¶¶ 17-19; Rudoff Decl. ¶¶ 8-10; Wong Decl. ¶ 13; Yau Decl. ¶ 8.)

The federal agents argue that Plaintiffs must "establish a likelihood of irreparable harm." (Mot. at 21.) But in seeking to dissolve the Injunction, they are the ones who must show that the likelihood of irreparable harm the Court found in granting the Injunction has dissipated. *Karnoski*, 926 F.3d at 1198 (explaining that the burden for all the injunctive factors remains with the party seeking dissolution). They have not met that burden.

Under blackletter equitable principles, a court's "power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). As long as there remains "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive," injunctive relief is warranted. *Id.* "To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.*[31]

Taking these factors in sequence, first, the federal agents have expressed *no* intent to comply, let alone a bona fide intent. Rather, as explained above in Part II.B (citing Zitny Decl. ¶¶ 18, 19, 20; McKenna Decl. ¶ 5; Acuna Decl. ¶ 9), the federal agents have made clear that if the Injunction is lifted, they intend to resume using physical force to disperse journalists and legal observers at protests. Second, the effectiveness of the purported present discontinuance is dubious at best. The federal agents argue that "Plaintiffs have raised no claims with this Court of

---

[31] The Ninth Circuit elaborated on these factors in *Fed. Election Comm'n v. Furgatch*: "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations." 869 F.2d 1256, 1263 n.5 (9th Cir. 1989). The federal agents argue for the first time that *Furgatch* doesn't apply to "disputes over equitable preliminary injunctions." (Mot. at 23.) Of course, both this Court and the Ninth Circuit have already disagreed. *Index Newspapers*, 977 F.3d at 826-27 & n.3; *Index Newspapers*, 480 F. Supp. 3d at 1152-53. But the factors are essentially the same "whether as articulated by the Supreme Court in *W.T. Grant* or the Ninth Circuit in *Furgatch*," and either way the federal agents are not entitled to dissolution of the injunction. *Index Newspapers*, 480 F. Supp. 3d at 1153.

PAGE 30 - PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR
        INDICATIVE RULING

violations of the preliminary injunction," ignoring (1) that Plaintiffs have an outstanding motion for contempt before the Court (Dkt. 85), and (2) that, as they are well aware, Plaintiffs have chosen to raise violations of the injunction with their counsel in an attempt to resolve issues without bringing them before the Court. (Borden Decl., Exs. 3-4.) Since the change in administration, federal agents have shot Plaintiff Yau twice (Yau Decl. ¶ 6), Plaintiff Mahoney once (Mahoney Decl. ¶¶ 15-16), two other ACLU observers once each (Mahoney Decl. ¶¶ 8, 12), and in a particularly violent outburst in March, "ke[pt] shooting press people with munitions."[32] Finally, as the Court explained in its Order, the character of the past violations is "particularly egregious." *Index Newspapers*, 480 F. Supp. 3d at 1153.

In sum, even if there are fewer protests today than in July 2020, there certainly remains "some cognizable danger of recurrent violation." *W. T. Grant Co.*, 345 U.S. at 633. Thus, the federal agents have failed to meet their burden to show that circumstances have so changed that the Injunction should be dissolved.

### C.    The Balance of Equities and Public's Interest Favor Continuing the Injunction

As this Court recognized in granting the Injunction, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (granting an injunction under the Fourth Amendment). Regarding balancing the equities, when a plaintiff has "raised serious First Amendment questions," the balance of hardships "tips sharply in [the plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (alterations in original) (quotation marks omitted). *See generally Index Newspapers*, 480 F. Supp. 3d at 1154-55.

---

[32] @suzettesmith, Twitter (Mar. 11, 2021, 11:35 P.M.), https://twitter.com/suzettesmith/status/1370277185760600069.

The federal agents' discussion of the balance of equities is merely a truncated regurgitation of old arguments about the federal government's interest in protesting federal property and personnel and the purported unworkability of the Injunction. (*Compare* Mot. at 24-26, *with* Dkt. 138 at 25-35.) It is mistaken for reasons the Court has already laid out: The Injunction does not protect unlawful conduct, it already provides that "press and legal observers may not impede, block, or interfere with law enforcement," and "[t]he fact that a few people may have engaged in some unlawful conduct does not outweigh the important First Amendment rights of journalists and legal observers and the public for whom they act as surrogates." *Index Newspapers*, 480 F. Supp. 3d at 1154-55. Thus, even if, for example people marked as press have "physically surround[ed] law enforcement officers during operations"—an accusation for which the federal agents decline to offer a declarant with personal knowledge—the Injunction withdraws protection from such persons. (Mot. at 25; Dkt. 157 at 58.) Furthermore, the federal agents complain that if they allow journalists behind their lines, an officer must remain behind to liaise with them (Mot. at 25)—but that is exactly what Gil Kerlikowske, the former head of CBP, explained in his expert opinion that they should do. (Dkt. 135 ¶ 17.) The federal agents' arguments to the contrary are no more availing now, when they bear the burden, than they were when Plaintiffs bore the burden.

More fundamentally, however, the federal agents' discussion of the equities highlights the fundamental tension in their argument. If the Injunction was necessary only because of "long-past incidents that were part of a concluded law enforcement operation carried out in response to abated civil unrest and ultimately directed by departed officeholders" (Mot. at 23), then how can the federal agents also claim that the Injunction so substantially injures law-enforcement interests as to overcome the "significant public interest in First Amendment rights"? *See Index Newspapers*, 480 F. Supp. 3d at 1155. The answer is that they cannot.

* * *

While protests may have reduced in frequency and size since their height last summer, protests in Portland have hardly ended, and neither has federal agents' interacting with journalists

PAGE 32 - PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR INDICATIVE RULING

and legal observers while dispersing crowds. When protests do take place at federal property, Plaintiffs and other journalists and legal observers still attend and report on them. And the federal agents' stated intention is to resume denying journalists and legal observers access to report if the Injunction is lifted. Journalists and legal observers still need the protection of the Court's Injunction.

## **CONCLUSION**

For the foregoing reasons, the Court should decline to issue an advisory opinion, or in the alternative opine that it would deny the federal agents' motion.

Dated: July 28, 2021                    Respectfully submitted,


By: /s/ Matthew Borden
    Matthew Borden, *pro hac vice*
    J. Noah Hagey, *pro hac vice*
    Ellen V. Leonida, *pro hac vice*
    Athul K. Acharya, OSB No. 152436
    Gunnar K. Martz, *pro hac vice*
    BRAUNHAGEY & BORDEN LLP


    Kelly K. Simon, OSB No. 154213
    ACLU FOUNDATION OF OREGON

    *Attorneys for Plaintiffs*