# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

INDEX NEWSPAPERS LLC d/b/a
PORTLAND MERCURY, *et al.*,

        Plaintiffs,

    v.

CITY OF PORTLAND, *et al.*,

        Defendants.

Case No. 3:20-cv-1035-SI

**OPINION AND ORDER**

Matthew Borden, J. Noah Hagey, Ellen V. Leonida, Athul K. Acharya, Sarah Saloman, Kory J. DeClark, and Gunnar K. Martz, BRAUNHAGEY & BORDEN LLP, 351 California Street, Tenth Floor, San Francisco, CA 94104; Kelly K. Simon, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF OREGON, P.O. Box 40585, Portland, OR 97240. Of Attorneys for Plaintiffs.

Denis M. Vannier and Naomi Sheffield, Senior Deputy City Attorneys; and Ryan C. Bailey, Deputy City Attorney, OFFICE OF THE CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Bryan M. Boynton, Acting Assistant Attorney General, Civil Division; Scott Erik Asphaug, Acting United States Attorney for the District of Oregon; Alexander K. Haas, Director, Federal Programs Branch; Brigham J. Bowen, Assistant Director, Federal Programs Branch; Andrew I. Warden, Senior Trial Counsel; Jordan L. Von Bokern, Keri L. Berman, Jason Lynch, and Michael P. Clendenen, Trial Attorneys; U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L. Street, NW, Washington, D.C. 20530. Of Attorneys for Defendants U.S. Department of Homeland Security and U.S. Marshals Service.

James L. Buchal, MURPHY & BUCHAL LLP, 3425 SE Yamhill Street, Suite 100, Portland, OR 97214. Of Attorney for *Amicus Curiae* National Police Association.

Christopher J.K. Smith, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201; Katie Townsend, Gabe Rottman, and Adam A. Marshall, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, 1156 15th Street NW, Suite 1020, Washington, D.C. 20005. Of Attorneys for *Amici Curiae* Reporters Committee for Freedom of the Press and 16 News Media Organizations.

**Michael H. Simon, District Judge.**

On August 20, 2020, the Court preliminarily enjoined the U.S. Department of Homeland Security (DHS) and the U.S. Marshals Service (USMS) (collectively, the Federal Defendants) from engaging in particular law enforcement activity with respect to journalists and authorized legal observers while responding to protests in Portland, Oregon. The Court entered the injunction after making specific findings regarding the use of excessive force against journalists and authorized legal observers by some law enforcement agents of the Federal Defendants while responding to the nightly protests that were then occurring in Portland. The Federal Defendants timely appealed the Court's decision to the Ninth Circuit Court of Appeals, and that appeal remains pending.

Before the Court is the Federal Defendants' motion under Rule 62.1(a) of the Federal Rules of Civil Procedure for an indicative ruling by this Court that it would grant the Federal Defendants' motion to dissolve the preliminary injunction if the Ninth Circuit were to remand the case for that purpose. The Federal Defendants argue that changed circumstances in Portland no longer support preliminary injunctive relief and have rendered moot the claims for injunctive relief. As discussed below, the Court finds that the Federal Defendants have shown a significant change in facts that warrant dissolution of the injunction. Thus, there is no need also to reach the Federal Defendants' arguments relating to mootness, and the Court declines to do so. The Court grants the Federal Defendants' request for an indicative ruling, construes the Federal Defendants' motion as including a motion to dissolve the preliminary injunction for which the Court does not have jurisdiction because of the pending appeal, and states under Rule 62.1(a)(3) that the Court would grant the motion to dissolve if the Ninth Circuit remands for that purpose.

## STANDARDS

### A.  Indicative Ruling

Rule 62.1 of the Federal Rules of Civil Procedure provides:

> (a) **Relief Pending Appeal**. If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>
> (1) defer considering the motion;
>
> (2) deny the motion; or
>
> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 62.1(a). If a court states that it would grant the motion or that the motion raises a substantial issue, the movant must promptly notify the circuit clerk, and the Court of Appeals may then decide whether to remand for further proceedings. *See* Fed. R. Civ. P. 62.1(b); Fed. R. App. P. 12.1(a) & (b).

