**Matthew Borden**, admitted *pro hac vice*
borden@braunhagey.com
**J. Noah Hagey**, admitted *pro hac vice*
hagey@braunhagey.com
**Ellen V. Leonida,** admitted *pro hac vice*
leonida@braunhagey.com
**Sarah Salomon,** admitted *pro hac vice*
salomon@braunhagey.com
**Athul K. Acharya,** OSB No. 152436
acharya@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210

Attorneys for Plaintiffs

**Kelly K. Simon,** OSB No. 154213
ksimon@aclu-or.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF OREGON
P.O. Box 40585
Portland, OR 97240
Telephone: (503) 227-6928

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **INDEX NEWSPAPERS LLC**, a Washington limited-liability company, dba **PORTLAND MERCURY; DOUG BROWN; BRIAN CONLEY; MATHIEU LEWIS-ROLLAND; KAT MAHONEY; SERGIO OLMOS; JOHN RUDOFF; ALEX MILAN TRACY; TUCK WOODSTOCK; JUSTIN YAU**; and those similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>**CITY OF PORTLAND**, a municipal corporation; **JOHN DOES 1-60**, officers of Portland Police Bureau and other agencies working in concert; and **JOHN DOES 61-200**, federal agents,<br><br>        Defendants. | Case No. 3:20-cv-1035-SI<br><br>**CLASS ACTION ALLEGATION THIRD AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

THIRD AMENDED COMPLAINT

Plaintiffs Index Newspapers LLC ("Portland Mercury"), Doug Brown, Brian Conley, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau, on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1.      Plaintiffs Doug Brown, Brian Conley, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau are journalists and legal observers who cover newsworthy events, including civil unrest, in Portland, nationally and internationally.  Plaintiff Index Newspapers is a newspaper publisher whose publications include the *Portland Mercury*.  Its newspapers have reported on significant events, including civil unrest, in Portland, nationally and internationally for two decades.  Plaintiffs bring this action on behalf of themselves and similarly situated individuals to protect their constitutional right to document and observe protests in Portland and for money damages for the injuries that Defendants have caused them.

2.      Defendants the Portland police[1], and the individual local officers (Does 1-60) are responsible for responding to protests.  Defendants Does 61-200 are the individual federal officers who assaulted Plaintiffs during the summer of 2020 ("Federal Defendants").

3.      When Plaintiffs sought to lawfully exercise their right to observe and report on the protests that arose in the wake of George Floyd's murder, Defendants attacked Plaintiffs with rubber bullets, pepper spray, tear gas, batons, closed fists, and arrests.

4.      For many years predating the George Floyd protests, the Portland Police have assaulted reporters and legal observers at protests, including Plaintiff Doug Brown.  The Portland Police have a written policy that provides that they will violently disperse journalists and legal observers when the Portland Police unilaterally decide that a protest has become too disorderly.

---

[1] For convenience, the term "Portland police" in this Complaint refers to officers of the Portland Police Bureau as well as any officers of other law enforcement agencies working in concert with the Portland Police Bureau within the City of Portland.

This policy violates the First Amendment because it is unnecessary to disperse individuals who are merely reporting and observing at protests, and it gives the Portland Police, who have their own agents recording the events, plenary control over the public narrative.  When this Court ordered the Portland Police to stop attacking journalists and legal observers, the Portland Police were able to do so, while effectively policing the protests, and without danger to law enforcement.

5.     The U.S. Department of Homeland Security ("DHS"), the U.S. Marshals Service ("USMS") follow a similar de facto policy of attacking journalists and legal observers who attempt to report on protests after a general dispersal order has been issued.  DHS and USMS, too, deploy their own agents who record and observe the protests, and who are not dispersed when DHS and USMS begin assaulting the free press.  While the Federal Defendants purport to follow Department of Justice ("DOJ") Guidelines that require them to protect First Amendment rights during civil unrest, the federal government maintains that the First Amendment does not require it to allow reporters and legal observers who pose no threat to law enforcement to do their jobs if law enforcement unilaterally decides that a protest has become too disorderly.  When this Court ordered DHS and USMS to stop dispersing reporters and legal observers, DHS and USMS agents were able to do so, while effectively policing the protests, and without danger to law enforcement.  Nonetheless, the federal government maintains that it will continue to follow their de facto policy of unnecessarily attacking reporters and legal observers.

6.     Intimidating reporters is the craft of the world's most oppressive regimes and has no place in Portland—or anywhere else in the world.  *See*, *e.g.*, *Russia Takes Censorship to new Extremes, Stifling War Coverage*, N.Y. Times (Mar. 4, 2022),

https://www.nytimes.com/2022/03/04/world/europe/russia-censorship-media-crackdown.html.[2]

---

[2] *See also Syrian Forces Aimed to Kill Journalists, U.S. Court Is Told*, N.Y. Times (Apr. 9, 2018), https://www.nytimes.com/2018/04/09/world/middleeast/syria-marie-colvin-death.html; *Duterte Says Journalists in the Philippines 'Are Not Exempt from Assassination'*, Time (June 1, 2016), https://time.com/4353279/duterte-philippines-journalists-assassination/; *Violence against*

As both this Court and the Ninth Circuit have observed, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

7.      Defendants' efforts to intimidate the press and suppress reporting on the police's own misconduct offends fundamental constitutional protections and strikes at the core of our democracy.

8.      "If a government agency restricts public access, the media's only recourse is the court system.  The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 900.

## PARTIES

**A.      Plaintiffs**

9.      Plaintiff Portland Mercury is an alternative bi-weekly newspaper and media company founded in 2000 in Portland, Oregon.  Its headquarters are at 115 SW Ash Street, Suite 600, Portland, OR 97204.  It is published by Index Newspapers LLC, a Washington limited-liability company.

10.     Plaintiff Doug Brown is an Oregon resident who lives in the City of Portland.  He has attended protests in Portland every year since 2016, first as a journalist with the *Portland Mercury* and then as a volunteer legal observer with the ACLU.  He attended the George Floyd protests on several nights for the purpose of documenting police interaction with protesters.

11.     Plaintiff Mathieu Lewis-Rolland is an Oregon resident who lives in the City of Portland.  He is a photographer for international news wires such as Reuters, Getty Images and Agence France-Presse, through which his work has been published in the *New York Times*, the *Wall Street Journal*, ABC, NBC, CBS, PBS, CNN, and multiple other national and international news organizations.  He attended protests in Portland on several nights for the purpose of documenting them.

*Journalists Escalates in Hong Kong*, Reporters Without Borders (Aug. 13, 2019), https://rsf.org/en/news/violence-against-journalists-escalates-hong-kong.

12.     Plaintiff Kat Mahoney is an Oregon resident who lives in the City of Portland. She is an independent attorney and volunteers as a legal observer with the ACLU.  She attended the 2020 and 2021 protests nearly every night for the purpose of documenting police interaction with protesters.  She is among the ACLU's most active legal observers, and usually attends and observes any protest that takes place in Portland.

13.     Plaintiff Sergio Olmos is a journalist and Oregon resident who lives in the City of Portland.  His work has been published in the *New York Times*, the *Washington Post*, the *Portland Tribune*, *Crosscut*, the *Columbian*, *Investigate West*, CNN, ABC, NBC, CBS, Reuters, NPR, Oregon Public Broadcasting, and others.  He attended the protests as a freelance journalist on many nights for the purpose of documenting and reporting on them.

14.     Plaintiff John Rudoff is an Oregon resident who lives in the City of Portland.  He is a photojournalist whose work has been published internationally, including extensive reporting on the Syrian refugee crisis, the 'Unite the Right' events in Charlottesville, Virginia, the Paris 'Yellow Vest' protests, and the Rohingya Genocide.  He has covered protests (among other things) in Portland for more than five years, and his work has appeared in the *New York Times*, the *Guardian*, CBS, and ABC, among other sites.  He attended the protests in Portland on many nights for the purpose of documenting and reporting on them.

15.     Plaintiff Alex Milan Tracy is an Oregon resident who lives in the City of Portland. He has published his work in local and national publications, including the Associated Press.  He attended the protests as a freelance journalist on many nights for the purpose of documenting and reporting on them.

16.     Plaintiff Tuck Woodstock is an Oregon resident who lives in the City of Portland. They have been a journalist for nine years and their work has been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*.  They attended the protests in Portland over 20 times as a freelance and independent journalist for the purpose of documenting and reporting on them.

17.     Plaintiff Justin Yau is an Oregon resident who lives in the City of Portland.  He has covered protests in Hong Kong and Portland.  He is a student at the University of Portland studying communications under the G.I. Bill, with a focus on journalism; before that, he served in the U.S. Army, where he was deployed to the Middle East in support of Operation Inherent Resolve.  His work has been published in the *Los Angeles Times*, the *Willamette Week*, *Reuters*, *Pro Publica*, OPB, the *Daily Mail*, and msn.com.  He attended the protests in Portland as a freelance and independent journalist for the purpose of documenting and reporting on them.

**B.     Defendants**

18.     Defendant City of Portland is a municipality incorporated in the State of Oregon.  As a local governmental entity, the City of Portland is a juridical entity under 42 U.S.C. § 1983.  The Bureau is a department or division of the City.

19.     Defendant John Does 1-20 are police officers employed by the City who directly assaulted Plaintiffs and members of the Plaintiff Class.  They are sued in their individual capacity.

20.     Defendant John Does 21-30 are supervisory officials whose liability could include their own culpable action or inaction in the training, supervision, or control of their subordinates, their acquiescence in the constitutional deprivations alleged here, or conduct showing a reckless or callous indifference to the rights of Plaintiffs.  They are sued in their individual capacity.

21.     Defendant John Does 31-60 are individual and supervisory officers of other law enforcement agencies, including but not limited to the Clackamas County Sheriff's Office, Clark County Sheriff's Office, Multnomah County Sheriff's Office, Washington County Sheriff's Office, Port of Portland Police, Gresham Police, Vancouver Police, Washougal Police, Oregon State Police, and the Oregon National Guard, who are working under the Portland Police Bureau's direction and control pursuant to PPB Directive 635.10 § 7 ("The Bureau may request assistance from other law enforcement agencies . . . . The Bureau [Incident Commander] shall maintain the authority to determine tactical objectives; direct the overall police response (all agencies); and determine, when objectively reasonable, how and when force may be used and

when to deploy less lethal munitions to address civil disturbance and/or disperse the crowd.").

Does 31-60 are acting in concert with and as agents of the City and Does 1-30.

22.     The rest of this Complaint refers to the City and Doe Defendants 1-60 collectively
as the Municipal Defendants.

23.     This Complaint refers to the U.S. Department of Homeland Security and the U.S.
Marshals Service as the Federal Agencies.  The Federal Agencies are no longer parties to this
action because the Court has held that the claims against them are moot.

24.     Defendants John Does 61-200 are federal agents employed by the Federal
Agencies who were or are temporarily or permanently deployed in Portland and who have
responded to protests in 2020 or since then.  The rest of this Complaint refers to Does 61-200
collectively as the Federal Agents or Federal Defendants.

25.     Defendant Does 61-200 were personally involved in the deprivation of one or
more Plaintiffs' constitutional rights, including Defendant Does who directly used force against,
arrested, detained, or searched Plaintiffs.  Defendant Does also include supervising officers who
knew of unconstitutional actions by subordinate Defendants Does, and ordered, approved, or
acquiesced in that conduct or otherwise failed to act, or who engaged in conduct or inaction in
the training, supervision or control of subordinate Defendants Does that was causally connected
to the constitutional violations suffered by Plaintiffs.

26.     Defendant Does 61-200 are not readily identifiable because they frequently acted
in groups and wore uniforms, helmets, and/or other clothing without obvious identifying
information.  Defendant Does 61-200 are sued in their individual capacity.  This Complaint will
be amended with leave of the Court after they are identified in discovery.

27.     Plaintiffs are informed and believe, and therefore allege that each of the
Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer,
employee, representative, affiliate, partner, associate, or similar legal capacity of each of the
other Defendants and that, at all times, they acted and performed (or omitted to act or perform)

within the course and scope of each capacity, and with the authorization, consent, permission or ratification of each of the other Defendants.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over Plaintiffs' claims of violation of federal constitutional rights under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' causes of action arise under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

29.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

## FACTUAL ALLEGATIONS

### A.    The Police Murdered George Floyd

30.     On May 25, 2020, the police killed George Floyd in Minneapolis, Minnesota.

31.     Mr. Floyd was the most recent in a long list of Black victims of police brutality, many of which caused protests across the nation.  In Portland alone, the police have killed several Black people, including Quanice Hayes, Terrell Johnson, Keaton Otis, Aaron Campbell, Patrick Kimmons, Darris Johnson, and Kendra James.  Some other well-known victims of lethal police force include Michael Brown, Breonna Taylor, Tamir Rice, Philando Castile, Freddie Gray, Walter Scott, Botham Jean, Atatiana Jefferson, and, of course, Eric Garner, whose last words echoed those of Mr. Floyd: "I can't breathe."

32.     Videos of Mr. Floyd's murder were widely and rapidly disseminated around the world and catalyzed protests across the country in every major city.

### B.    The Portland Protests and the Violent Response by Portland Police

33.     Beginning on or about May 29, 2020, protesters took to the streets of Portland in large numbers.  These protests continued for more than 80 consecutive nights.  Indeed, as the

*New York Times* reported, while protests over the George Floyd murder gradually petered out in other cities, they remained ongoing in Portland until April 2021, nearly a year later.[3]

34.    One of the focal points for George Floyd protests was the "Justice Center" in downtown Portland.  The building houses the police's central precinct, which includes offices for their command staff, a few county courtrooms, and a county jail where hundreds of people— disproportionately Black—are warehoused in small cage-like cells.  Both Portland police arrest data and Multnomah County criminal justice data reveal that Black residents are disproportionately harmed by every part of the criminal justice system from arrest through prosecution and sentencing.[4] The Justice Center is, in short, a perfect symbol of the iniquities protesters were demonstrating against.

35.    With limited exceptions, these protests were overwhelmingly peaceful.  But nearly every night, the Portland police began using increasingly severe tactics to deter speech on this important issue.

36.    Portland police shot rubber bullets into crowds of George Floyd protesters. Rubber bullets are 40mm-wide "pain compliance devices." They are designed to "provide sufficient pain stimulus" to "incapacitat[e] … an aggressive, non-compliant subject." But they can be lethal, especially if they hit someone in the head.  Figure 1 depicts a round that an officer shot at one protester's head as he was retreating with his hands up.  Figure 2 depicts the severe type of injury such a round can inflict, even when it impacts only a large muscle group on a young, healthy individual.

---

[3] Mike Baker, *After Nearly a Year of Unrest, Portland Leaders Pursue a Crackdown*, N.Y. TIMES (April 27, 2021), https://www.nytimes.com/2021/04/27/us/portland-protests-mayor-ted-wheeler.html.

[4] W. Haywood Burns Institute for Justice Fairness and Equity, *Racial and Ethnic Disparities in Multnomah County* (Nov. 2019), https://multco.us/file/84525/download.