"Courts are split as to whether a party seeking a ruling under Rule 62.1 must also file an accompanying predicate motion that the district court lacks authority to grant." *Est. of Najera-Aguirre v. County of Riverside*, 2020 WL 5370618, at *1 (C.D. Cal. Aug. 13, 2020). Some courts find that Rule 62.1(a) "only applies when a 'timely motion' (typically a Rule 60(b) motion) has been made for relief that the court lacks jurisdiction to grant, because of the pendency of an appeal. Absent an underlying, predicate motion, there is no basis for relief under Rule 62.1." *Medgraph, Inc. v. Medtronic, Inc.*, 310 F.R.D. 208, 210 (W.D.N.Y. 2015) ("[P]rocedurally there is no basis for an independent, free-standing Rule 62.1 motion . . . ."); *see also Rowe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.*, 2017 WL 10398767, at *2 (N.D. Ga. July 14, 2017) ("Rule 62.1 is intended to be used in conjunction with a separate motion seeking relief, such as a Rule 60(b) motion to vacate a judgment that is pending on appeal."); *United States v.*

*Ocampo*, 2013 WL 686922, at *1 (E.D. Mich. Feb. 26, 2013) (denying petitioner's motion for an injunction pursuant to Rule 62.1(a)(1) where "there is no pending motion. Rather, Petitioner has simply filed a Rule 62[.1](a)(1) motion").

Other courts accept a "freestanding" Rule 62.1(a) motion if the moving party sufficiently states the merits of its substantive argument in its briefs. *See Est. of Najera-Aguirre*, 2020 WL 5370618, at *1 ("Because Defendants' Rule 62.1(a) motion sufficiently sets forth the merits of their arguments to reconsider the Court's denial of summary judgment, the Court declines to deny Defendants' motion for an indicative ruling merely because they failed to file a separate motion for reconsideration."); *Lawson v. Grubhub, Inc.*, 2018 WL 6190316, at *2 (N.D. Cal. Nov. 28, 2018) ("Plaintiff, however, has not made a formal Rule 60(b)(6) motion; instead, he asks, in effect, for the Court to indicate what it would do if Plaintiff filed a Rule 60(b)(6) motion. Nonetheless, rather than deny Plaintiff's motion for this procedural defect, the Court will construe it as a Rule 60(b)(6) motion which this Court does not have jurisdiction to decide because of the pending appeal."); *Metalcraft of Mayville, Inc. v. Toro Co.*, 2016 WL 8737777, at *2 (E.D. Wis. Nov. 18, 2016) ("I find that defendants' motion is procedurally sufficient. It requests relief that I cannot currently grant because of defendants' pending appeal and asks, instead, that I grant an indicative ruling under Rule 62.1. It is clear to me (and seems to be clear to the parties) what underlying relief defendants are requesting; the basis for their request; and why, under the circumstances, I lack the authority to grant that relief."); *Gorrell v. Haynes*, 2013 WL 174561, at *1 n. 1 (S.D. Ga. Jan. 16, 2013) ("The Court will consider Gorrell's Motion for Indicative Ruling filed pursuant to Rule 62.1 as if Gorrell had filed a motion to vacate the judgment pursuant to Rule 60(b) because Gorrell makes arguments in support of a Rule 60(b) motion in the instant Motion.").

The Federal Defendants' motion for indicative ruling contains argument and authority supporting the merits of their position that the preliminary injunction should be dissolved. The Court agrees with the line of cases accepting freestanding motions for indicative rulings that contain sufficient arguments on the merits of the intended underlying motion. Accordingly, the Court construes the Federal Defendants' motion for indicative ruling as including an underlying motion to dissolve the preliminary injunction, which the Courts lack jurisdiction to resolve because of the pending appeal.

**B. Preliminary Injunction**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

### C. Dissolving or Vacating a Preliminary Injunction

A preliminary injunction is an interlocutory order. As such, it can be dissolved, vacated, or modified "at any time" before final judgment is entered—the Ninth Circuit has "long recognized 'the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory.'" *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quoting Rule 54(b) of the Federal Rules of Civil Procedure and *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)). A motion to dissolve, vacate, or modify a preliminary injunction under Rule 54, however, must be "based on new circumstances that have arisen after the district court granted the injunction." *Id.* at 1125; *see also Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (plurality opinion) ("Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong."); *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) ("A district court has inherent authority to modify a preliminary injunction in consideration of new facts.").