 

*Figure 1: Left, the manufacturer's image of the 40mm eXact iMpact Sponge Round.*
*Right, a rubber bullet that Portland police officers fired at a retreating, compliant protester.*



*Figure 2: An example of the severe injuries rubber bullets can inflict.*

37.     Portland police have also deployed multiple types of tear gas, including Agent CS, phenacyl chloride, and oleoresin capsicum.  The use of tear gas is banned in warfare.[5]  It can cause inflammation, coughing, wheezing, vomiting, blistering, burns, and breathing difficulty or airway closure, especially in people with respiratory conditions.[6]  Its use is especially deadly during the current coronavirus pandemic, because it (1) "weaponizes" infected individuals to become "efficient transmitter[s] of infection"; (2) makes those not infected more likely to become infected; and (3) makes coronavirus more deadly to those it infects.[7]  Nevertheless, the police used tear gas indiscriminately against protesters nearly every night for the first week of the George Floyd protests and many nights after that.

38.     On June 6, 2020, Mayor Wheeler supposedly suspended the use of tear gas.[8]  On June 9, 2020, another judge of this Court enjoined the police from using tear gas unless "the lives or safety of the public or the police are at risk," and specifically ordered the police not to use tear gas "to disperse crowds where there is no or little risk of injury."[9]

39.     Nevertheless—defying this Court's Order—Portland police continued to use tear gas.  On August 6, 2020, for example, police deployed smoke grenades and used mass force to disperse a crowd of about 200 protesters near the precinct station after declaring an unlawful assembly.[10]

---

[5] *Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare*, June 17, 1925, 26 U.S.T. 571.

[6] *Health Impacts of Crowd-Control Weapons: Chemical Irritants (Tear Gas and Pepper Spray)*, Physicians for Human Rights (Jan. 1, 2017), https://phr.org/our-work/resources/health-impacts-of-crowd-control-weapons-chemical-irritants-tear-gas-and-pepper-spray/.

[7] Expert Declaration of Peter Chin-Hong ¶¶ 6-7, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 24.

[8] Nicole Chavez, *Portland is the latest city to suspend the use of tear gas on protesters*, CNN (June 6, 2020), https://www.cnn.com/2020/06/06/us/portland-police-tear-gas-protests/index.html.

[9] Order, *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-917-HZ (June 9, 2020), Dkt. 29.

[10] Sergio Olmos, *Portland police return to using tear gas during protests Wednesday night*, OPB (August 6, 2020), https://www.opb.org/article/2020/08/06/portland-oregon-protests-day-69-police-tear-gas/.

40.     The police also beat protesters with truncheons and shot them with flash-bang grenades with little or no warning, in the absence of any danger to the public, police, or property.

41.     The police's use of disproportionate force against demonstrations over police violence against people of color follows the Portland police's prolific history of excessive force against people of color, including the shootings of Quanice Hayes in 2017, Denorris McClendon in 2015, Keaton Otis and Aaron Campbell in 2010, and Kendra James in 2003.

42.     In 2012, the U.S. Department of Justice filed suit against the City "to remedy a pattern or practice of unconstitutional uses of force by officers of the Portland Police Bureau,"[11] which was settled by a consent decree in 2015.[12]  The decree has not resulted in a less brutal police force.[13]

43.     To the contrary, Portland police have continued to receive explicit instruction and training to use force on protestors.  For example, a 2018 slide show designed to train officers on methods of policing protests concluded with a message that celebrated the use of violence against demonstrators, suggesting they would end up "stitched and bandaged"[14]:

---

[11] Complaint, *United States v. City of Portland*, No. 3:12-cv-2265-SI (Dec. 17, 2012), Dkt. 1.

[12] Amended Order Entering Settlement Agreement Conditionally Dismissing Litigation, *id.*, Dkt. 99.

[13] Alex Zielinski, *Hall Monitor: Checking Boxes*, Portland Mercury (Nov. 7, 2019), https://www.portlandmercury.com/opinion/2019/11/07/27438204/hall-monitor-checking-boxes.

[14] Mike Baker, *Police Presentation in Portland Celebrated Violence Against Protesters*, N.Y. Times (Jan. 14, 2022), https://www.nytimes.com/2022/01/14/us/portland-police-protests.html.



44.    After reviewing the Portland Police's response to the 2020 and 2021 protests, the Department of Justice asked the City to produce a plan to return to compliance with the settlement agreement in several areas, including inappropriate use and management of force during protests, inadequate training, and subpar police oversight.[15]

---

[15] Maxine Bernstein, *Portland police not meeting federal requirements on use of force, training, Justice Department finds*, The Oregonian (Feb. 11, 2021), https://www.oregonlive.com/crime/2021/02/portland-police-not-meeting-federal-requirements-on-use-of-force-training-justice-department-finds.html.

45.    The City refused,[16] and the Department of Justice formally notified the City of its

noncompliance with the consent decree.[17]  The parties reached a tentative agreement in January

2022,[18] after which the City produced the "Prayer of the Alt Knight" meme depicted above.[19]

### C.    The Police's Pattern of Intentionally Targeting and Retaliating Against Journalists and Observers

46.    Since the George Floyd protests began, the Portland police have been

intentionally and indiscriminately attacking neutral members of the press and legal observers.

This conduct has intimidated journalists and neutrals and reduced the number of media and

observers willing to attend protests and to stay to document and observe the protests.  The

police's conduct is part of a longstanding pattern of assaulting and threatening members of the

press to prevent them from telling the public about the police's conduct.

### 1.    Police Threaten and Arrest Plaintiff Yau

47.    Plaintiff Yau is a freelance journalist who covered the Portland protests.  He wears

a black helmet that says "PRESS" in white letters on both sides, a glo-vest that says "PRESS" on

the front and the back, and a press pass around his neck; and carried an SLR camera around his

neck and a gimbal video camera on his backpack.  He was unmistakably present at the protests in

a journalistic capacity.

---

[16] Maxine Bernstein, *Feds want Portland police to produce plan on how they will conform with settlement. City says no.*, The Oregonian (Mar. 24, 2021), https://www.oregonlive.com/portland/2021/03/feds-want-portland-police-to-produce-plan-on-how-they-will-conform-with-settlement-city-says-no.html.

[17] Maxine Bernstein, *Feds put city of Portland on formal notice of non-compliance with police use-of-force agreement*, The Oregonian (Apr. 6, 2021), https://www.oregonlive.com/crime/2021/04/feds-put-city-of-portland-on-formal-notice-of-non-compliance-with-justice-dept-settlement-agreement.html.

[18] Maxine Bernstein, *Portland, feds reach tentative pact on body cameras, protest accountability*, The Oregonian (Jan. 11, 2022), https://www.oregonlive.com/crime/2022/01/portlands-feds-reach-tentative-pact-on-police-reforms-to-comply-with-settlement.html.

[19] Maxine Bernstein, *Feds furious that Portland police, city kept them in dark about training slide advocating violence against demonstrators*, The Oregonian (Jan. 18, 2022), https://www.oregonlive.com/crime/2022/01/feds-furious-city-kept-them-in-dark-about-derogatory-training-slide-advocating-violence-against-demonstrators.html.

48.     On June 5, Mr. Yau was covering the police's dispersal of a crowd with two other journalists.  They remained in front of the police skirmish line, but police yelled at them that "you have to pick up the pace—you're interfering at this point and you will be arrested.  Let's go—FASTER!"

49.     Mr. Yau and his colleagues informed the police that they were press.  The police responded: "You'd better start running!"[20]

50.     In the early hours of July 1, only a day after Plaintiffs filed this lawsuit, Mr. Yau was attending a protest in North Portland that the police had begun to disperse.  He was 30-45 feet away from the police skirmish line, documenting a female protester walking slowly by herself, when he heard the leader of the skirmish line order her to "move to the sidewalk or you will be hurt." He began filming.

51.     Officers sprinted forward to tackle, mace, and arrest her.

52.     A second later, as he was on the sidewalk, filming, Mr. Yau himself was tackled by several officers.  All of his fragile equipment hit the ground at high speed.  His phone flew out of his hands and his DSLR crashed to the ground with him, as did his gimbal camera.

53.     At least two officers dogpiled on top of him, pushed him into the ground, removed his backpack, and put metal handcuffs on him.  A third was also present.

54.     Mr. Yau informed the arresting officers that he was a journalist.  The officers looked at his press badge, said that they did not recognize the issuing organization, and asked what news stations he contributes to.  Mr. Yau informed them that his work has been published in the *Daily Mail*, *Reuters*, and *Spectee*, a Japanese news outlet.  The officers did not release Mr. Yau.

55.     When the officers tackled Mr. Yau, he landed on his knee.  It was so sore that he was unable to sleep.

---

[20] @PDocumentarians, Twitter (June 5, 2020, 3:51 A.M.), https://twitter.com/PDocumentarians/status/1268858091358924800.

56.     This Court issued a TRO on July 2 ordering the police to "return any seized equipment or press passes immediately upon release of a person from custody."  Nevertheless, the police did not return Mr. Yau's equipment until July 6.

57.     On the night of the arrest, Mr. Yau was in contact with two news agencies, *Reuters* and *Ruptly*, to publish his footage from the night.  Because officers confiscated his equipment, he was unable to complete the arrangement.  He was deprived of licensing revenue and the public was deprived of his footage.

### 2.     Police Intentionally Shoot at and Tear Gas Plaintiff Lewis-Rolland

58.     Plaintiff Lewis-Rolland is a freelance photographer and photojournalist who covered the George Floyd protests.  He carries a large Nikon D850 camera with a 70-200mm lens and a flash.  He was unmistakably present at the protests in a journalistic capacity.

59.     On the night of May 31, Mr. Lewis-Rolland was covering the protests.  Around 10:40 p.m., he heard a loud bang and began proceeding toward the intersection it came from, SW Salmon Street and SW 3rd Street.  The intersection was not crowded and was mostly clear of protesters.  As he approached, he saw police marching in his direction.  He began taking photographs.  That is when he captured this image of an officer aiming a gun directly at him:



*Figure 3: Police take aim at Plaintiff Mathieu Lewis-Rolland.*

60.    Shortly after Mr. Lewis-Rolland captured that image, the officer fired upon him.

The officer offered no warning, and Mr. Lewis-Rolland had done nothing to provoke the officer

other than take a photograph.  Mr. Lewis-Rolland was showered with shrapnel as the first round

exploded at his feet.  Several more followed, as well as canisters of tear gas.  Mr. Lewis-Rolland

was overcome by the effects of tear gas and was unable to continue documenting protests or

police action at that location, but he attempted to continue operating his camera to the best of his

ability while recovering from the effects of the tear gas.  He was able to capture a visual cloud of gas hovering over the intersection he had just retreated from.

61.      About an hour later, at the intersection of SW 4th Street and SW Taylor Street, Mr. Lewis-Rolland was documenting a tense interaction between police and protesters:



*Figure 4: Plaintiff Lewis-Rolland (not pictured) documents a tense interaction between police and peaceful protesters.*

62.      This time, an officer popped open a crowd-control-sized canister of tear gas and threw it directly at Mr. Lewis-Rolland's feet.  Used at such close range, the canister delivered a full-frontal blast of gas to Mr. Lewis-Rolland's face and once again, he was overcome by its effects.  Mr. Lewis-Rolland was completely incapacitated for at least 30 seconds and forced to stop documenting the scene until he could recover.

### 3.      The Police's Repeated Attacks on Plaintiff Mahoney

63.      On June 2, the police used tear gas of a different formulation or a stronger concentration on Plaintiff Mahoney.  On June 10, they shot a rubber bullet at her to prevent her

from recording an arrest.  And the day after Plaintiffs filed this action, the police beat Plaintiff

Mahoney—right across the back of her vest where it says "ACLU LEGAL OBSERVER" in big

block letters.

### a.    Police Use Extra-Strong Tear Gas on Plaintiff Mahoney

64.    Plaintiff Mahoney attended the protests nearly every night.  Nearly every night,

from the beginning of the protests until this Court issued its injunction in *Don't Shoot Portland v.*

*City of Portland*, Ms. Mahoney was a victim of police's tear gas.

65.    Ms. Mahoney has served as a legal observer since 2017.  She is no stranger to the

police's indiscriminate, excessive, and unlawful use of tear gas.

66.    On June 2, however, she noticed that the police had begun to use a new form of

tear gas.  On that night, Ms. Mahoney was on her motorcycle.  To avoid getting tear gas inside

her helmet, she remained on a side street near the edges of the crowd.  Nevertheless, the tear gas

reached her and she sought to retreat.

67.    Her first indication that this was a new type of gas was that it smelled different

and felt stronger.  She managed to drive her motorcycle only two blocks before losing her vision.

In addition to the usual effects—profuse tears, profusely runny nose—her throat began to close

and she had trouble breathing.  She quickly sought medical attention.

68.    Once she felt it was safe, she attempted to return home on her motorcycle.  On the

way home, however, she began involuntarily convulsing, shaking, and twitching.  She was

unable to concentrate on basic tasks like shifting gears.  Fortunately, she was able to arrive home

safely.

69.    Once home, however, she was disoriented and unable to function for several

hours.  She was barely able to open her door.  She was unable to count past six.  She was unable

to open a tube of toothpaste.  Although Ms. Mahoney has been the victim of Portland police's

tear gas many times, she has never suffered such symptoms.

70.    Ms. Mahoney later found spent munitions with past expiration dates, suggesting

that the tear gas used on her on June 2 may have been expired.

71.     On information and belief, on June 2, Portland police used tear gas of a different formulation, or a stronger concentration, in order to inflict more severe injuries on neutrals and protesters.  On information and belief, the police also used such tear gas in the "killbox" maneuver detailed below.

### b.    Police Shoot at Plaintiff Mahoney

72.     On the night of June 10, Ms. Mahoney was attending the protests near the Justice Center as a legal observer volunteering with the ACLU.  She was wearing a blue vest which clearly identified her as an ACLU legal observer.  At all relevant times, she was well-lit by police floodlights.  No police officer could have been confused as to the role in which she was attending.

73.     Shortly after midnight, a woman who appeared to be mentally unstable wandered into the fenced-off area near the Justice Center.  She walked back and forth for a moment, exited Ms. Mahoney's field of view, and then returned having shed all of her clothing.  At this point, Ms. Mahoney moved to the front of the crowd, because she knew that legal observation might become crucial.

74.     Portland police officers began running at the woman.  She began running away, but became confused and was unable to find the exit.  She panicked.  As she ran alongside the fence, a protester entered the fenced-off area to assist her.  Together, they began running away from the police and toward the exit.

75.     Most people who were at the fence, including Ms. Mahoney, were recording the events unfolding on their cameras and smartphones.  Even though the two individuals inside the fenced-off area were retreating, Portland police officers opened fire on them.  And, in an attempt to minimize video evidence, Portland police also opened fire on people recording the event near the fence, including Ms. Mahoney.

76.     One rubber bullet impacted a cement barrier a few inches from Ms. Mahoney's face.  It exploded and shrapnel from the detonation hit Ms. Mahoney's hands, phone, and shoulders.  Had Ms. Mahoney not been recording the event, shrapnel would have hit her directly

in the face.  As it was, Ms. Mahoney suffered severe injuries to her left hand, including her left ring finger, which swelled up to three times its normal size.

77.    The police targeted Ms. Mahoney, even though she was clearly marked as a neutral legal observer by her blue vest, because she was recording an altercation between police and protesters.

**c.    The Police Intentionally Beat Plaintiff Mahoney the Day after Plaintiffs Filed this Action**

78.    The day after Plaintiffs filed this action, Ms. Mahoney attended the protests in North Portland as a legal observer.  She wore her blue ACLU vest that clearly identified her as a legal observer with the words "ACLU LEGAL OBSERVER" in big block letters across the back and in smaller lettering on the front.

79.    She had not intended to attend the protests that night, but another legal observer who was present informed her that only one ACLU observer was there, and that based on the police's actions, more might be necessary.