"A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)). This inquiry requires two steps—first, a court must determine whether the movant has shown a significant change in facts or law. *Id.* If so, then the district court must consider whether the changed circumstance "warrants dissolution of the injunction." *Id.* (simplified) "This latter inquiry should be guided by the same criteria that govern the issuance of a preliminary injunction. In seeking dissolution of a preliminary injunction, however, the burden with respect to these criteria is on the party seeking dissolution." *Id.* "A

district court has 'wide discretion' to dissolve, modify, or reconsider a preliminary injunction

based on a change in factual or legal circumstances." *Latimore v. County of Contra Costa*, 77

F.3d 489 (9th Cir. 1996) (unpublished) (quoting *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647

(1961)); *see also Taylor v. Westly*, 525 F.3d 1288, 1289 (9th Cir. 2008) (stating that the Ninth

Circuit "review[s] a district court's decision disposing of a motion to modify or dissolve a

preliminary injunction for abuse of discretion"); *Starr v. Hawaii*, 2007 WL 842060, at *1 (D.

Haw. Mar. 19, 2007) ("A district court has wide discretion to dissolve or to modify a preliminary

injunction if circumstances, whether of fact or law, have changed since the issuance of the

injunction.").

## BACKGROUND

### A. Procedural History

Plaintiffs filed their original Complaint against the City of Portland (City) on June 28,

2020. On July 14, 2020, Plaintiffs moved for leave to file a Second Amended Complaint (SAC),

adding the Federal Defendants to this lawsuit. The Court granted Plaintiffs' motion. On

July 17th, Plaintiffs filed their SAC and moved for a temporary restraining order (TRO) against

the Federal Defendants, which the City supported shortly thereafter. On July 23, 2020, the Court

granted Plaintiffs' motion for a TRO against the Federal Defendants. The TRO against the

Federal Defendants was set to expire by its own terms on August 6, 2020. On July 28th,

Plaintiffs moved for a finding of contempt and imposition of sanctions against the Federal

Defendants, alleging several violations of the Court's TRO. On July 30th the Federal Defendants

moved for reconsideration of the TRO, requesting that it be dissolved. On July 31st the Court

stayed briefing on Plaintiffs' contempt motion. On August 4th, Plaintiffs moved to extend the

TRO against the Federal Defendants for an additional 14 days. On August 6th, after finding good

cause, the Court granted Plaintiffs' motion and extended the TRO against the Federal Defendants through August 20, 2020 and denied the Federal Defendants' motion for reconsideration.

On August 20, 2020, the Court granted Plaintiffs' motion for a preliminary injunction against the Federal Defendants and issued a preliminary injunction as follows: (1) preliminarily enjoining the Federal Defendants from "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer" absent probable cause the person has committed a crime, and providing that journalists and legal observers could not be subject to arrest for failing to disperse after a dispersal order, but further providing that journalists and legal observers were bound by all other laws and were expressly prohibited from blocking, impeding, or otherwise interfering with the lawful activities of the Federal Defendants; (2) preliminary enjoining the Federal Defendants from "seizing any photographic equipment, audio- or video-recording equipment, or press passes from any person whom they know or reasonably should know is a Journalist or Legal Observer," and from "ordering such person to stop photographing, recording, or observing a protest" unless the Federal Defendants were lawfully seizing the person; (3) preliminarily requiring the Federal Defendants to make a list of all property seized when arresting a journalist or legal observer and provide that list to the arrested person, obtain a search warrant if property is needed for evidentiary purposes, and promptly return all property not needed for evidentiary purposes and for which a search warrant was denied; (4) providing a list of indicia to help identify journalists; (5) providing a list of indicia to help identify legal observers; (6) expressly permitting the Federal Defendants to issue lawful crowd dispersal orders and providing that they "shall not be liable for violating this injunction if a Journalist or Legal Observer is incidentally exposed to crowd-control devices after remaining in the area where such devices were deployed after the

issuance of an otherwise lawful dispersal order"; and  (7) requiring the parties to confer on how

the Federal Defendants' officers could most appropriately place on their uniforms unique

identifying markers of letters or numbers that could be visible from a distance. *Index*

*Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1155-57 (D. Or. Aug. 20, 2020).