80.    She arrived at the intersection of N Lombard Street and N Denver Avenue a little before 9:30 p.m.  When she arrived, the police had already declared an unlawful assembly and were pushing the crowd east.

81.    Within minutes of Ms. Mahoney's arrival, the police began firing pepper balls indiscriminately into the crowd.  She began coughing and choking, and was forced to seek medical treatment.  After she recovered from the pepper spray, she returned to continue observing.

82.    Later, she became the target of a police dispersal maneuver.  Officers began running toward her location yelling "MOVE!" Because there was a dense crowd in front of her, including a man on crutches whom several other protesters were helping, she could not get out of the way in time.

83.    One officer slammed her in the back with a truncheon.  He struck diagonally from the base of her right shoulder blade to her lower left side, across her spine and ribcage.  Another

officer ran up to her, yelled "MOVE," and shoved her so hard she stumbled into a protester and had to be helped to her feet.

84.    Because she was wearing her blue ACLU legal observer vest, both officers could plainly see the words "ACLU LEGAL OBSERVER" when they beat her and shoved her.

85.    The same night, Ms. Mahoney also saw the police chase and attempt to beat two other legal observers who were clearly marked as legal observers.

86.    The following morning, her back was in extreme pain.  She was unable to rotate her torso or sit up for periods of time without pain.  It hurt her to breathe.

### d.    The Police Arrest Plaintiff Mahoney

87.    On August 8-9, 2020, Plaintiff Mahoney attended the protests in North Portland to document police interaction with protesters.  As always, she wore a blue ACLU vest that clearly identified her as a legal observer.

88.    A video of the following events can be viewed here:

https://youtu.be/kSLzDRZIpFc and https://youtu.be/1F9OMYIzzD0.

89.    Around 1:45 a.m., she was on N Denver, near the intersection with N Watts with a few other legal observers, including Stasia Brownell and Rachelle Collins, when PPB riot police arrived and began to push a group of protesters west down N Watts.

90.    The legal observers, including Ms. Mahoney, began to receive conflicting instructions from the officers about where to place themselves.  One officer from the riot van shouted "right there, stop right there"—i.e., at the front of the van—"do not get closer to the officers." Officer No. 1004013, Craig Lehman, pointed to the northwest—i.e., past the van and the officers—and told the observers to "go down that way." Almost simultaneously, Officer No. 1000421, Sergeant Oliphant, yelled at the observers to "back up to the back of the van . . . film from back there PLEASE!"

91.    Less than three seconds after Sergeant Oliphant issued his instructions, Sergeant Justin Damerville stamped over to the observers, yelling, "I know you heard him, to get behind

the back of the van.  That, or go to jail!" Sergeant Damerville then grabbed Ms. Mahoney, who instinctually grabbed onto Sergeant Oliphant to avoid falling.

92.     As soon as Ms. Mahoney was able to regain her balance, she let go of Sergeant Oliphant and raised her phone to resume recording.  When Sergeant Damerville saw this, he grabbed her arm, took her to the ground, removed her COVID-19 respirator, and shoved her face into the dirt.

93.      He then twisted her arms around to put handcuffs on her, tried to lift her up by the cuffs, and ultimately used her shoulder blade as a handle to bring her to her feet.  In the process, he pulled Mahoney's left shoulder out of its socket and sprained her left wrist.

### 4.     The Police's Assaults on Plaintiff Brown

94.     On June 12, police fired a flash-bang grenade directly at Plaintiff Brown, twice, and beat him with their bats.  And on June 14, they threatened to arrest him, even though they knew he was an ACLU legal observer.

### a.     Police Shoot at and Beat Plaintiff Brown

95.     On the night of June 12, legal observer Doug Brown was attending the protests as a volunteer with the ACLU.  He was wearing a blue vest which clearly identified him as an ACLU legal observer.

96.     Shortly after 12:30 a.m., the police decided to put an end to the protests.  They declared the area between Naito Parkway and 13th Street, from SW Lincoln Street to NW Everett Street, off-limits to everyone—protesters, press, legal observers, and anyone else.  This area contains the entirety of downtown Portland and parts of two Northwest Portland neighborhoods and comprises some 21 million square feet.

97.     A video of the following events can be viewed here:

https://tinyurl.com/BrownAttacked.

98.     At around 12:35 a.m., the police began firing flash-bang grenades into the crowd. A minute later, they fired a flash-bang grenade directly at Mr. Brown. *Id.* at 4:11-16.

99.     Then, they began physically clearing people out of the park.  Mr. Brown complied with their directive and moved with the crowd, but because he was present as an observer and not a protester, he continued filming and observing how the police enforced their order.

100.     Around 12:39 a.m., the police had moved the crowd one block from their starting position.  Then they began what is known as a "dynamic" maneuver.  They halted and arranged in formation, truncheons and guns at the ready.  *Id.* at 7:44.  On command, they all began running at the crowd, yelling "MOVE!" and beating anyone in their way.  *Id.* at 8:18.

101.     This type of massed kinetic maneuver—a massed charge—is extremely dangerous.  Strong, armored police, running full tilt at less-armored persons, frequently cause grave injury.  And by design, they run over all things in their path—including journalists and legal observers.

102.     Mr. Brown continued to observe and record.  For that, the police beat him, too. *Id.* at 8:23-34.  This still frame from his video shows police officers charging at him with their truncheons, shortly before they beat him:



*Figure 5: Police charge at an ACLU legal observer to beat him with their truncheons.*

103.    Mr. Brown was forced to flee and could no longer safely document the police's violent enforcement tactics.

104.    After a minute, the police halted and began firing flash-bang grenades directly at people.  They scored a direct hit on Mr. Brown.  *Id.* at 8:58-9:09.

105.    As a result of the police's firing two flash-bang grenades at him and beating him with their batons, Mr. Brown suffered temporary tinnitus for several hours and some contusions.

106.    The police's efforts to prevent Mr. Brown from recording and reporting on their violent tactics were successful.  Shortly after the second flash-bang, he left the scene, even though the protests and the police's violent dispersal of protesters continued.

### b.    Police Threaten to Arrest Plaintiff Brown

107.    On the night of June 14, Mr. Brown was again attending the protests as a volunteer with the ACLU.  He was wearing a blue vest which clearly identified him as a legal observer.

108.    Audio of the following events, together with some contemporaneous photos Mr. Brown took, is available here: https://tinyurl.com/BrownThreatened.

109.    Around 10:40 p.m., Mr. Brown arrived at the intersection of SW 6th Street and SW Market Street, where Portland police officers were arresting a man undergoing a mental-health crisis.

110.    As they had the previous night, the police had issued a dispersal order vacating downtown Portland.

111.    Nevertheless, some five to seven people were at the scene, observing the arrest. Mr. Brown also began observing and recording the event.

112.    For the first seven minutes Mr. Brown was present, the interaction between police and the individuals watching them was calm and uneventful.

113.    At 10:47 p.m., the police decided to remove all observers from the scene.  One officer, with a makeshift ID number 254047, ordered everyone to leave and threatened them with arrest if they did not comply.  *Id.* at 7:00-7:50.

114.    Mr. Brown continued to document the events.  The officer heard his shutter clicking and turned on him: "You have plenty of pictures, okay? … We don't want to make an arrest."  *Id.* at 7:58-8:20.

115.    Three more officers walked up to Mr. Brown and put their hands on him.  One of them said: "You should know better, you're with the ACLU."  *Id.* at 8:35.

116.    A minute later, a police SUV with a long-range acoustic system arrived.  It, too, singled Mr. Brown out as an ACLU legal observer and threatened him with arrest: "You are all subject to arrest for trespassing.  This area is closed.  That includes the ACLU legal observer.

You are trespassing. … You are failing to obey the direct order of a peace officer in the State of Oregon." *Id.* at 9:52-10:15.

117.    Again, the police's efforts to eject Mr. Brown from the scene of an arrest were successful.  Rather than be arrested himself, he left the scene and was no longer able to fulfill his role as a legal observer.

### 5.    Police Assault Plaintiff Olmos

118.    Plaintiff Olmos is a freelance journalist who covered the George Floyd protests. He wears a press badge and a Kevlar vest that says "PRESS" on both sides.  He also carries several cameras, including a film camera, in part so that it is unmistakable when he is present in a journalistic capacity as a member of the press.

119.    On the night of June 6, Mr. Olmos was recording the way the police were enforcing their dispersal order.

120.    He was also attempting to comply with the order, but found himself trapped behind a phalanx of police officers.  To avoid giving surprise, he tried to inform them that he was approaching from behind.  He had his press pass clearly visible.

121.    Nevertheless, the police beat Plaintiff Olmos with a truncheon and threatened him with tear gas because he was recording them.[21]

122.    Mr. Olmos has been subjected to physical harm by the Portland police on many other occasions during the protests.  They have physically assaulted him to make him comply with a dispersal order, thrown a flash-bang grenade at his chest, and impacted him with flash-bang grenades several other times.

---

[21] @MrOlmos, Twitter (June 6, 2020, 1:27 A.M.), https://twitter.com/MrOlmos/status/1269184050314407936; @MrOlmos, Twitter (June 6, 2020, 4:15 A.M.), https://twitter.com/MrOlmos/status/1269226525020184577.

### 6.  Police Attack Plaintiff Tracy and Seize His Equipment after He Filed this Lawsuit

123.    Plaintiff Tracy is a freelance journalist who covered the George Floyd protests. He wears a helmet that reads "PRESS" on the front and back and a business card on his chest that clearly identifies him as a photojournalist.  He also carries two large, professional-grade cameras around his neck and over his shoulder.  He was unmistakably present at the protests in a journalistic capacity.

124.    On June 7, Mr. Tracy was documenting as protesters ran and hid from oncoming police vehicles as streets were cleared in the early hours of the day.  As he was recording, the police arrested two people who were hiding behind a car because they had been "taking photos." Another officer approached Mr. Tracy and threatened to arrest him, too, if he did not leave. Mr. Tracy held up his credentials and one of his two cameras clearly stating that he was press, but also moved back and complied with the order.  The police's threats prevented Mr. Tracy from documenting how the police executed the arrest.[22]

125.    Later that evening, the police hit Mr. Tracy on the lower left leg with a neon green police paint marker round.

---

[22] @ AlexMilanTracy, Twitter (June 7, 2020, 3:29 A.M.), https://twitter.com/AlexMilanTracy/status/1269577129265524736.

126.    Just after midnight that same evening, Mr. Tracy witnessed the police arrest a member of the media with press credentials clearly visible.  The following is a photograph he took of the incident, with a close-up of the press pass inset:



*Figure 6: Police arrest a member of the press with his press pass clearly visible.*

127.    On June 16, Plaintiff Tracy was documenting Portland police making arrests.  One officer told him to "get out of here now," or he was going to go to jail.  "I don't care if you're press," he repeated, "get out of here right now."[23] Mr. Tracy was unable to continue reporting on the arrest.

128.    The day after this action was filed, the police confiscated Mr. Tracy's camera, claiming it was "evidence." They had repeatedly been executing "dynamic" maneuvers against crowds including journalists and observers.  While running away from one such charge, a GoPro Hero 8 camera that Mr. Tracy used for newsgathering purposes fell out from a pouch on his waist.  One officer told him that it would be seized "as evidence" because the police line had advanced in front of it.  He tried to communicate with officers to be able to look for and retrieve his camera, but they prevented him from doing so.

### 7.    Police Intimidate and Launch Flash-Bangs at Plaintiff Conley

129.    Plaintiff Brian Conley has been a journalist for twenty years and has trained journalists in video production across a dozen countries internationally.  He founded Small World News, a documentary and media company dedicated to providing tools to journalists and citizens around the world to tell their own stories.

130.    On the night of June 15-16, the police launched one or more flash-bang grenades directly at Mr. Conley, who was standing at least ten feet away from any protesters in the area around the Justice Center.

131.    Mr. Conley was wearing a photographer's vest and carrying a micro four-thirds camera with a large telephoto lens, an off-camera flash, a streaming cellphone held aloft in one hand, and at times held a second video camera that he otherwise carried in his backpack.  He was unmistakably present in a journalistic capacity.

---

[23] @ AlexMilanTracy, Twitter (June 16, 2020, 1:16 A.M.), https://twitter.com/AlexMilanTracy/status/1272805156225048578.

132.    The police did not notice him until he activated the light on his camera.  At that point, an officer who was about 5-10 feet away saw him, saw that he was using his camera, and threw a flash-bang at him.

133.    Mr. Conley was isolated away from protesters.  There was no other target in the immediate vicinity.

134.    Despite having covered international protests and war zones for twenty years, this was the first time that Mr. Conley was hit with a flash-bang grenade.  The impact left him shocked, stunned, and the closest individual to the advancing police line.

135.    Later, Mr. Conley was documenting near the intersection of Broadway and Salmon Streets in downtown Portland when the police issued a dispersal order.  When Mr. Conley activated the light on his bigger camera, he saw an officer point at him and signal other officers towards Mr. Conley's position.

136.    Another officer approached Mr. Conley and several fellow journalists and told them they had to leave, and that it did not matter if they were media.  Two officers then pursued them down the street outside the Heathman Hotel.  Plaintiff Conley fell over a statue of a bulldog outside the hotel while fleeing but narrowly avoided a traumatic head injury.

137.    Mr. Conley has covered only a few protests since that day because the police's actions that day made him fearful about covering the protests without someone else present, such as a friend or colleague, in case the police were to ultimately injure or arrest Mr. Conley.

### 8.    Police Shoot Plaintiff Rudoff

138.    Plaintiff John Rudoff is an internationally renowned freelance journalist who covered the George Floyd protests.  Mr. Rudoff wears press identification from the National Press Photographers Association, carries large camera equipment, and wears a helmet clearly marked "press."

139.    Since he began covering protests in Portland, Mr. Rudoff has been tear-gassed many times and occasionally shot with pepper balls.  On June 19, the Portland police shot Mr. Rudoff with pepper balls while he was documenting the protest at the Justice Center.

140.    On the same day, Mr. Rudoff was documenting police action near the Justice Center when a line of police began pushing the crowd down the street.  He showed them his press pass and camera equipment, and an officer responded that he "[didn't] care if you're media" and pushed him to move with the crowd.

141.    Mr. Rudoff was prevented from further documenting the protests and violent police response at that time.  Moreover, he did not attend protests from that day until this Court entered a temporary restraining order on July 2, because the police's actions that day made him fearful that the police would ultimately injure him.

### 9.    Police Assault Plaintiff Woodstock

142.    Plaintiff Woodstock is a freelance journalist who has covered the ongoing Portland protests.  They wear a press pass from the *Portland Mercury* that says "MEDIA" in large block letters.

143.    On the evening of June 30, they attended the protests in North Portland to report on them.  Around 11:00 p.m., after the police issued their dispersal order, they were walking with a group of protesters and journalists complying with the order and moving east.  All of a sudden, the police arrayed themselves in a line and then started sprinting at the group.  The police tackled and arrested people to either side of Plaintiff Woodstock.

144.    Plaintiff Woodstock tried to film the arrests.  Almost immediately, however, they felt a baton pressed into their back as an officer yelled "MOVE, MOVE, MOVE, MOVE," directly in their ear.  They informed the officer several times that they were media, but the officer did not care and continued to push them to the east.  They were physically pushed at least four times by two officers during this incident.

145.    Some time later, police conducted another sprint-and-arrest maneuver.  Again, there were people being arrested all around Plaintiff Woodstock.  They tried to film the arrests but, again, an officer removed them from the scene.  The officer said that "[I] know you're media but you have to leave."