## B.  New Facts

### 1.  Protest Activity and the Federal Defendants' Response

The Federal Defendants describe the significant change in protest activity in Portland

from summer 2020 to summer 2021 as it relates to federal buildings. The protests have largely

moved from the downtown federal courthouse to the Immigration and Customs Enforcement

(ICE) building two miles away, and focus more on "anti-government sentiment" than social

justice. *See* ECF 205, at 3. The protests generally involve fewer than 200 people and some

involve less than a dozen. *Id.* From November 1, 2020 to August 11, 2021 (slightly more than

nine months), there were 23 protests involving federal property that were declared unlawful

assemblies and required a use of force, but from June 11, 2021 to August 11, 2021, there were

none. *Id.* (describing protests through June 11, 2021); ECF 227, at 1 (explaining that no protests

occurred between June 11, 2021 and August 11, 2021 that required a federal response involving

a use of force). Since November 1, 2020, protests resulted in the arrest of approximately 35

individuals for misdemeanor offenses and about 35 federal law enforcement officers sustaining

injuries. ECF 205, at 3. In the summer of 2021, the protests involving unlawful behavior at

federal buildings included a protest by seven persons on the evening of June 1st, which dwindled

to three persons by the early morning of June 2nd and a protest by 12 persons on May 29th. *Id.*

By comparison, from May 26, 2020 through October 31, 2020 (slightly more than five months),

there were protests that were declared unlawful assemblies daily, which resulted in the arrest of

more than 1,000 people and the injury of 219 federal law enforcement officers. *Id.* These protests also involved much larger crowd sizes.

The federal government's changed deployment in Portland also relates to the reduction in the protests. On May 2, 2021, Federal Protective Service (FPS) terminated Operation Diligent Valor, the augmented federal response in Portland. *Id.* at 3-4. As of June 11, 2021, FPS had less than 12 officers from outside Region 10[1] deployed in Portland, and FPS was no longer being augmented by other law enforcement agencies. *Id.* at 4. By August 11, 2021, "the FPS presence in Portland ha[d] mostly returned to [a] steady state, with only those officers normally assigned to Portland." ECF 227, at 3.

As of November 9, 2020, the USMS in Portland was no longer being augmented by additional staff. Additionally, the USMS officially shut down operations related to protest activity on November 15, 2020, and is no longer responding to protests. ECF 204, at 2-3. Even when the federal courthouse had a renewed attack against it on March 11, 2021 after its protective fencing was temporarily removed, the USMS did not respond. *Id.* at 3. Instead, only FPS and Portland Police Bureau responded. The last time the USMS exited the federal courthouse to respond to a protest was July 30, 2020, more than a year ago. *Id.* at 2.

Other federal law enforcement agencies that were once augmenting the federal forces in Portland are no longer deployed in the City. The U.S. Customs and Border Protection Border Patrol Special Operations Group has not been deployed in Portland since January 24, 2021. ECF 206, at 2. ICE Enforcement and Removal Operations Special Response Team members have not been deployed in Portland since March 21, 2021. ECF 207, at 6. ICE Homeland

---

[1] Region 10 of FPS includes the states of Washington, Oregon, Idaho, and Alaska.

Security Investigations Special Response Team members have not been deployed in Portland since about March 30, 2021. ECF 208, at 4.

Further, the federal government's approach to protests has changed at the highest levels from summer 2020. Then-President Donald Trump had issued Executive Order 13,933 ("Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence"), which focused on enforcing laws prohibiting the "desecration of public monuments" and "the vandalism of government property." Exec. Order No. 13933, 85 Fed. Reg. 40,081, 40,083 (June 26, 2020). That Executive Order directed the United States "to prosecute to the fullest extent permitted under Federal law, and as appropriate," persons who destroy or vandalize monuments, memorials, statues, or religious property and "to withhold Federal support" from State and local governments and law enforcement agencies "that have failed to protect public monuments, memorials, and statues from destruction or vandalism." *Id.* It also contained a provision allowing DHS to provide additional "personnel to assist with the protection of Federal monuments, memorials, statues, or property." *Id.* This latter provision expired by its own terms on December 26, 2020. President Biden revoked the Executive Order in its entirety on May 14, 2021.[2] Additionally, former Acting DHS Secretary Chad Wolf, who was involved in Operation Diligent Valor and visited Portland in the summer of 2020, has been replaced by Secretary Alejandro Mayorkas.