146.     Because of the actions of the police, Plaintiff Woodstock was unable to film the arrests at all.  Both times, the officers pushed Plaintiff Woodstock out of the area so fast that they could not even record over their shoulder—they had to put down their phone and run or risk falling over and getting arrested as well.

> **10.     Police Deploy a Killbox Tactic against *Portland Mercury* Reporters, Plaintiffs Mahoney and Tracy, and Other Journalists and Observers**

147.     Portland police use tear gas indiscriminately when confronted with crowds. Lt. Franz Schoening, commander of the Bureau's Rapid Response Team, has stated as much: "[W]hen officers can't see disrupters in a dense crowd because they're four to five rows back from officers and they won't comply with orders to leave the area," the Bureau's formal policy is to use tear gas against the crowd as a whole.[24]

148.     Because tear gas is inherently an indiscriminate weapon, this policy necessarily means that Portland police shoot tear gas at neutral parties who are attending to document and report on protests.  And indeed, many journalists and legal observers have found themselves caught in the police's widespread use of tear gas during these protests.

149.     One particularly egregious example took place on the night of June 2, when reporters employed by the *Portland Mercury*, as well as Plaintiffs Kat Mahoney, and Alex Tracy, found themselves victims of a "killbox" action by Portland police.

150.     Portland Mercury reporters Alex Zielinski and Blair Stenvick were covering the protests for the *Mercury* that night.  Ms. Zielinski was in the middle of the crowd, while Stenvick was towards the back.  Neither was near the fence surrounding the Justice Center.  Plaintiff Tracy was also in the crowd reporting on the protests.

---

[24] Maxine Bernstein, *Portland police, fire medics describe crowd control tactics, munitions*, The Oregonian (June 4, 2020), https://www.oregonlive.com/portland/2020/06/portland-police-fire-medics-describe-crowd-control-tactics-munitions.html.

151.    The police issued a warning to protesters to stay away from the fence.  To underscore the point, officers on the other side of the fence shot tear gas at protesters near the fence.

152.    Had officers merely shot gas at protesters closest to the fence, the reporters might not have been injured.  However, the police had decided to create a gas trap by shooting tear gas from the rear and sides of the crowd as well.  This gas trap, by design, snared not only protesters agitating near the fence, but many other peaceful protesters far from the fence with no desire to get involved.  And, of course, it also caught all four reporters, as well as Plaintiff Mahoney.

153.    Because they had been inundated with tear gas, neither Ms. Zielinski nor Stenvick was able to report on the protests for the rest of the night.  As the *Mercury*'s editor wrote that night: "Due to the dangerous situation and loss of control exhibited by the Portland Police, we have pulled our reporters off the street for the night.  It's simply too dangerous for them to be out there right now."[25]

154.    Portland police have a policy or practice of using indiscriminate killbox or kettling tactics against crowds including journalists and other neutrals.  They have used the same tactics in at least November 2014, January 2017, and June 2017.[26]

### 11.    The Police Have Intentionally Targeted Many Other Reporters and Neutrals

155.    The police's use of excessive force against neutral observers extends to all Plaintiff Class members and other neutrals.

156.    On June 3, 2020, the police physically assaulted KBOO reporter Cory Elia because he was recording them.  He had identified himself as press.  As the bystander who

---

[25] Wm. Steven Humphrey, *Live Updates: Protesting the Death of George Floyd in Downtown Portland, Night Five*, Portland Mercury (June 2, 2020), https://www.portlandmercury.com/blogtown/2020/06/02/28499376/live-updates-protesting-the-death-of-george-floyd-in-downtown-portland-night-five.

[26] Maxine Bernstein, *Portland police deny 'kettling' of protesters in response to ACLU lawsuit*, The Oregonian (Jan. 19, 2019), https://www.oregonlive.com/portland/2018/01/portland_police_deny_kettling.html.

recorded the interaction later recalled, "Hearing the screams from him in the background is truly terrifying."[27]

157.    On the night of June 5, 2020, a red truck flying an American flag drove through a crowd of protesters and nearly hit one of iHeartRadio podcaster Robert Evans's staffers.  When the staffer attempted to capture the license plate of the truck, the police aimed their crowd-control weapons at her and threatened to fire.  They prevented her from recording the license plate of the truck.  She no longer accompanies Mr. Evans to the protests in Portland.[28]

158.    Also on June 6, 2020, Mr. Evans was filming the police arranged in a phalanx advancing on a crowd of protesters.  He was holding his phone in one hand and his press pass in the other.  Also, his helmet was clearly labeled "PRESS."  Police fired an impact munition at him, hitting him in the very hand that was holding the press pass.

159.    June 7, 2020 was a banner day for Portland police's campaign of violence against journalists:

> a.    The police brutally attacked Donovan Farley with a truncheon and tear gas.
> Farley, a reporter who has been published in *Rolling Stone*, *VICE*, and the
> *Willamette Week*, was recording the police, who were arresting a protester using
> exactly the same maneuver that had killed George Floyd.  When they noticed him,
> they chased him away, beat him, and—even as he was retreating from the scene—
> sprayed him in the face with tear gas.[29]

---

[27] @Billings29James, Twitter (June 3, 2020, 12:16 A.M.),
https://twitter.com/Billings29James/status/1268079034321133570.

[28] @IwriteOK, Twitter (June 6, 2020, 3:41 P.M.),
https://twitter.com/IwriteOK/status/1269399061775306752.

[29] @DonovanFarley, Twitter (June 7, 2020, 11:44 A.M.),
https://twitter.com/DonovanFarley/status/1269701897377603584; @TVAyyyy, Twitter (June 7,
2020, 12:08 A.M.), https://twitter.com/TVAyyyy/status/1269526590456643584.

  b. The police also attacked Mr. Elia again—this time with tear gas rather than a truncheon—even though, as before, he was holding up his press pass and police knew he was press when they attacked him.[30]

  c. The police threatened to arrest Plaintiff Tracy for recording them arresting two people hiding behind a car, as described above.

  d. The police also arrested one of Mr. Evans's staff members for asking an officer his name.  She did not provoke him in any other way or do anything to justify police action.  Nevertheless, police arrested her and took her to the Justice Center, where they held her for several hours.

160. On June 13, 2020, the police beat reporter Beth Nakamura of *The Oregonian* with a truncheon, even though she was displaying her press pass and shouting "press, press." The officer responded: "I don't give a fuck."[31]

161. Also on June 13, 2020, the police ordered reporter Zane Sparling of *The Portland Tribune* to leave an area where they were enforcing a dispersal order against protesters, shoved him into a wall, and shot a crowd-control munition at his heel.[32]  When Mr. Sparling informed them that he was media, they responded that they didn't "give a shit."

162. On the night of June 15, 2020, OPB reporter Jonathan Levinson was reporting on the protests downtown.  As Portland police issued orders to disperse, he continued reporting. Officers informed him that if he did not "run," they would arrest him.[33]  They then violently

---

[30] @Human42LM, Twitter (June 7, 2020, 10:29 A.M.), https://twitter.com/Human42LM/status/1269683012515409921.

[31] @bethnakamura, Twitter (June 15, 2020, 8:27 A.M.), https://twitter.com/bethnakamura/status/1272551330184228864; @bethnakamura, Twitter (June 15, 2020, 8:54 A.M.), https://twitter.com/bethnakamura/status/1272558094870970368.

[32] @PDXzane, Twitter (June 13, 2020, 11:49 P.M.), https://twitter.com/PDXzane/status/1272058454799028226.

[33] @MrOlmos, Twitter (June 16, 2020, 12:40 A.M.), https://twitter.com/MrOlmos/status/1272796206071087105.

arrested another individual and prevented Mr. Levinson from recording or reporting on the arrest.[34]

163.    The day after this action was filed, the police set a new high-water mark for violence against journalists and legal observers:

      a.    The police confiscated Plaintiff Tracy's camera as described above.

      b.    The police arrested Plaintiff Yau as described above.

      c.    The police assaulted Plaintiff Woodstock as described above.

      d.    And finally, the police arrested two other journalists: Mr. Elia and his KBOO colleague Lesley McLam.  Neither Mr. Elia nor Ms. McLam were engaging in any conduct that posed a threat to police, property, or the public.  Both were simply reporting on the events of the evening.[35]

164.    At around 2:30 a.m. on the morning of August 11, 2020, Sergeant Damerville threw journalist Maranie Staab, who was wearing a press vest, to the ground as she was recording PPB officers from a safe distance.

165.    On August 16, 2020 Ms. Staab watched and recorded as PPB Officer Lehman pushed a protester to the ground, threw her up against a telephone post, and ripped off her face mask to ensure she would be exposed to tear gas.  When Officer Lehman noticed she was recording, he attacked Ms. Staab, throwing her to the ground.

166.    On September 28-29, 2020, Ms. Staab was again attacked several times by Sergeant Damerville while observing and recording the protests.

---

[34] @MrOlmos, Twitter (June 16, 2020, 12:48 A.M.),
https://twitter.com/MrOlmos/status/1272798234809782272.

[35] @TheRealCoryElia, Twitter (June 30, 2020, 11:14 P.M.),
https://twitter.com/therealcoryelia/status/1278210455652061184, at 6:00; @mayorofbabytown,
Twitter (July 1, 2020, 1:14 A.M.),
https://twitter.com/mayorofbabytown/status/1278240587095785472.

**12.    The Police's Violent Activities Continue into 2021**

167.    Despite the entry of an injunction prohibiting the police from violently targeting journalists, the police persisted in such activities well into 2021.

168.    On April 13, 2021, for example, officer Andrew Braun assaulted Melissa Lewis, a member of the press.  He walked up to her and hit her in the hand that was holding her phone, causing it to fall to the ground.  Video of these events can be found here: https://www.youtube.com/watch?v=HbkiJGwsZ2s.

169.    Not only was Ms. Lewis well-marked as PRESS, but Officer Braun actually recognized her and addressed her by name.  He told her to stay out of the way and she was complying.

170.    She was manifestly out of the way because he walked past her and had to walk *back* to her—and reach across a shrubbery—in order to assault her.

**13.    The Police Have Intentionally Targeted Reporters and Legal Observers in the Past**

171.    The Portland police's attacks on journalists and legal observers covering the George Floyd protests are part of a years-long pattern of such conduct.

172.    In August 2018, Plaintiff Brown and Donovan Farley were reporting on protests in downtown Portland.  Without warning, the police rushed protesters, shot rounds, and set off explosions.  Then, they charged at and beat a group of journalists, including Mr. Brown and Mr. Farley, all of whom had press passes clearly displayed or were holding obviously professional cameras.[36]  Video here: https://tinyurl.com/BrownBeaten18.

---

[36] Donovan Farley, *In Portland, the Police Played Into the Hands of the Fascists and Attacked Their Own Citizens*, Paste Magazine (Aug. 7, 2018), https://www.pastemagazine.com/politics/political-violence/in-portland-the-police-played-into-the-hands-of-th/.

173.    At the same protest, police hit KATU reporter Ric Peavyhouse with a rubber bullet[37] and documentary filmmaker Michelle Fawcett with a flash-bang grenade.[38]

174.    During protests in 2017, Mr. Brown was attending as a journalist for the *Portland Mercury*.  Police beat him with a truncheon and fired on him with flash-bangs.

175.    Also during protests in 2017, the police beat Plaintiff Rudoff with a truncheon because he was not moving quickly enough for an officer's liking.

**D.    The Police Announce an Unconstitutional Policy of Dispersing and Arresting Members of the Press Who Are Trying to Report on the Protests**

176.    On June 14, 2020, the police announced that they would enforce dispersal orders against media and neutral observers unless the members of the press had been handpicked by the police to be "imbed[ded]" with the police.[39]

177.    The police subsequently warned reporters and neutral observers that they must obey the police's dispersal orders to protesters if they wished to "stay safe and avoid arrest or altercation." In the view of the police, "[t]he unlawful orders [sic] apply to everyone"—except those the police have permitted to be "imbedded" with them.[40]

178.    This proclamation was issued from the official Twitter account of the Portland police, @PortlandPolice, and is a written statement of the Bureau's formal policy.  It is also an accurate statement of the Portland police's widespread custom and practice.  Plaintiffs and Plaintiff Class have repeatedly been dispersed by the police when they were peacefully trying to record the protests and posed no danger to the public or law enforcement.

---

[37] @RPeavyhouse, Twitter (Aug. 5, 2018, 2:34 P.M.), https://twitter.com/RPeavyhouse/status/1026219809552224256.

[38] Alex Zielinski, *Portland Police Explain Why They Fired Munitions at Protesters on August 4, Portland Mercury* (June 4, 2019), https://www.portlandmercury.com/blogtown/2019/06/04/26589682/portland-police-explain-why-they-fired-munitions-at-protesters-on-august-4.

[39] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386641462607872.

[40] @PortlandPolice, Twitter (June 14, 2020, 9:33 P.M.), https://twitter.com/PortlandPolice/status/1272386738338410496.

179.    The police have not rescinded this proclamation or changed their practice.

180.    This policy is an unlawful viewpoint-based restriction on speech.  Once the police issue a dispersal order, this policy gives them unbridled discretion over which reporters may remain, and thus permits them to control the content of reporters' coverage.[41]

181.    It is designed to prevent reporters and legal observers from holding the police accountable precisely when accountability is most needed.  No government interest can justify such a policy, especially because reporters are not a threat to the public, police, or property.  Nor is there any alternative way for reporters not embedded with the police to report on the violence with which police enforce their dispersal order.

182.    On October 3, 2022, based on a PPB officer's testimony in another case, Oregon Public Broadcasting reported that PPB officers continue to have an "aggressive understanding" of their authority to use force at protests.[42]

### E.    The Police Engage in Unlawful Surveillance

183.    The police have not stopped at violently dispersing protestors.

184.    An audit of the Portland Police Bureau's intelligence gathering practices during the 2020 protests found officers collected information about political activity without providing evidence a crime had been committed.[43]

---

[41] *See, e.g.*, Elana J. Zeide, Note, *In Bed with the Military: First Amendment Implications of Embedded Journalism*, 80 N.Y.U. LAW REV. 1309, 1321 ("Embedding typically takes place in a constrained environment where journalists cannot afford to alienate the limited sources available. Accordingly, most reporters will be reluctant to publish anything that the officers and soldiers surrounding them might receive badly.").

[42] Jonathan Levinson, *Officers' testimony indicates Portland police still have an aggressive understanding of use-of-force law*, OPB (Oct. 3, 2022), https://www.opb.org/article/2022/10/03/portland-police-testimony-aggressive-use-of-force-protesters/.

[43] Jonathan Levinson, Audit finds issues with Portland Police Bureau's surveillance practices during 2020 protests, OPB (Apr. 6, 2022), https://www.opb.org/article/2022/04/06/audit-portland-police-bureau-surveillance-practices-during-protests/.

185.    In one instance, an officer recorded protesters with his personal cellphone for his personal use.  In other instances, officers took photos of protesters, video of organizers, recorded license plate information and saved photos and videos posted to social media without indicating any suspected criminal activity.[44]

186.    According to the audit report, "[t]he Bureau had no directives or instructions for officers specific to investigating criminal activity during (protests)." "Without guidance, officers used their individual discretion to decide how and what type of information to collect."[45]

187.    The audit, conducted by the city auditor's office, also found the Criminal Intelligence Unit did not limit access to their reports and kept them longer than they were supposed to.[46]

188.    Plaintiffs have been the target of surveillance by the police.  For example, on January 1, 2022, Plaintiff Mahoney was informed of an unmarked police car loitering near her apartment.