---

[2] The Court takes judicial notice of President Biden's "Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment" pursuant to Fed. R. Civ. P. 201(c)(1). *See White House Briefing Room, Executive Order on the Revocation of Certain Presidential Actions and Technical Amendment* (May 14, 2021), https://www.whitehouse.gov/briefing-room/presidentialactions/2021/05/14/executive-order-on-the-revocation-of-certain-presidential-actions-andtechnical-amendment/.

###### 2. Plaintiffs' Asserted Ongoing Harm

Plaintiff Kat Mahoney is an attorney and unpaid legal observer for the ACLU who wears a clearly identifying vest. She describes that on January 27, 2021, she was standing with Caitlin Wong, another legal observer, and members of the press when federal agents fired pepper balls at the group, along with firing pepper balls at protesters who had shot fireworks at the ICE building and moved a dumpster onto its driveway. ECF 221, at 2. Ms. Mahoney also describes an encounter on March 11, 2021, when she attempted to capture video of the remnants of an apparently new type of smoke grenade that had been launched by federal officers. Ms. Mahoney states that she and nearby members of the press were shot with pepper balls while no protesters were near. *Id.* at 3. Ms. Mahoney notes that because she has been attacked by federal agents, she is fearful that if the injunction is dissolved she will be in greater danger.

Plaintiff John Rudoff is a photojournalist. His work has been published internationally. Since this lawsuit began, he has been published in *Rolling Stone*, *The Nation*, and on the front page of the *New York Times*. He wears identifying press markings on his clothing and helmet. Mr. Rudoff describes covering a protest on May 1, 2021 outside the ICE facility in Portland when he was pushed away by federal agents. ECF 222, at 3. He adds that other than that incident, he has not been targeted by federal officers but believes that is because he is protected by the preliminary injunction. He fears that if the injunction is dissolved, federal officers will resume targeting and injuring journalists and legal observers. He notes his "profound concern" that the government is trying to dissolve the injunction and that he and other journalists he knows will either stop covering protests or reduce coverage if the injunction is dissolved because they will not be able to do their jobs "properly and safely." *Id.* at 5.

Caitlin Wong is an attorney and unpaid legal observer with the ACLU who wears an identifying vest. She also describes the January 27, 2021 incident at the ICE facility when she

and Ms. Mahoney were standing with members of the press, in a lighted area, away from protesters, while monitoring the federal agents' response to the protesters who had lit a dumpster fire. ECF 223, at 3. She began video-recording with her phone because she believed that federal officers would engage with protesters after they lit the fire. She states that it appeared that she, Ms. Mahoney, and the members of the press around them were targeted, and she was hit in her hand by a munition while holding the phone that was recording the incident. *Id.* She was unable to use her hand for the rest of the night. Her finger knuckles were knocked out of joint, and she had to tape her hand for six weeks. Ms. Wong fears that without the injunction, federal agents will target legal observers to avoid accountability and deter being observed. She worries that without the injunction, "the risk of being hurt by law enforcement while acting as a legal observer becomes a near certainty." *Id.* at 4.

Plaintiff Justin Yau is an independent journalist who has been published in the *Daily Mail*, *Reuters*, *Yahoo! News*, *The Sun*, *Los Angeles Times*, *Portland Mercury*, *Willamette Week*, *Spectee* (a Japanese news outlet), msn.com, and has had his photographs featured in *ProPublica* and *Oregon Public Broadcasting*. He is identified as press at all times while covering the Portland protests. He describes that on March 11-12, 2021, he was covering protests around the Hatfield U.S. Courthouse with a large camera, standing apart from protesters, when federal agents shot him with pepper balls, including his hands and the phone on which he was recording their actions. ECF 224, at 1. He also explains that on April 13-14, 2021, he was covering protests at the ICE facility, standing across the street from protesters, when federal agents shot multiple pepper balls at him, hitting him twice. *Id.* at 2-3. Mr. Yau believes that if the injunction is lifted, federal agents will return to pre-injunction behavior of "indiscriminate" use of tear gas and less lethal munitions, which would make him feel less safe to perform his job. *Id.* at 4.

The Federal Defendants dispute many of these declarants' characterizations of the events and the federal officers' conduct. Because the Court would grant the Federal Defendants' motion even under the facts as described by Plaintiffs and the other declarants, those disputes are not relevant to the Court's decision. The Court need not resolve the disputed facts regarding the interactions with federal officers on the handful of nights as described by Plaintiffs' declarants.