## F.    The Police's Intimidation Campaign Works

189.    The police's campaign of intimidation and fear has been effective.  Plaintiff Woodstock's experience is typical.

190.    Plaintiff Woodstock has been a journalist for seven years.  They have been published in the *Washington Post*, *NPR*, *Portland Monthly*, *Travel Portland*, and the *Portland Mercury*.  They are a seasoned veteran of reporting in tense situations.

191.    Plaintiff Woodstock is not a threat to the public or to law enforcement and has not engaged in any activities that would constitute such a threat.  Plaintiff Woodstock does their best to avoid police violence but has been swept up in it anyway when the police assaulted individuals near them or ordered them to leave on pain of being assaulted or arrested.  They have

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

seen people next to them get shot in the head with rubber munitions. They have witnessed reporters getting shot with rubber bullets or maced in the face when they tried to gather evidence. The have been tackled by police in the course of their reporting through no fault of their own.

192.    The Portland police's indiscriminately violent conduct toward journalists and protesters alike has made it difficult—and at times, impossible—for Plaintiff Woodstock to report on the protests accurately and thoroughly.

193.    For example, because police shoot rubber bullets at and otherwise use force against anyone who approaches gas canisters or spent rounds, including journalists, Plaintiff Woodstock is unable to verify whether tear gas was used at a particular location, or whether a particular round fired at a protester's head was a rubber bullet or some other impact munition.

194.    Similarly, Plaintiff Woodstock is unable to determine which agency's officers are enforcing a dispersal order in a given location because police shoot anyone who approaches, including journalists.

195.    Because the police threaten to arrest any journalist who remains in an area after a dispersal order, Plaintiff Woodstock generally complies and departs after a dispersal order is issued. The result, however, is that Plaintiff Woodstock is unable to document the violent tactics with which police enforce their dispersal order against protesters. On information and belief, at least one time after they complied with a dispersal order, the police severely attacked the group of protesters they were covering.

196.    The police's goal is to prevent the press from holding them accountable. It works.

**G.    The Federal Agents' Deployment of Operation "Diligent Valor"**

197.    The Portland police did not act alone in attempting to quell Plaintiffs' exercise of their First Amendment rights to observe and report on protests. Several weeks after the protests began, Portland police were joined by federal agents deployed to carry out then-President Trump's illiberal agenda.

198.    Over the course of the month following Mr. Floyd's murder, former-president Trump issued multiple statements denouncing the protests in various cities and threatening to use

federal forces to crush them.  For example, on May 29, 2020, three days after the protests began

in Minneapolis, then-president Trump issued a tweet stating, "Either the very weak Radical Left

Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the

National Guard & get the job done right."[47]  He continued, "Any difficulty and we will assume

control but, when the looting starts, the shooting starts."[48]

199.    On June 26, 2020, as the protests in Portland continued, former-president Trump

went further, issuing an Executive Order on Protecting American Monuments Memorials, and

Statutes and Combating Recent Criminal Violence ("Executive Order").[49]  The Executive Order

blamed "left-wing extremists" for "advanc[ing] a fringe ideology that paints the United States of

America as fundamentally unjust and have sought to impose that ideology on Americans through

violence and mob intimidation." In addition, it directed the Secretary of DHS to provide

"personnel to assist with the protection of Federal monuments, memorials, statues, or property."

200.    Acting pursuant to Defendant Trump's Executive Order, then-acting Secretary of

DHS Chad Wolf announced, on July 1, 2020, that DHS would form a special task force charged

with "conduct[ing] ongoing assessments of potential civil unrest or destruction and allocat[ing]

resources to protect people and property," and to engage in "potential surge activity to ensure the

continuing protection of critical locations."[50]

---

[47] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM),
https://twitter.com/realdonaldtrump/status/1266231100172615680.

[48] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM),
https://twitter.com/realDonaldTrump/status/1266231100780744704.

[49] Exec. Order No. 13,933, 85 Fed. Reg. 40,081 (June 26, 2020),
https://www.whitehouse.gov/presidential-actions/executive-order-protecting-
americanmonuments-memorials-statues-combating-recent-criminal-violence/.

[50] Press Release, U.S. Dep't of Homeland Sec., DHS Announces New Task Force to Protect
American Monuments, Memorials, and Statues (July 1, 2020),
https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect
americanmonuments-memorials-and-statues.

201.    Soon after, Mr. Wolf, FPS Director L. Eric Patterson, and other DHS officials initiated "Operation Diligent Valor" and sent a rapid deployment force to Portland comprised of approximately 114 CBP and ICE officers.  The CBP officers included members of the Border Patrol Tactical Unit, a quasi-militarized operations unit typically based on the United States-Mexico border or deployed overseas.[51]  As DHS itself has admitted, such federal agents do "not specifically [have] train[ing] in riot control or mass demonstrations."[52]

202.    "Operation Diligent Valor" also relied on USMS officers, federal agents tasked with protecting federal judges and courthouses, who were present or brought to Portland and who conducted operations in concert with the DHS rapid deployment force.[53]

203.    Starting in the early hours of July 4, 2020, federal agents began to engage in systematic efforts to dismantle the protests in Portland.  These unlawful tactics went far beyond what was required to protect federal property—the stated purpose for deploying federal agents in Portland— and reflected the retaliatory intent to punish protestors for voicing their beliefs, and journalists and legal observers for conveying those beliefs to the nation.

**H.    Federal Agents Attack Journalists and Legal Observers**

204.    The federal agents' tactics, like those of the Portland police, included wielding of excessive force, including shooting journalists and observers with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting

---

[51] Ben Fox & Gillian Flaccus, *Homeland Security Gets New Role Under Trump Monument Order*, Associated Press, July 10, 2020, https://apnews.com/4435a1f27cf85e087e112ba1224a2f1f; Ed Pilkington, *'These Are His People': Inside the Elite Border Patrol Unit Trump Sent to Portland*, The Guardian, July 27, 2020, https://www.theguardian.com/us-news/2020/jul/27/trump-border-patrol-troops-portlandbortac?CMP=Share_iOSApp_Other.

[52] Sergio Olmos et al., *Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times, July 18, 2020, https://www.nytimes.com/2020/07/18/us/portland-protests.html.

[53] Josh Gerstein, *Feds assemble 'Operation Diligent Valor' force to battle Portland unrest*, POLITICO (July 22, 2020), https://www.politico.com/news/2020/07/22/federal-government-assembles-force-portland-unrest-377785.

and beating them with batons, and firing tear gas at them.  The federal agents also engaged in surveillance of journalists and conducted warrantless arrests and custodial detentions, all in direct response to Plaintiffs' exercise of their First Amendment rights.

205.    Indeed, even after this Court issued a preliminary injunction on July 16, 2020, preventing the Portland police from retaliating against and dispersing journalists and legal observers, the federal agents continued their attacks on journalists and legal observers.

206.    On July 23, 2020, the Court issued a temporary restraining order prohibiting the federal agents from assaulting and dispersing journalists and legal observers.  Within hours, however, the federal agents began deliberately flouting the Court's order.

### 1.    Federal Agents Shoot Plaintiff Lewis-Rolland

207.    In the early hours of July 12, Mr. Lewis-Rolland was at the protests near the federal courthouse, documenting the protesters and their interaction with federal officials.  He was carrying bulky camera equipment, wearing a t-shirt that said "PRESS" in big block letters, and staying in well-lit areas to make sure officials could see that he was there in a journalistic capacity.

208.    Around 1:54 a.m., federal agents began rushing out of the federal courthouse to eject protesters and neutrals alike from the area with tear gas, impact projectiles, and physical force.  The agents were from "more than a half-dozen federal law enforcement agencies and departments" under the purview of DHS, including the Federal Protective Service.

209.    Video of the below events is available here:

https://www.facebook.com/MathieuLewisRolland/videos/10218671503762415/.

210.    Soon after the federal agents emerged from the courthouse, one shoved Mr. Lewis-Rolland, shouting "GET BACK! GET BACK!" Mr. Lewis-Rolland began moving west, complying with the agents' orders.

211.    About three minutes after the agents began their offensive, Mr. Lewis-Rolland had moved almost all the way to SW 4th Avenue, well past the boundary of federal property. Nevertheless, federal agents, including Defendant Doe, continued to chase him and the crowd.

212.    A few seconds later, Defendant Doe or other federal agents next to him shot Mr. Lewis-Rolland in the side and back ten times.  They riddled him with hard plastic bullets launched with enough force to put bullet holes in his "PRESS" t-shirt.



Figure 7: Federal agents' bullets ripped Mr. Lewis-Rolland's t-shirt at the bottom left and bottom right corners.

**2.    Federal Agents Throw Smoke Chasers at Plaintiff Mahoney and Shoot Her**

213.    On July 21, Plaintiff Mahoney was observing the protest that extended along SW 3rd Avenue from SW Salmon Street to SW Madison Street.  Shortly after midnight on July 22, federal agents came out of the federal courthouse to begin a second push to clear protestors from the sidewalk in front of the building, SW 3rd Avenue, Lownsdale Square, and Chapman Park.

214.    Federal agents fired a smoke chaser towards where the food tents, known as Riot Ribs, resided.  Smoke chasers were also fired at people near Ms. Mahoney, to her right.  The

people near her were journalists and a handful of protestors that had not been pushed west on SW 3rd Avenue.

215.    Ms. Mahoney was hit with a smoke chaser that a federal agent had fired at her, which struck her left knee.  Within a second, a second smoke chaser was fired at her, hitting her right foot.  A third smoke chaser was fired towards her which she jumped to avoid hitting her legs.

216.    At around 12:45 a.m. on July 24, Ms. Mahoney was on SW 3rd Avenue facing the federal courthouse.  Federal agents began aggressively firing through the fence at protesters on the other side.

217.    As they began approaching her position, Ms. Mahoney moved north on SW 3rd Avenue away from them, and then slightly onto SW Salmon Street to continue filming and observing the events taking place.

218.    Suddenly, for no reason, a federal agent shot a pink paint bullet directly at Ms. Mahoney's head.

219.    There was no discernible reason to shoot in her direction.  Ms. Mahoney was near members of the press, but six to ten feet away from protesters.  Nor was there any reason to shoot the protesters, who were not doing anything violent.

   **3.    Federal Agents Shoot and Throw Tear Gas Canister at Plaintiff Brian Conley**

220.    On July 23, 2020, the night the TRO issued against the federal agents, federal agents intentionally shot Plaintiff Brian Conley and threw a tear-gas canister at his head.

221.     Mr. Conley was documenting events at 4:00 a.m., when only a few protesters were remaining.  He was using a large Micro Four Thirds camera with a telephoto lens and external 20W LED light mounted on it.  He was wearing a photographer's vest that said "PRESS" on it as well as a helmet that said "PRESS" in big block letters across the front.  He was plainly a member of the press.

222.    When a female protester holding flowers skipped towards federal agents, they grabbed her.  They also grabbed a protester who tried to free her.  Having neutralized this threat, the federal agents inundated the street with tear gas.  Mr. Conley yelled that he was press, over and over.

223.    Suddenly, without warning, federal agents shot him multiple times with impact munitions, which were incredibly painful, in his chest and foot.  This can only have been intentional, for there was nobody else nearby except press and a few medics.

224.    Further confirming that federal agents were targeting press intentionally, an agent then threw a tear-gas canister directly at Mr. Conley, where it exploded above his head.  Federal agents again threw canisters of tear gas at several members of the press, including Mr. Conley, the following night.

225.    Plaintiff Conley returned to cover the protests on the night of July 27.  He was still using a large Micro Four Thirds camera with a telephoto lens and external 20W LED light mounted on it and wearing his photographer's vest and his helmet that said "PRESS" across the front.  He was, again, plainly a member of the press.

226.    Just before 1:00 a.m. on July 28, federal agents—again—intentionally shot Mr. Conley and threw tear-gas canisters and flashbangs directly at him.  Even once Mr. Conley moved to the side, and there was nobody else near him, a federal agent threw another flashbang directly at him.

227.    Mr. Conley was hit multiple times, rearranging the "PRESS" stickers on his helmet, and he is having trouble walking today.

228.    On August 4, 2020, Plaintiff Conley was pepper-sprayed by a federal agent at point-blank range not long after the agent recognized him as press.

**4.    Federal Agents Fire a Tear-Gas Canister at Plaintiff Yau**

229.    Early the morning of July 15, 2020, Plaintiff Yau was covering the protests in downtown Portland outside the Justice Center and Hatfield Courthouse.  He was taking photographs with his Nikon D3100 DSLR camera with an 18-55mm lens, wearing a high-

visibility vest that said "PRESS" in large block letters, a "PRESS" helmet, and a press pass around his neck.

230.    Plaintiff Yau was standing as far from the crowd as was possible while still attempting to report effectively.

231.    Nevertheless, a federal agent fired a tear-gas canister from a grenade launcher directly at him.  Two burning fragments of the canister struck him, one on his leg and one on his arm.

### 5.    Federal Agents Throw a Tear Gas Canister at Plaintiff Brown and Threaten to Shoot Him

232.    Plaintiff Brown covered the protests on July 16, 2020 in his capacity as an ACLU legal observer.  He was wearing his blue ACLU vest.

233.    At around 11:00 pm, Mr. Brown saw federal agents emerging from the Edith Green federal building next to the Justice Center and amassing in the street.  The federal agents formed a wall to block the road.  More federal agents positioned themselves on the sidewalk.

234.    Mr. Brown stood with a small group of protesters, NLG legal observers, and a journalist about 500 feet away from the federal agents were standing.  The federal agents kept their guns trained on approaching protesters.

235.    Without warning, the federal agents began firing at the feet of the people on the sidewalk, then began firing indiscriminately into the crowd.  Prior to this occurring, Mr. Brown did not see any threats or unlawful activity from the protesters.

236.    Mr. Brown observed the federal agents shoot a journalist.  Video here: https://tinyurl.com/FedsVsReporters, at 14:55–17:12.  The journalists were not doing anything threatening or illegal.

237.    After they started shooting, federal agents lit a fiery stick that gave off some kind of smoke, set off flash bang grenades and tear gas.  Mr. Brown was tear gassed and had to run away from the area and could no longer report on or observe what the federal agents did to the protesters.

238.    Once Mr. Brown was able to breathe and see well, he returned to SW 4th Street, across from Chapman Square.  Federal agents told him that he could not go near the fence and threatened to shoot him.  He saw a person with press insignia and a camera walking on the west side of SW 4th.  Federal agents threatened to shoot him.  He was holding his camera and looked like he was recording.  Video here: https://tinyurl.com/FedsVsReporters, at 22:42–23:25.

### 6.    Federal Agents Shoot Plaintiff Rudoff

239.    On the night of July 19, Plaintiff Rudoff was reporting on the protests in downtown Portland in front of the Hatfield Courthouse.  He was using two large professional cameras, wearing a press credential issued by the National Press Photographers' Association, and a vest and helmet that both said "PRESS" in big block letters.

240.    Around 11:50 p.m., Mr. Rudoff was documenting federal agents as they were exiting the courthouse shooting tear gas and other munitions.  He was standing in an open, well-lit area with very few people in my immediate vicinity.  He was not near an arrest or a skirmish line.

241.    Suddenly, and for no reason, a federal agent shot him in his right shoulder, inches from his head.  Based on the contusion, it was likely a 40mm rubber bullet.