## DISCUSSION

The Federal Defendants argue that the changed facts regarding the significantly reduced number and size of protests in Portland, which have resulted in a significantly reduced federal response involving the use of force, warrant dissolution of the preliminary injunction. In the alternative, the Federal Defendants argue that these changed circumstances render Plaintiffs' claims moot. Because the Court agrees that the changed circumstances warrant dissolving the preliminary injunction, the Court declines to address the Federal Defendants' mootness argument.

## A.  Whether There are Significantly Changed Circumstances

The burden is on the Federal Defendants to show a significant change in facts or law. Plaintiffs argue that the Federal Defendants fail to meet this burden. The Court disagrees.

In granting the preliminary injunction, the Court relied on the significant volume and frequency of incidents from the near nightly protests that resulted in numerous responses from the Federal Officers involving force against journalists and legal observers in considering likelihood of success on the merits, irreparable harm, and the balance of the equities and public interest. *See Index Newspapers*, 480 F. Supp. 3d at 1142-45, 1151-55. The Court also relied, in finding irreparable harm, on the presence of out-of-state federal officers sent to Portland to police the protests and their apparent lack of training in crowd control and other relevant tactics. *Id.* at 1149-50. Indeed, the problems addressed by the injunction appeared so linked to the out-

of-state federal officers that the Court expressly stated in the preliminary injunction that local USMS officers stationed in Portland under the direction of the U.S. Marshal for the District of Oregon were exempt from the terms of the injunction. *Id.* at 1157.

These facts have changed in materially significant ways. Protests resulting in the use of force by federal agents have dwindled from nightly to sporadic, with none taking place in the last several months, at least based on information provided to the Court. Regarding the use of force against journalists or legal observers, Plaintiffs describe such conduct as occurring on only four nights—January 27, 2021, March 11, 2021, April 13, 2021, and May 1, 2021. Plaintiffs do not report any such conduct in May (other than the first day), June, or July, 2021. Additionally, there are no longer any out of state federal officers stationed in Portland.

The Court finds that the substantial change in the protests in Portland that have been declared unlawful assemblies and have been met with a law enforcement response that includes injury-producing conduct is a significant change in the facts underlying the preliminary injunction. So is the lack of augmentation in the federal police force. Thus, the Court turns to the second step of the analysis for a motion to dissolve the injunction—whether the changed circumstances warrant dissolving the injunction—by considering the factors required for a preliminary injunction based on the current factual situation. *Karnoski*, 926 F.3d at 1198.

**B.  Whether the Circumstances Warrant Dissolving the Preliminary Injunction**

In determining whether the changed circumstances warrant dissolving the preliminary injunction, the Court considers the same factors that are required to issue a preliminary injunction, but the burden of proof is now on the Federal Defendants to show that the factors do not support a preliminary injunction. *Id.*

### 1.  Likelihood of Success on the Merits

The Court previously found that Plaintiffs had at least raised serious questions going to the merits of their First Amendment retaliation and right of access claims. The Court addresses each claim under the current factual circumstances.

### a.  First Amendment Retaliation

To establish a claim of First Amendment retaliation, Plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) the Federal Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the Federal Defendants' conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006). The Federal Defendants argue that the changed circumstances alter the Court's analysis for the third factor.

In concluding that Plaintiffs sufficiently demonstrated retaliatory intent, the Court relied on "numerous declarations and other video evidence describing and showing situations in which the declarants were identifiable as press, were not engaging in unlawful activity or even protesting, were not standing near protesters, and yet were subjected to violence by federal agents under circumstances that appear to indicate intentional targeting." *Index Newspapers*, 480 F. Supp. 3d at 1145-46; *see also id.* at 1144-45 (describing the evidence). The Court found retaliatory intent based in part on this circumstantial evidence. *Id.* at 1145 ("These videos and declarations are all circumstantial evidence supporting retaliatory animus."). The Federal Defendants provide evidence that only a few, if any, such situations occurred in the nine months before the motion to dissolve was fully briefed. Plaintiffs have not provided evidence to the contrary, describing only four nights in which the federal officers engaged in improper conduct.