242.    Early in the morning of July 22, 2020, Mr. Rudoff was documenting the protests in downtown Portland.  He was wearing his "PRESS" helmet and vest, and his press credential.

243.    At approximately 12:40 a.m., he was standing on the east sidewalk of SW 4th Avenue, just north of the intersection of SW 4th and SW Salmon, where he was photographing a skirmish line.  They were all federal officers.

244.    Minutes later, he suddenly felt a tremendous strike and extreme pain in the lower medial aspect of his left tibia, directly above the line of his boot.  He could not continue working after this because he was hobbled and in too much pain.

### 7.    Federal Agents Shoot and Tear Gas Alex Tracy

245.    On July 19, 2020, Plaintiff Tracy was reporting on the protests in downtown Portland in front of the Hatfield Courthouse using two large professional cameras and wearing a press card and helmet.

246.    He was documenting federal agents just before midnight as they were launching a barrage of tear gas at a group of people in conjunction with other munitions.  He was standing in an open, well-lit area, not behind any protestors.

247.    As he was taking video and photographing the chaos, a federal agent shot him in his left ankle joint with an impact munition round.

248.    At the same time, he was consumed with tear gas and hit with pepper balls on his right elbow.  The pain was so bad that he had to be assisted away from the scene and had to stop documenting what was happening at the protest while he recovered.

249.    On July 22, 2020, Plaintiff Tracy was again documenting the protests in downtown Portland in front of the Hatfield Courthouse, using his two large cameras and wearing his press card and helmet.

250.    At approximately 12:30 a.m., he was standing in the street and filming tear gas and a group of federal officers who were on the sidewalk in front of the Courthouse.  Two federal officers gestured at him with their batons to move back.

251.    A few minutes later, the closest federal officer launched a flash bang towards Plaintiff Tracy, hitting him.

### 8.    The Federal Agents Have Intentionally Targeted Many Other Reporters and Neutrals

252.    The federal agents' use of excessive force against neutral observers extends to all Plaintiff Class members and other neutrals.

253.    In addition to the unconstitutional activities described above, the federal agents have carried out many additional violations of journalists' and legal observers' rights.

254.    For example, Journalist Garrison Davis was also covering the protests on the night of July 11, 2020 and the early morning of July 12, while wearing a "PRESS" helmet and holding a press pass.

255.    Shortly after midnight, the federal agents issued what they called a "last warning." They then launched a tear-gas offensive, engulfing the entirety of the steps of the courthouse, SW 3rd Avenue, and Lownsdale Square in tear gas.

256.    As Mr. Davis moved backward, one federal agent shot him in the back with a tear gas canister.  The canister fell into Mr. Davis's bag and inundated him with tear gas until people nearby helped him remove it.

257.    Federal agents also shot directly at him with pepper bullets and other munitions, even though he was no threat to them or anyone else.  Mr. Davis also saw federal agents chase, truncheons swinging, after legal observers who were clearly affiliated with the National Lawyers' Guild.

258.    July 19 and 20 were nights of unmitigated brutality by the federal agents.

259.    The evening of July 19, NLG legal observer James Comstock was shot in the hand by a federal agent while he stood against the wall of the Portland building alone making notes on his phone.

260.    Photojournalist Noah Berger, who was carrying two large professional cameras and wearing two press credentials, was shot twice by federal agent with a rubber bullet or impact munition that same night.  Even though he repeatedly identified himself as press, he was then charged by three federal agents, who beat him with batons and pepper-sprayed him.[54]

261.    Jungho Kim, a freelance photojournalist, was shot suddenly and without warning on July 19, 2020 in the chest with a pink marker round.  He was wearing a reflective neon yellow

---

[54] Mr. Berger won a Pulitzer Prize for his coverage of the 2020 protests. *AP Photographers win Pulitzer Prize in Breaking News Photography*, Associated Press (June 11, 2021), https://apimagesblog.com/blog/2021/6/11/ap-photographers-win-pulitzer-prize-in-breaking-news-photography-racial-reckoning.

vest with a large reflective white stripe that said "PRESS" in big block letters, a white helmet with reflective patches on the sides that said "PRESS" on the front and rear, and a press pass issued by the National Press Photographers' Association.

262.    Nate Haberman-Ducey, an NLG legal observer, was walking with his bicycle through Lawnsdale Park around 1:45 a.m. on July 19 wearing a green, NLG-issued hat. Suddenly, without warning or reason, a federal agent shot his bike with a pink paint marking round from a FN 303 riot gun, and then shot him in the hand with equal force.

263.    Late on July 19, 2020 or early on July 20, photojournalist Nathan Howard was covering interactions between federal agents and protesters near the Justice Center and the Hatfield Courthouse.  Even after he'd identified himself as press, a federal agent fired at least two pepper balls at him.

264.    Then 17-year-old Eddy Binford-Ross was covering the protests for her school newspaper on July 19, 2020.  She carried a large Canon Rebel T3 camera with a zoom lens around her neck, and regularly wore her press lanyard and badge.  Despite her being clearly identified as press, federal agents threw a flashbang grenade and shot a teargas canister towards her.

265.    Around 12:30 a.m. on July 20, 2020, Jake Johnson was reporting on the protests in downtown Portland in front of the Hatfield Courthouse while wearing a press helmet and carrying a large professional camera.  Suddenly, without warning, provocation, or reason, a federal agent took aim and fired a 40mm rubber bullet at his torso, where his camera was hanging.  Based on where he hit Mr. Johnson, it is reasonable to assume the federal agent was attempting to destroy his equipment.

266.    Also on July 20, 2020, journalist Mike Bivins was pepper-sprayed at point-blank range while documenting federal agents' interactions with protestors in front of the Hatfield Courthouse after midnight.  He was wearing a press pass and standing in a well-lit area with other journalists.

267.     On July 23, 2020, the very night the Court issued its TRO, federal agents intentionally violated it by shooting OPB reporter Jonathan Levinson.  Mr. Levinson was wearing an OPB press pass with his name, his photograph, the OPB logo, and the word "MEDIA."  He was also wearing a helmet that said "PRESS" in large letters on the front and back and carrying two professional cameras with large, bulky lenses.

268.     Mr. Levinson's camera and lens were splattered with paint.  Based on Mr. Levinson's position and the position of people around him, there is almost no chance the agent was aiming at anyone other than Mr. Levinson.

269.     Like Mr. Levinson, Rebecca Ellis attended the protests on the night the Court issued the TRO.  She too was wearing her OPB press pass.  Around 1:30 a.m., she was standing with a group of journalists, away from protesters, and filming federal agents as they exited the federal courthouse.  Suddenly, for no reason, a federal agent fired directly at her, hitting her in the hand and singeing her arm.

270.     Around ten minutes later, she was on SW Salmon Street with several other journalists, attempting to film federal agents' enforcement of dispersal orders.  Two agents physically forced her to leave; one shouted "MOVE, MOVE," and "WALK FASTER!" in her face, forcing her and her colleagues to walk backward, while another agent kept pace menacingly holding his gun.  These two agents together prevented her and her colleagues from reporting on what was going on behind them.

271.     Federal agents also shot a photojournalist the following night.  Freelance photographer Kathryn Elsesser attended the protests on the night of July 24, 2020 on assignment for the world's oldest news agency, the Agence France-Presse (AFP).  She was wearing a press pass and a helmet with "PRESS" written on it in big letters across the front.

272.     At around 2:00 a.m., Ms. Elsesser was standing alone at the edge of the park, across the street from the federal courthouse, when a federal agent shot her in the arm from across the street.  She also saw the federal agents shoot and tear gas four additional journalists.

273.    Federal agents also shot an NLG legal observer Haley Nicholson on July 24.  She was wearing a green NLG legal-observer hat.

274.    At around 11:50 p.m., she was recording and observing events on SW 3rd Avenue, near the intersection with SW Salmon Street.  A federal agent lined her up in his sights, but she was facing away from him.

275.    When she turned to face him, he shot her in the chest, directly above the heart, at nearly point-blank range.  The federal agent used a 40mm rubber bullet for which the minimum safe distance is 2 meters (approximately 6 feet) and the minimum recommended distance is 5 meters (approximately 15 feet).

276.    On July 25, 2020, two ACLU legal observers—Plaintiff Mahoney and Bruce Knivila—were standing with two NLG legal observers and some press at the corner of SW Salmon Street and SW 3rd Avenue, facing the federal courthouse.  All four were clearly marked as legal observers affiliated with their respective organizations.

277.    To the right of the group were some protesters.  The four legal observers were distinguishable from protesters; in fact, at least two federal agents *actually distinguished* them and declined to pepper-spray them.  Then, one agent chose to walk over, pop open a can of tear gas, and casually drop it right at the feet of the legal observers, in an area where only press and legal observers would suffer its effects.

278.    A couple of minutes later, an agent walked directly to the group—exactly to where his collaborators had stopped their pepper-spraying—and maced or pepper-sprayed the legal observers.

279.    In the early hours of July 26, 2020, Daniel Hollis, a videographer for VICE News, was recording the protest while wearing a helmet with the word "PRESS" on it.

280.    He went to the intersection of SW Salmon Street and SW 3rd Avenue specifically to get away from protesters for a wide angle shot.  There were very few people near him, and nearly all of them were clearly marked as press.

281.    Nevertheless, the agents launched a barrage of munitions at Mr. Hollis and the members of the press around him, hitting Mr. Hollis near his groin and in his lower back.  Mr. Hollis was forced to stop reporting for the night.

282.    On the nights of July 25 and 26, 2020, Justin Grinnell, the Managing Editor of the Portland State Vanguard, was covering the protests outside the Hatfield Courthouse.  He was wearing a press pass and his hat and backpack were labeled "PRESS" in large letters written on yellow tape.

283.    Just before 2:30 a.m. on July 26, Mr. Grinnell documented a federal agent who temporarily left the advancing line to kick a flaming tear-gas canister directly at a group of journalists.

284.    The next night, in the early hours of July 27, 2020, federal agents dispersed Mr. Grinnell and other journalists, forcing them in the opposite direction from where federal agents were advancing on protestors.  But there was no reason to disperse Mr. Grinnell, or any of the press he was standing with, who were all following the federal agents' orders.

285.    A while later, a federal agent launched a tear gas canister at a group of press with whom Mr. Grinnell was standing.  There were no protestors nearby, just clearly identified members of the press.

286.    On July 26, 2020, the federal agents shot journalist Emily Molli in the arm while she was recording them.  They also shot a group of clearly marked journalists—all of whom were holding up their press passes, yelling that they were press, and taking pictures—with a barrage of impact munitions and tear gas.

287.    On July 27, 2020, federal agents shot and tear-gassed journalist Amy Katz with no protesters nearby.

288.    On July 29, 2020, the evening after the federal government supposedly reached a deal with the State of Oregon to withdraw from Portland, federal agents shot tear gas at a group of journalists three times.

I.      **The Federal Agents' Retaliatory Animus and Surveillance Activities**

289.    The sheer scope and force of the federal agents' violence is proof positive that their intent was to crush journalists and legal observers like Plaintiffs precisely because they were exercising their First Amendment right to observe and document government conduct.

290.    However, that is not the only proof of the federal agents' retaliatory animus.  The federal agents also engaged in unprecedented surveillance of journalists, legal observers, and citizens involved in the George Floyd protests.

291.    In July 2020, reports surfaced that the federal agents had compiled "intelligence reports" about specific journalists covering the protests in Portland.[55]

292.    These intelligence reports summarized tweets written by at least two journalists — a reporter for the New York Times and the editor in chief of the blog Lawfare — and included written descriptions and images of the journalists' tweets and the number of times they had been liked or retweeted by others.[56]

293.    Officials who are familiar with the reports said they are consistent with the federal agents' aggressive tactics in Portland.[57]

294.    In October 2021, it emerged that the federal agents had compiled intelligence and background reports — dubbed "baseball cards" — on people arrested by federal authorities in connection with the George Floyd protests, despite their charges being unrelated to national security threats.[58]

---

[55] Shane Harris, *DHS compiled 'intelligence reports' on journalists who published leaked documents*, Wash. Post (July 30, 2020), https://www.washingtonpost.com/national-security/dhs-compiled-intelligence-reports-on-journalists-who-published-leaked-documents/2020/07/30/5be5ec9e-d25b-11ea-9038-af089b63ac21_story.html.

[56] *Id.*

[57] *Id.*

[58] Maxine Bernstein, *DHS compiled intelligence reports on protesters arrested in Portland without legal justification*, The Oregonian (Oct. 2, 2021), https://www.oregonlive.com/portland/2021/10/dhs-compiled-intelligence-reports-on-protesters-arrested-in-portland-without-legal-justification-report-finds.html.

295.    Historically, military and intelligence officials have used such baseball cards for biographical dossiers of suspected terrorists, including those targeted in lethal drone strikes.[59]

296.    Most troubling of all, in December 2021, the *NY Times* reported that the federal agents set up extensive surveillance operations inside the George Floyd protests, with agents posing as protestors to monitor their activities, following vandalism suspects to guide the local police toward arrests, and secretly videotaping protestors, journalists and legal observers.[60]

297.    The federal agents have consistently claimed that it is impossible to distinguish clearly-marked legal observers and journalists from protestors.  However, tellingly, they were sufficiently able to distinguish their own undercover agents from genuine protestors to carry out this covert program, which is reminiscent of COINTELPRO project that sought to spy on and disrupt various activist groups in the 1950s and 1960s.

298.    These surveillance activities continued even after the inauguration of President Biden.  In the hours after President Biden's inauguration this year, protesters marched once again through the streets of Portland, sending a message that putting a Democrat in the White House would not resolve the problems of racial injustice and corporate greed.  Among those protestors were plainclothes federal agents.[61]

J.    **The Federal Government's Policy of Dispersing Reporters and Legal Observers at Protests**

299.    Even setting retaliatory animus aside, the federal agents' policy, or widespread practice in which they have acquiesced, is to violently disperse *everyone* when dispersing a

---

[59] Shane Harris, DHS compiled 'intelligence reports' on journalists who published leaked documents, Wash. Post (July 30, 2020), https://www.washingtonpost.com/national-security/dhs-compiled-intelligence-reports-on-journalists-who-published-leaked-documents/2020/07/30/5be5ec9e-d25b-11ea-9038-af089b63ac21_story.html.

[60]  Mike Baker, Sergio Olmos, and Adam Goldman, *The F.B.I. Deployed Surveillance Teams Inside Portland Protests*, N.Y. Times (Dec. 22, 2021), https://www.nytimes.com/2021/12/22/us/portland-protests-fbi-surveillance.html.

[61] *Id.*

protest or riot, including journalists and legal observers, without regard to their right to access, observe, and report on federal agents' dispersal methods.

300.    The Federal Agents have no specific policy regarding treatment of journalists and legal observers at protests or riots. They have only vague, general policies about respecting First Amendment rights.  They specifically have no policy permitting journalists and legal observers to remain when a protest or riot is dispersed.

301.    During the 2020 protests, continuing into 2021, Federal Agents violently dispersed journalists and legal observers along with protesters when dispersing protests, both before and after this Court entered its Preliminary Injunction.

302.    On information and belief, the Federal Agents have never disciplined, reprimanded, or imposed any consequence upon a Federal Agent for violently dispersing a journalist or legal observer in Portland.

303.    The Federal Agents' apparent policy, or widespread practice in which they have acquiesced, is that journalists and legal observers may be violently dispersed from protests or riots as long as the dispersal is done without retaliatory animus.