The Court previously found circumstantial evidence of retaliatory animus based on Plaintiffs' expert's declaration describing the lack of training of the out-of-state federal officers

and the lack of leadership and supervision to help those officers. *Id.* Those out-of-state federal officers, however, are no longer stationed in Portland. Thus, the facts on which the Court relied to find retaliatory animus have changed. The Court agrees with the Federal Defendants that based on the changed circumstances, the circumstantial evidence no longer supports a finding of retaliatory animus. Thus, the Court finds that Plaintiffs currently are not likely to succeed on the merits of their First Amendment retaliation claim, for purposes of prospective injunctive relief.

### b.  Right of Access to Public Streets and Sidewalks

In granting the preliminary injunction, the Court found that Plaintiffs at least raised serious questions on the merits that their right of access under the First Amendment was being infringed. *Id.* at 1146-48. This finding was based on the federal officers' repeated "closures" (*i.e.*, declaring a riot or unlawful assembly) of public streets and sidewalks. The Court applied *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986), to articulate the standard to apply in evaluating likelihood of success in Plaintiffs' claim of right of access. In *Press-Enterprise*, the Supreme Court established a two-part test for a claim of violation of the right of access. First, the court must determine whether a right of access attaches to the government proceeding or activity by considering whether the place and process have historically been open to members of the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise*, 478 U.S. at 8-9. Second, if the court determines that a qualified right applies, the government may overcome that right only by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. at 9 (citation omitted).

The Court previously agreed that protecting federal property is a strong government interest but noted that the Federal Defendants must craft a narrowly tailored response to achieve that government interest without unreasonably burdening First Amendment rights. *Index*

*Newspapers*, 480 F. Supp. 3d at 1147. The Court's concerns were driven by the sheer volume protests declared unlawful and the extensive reach of the federal officers' closures—going well beyond federal property. *See id.* at 1125 n.2, 1149. The changed circumstances, however, alter the *Press Enterprise* analysis. The Federal Defendants provide evidence that they rarely are declaring an unlawful assembly (thus, "closing" streets and sidewalks) and that the protests in which they are engaged are more focused on federal property, particularly the ICE facility. Plaintiffs describe only two occasions when federal officers left federal property, March 11, 2021, the night the Federal Defendants attempted to remove the protective fence around the federal courthouse and the courthouse was vandalized, and May 1, 2021, the night of a violent attack on the ICE facility. The Court now finds the changed circumstances alter the calculus for Plaintiffs' likelihood of success on the merits of their claim to right of access to public streets and sidewalks.

## 2. Irreparable Harm

In addition to the irreparable harm stemming from the likelihood of success on the merits of the First Amendment violations, which is altered by the Court's conclusions above, the Court also found a likelihood of imminent irreparable harm to Plaintiffs from the federal officers' conduct based on the augmented federal police force, the numerous videos and declarations showing federal officer misconduct, and the fact that the Federal Defendants' voluntary cessation through an agreement with the Oregon State Police was insufficient to protect Plaintiffs. *Id.* at 1149-54. As discussed above, all of those facts have changed.

The Ninth Circuit has explained that "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate*

immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac.*

*Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original) (simplified).

In denying the Federal Defendants' motion to stay the Court's preliminary injunction

during appeal, the Ninth Circuit explained that Plaintiffs' harm was not speculative because

> Plaintiffs introduced powerful evidence of the Federal Defendants'
> ongoing, sustained pattern of conduct that resulted in numerous
> injuries to members of the press between the date the complaint
> was filed and the date the district court entered its preliminary
> injunction. The district court's preliminary injunction included
> twelve pages solely dedicated to factual findings that describe in
> detail dozens of instances in which the Federal Defendants beat
> plaintiffs with batons, shot them with impact munitions, and
> pepper sprayed them.

*Index Newspapers LLC v. U. S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020). The changed

circumstances, however, show that now Plaintiffs' claimed harm is too speculative to show the

requisite immediate irreparable injury to support injunctive relief.