304.    The Federal Agents have not changed any policy or practice at issue in this lawsuit, including any policy or practice relating to the treatment of journalists and legal observers at protests.

**K.    Protests are Ongoing in Portland**

305.    Portland has a long and vital tradition of protests and expression.  There were protests when Medgar Evers was murdered, protests over the Vietnam War, the Iraq War, the Afghanistan War and U.S. policy in Central America, the Battle of Park Blocks, May Day, Earth First, Occupy Portland, the Women's March Against Trump, Indigenous Peoples' Day, protests over state pay, immigration policy, police misconduct, taxes, the inhumane treatment of animals, the inauguration of President Bush, and Walmart, just to name a few.

306.    According to Portland's current mayor, Portland is the site of around 200 demonstrations per year.[62]

307.    Protests in Portland will also continue to draw a response from both the Portland police and the Federal Agents.  Indeed, as Gabriel Russell—who served as the federal agents' commander under former President Trump and continued on in that role at least until August 2021—has testified, the agents under his command respond to "as many as a hundred" protests in the region every year.

308.    These assemblies have been consistently observed and reported on by the press and by legal observers, who play an essential, and constitutionally protected, role in social and political discourse.

309.    In summer 2020, the nation watched transfixed as protests erupted in Portland in the aftermath of the Minneapolis police killing of George Floyd on May 25, 2020 ("the George Floyd Protests").  For nearly a year, protesters took to the streets and raised their voices against systemic racism and police violence towards Black Americans.

310.    Although the George Floyd protests have subsided, Portland remains an active site of demonstration and dissent.  Portland's identity is so bound up with protest that former President George H.W. Bush called Portland "Little Beirut" during anti-war protests in the 1990s.[63]  And in 2020, the DOJ under former President Trump, attempted to designate Portland (along with New York City and Seattle) as a different jurisdiction altogether, wholly separate

---

[62] Jason Kravarik & Sara Snider, *Why Portland? The city's history of protest takes an exceptional turn*, CNN (July 26, 2020), https://www.cnn.com/2020/07/26/us/portlandprotest-history-federal-police/index.html.

[63] Douglas Perry, *'Little Beirut' legacy: 21 of the most memorable protests in Portland history*, OREGONLIVE (Apr. 11, 2016), https://www.oregonlive.com/living/2016/04/little_beirut_legacy_20_of_the.html.

from the rest of the country.[64]  Simply put, protests have always taken place in Portland.  They will continue to occur.

311.    Despite their claims to the contrary, Defendants are well aware that protests will occur again in Portland.  It is for that reason that, even today, the Hatfield courthouse remains behind the same barricades that were erected during the George Floyd protests.



*Figure 8: The Hatfield courthouse remains behind barricades.*

---

[64] Rebecca Ellis, Justice Department labels Portland 'anarchist jurisdiction,' threatens cuts to federal funding, OPB (Sep. 21, 2020), https://www.opb.org/article/2020/09/21/justice-department-labels-portlandanarchist-jurisdiction-threatens-to-cuts-federal-funding/.

312.    As recently as October 2, 2022, hundreds of people gathered in Pioneer Square in downtown Portland to protest against the Iranian government's human-rights abuses against women.[65]

313.    An even bigger protest took place on June 24, 2022, when "[t]housands of people took to downtown Portland's streets" to protest the Supreme Court's decision overruling *Roe v. Wade*.[66]  Protesters also gathered downtown on May 3, 2022, when that decision was leaked.[67]

314.    On February 20, 2022, activists were participating in a march partly led by Letha Winston, whose son Patrick Kimmons was fatally shot in 2018 by police officers in Portland who were responding to an altercation.[68]  The protest also followed on the heels of the death of Amir Locke, 22, who was fatally shot by the police in Minneapolis when they were carrying out a search warrant early on February 2, 2022.[69]

315.    A right-wing gunman, Benjamin Smith, opened fire on the peaceful and unarmed protestors, killing a 60-year-old woman and wounded three other women, as well as a male protest medic who responded to their calls for help.[70]

---

[65] Audtin De Dios, *Hundreds gather in Portland to support Iranian freedom*, The Oregonian (Oct. 2, 2022), https://www.oregonlive.com/news/2022/10/hundreds-gather-in-portland-to-support-iranian-freedom.html.

[66] Andrew Jankowski, *The Evening After* Dobbs v. Jackson *Ruling Changes America, Portlanders Make a Familiar Pilgrimage Downtown*, Willamette Week (June 24, 2022), https://www.wweek.com/news/2022/06/24/the-evening-after-dobbs-v-jackson-ruling-changes-america-portlanders-make-a-familiar-pilgrimage-downtown/.

[67] Emily Allen, Protesters rally in downtown Portland for abortion rights, OPB (May 4, 2022), https://www.pressherald.com/2022/05/03/protesters-rally-in-downtown-portland-for-abortion-rights/.

[68] Sergio Olmos, Austin Ramzy, & Melina Delkic, *One Dead in Shooting at Portland Protest Against Police Violence*, N.Y. Times (Feb. 20, 2022), https://www.nytimes.com/2022/02/20/us/portland-shooting-protest.html.

[69] *Id.*

[70] Robert Mackey, *Survivors of a Deadly Attack on a Portland Protest Were Victimized Twice: First by the Gunman, Then by the Police*, The Intercept (Feb. 23, 2022), https://theintercept.com/2022/02/23/portland-protest-shooting/.

316.    The next day the Portland Police Bureau issued a press release that wrongly stated that the incident had "started with a confrontation between an armed homeowner and armed protesters." But for the work of journalists, that misstatement would have stood uncorrected.

317.    On November 19, 2021, Portland police declared as a "riot" a demonstration downtown against the acquittal of Kyle Rittenhouse, a teen who killed two people and injured another during a protest in Wisconsin.[71]

318.    On August 22, 2021, a confrontation between right-wing demonstrators and left-wing counter-protestors devolved into violence after a man fired a handgun near demonstrators in downtown Portland.[72]

319.    On June 3, 2021, federal agents pepper-sprayed an individual "filming [a protest] from the sidewalk in [her] own neighborhood."[73]

320.    On May 28-29, 2021, protesters demonstrated outside the southwest Portland ICE facility; federal agents arrested one protester and shot another with impact rounds from less than a yard away.

321.    On May 27-28, 2021, federal agents arrested two protesters at the ICE facility.[74] Protesters also demonstrated outside the Edith Green – Wendell Wyatt Federal Building.

322.    On May 25, 2021, about 75 protesters gathered in Chapman Square, blocked an intersection next to the Hatfield Courthouse, and set a dumpster on fire.  Local police responded and declared an unlawful assembly.

---

[71] *Rittenhouse protest in Portland, Oregon, declared a riot*, ABC News (Nov. 20, 2021), https://abcnews.go.com/US/wireStory/rittenhouse-protest-portland-oregon-declared-riot-81294500.

[72] Jenny Young, Gabby Urenda, *Protesters clash in NE Portland; shots fired near demonstrators downtown*, KOIN (Aug. 22, 2021), https://www.koin.com/news/protests/portland-protests-august-22-2021/.

[73] @cozca503, Twitter (June 4, 2021, 12:12 P.M.), https://twitter.com/cozca503/status/1400893293202866179.

[74] @Johnthelefty, Twitter (May 28, 2021, 12:30 A.M.), https://twitter.com/Johnnthelefty/status/1398181228767977472.

323.    On May 1, 2021, federal agents responded to an afternoon protest outside the ICE facility.[75]  They shot pepper balls and other munitions at the crowd.  Later that evening, they "brutalize[d] an indigenous person."[76]

324.    On April 22, 2021, 100 people protested the killing of Ma'Khia Bryant outside the Pioneer Courthouse.

325.    On April 21, 2021, protesters demonstrated outside the Multnomah County Justice Center and blocked an intersection next to the Hatfield Courthouse.

326.    On April 20, 2021, protesters demonstrated outside the Justice Center and in Pioneer Square.  Local police declared an unlawful assembly and arrested two individuals.

327.    On April 18, 2021, during a protest near the Hatfield Courthouse, individuals started a fire at SW 3rd Avenue and SW Main Street.

328.    On April 13-14, 2021, protesters assembled outside the ICE facility.  A few individuals pushed a burning dumpster against the building, and both local police and federal agents responded.  One federal agent shot Plaintiff Justin Yau with multiple pepper balls, even though he was well-marked and nowhere near protesters.

329.    On April 10-11, 2021, protesters gathered at the ICE facility.  Federal agents shot at least one journalist in the knee with an impact round.[77] They also shot another attendee in the head.[78]

330.    On April 1, 2021, protesters demonstrated outside the ICE facility.

---

[75] @isabellagarcia, Twitter (May 1, 2021, 4:39 P.M.), https://twitter.com/isabellaaliciaa/status/1388639360866684931; @Claudio_Report, Twitter (May 1, 2021, 4:18 P.M.), https://twitter.com/Claudio_Report/status/1388633843893096450.

[76] @Claudio_Report, Twitter (May 1, 2021, 11:46 P.M.), https://twitter.com/Claudio_Report/status/1388746771849875460.

[77] @jwcroxton, Twitter (April 11, 2021, 1:33 A.M.), https://twitter.com/jwcroxton/status/1381163470264037382.

[78] @JuniperLSimonis, Twitter (April 11, 2021, 3:38 A.M.), https://twitter.com/JuniperLSimonis/status/1381194874909720578.

331.    On March 11-12, 2021, federal agents reenacted the gas- and smoke-drenched scenes of summer 2020 through several blocks of downtown Portland around the Hatfield Courthouse.

332.    They shot Plaintiff Justin Yau with pepper balls, even though he was (again) well-marked and nowhere near protesters.  Other agents shot a dozen or more pepper balls at ACLU legal observer and Plaintiff Kat Mahoney and a group of press who were documenting a spent munition.[79]

333.    They also hit another ACLU legal observer, Sage Mist, in the back with a smoke grenade.  Suzette Smith, a journalist for *Willamette Week*, reported that federal agents "ke[pt] shooting press people with munitions."[80]

334.    On February 5, 2021, federal agents shot pepper balls and tear gas at protesters outside the ICE facility.[81]

335.    On January 27, 2021, federal agents responded with force to a Holocaust Remembrance Day vigil outside the ICE facility.[82]  They targeted at least one ACLU legal observer, Caitlyn Wong, shooting her phone out of her hand and then shooting at her head as she bent down to pick it up.

336.    On January 23, 2021, federal agents shot munitions and used tear gas against a crowd of protesters and press outside the ICE facility.  Agents ordered press to disperse, fired munitions at them, and threw a flash-bang grenade at them; one agent, with his callsign insignia

---

[79] *Feds shoot ACLU legal observer & press documenting spent munition*, YouTube (Mar. 11, 2021), https://www.youtube.com/watch?v=8igUuBalXZg; @MasonLakeMedia, Twitter (Mar. 12, 2021, 12:55 A.M.), https://twitter.com/MasonLakePhoto/status/1370297427782111235.

[80] @suzettesmith, Twitter (Mar. 11, 2021, 11:35 P.M.), https://twitter.com/suzettesmith/status/1370277185760600069.

[81] @Claudio_Report, Twitter (Feb. 6, 2021, 12:34 A.M.), https://twitter.com/Claudio_Report/status/1357970821541625856.

[82] @AlissaAzar, Twitter (Jan. 27, 2021, 11:59 P.M.), https://twitter.com/AlissaAzar/status/1354700694842826752; @cozca503, Twitter (Feb. 23, 2021, 7:56 P.M.), https://twitter.com/cozca503/status/1364424015046090759 (posted several weeks later).

obscured by duct tape, pushed Plaintiff John Rudoff.[83]  Another agent, bearing callsign NZ-30, walked with tear-gas fogger to a group composed primarily of members of the press and doused them with tear gas.[84]

337.    On January 20, 2021—the night after President Biden was inaugurated—federal agents responding to a protest outside the ICE facility targeted photographer Mason Lake with a canister of "Instant Blast" pepper spray.[85]  They also engulfed several blocks of southwest Portland in tear gas.[86]

338.    Federal agents "continue to provide protective security and law enforcement services" during these protests.  As many as 60 federal officers have been called to respond to a single protest—including the one on March 11-12, 2021, when Plaintiff Justin Yau and other journalists documented dozens of officers dispersing crowds outside the Hatfield Courthouse.[87]

339.    And though the federal agents claim that "FPS [has] terminated Operation Diligent Valor," as many as a dozen out-of-region officers remain in Portland, ready to engage crowds.

---

[83] *Federal agents push, shoot, and disperse press*, YouTube (Jan. 23, 2021), https://www.youtube.com/watch?v=ajhAVbd_uFs at 0:15 (pushing John Rudoff), 0:33 (firing at group of press), 0:36 (tossing flash-bang grenade at press), 0:42 (firing flash-bang grenade at press).

[84] *DHS agent teargasses group of press*, YouTube (Jan. 23, 2021), https://www.youtube.com/watch?v=hBz-AR4VBaY.

[85] @MasonLakePhoto, Twitter (Jan. 30, 2021, 11:35 A.M.), https://twitter.com/MasonLakePhoto/status/1355600531553615875.

[86] @GriffinMalone6, Twitter (Jan. 20, 2021, 9:54 P.M.), https://twitter.com/GriffinMalone6/status/1352132514496671746; @jwcroxton, Twitter (Jan. 20, 2021, 9:48 P.M.), https://twitter.com/jwcroxton/status/1352130818991292416; @Claudio_Report, Twitter (Jan. 20, 2021, 10:46 P.M.), https://twitter.com/Claudio_Report/status/1352145524783136768.

[87] @PDocumentarians, Twitter (Mar. 11, 2021, 11:46 P.M.), https://mobile.twitter.com/PDocumentarians/status/1371714441616650240; @suzettesmith, Twitter (Mar. 11, 2021, 10:56 P.M.), https://twitter.com/suzettesmith/status/1370267405218279425.

340.    When—not if—these protests reoccur, the Portland police and federal agents continue to lack any policy respecting journalists' right to report on protests and law enforcement's response to them.  Even if there are fewer such occasions than at the height of the protests in July 2020, journalists and legal observers continue to need the Court's protection to report on the protests that occur.

**L.    Plaintiffs Are Suffering Ongoing Harm**

341.    Plaintiffs fear for their safety from police violence.  Reporters and legal observers who attended and documented the George Floyd protests in Portland were hit with tear gas, rubber bullets, police batons, arrests, and more.

342.    For the same reasons, Plaintiffs fear for their safety from federal agents' violence. Not only do federal agents use the same types of force—tear gas, rubber bullets, batons, arrests—in much the same way as the police, but they often coordinate with the police.

343.    Plaintiffs and Plaintiff Class want to continue attending protests to gather news and observe and document how police are treating demonstrators.  They also want to be able to document how police are dispersing protesters.

344.    They are fearful, however, that they themselves will be targeted for the same violence police mete out against protesters.  The police have prevented Plaintiffs and Plaintiff Class from documenting how police have dispersed protesters and have repeatedly told them that they will be similarly arrested and assaulted if they fail to stop recording these events.

345.    Plaintiffs and others similarly situated also continue to suffer from the physical injuries they sustained as a result of both the police and federal agents' excessive use of force.

346.    On information and belief, countless others would report on the ongoing protests and volunteer to neutrally and peacefully observe them, but for fear that they would be subjected to violence at the hands of the police and the federal defendants.

## CLASS ALLEGATIONS

347.    Plaintiffs bring this action under Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil procedure on behalf of themselves and a class of similarly situated people who, as

journalists, reporters, photographers, and legal observers, have been subjected to violence, retaliation, arrest, or dispersal by the Portland police or federal agents, or who will in the future report on protest activity or the conduct of law enforcement officers or federal agents on duty within the City of Portland in traditional or designated public fora (the "Plaintiff Class"). The Plaintiff Class is defined as:

> All reporters, journalists, photographers, and legal observers who on or after May 25, 2020, have been subjected to violence, arrested, or dispersed by the Portland police or federal agents while covering a protest, or who intend to engage in newsgathering or reporting in Portland related to protest activities and/or the law enforcement response to those protests.

348.    The Plaintiff Class is so numerous that joinder of all the members would be impracticable. Hundreds of journalists and legal observers are in Portland to cover the protests that followed Mr. Floyd's murder and the aftermath.

349.    As a result of Defendants' custom or policy of arresting members of the Plaintiff Class; targeting them with rubber bullets, chemical irritants, truncheons, and other uses of force; denying them freedom of movement to observe, record, and report on public demonstrations and law enforcement officers on duty; and intimidating them by threats of violence and arrest, the Plaintiff Class has been and will continue to be deprived of its constitutional rights under the First and Fourth Amendments.

350.    Plaintiffs' claims for prospective relief are typical of the members of the Plaintiff Class because protests are ongoing and Plaintiffs and Plaintiff Class have a reasonable fear that Defendants will continue to carry out their unconstitutional customs or policies.

351.    Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs understand their role as class representatives and their duties to the class in this litigation. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

352.    Questions of law or fact are common to the class.  These legal and factual questions include but are not limited to:

a.   Whether targeting journalists and legal observers with violence and threats of violence violates the First Amendment;

b.   Whether targeting journalists and legal observers with violence and threats of violence violates the Fourth Amendment;

c.   Whether targeting journalists and legal observers with violence and threats of violence violates the Oregon Constitution, Art. I, § 8;

d.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the First Amendment;

e.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the Fourth Amendment;

f.   Whether targeting journalists and legal observers with arrests and threats of arrest violates the Oregon Constitution, Art. I, § 8;

g.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute a viewpoint-based restriction on speech that violates the First Amendment;

h.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute a viewpoint-based restriction on speech that violates the Oregon Constitution, Art. I, § 8;

i.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute an overbroad restriction on speech that violates the First Amendment;

j.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers constitute an overbroad restriction on speech that violates the Oregon Constitution, Art. I, § 8;

k.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers serve any legitimate government interest;

l.   Whether Defendant City of Portland's written or unwritten policies regarding dispersal of journalists and legal observers are narrowly tailored;

m.   Whether the Municipal Defendants' policy of embedding select journalists vests unbridled discretion to permit or prohibit speech in City officials;

n.   Whether the Municipal Defendants' policy of embedding select journalists is an unlawful prior restraint in violation of the First Amendment;

o.   Whether Defendant City of Portland is liable for implementing a written or unwritten policy that violates the Fourth Amendment under principles of municipal liability;

p.   Whether Defendant City of Portland is liable for a custom or practice that violates the First Amendment under principles of municipal liability;

q.   Whether Defendant City of Portland is liable for a custom or practice that violates the Fourth Amendment under principles of municipal liability;

r.   Whether Defendant City of Portland has manifested a failure to properly train and supervise its agents and officers;

s.   Whether Defendant City of Portland or the Federal Defendants have exhibited a deliberate indifference to the unconstitutional conduct alleged in this Complaint.

353.   Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(A).  Multiple courts issuing multiple injunctions governing the engagement and use-of-force standards for law enforcement would be entirely untenable.  Doing so would only contribute to a state of uncertainty and confusion that would allow the constitutional violations described in this Complaint to continue.

PAGE 69 - THIRD AMENDED COMPLAINT

354.    This case involves "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(B).  A ruling with respect to a single Plaintiff in this case would arguably be strong *stare decisis* with respect to other putative class members and members of the law enforcement community.  There is no benefit to litigating the overwhelmingly common issues in this case individually.  The interests of both Plaintiff Class members and Defendants require class-wide treatment.

355.    Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).  Plaintiffs were targeted not because of anything unique to them as individuals, but because of their activities as journalists and legal observers. Defendants targeted Plaintiffs as part of a broader pattern and practice of unconstitutional conduct directed against the Plaintiff Class, including without limitation the police's unlawful policy related to dispersing members of the press.  Injunctive relief for the "class as a whole" is the only mechanism available to afford relief in light of conduct directed specifically to the class.

356.    Common questions of law and fact "predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating" this controversy. Fed. R. Civ. P. 23(b)(3).  The questions outlined in paragraph 352 above are the primary questions in this litigation, and no other method will adjudicate this controversy as fairly and efficiently as a class action.

## CAUSES OF ACTION

357.    "If a government agency restricts public access, the media's only recourse is the court system.  The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 900.

**First Cause of Action**
**(Violation of the First Amendment)**

358.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

359.    Plaintiffs bring this claim under 42 U.S.C. § 1983 against the Municipal Defendants, and under *Bivens v. Six Unknown Federal Agents* against the Federal Defendants.

360.    Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct.  Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity.  Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

361.    Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' First Amendment rights on its face and as applied.  Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest.  Defendants know that reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests.  Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

362.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were demonstrating.  Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

363.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity.  These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.  Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in

such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

364. By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, and by adopting an unlawful policy that restricts activities protected by the First Amendment, Defendants, under color of state or federal law, subjected or caused Plaintiffs and Plaintiff Class to be subjected to the deprivation of rights secured by the First Amendment of the Constitution.

365. It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

366. The City's failure to supervise and train its employees and agents with respect to the First Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and discipline officers for First Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

367. The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the George Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's First Amendment rights.

368. Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

369. As a direct and proximate result of Defendants' unconstitutional and retaliatory acts, Plaintiffs and members of the class suffered physical injury and mental harms, outrage, betrayal, offense, indignity, and insult, all causing damage in amounts to be determined at trial.

370.    Plaintiffs and members of the class are entitled to an award of punitive damages against defendants to punish and deter them and others from similar deprivations of constitutional rights in the future.

## Second Cause of Action
### (Violation of the Fourth Amendment)

371.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

372.    Plaintiffs bring this claim under 42 U.S.C. § 1983 against the Municipal Defendants, and under *Bivens v. Six Unknown Federal Agents* against the Federal Defendants.

373.    Plaintiffs and Plaintiff Class, who were present at the protests to observe and report committed no crime.  Nor did they pose a threat to any of Defendants' officers or agents or any other person.

374.    Plaintiffs and Plaintiff Class are entitled to be free from unlawful seizure of their persons pursuant to the parameters of the Fourth Amendment to the U.S. Constitution.  Plaintiffs and members of the class are also entitled to be free from undue, unreasonable, and deadly force, including the use of tear gas without lawful justification, for the sole purpose of crowd dispersal, or to inflict pain; the shooting of rubber bullet or impact munitions, often at point-blank range; the shooting of pepper-spray balls indiscriminately or directly at their person; the spraying of pepper spray to inhibit their ability to see; the beating of their person with batons, fists, or other weapons; and the use of exploding grenades designed to disorient and confuse.

375.    Plaintiffs and Plaintiff Class also have the right under the Fourth Amendment of the U.S. Constitution to be free from unlawful arrest or detention that is not based on a probable cause belief that the particular person is committing a crime or about to commit a crime. Plaintiffs and members of the class are entitled to be free from unwarranted detention absent probable cause.

376.    Plaintiffs and Plaintiff Class were seized by Defendants when their officers intentionally, through threats of arrest, chemical agents, rubber bullets, and other uses of force, terminated their freedom of movement.

377.    Defendants did not have, at any time, a legally valid basis to seize Plaintiffs and members of the Plaintiff Class and, at all times material, lacked an objectively reasonable belief that Plaintiffs and members of the Plaintiff Class presented an imminent and serious danger to themselves or others.  As such, Defendants' unlawful seizure of Plaintiffs violated the Fourth Amendment.

378.    When Defendants used and applied force, Defendants knew the weapons and munitions they were using were capable of causing serious and permanent injury, were inaccurate and unreliable at the distances from which they were deploying them, and could not be deployed without risk of hitting individuals in vulnerable areas or endangering persons, such as Plaintiffs and members of the Plaintiff Class, against whom no such use of force was reasonable nor sanctioned under the Fourth Amendment.

379.    Using threats of arrest, riot batons, semi-lethal projectiles, and chemical weapons against neutral parties who are present to observe protests and report on them is an unconstitutionally excessive use of force.  Defendants' seizure of Plaintiffs and Plaintiff Class was thus objectively unreasonable.  Defendants, under color of state or federal law, subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Fourth Amendment of the Constitution.

380.    Each of the Defendants failed to intervene to prevent the other Defendants from violating the constitutional rights of Plaintiffs and members of the Plaintiff Class and is liable for their failure to act to protect journalists and legal observers.

381.    At all times material, the law was clearly established that Defendants' seizures, arrests, and use of force, in the manner and under the circumstances used against Plaintiffs and members of the class, was objectively unreasonable and any reasonable federal agent Defendant

would have known that the force used against Plaintiffs and members of the class was unreasonable and violated their clearly established Fourth Amendment rights.

382.    It was the City's policy, practice, or custom, as well as its failure to train and supervise its employees and agents and issue corrective instructions after violations were brought to light, that caused the Fourth Amendment violations.

383.    The City's failure to supervise and train its employees and agents with respect to the Fourth Amendment rights of Plaintiffs and Plaintiff Class, including a failure to investigate and discipline officers for Fourth Amendment violations, amounts to deliberate indifference to the rights of Plaintiffs and Plaintiff Class.

384.    The pattern of similar constitutional violations against Plaintiffs and Plaintiff Class that occurred during the Floyd protests demonstrates the City's deliberate indifference to Plaintiffs' and Plaintiff Class's Fourth Amendment rights.

385.    Given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the City demonstrated its deliberate indifference to the need for such training and supervision.

386.    Plaintiffs reasonably fear further retaliation in the future in violation of the Fourth Amendment if they continue to observe, record, or participate in constitutionally protected activity.

387.    As a direct and proximate result of Defendants' unconstitutional and retaliatory acts, Plaintiffs and members of the class suffered physical injury and mental harms, outrage, betrayal, offense, indignity, and insult, all causing damage in amounts to be determined at trial.

388.    Plaintiffs and members of the class are entitled to an award of punitive damages against defendants to punish and deter them and others from similar deprivations of constitutional rights in the future.

**Third Cause of Action**

**(Violation of the Oregon Constitution, Art. I, §§ 8, 26)**

389.     Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

390.     Article I, § 8, of the Oregon Constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." Article I, § 26, provides: "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of [grievances]."

391.     "The difference in the language of the Oregon and federal constitutions may . . . be pointed to as indicating an intention to provide a larger measure of protection to free expression under the Oregon Constitution.  The California Constitution, which contains language similar to Oregon Constitution, Art. I, § 8, was so construed in *Wilson v. Superior Court of Los Angeles County*, 532 P.2d 116, 120 (Cal. 1975), where the court said: 'A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press.'" *Deras v. Myers*, 272 Or. 47, 64 n.17 (Or. 1975); *see also State v. Tusek*, 52 Or. App. 997, 1000 n.2 (Or. Ct. App. 1981) ("[I]n some instances, Art. I § 8 of the Oregon Constitution provides a larger measure of protection to citizens than does the First Amendment to the U.S. Constitution.").

392.     Plaintiffs and Plaintiff Class are engaged in constitutionally protected acts of speech and expressive conduct secured by the Oregon Constitution, Art. I, §§ 8 and 26. Defendants retaliated against Plaintiffs and Plaintiff Class for engaging in such constitutionally protected activity.  Defendants have targeted journalists and legal observers for arrests, threats of arrests, and use of force.

393.    Defendants' policy of dispersing neutrals who are reporting on protests violates Plaintiffs' constitutional right to free speech on its face and as applied.  Journalists and observers engaged in newsgathering do not present public safety issues, and keeping them from newsgathering during a protest thus does not serve any legitimate government interest. Defendants know that reporters do not threaten public safety because they are willing to allow reporters and observers whom they handpick to attend the protests.  Moreover, preventing journalists and observers from newsgathering during enforcement of an unlawful-assembly order does not provide alternative channels for newsgathering on police's enforcement of that order.

394.    Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from reporting on the protests, including the very police brutality against which the protesters were demonstrating.  Defendants directly prevented and deterred Plaintiffs and Plaintiff Class from monitoring, recording, and reporting on police misconduct.

395.    Defendants' acts would chill a reasonable person from continuing to engage in a constitutionally protected activity.  These acts did, in fact, chill Plaintiffs and Plaintiff Class from continuing to support, observe, record, and report on some events of public interest, including constitutionally protected demonstrations and the conduct of law enforcement officers on duty in a public place.  Plaintiffs and Plaintiff Class reasonably fear that if they continue to engage in such constitutionally protected activity, the police will continue to use tear gas, excessive force, flash-bang grenades, rubber bullets, riot batons, and other means to chill their right to free speech.

396.    By retaliating against Plaintiffs and Plaintiff Class for engaging in constitutionally protected activity, Defendants subjected or caused Plaintiffs to be subjected to the deprivation of rights secured by the Oregon Constitution, Art. I, §§ 8 and 26.

**Fourth Cause of Action**
**(Declaratory Judgment)**

397.    Plaintiffs and Plaintiff Class incorporate all paragraphs above by reference as if fully set forth herein.

398.    Plaintiffs and Plaintiff Class intend to continue attending protests in Portland for the purpose of documenting, reporting on and observing the events.  Plaintiffs are fearful, however, that they will be subjected to police violence or dispersed pursuant to Defendants' illegal policies.  Plaintiffs are also fearful that Defendants will continue to use kettling and killbox tactics against protesters that sweep in media and observers.

399.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates the First Amendment.

400.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates the Fourth Amendment.

401.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that threatening Plaintiffs and Plaintiff Class with arrest, arresting Plaintiffs and Plaintiff Class, and targeting Plaintiffs and Plaintiff Class for uses of force, while they were engaged in

constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters, violates Article I, Section 8 of the Oregon Constitution.

402.    A judicial declaration is necessary and appropriate so that Plaintiffs and Plaintiff Class may ascertain their rights to engage in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

403.    Plaintiffs and Plaintiff Class are entitled to a declaratory judgment that Defendants may not threaten Plaintiffs and Plaintiff Class with arrest, arrest Plaintiffs and Plaintiff Class, or target Plaintiffs and Plaintiff Class for uses of force, while they are engaged in constitutionally protected acts of speech and expressive conduct during protests, including newsgathering, reporting, and documenting police interaction with protesters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    Declaratory relief;

B.    Injunctive relief;

C.    Compensatory damages;

D.    Punitive damages;

E.    An award of pre-judgment interest;

F.    An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G.    Any other relief the Court deems proper.

Dated: October 11, 2022                    Respectfully Submitted,

                                By: /s/ Matthew Borden
                                Matthew Borden, *pro hac vice*
                                J. Noah Hagey, *pro hac vice*
                                Ellen V. Leonida, *pro hac vice*
                                Sarah Salomon, *pro hac vice*

Athul K. Acharya, OSB No. 152436
BRAUNHAGEY & BORDEN LLP

Kelly K. Simon, OSB No. 154213
ACLU FOUNDATION OF OREGON

*Attorneys for Plaintiffs*