The current situation in Portland is that there are only intermittent protests and they are of

significantly reduced size. In some circumstances these protests have been declared an unlawful

assembly, and in only some of those instances might a law enforcement response result in the

alleged injury-producing police conduct. No such conduct, however, occurred between May 2,

2021 and August 11, 2021, the last date for which the Court has been given information. The

declarations submitted by Plaintiffs, describing four nights of alleged misconduct in the first

eight months of 2021, do not show a realistic threat of repeated injury. *See Armstrong v.*

*Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (noting that for prospective injunctive relief, a

plaintiff "must demonstrate that he is realistically threatened by a *repetition* of the violation"

(emphasis in original) (simplified)); *see also Index Newspapers*, 977 F.3d at 825 (noting that for

future injunctive relief, the injury must be "certainly impending, or there is a substantial risk the

harm will occur" (quoting *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018))).

For Plaintiffs' alleged injury to occur requires "attempting to anticipate whether and when these" Plaintiffs might attend a protest that is then declared an unlawful assembly. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974). Then, if such a protest is declared an unlawful assembly, it must result in a law enforcement response that includes the alleged excessive force, failure to accommodate, or other misconduct. Finally, Plaintiffs must be harmed by that alleged misconduct. All of these steps must occur despite the currently reduced crowd size and protest circumstances in Portland. This "takes us into the area of speculation and conjecture." *Id.* For Plaintiffs' alleged injury to occur requires too speculative of a chain of possibilities. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Wolfe v. City of Portland*, 2021 WL 4713237, at *10-11 (D. Or. Oct. 8, 2021) (finding claims for equitable relief against Secretary Mayorkas and Director of USMS Donald Washington, among others, moot based on the changed circumstances in Portland).

The circumstances now simply are not the same as "the time the preliminary injunction was entered, [when this] court found that the Federal Defendants had engaged in a pattern of conduct that had persisted for weeks and was ongoing." *Index Newspapers*, 977 F.3d at 826. Thus, the Federal Defendants have met their burden of showing that irreparable harm is not likely by demonstrating that the federal law enforcement response involving force is at most sporadic. Plaintiffs' attempts to counter this evidence with declarations describing events on four nights that occurred during the first few months of 2021 is unavailing.

Plaintiffs also contend that they are afraid that without the preliminary injunction the federal officers will engage in more force against Plaintiffs. The Court has two concerns with this argument. The first is that there are no longer very many protests involving a declaration of an unlawful assembly in which federal officers could use force against Plaintiffs. The second is

that Plaintiffs must provide "concrete evidence to substantiate their fear" of future injury by the

Federal Defendants. *Id.* at 825 (quoting *Clapper*, 568 U.S. at 420). Although Plaintiffs do not

have to "await the consummation of threatened injury to obtain preventative relief," they must

plausibly show "that based on their course of conduct, there is a 'realistic danger' or 'credible

threat'" that "a probabilistic harm will materialize." *Doe #1 v. Trump*, 335 F.R.D. 416, 429-30

(D. Or. 2020) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) and

*Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013)). Under the changed

circumstances, Plaintiffs are unable to do so.

Nor does the fact that the individual Plaintiffs assert that their First Amendment rights

have been chilled or will be further chilled if the preliminary injunction is dissolved suffice to

show injury for standing, let alone the more stringent requirement to *demonstrate* irreparable

harm for preliminary injunctive relief. "A chilling of First Amendment rights can constitute a

cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself

[is] too speculative to confer standing.'" *Index Newspapers*, 977 F.3d at 826 (alteration added in

*Index Newspapers*) (quoting *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)). As discussed

above, Plaintiffs' fear of future injury is too speculative. *Clapper*, 568 U.S. at 416 ("[Plaintiffs]

cannot manufacture standing merely by inflicting harm on themselves based on their fears of

hypothetical future harm that is not certainly impending.").

Because the Court finds that the Federal Defendants have met their burden with respect to

likelihood of success on the merits and irreparable harm, the Court declines to reach the other

*Winter* factors. Based on the Federal Defendants' showing on the first two factors, which are

required for the preliminary injunction to continue, the Court would grant the Federal

Defendants' motion to dissolve the injunction.

**CONCLUSION**

The Court GRANTS the Federal Defendants' motion for an indicative ruling (ECF 209). The Court would grant the Federal Defendants' motion to dissolve the preliminary injunction if the Ninth Circuit were to remand the case for this purpose. The Federal Defendants shall promptly notify the Clerk of the United States Court of Appeals for the Ninth Circuit pursuant to Rule 12.1(a) of the Federal Rules of Appellate Procedure of the Court's indicative ruling.

**IT IS SO ORDERED**.

DATED this 7th day of January, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge